# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: PHILIPS RECALLED CPAP, BI-LEVEL PAP, AND MECHANICAL VENTILATOR PRODUCTS LITIGATION** | : : : : : | **Master Docket: Misc. No. 21-mc-1230-JFC** |
| | | **MDL No. 3014** |
| **This Document Relates to:** | : | **CONSOLIDATED AMENDED CLASS** |
| **All Actions** | : : | **ACTION COMPLAINT FOR ECONOMIC LOSSES** |

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS .................................................................................................. i

I.      NATURE OF THE ACTION ................................................................. 2

II.     THE PARTIES ..................................................................................... 6

        A.      PLAINTIFFS .......................................................................... 6

        B.      DEFENDANTS ...................................................................... 40

III.    JURISDICTION AND VENUE ............................................................ 42

IV.     FACTUAL ALLEGATIONS ................................................................ 42

        A.      CPAP AND BIPAP MACHINES AND VENTILATORS ARE
                PRESCRIBED TO TREAT BREATHING DISORDERS. ............... 42

        B.      PHILIPS SOLD CPAP, BIPAP, AND VENTILATOR DEVICES
                CONTAINING PE-PUR FOAM. ................................................ 45

        C.      PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM SINCE AT
                LEAST 2015 ............................................................................ 48

                1.      In 2015, Philips Communicated With Its Foam Suppliers About
                        The Problem Of PE-PUR Foam Degradation. .......................... 53

                2.      Philips Opened An Internal Investigation Into Foam Degradation In
                        Mid-2018 That Confirmed PE-PUR Foam Is Prone To Degradation. ..... 56

                3.      Philips Finally Opened A Formal CAPA In 2019 – But Did Not
                        Initiate A Recall For Two More Years. .................................... 62

        D.      UNTIL THE RECALL, PHILIPS ADVERTISED ITS BREATHING
                MACHINES AS SAFE AND EFFECTIVE. ................................... 64

        E.      PHILIPS BELATEDLY RECALLED ITS DEFECTIVE DEVICES
                CONTAINING PE-PUR FOAM DUE TO THE SERIOUS HEALTH
                HAZARDS THAT THEY CAUSE. .............................................. 65

                1.      In April And May 2021, Philips Launched The DreamStation 2 And
                        Tried To Convince Patients To Buy It, Without Initiating A Recall. ....... 65

                2.      In June 2021, Philips Finally Recalled Its Defective Devices. ............. 67

        F.      PHILIPS' INEFFECTIVE MEASURES TO RECALL THE DEVICES ........... 74

                1.      Many Patients, Providers, And Others Were Not Notified About The
                        Recall. .......................................................................... 75

                2.      Philips' Repair/Replacement Program Has Been Extremely Slow. ......... 77

V.      CLASS ALLEGATIONS ..................................................................... 79

VI.     EQUITABLE TOLLING OF STATUTES OF LIMITATIONS ..................... 89

VII.    CAUSES OF ACTION ........................................................................ 89

VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
   ORGANIZATIONS ACT, 18 U.S.C. § 1962(C), AGAINST PHILIPS
   AND POLYTECH ............................................................................... 89

VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
   ORGANIZATIONS ACT, 18 U.S.C. § 1962(D), AGAINST PHILIPS
   AND POLYTECH ............................................................................. 113

BREACH OF EXPRESS WARRANTY ....................................................... 116

BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY .................. 117

BREACH OF THE IMPLIED WARRANTY OF USABILITY .................................. 120

VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT ................. 122

COMMON LAW FRAUD ......................................................................... 124

UNJUST ENRICHMENT (IN THE ALTERNATIVE) ...................................... 127

ALABAMA DECEPTIVE TRADE PRACTICES ACT .................................... 128

ALASKA UNFAIR TRADE PRACTICES AND CONSUMER
   PROTECTION ACT ........................................................................... 130

ARIZONA CONSUMER FRAUD ACT ....................................................... 131

ARKANSAS DECEPTIVE TRADE PRACTICES ACT ................................... 132

CALIFORNIA UNFAIR COMPETITION LAW ............................................ 134

CALIFORNIA UNFAIR COMPETITION LAW ............................................ 136

CALIFORNIA CONSUMERS LEGAL REMEDIES ACT ............................... 138

CALIFORNIA FALSE ADVERTISING LAW ............................................... 140

COLORADO CONSUMER PROTECTION ACT ........................................... 141

CONNECTICUT UNFAIR TRADE PRACTICES ACT ................................... 143

DELAWARE CONSUMER FRAUD ACT ................................................... 144

DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT ..... 145

FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ................... 147

FLORIDA FALSE ADVERTISING STATUTE ............................................. 148

GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT ....................... 149

GEORGIA FAIR BUSINESS PRACTICES ACT ........................................... 151

HAWAII UNFAIR AND DECEPTIVE ACTS OR PRACTICES ACT ................. 152

IDAHO CONSUMER PROTECTION ACT ................................................. 154

ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS
   PRACTICES ACT ............................................................................. 155

ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT ....................... 156

INDIANA DECEPTIVE CONSUMER SALES ACT .................................................. 158

IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT.............. 159

KANSAS CONSUMER PROTECTION ACT ............................................................ 161

KENTUCKY CONSUMER PROTECTION ACT ....................................................... 162

REDHIBITION........................................................................................................... 163

LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER
    PROTECTION LAW.......................................................................................... 166

MAINE UNFAIR TRADE PRACTICES ACT.......................................................... 167

MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT .................................. 169

MARYLAND CONSUMER PROTECTION ACT ...................................................... 170

MASSACHUSETTS REGULATION OF BUSINESS PRACTICES FOR
    CONSUMERS ................................................................................................... 171

MICHIGAN CONSUMER PROTECTION ACT ....................................................... 173

MINNESOTA PREVENTION OF CONSUMER FRAUD ACT ................................. 174

MINNESOTA FALSE ADVERTISING ACT............................................................. 176

MISSISSIPPI CONSUMER PROTECTION ACT ...................................................... 177

MISSOURI MERCHANDISING PRACTICES ACT .................................................. 179

MONTANA UNFAIR TRADE PRACTICES AND CONSUMER
    PROTECTION ACT........................................................................................... 180

NEBRASKA CONSUMER PROTECTION ACT ....................................................... 181

NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT .......................... 183

NEVADA DECEPTIVE TRADE PRACTICES ACT ................................................. 184

NEW HAMPSHIRE CONSUMER PROTECTION ACT ........................................... 185

VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT ........................ 187

VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT ...................... 188

VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS OR PRACTICES
    AND FALSE ADVERTISING.......................................................................... 189

VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE
    TRADE PRACTICES ACT ("UDTPA")........................................................... 191

VIOLATIONS OF THE NORTH DAKOTA UNLAWFUL SALES OR
    ADVERTISING PRACTICES ACT .................................................................. 192

VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT .................. 193

VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT .............. 195

VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT ......... 196

VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ......................................................... 197

VIOLATIONS OF THE RHODE ISLAND UNFAIR TRADE PRACTICE AND CONSUMER PROTECTION ACT ........................................................... 199

VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT ...................................................................................................... 200

SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW .................................................... 201

TENNESSEE CONSUMER PROTECTION ACT ......................................... 203

TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT ................................................................................ 204

UTAH CONSUMER SALES PRACTICES ACT .......................................... 206

TRUTH IN ADVERTISING ACT (UTAH) ................................................. 207

VERMONT CONSUMER FRAUD ACT .................................................... 208

VIRGINIA CONSUMER PROTECTION ACT ........................................... 209

WASHINGTON CONSUMER PROTECTION ACT .................................... 211

WEST VIRGINIA CONSUMER CREDIT PROTECTION ACT ................... 212

WISCONSIN DECEPTIVE TRADE PRACTICE ACT ................................ 213

WYOMING CONSUMER PROTECTION ACT .......................................... 215

VIII.   RELIEF NOT REQUESTED AND RESERVATION OF RIGHTS ............................ 216

IX.   PRAYER FOR RELIEF ............................................................................. 217

X.   JURY DEMAND ..................................................................................... 217

Plaintiffs Mark Goodenough, Darrell Gothard, Keith Penberthy, Ivy Creek of Tallapoosa LLC d/b/a Lake Martin Community Hospital, Elmore Community Hospital Rural Health Association d/b/a Elmore Community Hospital, Gail Gilliard-Gunter, Jeffrey Groudan, Russell Autry, Deanna Melcher, Paul Bailey, Michael Bastasch, Mary Campbell, Don Luenebrink, Douglas Mest, Lisa Mitrovich, Patrick Nielson, Robert Waybright, Kenneth Archuleta, Natalie Gottlieb, Jill Leavenworth, Paul Rohan, Jose Toscano, Anthony George, Kenneth Dzierzanowski, Tara Fields, Barbara Smith, Roy Fultz, Dephine Lewis, Jared Luke, John Mercure, Cherry Merrell, Chris Brown, Asherdee Diamond, Chad Savoure, Danny Baran, Shannon Brooks, Debbie Rootberg, Diane Anderson, Steven Clark, Michael Dusza, Stephen Smith, Steve Abarr, Jeff Wilson, Sharon Cathers, Andrew Fisher, Mia Coleman, John Ratliff, Paul Baudoin, Susan Martin, Lula Minnifield, Ronald Romas, Julie Barrett, Peter Barrett, Doris Margoles, Ryan Schwartz, Quinton Goodall, Pete Bellotti, Daniel F. Conley, Heidi McGuire, William Wilks, Prinna Boudreau, Mary Godeaux, Grady Tucker, Jr., John Young, Danny David, Elizabeth Lemus, Elaine Lizotte, William Vlahos, Susanne Dennis, Joseph Ryan, Aaron Taylor, Mark Bossey, Sonia Diaz, Bruce Ginsberg, Carl Gold, Susan Woodward, Jeffrey Bartalo, Richard Radack, Aimee Frenzel-Drew, Patricia Flick, Jack Giordano, Rachel Hock, Vincent Stefanini, Matthew Ward, Jason Mcelyea, John Masington, Matthew Smith, Marilyn Sweeney, Antonio Perez Bonano, Diane Lamontagne, Mark Weiner, William Anderson, Murray Craig, Jeffrey Hill, Raul Deleon, Sarah Lowney, Sabrina Malone, Paul Panzera, David Phillips, Rosita Polk, Michael Tobin, David Martin, Elizabeth Heilman, Penny Hudson, Beth Rodgers, Cameron Rose, Jose Lopez, Robert Peebles, David Bays, Brent Hamlin, Robert Matters, and ASEA/AFSCME Local 52 Health Benefits Trust, individually and on behalf of all others similarly situated, through the undersigned counsel, allege as follows:

1

## I.      NATURE OF THE ACTION

1.      Defendants Koninklijke Philips N.V., Philips North America LLC, Philips Holding USA Inc., Philips RS North America LLC, and Philips RS North America Holding Corporation, collectively, "Philips") manufacture and sell certain lines of products that are intended to help people breathe. These include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("BiPAP") machines, which are commonly used to treat sleep apnea, and mechanical ventilators ("ventilators"), which treat respiratory failure. In general, these devices blow air into patients' airways. CPAP and BiPAP machines are intended for daily use, and ventilators are used continuously when needed.

2.      On June 14, 2021, Philips announced a recall of millions of its CPAP and BiPAP machines and ventilators (the "Recall"). Each of these recalled products (referred to herein as a "Recalled Device" or collectively as the "Recalled Devices") contained polyester-based polyurethane ("PE-PUR") foam used by Philips for sound abatement. The PE-PUR foam was provided by, among others, Defendant Polymer Technologies, Inc. ("PolyTech"). Despite knowing at least as far back as 2015 that PE-PUR foam would degrade and that this foam should not be used in the Recalled Devices, Philips waited until June 2021 to issue the Recall and notify the public. In its Recall, Philips publicly announced that the PE-PUR foam may break down into particles and be inhaled or ingested, or may emit volatile organic compounds ("VOCs") that may be inhaled, resulting in "serious injury, which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment"[1] (referred to

---

[1] Philips Recall Notices dated 6/14/2021 (attached hereto as Exhibit "A"). All attached Exhibits and reference material are incorporated as if fully stated herein.

herein as the "Defect"). Philips stated that the potential risks of exposure due to such chemicals include "headache/dizziness, irritation (eyes, nose respiratory tract, skin), hypersensitivity, nausea, vomiting, toxic and carcinogenic effects."[2] Philips' announcement to doctors advised that these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."[3]

3.      On July 22, 2021, the U.S. Food and Drug Administration ("FDA") confirmed the severity of the problem and classified the Recall as Class I or "the most serious type of recall," meaning use of the Recalled Devices "may cause serious injuries or death."[4]

4.      Philips knew about the serious risks caused by the Recalled Devices long before the Recall. According to the FDA, beginning in 2015, Philips received data from a variety of sources regarding degradation of the PE-PUR foam contained within the Recalled Devices, including complaints, test reports, information from suppliers, and information from another entity owned by the ultimate parent company of Philips.

5.      Philips notified its shareholders about the Defect in the Recalled Devices in late April 2021,[5] but even then, did not initiate the Recall of the dangerously defective machines until June 14, 2021.

6.      In fact, Philips apparently timed its Recall to coincide with its launch of a next generation of the affected products, which Philips claims does not suffer from the same defective and harmful foam issues. Thus, at the time of the Recall, the only purportedly safe option that

---

[2] *Id*.

[3] *Id*.

[4] https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-continuous-and-non-continuous-ventilators-including-cpap-and (last accessed June 16, 2022).

[5] https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html (last accessed June 17, 2022).

Philips offered to its customers—many of whom require a BiPAP or CPAP machine to sleep safely —was to purchase, *at full price*, Philips' new, next-generation device, profiting Philips further.

7.      Because of the increased demand for safe and effective CPAP, BiPAP, and ventilator devices, replacement machines are difficult to find and expensive, a situation that was exacerbated by a shortage of microchips for these devices. Thus, many users were forced into a Hobson's choice—continue using their Philips' Recalled Devices and expose themselves to risks of serious injury or death or stop using their breathing devices and risk health consequences from their underlying conditions.

8.      Philips' flagship line and top seller of its CPAP Recalled Devices are its DreamStation devices. On September 1, 2021, Philips received authorization from the FDA to begin a repair and/or replacement process for affected DreamStation devices in the United States.[6] DreamStation customers, however, were not told when they might receive a replacement device, nor were they given any specifics as to how the replacement program would work. Moreover, the repair and/or replacement process was only for DreamStation Recalled Devices and did not encompass any other Recalled Device.

9.      The Recalled Devices are:

- E30

- DreamStation ASV

- DreamStation ST, AVAPS

- SystemOne ASV4

---

[6] https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/philips-starts-repair-and-replacement-program-of-first-generation-dreamstation-devices-in-the-us-and-other-markets (last accessed June 16, 2022).

- C Series ASV, S/T, AVAPs

- OmniLab Advanced Plus

- SystemOne (Q Series)

- DreamStation CPAP, Auto CPAP, BiPAP

- DreamStation Go CPAP, APAP

- Dorma 400, 500 CPAP

- REMStar SE Auto CPAP

- Trilogy 100 and 200

- Garbin Plus, Aeris, LifeVent

- A-Series BiPAP Hybrid A30

- A-Series BiPAP V30 Auto

- A-Series BiPAP A40

- A-Series BiPAP A30

10.     All of the Recalled Devices suffer from the same problem, the use of the PE-PUR foam.

11.     Each of the Plaintiffs acquired or paid for a Recalled Device. They would not have purchased or leased the Recalled Device had they known that the PE-PUR foam in the Recalled Device could expose users to life-threatening injuries or cause serious health problems, rendering the Recalled Device defective and unsafe, and not fit for their intended purpose.

12.     Plaintiffs, individually and on behalf of all others similarly situated who purchased or leased the defective Recalled Devices, seek to recover economic losses and punitive damages from Philips for breach of express warranty, breach of the implied warranty of merchantability, breach of the implied warranty of usability, the Magnuson Moss Warranty Act, fraud, the

Racketeer Influenced and Corrupt Organizations ("RICO") Act, unjust enrichment, redhibition, and applicable state consumer protection statutes.

## II.     THE PARTIES

### A.     PLAINTIFFS

13.     Plaintiff Mark Goodenough ("Goodenough") is and at all relevant times was a citizen of Alabama and the United States. Plaintiff acquired a Philips DreamStation BiPAP on or about 2019, in Alabama. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

14.     Plaintiff Darrell Gothard ("Gothard") is and at all relevant times was a citizen of Alabama and the United States. Plaintiff acquired a Philips Respironics DreamStation on or about 2015, in Alabama. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

15.     Plaintiff Keith Penberthy ("Penberthy") is and at all relevant times was a citizen of Alabama and the United States. Plaintiff acquired a Philips DreamStation on or about 2017, in Alabama. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

16.     Plaintiff Ivy Creek of Tallapoosa LLC d/b/a Lake Martin Community Hospital ("Lake Martin") is an Alabama Limited Liability Company with its principal place of business in Tallapoosa County, Alabama. Lake Martin is and at all relevant times was a Limited Liability Company organized and operating in Alabama and the United States. Lake Martin purchased two Philips OmniLab Advanced + continuous ventilators and two DreamStation devices for use in the hospital in Alabama. Lake Martin was unaware of the Defect at the time of purchase, and only became aware of the Defect after it learned that its devices were included in the Recall. Had Lake Martin been aware of the Defect in its Omnilab Advanced + and DreamStation devices, it would not have purchased them. Lake Martin seeks full reimbursement of all costs and damages associated with the purchase of the Recalled Devices and costs and damages associated with the Recall.

17.     Plaintiff Elmore Community Hospital Rural Health Association d/b/a Elmore Community Hospital ("Elmore") is an Alabama Limited Liability Company with its principal place of business in Elmore County, Alabama. Elmore is and at all relevant times was a Limited Liability Company organized and operating in Alabama and the United States. Elmore purchased two Philips OmniLab Advanced + continuous ventilators in Alabama. Elmore was unaware of the Defect at the time of the purchase, and only became aware of the Defect after it learned that its devices were included in the Recall. Had Elmore been aware of the Defect in its Omnilab Advanced + devices, it would not have purchased them. Elmore seeks full reimbursement of all costs and damages associated with purchasing the Recalled Devices and all costs and damages associated with the Recall.

18.     Plaintiff Gail Gilliard-Gunter ("Gilliard-Gunter") is and at all relevant times was a citizen of the United States and has lived in Louisiana and Arizona since acquiring the Recalled

Devices. Plaintiff acquired a Philips DreamStation on or about 2017, while residing in Louisiana, and a Philips DreamStation BiPAP on or about January 2020, while residing in Arizona. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

19.     Plaintiff Jeffrey Groudan ("Groudan") is and at all relevant times was a citizen of Arizona and the United States. Plaintiff acquired a Philips DreamStation on or about November 2020, in Arizona. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

20.     Plaintiff Russell Autry ("Autry") is and at all relevant times was a citizen of Arkansas and the United States. Plaintiff acquired a Philips DreamStation on or about January 2020, in Arkansas. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

21.     Plaintiff Deanna Melcher ("Melcher") is and at all relevant times was a citizen of Arkansas and the United States. Plaintiff acquired a Philips DreamStation on or about March 2020, in Arkansas. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff

would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

22.     Plaintiff Paul Bailey ("Bailey") is and at all relevant times was a citizen of California and the United States. Plaintiff acquired a Philips DreamStation on or about October 2018, in California. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

23.     Plaintiff Michael Bastasch ("Bastasch") is and at all relevant times was a citizen of California and the United States. Plaintiff acquired a Philips System One REMStar 60 Series Auto on or about August 2015, in California. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

24.     Plaintiff Mary Campbell ("Campbell") is and at all relevant times was a citizen of California and the United States. Plaintiff acquired a Philips DreamStation on or about 2018, in California. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement

device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

25.     Plaintiff Don Luenebrink ("Luenebrink") is and at all relevant times was a citizen of California and the United States. Plaintiff acquired a Philips DreamStation on or about September 2019, in California. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

26.     Plaintiff Douglas Mest ("Mest") is and at all relevant times was a citizen of California and the United States. Plaintiff acquired a Philips DreamStation on or about October 2016, in California. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

27.     Plaintiff Lisa Mitrovich ("Mitrovich") is and at all relevant times was a citizen of California and the United States. Plaintiff acquired a Philips DreamStation on or about February 2019, in California. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

28.     Plaintiff Patrick Nielson ("Nielson") is and at all relevant times was a citizen of the United States and has lived in Oregon and California since acquiring the Recalled Devices. Plaintiff acquired a Philips Respironics PR System One REMstar Pro on or about March 2014, in California, and acquired another Philips Respironics PR System One REMstar Pro on or about May 2016, in Oregon. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

29.     Plaintiff Robert Waybright ("Waybright") is and at all relevant times was a citizen of California and the United States. Plaintiff acquired a Philips DreamStation on or about March 2016, in California. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

30.     Plaintiff Kenneth Archuleta ("Archuleta") is and at all relevant times was a citizen of Colorado and the United States. Plaintiff acquired a Philips DreamStation on or about August 2020, in Colorado. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

31.     Plaintiff Natalie Gottlieb ("Gottlieb") is and at all relevant times was a citizen of Connecticut and the United States. Plaintiff acquired a Philips DreamStation on or about March 2020, in Connecticut. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's

device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

32.     Plaintiff Jill Leavenworth ("Leavenworth") is and at all relevant times was a citizen of Connecticut and the United States. Plaintiff acquired a Philips DreamStation on or about May 2020, in Connecticut. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

33.     Plaintiff Paul Rohan ("Rohan") is and at all relevant times was a citizen of Connecticut and the United States. Plaintiff acquired a Philips DreamStation on or about May 2019, in Connecticut. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

34.     Plaintiff Jose Toscano ("Toscano") is and at all relevant times was a citizen of Connecticut and the United States. Plaintiff acquired a Philips DreamStation on or about November 2016, and a second Philips DreamStation on or about November 2020, in Connecticut. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would

not have acquired the devices. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

35.     Plaintiff Anthony George ("George") is and at all relevant times was a citizen of Delaware and the United States. Plaintiff acquired a Philips DreamStation on or about August 2019, in Delaware. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

36.     Plaintiff Kenneth Dzierzanowski ("Dzierzanowski") is and at all relevant times was a citizen of Florida and the United States. Plaintiff acquired a Philips DreamStation on or about the Summer of 2019, in Florida. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

37.     Plaintiff Tara Fields ("Fields") is and at all relevant times was a citizen of Florida and the United States. Plaintiff acquired a Philips Dreamstation in or around September 2020, in Florida. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

38.     Plaintiff Barbara Smith is and at all relevant times was a citizen of Florida and the United States. Plaintiff acquired a Philips DreamStation in the Spring of 2017, and a second DreamStation in April 2018, in Florida. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

39.     Plaintiff Roy Fultz ("Fultz") is and at all relevant times was a citizen of the United States and has lived in Ohio and Georgia since acquiring the Recalled Device. Plaintiff acquired a Philips SystemOne on or about 2016, in Georgia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

40.     Plaintiff Dephine Lewis ("Lewis") is and at all relevant times was a citizen of Georgia and the United States. Plaintiff acquired a Philips DreamStation in or around May 2019, in Georgia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

41.     Plaintiff Jared Luke ("Luke") is and at all relevant times was a citizen of Georgia and the United States. Plaintiff acquired a Philips DreamStation in or around 2018, in Georgia.

14

Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

42.     Plaintiff John Mercure ("Mercure") is and at all relevant times was a citizen of Georgia and the United States. Plaintiff acquired a Philips DreamStation in or around October 2020, in Georgia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

43.     Plaintiff Cherry Merrell ("Merrell") is and at all relevant times was a citizen of Georgia and the United States. Plaintiff acquired a Philips REMstar on or about March 6, 2013, in Georgia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

44.     Plaintiff Chris Brown ("Brown") is and at all relevant times was a citizen Hawaii and the United States. Plaintiff acquired a Philips DreamStation on or about October 2017, in Hawaii. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not

manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

45.    Plaintiff Asherdee Diamond ("Diamond") is and at all relevant times was a citizen of Idaho and the United States. Plaintiff acquired a Philips REMStar on or about 2016, and a Philips DreamStation on or about 2019, in Idaho. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

46.    Plaintiff Chad Savoure ("Savoure") is and at all relevant times was a citizen of Idaho and the United States. Plaintiff acquired a Philips DreamStation Auto CPAP on or about February 2021, in Idaho. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

47.    Plaintiff Danny Baran ("Baran") is and at all relevant times was a citizen of Illinois and the United States. Plaintiff acquired a Philips DreamStation in or about February 2019, in Illinois. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

16

48.     Plaintiff Shannon Brooks ("Brooks") is and at all relevant times was a citizen of Illinois and the United States. Plaintiff acquired a Philips DreamStation on or about April 2021, in Illinois. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

49.     Plaintiff Debbie Rootberg ("Rootberg") is and at all relevant times was a citizen of Illinois and the United States. Plaintiff acquired a Philips System One on or about June 2012, in Illinois. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

50.     Plaintiff Diane Anderson is and at all relevant times was a citizen of Indiana and the United States. Plaintiff acquired a Philips DreamStation on or about December 2019, in Indiana. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

51.     Plaintiff Steven Clark ("Clark") is and at all relevant times was a citizen of Indiana and the United States. Plaintiff acquired a Philips DreamStation on or about December 2020, in

Indiana. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

52.     Plaintiff Michael Dusza ("Dusza") is and at all relevant times was a citizen of Indiana and the United States. Plaintiff acquired a Philips DreamStation on or about June 20, 2016, in Indiana. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

53.     Plaintiff Stephen Smith is and at all relevant times was a citizen of Indiana and the United States. Plaintiff acquired a Philips DreamStation on or about June 2019, in Indiana. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

54.     Plaintiff Steve Abarr ("Abarr") is and at all relevant times was a citizen of Iowa and the United States. Plaintiff acquired a Philips DreamStation on or about December 2019, in Iowa. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

55.     Plaintiff Jeff Wilson ("Wilson") is and at all relevant times was a citizen of Iowa and the United States. Plaintiff acquired a Philips DreamStation on or about April 2020, in Iowa. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

56.     Plaintiff Sharon Cathers ("Cathers") is and at all relevant times was a citizen of Kansas and the United States. Plaintiff acquired a Philips DreamStation on or about January 2021, in Kansas. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

57.     Plaintiff Andrew Fisher ("Fisher") is and at all relevant times was a citizen of the United States. Plaintiff acquired a Philips DreamStation on or about April 2020, in Missouri, while residing in Kansas. Plaintiff now lives in Georgia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

58.     Plaintiff Mia Coleman ("Coleman") is and at all relevant times was a citizen of Kentucky and the United States. Plaintiff acquired a Philips DreamStation around 2017, in Kentucky. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was

included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

59.     Plaintiff John Ratliff ("Ratliff") is and at all relevant times was a citizen of Kentucky and the United States. Plaintiff acquired a Philips DreamStation on or about 2018, in Kentucky. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

60.     Plaintiff Paul Baudoin ("Baudoin") is and at all relevant times was a citizen of Louisiana and the United States. Plaintiff acquired a Philips REMstar on or about December 2017, in Louisiana. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

61.     Plaintiff Susan Martin is and at all relevant times was a citizen of Louisiana and the United States. Plaintiff acquired a Philips DreamStation on or about June 2020, in Louisiana. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

62.     Plaintiff Lula Minnifield ("Minnifield") is and at all relevant times was a citizen of Louisiana and the United States. Plaintiff acquired a Philips DreamStation on or about January

2019, in Louisiana. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

63.    Plaintiff Ronald Romas ("Romas") is and at all relevant times was a citizen of Louisiana and the United States. Plaintiff acquired a Philips DreamStation in Louisiana. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

64.    Plaintiff Julie Barrett is and at all relevant times was a citizen of the United States and has lived in Maine and Oregon since acquiring a Recalled Device. While residing in Maine, Plaintiff acquired a Philips DreamStation on or about July 2018, from a provider in New Hampshire. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

65.    Plaintiff Peter Barrett is and at all relevant times was a citizen of the United States and has lived in Maine and Oregon since acquiring a Recalled Device. While residing in Maine, Plaintiff acquired a Philips DreamStation on or about July 2018, from a provider in New Hampshire. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device

21

was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

66.     Plaintiff Doris Margoles ("Margoles") is and at all relevant times was a citizen of the United States and has resided in Maine and North Carolina since acquiring the Recalled Device.  Plaintiff acquired a Philips DreamStation CPAP on or about 2017, in Maine. Plaintiff now lives in North Carolina. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

67.     Plaintiff Ryan Schwartz ("Schwartz") is and at all relevant times was a citizen of Maine and the United States. Plaintiff acquired a Philips DreamStation on or about January 19, 2018, in Maine. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

68.     Plaintiff Quinton Goodall ("Goodall") is and at all relevant times was a citizen of Maryland and the United States. Plaintiff acquired a Philips DreamStation on or about August 2016, in Maryland. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a

22

replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

69.     Plaintiff Pete Bellotti ("Bellotti") is and at all relevant times was a citizen of Massachusetts and the United States. Plaintiff acquired a Philips DreamStation on or about September 2017, in Massachusetts. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

70.     Plaintiff Daniel F. Conley ("Conley") is and at all relevant times was a citizen of Massachusetts and the United States. Plaintiff acquired a Philips DreamStation on or about April 2020, in Massachusetts. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

71.     Plaintiff Heidi McGuire ("McGuire") is and at all relevant times was a citizen of Michigan and the United States. Plaintiff acquired a Philips DreamStation on or about January 2018, in Michigan. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

72.     Plaintiff William Wilks ("Wilks") is and at all relevant times was a citizen of Michigan and the United States. Plaintiff acquired a Philips DreamStation on or about December 2020, in Michigan.  Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

73.     Plaintiff Prinna Boudreau ("Boudreau") is and at all relevant times was a citizen of Minnesota and the United States. Plaintiff acquired a Philips DreamStation Auto CPAP on or about 2019, and a Philips System One on or about 2011, in Minnesota. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

74.     Plaintiff Mary Godeaux ("Godeaux") is and at all relevant times was a citizen of Mississippi and the United States. Plaintiff acquired a Philips System One on or about March 23, 2016, in Mississippi. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

75.     Plaintiff Grady Tucker, Jr. ("Tucker") is and at all relevant times was a citizen of Mississippi and the United States. Plaintiff acquired a Philips DreamStation on or about August 29, 2016, and a Philips DreamStation Go on or about June 2, 2021, in Mississippi. Plaintiff was

unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

76.     Plaintiff John Young ("Young") is and at all relevant times was a citizen of Missouri and the United States. Plaintiff acquired a Philips DreamStation CPAP on or about January 2021, in Missouri. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

77.     Plaintiff Danny David ("David") is and at all relevant times was a citizen of Montana and the United States. Plaintiff acquired a Philips DreamStation Auto CPAP on or about January 2021, in Montana. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

78.     Plaintiff Elizabeth Lemus ("Lemus") and at all relevant times was a citizen of Nevada and the United States. Plaintiff acquired a Philips DreamStation on or about September 2017, in Nevada. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device,

Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

79.     Plaintiff Elaine Lizotte ("Lizotte") is and at all relevant times was a citizen of New Hampshire and the United States. Plaintiff acquired a Philips DreamStation Auto CPAP on or about June 2019, in New Hampshire. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

80.     Plaintiff William Vlahos ("Vlahos") is and at all relevant times was a citizen of New Hampshire and the United States. Plaintiff acquired a Philips DreamStation on or about October 2018, from a provider in Massachusetts. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

81.     Plaintiff Susanne Dennis ("Dennis") is and at all relevant times was a citizen of New Jersey and the United States. Plaintiff acquired a Philips DreamStation Auto CPAP on or about November 2018, in New Jersey. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full

26

reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

82.     Plaintiff Joseph Ryan ("Ryan") is and at all relevant times was a citizen of New Jersey and the United States. Plaintiff acquired a Philips DreamStation on or about July 2018, in New Jersey. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

83.     Plaintiff Aaron Taylor ("Taylor") is and at all relevant times was a citizen of New Jersey and the United States. Plaintiff acquired a Philips DreamStation in or around late 2015/early 2016, in New Jersey. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

84.     Plaintiff Mark Bossey ("Bossey") is and at all relevant times was a citizen of New York the United States. Plaintiff acquired a Philips DreamStation CPAP on or about November 2019, in New York. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

85.     Plaintiff Sonia Diaz ("Diaz") is and at all relevant times was a citizen of the United States and since acquiring the Recalled Device has lived in New York and South Carolina. Plaintiff acquired a Philips DreamStation Auto CPAP in October 2016, in New York. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

86.     Plaintiff Bruce Ginsberg ("Ginsberg") is and at all relevant times was a citizen of New York and the United States. Plaintiff acquired a Philips DreamStation CPAP on or about 2018, in New York. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

87.     Plaintiff Carl Gold ("Gold") is and at all relevant times was a citizen of New York and the United States. Plaintiff acquired a Philips DreamStation on or about August 2020, in New York. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

88.     Plaintiff Susan Woodward ("Woodward") is and at all relevant times was a citizen of New York and the United States. Plaintiff acquired a Philips DreamStation on or about December 2018, in New York. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

89.     Plaintiff Richard Radack ("Radack") is and at all relevant times was a citizen of the North Carolina and the United States. Plaintiff acquired a Philips DreamStation on or about April 2020, in North Carolina. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

90.     Plaintiff Jeffrey Bartalo ("Bartalo") is and at all relevant times was a citizen of North Carolina and the United States. Plaintiff acquired a Philips DreamStation on or about December 2019, in North Carolina. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

91.     Plaintiff Aimee Frenzel-Drew ("Frenzel-Drew") is and at all relevant times was a citizen of North Dakota and the United States. Plaintiff acquired a Philips REMstar Pro on or about 2015, in North Dakota. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's

device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

92.     Plaintiff Patricia Flick ("Flick") is and at all relevant times was a citizen of Ohio and the United States. Plaintiff acquired a Philips REMstar CPAP machine on or about October 2012, in Ohio. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

93.     Plaintiff Jack Giordano ("Giordano") is and at all relevant times was a citizen of Ohio and the United States. Plaintiff acquired a Philips DreamStation on or about January 2016, in Ohio. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

94.     Plaintiff Rachel Hock ("Hock") is and at all relevant times was a citizen of Ohio and the United States. Plaintiff acquired a Philips System One on or about 2014, and a Philips DreamStation CPAP on or about November 2018, in Ohio. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

95.     Plaintiff Vincent Stefanini ("Stefanini") is and at all relevant times was a citizen of Ohio and the United States. Plaintiff acquired a Philips DreamStation on or about November 2019, in Ohio. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

96.     Plaintiff Matthew Ward ("Ward") was at all relevant times a citizen of Ohio and the United States. Plaintiff acquired a Philips DreamStation Auto CPAP on or about December 2016, in Ohio. Plaintiff moved to Florida in May 2022. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

97.     Plaintiff Jason Mcelyea ("Mcelyea") is and at all relevant times was a citizen of Oklahoma and the United States. Plaintiff acquired two Philips DreamStations on or about November and December 2020, in Oklahoma. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

98.     Plaintiff John Masington ("Masington") is and at all relevant times was a citizen of Pennsylvania and the United States. Plaintiff acquired a Philips DreamStation on or about December 19, 2016, and a second Philips DreamStation on or about April 24, 2017, in

Pennsylvania. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

99.     Plaintiff Matthew Smith is and at all relevant times was a citizen of Pennsylvania and the United States. Plaintiff acquired a Philips DreamStation around 2017. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

100.     Plaintiff Marilyn Sweeney ("Sweeney") is and at all relevant times was a citizen of Pennsylvania and the United States. Plaintiff acquired a Philips DreamStation on or about January 1, 2019, and a Philips DreamStation Go on or about February 6, 2019, in Pennsylvania. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

101.     Plaintiff Antonio Perez Bonano ("Bonano") is and at all relevant times was a citizen of Puerto Rico and the United States. Plaintiff acquired a Philips DreamStation on or about April 2019, in Puerto Rico. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device,

Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

102.    Plaintiff Diane Lamontagne ("Lamontagne") is and at all relevant times was a citizen of Rhode Island and the United States. Plaintiff acquired a Philips DreamStation on or about March 2016 in Rhode Island. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the recalled device and costs associated with the Recall.

103.    Plaintiff Mark Weiner ("Weiner") is and at all relevant times was a citizen of Rhode Island and the United States. While residing in Rhode Island, Plaintiff acquired a Philips DreamStation from a provider located in Massachusetts. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

104.    Plaintiff William Anderson is and at all relevant times was a citizen of South Carolina and the United States. Plaintiff acquired a Philips DreamStation CPAP on or about June 2018, in South Carolina. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a

replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

105.    Plaintiff Murray Craig ("Craig") is and at all relevant times was a citizen of Tennessee and the United States. Plaintiff acquired a Philips DreamStation on or about June 2019, in Tennessee. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

106.    Plaintiff Jeffrey Hill ("Hill") is and at all relevant times was a citizen of Tennessee and the United States. Plaintiff acquired a Philips DreamStation in Tennessee. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

107.    Plaintiff Raul Deleon ("Deleon") is and at all relevant times was a citizen of Texas and the United States. Plaintiff acquired a Philips DreamStation in 2016, and a DreamStation Go in 2019, in Texas. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

108.    Plaintiff Sarah Lowney ("Lowney") is and at all relevant times was a citizen of Texas and the United States. Plaintiff acquired a Philips DreamStation Auto CPAP on or about April 2021, in Texas. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's

device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

109.    Plaintiff Sabrina Malone ("Malone") is and at all relevant times was a citizen of Texas and the United States. She has also lived in New Hampshire since acquiring the Recalled Device. Plaintiff acquired a Philips DreamStation on or about December of 2017, in Texas. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

110.    Plaintiff Paul Panzera ("Panzera") is and at all relevant times was a citizen of Texas and the United States. Plaintiff acquired a Philips DreamStation on or about June 2018, in Texas. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

111.    Plaintiff David Phillips ("Phillips") is and at all relevant times was a citizen of Texas and the United States. Plaintiff acquired a Philips REMstar Pro on or about 2015 or 2016, in Texas. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would

not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

112. Plaintiff Rosita Polk ("Polk") is and at all relevant times was a citizen of Texas and the United States. Plaintiff acquired a Philips DreamStation on or about October 2018, in Texas. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

113. Plaintiff Michael Tobin ("Tobin") is and at all relevant times was a citizen of Texas and the United States. Plaintiff acquired a Philips DreamStation CPAP on or about 2019, in Texas. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

114. Plaintiff David Martin is and at all relevant times was a citizen of Vermont and the United States. Plaintiff acquired a Philips REMstar on or about 2011, and a Philips DreamStation on or about June 2016, in Vermont. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

115. Plaintiff Elizabeth Heilman ("Heilman") is and at all relevant times was a citizen of Virginia and the United States. Plaintiff acquired a Philips DreamStation on or about 2018, in

Virginia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

116.    Plaintiff Penny Hudson ("Hudson") is and at all relevant times was a citizen of the Virginia and the United States. Plaintiff acquired a Philips DreamStation on or about December 2019, in Virginia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

117.    Plaintiff Beth Rodgers ("Rodgers") is and at all relevant times was a citizen of the United States and has lived in New Mexico and Virginia since acquiring a Recalled Device. Plaintiff acquired a Philips SystemOne on or about 2013, while living in New Mexico, and a Philips DreamStation in or about June 2019, while living in Virginia. Plaintiff was unaware of the Defect at the times of acquisition, and Plaintiff's devices were included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's devices, Plaintiff would not have acquired the devices. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Devices and costs associated with the Recall.

118.    Plaintiff Cameron Rose ("Rose") is and at all relevant times was a citizen of Virginia and the United States. Plaintiff acquired a Philips DreamStation on or about May 2018, in Virginia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff

would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

119.    Plaintiff Jose Lopez ("Lopez") is and at all relevant times was a citizen of Washington and the United States. Plaintiff acquired a Philips DreamStation on or about October 2019, in Washington. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

120.    Plaintiff Robert Peebles ("Peebles") is and at all relevant times was a citizen of Washington and the United States. Plaintiff acquired a Philips DreamStation on or about October 2020, in Washington. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

121.    Plaintiff David Bays ("Bays") is and at all relevant times was a citizen of West Virginia and the United States. Plaintiff acquired a Philips DreamStation on or about October 2019, in West Virginia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

122.    Plaintiff Brent Hamlin ("Hamlin") is and at all relevant times was a citizen of West Virginia and the United States. Plaintiff acquired a DreamStation in or about December 2019, in West Virginia. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

123.    Plaintiff Robert Matters ("Matters") is and at all relevant times was a citizen of Wisconsin and the United States. Plaintiff acquired a Philips DreamStation in or around 2019, while residing in Wisconsin. Plaintiff was unaware of the Defect at the time of acquisition, and Plaintiff's device was included in the Recall. Had Plaintiff been aware of the Defect in Plaintiff's device, Plaintiff would not have acquired the device. As a result of the Recall, Plaintiff acquired a replacement device not manufactured by Philips. Plaintiff seeks full reimbursement of all costs associated with acquiring the Recalled Device and costs associated with the Recall.

124.    Plaintiff ASEA/AFSCME Local 52 Health Benefits Trust (the "ASEA Health Trust") is a tax-exempt IRC Section 501(c)(9) Voluntary Employee Benefit Association. The ASEA Health Trust provides healthcare benefits to participants and their eligible family members consisting of permanent and long-term nonpermanent employees of the State of Alaska General Government Unit covered by a collective bargaining agreement between the State of Alaska and the ASEA Health Trust. The ASEA Health Trust paid a portion of the cost of Recalled Devices for its insureds. Had Philips timely and appropriately disclosed the Defect, that information would have been accessible to prescribing physicians and the general public. Physicians would not have prescribed the Recalled Devices, and the ASEA Health Trust would not have incurred costs related

39

to them. The ASEA Health Trust seeks full reimbursement of all costs associated with acquiring the Recalled Devices for its insureds and for the replacement costs of Recalled Devices.

### B.   DEFENDANTS

125.   Defendant Koninklijke Philips N.V. ("Royal Philips") is a Dutch multinational company having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. Royal Philips is the parent company of the Philips group of healthcare technology businesses including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries, Philips North America LLC and Philips RS North America LLC.[7] As such, Royal Philips controls Philips North America LLC and Philips RS North America LLC with respect to the manufacturing, selling, distributing, and supplying of the Recalled Devices.[8]

126.   Defendant Philips North America LLC ("Philips NA") is a Delaware company with its principal place of business at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly-owned subsidiary of Royal Philips. Philips NA manages the operation of Royal Philips' various lines of business, including Philips RS North America LLC, in North America. The sole member of Philips NA is Philips Holding USA Inc. Philips NA is 100% owned by Philips RS North America Holding Corporation which, in turn, is 100% owned by Philips Holding USA Inc.

---

[7] Philips 2020 annual filing with the SEC, fn. 8, https://www.sec.gov/Archives/edgar/data/313216/000031321621000008/phg-exhibit8.htm (last accessed June 16, 2022).

[8] Philips 2020 annual filing with the SEC, https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (last accessed June 16, 2022).

127.     Defendant Philips Holding USA Inc. ("PHUSA") is a Delaware corporation with its principal place of business at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. PHUSA is a holding company that is 100% owned, directly or indirectly, by Royal Philips. PHUSA owns 100% of Philips RS North America LLC and Philips RS North America Holding Corporation, and is the member/manager of Philips NA.

128.     Defendant Philips RS North America LLC ("Philips RS") is a Delaware company with its principal place of business at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.[9] Philips RS is 100% owned by Philips RS North America Holding Corporation, which in turn, is 100% owned by PHUSA.

129.     Defendant Philips RS North America Holding Corporation ("Philips RS Holding") is a Delaware corporation with its principal place of business at 222 Jacobs Street, Cambridge, Massachusetts 02141, and is wholly owned by PHUSA. Accordingly, Philips RS Holding is a citizen of Massachusetts and Delaware.

130.     At all relevant times, each Philips Defendant acted in all aspects as the agent and alter ego of one another, and reference to "Philips" refers to each Philips Defendant individually and collectively.

131.     Defendant PolyTech is a Delaware Corporation with its principal place of business at 420 Corporate Boulevard, Newark, Delaware 19702. PolyTech directly or through another intermediary provided Philips with the PE-PUR foam that was used in the Recalled Devices.

---

[9] Philips announces completion of tender offer to acquire Respironics, WEB WIRE, https://www.webwire.com/ViewPressRel.asp?aId=61199 (last accessed June 16, 2022).

### III.   JURISDICTION AND VENUE

132.   The Court has subject matter jurisdiction over the federal claims asserted herein under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. The Court further has jurisdiction under 28 U.S.C. § 1331 for the RICO and Magnuson-Moss Warranty claims and under 28 U.S.C. § 2310(d) for the Magnuson-Moss Warranty claims. The Court has jurisdiction under 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005, because the matter in controversy exceeds $5 million, exclusive of interest and costs, and is a class action in which Plaintiffs and some members of the Class are citizens of states different than Defendants. *See* 28 U.S.C. § 1332(d)(2)(A).

133.   Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

### IV.   FACTUAL ALLEGATIONS

#### A.   CPAP AND BIPAP MACHINES AND VENTILATORS ARE PRESCRIBED TO TREAT BREATHING DISORDERS.

134.   Sleep apnea is a sleeping disorder in which breathing is disturbed during sleep. These disturbances are called "apneas."

135.   According to the Mayo Clinic, the main types of sleep apnea are obstructive sleep apnea, central sleep apnea, and complex sleep apnea syndrome (also known as treatment-emergent central sleep apnea).

136.   Obstructive sleep apnea is the most common type. It occurs when the muscles in the back of the throat relax during inhalation, which causes the airway to narrow or close and prevent sufficient air from passing through. This in turn lowers the oxygen level in the blood, which causes the brain briefly to wake the body from sleep to reopen the airway. This reawakening may be so brief that the patient does not remember it, and it may be associated with snorting,

choking, or gasping. It can happen anywhere from a few times per hour to once every few minutes, and can prevent the patient from reaching the deep, restful phases of sleep.

137.    Central sleep apnea occurs when the brain fails to transmit signals to the breathing muscles. As a result, the body stops breathing, which can cause waking with shortness of breath or difficulty getting to sleep or staying asleep.

138.    Complex sleep apnea syndrome occurs when a patient has both obstructive sleep apnea and central sleep apnea. An image showing how an airway can be blocked as a result of sleep apnea appears below:



139.    CPAP therapy is a common treatment for sleep apnea. In CPAP therapy, a machine delivers a flow of air through a mask over the nose or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea. The illustration below shows a generic CPAP machine being used by a patient while sleeping.



140.    Another therapy to treat sleep apnea includes use of BiPAP machines, which use two different pressures – one for inhaling and one for exhaling.

141.    Patients customarily place the CPAP or BiPAP machines on a nearby nightstand or shelf. A hose connects the unit to the mask, which is worn over the nose or mouth during sleep. Below is an image of a Philips DreamStation machine on a nightstand.



142.    Patients who use CPAP or BiPAP machines typically must use them every time they sleep.

143.    Mechanical ventilators, usually called "ventilators," are often used to treat respiratory failure. Ventilators push air into and out of the patient's lungs like a bellows, typically through a tube that is connected to the machine on one end and inserted through the patient's nose or mouth into the trachea on the other end. Patients are typically sedated while on ventilation

because it can otherwise cause intense pain. Ventilators can also be used in other circumstances, such as during surgery when general anesthesia may interrupt normal breathing. There are also ventilators for home use. The following image from the National Institute of Health shows a typical ventilator and how it works:



### B. PHILIPS SOLD CPAP, BIPAP, AND VENTILATOR DEVICES CONTAINING PE-PUR FOAM.

144.    Philips manufactures and sells CPAP and BiPAP machines and ventilators, among other products. According to Philips' 2020 Annual Report,[10] Sleep & Respiratory Care constituted 49% of Philips' total sales in its Connected Care line of business, which in turn accounted for 28%

---

[10] https://www.results.philips.com/publications/ar20/downloads/pdf/en/PhilipsFullAnnualReport2020-English.pdf?v=20210531142942 (last accessed June 16, 2022).

of Philips' overall sales of about €19.535 billion (*i.e.*, $22,541,631,850). Philips has sold millions of CPAP and BiPAP machines and ventilators in the United States.

145.     The basic technology used in CPAP and BiPAP devices was developed in 1980 by an Australian pulmonologist, Dr. Colin Sullivan, who used it to treat dogs with respiratory problems, before the technology was adapted for humans.

146.     Respironics commercialized this technology and sold the first publicly available CPAP device in 1985. ResMed, an industry competitor, followed with the release of its CPAP device in 1989.

147.     These first-generation CPAP and BiPAP devices created a new and commercially viable field of respiratory therapy. The devices, however, were large and noisy, resulting in an "arms-race" between manufacturers to develop devices that were smaller, more responsive to patient breathing patterns, and quieter.

148.     The noise level of CPAP and BiPAP devices became a driver of adult consumer preference because loud devices interrupt the peaceful sleep of both the patient and their partner, making it less likely that the patient will continue to use the device.

149.     Noise is also a problem in neonatal intensive care units where infants, especially those born premature, may remain on ventilators or CPAP or BiPAP devices for long periods.

150.     To develop the quietest devices on the market with the lowest decibel ratings, device manufacturers such as Philips filled CPAP, BiPAP, and ventilator devices with sound abating foam to reduce the volume of noise emitted from the motor and airflow.

151.     Since at least 2009, Philips has incorporated PE-PUR foam in its CPAP, BiPAP, and ventilator devices for sound abatement purposes.

152.     In fact, the relative quiet of DreamStation products factored prominently into Philips' marketing.[11] Philips put out information that it extensively studied and measured the amount of sound produced by DreamStation products. Philips even included an infographic indicating DreamStation products are barely louder than a whisper.

153.     Polyurethane is an organic polymer in which urethane groups connect the molecular units and is usually formed by reacting a diisocyanate or triisocyanate with a polyol. Under certain circumstances, polyurethane may break down into a diisocyanate or triisocyanate as well.

154.     The two main types of polyurethane are polyester and polyether. Polyester polyurethane has much better shock absorption and vibration dampening properties and is commonly used for soundproofing or sound dampening.

155.     It has been known for decades that polyester polyurethane is subject to breakdown *via* hydrolysis, particularly in medical applications. For example, a chapter of a scientific encyclopedia published in 2013 states: "Poly(ester urethanes) were the first generation of PURs used in medical devices but were found unsuitable for long-term implants because of rapid hydrolysis of the polyester soft segment[.]"[12]

156.     Polyether polyurethane, on the other hand, is less prone to breakdown *via* hydrolysis. The same encyclopedia chapter notes that polyether polyurethanes "with excellent

---

[11] *See* https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.pdf (last accessed June 16, 2022).

[12] Pal Singh Chauhan, N., and Kumari Jangid, N., "Polyurethanes and Silicone Polyurethane Copolymers," Chapter in Encyclopedia of Biomedical Polymers and Polymeric Biomaterials, January 2013, *available at* https://www.researchgate.net/publication/236144965_POLYURETHANES_AND_SILICONE_POLYURETHANE_COPOLYMERS (last accessed June 16, 2022).

hydrolytic stability replaced poly(ester urethanes) and have been used in medical devices for the past two decades."[13]

157.     All of the Philips Recalled Devices contain PE-PUR foam.

158.     In the DreamStation Recalled Device, for example, there is a channel that surrounds the central fan in the device. The top of this channel is stuffed with PE-PUR foam to absorb the noise from the machine while the patient is sleeping. Air passes through this channel underneath the PE-PUR foam before it enters the fan and is pumped into the patient's airway.

159.     There were readily available alternatives available to Philips other than to use PE-PUR foam for sound abatement, including, without limitation, other types of sound abating foam.

160.     One of Philips' primary competitors, ResMed, primarily uses polyether polyurethane foam, not PE-PUR foam, for sound dampening.[14]

**C.     PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM SINCE AT LEAST 2015**

161.     The FDA has concluded that:

Beginning in 2015, Philips received data from a variety of sources regarding degradation of the PE-PUR foam contained within the recalled devices, including complaints, test reports, information from suppliers, and information from another entity owned by Philips' parent company. Philips failed to adequately evaluate this data and incorporate it into its CAPA [Corrective and Preventive Actions] system for further investigation and potential mitigation, as required by current good manufacturing practice requirements codified in 21 C.F.R. § 820.100.[15]

162.     The FDA's finding was based in part on twenty-one (21) site inspections of Philips' Murrysville, Pennsylvania facility between August 26, 2021 and November 9, 2021. The lead FDA

---

[13] *Id.*

[14] https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed June 16, 2022).

[15] https://www.fda.gov/media/158129/download (last accessed June 16, 2022) ("518(b) Notice"), at 6.

investigator, Katelyn A. Staub-Zamperini, memorialized the agency's finding in a 28-page FDA-483 Report issued on November 9, 2021.[16] The FDA delivered the 483 Report to Rodney Mell, Head of Quality at Philips Respironics, on or around November 9, 2021.[17]

163.    A 483 Report "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts."[18] These observations are made in a 483 Report "when in the investigator's judgment, conditions or practices observed would indicate that any food, drug, device or cosmetic has been . . . or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health."[19]

164.    In connection with its investigation for its 483 Report, the FDA learned that Philips had received numerous complaints from customers in the field about degradation of the foam in its Recalled Devices from at least as early as 2008:

> [A] query of your firm's consumer complaints from 01/01/2008 to current, for the keywords contaminants, particles, foam, debris, airway, particulate, airpath, and black, **resulted in over 222,000 complaints, and over 20,000 of which occurred between 2008 to 2017 and involved Trilogy devices**. Additionally, your firm performed a foam related complaint data analysis in April 2021 on complaints confirmed to be related to or involve foam degradation issues. The raw complaint data documents that **30 Trilogy related complaints were received from 2014 to 2017, and 1,254 related complaints were received across all products containing the affected foam, from 2014 to 2021**.[20]

---

[16] A redacted version of the 483 report is available here:
https://www.fda.gov/media/154244/download (last accessed June 16, 2022). ("483 Report").

[17] *Id.* at 1, 28.

[18] https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last accessed June 16, 2022).

[19] *Id.*

[20] 483 Report at 12 (emphasis added).

165.    Yet, "[n]o formal investigation, risk analysis, or CAPA were initiated, performed, or documented [by or on behalf of Philips], in response to the at least 222,000 complaints that could potentially be related to foam degradation and received from 2008 to 2017 . . . ."[21]

166.    A Corrective and Preventative Action ("CAPA") refers to procedures that medical device manufactures must follow to identify and attempt to correct when a quality problem is detected. *See* 21 C.F.R. § 820.100. A CAPA is designed "to collect information, analyze information, identify and investigate product and quality problems, and take appropriate and effective corrective and/or preventive action to prevent their recurrence."[22]

167.    The FDA also found that Philips "was made aware of polyester polyurethane foam degradation issues in/around October 2015 . . . ."[23]

168.    In fact, an adverse event report from the FDA Manufacturer and User Facility Device Experience ("MAUDE") database shows that, as early as 2011, Philips knew that a patient discovered "black dust" on her nose when she awoke after using a Philips RemStar CPAP device and subsequently underwent treatment for "intoxication" and "chest tightness."[24]

169.    Philips investigated this report and confirmed that the device contained "evidence of an unk[nown] black substance in the air path and on internal components . . . present throughout both the intake and exhaust portions of the air path . . . ."[25]

---

[21] *Id.* at 16.

[22] https://www.fda.gov/corrective-and-preventive-actions-capa (last accessed June 16, 2022).

[23] 483 Report at 18.

[24] MAUDE Adverse Event Report: RESPIRONICS, INC. REMSTAR PRO INTERNATIONAL, http://www.fdable.com/advanced_maude_query/324fd08a137ce36c2d5faf453ee26f2f (last visited June 16, 2022).

[25] *Id.*

170.     Philips, however, stubbornly denied that the presence of the black substance was due to a product defect.

171.     The FDA found that Philips' analysis of consumer complaints was itself defective in that it "was not adequately performed to identify or detect quality problems."[26] The FDA concluded that "potential foam degradation in Trilogy ventilator devices is not an isolated incident, and you [Philips] also have not documented a detailed rationale for why harm is not likely to occur again, as required by your Health Hazard Evaluation's instructions."[27] In light of this, the FDA concluded that Philips' "risk analysis is inadequate or was not performed when appropriate or within an appropriate time frame of your firm becoming aware" of these issues.[28]

172.     On May 2, 2022, the FDA issued a formal notice to Philips pursuant to Section 518(b) of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 360h(b) (the "518(b) Notice").[29] The 518(b) Notice stated that the FDA's "Center for Devices and Radiological Health (CDRH) is proposing that an order should be issued pursuant to section 518(b)" of the FDCA "to require Philips to submit a plan for the repair, replacement, and/or refund of the purchase price of devices subject to the recall that were manufactured after November 2015, sufficient to assure that the unreasonable risk of substantial harm to the public health presented by those devices will be eliminated."[30] This notice was directed to Thomas J. Fallon, Head of Quality, Sleep and Respiratory Care, for Philips Respironics, Inc.

---

[26] 483 Report at 16.

[27] *Id.* at 13.

[28] *Id.* at 3.

[29] https://www.fda.gov/media/158129/download (last accessed June 16, 2022).

[30] 518(b) Notice at 1.

173.     The 518(b) Notice stated that "there is sufficient evidence for FDA to determine that the devices subject to the recall present an unreasonable risk of substantial harm to the public health" and "that there are reasonable grounds to believe that the recalled devices that Philips manufactured after November 2015 were not properly manufactured with reference to the state of the art as it existed at the time of the devices' manufacture."[31]

174.     The 518(b) Notice also stated that "there is sufficient evidence for FDA to determine that there are reasonable grounds to believe that the risk associated with the devices was not caused by the failure of a person other than Philips to exercise due care in the installation, maintenance, repair, or use of the devices at issue" and specifically that "evidence indicates that the unreasonable risk associated with the products was not caused by the use of ozone cleaning agents, nor did the use of ozone to clean the products constitute a failure to exercise due care."[32]

175.     The FDA concluded that "patients and providers cannot readily mitigate the unreasonable risk associated with the recalled devices[.]"[33]

176.     The FDA also concluded that "[t]his risk is not the unavoidable byproduct of current ventilator, CPAP machine, and BiPAP machine technologies. Indeed, Philips and its competitors market ventilators, CPAP machines, and BiPAP machines that do not use PE-PUR foam."[34]

---

[31] *Id.* at 2.

[32] *Id.*

[33] *Id.*

[34] *Id.* at 6.

1.      **In 2015, Philips Communicated With Its Foam Suppliers About The Problem Of PE-PUR Foam Degradation.**

177.    The PE-PUR foam that Philips used in its Recalled Devices was manufactured by William T. Burnett & Co. ("Burnett"), a bulk foam manufacturer. Burnett produces foam in sheets that are between approximately four feet to more than six feet wide and may be as long as one hundred or two hundred feet.

178.    Burnett sells its bulk foam to intermediaries, including Defendant PolyTech and The SoundCoat Company ("SoundCoat"). PolyTech and SoundCoat then sell the foam to Philips, either directly or through another intermediary, Paramount Die Corporation, which may modify the foam.

179.    According to the FDA, "email correspondence between [Philips] and its raw foam supplier [PolyTech] beginning 10/30/2015 and forward, document that [Philips] was made aware of polyester polyurethane foam degradation issues in/around October 2015, which was later confirmed by [Philips'] foam supplier on 08/05/2016, via email."[35]

180.    On August 5, 2016, Bob Marsh, a PolyTech employee, wrote to Lee Lawler, an employee of Burnett, referencing a concern expressed by one of its customers [Philips] in the Fall of 2015 regarding foam degradation in its medical devices.[36] Mr. Marsh stated: "They [Philips] are asking again, and wondered if we could give them any estimate on lifespan of the foam when exposed to 40 C and high humidity."[37] Mr. Lawler responded that, under those conditions, he "would not be surprised if ester foam . . . would exhibit signs of hydrolysis in as short a time as a

---

[35] 483 Report at 18.

[36] *See* Email exchange between Bob Marsh at PolyTech and Lee Lawler at Burnett (Affidavit of Lee Lawler, Technical and R&D Manager at Burnett ("Lawler Aff.") Exh. E, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-7) (attached hereto as Exhibit "B"), at WTB 000056.

[37] *Id.*

year."[38] He added that "that is not a good environment for polyester foam. Polyether foam could last years in that environment."[39] Mr. Marsh responded that he would "let them [presumably Philips] know they'd be better off with the ether."[40]

181.    Knowing about these issues with the PE-PUR foam, Philips tested the foam material used in its Recalled Devices. According to the FDA, "this testing spoke only to the limited finding that in the case of the [redacted] foam samples 'returned from service in a Pacific rim location,' spectroscopy results were 'consistent with an environmental/chemical exposure causing base polymer cleavage and embrittlement of the material.'"[41] Nonetheless, based on the results of this limited testing, Philips concluded that no escalation to a CAPA process was required.

182.    According to the FDA, "no further investigation, health hazard evaluation, risk analysis, or design review was performed or documented by Philips at that time . . . and no preventative maintenance procedures were implemented[,]" other than a limited "preventative maintenance procedure" instituted by a "Philips … entity owned by the parent company of Philips Respironics" "to replace the air intake assembly of Trilogy ventilator products, due to complaints that had been received regarding degradation of the PE-PUR foam."[42] And even then, "Philips did not verify the effectiveness of this measure."[43]

---

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] 518(b) Notice at 7.

[42] *Id.* at 6-7.

[43] *Id.* at 8.

183.    Philips was alerted to more warning signs as it continued to ask its supplier about the properties of the PE-PUR foam it was continuing to put in medical devices that millions of its customers were breathing through daily.

184.    Testing conducted for Philips in 2016 confirmed that Mr. Lawler from Burnett was correct. According to the FDA, this testing "determined that the PE-PUR foam was susceptible to degradation, resulting in the conclusion at that time that 'polyester urethanes show bad resistance against high humidity in combination with high temperature.'"[44] Additional testing "determined that, compared to PE-PUR foam, another type of foam, polyether urethane, 'show[s] a far better resistance against high humidity at high temperature.'"[45]

185.    The 483 Report identified "at least fourteen instances, assessments, and/or test reports, dated from 04/01/2016 to 01/22/2021, where [Philips] was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions, with various Sleep and Respiratory care devices."[46] It listed the specific analyses and tests, including one which concluded that "contrary to polyester urethane foams, [redacted] foams shows a far better resistance against high humidity at high temperature."[47]

186.    Philips received at least 110 complaints confirmed to be related to foam degradation between 2014 and 2017.[48] Approximately 80 of these complaints concerned CPAP and BiPAP devices.[49]

---

[44] *Id.* at 7-8.

[45] *Id.* at 8.

[46] 483 Report at 3.

[47] *Id.* at 4.

[48] 518(b) Notice at 7.

[49] *Id.* at 8.

187.    Nonetheless, Philips continued manufacturing and selling the now Recalled Devices containing PE-PUR foam.

### 2.    Philips Opened An Internal Investigation Into Foam Degradation In Mid-2018 That Confirmed PE-PUR Foam Is Prone To Degradation.

188.    On April 12, 2018, Philips opened a precursor to a formal CAPA, referred to by Philips as a CAPA INV 0988, "to investigate complaints related to potential foam degradation for the Trilogy devices in Australia and to determine what actions should be taken."[50] Philips reported that "[u]nits were returned from the field where the Trilogy Removable Air Path Foam [redacted] and the foam in the Inlet Air Path Assembly [redacted] was degrading, and getting into the motor/air path, causing at least 1 Trilogy unit to fail."[51]

189.    On April 20, 2018, Vincent Testa, a Project Mechanical Engineer at Philips, emailed Bonnie Peterson, Project Manager at PolyTech. Mr. Testa stated, "We use the PAFS foam in the air path of our Trilogy family of ventilators as a means for noise reduction . . . ."[52] PAFS foam is PolyTech's open cell, flexible acoustical grade PE-PUR foam.[53] Mr. Testa at Philips continued: "Recently weve [sic] received a few complaints from our customers that the foam is disintegrating . . . . The material sheds and is pulled into the ventilator air path. As you can imagine,

---

[50] *Id.*

[51] 483 Report at 14.

[52] *See* Email from Vincent Testa at Philips to Bonnie Peterson at PolyTech (Lawler Aff. Exh. H, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-10) (attached hereto as Exhibit "C"), at WTB 000070.

[53] https://www.polytechinc.com/products/acoustic-foam (last accessed June 16, 2022).

this is not a good situation for our users."[54] Mr. Testa asked, "what could cause this material to break down."[55]

190.    On April 23, 2018, Mr. Marsh from PolyTech forwarded Philips' April 20, 2018 email to Mr. Lawler from Burnett, reporting that "[t]he customer [Philips] is finding degradation of the ester foam and the urethane film in their device, such that particles are breaking off and flowing in the airstream."[56]

191.    On May 2, 2018, Mr. Marsh added in an email to Mr. Lawler that "Philips gave us another bit of information. They tested ether vs ester in high heat and humidity and found ether to be the better performer. It validated what we (you) had conveyed."[57] Mr. Marsh asked whether exposure to oxygen, higher temperature, and higher humidity could accelerate deterioration of PE-PUR foam.[58]

192.    Mr. Lawler responded that he did "not believe that exposure to oxygen will cause any significant damage to polyurethane foam unless elevated temperature and/or humidity is also present."[59]

193.    Mr. Testa from Philips admitted in a follow-up email to Bob Marsh from PolyTech on May 3, 2018, that:

---

[54] *See* Email from Vincent Testa at Philips to Bonnie Peterson at PolyTech (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000070.

[55] *Id.*

[56] *See* Email from Bob Marsh to Lee Lawler dated 4/23/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000070.

[57] *See* Email from Bob Marsh to Lee Lawler dated 5/2/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000069.

[58] *Id.*

[59] *See* Email from Lee Lawler to Bob Marsh dated 5/2/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000069.

We [Philips] are evaluating our options regarding the foam. We could switch to the PAF [ether-based foam], or we could indicate a preventative maintenance cycle in which they would replace the PAFS [ester-based] foam pieces. . . . The environmental conditions for our device are a maximum of 40C and 95% R.H. Note the difference in temperature.[60]

194.     Mr. Testa at Philips asked Bob Marsh from PolyTech the following:

1. Please ask your foam supplier to calculate the service life based on this higher temperature (40C vs. 27C).

>     a. It would also be useful if they could provide a graph depicting failure over time. For example, if tensile strength reduced over time, they would plot strength vs. time.

2. At the end of the service life, what is the failure mode of this material?[61]

195.     Mr. Marsh again forwarded these questions to Mr. Lawler at Burnett, who responded:

I am unable to answer Question Number 1. We would not recommend using **polyester** foam in such an environment and have no direct data to use to calculate the rate of hydrolysis. **Polyether** foam lifetime would not be expected to reduce significantly at the stated conditions. Use with pure oxygen could shorten the lifetime some by promoting more rapid oxidation. I do not know the extent of the reduction, but do not expect it to be overly significant.

Polyester foam will lose tensile strength and overall integrity as it hydrolyzes. It will eventually decompose to a sticky powder. That will happen very rapidly at 40C, 95% R.H.[62]

196.     Mr. Lawler from Burnett added: "Is it one of our data sheets that states foam lifetime being 10 years at 95% R.H? I do not think I have seen a sheet with that statement."[63] Mr. Marsh at PolyTech responded that he would pass along the information to Philips and that "[w]e

---

[60] *See* Email from Vincent Testa to Bob Marsh dated 5/3/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000068-69).

[61] *Id*.

[62] *See* Email from Lee Lawler to Bob Marsh dated 5/4/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000067-68.

[63] *Id*. at WTB 000068.

have no idea where that statement came from. It has been on our data sheets for probably 20 years. We are removing it."[64]

197. On May 23, 2018, Mr. Marsh from PolyTech forwarded to Lee Lawler another question from Mr. Testa at Philips, about the degradation of the foam it was using in its Recalled Devices.[65] Mr. Testa explained that Philips had "sent samples to a local lab for analysis."[66] The local lab concluded that the degradation was a result of cleavage of the bonds in the base polymer, and Mr. Testa stated that "[f]urther investigation concluded that prolonged exposure to high humidity causes the foam to degrade."[67] Mr. Testa noted that "[a]s the foam degrades it breaks down into small particulate" and asked whether the foam "maintain[s] its UL 94 Flame Resistance rating if it is broken down into particulate?"[68]

198. Mr. Lawler replied: "I am sure the degraded foam will not perform well in UL94 testing, though I cannot imagine how one would actually perform the test on such degraded material."[69]

199. On June 7, 2018, Mr. Testa at Philips again emailed Mr. Marsh at PolyTech:

---

[64] *See* Email from Bob Marsh at PolyTech to Lee Lawler at Burnett dated 5/4/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000067. Notably, PolyTech still advertises on its website that PE-PUR foam is resistant to heat and humidity. *See* https://www.polytechinc.com/products/polymer-acoustic-foam (last accessed June 16, 2022) ("Ester foams have superior physical properties and offer excellent resistance to heat, moisture, and chemicals.").

[65] *See* Email from Bob Marsh to Lee Lawler dated 5/23/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000066-67.

[66] *Id.* at WTB 000066.

[67] *Id.* at WTB 000067.

[68] *Id.*

[69] *See* Email from Lee Lawler to Bob Marsh dated 5/23/2018 (Lawler Aff. Exh. H) (Exhibit "C" hereto), at WTB 000066.

As we continue our investigation of the deterioration of the PAFS foam, a few questions has [*sic*] been posed regarding the material. Can you please reach out to your foam supplier regarding the following.

1. What is the actual composition of the polyurethane-ester foam PAFS-038? (CAS #s/percentages/weight percent/reactive groups etc. any chemistry is very appreciated)

2. What kind of diisocynate is used in the polyurethane foam synethesis process and how much?

3. Is diethylene glycol or another polyol utilized in the foam synthesis process?

4. Have you tested to see if all diisocyanate groups are reacted in your foam or are there unreacted groups even after manufacturing?[70]

200.    Mr. Marsh forwarded the questions to Mr. Lawler at Burnett, who asked why Mr. Testa needed this information. Mr. Marsh did not provide a definitive answer but said, "What Vince [Testa] told us is that they are investigating alternatives to polyurethane foam (ester and ether)."[71] Mr. Lawler ultimately did not answer Mr. Testa's questions because they touched on Burnett's confidential, proprietary information.

201.    On June 20, 2018, Philips closed CAPA INV 0988.[72] According to the FDA, Philips implemented "a preventative maintenance procedure for Trilogy devices, but Philips did not verify the effectiveness of this measure."[73] Yet "after CAPA INV 0988, Philips modified its CAPA procedures to include 'requirements to help ensure that CAPAs are fully complete [and] appropriately scoped,' and that 'processing the issue [that was the subject of CAPA INV 0988]

---

[70] *See* Email from Vincent Testa to Bob Marsh dated 6/7/2018 (Lawler Aff. Exh. I, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-11) (attached as Exhibit "D" hereto), at WTB 000076-77.

[71] *See* Email from Bob Marsh to Lee Lawler dated 6/14/2018 (Lawler Aff. Exh. I) (Exhibit "D" hereto), at WTB 000075.

[72] 483 Report at 15.

[73] 518(b) Notice at 8.

through the current CAPA program would have result[ed] in an appropriate horizontal assessment.'"[74]

202.    The FDA pointed out that Philips' informal CAPA INV[75] related to these Trilogy devices did "not include, investigate, or examine all of your firm's CPAP and BiPAP medical devices, which also include similar air path assemblies and/or the affected polyester polyurethane foam, which is susceptible to degradation."[76] But Philips had acknowledged to the FDA that it had "received approximately eighty complaints related to foam degradation, **on non-Trilogy ventilator devices**, from 2014 to 2017."[77]

203.    The FDA concluded that Philips had not "adequately established" procedures for initiating CAPA procedures.[78] Specifically, the FDA faulted Philips for not initiating a "formal" CAPA after receiving "various complaints alleging foam degradation in Trilogy ventilator devices" and then closing its informal investigation just two months later without "verify[ing] the effectiveness" of the limited "preventative maintenance procedure for Trilogy devices."[79]

204.    Philips continued to receive more information that suggested that the PE-PUR foam was prone to degradation. According to the FDA, "[a] follow-up email amongst your firm's [Philips'] personnel, dated 08/24/2018, states that testing confirmed that the affected foam breaks

---

[74] *Id.*

[75] The 483 Report explained that Philips's practice at the time was to first open CAPA requests—called "CAPA INVs"—as a precursor to a formal CAPA, but this could only occur if approved by a "CAPA Review Board" or delegate. *See* 483 Report at 14-15.

[76] *Id.* at 15.

[77] *Id.* at 16 (emphasis supplied).

[78] *Id.* at 14.

[79] 518(b) Notice at 8.

down in high heat and high humidity environments, which concurred with Trilogy ventilator related complaints . . . ."[80]

205.    Further, "[o]n December 12, 2018, several months after CAPA INV 0988 was closed, a report from additional testing conducted for Philips found that '[p]olyester polyurethane foam showed clear disintegration after 2 weeks."[81]

206.    Nonetheless, Philips continued manufacturing and selling the Recalled Devices containing PE-PUR foam.

### 3.    Philips Finally Opened A Formal CAPA In 2019 – But Did Not Initiate A Recall For Two More Years.

207.    In April 2019, Philips received two complaints that "sound abatement foam 'is degrading and entering the air path[.]'"[82]

208.    In response, in June 2019, Philips finally initiated a formal CAPA, numbered CAPA 7211, related to the issues associated with the PE-PUR foam. But as the FDA explains:

> Even then, that CAPA failed to evaluate all relevant data. Philips' search of FDA's Manufacturer and User Facility Device Experience (MAUDE) database in connection with CAPA 7211 identified only three medical device reports (MDRs) associated with potential foam degradation involving Trilogy ventilators between January 2011 and January 2021. Yet an MDR analysis conducted by Philips in 2018 had already identified 17 documented complaints related to foam degradation in Trilogy ventilators, and at least 14 of those 17 complaints had related MDRs. Similarly, Philips' analysis of foam degradation-related complaints conducted in connection with CAPA 7211 identified 1,254 complaints confirmed to be related to foam degradation between 2014 and April 2021 across all affected products, yet this analysis failed to include several complaints confirmed to be related to foam degradation in Trilogy ventilators that were documented in 2018 in connection with CAPA INV 0988.[83]

---

[80] 483 Report at 18.

[81] 518(b) Notice at 8.

[82] *Id.*

[83] *Id*. at 8-9.

209.     Philips continued to test the PE-PUR foam while the CAPA was underway. A Biological Risk Assessment dated July 2, 2020, found that "the biological and toxicological risks from exposure to degraded PE-PUR foam are of concern…."[84]

210.     Another internal "Biological Risk Assessment" dated December 10, 2020 – and "conducted as a result of field reports/complaints regarding degraded sound abatement foam in various CPAP and ventilator products"[85] – described the risks that degraded polyurethane foam posed to humans in no uncertain terms:

> The cytotoxicity and positive genotoxicity results observed from degraded PE-PUR foam samples **indicate a potential patient risk. Potential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure.** Overall, based on an understanding of the toxicological significance of the foam degradants and the results of the ISO 10993 testing to include mutagenic responses in both a bacterial and mammalian system, **the degraded PE-PUR foam is not considered biocompatible and presents a significant biological risk to those patient populations who are exposed to degraded PE-PUR foam.**[86]

211.     An additional Philips' Biocompatibility Risk Assessment dated January 11, 2021, concurred that degraded PE-PUR foam "presents a significant biological risk to patients," and goes on to state that "[p]otential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure."[87]

212.     Ultimately, in CAPA 7211, Philips concluded that "the cause of the foam degradation condition is long-term exposure to environmental conditions of high temperature combined with high humidity" and restated that "the cause of degradation was due to chemical

---

[84] 483 Report at 7; *see also id.* ("Philips Respironics Inc. (PRI) was made aware in May 2019 that four CPAP units were returned to a service center with degraded sound abatement foam.").

[85] *Id.* at 8.

[86] *Id.* at 7-8 (emphasis added).

[87] *Id.* at 8.

breakdown of the foam due to exposure to water caused by long-term exposure to environmental conditions."[88]

213.    Based on its investigation, the FDA concluded that Philips' upper management was aware of the foam degradation issues, discussed it at numerous management review meetings, and yet delayed doing anything about it:

> [F]irm management, including management with executive responsibility, were aware of potential foam degradation issues concerning CPAPs, BiPAPs, and Trilogy ventilators since at least 01/31/2020, or earlier, and implemented no further corrective actions until April 2021.

> Polyester polyurethane foam degradation issues concerning CPAPs, BiPAPs, and Trilogy Ventilators were discussed at all [redacted] management review meetings, since the 2019 [redacted], dated 01/31/2020 . . . . Additionally, your firm [Philips] became aware of this issue and related field complaints in at least 2015 or earlier.[89]

### D.    UNTIL THE RECALL, PHILIPS ADVERTISED ITS BREATHING MACHINES AS SAFE AND EFFECTIVE.

214.    At no point prior to April 2021, when Philips first disclosed foam issues to its shareholders, did Philips even hint that there was a dangerous condition in its CPAP, BiPAP, and ventilator Recalled Devices. Instead, Philips held itself out as a trusted brand and "global leader in the sleep and respiratory markets."[90] Its branding promises consumers that they will "[b]reath easier, sleep more naturally[.]"[91] Philips further assures consumers that its "sleep therapy systems are designed with the needs of care practitioners and patients in mind," and that its "quality systems reflect [Philips'] commitment to providing enhanced patient comfort," among other things. And it

---

[88] 518(b) Notice at 10.

[89] 483 Report at 24.

[90] http://www.respironics.com/product_library (last accessed June 16, 2022).

[91] *Id.*

has long advertised its CPAP and BiPAP Machines as "clinically proven" treatment for sleep disorders.[92]

215.   Philips boasts that it has the "most prescribed CPAP systems by U.S. sleep physicians."[93] The CPAP and BiPAP machines routinely cost from seven or eight hundred dollars to thousands of dollars per machine, and the ventilators cost more than several thousands of dollars per machine.

**E.   PHILIPS BELATEDLY RECALLED ITS DEFECTIVE DEVICES CONTAINING PE-PUR FOAM DUE TO THE SERIOUS HEALTH HAZARDS THAT THEY CAUSE.**

**1.   In April And May 2021, Philips Launched The DreamStation 2 And Tried To Convince Patients To Buy It, Without Initiating A Recall.**

216.   Two months prior to the Recall, Philips announced on April 13, 2021, that it was launching the DreamStation 2, a next-generation machine in its DreamStation product family. The DreamStation 2 does not contain PE-PUR foam.

217.   Less than two weeks after its launch of the DreamStation 2, on April 26, 2021, Philips announced that its previous generation DreamStation products posed serious health risks to users and, in the same release, Philips started trying to convince consumers to purchase its DreamStation 2 device:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone,* and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this

---

[92] https://www.usa.philips.com/healthcare/solutions/sleep (last accessed June 16, 2022).

[93] *See* https://www.usa.philips.com/healthcare/solutions/sleep/sleep-therapy (last accessed June 16, 2022) (citing 2016 Philips survey).

matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.[94]

218.     Philips' April 26, 2021 statement to investors did not disclose the full extent of its knowledge about the risks posed by the PE-PUR foam and attempted to deflect the blame on factors such as ozone cleaners. The FDA later rejected this notion, concluding that "***the unreasonable risk associated with the products was not caused by the use of ozone cleaning agents, nor did the use of ozone to clean the products constitute a failure to exercise due care.***"[95]

219.     Meanwhile, Philips continued to conduct tests that confirmed that its breathing products were defective.

220.     For example, on May 17, 2021, Ken Cole from RJ Lee, an industrial forensics analytical laboratory and scientific consulting firm, produced a presentation analyzing the foam in Philips' Trilogy EVO devices. The presentation states that the investigation was "prompted by staff observation of color variance across both current production and previous builds."[96]

221.     The analysis involved six samples of foam, two from units built in 2018 and four taken from Philips' current production stock in May 2021.[97] Some of the samples from 2021 showed "differing cell structure" which is an "[i]ndication of poor process control."[98] The 2021

---

[94] https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html (last accessed June 16, 2022).

[95] 518(b) Notice at 10 (emphasis in original).

[96] *See* RJ Lee Analysis Review of Trilogy EVO Foam (Lawler Aff. Exh. A, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-3) (attached as Exhibit "E" hereto), at (WTB 000001-03).

[97] *Id.* at WTB 000006.

[98] *Id.* at WTB 000008.

foam had "significant contaminants."[99] The foam was supposed to be ether-based,[100] but testing revealed indications that some of the foam was actually ester-based.[101]

### 2.  In June 2021, Philips Finally Recalled Its Defective Devices.

222.   Finally, on June 14, 2021, Philips issued a recall notice directed to its customers in the United States, stating:

> To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone,** and high heat and high humidity environments may also contribute to foam degradation.

> Therefore, Philips has decided to voluntarily issue a recall notification* to inform patients and customers of potential impacts on patient health and clinical use related to this issue, as well as instructions on actions to be taken.[102]

223.   Philips stated that "[t]he majority of the affected devices within the advised 5-year service life are in the first-generation DreamStation product family."[103] Philips elaborated:

> Based on the latest analysis of potential health risks and out of an abundance of caution, the recall notification advises patients and customers to take the following actions:

> For patients using affected BiLevel PAP and CPAP devices: Discontinue use of your device and work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment. To continue use of your device due to lack of alternatives, consult with your physician

---

[99] *Id.* at WTB 000009; *see also* WTB 000010 ("Indication of poor process control and/or contamination.").

[100] *Id.* at WTB 000002.

[101] *Id.* at WTB 000013.

[102] Recall Notices (Exhibit "A" hereto).

[103] *Id.*

to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.

For patients using affected life-sustaining mechanical ventilator devices: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.

**Possible health risks**

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.[104]

224.    On the same day as the Recall, Philips provided additional information in an announcement entitled "Clinical information for physicians," that explained that the foam breakdown "may lead to patient harm and impact clinical care."[105] It added the following:

While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, *it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.*[106]

---

[104] *Id.*

[105] Sleep and respiratory care update: Clinical information for physicians: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed June 16, 2022) (emphasis added).

[106] Sleep and respiratory care update: Clinical information for physicians: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed June 16, 2022) (emphasis added).

225.    The announcement detailed two types of hazards from the foam in the devices.

First, the announcement described dangers due to foam degradation exposure:

> **Potential Hazard:** Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation.
>
> The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:
>
> - Toluene Diamine
>
> - Toluene Diisocyanate
>
> - Diethylene glycol[107]

226.    Millions of patients across the United States, including all of the individual Named Plaintiffs, used and trusted the Recalled Devices. Philips has now revealed that the PE-PUR foam in their breathing machines degrades and exposes patients to toxic particles and gasses.

227.    That the patients using the Recalled Devices were exposed to toxic and poisonous chemicals is not reasonably in dispute. According to the Report on Carcinogens, Fifteenth Edition, by the National Toxicology Program in the United State Department of Health and Human Services,[108] toluene diisocyanates are reasonably anticipated to be human carcinogens based on sufficient evidence of carcinogenicity from studies in experimental animals. Administration of commercial-grade toluene diisocyanate (analyzed as 85% 2,4 isomer and 15% 2,6 isomer) by stomach tube caused liver tumors (hepatocellular adenoma) in female rats and mice, benign tumors

---

[107] *Id.*

[108] https://ntp.niehs.nih.gov/ntp/roc/content/zip15.zip (last accessed June 16, 2022).

of the mammary gland (fibroadenoma) and pancreas (islet-cell adenoma) in female rats, and benign tumors of the pancreas (acinar-cell adenoma) in male rats. It also increased the combined incidences of benign and malignant tumors of subcutaneous tissue (fibroma and fibrosarcoma) in rats of both sexes and of the blood vessels (hemangioma and hemangiosarcoma) in female mice.

228.    The Report also notes that toluene diisocyanates are used primarily to manufacture flexible polyurethane foams for use in furniture, bedding, and automotive and airline seats. The foam in Philips' Recalled Devices is flexible polyurethane foam.

229.    Toluene diamine ("TDA") is classified by the United States Environmental Protection Agency ("EPA") as a probable human carcinogen. The EPA also determined that acute exposure to TDA can produce severe skin and eye irritation, sometimes leading to permanent blindness, respiratory problems (e.g., asthma), rise in blood pressure, dizziness, convulsions, fainting, and coma.

230.    The European Union warns that toluene diisocyanate is "fatal if inhaled"[109] and has concluded that toluene diamine "cannot be considered safe for use" even as a hair dye, let alone breathed into the lungs for many hours each night.[110]

231.    Diethylene glycol ("DEG") is a widely used solvent, but there is limited information about its toxicity in humans, despite its historical involvement in mass poisonings around the world. Famously, DEG caused the death of 100 people across 15 states in the 1937

---

[109] https://echa.europa.eu/substance-information/-/substanceinfo/100.043.369 (last accessed June 16, 2022).

[110] https://ec.europa.eu/health/scientific_committees/consumer_safety/docs/sccs_o_093.pdf (last accessed June 16, 2022), at 5.

Elixir Sulfanilamide Incident, which served as a catalyst for the enactment of the Federal Food, Drug, and Cosmetic Act in 1938.[111]

232.    Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)." The PE-PUR foam is black, and when it breaks down, it can release black particles.[112]

233.    Philips concluded in its Health Hazard Evaluations ("HHEs") regarding the foam degradation risk that "[b]ased on the cytotoxicity and genotoxicity results and toxicological risk assessment, combined with [the] conclusion that particles are likely to reach the upper airway and potentially the lower respiratory track, a reasonable worst-case estimate for the general and higher risk (e.g., patient populations with preexisting conditions or comorbidities) patient populations is a severity level 3 (Crucial) for both short/intermediate and long term exposure."[113]

234.    Philips' HHEs note that the harm due to foam degradation "'may not be immediately recognizable and may not be something that the customer would/could report,' adding that certain harms 'may not be easily linked to the hazardous situation or device use in general'— and that in the case of genetic mutations in particular, 'a presumed lag time from exposure to harm development may make it difficult for patients to attribute their individual harm to the device usage.'"[114]

---

[111] https://www.fda.gov/files/about%20fda/published/The-Sulfanilamide-Disaster.pdf (last accessed June 16, 2022).

[112] Sleep and respiratory care update: Clinical information for physicians: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed June 16, 2022).

[113] 518(b) Notice at 3-4.

[114] *Id.* at 5.

235.    The second hazard is the possibility of VOCs, that is, chemical emissions from the

PE-PUR foam. Philips explained:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long-term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> - Dimethyl Diazine
>
> - Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)-[115]

236.    Philips admitted that the risks of these VOCs include: "irritation and airway

inflammation, and this may be particularly important for patients with underlying lung diseases or

reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness,

irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and

carcinogenic effects," as well as "adverse effects to other organs such as kidney and liver."[116]

237.    Corroborating the dangerous nature of the Recalled Devices, on July 22, 2021, the

FDA upgraded Philips' recall of the Recalled Devices to its most serious classification, Class I,

which according to the FDA means: "A situation in which there is a reasonable probability that

the use of or exposure to a violative product will cause serious adverse health consequences or

death."[117]

---

[115] Sleep and respiratory care update: Clinical information for physicians: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed June 16, 2022).

[116] *Id.*

[117] https://www.fda.gov/safety/industry-guidance-recalls/recalls-background-and-definitions (last accessed June 16, 2022).

238.   Also, on June 14, 2021, Philips' main competitor, ResMed, issued "[a] message from ResMed's CEO" to the public regarding the Philips Recall. In this notice, ResMed CEO, Mick Farrell, stated that "ResMed devices are safe to use and are not subject to Philips' recall. ResMed devices use a different material than what Philips uses in their recalled machines."[118]

239.   ResMed PAP devices and ventilators use polyether polyurethane or silicone-based foam for sound abatement purposes, not PE-PUR foam.[119]

240.   On July 8, 2021, Philips released a global supplemental clinical information document that was based on their own testing of the affected devices, stating that, "According to analysis performed by Philips, the majority of particulates are of a size (>8 μm) . . . Smaller particulates (<1-3 μm) are capable of diffusing into deep lung tissue and deposit into the alveoli. During testing performed by an outside laboratory on lab degraded foam, the smallest particulate size identified was 2.69 μm."[120] The Environmental Protection Agency (EPA) notes that exposure to particles less than 10 micrometers can be linked to a variety of health problems including: aggravated asthma, decreased lung function, increased respiratory symptoms, and cardiac related diseases."[121]

241.   The purity of the air coming from a breathing device to a patient is highly important and material to a typical patient. Philips advertises the filtration systems in its devices, for example,

---

[118]  https://www.resmed.com/en-us/healthcare-professional/other-manufacturer-recall-2021/  (last accessed June 16, 2022).

[119] https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed June 16, 2022).

[120] Sleep and Respiratory Care update Clinical information (July 8, 2021), accessible at philips-global-supplemental-clinical-information-document.pdf (last accessed June 16, 2022).

[121] https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last accessed June 16, 2022).

noting them on a diagram in its DreamStation Family Brochure.[122] Philips' filtration system, however, does not filter out the particles and VOCs described above.

242.   As noted here, Philips has admitted that the Recalled Devices are defective and unsafe. Plaintiffs and the Class have suffered injuries as a result of their purchase or lease of the Recalled Devices, including substantial economic losses related to their purchase or lease of the Recalled Devices and accessories, and replacement machines and accessories, and losses from not being able to use their machines, and other consequential damages.

### F.   PHILIPS' INEFFECTIVE MEASURES TO RECALL THE DEVICES

243.   Philips' CEO, Frans van Houten, stated in the Recall announcement: "We deeply regret any concern and inconvenience that patients using the affected devices will experience because of the proactive measures we are announcing today to ensure patient safety."[123]

244.   But Philips' "recall" was a recall in name only and did not effectively provide patients with notice of the risks of the Recalled Devices or with new Philips CPAP, BiPAP, or ventilator devices.

---

[122] https://www.documents.philips.com/assets/20180205/15ef65ad106d4ddc88fca87e0134dc60.pdf?_gl=1*1l6jo9f*_ga*MTM1OTI5NDM5Ny4xNjIzODE3MzMz*_ga_2NMXNNS6LE*MTYyNjkxMDEyNC4yMi4xLjE2MjY5MTQyNTkuMjc.&_ga=2.220564312.1106063144.1626914226-1359294397.1623817333 (last accessed June 16, 2022).

[123] https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed June 16, 2022).

1.     **Many Patients, Providers, And Others Were Not Notified About The Recall.**

245.    On March 10, 2022, the FDA issued a Notification Order under § 518(a) of the FDCA.[124] The Notification Order stated that the "FDA has received a number of calls from patients and consumers who contacted FDA to report problems and/or concerns regarding the Recalled Products, but were unaware of the recall and had not been informed of the health risks presented by the Recalled Devices."[125]

246.    The FDA estimated that, after nine months of the Recall, "approximately 50% of patients and consumers who have purchased or received the Recalled Products (excluding ventilators) within the last five years (the service life of the devices) have registered with Philips to obtain a replacement device."[126] But it was "unclear whether the remaining patients and consumers have not registered because they are unaware of the need to register, or because they do not want or need a replacement device from Philips."[127]

247.    The FDA surveyed 182 consignees to determine whether they had been notified of the Recall and found 28 "who had reported to FDA that they were not aware of the recall."[128] The FDA reported its results to Philips on September 8 and October 29, 2021, and Philips did not respond. On November 22, 2021, Philips stated that it had notified 23 of the 28 consignees of the Recall, but Philips did not "indicate whether the consignees identified by FDA had been sent notification before, or only after, they had been identified by FDA as being unaware of the

---

[124] https://www.fda.gov/media/156811/download (last accessed June 16, 2022).

[125] 518(a) Notification Order at 2.

[126] *Id.*

[127] *Id.*

[128] *Id.*

recall."[129] Moreover, Philips' evidence of notification consisted of delivery confirmation receipts, reflecting that written correspondence was delivered to the consignees. As the FDA explained, "[t]ypically, firms demonstrate the effectiveness of its recall communications through evidence more meaningful than a delivery confirmation receipt, such as a returned response form or a documented telephone conversation."[130]

248.     Throughout the Recall, the FDA "on multiple occasions has informed Philips that FDA was concerned that Philips' efforts to notify patients and consumers, healthcare providers, and consignees regarding the recall have been insufficient" and has expressed concern that "it is likely that a significant portion of patients and consumers using the Recalled Products are unaware of the health risks presented by those products."[131]

249.     Noting "Philips' failure to timely provide effective notice to health professionals who prescribe or use the Recalled Products and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products," the FDA issued an order under Section 518(a) of the FDCA ordering Philips to "notify all health professionals who prescribe or use the Recalled Products, and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products **within the next 45 days**[.]"[132]

---

[129] *Id.*

[130] *Id.* at 3.

[131] *Id.*

[132] *Id.* at 4 (emphasis in original).

## 2. Philips' Repair/Replacement Program Has Been Extremely Slow.

250.     Those patients who registered their Recalled Devices with Philips for the Recall did not immediately receive replacement devices and were not told when a replacement device would be provided.

251.     As Philips' June 14, 2021 announcement explained:

**Repair and replacement program**

Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already begun the preparations, which include obtaining the relevant regulatory clearances. Philips aims to address all affected devices in scope of this correction as expeditiously as possible.

As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.[133]

252.     In reality, patients may register their DreamStation Recalled Device with Philips for the Recall, but Philips has not immediately replaced the defective PE-PUR foam in the DreamStation Recalled Devices. Rather, patients have had to wait, sometimes for many months, for Philips to repair or replace their devices, and many patients are still waiting for a replacement device.

253.     As of the date of this Complaint—about one year after the Recall was announced—Philips continues to repair or replace defective DreamStation 1 Recalled Devices. In other words, the Recall remains ongoing.

---

[133] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/philips-issues-recall-notification-mitigate-potential-health-risks-related-sound-abatement-foam (last accessed June 16, 2022).

254.     The replacement program for the Trilogy devices has been even slower. Philips has only just begun the rework of affected Trilogy 100/200 devices and Philips projects that the process will take approximately 12-14 months to complete.[134]

255.     There is no repair or replacement program for any of the other Recalled Devices recalled by Philips.

256.     Due to the design of the Recalled Devices, it is prohibitively difficult for patients to remove or replace the PE-PUR foam themselves. Also, the FDA warns:

> Do **not** try to remove the foam from your device. Trying to or successfully removing the foam may damage the device or change how the device works. It may also lead to more foam or chemicals entering the air tubing of the device.[135]

257.     As a result, the Recall leaves patients without safe, free options. Instead, patients may simply be forced to buy Philips' next-generation product or a competitor's product—at full price, and indeed, thousands of patients, including some of the Named Plaintiffs, have already done so.

258.     Thus, Philips intends to, and is, simply profiting from its so-called "recall" by selling more of its next generation product, the DreamStation 2, to affected patients. It appears that Philips intentionally timed the "recall" to coincide with the launch of the DreamStation 2.

259.     The FDA also believes that the Recall is not proceeding quickly enough. It recently stated:

> Based on the status of Philips' recall as of the date of this letter [May 2, 2022], CDRH believes that, if an order were to be issued to Philips under section 518(b), the plan submitted by Philips in response to that order should provide for significant improvements to Philips' ongoing repair and replacement activities to speed the

---

[134] https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/ventilation-news-and-updates (last accessed June 16, 2022).

[135] https://www.fda.gov/medical-devices/safety-communications/faqs-philips-respironics-ventilator-bipap-machine-and-cpap-machine-recalls (emphasis in original) (last accessed June 16, 2022).

pace of remediation and address other deficiencies identified by CDRH and communicated to Philips, to the extent such improvements are achievable by Philips.[136]

## V. CLASS ALLEGATIONS

260.     Plaintiffs bring this action individually and as a class action, pursuant to Fed. R.

Civ. P. 23(a) and 23(b)(3). Specifically, the Class consists of the following:

> **Nationwide Class:** All persons or entities in the United States who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

261.     Alternatively, and in addition, Plaintiffs seek certification on behalf of subclasses

defined as more fully set forth below and collectively referred to as the "State Subclasses."

262.     Plaintiffs Goodenough, Gothard, Penberthy, Lake Martin, and Elmore seek

certification on behalf of a subclass defined as follows ("Alabama Subclass"):

> **Alabama Subclass:** All persons or entities in Alabama who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

263.     Plaintiff ASEA Health Trust seeks certification on behalf of a subclass defined as

follows ("Alaska Subclass"):

> **Alaska Subclass:** All persons or entities in Alaska who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

264.     Plaintiffs Groudan and Gilliard-Gunter seek certification on behalf of a subclass

defined as follows ("Arizona Subclass"):

> **Arizona Subclass:** All persons or entities in Arizona who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

265.     Plaintiffs Autry and Melcher seek certification on behalf of a subclass defined as

follows ("Arkansas Subclass"):

> **Arkansas Subclass:** All persons or entities in Arkansas who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

---

[136] 518(b) Notice at 13.

266.     Plaintiffs Bailey, Bastasch, Campbell, Luenebrink, Mest, Mitrovich, Nielson, and

Waybright seek certification on behalf of a subclass defined as follows ("California Subclass"):

> **California Subclass:** All persons or entities in California who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

267.     Plaintiff Archuleta seeks certification on behalf of a subclass defined as follows

("Colorado Subclass"):

> **Colorado Subclass:** All persons or entities in Colorado who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

268.     Plaintiffs Gottlieb, Leavenworth, Rohan, and Toscano seek certification on behalf

of a subclass defined as follows ("Connecticut Subclass"):

> **Connecticut Subclass:** All persons or entities in Connecticut who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

269.     Plaintiff George seeks certification on behalf of a subclass defined as follows

("Delaware Subclass"):

> **Delaware Subclass:** All persons or entities in Delaware who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

270.     Plaintiffs Dzierzanowski, Fields, and Barbara Smith seek certification on behalf of

a subclass defined as follows ("Florida Subclass"):

> **Florida Subclass:** All persons or entities in Florida who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

271.     Plaintiffs Fisher, Fultz, Lewis, Luke, Mercure, and Merrell seek certification on

behalf of a subclass defined as follows ("Georgia Subclass"):

> **Georgia Subclass:** All persons or entities in Georgia who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

272.     Plaintiff Brown seeks certification on behalf of a subclass defined as follows

("Hawaii Subclass"):

**Hawaii Subclass:** All persons or entities in Hawaii who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

273.   Plaintiffs Diamond and Savoure seek certification on behalf of a subclass defined as follows ("Idaho Subclass"):

**Idaho Subclass:** All persons or entities in Idaho who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

274.   Plaintiffs Baran, Brooks, and Rootberg seek certification on behalf of a subclass defined as follows ("Illinois Subclass"):

**Illinois Subclass:** All persons or entities in Illinois who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

275.   Plaintiffs Diane Anderson, Clark, Dusza, and Stephen Smith seek certification on behalf of a subclass defined as follows ("Indiana Subclass"):

**Indiana Subclass:** All persons or entities in Indiana who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

276.   Plaintiffs Abarr and Wilson seek certification on behalf of a subclass defined as follows ("Iowa Subclass"):

**Iowa Subclass:** All persons or entities in Iowa who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

277.   Plaintiffs Cathers and Fisher seek certification on behalf of a subclass defined as follows ("Kansas Subclass"):

**Kansas Subclass:** All persons or entities in Kansas who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

278.   Plaintiffs Coleman and Ratliff seek certification on behalf of a subclass defined as follows ("Kentucky Subclass"):

**Kentucky Subclass:** All persons or entities in Kentucky who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

279.     Plaintiffs Baudoin, Gilliard-Gunter, Susan Martin, Minnifield, and Romas seek certification on behalf of a subclass defined as follows ("Louisiana Subclass"):

**Louisiana Subclass:** All persons or entities in Louisiana who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

280.     Plaintiffs Peter Barrett, Julie Barrett, Margoles, and Schwartz seek certification on behalf of a subclass defined as follows ("Maine Subclass"):

**Maine Subclass:** All persons or entities in Maine who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

281.     Plaintiff Goodall seeks certification on behalf of a subclass defined as follows ("Maryland Subclass"):

**Maryland Subclass:** All persons or entities in Maryland who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

282.     Plaintiffs Bellotti and Conley seek certification on behalf of a subclass defined as follows ("Massachusetts Subclass"):

**Massachusetts Subclass:** All persons or entities in Massachusetts who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

283.     Plaintiffs McGuire and Wilks seek certification on behalf of a subclass defined as follows ("Michigan Subclass"):

**Michigan Subclass:** All persons or entities in Michigan who purchased, otherwise acquired, or leased a Recalled Device but did not resell it

284.     Plaintiff Boudreau seeks certification on behalf of a subclass defined as follows ("Minnesota Subclass"):

**Minnesota Subclass:** All persons or entities in Minnesota who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

285.     Plaintiffs Godeaux and Tucker seek certification on behalf of a subclass defined as follows ("Mississippi Subclass"):

> **Mississippi Subclass:** All persons or entities in Mississippi who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

286.    Plaintiff Young seeks certification on behalf of a subclass defined as follows ("Missouri Subclass"):

> **Missouri Subclass:** All persons or entities in Missouri who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

287.    Plaintiff David seeks certification on behalf of a subclass defined as follows ("Montana Subclass"):

> **Montana Subclass:** All persons or entities in Montana who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

288.    Plaintiff Lemus seeks certification on behalf of a subclass defined as follows ("Nevada Subclass"):

> **Nevada Subclass:** All persons or entities in Nevada who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

289.    Plaintiffs Lizotte, Malone, and Vlahos seek certification on behalf of a subclass defined as follows ("New Hampshire Subclass"):

> **New Hampshire Subclass:** All persons or entities in New Hampshire who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

290.    Plaintiffs Dennis, Ryan, and Taylor seek certification on behalf of a subclass defined as follows ("New Jersey Subclass"):

> **New Jersey Subclass:** All persons or entities in New Jersey who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

291.    Plaintiff Rodgers seeks certification on behalf of a subclass defined as follows ("New Mexico Subclass"):

> **New Mexico Subclass:** All persons or entities in New Mexico who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

292. Plaintiffs Bossey, Diaz, Ginsberg, Gold, and Woodward seek certification on behalf of a subclass defined as follows ("New York Subclass"):

> **New York Subclass:** All persons or entities in New York who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

293. Plaintiffs Bartalo, Margoles, and Radack seek certification on behalf of a subclass defined as follows ("North Carolina Subclass"):

> **North Carolina Subclass:** All persons or entities in North Carolina who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

294. Plaintiff Frenzel-Drew seeks certification on behalf of a subclass defined as follows ("North Dakota Subclass"):

> **North Dakota Subclass:** All persons or entities in North Dakota who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

295. Plaintiffs Flick, Fultz, Giordano, Hock, Stefanini, and Ward seek certification on behalf of a subclass defined as follows ("Ohio Subclass"):

> **Ohio Subclass:** All persons or entities in Ohio who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

296. Plaintiff Mcelyea seeks certification on behalf of a subclass defined as follows ("Oklahoma Subclass"):

> **Oklahoma Subclass:** All persons or entities in Oklahoma who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

297. Plaintiffs Julie Barrett, Peter Barrett, and Nielson, seek certification on behalf of a subclass defined as follows ("Oregon Subclass"):

> **Oregon Subclass:** All persons or entities in Oregon who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

298. Plaintiffs Masington, Matthew Smith, and Sweeney seek certification on behalf of a subclass defined as follows ("Pennsylvania Subclass"):

**Pennsylvania Subclass:** All persons or entities in Pennsylvania who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

299.    Plaintiff Bonano seeks certification on behalf of a subclass defined as follows ("Puerto Rico Subclass"):

**Puerto Rico Subclass:** All persons or entities in Puerto Rico who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

300.    Plaintiffs Lamontagne and Weiner seeks certification on behalf of a subclass defined as follows ("Rhode Island Subclass"):

**Rhode Island Subclass:** All persons or entities in Rhode Island who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

301.    Plaintiffs William Anderson and Diaz seek certification on behalf of a subclass defined as follows ("South Carolina Subclass"):

**South Carolina Subclass:** All persons or entities in South Carolina who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

302.    Plaintiffs Craig and Hill seek certification on behalf of a subclass defined as follows ("Tennessee Subclass"):

**Tennessee Subclass:** All persons or entities in Tennessee who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

303.    Plaintiffs Deleon, Lowney, Malone, Panzera, Phillips, Polk, and Tobin seek certification on behalf of a subclass defined as follows ("Texas Subclass"):

**Texas Subclass:** All persons or entities in Texas who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

304.    Plaintiff David Martin seeks certification on behalf of a subclass defined as follows ("Vermont Subclass"):

**Vermont Subclass:** All persons or entities in Vermont who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

305.    Plaintiffs Heilman, Hudson, Rodgers, and Rose seek certification on behalf of a subclass defined as follows ("Virginia Subclass"):

> **Virginia Subclass:** All persons or entities in Virginia who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

306.    Plaintiffs Lopez and Peebles seek certification on behalf of a subclass defined as follows ("Washington Subclass"):

> **Washington Subclass:** All persons or entities in Washington who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

307.    Plaintiffs Bays and Hamlin seek certification on behalf of a subclass defined as follows ("West Virginia Subclass"):

> **West Virginia Subclass:** All persons or entities in West Virginia who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

308.    Plaintiff Matters seeks certification on behalf of a subclass defined as follows ("Wisconsin Subclass"):

> **Wisconsin Subclass:** All persons or entities in Wisconsin who purchased, otherwise acquired, or leased a Recalled Device but did not resell it.

309.    Plaintiffs also seek to represent the claims of:  All persons or entities in the District of Columbia ("D.C. Subclass"), Nebraska ("Nebraska Subclass"), South Dakota ("South Dakota Subclass"), Utah ("Utah Subclass"), and Wyoming ("Wyoming Subclass") who purchased, otherwise acquired, or leased a Recalled Device but did not resell it. The claims of persons and entities in the District of Columbia, Nebraska, South Dakota, Utah, and Wyoming share common questions of fact and law that predominate over any individualized issues.

310.    Together, the Nationwide Class and the Subclasses shall collectively be referred to herein as the "Class." Excluded from the Class are Defendants and their employees, officers, and directors; and the Judge(s) assigned to this case.

311.    Plaintiffs reserve the right to adjust, modify, or narrow the Class prior to class certification.

312.    The rights of each member of the Class were violated in a similar fashion based upon Defendants' uniform actions.

313.    This action has been brought and may be properly maintained as a class action for the following reasons:

a.    <u>Numerosity</u>: Members of the Class are so numerous that their individual joinder is impracticable. The proposed Class contains at least millions of individuals who purchased, otherwise acquired, or leased a Recalled Device. The Class is therefore sufficiently numerous to make joinder impracticable, if not impossible. The precise number of Class members is unknown to Plaintiffs at this time, but the Class members are readily ascertainable and can be identified by Philips' records and records of third parties, such as durable medical equipment providers.

b.    <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions affecting only individual Class members. These common legal and factual questions include, without limitation:

i.    Whether Defendants violated RICO by selling the Recalled Devices;

ii.    Whether Defendants were unjustly enriched by the sale of Recalled Devices;

iii.    Whether Defendants failed to warn consumers regarding the risks of the Recalled Devices;

87

iv.      Whether Philips violated express or implied warranties in selling the Recalled Devices;

v.       Whether Philips' practices constitute unfair or deceptive acts or practices under state consumer protection statutes;

vi.      The appropriate nature of class-wide equitable relief;

vii.     The appropriate measurement of restitution and/or measure of damages to Plaintiffs, and members of the Class;

viii.    The appropriate measure of statutory damages; and

ix.      Whether Plaintiffs are entitled to punitive damages.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

c.       Typicality: Plaintiffs' claims are typical of the claims of all members of the Class.

d.       Adequacy: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class that they seek to represent; they have retained counsel competent and highly experienced in complex class action litigation and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

e.       Superiority: A class action is superior to other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injury suffered by each Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class to individually and effectively redress the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments.

Individualized litigation also increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.

## VI.    EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

314.    The running of any statute of limitations has been equitably tolled by Defendants' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiffs and their physicians the true risks associated with the Recalled Devices.

315.    As a result of Defendants' actions, Plaintiffs were unaware, and could not have reasonably known or learned through reasonable diligence, that they had been exposed to the risks and harms set forth here and that those risks and harms were the direct and proximate result of Defendants' acts and omissions.

## VII.    CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(C), AGAINST PHILIPS AND POLYTECH
### On behalf of the Nationwide Class and all Subclasses[137]

316.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

317.    This claim is brought by Plaintiffs against Philips and PolyTech (within this claim, the "RICO Defendant(s)") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq*.

---

[137] Plaintiffs will submit a RICO case statement pursuant to Local R. Civ. P. 7.1.B within 14 days.

318.     Pursuant to 18 U.S.C. § 1962(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

319.     At all relevant times, each RICO Defendant is and has been a "person" under 18 U.S.C. § 1961(3) because each was capable of holding "a legal or beneficial interest in property."

320.     Philips and PolyTech each violated 18 U.S.C. § 1962(c) and injured the business or property of the Plaintiffs and the Nationwide Class. Plaintiffs are each a "person," as defined in 18 U.S.C. § 1961(3). Further, Plaintiffs have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

a.     **The Philips-PolyTech Enterprise Was An Association-In-Fact Enterprise With A Common Purpose To Conceal The Health And Safety Risks Of The Recalled Devices.**

321.     Philips and PolyTech conducted or participated in the affairs of an "association-in-fact enterprise"—*i.e.*, the Philips-PolyTech Enterprise —through a pattern of racketeering activity (stemming from the predicate racketeering acts of mail and wire fraud) in violation of 18 U.S.C. § 1962(c). The Philips-PolyTech Enterprise engaged in this pattern of illegal activities in furtherance of its common purpose to unlawfully defraud and mislead the FDA, prescribers, third-party payors, hospitals, and consumers about the safety of the Recalled Devices. In so doing, each of the RICO Defendants knowingly conducted and participated in mail and wire fraud in violation of 18 U.S.C. ¶¶ 1962(c) and (d).

322.    The Philips-PolyTech Enterprise included Philips and PolyTech, as well as other nonparty individuals and corporations, including Paramount Die. Discovery will likely reveal additional members of the Philips-PolyTech Enterprise that are not currently known to Plaintiffs.

323.    Each RICO Defendant participated in the Philips-PolyTech Enterprise, played a distinct role in furthering the enterprise's common purpose of increasing profits and knowingly concealed information about the safety of the Recalled Devices.

324.    Specifically, the RICO Defendants worked together to coordinate the enterprise's goals, conceal the existence of the enterprise, and conceal their individual roles. Further, each of the RICO Defendants were linked through their business relationships and continuing coordination of activities. This business relationship facilitated the formation of a common purpose among the RICO Defendants, who each agreed to participate in the conduct of the Philips-PolyTech Enterprise. Specifically, each RICO Defendant played a critical role in producing the Recalled Devices, concealing the Recalled Devices' defective condition and selling the devices to third-party payors, hospitals and consumers.

325.    At all relevant times, the Philips-PolyTech Enterprise: (i) had an existence that was separate and distinct from the individual RICO Defendants and their members; (ii) was separate and distinct from the pattern of racketeering in which the individual RICO Defendants engaged; (iii) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the RICO Defendants; (iv) was characterized by business relationships between and among each RICO Defendant; and (v) had sufficient longevity for the enterprise to pursue its common purpose and function as a unit.

326.    The RICO Defendants participated in the conduct of the Philips-PolyTech Enterprise through a pattern of racketeering activity that employed the use of mail and wire

facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).  This was done to increase profits by hiding and misrepresenting the dangers associated with the Recalled Devices.

327.    The Philips-PolyTech Enterprise engaged in and affected interstate commerce because it manufactured, marketed, sold, or provided the Recalled Devices to millions of individuals throughout the United States.

       b.    **The Philips-PolyTech Enterprise Had A Common Purpose.**

328.    The Philips-PolyTech Enterprise came together for the common purpose to perpetuate a fraudulent scheme to conceal from patients, prescribers, third-party payors, hospitals, and the FDA the true health and safety risks associated with the Recalled Devices and PE-PUR foam. This concealment was aimed to allow the Enterprise participants to profit, continue to profit, and retain profits from the sale of Recalled Devices.

329.    By knowingly concealing and minimizing the defect, the RICO Defendants could represent the Recalled Devices as being safe and effective, including through omitting information to the contrary. This false representation resulted in significant sales and revenue generated from the sale of defective Recalled Devices. Concealing and minimizing the defect also allowed the RICO Defendants to avoid or limit the substantial costs and reputational harm associated with a recall, repair or replacement of the Recalled Devices.

330.    Each of the RICO Defendants profited, directly or indirectly, from the scheme. These profits were substantially greater than they would have been if the defect and true risks of the Recalled Devices had been disclosed.

       a.    Philips profited directly from the sales of the Recalled Devices, which resulted from the Enterprise's deception of consumers, prescribers, third-party payors, hospitals, and the FDA.

92

b.     Likewise, PolyTech profited from the sale of the Recalled Devices that contained the PE-PUR foam cut and sold by PolyTech.

c.     Paramount Die likewise profited from the sale of the Recalled Devices that contained the PE-PUR foam modified by Paramount Die for use in the Recalled Devices.

331.   Because the RICO Defendants' ability to profit from this scheme depended on the prescription and sale of the Recalled Devices, the Philips-PolyTech Enterprise needed to ensure complete allegiance to a false premise: that the Recalled Devices were safe and effective. For this scheme to work, it was essential for the Philips-PolyTech Enterprise to conceal the Defect from the FDA, because the agency could otherwise investigate, recall the devices, and notify the public of the Defect. The expense of a recall and the resulting inability to sell the defective Recalled Devices would undermine the profitability of the scheme.

332.   This common purpose served the interests of all of the RICO Defendants.

c.     **The Philips-PolyTech Enterprise Had An Ongoing Organization.**

333.   The RICO Defendants, in concert with the other Enterprise participants, created and maintained systematic links toward this common purpose, *i.e.*, to manufacture, market, and sell the Recalled Devices while concealing their health and safety risks.

334.   The Philips-PolyTech Enterprise continued for several years, at least from 2015 to the present. During this time, the RICO Defendants remained stable, with Philips, PolyTech, and Paramount Die actively producing, marketing, and selling the defective Recalled Devices.

335.   The RICO Defendants exerted control over the Enterprise and have coordinated and participated in the operation or management of Enterprise affairs. At the same time, the RICO

Defendants were and are separate entities existing outside the Enterprise. The RICO Defendants' independent existences are demonstrated by the following:

    a.    During the relevant period, Philips contemporaneously designed, manufactured and sold many medical devices and products separate and apart from the Recalled Devices.

    b.    During the relevant period, PolyTech contemporaneously sold and distributed many other noise abatement products aside from the PE-PUR foam used in the Recalled Devices.

    c.    During the relevant period, Paramount Die contemporaneously provided cutting services for rubber, foam, plastic and other materials apart from the PE-PUR foam used in the Recalled Devices.

336.    The RICO Defendants also occupied delineated roles that furthered the organization's goals. Each RICO Defendant performed important but separate roles within the Philips-PolyTech Enterprise organization.

337.    Philips participated in the conduct of the Enterprise when it, among other things:

    a.    Designed, marketed, manufactured, and sold the Recalled Devices;

    b.    Coordinated with PolyTech and Paramount Die to select and order the PE-PUR foam to use for sound abatement in the Recalled Devices;

    c.    Downplayed, ignored, and failed to investigate issues of foam degradation in its devices using PE-PUR foam for sound abatement, including failing to perform and document required risk analyses;

    d.    Obscured and minimized the defect in the Recalled Devices by misleadingly blaming other factors, such as the use of ozone cleaners, when faced with

recurring evidence of serious problems (*e.g.*, including consumer complaints of "black dust" and related issues);

e.    Communicated and coordinated regularly with PolyTech about known instances of foam degradation and consumer complaints for devices with PE-PUR foam, beginning at least as early as 2015;

f.    Failed to implement a preventative maintenance procedure for Trilogy ventilator devices with PE-PUR foam that a Philips entity successfully instituted in Japan;

g.    Concealed that the Recalled Devices were equipped with defective PE-PUR foam that could degrade and emit dangerous VOCs; and

h.    Collected revenue flowing from the sale of the Recalled Devices.

338.    PolyTech participated in the conduct of the Enterprise when it, among other things:

a.    Obtained bulk PE-PUR foam from Burnett, and cut, shipped, and sold PE-PUR foam for installation in the Recalled Devices;

b.    Disregarded specific warnings from Burnett about PE-PUR foam, and continued to obtain and sell the defective PE-PUR foam for use in the Recalled Devices;

c.    Relayed communications from Philips to Burnett, including as to questions about the PE-PUR foam chemistry and the safety risks, field issues, and testing for the Recalled Devices;

d.    Concealed that the Recalled Devices were equipped with defective PE-PUR foam that could degrade and emit dangerous VOCs;

e.      Misrepresented the PE-PUR foam in the Recalled Devices to be effectively resistant to heat and humidity;

f.      Communicated with Philips about known instances of foam degradation and consumer complaints for devices with PE-PUR foam; and

g.      Collected revenue flowing from the sale of the Recalled Devices.

339.   In addition, each of the RICO Defendants separately ensured that the FDA, prescribers, third-party payors, hospitals, and consumers did not discover the defect in the Recalled Devices.

340.   Without the RICO Defendants' willing participation in the conduct above, the Enterprise's scheme and common course of conduct would have been unsuccessful.

341.   The participants' dedication of personnel to the Enterprise's scheme further evidences the ongoing structure of the Enterprise. For example,

a.      PolyTech dedicated its employees Bob Marsh and Bonnie Peterson to work with Philips relating to the PE-PUR foam in the Recalled Devices, and to coordinate their communications with Burnett on behalf of Philips. Ms. Peterson served as a regular point of contact for technical questions about the PE-PUR foam, while Mr. Marsh liaised with Philips' personnel on foam degradation issues and questions. Likewise, PolyTech dedicated its employee Michael Haupt to coordinate with Paramount Die.

b.      Philips, for its part, dedicated key personnel to the Recalled Devices' design, marketing or sale, and/or to contacting PolyTech. This included Vince Testa, who attended internal meetings on foam degradation issues

96

and who was then designated as a point of contact for PolyTech as a follow-up to those meetings.

      c.    Establishing these regular points of contact further organized the Enterprise.

342.    The RICO Defendants were aware of the other member's involvement with the Enterprise and aided its purposes by conducting illegal and fraudulent acts, *i.e.*, mail and wire fraud. Accordingly, each member of the Enterprise benefited from the involvement and existence of the others.

      **d.**    **The RICO Defendants Committed At Least Two Predicate Acts Of Mail And Wire Fraud In Furtherance Of The Enterprise's Fraudulent Scheme.**

343.    The RICO Defendants devised a scheme for the purpose of defrauding consumers, prescribers, third-party payors, hospitals, and the FDA by falsely concealing or minimizing defects in the Recalled Devices.

344.    In addition, the RICO Defendants devised an illicit scheme for the purpose of obtaining money by fraudulent pretenses to maximize sales of the Recalled Devices. This scheme ultimately financially enriched the RICO Defendants.

345.    In furtherance of the scheme, the RICO Defendants knowingly conducted or participated, directly or indirectly, in the Philips-PolyTech Enterprise through racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Specifically, the RICO Defendants committed, conspired to commit, and/or aided and abetted in the commission of, *at least* two predicate acts of racketeering activity within the past ten years, therefore constituting a "pattern of racketeering activity." The racketeering activity was made possible by the RICO Defendants' regular use of the facilities, services, distribution channels and employees of the Philips-PolyTech Enterprise, the U.S. Mail and interstate wire facilities. The RICO Defendants

participated in the scheme to defraud by using mail, telephones and Internet to transmit mailings and wires in interstate or foreign commerce.

346.    The RICO Defendants used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of the enterprise's objectives through misrepresentations, concealments, and material omissions.

347.    The RICO Defendants caused such mailings and uses of the wire to be made either by directly making or approving certain fraudulent statements or by setting in motion a scheme to defraud that would reasonably lead to those mailings and wirings. These multiple acts of racketeering activity were related to each other, pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

348.    The RICO Defendants' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to:

> a.    Mail Fraud: The RICO Defendants violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Recalled Devices by means of false pretenses, misrepresentations, promises, and omissions.
>
> b.    Wire Fraud: The RICO Defendants violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

349.    The RICO Defendants' uses of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by the RICO Defendants or third parties that were foreseeably caused to be sent in furtherance and as a result of the RICO Defendants' illegal scheme to defraud:[138]

a.    Shipments by Philips of the Recalled Devices, known to be defective, to locations throughout the United States for distribution and sale. Plaintiffs do not have access to the confidential records that provide the precise dates and locations of these shipments, which occurred in each year between 2015-2021. The Recalled Devices transported in interstate commerce were misbranded, in violation of 21 U.S.C. § 352.

b.    Shipments from PolyTech to Philips (including *via* Paramount Die) of the PE-PUR foam for installation in the Recalled Devices, knowing that Philips would use the foam in the defective Recalled Devices and distribute the Recalled Devices throughout the United States using interstate carriers. Plaintiffs do not have access to the confidential records that provide the precise dates and locations of these shipments, which occurred in each year between 2015-2021.

c.    Shipments by Burnett of bulk PE-PUR foam sheets by private or commercial interstate carrier to PolyTech for use in the Recalled Devices. PolyTech caused Burnett to make these shipments when it ordered the bulk

---

[138] Many of the precise dates and examples of the uses of the U.S. Mail and interstate wire facilities to further their fraudulent scheme cannot be alleged without access to Defendants' books and records. However, Plaintiffs have described the types of, and in some instances, occasions on which the predicate acts of mail and/or wire fraud occurred.

foam, knowing it would then transmit the foam for installation in the Recalled Devices. Plaintiffs do not have access to the confidential records that provide the precise dates and locations of these shipments, which occurred in each year between 2015-2021. Documents provided to date from Burnett provide the particulars of at least one such shipment, which originated from Burnett in Baltimore, Maryland and was shipped to PolyTech in Newark, Delaware, on or about March 12, 2021.[139]

d.   Advertisements, brochures, labeling, and marketing from Philips that omitted the known health and safety risks of the Recalled Devices, distributed using mail, wire, radio, or television communications in interstate commerce. This includes transmission of statements from Philips that its "sleep therapy systems are designed with the needs of care practitioners and patients in mind" and the numerous other misrepresentations related to safety and efficacy cited above. *See* ¶¶ 213-14, *supra*. Each such mailed advertisement—including brochures or print advertisements—violated the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). Philips knew its advertisements about the Recalled Devices were misleading and omitted material information, but still disseminated the advertisements to ensure the continued prescription and sale of the Recalled Devices.

---

[139] *See* Purchase Order dated 3/12/2021 and supporting documentation (Lawler Aff. Exh. B, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-4) (attached hereto as Exhibit "F"), at WTB 000015-50.

e.   Advertisements and marketing from PolyTech for the PE-PUR foam used in the Recalled Devices, including marketing that falsely misrepresented the foam to have "superior physical properties and offer excellent resistance to heat, moisture, and chemicals." Each such mailed advertisement was a violation of the mail fraud statute (18 U.S.C. § 1341). Each such internet-based, radio, and television advertisement was a violation of the wire fraud statute (18 U.S.C. § 1343). PolyTech knew its advertisements were misleading and omitted material information, but still disseminated the advertisements to ensure the continued prescription and sale of the Recalled Devices.

f.   Documents necessary to facilitate the sale and transmission of bulk PE-PUR foam from Burnett for use in the Recalled Devices, including invoices, packing lists, labels, invoices, and test reports.[140] Each RICO Defendant knew that these documents would foreseeably result in the manufacture and sale of the Recalled Devices, thereby furthering the scheme to continue to make and sell them without disclosing the defect.

g.   Documents necessary to facilitate the manufacture and sale of the Recalled Devices, including bills of lading, invoices, shipping records, reports and correspondence. Each of the RICO Defendants knew that these documents would foreseeably result in the manufacture and sale of the Recalled

---

[140] *See* Lawler Aff., filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-1 (attached hereto as Exhibit "G"), at ¶ 20; *see also* Purchase Orders and supporting documentation (Lawler Aff. Exh. B) (Exhibit "F" hereto), at WTB 000015-50.

Devices, thereby furthering the scheme to continue to make and sell them without disclosing the defect.

h.   Documents necessary to process and receive payment for the Recalled Devices by unsuspecting Plaintiffs and Class members, including invoices and receipts. Each of the RICO Defendants knew that these documents were the foreseeable result of the manufacture and sale of the Recalled Devices, thereby furthering their scheme to continue to make and sell them without disclosing the defect.

i.   False or misleading communications, internally to Philips and PolyTech and externally with third parties including Burnett, that obscured the defect and prevented regulators and the public from discovering the true risks of the Recalled Devices, and/or purposely misidentified the cause of issues in the Recalled Devices to external factors, such as ozone cleaners.

j.   While using mail and wire to defraud and obtain revenue under false pretenses, Philips and PolyTech failed to timely, accurately, and completely disclose the defect and associated risks in the Recalled Devices when Philips and PolyTech had a duty to disclose this information.[141]

350.   The RICO Defendants (or their agents), in furtherance of their illegal scheme, sent and/or received (or caused to be sent and/or received) by mail or by private or interstate carrier, shipments of the Recalled Devices and related documents and communications. Because the RICO Defendants disguised their participation in the Enterprise, and worked to keep the Enterprise's

---

[141] As explained below, Philips and PolyTech had multiple independent duties to disclose material information about the Recalled Devices, which they failed to fulfill.

existence secret so as to give the false impression that the Recalled Devices were safe, many of the precise dates of the Enterprise's use of U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the RICO Defendants' records. Indeed, an essential part of the successful operation of the Philips-PolyTech Enterprise alleged herein depended upon secrecy. However, Plaintiffs describe occasions on which the RICO Defendants disseminated misrepresentations and false statements to consumers, prescribers, regulators, and Plaintiffs, and how those acts advanced the scheme. These disseminations include:

| From | To | Date | Description |
|------|-----|------|-------------|
| Philips | PolyTech | October 30, 2015 | Email message from Philips to PolyTech sharing information and implying that a customer made Philips aware of PE-PUR foam degradation issues. |
| PolyTech | Burnett | October 30, 2015 | Email message from PolyTech to Burnett transmitting information from Philips about PE-PUR foam degradation issues. |
| Japanese Philips entity | Philips | November 25, 2015 | Communications transmitting information about a preventative maintenance servicing procedure implemented on Trilogy devices by a Philips entity, which resulted in no documented further investigation, risk analysis, or design review.[142] |

---

[142] 483 Report at 2.

| Bob Marsh, PolyTech | Lee Lawler, Burnett | August 5, 2016 | Email message from Bob Marsh of PolyTech to Lee Lawler of Burnett, referring to questions from Philips, and admitting that PolyTech would inform Philips of risks of PE-PUR foam raised by Burnett in 2016. |
|---|---|---|---|
| Philips | | April 1, 2016 to January 22, 2021 | Documents and communications sharing results of at least fourteen instances, assessments, and/or test reports, where Philips was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions, with various Sleep and Respiratory care devices. |
| Vincent Testa, Philips | Bonnie Peterson, PolyTech | April 20, 2018 | Email reporting consumer complaints that PE-PUR foam in Trilogy devices was "disintegrating" and admitting it was a "potential safety concern." |
| Bob Marsh, PolyTech | Lee Lawler, Burnett | April 23, 2018 | Email correspondence regarding degradation of ester foam, and forwarding email from Vince Testa of Philips regarding the same.[143] |
| Bob Marsh, PolyTech (with Bonnie Peterson and Mike Haupt, PolyTech) | Lee Lawler, Burnett | May 2, 2018 and May 4, 2018 | Email correspondence confirming Philips' test results for ether vs. ester foam confirming that ether was the "better performer" but nonetheless raising Philips' |

---

[143] *See* Email from Vince Testa at Philips to Bonnie Peterson at PolyTech dated 4/20/2018, forwarded from Bob Marsh at PolyTech to Lee Lawler at Burnett on 4/23/2018 (Lawler Aff. Exh. D, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-6) (attached hereto as Exhibit "H"), at WTB 000054-55.

| | | | |
|---|---|---|---|
| | | | and PolyTech's plan to continue using ester foam.[144] |
| Philips | | May 22, 2018 | Communications to prepare Philips' Biological Risk Assessment document, which was deemed "inadequate" by the FDA because it did not "accurately reflect known data" about PE-PUR foam degradation in Trilogy ventilator devices.[145] |
| Philips | | May 2018 | Communications to prepare Philips' Health Hazard Evaluation, ER22227646, which was deemed "inadequate" by the FDA because it did not "accurately reflect known data" about PE-PUR foam degradation in Trilogy ventilator devices. |
| Philips | | June 2018 | Communications to close CAPA INV 0988 related to Trilogy Devices without reference to other CPAP and BiPAP devices, including the Recalled Devices despite knowledge of consumer complaints of foam degradation in those devices. |
| Philips | | August 24, 2018 | Intra-company email amongst Philips personnel discussing testing that confirmed that the affected foam breaks down in high heat and high humidity environments, which concurred with Trilogy |

---

[144] *See* Email correspondence by and among Vince Testa at Philips, Bob Marsh and Bonnie Peterson at PolyTech, and Lee Lawler at Burnett (Lawler Aff. Exh. G, filed in MDL 3014, Case 2:21-mc-01230-JFC, at Doc. 589-9) (attached hereto as Exhibit "I"), at WTB 000061-65.

[145] 483 Report at 12.

| | | | |
|---|---|---|---|
| | | | ventilator related complaints received. |
| Philips | | December 12, 2018 | Communications transmitting test results that acknowledged a "problem of degradation" in PE-PUR foam in Trilogy devices as a result of field reports/complaints, following which "no further design change, corrective action, or field correction was conducted" for the Recalled Devices for at least three years.[146] |
| Philips | | June 2019 | Documents and communications for inadequate formal CAPA 7211 investigation that excluded known medical device reports and complaints. |
| Philips | | April 26, 2021 | Press release admitting to serious health risks of the Recalled Devices but misleadingly casting blame on other "factors" such as ozone cleaners. |

351. Each of the predicate acts detailed above had the common purpose of generating significant revenue and profits for the RICO Defendants from the sale of Recalled Devices. This was accomplished concealing from patients, prescribers, third-party payors, and the FDA the true health risks and the safety defect associated with the Recalled Devices and their PE-PUR foam. Further, this common purpose was served by the above-described instances of RICO Defendants

---

[146] 483 Report at 5.

sharing information and evidence about the Defect among the Enterprise. This sharing of information allowed for the RICO Defendants to coordinate in their actions and efforts to conceal.

352.    The RICO Defendants' pattern of racketeering activity alleged herein and the Philips-PolyTech Enterprise are separate and distinct from each other. Likewise, the RICO Defendants are distinct from the Enterprise.

353.    The racketeering activities conducted by the RICO Defendants amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and Plaintiffs. Each separate use of the U.S. Mail and/or interstate wire facilities employed by the RICO Defendants was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators and Plaintiffs. The RICO Defendants have engaged in this pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Enterprise.

354.    Each of the RICO Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

355.    As described herein, the RICO Defendants engaged in a pattern of related and continuous predicate acts for years. The predicate acts constituted various unlawful activities, each conducted with the common purpose of obtaining revenue from the marketing and sale of the defective Recalled Devices. The predicate acts also had the same or similar results, participants, targeted pool of victims, and methods of commission. The predicate acts were related and not isolated.

e.   **The RICO Defendants Advanced Their Fraudulent Scheme By Concealing Material Information About Serious Safety Risks Posed By The Recalled Devices That They Had A Duty To Disclose.**

356.   The uses of mail and wire described above violated the mail and wire fraud statutes because they furthered a fraudulent scheme to mislead consumers, prescribers, third party payors, hospitals, and the FDA about the Recalled Devices.

357.   In addition, these same uses of mail and wire were illegal because, when they sent or caused to be sent, RICO Defendants had duties to disclose the health and safety risks associated with the Recalled Devices. The RICO Defendants failed to disclose this critical information in order to advance their scheme.

358.   For years, the RICO Defendants each knew of the risks and safety concerns in the Recalled Devices. Specifically, Philips and PolyTech knew at least as early as 2015—six years before a public recall announcement—about foam degradation issues in PE-PUR foam in the field. To further the goals of the Philips-PolyTech Enterprise and to their mutual monetary gain, the RICO Defendants failed to disclose the existence, scope, and material safety risks of the defect in the Recalled Devices, and continued to manufacture and sell them for years in spite of that knowledge.

359.   The RICO Defendants' careful efforts to conceal the risks of the Recalled Devices were critically important to the viability of their scheme. A decision by any one RICO Defendant to tell the truth about the defect would have been an existential threat to the Enterprise. Instead, each RICO Defendant kept key information about the risks of the Recalled Devices and known issues hidden for years. This omission of material facts about the Defect occurred because it advanced the RICO Defendants' scheme to sell defective Recalled Devices and avoid costly recalls and reputational harms.

360.     The RICO Defendants' failure to disclose the known safety risks given the defect in the Recalled Devices violated several independent duties to disclose.

a.     As a medical device manufacturer, Philips had a duty to disclose material facts about the safety risks of its devices to physicians, patients, and the FDA. This includes Philips' statutory and regulatory duties pursuant to 21 U.S.C. § 352 (FDCA); 21 C.F.R. § 820.70 and 21 C.F.R. § 803.

b.     The RICO Defendants also each had a duty to disclose the defect in the Recalled Devices because of their exclusive knowledge and far superior information in their possession. The RICO Defendants knew about the risks to users of the Recalled Devices due to the PE-PUR foam, which they gathered through their exclusive access to information about their design, development, and testing, and through their confidential and proprietary investigations following consumer complaints. Plaintiffs, by contrast, lack the sophisticated expertise that would be necessary to discover the defect and its implications on their own.

c.     The RICO Defendants' affirmative steps to conceal the defect deprived Plaintiffs and Class Members from an opportunity that otherwise could have led to their discovery of the truth. Philips and PolyTech also each had a duty to disclose because of the actions they took to conceal the Defect which was a material fact, in the Recalled Devices. Philips acted to suppress the truth including when it inappropriately limited and closed its CAPA investigations (thus avoiding a written record), omitted relevant data from its Biological Risk Assessments, and attempted to blame independent

factors such as ozone cleaners for the defect. PolyTech, for its part, suppressed the truth when it corresponded with Burnett about the known risks of PE-PUR foam and took no action, instead continuing to supply the foam to Philips for use in the Recalled Devices.

d.     Finally, Philips affirmatively disclosed information about the Recalled Devices such as the information discussed in ¶¶ 214 and 215 above. Because Philips opted to make these representations, and because it knew other information about the Recalled Devices that made those representations misleading or untrue, Philips was under a separate duty to disclose the full truth about the defect that materially qualified the information it provided.

361.    The RICO Defendants knew and intended that Plaintiffs would rely on their and the other Enterprise members' material omissions when they paid for and used the Recalled Devices. Plaintiffs' reliance on this concealment is demonstrated by the fact that they paid money for defective Recalled Devices that never should have been introduced into the U.S. stream of commerce.

**f.     The Philips-PolyTech Enterprise's Pattern Of Racketeering Injured Plaintiffs And The Nationwide Class Members In Their Business Or Property When They Paid For Defective Recalled Devices.**

362.    Plaintiffs and Nationwide Class members are "person[s] injured in his or her business or property" by reason of the Enterprise's RICO violations, within the meaning of U.S.C. § 1964(c). Plaintiffs and Nationwide Class members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

363.     Because of the Philips-PolyTech Enterprise's pattern of racketeering activity, Plaintiffs and Nationwide Class members have been injured in their business and/or property by paying for Recalled Devices with an undisclosed safety defect. Because of this Defect, Plaintiffs paid money for Recalled Devices that had no actual value at the time of purchase.

364.     As such, the Philips-PolyTech Enterprise directly or indirectly obtained money from Plaintiffs and the Nationwide Class by means of materially false or fraudulent misrepresentations and omissions of material facts. Had the Plaintiffs and Class members known what the RICO Defendants knew about the Recalled Devices, they would not have paid for the Recalled Devices.

365.     The RICO Defendants' violations of law and their pattern of racketeering activity directly and proximately caused injury to Plaintiffs' and Nationwide Class members' business and property. The RICO Defendants' pattern of racketeering activity logically, substantially, and foreseeably caused third party payors, hospitals, and consumers to purchase the Recalled Devices. The injuries suffered by the Plaintiffs and Nationwide Class members' injuries were not unexpected, unforeseen, or independent. Rather, the RICO Defendants knew that the Recalled Devices were defective and unsafe. Regardless of these known risks, the RICO Defendants used mail and wires to carry out their scheme of deception, thereby reaping increased profits.

366.     Had the RICO Defendants disclosed their knowledge of the defects in the Recalled Devices and informed the FDA and the public, Plaintiffs would have learned of the disclosure and made informed decisions about their health.

        a.     Had any of the RICO Defendants disclosed the Recalled Devices' defective condition to the FDA, the FDA would have considered the information material, and would have informed consumers. This is evidenced by the

FDA's classification of the recall as Class I after Philips ultimately disclosed the defect it had long concealed.

b.     Had the RICO Defendants disclosed the Recalled Devices' defective condition to the public, either through press releases, their websites, or in any other public forum, Plaintiffs and Nationwide Class members would have learned of the Defect. Further, given the seriousness of the information and the number of devices impacted, the news media and consumer forums would have published this information.

c.     Had the RICO Defendants disclosed the defective nature of the defect via any of the channels typically used to communicate information about the Recalled Devices, Plaintiffs and Nationwide Class members would have learned about the Defect.

367.    The Enterprise's misleading statements and omissions to the FDA and to prescribers were essential to the scheme. The FDA would have considered information about the defective PE-PUR foam material (as evidenced by its Class I classification of the ongoing recall), and prescribers would not have prescribed dangerous and defective breathing machines to their patients. At the very least, the RICO Defendants' misleading statements delayed the FDA's broader investigation of the Recalled Devices.

368.    In the case of fraud on third parties (i.e., the FDA and prescribers), the RICO Defendants' omissions and misrepresentations to third parties facilitated Plaintiffs' and Nationwide Class members' purchase of unsafe products that should not have been on the market. The FDA and prescribers have not suffered any direct injury as a result of the RICO Defendants' violations.

369.     As the purchasers and users of the Recalled Devices, Plaintiffs and the Nationwide Class are the parties most affected by the RICO Defendants' misconduct. The RICO Defendants knew that their concealment of the risks would cause Plaintiffs and the Nationwide Class to pay for the Recalled Devices and to suffer the attendant harms and safety risks of breathing through machines with potentially toxic foam.

370.     In light of the above, Plaintiffs and the Nationwide Class members seek actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq*.

## COUNT II
## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(D), AGAINST PHILIPS AND POLYTECH
## On behalf of the Nationwide Class and all Subclasses[147]

371.     Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

372.     This claim is brought by Plaintiffs against Philips and PolyTech (within this claim, the "RICO Defendant(s)") for actual damages, treble damages, and equitable relief under 18 U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq*.

373.     Plaintiffs are each a "person," as that term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

374.     It is unlawful "for any person to conspire to violate" 18 U.S.C. § 1962(c). *See* 18 U.S.C. § 1962(d). A defendant who "agreed to facilitate a scheme" violates section 1962(d) even

---

[147] Plaintiffs will submit a RICO case statement pursuant to Local R. Civ. P. 7.1.B within 14 days.

if he "does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Salinas v. United States*, 522 U.S. 52, 65-66 (1997).

375.     The RICO Defendants have undertaken the practices described herein as part of a common scheme and conspiracy. In violation of 18 U.S.C. § 1962(d), the RICO Defendants agreed to facilitate the operation of the Enterprise through a pattern of racketeering in violation of 18 U.S.C. § 1962(c), as described herein. The object of this conspiracy was to conduct or participate in, directly or indirectly, the conduct of the affairs of the Enterprise described in the previous Count through a pattern of racketeering activity. The RICO Defendants conspired with the Enterprise participants to manufacture, sell, and profit from the Recalled Devices while concealing their health and safety risks. The conspiracy is coterminous with the time period in which the Enterprise has existed, beginning in or about 2015 and continuing to this day.

376.     The words, actions, or interdependence of activities of each RICO Defendant supports the inference of their agreement. Put another way, the RICO Defendants' agreement is evidenced by their predicate acts and direct participation in the control and operation of the Enterprise, as detailed above in relation to the RICO Defendants' substantive violation of Section 1962(c).

377.     The RICO Defendants' acts in furtherance of the conspiracy include each of the predicate acts underlying the RICO Defendants' violations of Section 1962(c), as described above. Various other persons, firms, and corporations, including third-party entities and individuals not named as Defendants in this Complaint, have participated as co-conspirators with the members of the Enterprise in these offenses and furthered the conspiracy to conceal the health and safety risks in the Recalled Devices to increase or maintain revenue from their sale.

378.     The success of the Enterprise's fraudulent scheme depended upon the RICO Defendants' cooperation and agreement. These companies had to maintain strict confidentiality about the health and safety risks in the Recalled Devices or the scheme to continue. Even after learning about the health and safety risks associated with the PE-PUR foam used in the Recalled Devices, PolyTech continued to obtain the foam from Burnett and prepare it for use in the Recalled Devices. When doing so, PolyTech knew that Philips would manufacture and sell the Recalled Devices to Plaintiffs and the Nationwide Class without disclosing those risks. Likewise, Philips, with knowledge of the Defect, continued to place orders that would cause PolyTech to obtain and ship PE-PUR foam for use in the recalled devices.

379.     Philips depended upon PolyTech for the sourcing, cutting, and acquisition of the PE-PUR foam for the Recalled Devices, and for coordinating with Burnett to do so. On the other hand, PolyTech depended upon Philips for a viable path to profit from sale of the Recalled Devices. This interdependence evidences the agreement to further the fraudulent scheme.

380.     Where a RICO Defendant did not commit a predicate act itself, it is sufficient if it was aware of the essential nature and scope of the Enterprise such that it agreed to the commission of the foreseeable predicate acts to advance the Enterprise's goals. The actions detailed above and throughout the Complaint as to each member of the Enterprise were foreseeable to the other members of the Philips-PolyTech Enterprise given their direct relationship to and furtherance of the common goals of the scheme.

381.     Philips and PolyTech each violated 18 U.S.C. § 1962(d) and injured the business or property of Plaintiffs and the Nationwide Class. The RICO Defendants' violations of 18 U.S.C. § 1962(d) caused the same injuries and damages described in the prior Count. This Count incorporates by reference the allegations as to injury, damages, and causation from the prior Count.

Plaintiffs claim damages for themselves and the Nationwide Class members under 18 U.S.C. § 1964(c).

### COUNT III
### BREACH OF EXPRESS WARRANTY
### On behalf of the Nationwide Class and all Subclasses

382.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

383.    Philips warranted that all of the Recalled Devices "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."[148]

384.    Philips breached this express warranty in connection with the sale and distribution of Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth here, rendering them unsuitable and unsafe for personal use.

385.    Had Plaintiffs and the Class known the Recalled Devices were unsafe for use, they would not have purchased them.

386.    Philips has breached its warranty and refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

387.    To the extent privity may be required, Plaintiffs and the Class can establish privity with Philips or alternatively, Plaintiffs can establish that they fall into an exception to a privity

---

[148] *See, e.g.,* Warranty Exemplars: Dreamstation (attached hereto as Exhibit "J-1"), at 29; REMstar SE (attached hereto as Exhibit "J-2"), at 21; Trilogy 100 (attached hereto as Exhibit "J-3"), at 163.

requirement. Plaintiffs and the Class relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

388.    Alternatively, Plaintiffs and the Class were foreseeable third-party beneficiaries of Philips sale of the Recalled Devices.

389.    Plaintiffs are not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year. As a direct and proximate result of Philips' breach of its express warranty, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

390.    Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

## COUNT IV
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY
## On behalf of the Nationwide Class and all Subclasses

391.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

392.    By operation of law, Philips, as the manufacturer of the Recalled Devices and as the provider of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiffs and the Class that the Recalled Devices were of merchantable quality and safe for their ordinary and intended use.

393.    Such implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in each state. *See, e.g.*, Ala. Code §§ 7-2-314, *et seq.*; Alaska Stat. §§ 45.02.314, *et seq.*; Ariz. Rev. Stat. Ann. §§ 47-2314, *et seq.*; Ark. Code Ann. §§ 4-2-314, *et seq.*; Cal. Com. Code §§ 2314, *et seq.*; Colo. Rev. Stat. §§ 4-2-314, *et seq.*; Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq.*;

Del. Code Ann. tit. 6, §§ 2-314, *et seq.*; D.C. Code Ann. §§ 28:2-314, *et seq.*; Fla. Stat. Ann. §§ 672.314, *et seq.*; O.C.G.A. §§ 11-2-314, *et seq.*; Haw. Rev. Stat. §§ 490:2-314, *et seq.*; Idaho Code §§ 28-2-314, *et seq.*; Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.*; Ind. Code Ann. §§ 26-1-2-314, *et seq.*; Iowa Code Ann. §§ 554.2314, *et seq.*; Kan. Stat. Ann. §§ 84-2-314, *et seq.*; Ky. Rev. Stat. Ann. §§ 355.2-314, *et seq.*; La. Civ. Code Ann. art. 2520, *et seq.*; Me. Rev. Stat. Ann. tit. 11, §§ 2-314, *et seq.*; Md. Code Ann., Com. Law §§ 2-314, *et seq.*; Mass. Gen. Laws Ann. Ch. 106, §§ 2-314, *et seq.*; Mich. Comp. Laws Ann. §§ 440.2314, *et seq.*; Minn. Stat. Ann. §§ 336.2-314, *et seq.*; Miss. Code Ann. §§ 75-2-314, *et seq.*; Mo. Rev. Stat. §§ 400.2-314, *et seq.*; Mont. Code Ann. §§ 30-2-314, *et seq.*; Neb. Rev. Stat. §§ 2-314, *et seq.*; Nev. Rev. Stat. §§ 104.2314, *et seq.*; N.H. Rev. Stat. Ann. §§ 382-A:2-314, *et seq.*; N.J. Stat. Ann. §§ 12A:2-314, *et seq.*; N.M. Stat. Ann. § 55-2-314, *et seq.*; N.Y. U.C.C. Law §§ 2-314, *et seq.*; N.C. Gen. Stat. Ann. §§ 25-2-314, *et seq.*; N.D. Cent. Code §§ 41-02-31, *et seq.*; Ohio Rev. Code Ann. §§ 1302.27, *et seq.*; Okla. Stat. tit. 12A, §§ 2-314, *et seq.*; Or. Rev. Stat. §§ 72.3140, *et seq.*; 13 Pa. Stat. Ann. §§ 2314, *et seq.*; R.I. Gen. Laws §§ 6A-2-314, *et seq.*; S.C. Code Ann. §§ 36-2-314, *et seq.*; S.D. Codified Laws §§ 57A-2-314, *et seq.*; Tenn. Code Ann. §§ 47-2-314, *et seq.*; Tex. Bus. & Com. Code §§ 2.314, *et seq.*; Utah Code Ann. §§ 70A-2-314, *et seq.*; Va. Code Ann. §§ 8.2-314, *et seq.*; Vt. Stat. Ann. tit. 9A, §§ 2-314, *et seq.*; Wash. Rev. Code §§ 62A.2-314, *et seq.*; W. Va. Code §§ 46-2-314, *et seq.*; Wis. Stat. Ann. §§ 402.314, *et seq.*; and Wyo. Stat. Ann. §§ 34.1-2-314, *et seq.*

394.    Philips breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth herein rendering them unsuitable and unsafe for personal use.

395.    Philips breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth here rendering them unsuitable and unsafe for personal use.

396.    Had Plaintiffs and the Class known the Recalled Devices were unsafe for use, they would not have purchased or leased them.

397.    To the extent privity may be required, Plaintiffs and the Class can establish privity with Philips or alternatively, Plaintiffs can establish that they fall into an exception to a privity requirement. Plaintiffs and the Class relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

398.    Alternatively, Plaintiffs and the Class were foreseeable third-party beneficiaries of Philips's sale of the Recalled Devices.

399.    Plaintiffs are not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year.

400.    Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs and the Class reasonably expected, at the time of purchase, that the Recalled Devices were safe for their ordinary and intended use.

401.    As a direct and proximate result of Philips' breach of the implied warranty of merchantability, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

<u>COUNT V</u>
**BREACH OF THE IMPLIED WARRANTY OF USABILITY**
**<u>On behalf of the Nationwide Class and all Subclasses</u>**

402.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

403.    By operation of law, Philips, as the manufacturer of the Recalled Devices and as the providers of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiffs and the Class that the Recalled Devices were usable for their ordinary and intended use.

404.    Such implied warranty arises under U.C.C. § 2-314(3) as adopted in each state.

405.    Such implied warranty of usability, contained in U.C.C. § 2-314, has been codified in each state. *See, e.g.*, Ala. Code §§ 7-2-314, *et seq.*; Alaska Stat. §§ 45.02.314, *et seq.*; Ariz. Rev. Stat. Ann. §§ 47-2314, *et seq.*; Ark. Code Ann. §§ 4-2-314, *et seq.*; Cal. Com. Code §§ 2314, *et seq.*; Colo. Rev. Stat. §§ 4-2-314, *et seq.*; Conn. Gen. Stat. Ann. §§ 42a-2-314, *et seq.*; Del. Code Ann. tit. 6, §§ 2-314, *et seq.*; D.C. Code Ann. §§ 28:2-314, *et seq.*; Fla. Stat. Ann. §§ 672.314, *et seq.*; O.C.G.A. §§ 11-2-314, *et seq.*; Haw. Rev. Stat. §§ 490:2-314, *et seq.*; Idaho Code §§ 28-2-314, *et seq.*; Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.*; Ind. Code Ann. §§ 26-1-2-314, *et seq.*; Iowa Code Ann. §§ 554.2314, *et seq.*; Kan. Stat. Ann. §§ 84-2-314, *et seq.*; Ky. Rev. Stat. Ann. §§ 355.2-314, *et seq.*; La. Civ. Code Ann. art. 2520, *et seq.*; Me. Rev. Stat. Ann. tit. 11, §§ 2-314, *et seq.*; Md. Code Ann., Com. Law §§ 2-314, *et seq.*; Mass. Gen. Laws Ann. Ch. 106, §§ 2-314, *et seq.*; Mich. Comp. Laws Ann. §§ 440.2314, *et seq.*; Minn. Stat. Ann. §§ 336.2-314, *et seq.*; Miss. Code Ann. §§ 75-2-314, *et seq.*; Mo. Rev. Stat. §§ 400.2-314, *et seq.*; Mont. Code Ann. §§ 30-2-314, *et seq.*; Neb. Rev. Stat. §§ 2-314, *et seq.*; Nev. Rev. Stat. §§ 104.2314, *et seq.*; N.H. Rev. Stat. Ann. §§ 382-A:2-314, *et seq.*; N.J. Stat. Ann. §§ 12A:2-314, *et seq.*; N.M. Stat. Ann. § 55-2-314, *et seq.*; N.Y. U.C.C. Law §§ 2-314, *et seq.*; N.C. Gen. Stat. Ann. §§ 25-2-314, *et seq.*; N.D. Cent.

Code §§ 41-02-31, *et seq*.; Ohio Rev. Code Ann. §§ 1302.27, *et seq*.; Okla. Stat. tit. 12A, §§ 2-314, *et seq*.; Or. Rev. Stat. §§ 72.3140, *et seq*.; 13 Pa. Stat. Ann. §§ 2314, *et seq*.; R.I. Gen. Laws §§ 6A-2-314, *et seq*.; S.C. Code Ann. §§ 36-2-314, *et seq*.; S.D. Codified Laws §§ 57A-2-314, *et seq*.; Tenn. Code Ann. §§ 47-2-314, *et seq*.; Tex. Bus. & Com. Code §§ 2.314, *et seq*.; Utah Code Ann. §§ 70A-2-314, *et seq*.; Va. Code Ann. §§ 8.2-314, *et seq*.; Vt. Stat. Ann. tit. 9A, §§ 2-314, *et seq*.; Wash. Rev. Code §§ 62A.2-314, *et seq*.; W. Va. Code §§ 46-2-314, *et seq*.; Wis. Stat. Ann. §§ 402.314, *et seq*.; and Wyo. Stat. Ann. §§ 34.1-2-314, *et seq*.

406.    Through usage of trade, manufacturers of prescription drugs and medical devices impliedly warrant that their products are usable for the end consumer.

407.    Philips breached the implied warranty of usability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices while appearing normal—contained defects as set forth herein rendering them unusable.

408.    Philips, its agents and employees knew or should have known that the Recalled Devices suffer from a defect that causes negative health effects and/or places persons at risk for negative health effects to such an extent that the products are unusable.

409.    Philips' Recall announcement instructed Class members to not use Recalled Devices because of the health risks. This renders the products unusable and thus worthless.

410.    Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs and the Class reasonably expected, at the time of purchase, that the Recalled Devices were usable for their ordinary and intended use.

411.    To the extent privity may be required, Plaintiffs and the Class can establish privity with Philips or alternatively, Plaintiffs can establish that they fall into an exception to a privity

requirement. Plaintiffs and the Class relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

412.   Alternatively, Plaintiffs and the Class were foreseeable third-party beneficiaries of Philips sale of the Recalled Devices.

413.   Plaintiffs are not required to give notice to Philips, a remote manufacturer and Philips has had notice of the type and source of claims in this matter for nearly a year. Had Plaintiffs and Class members known they would not be able to use their Recalled Devices, they would not have purchased them or would have paid significantly less for them.

414.   As a direct and proximate result of Philips' breach of the implied warranty of usability, Plaintiffs and the Class have sustained damages in an amount to be determined at trial.

**COUNT VI**
**VIOLATIONS OF MAGNUSON-MOSS FEDERAL WARRANTY ACT**
**15 U.S.C. 2301, *et seq.***
**On behalf of the Nationwide Class and all Subclasses**

415.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

416.   The Recalled Devices constitute "consumer products" as defined in 15 U.S.C. § 2301.

417.   Plaintiffs and the members of the Class are "consumers" as defined in 15 U.S.C. § 2301.

418.   Philips is a "supplier" of the Recalled Devices as defined in 15 U.S.C. § 2301.

419.   Philips is a "warrantor" as defined in 15 U.S.C. § 2301.

420.   The warranties made by Philips pertained to consumer products costing the consumer more than five dollars, *see* 15 U.S.C. § 2302(e).

421.   Plaintiffs and the members of the Class invoke federal jurisdiction for the claims

stated under this Count pursuant to the Class Action Fairness Act.

422.     The Recalled Devices were defective when they came off Philips' assembly lines and at all subsequent times (including at the times of sale and/or delivery to Plaintiffs and the members of the Class) because the defective foam and design make them dangerously unsafe.

423.     As a result, the Recalled Devices were worth less (nothing or less than nothing) at the time of their sales than the prices paid for them.

424.     Plaintiffs and the members of the Class would not have purchased or accepted the Recalled Devices had they known the machines were dangerously defective.

425.     Philips violated the Magnuson-Moss Federal Warranty Act by failing to comply with the express warranties they made to Plaintiffs and the members of the Class. Philips violated the Magnuson-Moss Federal Warranty Act by failing to comply with the implied warranties they made to Plaintiffs and the members of the Class.

426.     Plaintiffs and the other members of the Class need not have given notice of the defects to Philips and an opportunity for Philips to comply with their warranty obligations prior to the filing of this suit, because Plaintiffs may give such notice to Philips on their own behalf and on behalf of the Class after class certification pursuant to 15 U.S.C. § 2310(e).

427.     Based on the facts alleged here, any durational limit to the warranties that would otherwise bar the Magnuson-Moss Federal Warranty Act claims in this Count are procedurally and substantively unconscionable and otherwise unenforceable under federal law and applicable state common law.

428.     Based on the facts alleged here, any durational limit to the warranties that would otherwise bar the claims in this Count is tolled under equitable doctrines.

429.     Plaintiffs and the members of the Class sustained injuries and damages as a

proximate result of Philips' violation of its express and implied warranties, and are entitled to legal and equitable relief against Philips, including economic damages, rescission or other relief as appropriate, including compensatory damages consisting of: (a) the difference between the values of the Recalled Devices as warranted (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages.

430.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other members of the Class are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by them in connection with the commencement and prosecution of this action.

**COUNT VII**
**COMMON LAW FRAUD**
**On Behalf of the Nationwide Class and all Subclasses**

431.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

432.    Philips knew that the Recalled Devices posed serious health risks to users.

433.    Philips failed to advise Plaintiffs and the Class of the material fact that the Recalled Devices posed serious health risks to users. Philips concealed information regarding the adverse health effects posed by the Recalled Devices from Plaintiffs and the Class members. Philips misrepresented to Plaintiffs and the Class members that the Recalled Devices were safe for use.

434.    Philips was under a duty to disclose to Plaintiffs and the Class members the serious health risks posed to users because: (a) Philips was in a superior position to Plaintiffs and the Class members to know the risks associated with the use of the Recalled Devices; (b) Philips was in a superior bargaining position to Plaintiffs and the Class members in determining whether or not to

disclose or conceal information regarding the Recalled Devices in its packaging, labels, advertising, and websites; (c) Philips made representations regarding the safety of the Recalled Devices and had a duty to fully disclose all facts related to the serious health risks to users posed by the Recalled Devices, once Philips became aware of such serious health risks; (d) Philips knew that the Plaintiffs and the Class members could not reasonably have been expected to learn or discover the serious health risks posed by use of the Recalled Devices prior to purchasing the Recalled Devices, given the representations, concealed material information, and omissions by Philips in its packaging, labels, advertising, and websites; and (e) Philips has a duty to disclose information related to the health and safety of its products.

435.    Philips intentionally, knowingly, and recklessly allowed its packaging, labels, advertisements, promotional materials, and websites to mislead Plaintiffs and the Class members to believe that the Recalled Devices were safe for use.

436.    Philips knew that its omissions, concealment, and representations in its packaging, labels, advertisements, promotional materials, and websites regarding the Recalled Devices were false, deceptive, inadequate, and misleading, and that the Recalled Devices contained PE-PUR Foam and thus could cause adverse health effects to users of the Recalled Devices.

437.    Philips concealed and misrepresented material information regarding the serious health risks posed to users of the Recalled Devices from Plaintiffs and the Class members, by failing to include material information in its packaging, labels, advertisements, promotional materials, and websites.

438.    The information undisclosed and concealed by Philips to Plaintiffs and the Class members were material, as a reasonable consumer would find information regarding serious

adverse health risks associated with the use of the Recalled Devices important when deciding whether to purchase the Recalled Devices.

439.    As a result of such deceptive packaging, labels, advertisements, promotional materials, and websites, Plaintiffs and the Class members justifiably and reasonably believed the Recalled Devices were safe for use.

440.    Philips intentionally, knowingly, and recklessly made these material omissions and misrepresentations, and concealed material information regarding the adverse health risks associated with the Recalled Devices in its packaging, labels, advertisements, promotional materials, and websites regarding the Recalled Devices to induce Plaintiffs and the Class members to purchase the Recalled Devices.

441.    Plaintiffs and the Class members relied on Philips' deceptive packaging, labels, advertisements, promotional materials, and websites and purchased and used the Recalled Devices to their detriment. Given the deceptive manner in which Philips advertised, represented, and promoted the Recalled Devices, such reliance by Plaintiffs and the Class members was reasonable and justified.

442.    As a direct and proximate result of Philips' material omissions, misrepresentations, and concealment of material information regarding the adverse health effects to users of the Recalled Devices, Plaintiffs and the Class members have suffered actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages.

## COUNT VIII
### UNJUST ENRICHMENT (in the alternative)
### On behalf of the Nationwide Class and all Subclasses

443.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

444.    Plaintiffs and Class members conferred a tangible and material economic benefit upon Philips by purchasing the Recalled Devices. Plaintiffs and Class members would not have purchased or paid for the Recalled Devices had they known the true risks of using the Recalled Devices.

445.    Philips readily accepted and retained these benefits. Philips profited from the sale of the Recalled Devices to the detriment and expense of Plaintiffs and Class members.

446.    Philips appreciated these benefits. These benefits were the expected result of Philips acting in its pecuniary interest at the expense of their customers. Philips knew of these benefits because Philips was aware of the defective nature of the Recalled Devices; Philips failed to disclose this knowledge, and thereby misled Plaintiffs and Class members regarding the nature and quality of the Recalled Devices while profiting from this deception.

447.    Under these circumstances, it would be unjust, inequitable, and unconscionable for Philips to retain the economic benefits it received at the expense of Plaintiffs and the Class, including because they were procured as a result of Philips' wrongful conduct alleged above. Failing to require Philips to provide remuneration under these circumstances would result in Philips being unjustly enriched at the expense of Plaintiffs and Class members who endure being exposed to the risk of developing serious medical conditions and can no longer use their machines safely.

448.    Philips' retention of the benefits conferred upon it by Plaintiffs and the Class would be unjust and inequitable.

449.    Plaintiffs are entitled to restitution of the benefits Philips unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Philips, such amounts to be determined at trial.

450.    Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

451.    Plaintiffs and the Class suffered damages in an amount to be determined at trial.

**COUNT IX**
**ALABAMA DECEPTIVE TRADE PRACTICES ACT**
**Ala. Code §§ 8-19-1, *et seq.***
**On Behalf of the Alabama Subclass, except for Class**
**<u>Members who purchased a Recalled Device for business use only</u>**

452.    Plaintiffs Goodenough, Gothard, Penberthy, Lake Martin, and Elmore reallege and incorporate by reference all preceding allegations as though fully set forth herein.

453.    Plaintiffs Goodenough, Gothard, Penberthy, Lake Martin, and Elmore bring this cause of action individually and on behalf of the members of the Alabama Subclass.

454.    The Alabama Deceptive Trade Practices Act ("ADTPA") was created to protect Alabama consumers from deceptive and unfair business practices.

455.    Philips' conduct described herein constitutes a violation of several of the provisions enumerated in Ala. Code § 8-19-5, including but not limited to: misrepresentations as to a product's characteristics; misrepresentations as to a product's standard or style; advertising goods with intent not to sell as advertised, and engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

456.     Plaintiffs and Alabama Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Ala. Code § 8-19-5. Plaintiffs and Alabama Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

457.     Accordingly, pursuant to Ala. Code § 8-19-10(a)(1), Plaintiffs and Alabama Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Alabama Subclass members are entitled to all available statutory, exemplary, treble and/or punitive damages based on the nature of the violation of the ADTPA and the factors in Ala. Code § 8-19-10(a)(2), and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

458.     To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

**COUNT X**
**ALASKA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT**
**Alaska Stat. §§ 45.50.471,** *et seq.*
**On Behalf of the Alaska Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

459.     Plaintiff ASEA Health Trust realleges and incorporates by reference all preceding allegations as though fully set forth herein.

460.     Plaintiff ASEA Health Trust brings this cause of action individually and on behalf of the members of the Alaska Subclass.

461.     The Alaska Unfair Trade Practices and Consumer Protection Act ("AUTPCPA") was created to protect Alaska consumers from deceptive and unfair business practices.

462.     Philips' conduct described herein with respect to the Recalled Devices constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce and thus is unlawful under Alaska Stat. § 45.50.471(a).

463.     Plaintiff and Alaska Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Alaska Stat. § 45.50.471(b). Plaintiff and Alaska Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

464.     Accordingly, pursuant to Alaska Stat. § 45.50.531(a), Plaintiff and Alaska Subclass members are entitled to recover either: (1) three times their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the

cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages; or (2) $500, whichever is greater. In addition, Plaintiff and Alaska Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

465.    To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiff involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

**COUNT XI**
**ARIZONA CONSUMER FRAUD ACT**
**Ariz. Rev. Stat. §§ 44-1521, *et seq.***
**On Behalf of the Arizona Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

466.    Plaintiffs Groudan and Gilliard-Gunter reallege and incorporate by reference all preceding allegations as though fully set forth herein.

467.    Plaintiffs Groudan and Gilliard-Gunter bring this cause of action individually and on behalf of the members of the Arizona Subclass.

468.    The Arizona Consumer Fraud Act was created to protect Arizona consumers from deceptive and unfair business practices.

469.    Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the

Recalled Devices, in trade or commerce in Arizona, making it unlawful under Ariz. Rev. Stat. § 44-1522(A).

470.    Plaintiffs and Arizona Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Ariz. Rev. Stat. § 44-1522(A). Plaintiffs and Arizona Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

471.    Accordingly, pursuant to Ariz. Rev. Stat. § 44-1528(A), Plaintiffs and Arizona Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Arizona Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

### COUNT XII
### ARKANSAS DECEPTIVE TRADE PRACTICES ACT
### Ark. Code. §§ 4-88-101, *et seq.*
### On Behalf of the Arkansas Subclass, except for Class
### Members who purchased a Recalled Device for business use only

472.    Plaintiffs Autry and Melcher reallege and incorporate by reference all preceding allegations as though fully set forth herein.

132

473.    Plaintiffs Autry and Melcher bring this cause of action individually and on behalf of the members of the Arkansas Subclass.

474.    The Arkansas Deceptive Trade Practices Act ("ADTPA") was created to protect Arkansas consumers from deceptive and unfair business practices.

475.    Philips' conduct described herein constitutes a violation of several of the provisions enumerated in Ark. Code § 4-88-107(a), including but not limited to: misrepresentations as to a product's characteristics; advertising goods with intent not to sell as advertised; and engaging in any other unconscionable, false, or deceptive act or practice in connection with the marketing and sale of Recalled Devices.

476.    Plaintiffs and Arkansas Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Ark. Code § 4-88-107(a). Plaintiffs and Arkansas Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

477.    Accordingly, pursuant to Ark. Code § 4-88-113(f)(1), Plaintiffs and Arkansas Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Arkansas Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages for the willful and knowing violation of the

ADTPA, and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

## COUNT XIII
### CALIFORNIA UNFAIR COMPETITION LAW
**Cal. Bus. & Prof. Code §§ 17200, *et seq*. (Unfair and Fraudulent Prongs)**
**On Behalf of the California Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

478.    Plaintiffs Bailey, Bastasch, Campbell, Luenebrink, Mest, Mitrovich, Nielson, and Waybright reallege and incorporate by reference all preceding allegations as though fully set forth herein.

479.    Plaintiffs Bailey, Bastasch, Campbell, Luenebrink, Mest, Mitrovich, Nielson, and Waybright bring this cause of action individually and on behalf of the members of the California Subclass.

480.    California Business & Professions Code § 17200 ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

481.    The acts and practices of Philips as alleged herein constitute "unfair" business acts and practices under the UCL in that Philips' conduct is unconscionable, immoral, deceptive, unfair, illegal, unethical, oppressive, and/or unscrupulous. Further, the gravity of Philips' conduct outweighs any conceivable benefit of such conduct.

482.    Philips has, in the course of its business and in the course of trade or commerce, undertaken and engaged in unfair business acts and practices under the UCL by concealing the true risks of the Recalled Devices.

483.     These acts also constitute "fraudulent" business acts and practices under the UCL in that Philips' conduct is false, misleading, and has a tendency to deceive California Subclass members and the general public.

484.     Plaintiffs and California Subclass members have suffered injury in fact and have lost money as a result of Philips' fraudulent business acts or practices.

485.     The above-described unfair business acts or practices present a threat and likelihood of harm and deception to Plaintiffs and California Subclass members in that Philips has systematically perpetrated the unfair conduct upon members of the public by engaging in the conduct described herein.

486.     Pursuant to Business and Professions Code §§ 17200 and 17203, Plaintiffs and California Subclass members seek an order providing restitution and disgorgement of all profits relating to the above-described unfair business acts or practices, and injunctive and declaratory relief as may be appropriate.

487.     Because of their reliance on Philips' omissions concerning the Recalled Devices, Plaintiffs and California Subclass members suffered an ascertainable loss of money, property, and/or value and were harmed and suffered actual damages.

488.     Plaintiffs and California Subclass members are reasonable consumers who did not expect the risks inherent with the Recalled Devices.

489.     Philips' conduct in concealing and failing to disclose the true risks of the Recalled Devices is unfair in violation of the UCL, because it is immoral, unethical, unscrupulous, oppressive, and substantially injurious.

490.     Philips acted in an immoral, unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner.

491.    The gravity of harm resulting from Philips' unfair conduct outweighs any potential utility. The practice of selling Recalled Devices that present a substantial health risk to consumers harms the public at large and is part of a common and uniform course of wrongful conduct.

492.    The harm from Philips' conduct was not reasonably avoidable by consumers because only Philips was aware of the true facts concerning the risks of its Recalled Devices, and Philips did not disclose them, despite knowing of such defects. Plaintiffs and California Subclass members did not know of and had no reasonable means of discovering the true risk of using the Recalled Devices.

493.    Plaintiffs and California Subclass members suffered injury in fact, including lost money or property, as a result of Philips' unfair acts. Absent Philips' unfair conduct, Plaintiffs would not have bought the Recalled Devices.

494.    Through their unfair conduct, Philips acquired money that Plaintiffs and California Subclass members once had ownership of.

495.    Plaintiffs and California Subclass members accordingly seek appropriate relief under the UCL, including (a) restitution in full and (b) such orders or judgments as may be necessary to enjoin Philips from continuing their unfair practices.

**COUNT XIV**
**CALIFORNIA UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*. (Unlawful Prong)**
**On Behalf of the California Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

496.    Plaintiffs Bailey, Bastasch, Campbell, Luenebrink, Mest, Mitrovich, Nielsen, and Waybright reallege and incorporate by reference all preceding allegations as though fully set forth herein.

497.     Plaintiffs Bailey, Bastasch, Campbell, Luenebrink, Mest, Mitrovich, Nielson, and Waybright bring this cause of action individually and on behalf of the members of the California Subclass.

498.     The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200 ("UCL"). By engaging in business practices which are also illegal, Philips have violated the UCL.

499.     Philips' "unlawful" acts and practices include its RICO violations, breach of express warranty, breach of the implied warranty of merchantability, breach of implied warranty of usability, violations of the Magnuson-Moss Federal Warranty Act, fraud-based omissions and unjust enrichment.

500.     More specifically, Philips breached applicable warranties in connection with the sale and distribution of the Recalled Devices. Philips sold the Recalled Devices to Plaintiffs and the California Subclass members, knowing that they were defective and could cause serious health problems. Philips further refused to provide appropriate warranty relief in connection with the Recalled Devices, despite knowing that these medical devices are vital to Plaintiffs and California Subclass members' health.

501.     Plaintiffs and California Subclass members conferred tangible and material economic benefits upon Philips by purchasing the Recalled Devices. Plaintiffs and California Subclass members would not have purchased the Recalled Devices had they known the associated risks, or that Philips would refuse to appropriately repair or replace the devices.

502.     Plaintiffs and California Subclass members hold a property interest and right to possession in their respective Recalled Devices. Plaintiffs and California Subclass members have

a legal interest in their ability to safely use these medical devices and to have their Recalled Devices appropriately repaired or replaced. Philips' actions violated these interests and rights.

503.    Philips reaped unjust profits, revenue, and benefits by virtue of their UCL violations. Plaintiffs and California Subclass members seek restitutionary disgorgement of these unjust profits and revenues.

**COUNT XV**
**CALIFORNIA CONSUMERS LEGAL REMEDIES ACT**
**Cal. Civ. Code §1750,** ***et seq.***
**On Behalf of the California Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

504.    Plaintiffs Bailey, Bastasch, Campbell, Luenebrink, Mest, Mitrovich, Nielson, and Waybright reallege and incorporate by reference all preceding allegations as though fully set forth herein.

505.    Plaintiffs Bailey, Bastasch, Campbell, Luenebrink, Mest, Mitrovich, Nielson, and Waybright bring this cause of action individually and on behalf of the members of the California Subclass.

506.    The California Consumers Legal Remedies Act ("CLRA") protects California consumers from deceptive and unfair trade practices.

507.    Philips' conduct described herein constitutes the knowing act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in California, and was made by Philips with knowledge of the serious health risks associated with use of the Recalled Devices and with the intention that Plaintiffs and California Subclass members would rely on such conduct in purchasing the Recalled Devices, making it unlawful under Cal. Civ. Code §1750, *et seq.*

138

508.     Plaintiffs and California Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Cal. Civ. Code §1750, *et seq.* Plaintiffs and California Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

509.     Accordingly, pursuant to Cal. Civ. Code §1750, *et seq.*, Plaintiffs and California Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and California Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

510.     To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

## COUNT XVI
### CALIFORNIA FALSE ADVERTISING LAW
#### Cal. Bus. & Prof. Code § 17500, *et seq.*
#### On Behalf of the California Subclass, except for Class
#### Members who purchased a Recalled Device for business use only

511.    Plaintiffs Bailey, Bastasch, Campbell, Luenebrink, Mest, Mitrovich, Nielson, and Waybright reallege and incorporate by reference all preceding allegations as though fully set forth herein.

512.    Plaintiffs Bailey, Bastasch, Campbell, Luenebrink, Mest, Mitrovich, Nielson, and Waybright bring this cause of action individually and on behalf of the members of the California Subclass.

513.    The California False Advertising Law ("FAL") was created to protect California consumers from deceptive and unfair business practices.

514.    Philips' conduct described herein constitutes the knowing act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in California, making it unlawful under Cal. Bus. & Prof. Code § 17500, *et seq*.

515.    Plaintiffs and California Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Cal. Bus. & Prof. Code § 17500, *et seq*. Plaintiffs and California Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

516.     Accordingly, pursuant to Cal. Bus. & Prof. Code § 17500, *et seq*., Plaintiffs and California Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and California Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

### COUNT XVII
### COLORADO CONSUMER PROTECTION ACT
### Colo. Rev. Stat. § 6-1-101, *et seq.*
### On Behalf of the Colorado Subclass, except for Class
### Members who purchased a Recalled Device for business use only

517.     Plaintiff Archuleta realleges and incorporates by reference all preceding allegations as though fully set forth herein.

518.     Plaintiff Archuleta brings this cause of action individually and on behalf of the members of the Colorado Subclass.

519.     The Colorado Consumer Protection Act ("CCPA") was created to protect Colorado consumers from deceptive and unfair business practices.

520.     Philips' conduct described herein constitutes the knowing and willful act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Colorado, and was made with the

intention that Plaintiff and Colorado Subclass members would rely upon such conduct in purchasing the Recalled Devices, significantly impacting consumers and making it unlawful under Colo. Rev. Stat. § 6-1-101 *et seq*.

521.    Plaintiff and Colorado Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful Colo. Rev. Stat. § 6-1-101, *et seq*. Plaintiff and Colorado Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

522.    Accordingly, pursuant to Colo. Rev. Stat. § 6-1-101, *et seq*., Plaintiff and Colorado Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Colorado Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XVIII**
**CONNECTICUT UNFAIR TRADE PRACTICES ACT**
**Conn. Gen. Stat. § 42-110a to -110q, *et seq.***
**On Behalf of the Connecticut Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

523.    Plaintiffs Gottlieb, Leavenworth, Rohan, and Toscano reallege and incorporate by reference all preceding allegations as though fully set forth herein.

524.    Plaintiffs Gottlieb, Leavenworth, Rohan, and Toscano bring this cause of action individually and on behalf of the members of the Connecticut Subclass.

525.    The Connecticut Unfair Trade Practices Act ("CUPTA") was created to protect Connecticut consumers from deceptive and unfair business practices.

526.    Philips' conduct described herein constitutes the knowing act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Connecticut, making it unlawful under Conn. Gen. Stat. §42-110a, *et seq*.

527.    Plaintiffs and Connecticut Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Conn. Gen. Stat. §42-110a, *et seq*. Plaintiffs and Connecticut Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

528.    Accordingly, pursuant to Conn. Gen. Stat. §42-110a, *et seq*., Plaintiffs and Connecticut Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective

evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Connecticut Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XIX**
**DELAWARE CONSUMER FRAUD ACT**
**Del. Code Ann. tit. 6, §2511, *et seq.***
**On Behalf of the Delaware Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

529.    Plaintiff George realleges and incorporates by reference all preceding allegations as though fully set forth herein.

530.    Plaintiff George brings this cause of action individually and on behalf of the members of the Delaware Subclass.

531.    The Delaware Consumer Fraud Act ("DCFA") was created to protect Delaware consumers from deceptive and unfair business practices.

532.    Philips' conduct described herein constitutes the act, use or employment of conduct in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Delaware, which conduct created confusion or misunderstanding on the part of Plaintiff and Delaware Subclass members, making it unlawful under Del. Code Ann. tit. 6, §2511, *et seq*.

533.    Plaintiff and Delaware Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use

144

or employment of a method, act or practice declared unlawful by Del. Code Ann. tit. 6, §2511, *et seq*. Plaintiff and Delaware Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

534.    Accordingly, pursuant to Del. Code Ann. tit. 6, §2511, *et seq*., Plaintiff and Delaware Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Delaware Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XX**
**DISTRICT OF COLUMBIA CONSUMER PROTECTION PROCEDURES ACT**
**D.C. Code § 28-3901, *et seq*.**
**On Behalf of the D.C. Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

535.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

536.    Plaintiffs bring this cause of action individually and on behalf of the members of the D.C. Subclass.

537.    The District of Columbia Consumer Protection Procedures Act ("CPPA") was created to protect D.C. consumers from deceptive and unfair business practices.

538.   Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in D.C., that were misleading to Plaintiffs and D.C. Subclass members, making it unlawful under D.C. Code §28-3901, *et seq.*

539.   Plaintiffs and D.C. Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by D.C. Code §28-3901, *et seq.* Plaintiffs and D.C. Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

540.   Accordingly, pursuant to D.C. Code §28-3901, *et seq.*, Plaintiffs and D.C. Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and D.C. Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXI**
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**Fla. Stat. Ann. § 501.201 *et seq.***
**On Behalf of the Florida Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

541.   Plaintiffs Dzierzanowski, Fields, and Barbara Smith reallege and incorporate by reference all preceding allegations as though fully set forth herein.

542.   Plaintiffs Dzierzanowski, Fields, and Barbara Smith bring this cause of action individually and on behalf of the members of the Florida Subclass.

543.   The Florida Deceptive and Unfair Trade Practices Act was created to protect Florida consumers from deceptive and unfair business practices.

544.   Philips' conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Florida, making it unlawful under Fla. Stat. Ann. § 501.201 *et seq.*

545.   Plaintiffs and Florida Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Fla. Stat. Ann. § 501.201, *et seq.* Plaintiffs and Florida Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

546.   Accordingly, pursuant to Fla. Stat. Ann. § 501.201 *et seq.*, Plaintiffs and Florida Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages

are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Florida Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXII**
**FLORIDA FALSE ADVERTISING STATUTE**
**Fla. Stat. Ann. §§817.06, 817.41 *et seq.***
**On Behalf of the Florida Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

547.    Plaintiffs Dzierzanowski, Fields, and Barbara Smith reallege and incorporate by reference all preceding allegations as though fully set forth herein.

548.    Plaintiffs Dzierzanowski, Fields, and Barbara Smith bring this cause of action individually and on behalf of the members of the Florida Subclass.

549.    The Florida False Advertising Statute was created to protect Florida consumers from deceptive and unfair advertising practices.

550.    Philips' conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the advertisement of merchandise, the Recalled Devices, in trade or commerce in Florida and was made with the intention that Plaintiffs and Florida Subclass members rely on such advertisements in purchasing the Recalled Devices, making it unlawful under Fla. Stat. Ann. § 817.06 and §817.41, *et seq.*

551.     Plaintiffs and Florida Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Fla. Stat. Ann. § 817.06 and § 817.41, *et seq.* Plaintiffs and Florida Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

552.     Accordingly, under Fla. Stat. Ann. § 817.06 and §817.41, *et seq.*, Plaintiffs and Florida Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Florida Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

### COUNT XXIII
### GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### Ga. Code. Ann. §10-1-370, *et seq.*
### On Behalf of the Georgia Subclass, except for Class
### Members who purchased a Recalled Device for business use only

553.     Plaintiffs Fisher, Fultz, Lewis, Luke, Mercure, and Merrell reallege and incorporate by reference all preceding allegations as though fully set forth herein.

554.    Plaintiffs Fisher, Fultz, Lewis, Luke, Mercure, and Merrell bring this cause of action individually and on behalf of the members of the Georgia Subclass.

555.    The Georgia Uniform Deceptive Trade Practices Act was created to protect Georgia consumers from deceptive and unfair business practices.

556.    Philips' conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Georgia, making it unlawful under Ga. Code. Ann. §10-1-370, *et seq.*

557.    Plaintiffs and Georgia Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and have suffered and will continue to suffer ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Ga. Code. Ann. §10-1-370, *et seq.* Plaintiffs and Georgia Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that has resulted and will continue to result in damages to Plaintiffs and Georgia Subclass members.

558.    Accordingly, pursuant to Ga. Code. Ann. §10-1-370, *et seq.*, Plaintiffs and Georgia Subclass members are entitled to equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXIV**
**GEORGIA FAIR BUSINESS PRACTICES ACT**
**Ga. Code. Ann. §10-1-390, *et seq.***
**On Behalf of the Georgia Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

559.     Plaintiffs Fisher, Fultz, Lewis, Luke, Mercure, and Merrell reallege and incorporate by reference all preceding allegations as though fully set forth herein.

560.     Plaintiffs Fisher, Fultz, Lewis, Luke, Mercure, and Merrell bring this cause of action individually and on behalf of the members of the Georgia Subclass.

561.     The Georgia Fair Business Practices Act ("GFBPA") was created to protect Georgia consumers from deceptive and unfair business practices.

562.     Philips' conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Georgia, making it unlawful under Ga. Code. Ann. §10-1-390, *et seq.*

563.     Plaintiffs and Georgia Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Ga. Code. Ann. §10-1-390, *et seq.* Plaintiffs and Georgia Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

564.     Accordingly, pursuant Ga. Code. Ann. §10-1-390, *et seq.*, Plaintiffs and Georgia Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages

are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Georgia Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

565.    To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

### COUNT XXV
**HAWAII UNFAIR AND DECEPTIVE ACTS OR PRACTICES ACT**
**Haw. Rev. Stat. § 480-1, *et seq.***
**On Behalf of the Hawaii Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

566.    Plaintiff Brown realleges and incorporates by reference all preceding allegations as though fully set forth herein.

567.    Plaintiff Brown brings this cause of action individually and on behalf of the members of the Hawaii Subclass.

568.    The Hawaii Unfair and Deceptive Acts or Practices Act was created to protect Hawaii consumers from deceptive and unfair business practices.

569.    Philips' conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of

152

material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Hawaii, making it unlawful under Haw. Rev. Stat. §480-1, *et seq.*

570.    Plaintiff and Hawaii Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Haw. Rev. Stat. §480-1, *et seq.* Plaintiff and Hawaii Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

571.    Accordingly, pursuant Haw. Rev. Stat. §480-1, *et seq.,* Plaintiff and Hawaii Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Hawaii Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXVI**
**IDAHO CONSUMER PROTECTION ACT**
**Idaho Code §48-601,** *et seq.*
**On Behalf of the Idaho Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

572.     Plaintiffs Diamond and Savoure reallege and incorporate by reference all preceding allegations as though fully set forth herein.

573.     Plaintiffs Diamond and Savoure bring this cause of action individually and on behalf of the members of the Idaho Subclass.

574.     The Idaho Consumer Protection Act was created to protect Idaho consumers from deceptive and unfair business practices.

575.     Philips' conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Idaho, making it unlawful under Idaho Code §48-601, *et seq.*

576.     Plaintiffs and Idaho Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Idaho Code §48-601, *et seq.* Plaintiffs and Idaho Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

577.     Accordingly, pursuant to Idaho Code §48-601, *et seq.,* Plaintiffs and Idaho Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the

difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Idaho Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXVII**
**ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**815 Ill. Comp. Stat. Ann. §505/1, *et seq.***
**On Behalf of the Illinois Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

578.     Plaintiffs Baran, Brooks, and Rootberg reallege and incorporate by reference all preceding allegations as though fully set forth herein.

579.     Plaintiffs Baran, Brooks, and Rootberg bring this cause of action individually and on behalf of the members of the Illinois Subclass.

580.     The Illinois Consumer Fraud and Deceptive Business Practices Act was created to protect Illinois consumers from deceptive and unfair business practices.

581.     Philips' conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Illinois, with the intention that Plaintiffs and Illinois Subclass members would rely on such conduct in deciding to purchase the Recalled Devices, making it unlawful under 815 Ill. Comp. Stat. Ann. §505/1, *et seq.*

582.     Plaintiffs and Illinois Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by 815 Ill. Comp. Stat. Ann. §505/1, *et seq.* Plaintiffs and Illinois Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

583.     Accordingly, pursuant to 815 Ill. Comp. Stat. Ann. §505/1, *et seq.,* Plaintiffs and Illinois Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Illinois Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXVIII**
**ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**815 Ill. Comp. Stat. Ann. §5105/1, *et seq.***
**On Behalf of the Illinois Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

584.     Plaintiffs Baran, Brooks, and Rootberg reallege and incorporate by reference all preceding allegations as though fully set forth herein.

585.   Plaintiffs Baran, Brooks, and Rootberg bring this cause of action individually and on behalf of the members of the Illinois Subclass.

586.   The Illinois Uniform Deceptive Trade Practices Act was created to protect Illinois consumers from deceptive and unfair advertising practices.

587.   Philips' conduct described herein constitutes use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Illinois, with the intention that Plaintiffs and Illinois Subclass members would rely on such advertisements in deciding to purchase the Recalled Devices, making it unlawful under 815 Ill. Comp. Stat. Ann. §5105/1, *et seq*.

588.   Plaintiffs and Illinois Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by 815 Ill. Comp. Stat. Ann. §5105/1, *et seq*. Plaintiffs and Illinois Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

589.   Accordingly, Plaintiffs and the Illinois Subclass members are entitled to equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXIX**
**INDIANA DECEPTIVE CONSUMER SALES ACT**
**Ind. Code §24-5-0.5-1, *et seq.***
**On Behalf of the Indiana Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

590.    Plaintiffs Diane Anderson, Clark, Dusza, and Stephen Smith reallege and incorporate by reference all preceding allegations as though fully set forth herein.

591.    Plaintiffs Diane Anderson, Clark, Dusza, and Stephen Smith bring this cause of action individually and on behalf of the members of the Indiana Subclass.

592.    The Indiana Deceptive Consumer Sales Act was created to protect Indiana consumers from deceptive and unfair business practices.

593.    Philips' conduct described herein constitutes the knowing use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Indiana, making it unlawful under Ind. Code §24-5-0.5-1, *et seq.*

594.    Plaintiffs and Indiana Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Ind. Code §24-5-0.5-1, *et seq.* Plaintiffs and Indiana Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

595.    Accordingly, pursuant to Ind. Code §24-5-0.5-1, *et seq.,* Plaintiffs and Indiana Subclass members are entitled to recover their actual damages, which can be calculated with a

reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Indiana Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

596.     To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

**COUNT XXX**
**IOWA PRIVATE RIGHT OF ACTION FOR CONSUMER FRAUDS ACT**
**Iowa Code §714H.1, *et seq.***
**On Behalf of the Iowa Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

597.     Plaintiffs Abarr and Wilson reallege and incorporate by reference all preceding allegations as though fully set forth herein.

598.     Plaintiffs Abarr and Wilson bring this cause of action individually and on behalf of the members of the Iowa Subclass.

599.     The Iowa Private Right of Action for Consumer Frauds Act was created to protect Iowa consumers from deceptive and unfair trade practices.

600.    Philips' conduct described herein constitutes the knowing act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Iowa, and was made with the intention that the Plaintiffs and Iowa Subclass members rely on such conduct in purchasing the Recalled Devices, making it unlawful under Iowa Code §714H.1, *et seq.*

601.    Plaintiffs and Iowa Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Iowa Iowa Code §714H.1, *et seq*. Plaintiffs and Iowa Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

602.    Accordingly, pursuant to Iowa Code §714H.1, *et seq.*, Plaintiffs and Iowa Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Iowa Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXXI**
**KANSAS CONSUMER PROTECTION ACT**
**Kan. Stat. §50-623, *et seq.***
**On Behalf of the Kansas Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

603.    Plaintiffs Cathers and Fisher reallege and incorporate by reference all preceding allegations as though fully set forth herein.

604.    Plaintiffs Cathers and Fisher bring this cause of action individually and on behalf of the members of the Kansas Subclass.

605.    The Kansas Consumer Protection Act was created to protect Kansas consumers from deceptive and unfair business practices.

606.    Philips' conduct described herein constitutes the knowing and willful act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Kansas, making it unlawful under Kan. Stat. §50-623.

607.    Plaintiffs and Kansas Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Kan. Stat. §50-623. Plaintiffs and Kansas Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

608.    Accordingly, pursuant to Kan. Stat. §50-623, Plaintiffs and Kansas Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the

161

difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Kansas Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXXII**
**KENTUCKY CONSUMER PROTECTION ACT**
**Ky. Rev. Stat. § 367.110,** *et seq.*
**On Behalf of the Kentucky Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

609.     Plaintiffs Coleman and Ratliff reallege and incorporate by reference all preceding allegations as though fully set forth herein.

610.     Plaintiffs Coleman and Ratliff bring this cause of action individually and on behalf of the members of the Kentucky Subclass.

611.     The Kentucky Consumer Protection Act was created to protect Kentucky consumers from deceptive and unfair business practices.

612.     Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Kentucky, making it unlawful under Ky. Rev. Stat. §367.110.

613.     Plaintiffs and Kentucky Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use

or employment of a method, act or practice declared unlawful by Ky. Rev. Stat. § 367.110. Plaintiffs and Kentucky Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

614.    Accordingly, pursuant to Ky. Rev. Stat. § 367.110, Plaintiffs and Kentucky Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Kentucky Subclass members are entitled to all available statutory exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

### COUNT XXXIII
### REDHIBITION
### (Including Warranty of Fitness)
### Pursuant to La. Civ. Code art. 2520, *et seq.*
### On behalf of the Louisiana Subclass, except for Class
### Members who purchased a Recalled Device for business use only

615.    Plaintiffs Baudoin, Gilliard-Gunter, Susan Martin, Minnifield, and Romas, and reallege and incorporate by reference all preceding allegations as though fully set forth herein.

616.    Plaintiffs Baudoin, Gilliard-Gunter, Susan Martin, Minnifield, and Romas bring this cause of action individually and on behalf of the members of the Louisiana Subclass

617.    At all times herein, Philips was the manufacturer of the Recalled Devices sold to Plaintiffs.

163

618.     At the time the Recalled Devices were sold and/or delivered to Plaintiffs herein, Philips had reason to know and were in fact aware that Plaintiffs and Louisiana Subclass members intended to use the devices to treat sleep apnea or for other reasons related to breathing.

619.     The devices manufactured, distributed and/or sold by Philips were not reasonably fit for their ordinary and intended use and purpose.

620.     Philips is therefore liable to Plaintiffs and Louisiana Subclass members for all damages reasonable in the premises, in accordance with La. Civ. Code art. 2524.

621.     The Recalled Devices manufactured, distributed and/or sold by Philips contained redhibitory defects at the time of sale and/or delivery, including the propensity to degrade and/or emit potentially harmful substances, as described above.

622.     The Recalled Devices manufactured, distributed and/or sold by Philips contained redhibitory defects at the time of sale and/or delivery that render the devices so useless and/or inconvenient that it must be presumed that Plaintiffs and Louisiana Subclass members would not have purchased the devices had they known of the redhibitory defects.

623.     In the alternative, the redhibitory defects diminish the Recalled Devices' use and/or value to such an extent that it must be presumed that Plaintiffs and Louisiana Subclass members would have bought them, but for a lesser price.

624.     Philips is conclusively presumed to know of the defects in the Recalled Devices it manufactured.

625.     In addition, it is believed and alleged that Philips knew of the Defect in the devices at the time the Recalled Devices were sold and/or delivered to Plaintiffs and Louisiana Subclass members, and as such Philips is considered to be a seller in bad faith.

164

626.    The defective condition affecting the Recalled Devices was present at the time of their sale and/or delivery to Plaintiffs and Louisiana Subclass members.

627.    The defective condition affecting the Recalled Devices was neither known nor could have been discovered by Plaintiffs at the time the Recalled Devices were sold and/or delivered to them.

628.    As a result of Philips' Recalled Devices' redhibitory defects, Plaintiffs and Louisiana Subclass members have suffered actual damages in that each Recalled Device they purchased is worth less than the price they paid and which they would not have purchased at all had they known of the health risks associated with the use of the Recalled Devices.

629.    In addition, because Philips was aware at the time the Recalled Devices were sold and/or delivered to Plaintiffs and Louisiana Subclass members that Plaintiffs intended to use the Recalled Devices to treat sleep apnea or for other reasons related to breathing and that the Recalled Devices were not fit for Plaintiffs' particular purposes, Philips breached the contract of sale in bad faith.

630.    Philips is therefore liable to Plaintiffs and Louisiana Subclass members for a return of the purchase price (with interest from the time it was paid), insurance co-payments, reimbursement of reasonable expenses occasioned by the sale and those incurred for the preservation of the Recalled Devices and associated items, for damages, including any and all economic damages, cost of procuring a replacement device, mental anguish, fear and fright, inconvenience, and/or loss of use, and for reasonable attorneys' fees, in accordance with La. Civ. Code art. 2545.

**COUNT XXXIV**
**LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**La. Rev. Stat. Ann. §51:1401, *et seq.***
**On Behalf of the Louisiana Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

631.    Plaintiffs Baudoin, Gilliard-Gunter, Susan Martin, Minnifield, and Romas reallege and incorporate by reference all preceding allegations as though fully set forth herein.

632.    Plaintiffs Baudoin, Gilliard-Gunter, Susan Martin, Minnifield, and Romas bring this cause of action individually and on behalf of the members of the Louisiana Subclass.

633.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("LUPTA") was created to protect Louisiana consumers from deceptive and unfair business practices.

634.    Philips' conduct described herein constitutes the knowing and willful act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Louisiana, and was made with the intention that Plaintiffs and Louisiana Subclass members would rely upon such conduct in purchasing the Recalled Devices, making it unlawful under La. Rev. Stat. Ann. §51:1401.

635.    Plaintiffs and Louisiana Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by La. Rev. Stat. Ann. §51:1401. Plaintiffs and Louisiana Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

636.    Accordingly, pursuant to La. Rev. Stat. Ann. §51:1401, Plaintiffs and Louisiana Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Louisiana Subclass members are entitled to all available statutory exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

## COUNT XXXV
### MAINE UNFAIR TRADE PRACTICES ACT
### 5 Me. Rev. Stat. Ann. §§205-A, *et seq.*
### On Behalf of the Maine Subclass, except for Class
### Members who purchased a Recalled Device for business use only

637.    Plaintiffs Julie Barrett, Peter Barrett, Margoles, and Schwartz reallege and incorporate by reference all preceding allegations as though fully set forth herein.

638.    Plaintiffs Julie Barrett, Peter Barrett, Margoles, and Schwartz bring this cause of action individually and on behalf of the members of the Maine Subclass.

639.    The Maine Unfair Trade Practices Act was created to protect Maine consumers from deceptive and unfair business practices.

640.    Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale and advertisement of merchandise, the

Recalled Devices, in trade or commerce in Maine, making it unlawful under 5 Me. Rev. Stat. Ann §205-A.

641.    Plaintiffs and Maine Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by 5 Me. Rev. Stat. Ann §205-A. Plaintiffs and Maine Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

642.    Accordingly, pursuant to 5 Me. Rev. Stat. Ann §205-A, Plaintiffs and Maine Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Maine Subclass members are entitled to all available statutory exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

643.    To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

## COUNT XXXVI
### MAINE UNIFORM DECEPTIVE TRADE PRACTICES ACT
### 10 Me. Rev. Stat. tit. §1211, *et seq.*
### On Behalf of the Maine Subclass, except for Class
### Members who purchased a Recalled Device for business use only

644.     Plaintiffs Julie Barrett, Peter Barrett, Margoles, and Schwartz reallege and incorporate by reference all preceding allegations as though fully set forth herein.

645.     Plaintiffs Julie Barrett, Peter Barrett, Margoles, and Schwartz bring this cause of action individually and on behalf of the members of the Maine Subclass.

646.     The Maine Uniform Deceptive Trade Practices Act was created to protect Maine consumers from deceptive and unfair business practices.

647.     Philips' conduct described herein constitutes the act, use or employment of conduct in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Maine, which conduct created confusion or misunderstanding on the part of Plaintiffs and Maine Subclass Members, making it unlawful under 10 Me. Rev. Stat. tit. §1121.

648.     Plaintiffs and Maine Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by 10 Me. Rev. Stat. tit. §1121. Plaintiffs and Maine Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

649.     Accordingly, Plaintiffs and the Maine Subclass members are entitled to equitable relief necessary or proper to protect them from Philips' unlawful conduct and to award all appropriate damages and attorneys' fees and costs.

169

**COUNT XXXVII**
**MARYLAND CONSUMER PROTECTION ACT**
**Md. Code Com. Law §13-101, *et seq.***
**On Behalf of the Maryland Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

650.     Plaintiff Goodall reallege and incorporate by reference all preceding allegations as though fully set forth herein.

651.     Plaintiff Goodall brings this cause of action individually and on behalf of the members of the Maryland Subclass.

652.     The Maryland Consumer Protection Act was created to protect Maryland consumers from deceptive and unfair business practices.

653.     Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Maryland, making it unlawful under Md. Code Com. Law §1301, *et seq.*

654.     Plaintiff and Maryland Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Md. Code Com. Law §1301, *et seq*. Plaintiff and the Maryland Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

655.     Accordingly, pursuant to Md. Code Com. Law §1301, *et seq.*, Plaintiff and Maryland Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those

170

damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Maryland Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XXXVIII**
**MASSACHUSETTS REGULATION OF BUSINESS PRACTICES FOR CONSUMERS**
**Mass. Gen. L. Ch. 93A §1-11,** *et seq.*
**On Behalf of the Massachusetts Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

656.    Plaintiffs Bellotti and Conley reallege and incorporate by reference all preceding allegations as though fully set forth herein.

657.    Plaintiffs Bellotti and Conley bring this cause of action individually and on behalf of the members of the Massachusetts Subclass.

658.    The Massachusetts Regulation of Business Practices for Consumers Act was created to protect Massachusetts consumers from deceptive and unfair business practices.

659.    Philips' conduct described herein constitutes the knowing and intentional act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Massachusetts, making it unlawful under Mass. Gen. L. Ch. 93A §1-11, *et seq.*

660.    Plaintiffs and Massachusetts Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and

171

suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Mass. Gen. L. Ch. 93A §1-11, *et seq.* Plaintiffs and Massachusetts Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

661.    Accordingly, pursuant to Mass. Gen. L. Ch. 93A §1-11, *et seq.*, Plaintiffs and Massachusetts Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Massachusetts Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

662.    To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

**COUNT XXXIX**
**MICHIGAN CONSUMER PROTECTION ACT**
**Mich. Comp. Laws Ann. §445.901, *et seq.***
**On Behalf of the Michigan Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

663.    Plaintiffs McGuire and Wilks reallege and incorporate by reference all preceding allegations as though fully set forth herein.

664.    Plaintiffs McGuire and Wilks bring this cause of action individually and on behalf of the members of the Michigan Subclass.

665.    The Michigan Consumer Protection Act was created to protect Michigan consumers from deceptive and unfair business practices.

666.    Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Michigan, made with the intention that Plaintiffs and Michigan Subclass members would rely upon such conduct in purchasing the Recalled Devices, making it unlawful under Mich. Comp. Law Ann. §445.901, *et seq.*

667.    Plaintiffs and Michigan Subclass members relied upon the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Mich. Comp. Law Ann. §445.901, *et seq.*

668.    Plaintiffs and Michigan Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

173

669.     Accordingly, pursuant to Mich. Comp. Law Ann. §445.901, *et seq.*, Plaintiffs and Michigan Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Michigan Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

### COUNT XL
**MINNESOTA PREVENTION OF CONSUMER FRAUD ACT**
**Minn. Stat. §325F.68, *et seq.***
**On Behalf of the Minnesota Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

670.     Plaintiff Boudreau realleges and incorporates by reference all preceding allegations as though fully set forth herein.

671.     Plaintiff Boudreau brings this cause of action individually and on behalf of the members of the Minnesota Subclass.

672.     The Minnesota Prevention of Consumer Fraud Act was created to protect Minnesota consumers from deceptive and unfair sales practices.

673.     Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale of merchandise, the Recalled Devices, in trade or commerce in Minnesota, made with the intention that Plaintiff and Minnesota Subclass

members would rely upon such conduct in purchase of the Recalled Devices, making it unlawful under Minn. Stat. §325F.68, *et seq.*

674.    Plaintiff and Minnesota Subclass members relied upon the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Minn. Stat. §325F.68, *et seq.*

675.    Plaintiff and Minnesota Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

676.    Accordingly, pursuant to Minn. Stat. §325F.68, *et seq.*, Plaintiff and Minnesota Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Minnesota Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

## COUNT XLI
## MINNESOTA FALSE ADVERTISING ACT
### Minn. Stat. §325F.67, *et seq.*
### On Behalf of the Minnesota Subclass, except for Class
### Members who purchased a Recalled Device for business use only

677.    Plaintiff Boudreau realleges and incorporates by reference all preceding allegations as though fully set forth herein.

678.    Plaintiff Boudreau brings this cause of action individually and on behalf of the members of the Minnesota Subclass.

679.    The Minnesota False Advertising Statute was created to protect Minnesota consumers from deceptive and unfair advertising practices.

680.    Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the advertisement of merchandise, the Recalled Devices, in trade or commerce in Minnesota, made with the intention that Plaintiff and Minnesota Subclass members would rely upon such conduct in purchasing the Recalled Devices, making it unlawful under Minn. Stat. §325F.67, *et seq.*

681.    Plaintiff and Minnesota Subclass members relied on the material representations made by Philips and purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Minn. Stat. Minn. Stat. §325F.67, *et seq.*

682.    Plaintiff and Minnesota Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

683.     Accordingly, pursuant to Minn. Stat. §325F.67, *et seq.*, Plaintiff and Minnesota Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Minnesota Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XLII**
**MISSISSIPPI CONSUMER PROTECTION ACT**
**Miss. Code §75-24-1, *et seq.***
**On Behalf of the Mississippi Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

684.     Plaintiffs Godeaux and Tucker reallege and incorporate by reference all preceding allegations as though fully set forth herein.

685.     Plaintiffs Godeaux and Tucker bring this cause of action individually and on behalf of the members of the Mississippi Subclass.

686.     The Mississippi Consumer Protection Act ("MCPA") was created to protect Mississippi consumers from deceptive and unfair business practices.

687.     Philips' conduct described herein constitutes the knowing and willful act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the advertisement and sale of

merchandise, the Recalled Devices, in trade or commerce in Mississippi, making it unlawful under Miss. Code §75-24-1, *et seq.*

688.    Plaintiffs and Mississippi Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Miss. Code §75-24-1, *et seq.*

689.    Plaintiffs and Mississippi Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

690.    Accordingly, pursuant to Miss. Code §75-24-1, *et seq.*, Plaintiffs and Mississippi Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Mississippi Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

691.    To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements and invited Philips to engage in

the alternative dispute resolution process with the Mississippi Attorney General. Philips has failed to remedy its unlawful conduct.

**COUNT XLIII**
**MISSOURI MERCHANDISING PRACTICES ACT**
**Mo. Rev. Stat. § 407.010, *et seq.***
**On Behalf of the Missouri Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

692.    Plaintiff Young realleges and incorporates by reference all preceding allegations as though fully set forth herein.

693.    Plaintiff Young brings this cause of action individually and on behalf of the members of the Missouri Subclass.

694.    The Missouri Merchandising Practices Act ("MMPA") was created to protect Missouri consumers from deceptive and unfair business practices.

695.    Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in Missouri, making it unlawful under Mo. Rev. Stat. § 407.020.

696.    Plaintiff and Missouri Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Mo. Rev. Stat. § 407.020. Plaintiff and Missouri Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

179

697.    Accordingly, pursuant to Mo. Rev. Stat. § 407.025, Plaintiff and Missouri Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Missouri Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

## COUNT XLIV
### MONTANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION ACT
### Mont. Code §30-14-101, *et seq.*
### On Behalf of the Montana Subclass, except for Class
### Members who purchased a Recalled Device for business use only

698.    Plaintiff David realleges and incorporates by reference all preceding allegations as though fully set forth herein.

699.    Plaintiff David brings this cause of action individually and on behalf of the members of the Montana Subclass.

700.    The Montana Unfair Trade Practices and Consumer Protection Act was created to protect Montana consumers from deceptive and unfair business practices.

701.    Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression, and omission of material facts in connection with the advertisement and sale of merchandise, the

Recalled Devices, in trade or commerce in Montana, making it unlawful under Mont. Code §30-14-101, *et seq*.

702.    Plaintiff and Montana Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Mont. Code §30-14-101, *et seq*.

703.    Plaintiff and Montana Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

704.    Accordingly, pursuant to Mont. Code §30-14-101, *et seq.*, Plaintiff and Montana Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Montana Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

### COUNT XLV
### NEBRASKA CONSUMER PROTECTION ACT
### Neb. Rev. Stat. §59-1601, *et seq.*
### On Behalf of the Nebraska Subclass, except for Class
### Members who purchased a Recalled Device for business use only

705.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

706. Plaintiffs bring this cause of action individually and on behalf of the members of the Nebraska Subclass.

707. The Nebraska Consumer Protection Act ("NCPA") was created to protect Nebraska consumers from deceptive and unfair business practices that restrain trade and commerce in Nebraska.

708. Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the advertisement and sale of merchandise, the Recalled Devices, in restraint of trade or commerce in Nebraska, which affects the public interest, making it unlawful under Neb. Rev. Stat. §59-1601, *et seq*.

709. Plaintiffs and Nebraska Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Neb. Rev. Stat. §59-1601, *et seq*.

710. Plaintiffs and Nebraska Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

711. Accordingly, pursuant to Neb. Rev. Stat. §59-1601, *et seq*., Plaintiffs and Nebraska Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Nebraska Subclass members are entitled to all available

statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XLVI**
**NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**Neb. Rev. Stat. §87-301, *et seq.***
**On Behalf of the Nebraska Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

712.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

713.    Plaintiffs bring this cause of action individually and on behalf of the members of the Nebraska Subclass.

714.    The Nebraska Uniform Deceptive Trade Practices Act ("NUDTPA") was created to protect Nebraska consumers from deceptive and unfair business practices.

715.    Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the advertisement and sale of merchandise, the Recalled Devices, in trade or commerce in Nebraska, making it unlawful under Neb. Rev. Stat. §87-301, *et seq.*

716.    Plaintiffs and Nebraska Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Neb. Rev. Stat. §87-301, *et seq.*

717.    Plaintiffs and Nebraska Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

183

718.     Accordingly, pursuant to Neb. Rev. Stat. §87-301, *et seq.*, Plaintiffs and Nebraska Subclass members are entitled any and all equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XLVII**
**NEVADA DECEPTIVE TRADE PRACTICES ACT**
**Nev. Rev. Stat. §598.0999, *et seq.***
**On Behalf of the Nevada Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

719.     Plaintiff Lemus realleges and incorporates by reference all preceding allegations as though fully set forth herein.

720.     Plaintiff Lemus brings this cause of action individually and on behalf of the members of the Nevada Subclass.

721.     The Nevada Deceptive Trade Practices Act was created to protect Nevada consumers from deceptive and unfair business practices.

722.     Philips' conduct described herein constitutes the knowing and willing act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the advertisement and sale of merchandise, the Recalled Devices, in trade or commerce in Nevada, making it unlawful under Nev. Rev. Stat. §598.0999, *et seq.*

723.     Plaintiff and Nevada Subclass members the representations made by Philips purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Nev. Rev. Stat. §598.0999, *et seq.*

724.    Plaintiff and Nevada Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

725.    Accordingly, pursuant to under Nev. Rev. Stat. §598.0999, *et seq.*, Plaintiff and Nevada Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Nevada Sublass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

## COUNT XLVIII
### NEW HAMPSHIRE CONSUMER PROTECTION ACT
### N.H. Rev. Stat. §358-A:1, *et seq.*
### On Behalf of the New Hampshire Subclass, except for Class
### Members who purchased a Recalled Device for business use only

726.    Plaintiffs Lizotte, Malone, and Vlahos reallege and incorporate by reference all preceding allegations as though fully set forth herein.

727.    Plaintiffs Lizotte, Malone, and Vlahos bring this cause of action individually and on behalf of the members of the New Hampshire Subclass.

728.    The New Hampshire Consumer Protection Act was created to protect New Hampshire consumers from deceptive and unfair business practices.

729.     Philips' conduct described herein constitutes the knowing and reckless act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the advertisement and sale of merchandise, the Recalled Devices, in trade or commerce in New Hampshire, making it unlawful under N.H. Rev. Stat. §358-A:1, *et seq.*

730.     Plaintiffs and New Hampshire Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by N.H. Rev. Stat. §358-A:1, *et seq.*

731.     Plaintiffs and New Hampshire Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

732.     Accordingly, pursuant to under N.H. Rev. Stat. §358-A:1, *et seq.*, Plaintiffs and New Hampshire Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and New Hampshire Subclass members are entitled to all available statutory, exemplary, treble, and/or punitive damages and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT XLIX**
**VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J. Stat. Ann. §§56:8-1, *et seq.* ("CFA")**
**On Behalf of the New Jersey Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

733.    Plaintiffs Dennis, Ryan, and Taylor reallege and incorporate by reference all preceding allegations as though fully set forth herein.

734.    Plaintiffs Dennis, Ryan, and Taylor bring this action individually and on behalf of the members of the New Jersey Subclass.

735.    The New Jersey Consumer Fraud Act ("CFA") was created to protect New Jersey consumers from fraudulent business practices.

736.    Philips has knowingly engaged in deceptive, unconscionable, unlawful, unfair, false, fraudulent and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

737.    Plaintiffs and New Jersey Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by N.J. Stat. Ann. §56:8-2. Plaintiffs and New Jersey Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

738.    Accordingly, pursuant to the aforementioned statutes, Plaintiffs and New Jersey Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid

187

and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and New Jersey Subclass members are entitled to recover statutory, exemplary, treble, and/or punitive damages, together with interest, cost of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

**COUNT L**
**VIOLATIONS OF THE NEW MEXICO UNFAIR PRACTICES ACT**
**N.M. Stat. Ann. §§57-12-1,** *et seq.*
**On Behalf of the New Mexico Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

739.    Plaintiff Rodgers realleges and incorporates by reference all preceding allegations as though fully set forth herein.

740.    Plaintiff Rodgers brings this action individually and on behalf of the members of the New Mexico Subclass.

741.    The New Mexico Unfair Practices Act was created to protect New Mexico consumers from unfair, deceptive, and unconscionable trade practices.

742.    Philips has knowingly engaged in deceptive, unconscionable, unlawful, unfair, false, fraudulent, and misleading commercial practices, including misleading omissions of material fact, in connection with the oral and written marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

743.    Plaintiff and New Mexico Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by N.M. Stat. Ann. §§57-12-3.

Plaintiff and New Mexico Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

744.     Accordingly, pursuant to the aforementioned statutes, Plaintiff and New Mexico Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and New Mexico Subclass are entitled to recover statutory, exemplary, treble, and/or punitive damages, together with interest, cost of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

### COUNT LI
**VIOLATIONS OF THE NEW YORK DECEPTIVE ACTS OR PRACTICES AND FALSE ADVERTISING**
**N.Y. Gen. Bus. Law §349; §350**
**On Behalf of the New York Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

745.     Plaintiffs Bossey, Diaz, Ginsberg, Gold, and Woodward reallege and incorporate by reference all preceding allegations as though fully set forth herein.

746.     Plaintiffs Bossey, Diaz, Ginsberg, Gold, and Woodward bring this action individually and on behalf of the members of the New York Subclass.

747.     The N.Y. Gen. Bus. Laws were created to protect New York consumers from fraudulent business practices and false advertising.

748.     Philips unfairly engaged in deceptive, unconscionable, unlawful, unfair, false, fraudulent and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

749.     Plaintiffs and New York Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by N.Y. Gen. Bus. Law §§349; 350. Such deceptive method, act or practice was material to Plaintiffs and the New York Subclass' decision to purchase the Recalled Devices, as reasonable consumers would have acted under the circumstances, thereby resulting in such damages.

750.     Accordingly, pursuant to the aforementioned laws, Plaintiffs and New York Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and New York Subclass members are entitled to recover statutory, exemplary, treble, and/or punitive damages, together with interest, cost of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

<u>COUNT LII</u>
**VIOLATIONS OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE
PRACTICES ACT ("UDTPA")
N.C. Gen. Stat. §§75-1, *et seq*.
On Behalf of the North Carolina Subclass, except for Class
<u>Members who purchased a Recalled Device for business use only</u>**

751.    Plaintiffs Bartalo, Margoles, and Radack hereby reallege and incorporate by reference all preceding allegations as though fully set forth herein.

752.    Plaintiffs Bartalo, Margoles, and Radack bring this action individually and on behalf of the members of the North Carolina Subclass.

753.    The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") was created to protect North Carolina consumers from unfair or deceptive business practices.

754.    Philips has engaged in immoral, unethical, oppressive, unscrupulous, substantially injurious and misleading commercial practices, with the intent to deceive the consumer in connection with the marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

755.    Plaintiffs and North Carolina Subclass members reasonably relied on the actions by Philips when they purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property, due to these unfair and deceptive act and practices. Plaintiffs and North Carolina Subclass members acted as reasonable consumers would have acted under the circumstances, and entered into the transactions (purchasing the Recalled Devices) that resulted in the damages.

756.    Accordingly, pursuant to the aforementioned statutes, Plaintiffs and North Carolina Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid

191

and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled

Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the

nature of Philips' conduct, Plaintiffs and North Carolina Subclass members are entitled to recover

statutory, exemplary, treble, and/or punitive damages, together with interest, cost of suit, and

attorneys' fees based on the amount of time reasonable expended and equitable relief necessary,

and all such other relief as the Court deems proper.

**COUNT LIII**
**VIOLATIONS OF THE NORTH DAKOTA UNLAWFUL SALES OR ADVERTISING**
**PRACTICES ACT**
**N.D. Cent. Code §§ 51-15-01, *et seq.***
**On Behalf of the North Dakota Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

757.     Plaintiff Frenzel-Drew realleges and incorporates by reference all preceding

allegations as though fully set forth herein.

758.     Plaintiff Frenzel-Drew brings this action individually and on behalf of the members

of the North Dakota Subclass.

759.     The North Dakota Unlawful Sales or Advertising Practices Act was created to

protect North Dakota consumers from fraudulent business practices.

760.     Philips has intentionally and knowingly engaged in deceptive acts or practices,

fraud, false pretense, false promise and misleading and unconscionable commercial practices,

including misleading omissions of material fact, in connection with the advertisement, marketing,

promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the

dangers caused by the PE-PUR foam degradation.

761.     Plaintiff and North Dakota Subclass members purchased the Recalled Devices for

personal purposes and suffered ascertainable losses of money or property as the result of the use

or employment of a method, act or practice declared unlawful by N.D. Cent. Code §51-15-02.

Plaintiff and North Dakota Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

762.   Accordingly, pursuant to the aforementioned statutes, Plaintiff and North Dakota Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and North Dakota Subclass members are entitled to recover statutory, exemplary, treble, and/or punitive damages, together with interest, cost of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

## COUNT LIV
### VIOLATIONS OF THE OHIO CONSUMER SALES PRACTICES ACT
#### Ohio Rev. Code §§ 1345.01, *et seq*. ("CSPA")
#### On Behalf of the Ohio Subclass, except for Class
#### Members who purchased a Recalled Device for business use only

763.   Plaintiffs Flick, Fultz, Giordano, Hock, Stefanini, and Ward reallege and incorporate by reference all preceding allegations as though fully set forth herein.

764.   Plaintiffs Flick, Fultz, Giordano, Hock, Stefanini, and Ward bring this action individually and on behalf of the members of the Ohio Subclass.

765.   The Ohio Consumer Sales Practices Act was created to protect Ohio consumers from unfair or deceptive business practices.

766.     Philips has intentionally engaged in deceptive and unfair acts or practices, false promises and misleading and unconscionable commercial practices, including misleading omissions of material fact, in connection with the advertisement, marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

767.     Plaintiffs and Ohio Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Ohio Rev. Code §§1345.02(A); 1345.03(A). Plaintiffs and Ohio Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

768.     Accordingly, pursuant to the aforementioned statutes, Plaintiffs and Ohio Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, Plaintiffs and Ohio Subclass members are entitled to cost of suit and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

## COUNT LV
### VIOLATIONS OF THE OKLAHOMA CONSUMER PROTECTION ACT
### 15 Okla. Stat. Ann. §§ 751, *et seq*. ("OCPA")
### On Behalf of the Oklahoma Subclass, except for Class
### Members who purchased a Recalled Device for business use only

769.     Plaintiff Mcelyea realleges and incorporates by reference all preceding allegations as though fully set forth herein.

770.     Plaintiff Mcelyea brings this action individually and on behalf of the members of the Oklahoma Subclass.

771.     The Oklahoma Consumer Protection Act ("OCPA") was created to protect Oklahoma consumers from unfair methods of competition and unfair or deceptive business practices.

772.     Philips has knowingly engaged in deceptive, unconscionable, unlawful, unfair, immoral, unethical, oppressive, unscrupulous, fraudulent and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

773.     Plaintiff and Oklahoma Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by 15 Okla. Stat. Ann. §§ 752 (13), 752 (14). Plaintiff and Oklahoma Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

774.     Accordingly, pursuant to the aforementioned statutes, Plaintiff and Oklahoma Subclass members are entitled to recover their actual damages, which can be calculated with a

reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Oklahoma Subclass members are entitled to recover all available statutory, exemplary, treble, and/or punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

## COUNT LVI
### VIOLATIONS OF THE OREGON UNLAWFUL TRADE PRACTICES ACT
Or. Rev. Stat. §§646.605, *et seq*. ("UTPA")
**On Behalf of the Oregon Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

775.    Plaintiffs Julie Barrett, Peter Barrett, and Nielson reallege and incorporate by reference all preceding allegations as though fully set forth herein.

776.    Plaintiffs Julie Barrett, Peter Barrett, and Nielson bring this action individually and on behalf of the members of the Oregon Subclass.

777.    The Oregon Unlawful Trade Practices Act ("UTPA") was created to protect Oregon consumers from fraudulent business practices.

778.    Philips has willfully, knowingly, and recklessly engaged in deceptive, unfair, false, fraudulent and misleading commercial practices, including misleading representation, or omissions of material fact, in connection with the marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

779.     Plaintiffs and Oregon Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Or. Rev. Stat. §646.607. Plaintiffs and Oregon Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

780.     Accordingly, pursuant to the aforementioned statutes, Plaintiffs and Oregon Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Oregon Subclass members are entitled to recover statutory, exemplary, treble, and/or punitive damages, together with interest, cost of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

### COUNT LVII
### VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW
### 73 Pa. Stat. Ann. §§201-1, *et seq.* ("UTPCPL")
### On Behalf of the Pennsylvania Subclass, except for Class
### Members who purchased a Recalled Device for business use only

781.     Plaintiffs Masington, Matthew Smith, and Sweeney reallege and incorporate by reference all preceding allegations as though fully set forth herein.

782.     Plaintiffs Masington, Matthew Smith, and Sweeney bring this action individually and on behalf of the members of the Pennsylvania Subclass.

783.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") was created to protect Pennsylvania consumers from fraudulent or deceptive business practices.

784.    Philips has knowingly engaged in deceptive, unconscionable, unfair, false, fraudulent and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

785.    Plaintiffs and Pennsylvania Subclass members justifiably relied on Philips unlawful conduct in purchasing the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the act or practice declared unlawful by 73 Pa. Stat. Ann. §§201-1, *et seq*. Plaintiffs and Pennsylvania Subclass members acted as reasonable consumers would have acted under the circumstances and would not have purchased the Recalled Devices had they known the truth.

786.    Accordingly, pursuant to the aforementioned statutes, Plaintiffs and Pennsylvania Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Pennsylvania Subclass members are entitled to recover all available statutory, exemplary, treble, and/or punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

**COUNT LVIII**
**VIOLATIONS OF THE RHODE ISLAND UNFAIR TRADE PRACTICE AND**
**CONSUMER PROTECTION ACT**
**R.I. Gen. Laws §§ 6-13.1-1, *et seq*.**
**On Behalf of the Rhode Island Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

787.    Plaintiffs Lamontagne and Weiner reallege and incorporate by reference all preceding allegations as though fully set forth herein.

788.    Plaintiff Lamontagne and Weiner bring this action individually and on behalf of the members of the Rhode Island Subclass.

789.    The Rhode Island Unfair Trade Practice and Consumer Protection Act was created to protect Rhode Island consumers from unfair and deceptive business practices.

790.    Philips has engaged in deceptive, unconscionable, unfair, immoral, unethical, oppressive, unscrupulous and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

791.    Plaintiff and Rhode Island Subclass members justifiably relied on Philips' unlawful conduct in purchasing the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of Philips' use or employment of a method, act or practice declared unlawful by R.I. Gen. Laws §§ 6-13.1-1, *et seq*. Plaintiff and the Rhode Island Subclass acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

792.    Accordingly, pursuant to the aforementioned statutes, Plaintiff and Rhode Island Subclass members are entitled to recover their actual damages, which can be calculated with a

reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Rhode Island Subclass members are entitled to recover all available statutory, exemplary, treble, and/or punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

## COUNT LIX
### VIOLATIONS OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT
#### S.C. Code Ann. §§ 39-5-10, *et seq*. ("SCUTPA")
#### On Behalf of the South Carolina Subclass, except for Class
#### Members who purchased a Recalled Device for business use only

793.    Plaintiffs William Anderson and Diaz reallege and incorporate by reference all preceding allegations as though fully set forth herein.

794.    Plaintiffs William Anderson and Diaz bring this action individually and on behalf of the members of the South Carolina Subclass.

795.    The South Carolina Unfair Trade Practices Act ("SCUTPA") was created to protect South Carolina consumers from unlawful business practices.

796.    Philips has knowingly engaged in unlawful, unfair, deceptive, immoral, unethical, oppressive, fraudulent and misleading commercial practices, including misleading omissions of material fact, in connection with the marketing, promotion and sale of the Recalled Devices misrepresenting their safety and failing to disclose the dangers caused by the PE-PUR foam degradation.

797.    Plaintiffs and South Carolina Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by S.C. Code Ann. §§ 39-5-10, *et seq*. Plaintiffs and the South Carolina Subclass acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

798.    Accordingly, pursuant to the aforementioned statutes, Plaintiffs and South Carolina Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and South Carolina Subclass members are entitled to recover all available statutory, exemplary, treble, and/or punitive damages, costs of suit, and attorneys' fees based on the amount of time reasonable expended and equitable relief necessary, and all such other relief as the Court deems proper.

### COUNT LX
**SOUTH DAKOTA DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**S.D. Codified Laws §§ 37-24-1, *et seq.***
**On Behalf of the South Dakota Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

799.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

800.    Plaintiffs bring this cause of action individually and on behalf of the members of the South Dakota Subclass.

801.     The South Dakota Deceptive Trade Practices and Consumer Protection Act was created to protect South Dakota consumers from deceptive and unfair business practices.

802.     Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts in connection with the sale and advertisement of merchandise, the Recalled Devices, in trade or commerce in South Dakota, making it unlawful under S.D. Codified Laws § 37-24-6(1).

803.     Plaintiffs and South Dakota Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by S.D. Codified Laws § 37-24-6.

804.     Plaintiffs and South Dakota Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

805.     Accordingly, pursuant to S.D. Codified Laws § 37-24-31, Plaintiffs and South Dakota Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and South Dakota Subclass members are entitled to recover all available statutory, exemplary, treble, or punitive damages, and attorneys' fees and

costs based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT LXI**
**TENNESSEE CONSUMER PROTECTION ACT**
**Tenn. Code Ann. §§ 47-18-101, *et seq*.**
**On Behalf of the Tennessee Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

806.    Plaintiffs Craig and Hill reallege and incorporate by reference all preceding allegations as though fully set forth herein.

807.    Plaintiffs Craig and Hill bring this cause of action individually and on behalf of the members of the Tennessee Subclass.

808.    The Tennessee Consumer Protection Act ("TCPA") was created to protect Tennessee consumers from deceptive and unfair business practices.

809.    Philips' conduct described herein with respect to the Recalled Devices constitutes "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce" in Tennessee, making it unlawful under Tenn. Code Ann. § 47-18-104(a).

810.    Plaintiffs and Tennessee Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Tenn. Code Ann. §§ 47-18-104(b). Plaintiffs and Tennessee Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

811.    Accordingly, pursuant to Tenn. Code § 47-18-109(a)(1), Plaintiffs and Tennessee Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages

are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Tennessee Subclass members are entitled to recover treble damages for the willful and knowing violation of the TCPA and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT LXII**
**TEXAS DECEPTIVE TRADE PRACTICES AND CONSUMER PROTECTION ACT**
**Tex. Bus. Comm. Code Ann. §§ 17.41, *et seq*.**
**On Behalf of the Texas Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

812.    Plaintiffs Deleon, Lowney, Malone, Panzera, Phillips, Polk, and Tobin reallege and incorporate by reference all preceding allegations as though fully set forth herein.

813.    Plaintiffs Deleon, Lowney, Malone, Panzera, Phillips, Polk, and Tobin bring this cause of action individually and on behalf of the members of the Texas Subclass.

814.    The Texas Deceptive Trade Practices Act ("TDTPA") was created to protect Texas consumers from deceptive and unfair business practices.

815.    Philips' conduct described herein constitutes a violation of several of the provisions enumerated in Tex. Bus. & Com. Code Ann. § 17.46(b), including but not limited to, misleading, misrepresenting, omitting, or supplying false information to consumers as to the source, affiliation, certification, characteristics, ingredients, uses, benefits, quantities, standard, or condition of the Recalled Devices.

816.    Plaintiffs and Texas Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use

204

or employment of a method, act or practice declared unlawful by Tex. Bus. & Com. Code Ann. § 17.46(b). Plaintiffs and Texas Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

817.    Accordingly, pursuant to Tex. Bus. & Com. Code Ann. § 17.50(b)(1), (h), Plaintiffs and Texas Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Texas Subclass members are entitled to recover treble damages for the willful and knowing violation of the TDTPA and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

818.    To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

**COUNT LXIII**
**UTAH CONSUMER SALES PRACTICES ACT**
**Utah Code Ann. §§ 13-11-1,** *et seq.*
**On Behalf of the Utah Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

819.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

820.    Plaintiff brings this cause of action individually and on behalf of the members of the Utah Subclass.

821.    The Utah Consumer Sales Practices Act ("UCSPA") was created to protect Utah consumers from deceptive and unfair business practices.

822.    Philips' conduct described herein constitutes the act, use or employment of deception, false promise, misrepresentation, unfair practice and the concealment, suppression and omission of material facts by a supplier in connection with a consumer transaction, purchase of Recalled Devices, making it unlawful under Utah Code Ann. §§ 13-11-4(1), 13-11-5(1).

823.    Plaintiffs and Utah Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Utah Code Ann. §§ 13-11-4(1), 13-11-4(2). Plaintiffs and Utah Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

824.    Accordingly, pursuant to Utah Code Ann. § 13-11-19(2), Plaintiffs and Utah Subclass members are entitled to recover either (1) their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their

prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices or (2) $2,000 each, whichever is greater. In addition, given the nature of Philips' conduct, Plaintiffs and Utah Subclass members are entitled to recover attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT LXIV**
**TRUTH IN ADVERTISING ACT (UTAH)**
**Utah Code Ann. §§ 13-11a-1, *et seq.***
**On Behalf of the Utah Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

825.    Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

826.    Plaintiffs bring this cause of action individually and on behalf of the members of the Utah Subclass.

827.    The Truth in Advertising Act ("TIAA") was created to protect Utah consumers from deceptive and unfair business practices.

828.    Philips' conduct described herein related to Recalled Devices constitutes deceptive, misleading, and false advertising practices and forms in the state of Utah and constitutes conduct which created a likelihood of confusion or of misunderstanding, making it unlawful under Utah Code Ann. §§ 13-11a-1, 13-11a-3(1)(t).

829.    Plaintiffs and Utah Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Utah Code Ann. § 13-11a-3. Plaintiffs and Utah Subclass members acted as reasonable consumers would have acted under the

circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

830.    Accordingly, pursuant to Utah Code Ann. § 13-11a-4(2)(b), Plaintiffs and Utah Subclass members are entitled to recover either (1) their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices or (2) $2,000 each, whichever is greater. In addition, given the nature of Philips' conduct, Plaintiffs and Utah Subclass members are entitled to recover attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT LXV**
**VERMONT CONSUMER FRAUD ACT**
**Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.***
**On Behalf of the Vermont Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

831.    Plaintiff David Martin reallege and incorporate by reference all preceding allegations as though fully set forth herein.

832.    Plaintiff David Martin brings this cause of action individually and on behalf of the members of the Vermont Subclass.

833.    The Vermont Consumer Fraud Act ("VCFA") was created to protect Vermont consumers from deceptive and unfair business practices.

834.    Philips' conduct described herein with respect to the Recalled Devices constitutes unfair or deceptive acts or practices in commerce in Vermont, making it unlawful under Vt. Stat. Ann. tit. 9, § 2453(a).

835.    Plaintiff and Vermont Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Vt. Stat. Ann. tit. 9, § 2453(a). Plaintiff and Vermont Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

836.    Accordingly, pursuant to Vt. Stat. Ann. tit. 9, § 2461(b), Plaintiff and Vermont Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Vermont Subclass Members are entitled to recover treble damages for the willful, wanton, and malicious violation of the VCFA and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT LXVI**
**VIRGINIA CONSUMER PROTECTION ACT**
**Va. Code Ann. §§ 59.1-196, *et seq.***
**On Behalf of the Virginia Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

837.    Plaintiffs Heilman, Hudson, Rodgers, and Rose reallege and incorporate by reference all preceding allegations as though fully set forth herein.

838.    Plaintiffs Heilman, Hudson, Rodgers, and Rose bring this cause of action individually and on behalf of the members of the Virginia Subclass.

839.    The Virginia Consumer Protection Act ("VCPA") was created to protect Virginia consumers from deceptive and unfair business practices.

840.    Philips' conduct described herein constitutes a violation of several of the provisions enumerated in Va. Code Ann. § 59.1-200(A)(1)-(60) including but not limited to: misrepresentations as to a product's characteristics; misrepresentations as to a product's standard or style; advertising goods with intent not to sell as advertised; and any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

841.    Plaintiffs and Virginia Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Va. Code Ann. § 59.1-200(A)(1)-(60). Plaintiffs and Virginia Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

842.    Accordingly, pursuant to Va. Code § 59.1-204(A), Plaintiffs and Virginia Subclass members are entitled to recover either (1) their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence, and those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices or (2) $500 each, whichever is greater. In addition, given the nature of Philips' conduct, Plaintiffs and Virginia Subclass members are entitled to recover treble damages (or $1,000 each, whichever is greater) for the willful and knowing violation of the VCPA and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT LXVII**
**WASHINGTON CONSUMER PROTECTION ACT**
**Wash. Rev. Code § 19.86.020, *et seq.***
**On Behalf of the Washington Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

843.    Plaintiffs Lopez and Peebles reallege and incorporate by reference all preceding allegations as though fully set forth herein.

844.    Plaintiffs Lopez and Peebles bring this cause of action individually and on behalf of the members of the Washington Subclass.

845.    The Washington Unfair Business Practices – Consumer Protection Act ("WCPA") was created to protect Washington consumers from deceptive and unfair business practices.

846.    Philips' conduct described herein with respect to the Recalled Devices constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce in Washington, making it unlawful under Wash. Rev. Code § 19.86.020.

847.    Plaintiffs and Washington Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Wash. Rev. Code § 19.86.020. Plaintiffs and Washington Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

848.    Accordingly, pursuant to Wash. Rev. Code § 19.86.090, Plaintiffs and Washington Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled

Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Washington Subclass members are entitled to recover treble damages for the knowing and willful violation of the WCPA and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT LXVIII**
**WEST VIRGINIA CONSUMER CREDIT PROTECTION ACT**
**W. Va. Code Ann. § 46A-6-101, _et seq._**
**On Behalf of the West Virginia Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

849.    Plaintiffs Bays and Hamlin reallege and incorporate by reference all preceding allegations as though fully set forth herein.

850.    Plaintiffs Bays and Hamlin bring this cause of action individually and on behalf of the members of the West Virginia Subclass.

851.    The West Virginia Consumer Credit Protection Act ("WVCCPA") was created to protect West Virginia consumers from deceptive and unfair business practices.

852.    Philips' conduct described herein with respect to the Recalled Devices constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce in West Virginia, making it unlawful under W. Va. Code Ann. §§ 46A-6-104.

853.    Plaintiffs and West Virginia Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by W. Va. Code Ann. § 46A-6-102(7). Plaintiffs and West Virginia Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

212

854.     Accordingly, pursuant to W. Va. Code § 46A-6-106(a), Plaintiffs and West Virginia Subclass members are entitled to recover either (1) their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence, and those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices or (2) $200 each, whichever is greater. In addition, given the nature of Philips' conduct, Plaintiffs and West Virginia Subclass Members are entitled to recover statutory damages of $1,000 per violation for the knowing and willful violation of the WVCCPA and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

855.     To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

**COUNT LXIX**
**WISCONSIN DECEPTIVE TRADE PRACTICE ACT**
**Wis. Stat. § 100.18, *et seq.***
**On Behalf of the Wisconsin Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

856.     Plaintiff Matters reallege and incorporate by reference all preceding allegations as though fully set forth herein.

857.     Plaintiff Matters brings this cause of action individually and on behalf of the members of the Wisconsin Subclass.

858.    The Wisconsin Deceptive Trade Practice Act ("WDTPA") was created to protect Wisconsin consumers from deceptive and unfair business practices.

859.    Philips' conduct described herein with respect to the Recalled Devices constitutes unfair or deceptive acts or practices and untrue, deceptive or misleading representations made in connection with a sale, making it unlawful under Wis. Stat. § 100.18(1).

860.    Plaintiff and Wisconsin Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Wis. Stat. §§ 100.18(2), 100.18(9)(a). Plaintiff and Wisconsin Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

861.    Accordingly, pursuant to Wis. Stat. § 100.18(11)(b)(2), Plaintiff and Wisonsin Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiff and Wisconsin Subclass members are entitled to recover attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

**COUNT LXX**
**WYOMING CONSUMER PROTECTION ACT**
**Wyo. Stat. Ann. §§ 40-12-101, *et seq.***
**On Behalf of the Wyoming Subclass, except for Class**
**Members who purchased a Recalled Device for business use only**

862.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

863.   Plaintiffs bring this cause of action individually and on behalf of the members of the Wyoming Subclass.

864.   The Wyoming Consumer Protection Act ("WCPA") was created to protect Wyoming consumers from deceptive and unfair business practices.

865.   Philips' conduct described herein constitutes a violation of several of the provisions enumerated in Wyo. Stat. Ann. § 40-12-105(a) including but not limited to: knowingly engaging in unfair or deceptive acts or practices, misrepresenting the source, nature, quality, condition, or price of merchandise, and advertising good with the intent not to sell them as advertised.

866.   Plaintiffs and Wyoming Subclass members purchased the Recalled Devices for personal purposes and suffered ascertainable losses of money or property as the result of the use or employment of a method, act or practice declared unlawful by Wyo. Stat. Ann. § 40-12-105(a). Plaintiffs and Wyoming Subclass members acted as reasonable consumers would have acted under the circumstances, and Philips' unlawful conduct would cause reasonable persons to enter into the transactions (purchasing the Recalled Devices) that resulted in the damages.

867.   Accordingly, pursuant to Wyo. Stat. Ann. § 40-12-108(a), Plaintiffs and Wyoming Subclass members are entitled to recover their actual damages, which can be calculated with a reasonable degree of certainty using sufficiently definitive and objective evidence. Those damages are: (a) the difference between the values of the Recalled Devices as represented (their prices) paid

and their actual values at the time of purchase ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages. In addition, given the nature of Philips' conduct, Plaintiffs and Wyoming Subclass members are entitled to statutory, exemplary, treble, and/or punitive damages for the willful and knowing violation of the WCPA and attorneys' fees based on the amount of time reasonably expended and equitable relief necessary or proper to protect them from Philips' unlawful conduct.

868.    To the extent that any pre-suit notice was purportedly required, Philips has had notice of its violations for nearly a year. Further, at a minimum on October 28, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements. Philips has failed to remedy its unlawful conduct.

## VIII.   <u>RELIEF NOT REQUESTED AND RESERVATION OF RIGHTS</u>

869.    None of the causes of action asserted herein seeks damages or other relief for medical monitoring or personal injuries allegedly attributable to Plaintiffs' and Class members' use of a Recalled Device. Such claims will be governed by the Consolidated Class Action (Medical Monitoring) Complaint and/or the Master Personal Injury Complaint, to be filed by August 22, 2022, pursuant to Pretrial Order #14 (ECF 573), and any additional Short Form complaints that may be filed (or as otherwise agreed by the parties). The named Plaintiffs in this complaint expressly reserve their right to seek damages or other relief for medical monitoring and/or personal injuries they may have suffered, regardless of whether those damages are sought through causes of action alleged herein or otherwise.

## IX.   **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs request, individually and on behalf of the Nationwide Class and State Subclasses, that this Court:

      A.    determine that the claims alleged herein may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Nationwide Class and Subclasses defined above, and designate Plaintiffs as the class and subclass representatives as specified above and Plaintiffs' counsel as counsel for the Nationwide Class and State Subclasses;

      B.    award equitable relief, including but not limited to, requiring Philips to provide restitution and disgorgement of profits;

      C.    award all damages to which Plaintiffs and Class members are entitled;

      D.    award pre-judgment and post-judgment interest on such monetary relief;

      E.    award reasonable attorneys' fees and costs; and

      F.    grant such further and other relief that this Court deems appropriate.

## X.   **JURY DEMAND**

Plaintiff and the Class and Subclasses demand a trial by jury on all issues so triable.

Dated:  June 17, 2022                          Respectfully submitted,


*/s/ Sandra L. Duggan*                         */s/ Kelly K. Iverson*
Sandra L. Duggan, Esquire                      Kelly K. Iverson, Esquire
**LEVIN SEDRAN & BERMAN LLP**                  **LYNCH CARPENTER, LLP**
510 Walnut Street, Suite 500                   1133 Penn Avenue, 5th Floor
Philadelphia, PA 19106                         Pittsburgh, PA 15222
(215)592-1500 (phone)                          (412) 322-9243 (phone)
(215)592-4633 (fax)                            kelly@lcllp.com
sduggan@lfsblaw.com

                                               */s/ Steven A. Schwartz*
*/s/ Christopher A. Seeger*                     Steven A. Schwartz, Esquire
Christopher A. Seeger, Esquire

217

**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
(973) 639-9100 (phone)
cseeger@seegerweiss.com

**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041
(610) 642-8500 (phone)
steveschwartz@chimicles.com

*Plaintiffs' Co-Lead Counsel*

William Audet, Esquire
**AUDET & PARTNERS, LLP**
711 Van Ness, Suite 500
San Francisco, CA 94102
(415) 568-2555 (phone)
(415) 568-2556 (fax)
waudet@audetlaw.com

Ron Anthony Austin, Esquire
**RON AUSTIN LAW, LLC**
400 Manhattan Blvd.
Harvey, LA 70058
(504) 227-8100 (phone)
(504) 227-8122 (fax)
raustin@ronaustinlaw.com

Shanon J. Carson, Esquire
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-4656 (phone)
(215) 875-4604 (fax)
scarson@bm.net

Lauren Sanderson Miller, Esquire
**HAGENS BERMAN SOBOL SHAPIRO
LLP**
1301 2nd Ave, Suite 2000
Seattle, WA 98101
(206) 623-7292 (phone)
laurenm@hbsslaw.com

Michael F. Ram, Esquire
**MORGAN & MORGAN**
Complex Litigation Group
711 Van Ness Avenue, Suite 500

Michael J. Blakely, Jr., Esquire
**POPE MCGLAMRY, P.C.**
3391 Peachtree Road, NE, Suite 300
Atlanta, GA 30326
(404) 523-7706 (phone)
mjblakely@pmkm.com

Virginia Marie Buchanan, Esquire
**LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN,
BARR & MOUGEY, P.A.**
316 S Baylen Street, Suite 600
Pensacola, FL 32502
(850) 435-7023 (phone)
(850) 436-6023 (fax)
vbuchanan@levinlaw.com

Jason Rathod, Esquire
**MIGLIACCIO & RATHOD LLP**
412 H St NE, Suite 302
Washington, DC 20002
(202) 509-5951 (phone)
(202) 800-2730 (fax)
jrathod@classlawdc.com

Joyce Chambers Reichard, Esquire
**KELLEY & FERRARO, LLP**
Ernst & Young Tower
950 Main Avenue, Suite 1300
Cleveland, OH 44113
(216) 575-0777 (phone)
(216) 575-0799 (fax)
jreichard@kelley-ferraro.com

Dena C. Sharp, Esquire
**GIRARD SHARP LLP**

218

San Francisco, CA 94102
(415) 358-6913 (phone)
(415) 358-6293 (fax)
MRam@forthepeople.com

601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800 (phone)
dsharp@girardsharp.com

David S. Stellings, Esquire
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson St., 8th Floor
New York, NY 10013
(212) 355-9500 (phone)
dstellings@lchb.com

*Plaintiffs' Steering Committee*

D. Aaron Rihn, Esquire
**ROBERT PEIRCE & ASSOCIATES, P.C.**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 (phone)
(412) 281-4229 (fax)
arihn@peircelaw.com

Peter St. Tienne Wolff, Esquire
**PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP**
One Oxford Centre - 38th Floor
Pittsburgh, PA 15219
(412) 263-2000 (phone)
(412) 263-2001 (fax)
psw@pietragallo.com

*Co-Liaison Counsel*

Miriam Fresco Agait, Esquire
**RUBENSTEIN LAW, P.A.**
9130 S. Dadeland Blvd, Suite PH
Miami, FL 33156
(305) 661-6000 (phone)
(305) 670-7555 (fax)
mfagrait@rubensteinlaw.com

Ava Cavaco, Esquire
**MESHBESHER & SPENCE**
1616 Park Avenue
Minneapolis, MN 55404
(612) 339-9121 (phone)
(612) 339-9188 (fax)
acavaco@meshbesher.com

Kristina Anderson, Esquire
**HENSLEY LEGAL GROUP, PC**
117 E. Washington Street, Ste 200
Indianapolis, IN 46204
(317) 472-3333 (phone)
kanderson@hensleylegal.com

Syreeta Defrance-Poindexter, Esquire
**BABIN LAW, LLC**
22 E. Gay Street, Suite 200
Columbus OH 43215
(614) 761-8800 (phone)
(614) 706-1775 (fax)
syreeta.poindexter@babinlaws.com

Claire E. Kreider, Esquire
**GAINSBURGH, BENJAMIN, DAVID,
MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163

Joseph L. Messa, Jr.
Ashley B. DiLiberto, Esquire
**MESSA & ASSOCIATES, P.C.**
123 S. 22nd Street

219

(504) 522-2304 (phone)
cberg@gainsben.com

Kathryn L. Harrison, Esquire
**CAMPBELL & LEVINE, LLC**
1700 Grant Building, Ste. 1700
Pittsburgh, PA 15219
(412) 261-0310 (phone)
(412) 261-5066 (fax)
kharrison@camlev.com

Inez Johnson Ross, Esquire
**ONDER LAW, LLC**
110 East Lockwood, 2nd Floor
St. Louis, MO 63119
(314) 227-7674 (phone)
(314) 963-1700 (fax)
iross@onderlaw.com

Philadelphia, PA  19103
(215) 568-3500 (phone)
(215) 568-3501 (fax)
adiliberto@messalaw.com

Ian W. Sloss, Esquire
**SILVER GOLUB & TEITELL LLP**
One Landmark Square, 15th Floor
Stamford, CT 06901
(203) 325-4491 (phone)
isloss@sgtlaw.com

Kevin W. Tucker, Esquire
**EAST END TRIAL GROUP LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
(412) 877-5220 (phone)
ktucker@eastendtrialgroup.com

*Leadership Development Committee*

Roberta D Liebenberg, Esquire (Chair)
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
(215) 567-6565 (phone)
(215) 568-5872 (fax)
rliebenberg@finekaplan.com

Lisa Ann Gorshe, Esquire (Vice Chair)
**JOHNSON BECKER PLLC**
444 Cedar Street, Ste 1800
Saint Paul, MN 55101
(612) 436-1852 (phone)
(612) 436-1801 (fax)
lgorshe@johnsonbecker.com

Arthur H. Stroyd, Jr., Esquire (Vice Chair)
**DEL SOLE CAVANAUGH STROYD LLC**
3 PPG Place, Suite 600
Pittsburgh, PA 15222
(412) 261-2172 (phone)
(412) 261-2110 (fax)
astroyd@dscslaw.com

*Settlement Committee*

Alyson L. Oliver, Esquire
**OLIVER LAW GROUP PC**
1647 W. Big Beaver Road
Troy, MI 48084-5380
(248) 327-6556 (phone)
(248) 436-3385 (fax)
aoliver@oliverlawgroup.com

*Time & Expenses Subcommittee*

Kyle G.A. Wallace, Esquire
**SHIVER HAMILTON CAMPBELL LLC**
3490 Piedmont Road, Suite 640
Atlanta, Georgia 30305
(404) 593-0020 (phone)
kwallace@shiverhamilton.com

Jason T. Dennett, Esquire
**TOUSLEY BRAIN STEPHENS PLLC**
1200 Fifth Avenue, Suite 1700
Seattle, WA 98101-3147
T (206) 682-5600
F (206) 682-2992
jdennett@tousley.com

Jeffrey A. Barrack, Esquire
**BARRACK, RODOS & BACINE**
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA  19103
(215) 963-0600 (phone)
(215) 963-0838 (fax)
jbarrack@barrack.com

John G. Emerson, Esquire
**EMERSON FIRM PLLC**
2500 Wilcrest, Suite 300
Houston, TX  77042
(800) 55-8449 (phone)
(501) 286-4659 (fax)
jemerson@emersonfirm.com

Justin Sobodash, Esquire
**LAW OFFICE OF JUSTIN SOBODASH PC**
833 SW Sunset Blvd., Suite 366
West Hollywood, CA  90069
(323) 337-9010 (phone)
Justin@Sobodashlaw.com

Caleb Marker, Esquire
**ZIMMERMAN REED**
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 (phone)

Joseph P. Guglielmo, Esquire
**SCOTT+SCOTT ATTORNEYS AT LAW**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY  10169
(212) 223-6444 (phone)
(212) 223-6334 (fax)
jguglielmo@scott-scott.com

Glenn A. Danas, Esquire
**ROBINS KAPLAN**
2049 Century Park East, Ste. 3400
Los Angeles, CA  90067
(310) 229-5410 (phone)
GDanas@RobinsKaplan.com

Rachel Soffin, Esquire
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN PLLC**
3833 Central Avenue
St. Petersburg, FL 33713
813-868-5601 (phone)
Rsoffin@milberg.com

Kenneth J. Grunfeld, Esquire
**GOLOMB SPIRIT GRUNFELD, P.C.**
1835 Market Street, Suite 2900
Philadelphia, PA 19103
(215) 985-4169 (phone)
(215) 985-4169 (fax)
kgrunfeld@GolombLegal.com

Marion Reilly, Esquire
**HILLIARD MARTINEZ GONZALES
L.L.P.**
719 S. Shoreline Blvd., Suite 500
Corpus Christi, TX 78401
(361) 882-1612 (phone)
marion@hmglawfirm.com

James J. Rosemergy, Esquire
**CAREY DANIS & LOWE**
8235 Forsyth Boulevard, Suite 1100
Saint Louis, MO 63105
(314) 725-7700 (phone)

(877) 500-8781 (fax)
caleb.marker@zimmreed.com

Kelly Hyman, Esquire
**THE HYMAN LAW FIRM, P.A.**
515 North Flagler Drive, Suite P-300
West Palm Beach, FL 33401
(561) 538-7198 (phone)
kellyhyman@thehymanlawfirm.com

David M. Birka-White, Esquire
**BIRKA-WHITE LAW OFFICES**
178 E. Prospect Avenue
Danville, CA  94526
(925) 362-9999 (phone)
dbw@birka-white.com

Geoffrey P. Norton, Esquire
**NORTON & MELNIK**
20920 Warner Center Lane, Suite B
Woodland Hills, CA  91367
(818) 999-9500 (phone)
(818) 999-9155 (fax)
gnorton@nortonmelnik.com

R. Scott Long, Esquire
**HENDRICKSON & LONG, PLLC**
214 Capital Street
Charleston, WV 25301
(304) 346-5500 (phone)
scott@handl.com

jrosemergy@careydanis.com

Myron Penn, Esquire
**PENN SEABORN, LLC**
53 Highway 110
P.O. Box 5335
Union Spring, AL  36089
(334) 738-4486 (phone)
(334) 738-4432 (fax)
myronpenn28@hotmail.com

J. Shane Hudson, Esquire
**HUDSON INJURY FIRM**
615 N. Virginia Avenue, Suite A
P.O. Box 2520
Tifton, GA  31793
(229) 396-5845 (phone)
jshudson@hudsoninjuryfirm.com

Robert H. Klonoff, Esquire
**ROBERT H. KLONOFF, LLC**
2425 SW 76th Ave
Portland, OR 97219
(503) 291-1570 (phone)
(503) 768-6671 (fax)
klonoff@usa.net

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was filed via the

Court's CM/ECF system on this 17th day of June 2022 and is available for download by all counsel

of record.

<u>*/s/ D. Aaron Rihn*</u>
D. Aaron Rihn, Esquire
PA I.D. No.: 85752
ROBERT PEIRCE & ASSOCIATES, P.C.
707 Grant Street
Suite 125
Pittsburgh, PA 15219
Tel: 412-281-7229
Fax: 412-281-4229
arihn@peircelaw.com

223