# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **IN RE: PHILIPS RECALLED CPAP,** | : | **Master Docket: Misc. No. 21-mc-1230-JFC** |
| **BI-LEVEL PAP, AND MECHANICAL** | : | |
| **VENTILATOR PRODUCTS** | : | **MDL No. 3014** |
| **LITIGATION** | : | |
| | : | **AMENDED MASTER LONG FORM** |
| **This Document Relates to:** | : | **COMPLAINT FOR PERSONAL** |
| **All Actions** | : | **INJURIES AND DAMAGES, AND** |
| | : | **DEMAND FOR JURY TRIAL** |

## TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF EXHIBITS ....................................................................................................... iv

I.      NATURE OF THE ACTION ................................................................... 2

II.     THE PARTIES ....................................................................................... 10

        A.      PLAINTIFFS ............................................................................... 10

        B.      DEFENDANTS ............................................................................ 11

        C.      THE GLOBAL PHILIPS ENTERPRISE, INCLUDING ALL PHILIPS
                ENTITIES NAMED AS DEFENDANTS, OPERATES AS A UNIFIED
                ENTITY KNOWN SIMPLY AS "PHILIPS." ................................ 16

III.    JURISDICTION AND VENUE ............................................................. 30

IV.     FACTUAL ALLEGATIONS ................................................................. 32

        A.      CPAP AND BIPAP MACHINES AND VENTILATORS ARE
                PRESCRIBED TO TREAT BREATHING DISORDERS................. 32

        B.      THE EVOLUTION OF CPAP, BIPAP, AND VENTILATOR DEVICES
                CONTAINING PE-PUR FOAM. ................................................ 35

        C.      PHILIPS DESIGNED, MANUFACTURED, AND MARKETED
                ADULTERATED CPAP, BIPAP, AND VENTILATOR DEVICES. ....... 39

                1.      Royal Philips Was Directly Involved With Launching And
                        Marketing The Recalled Devices. ................................... 39

                2.      Philips Obtained Clearances For the Recalled Devices. .......... 46

                3.      The Recalled Devices Are "Adulterated" According To The FDA's
                        Findings And, Therefore, They Are Worthless. ..................... 50

        D.      PE-PUR FOAM POSES SERIOUS HEALTH RISKS TO USERS OF
                PHILIPS DEVICES. ................................................................... 52

                1.      Formaldehyde Is A Known Carcinogen. ........................... 57

                2.      Toluene Diisocyanate Is A Likely Carcinogen. .................... 58

                3.      Toluene Diamine Is A Likely Carcinogen. ......................... 60

                4.      Diethylene Glycol Is Toxic To Humans. ........................... 61

                5.      Dimethyl Diazine Is A Precursor To A Known Carcinogen. ......... 62

                6.      Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl) Is A Toxic
                        Compound. ............................................................... 64

        E.      PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM FOR MANY
                YEARS PRIOR TO THE RECALL ............................................. 65

1.     In 2015, Philips Communicated With Its Foam Suppliers About The Problem Of PE-PUR Foam Degradation............................................. 75

2.     Philips Opened An Internal Investigation Into Foam Degradation In Mid-2018 That Confirmed PE-PUR Foam Is Prone To Degradation........................................................................................... 79

3.     Philips Finally Opened A Formal CAPA In 2019 – But Did Not Initiate A Recall For Two More Years. .................................................... 86

F.     PHILIPS CONSISTENTLY MARKETED ITS BREATHING MACHINES AS SAFE AND EFFECTIVE EVEN WHEN IT KNEW OF THE PROBLEMS WITH PE-PUR FOAM DEGRADATION AND ASSOCIATED HEALTH RISKS. ......................................................... 88

1.     Philips Never Hinted at the Dangerous Condition of the Recalled Devices.................................................................................................. 88

2.     Philips Knew Some of its Customers Were Using the SoClean Ozone Cleaning Technology with its Devices and Assented to Such Use. ................................................................................................. 89

3.     Philips Sold Its Humidifier Accessory Allowing Warm Storage Conditions and Contributing to Humidity of the Foam. .......................... 91

G.     PHILIPS FINALLY RECALLED ITS DEFECTIVE DEVICES CONTAINING HAZARDOUS PE-PUR FOAM, BUT ONLY AFTER LAUNCHING ITS NEWEST DEVICE WITHOUT PE-PUR FOAM. ............... 92

1.     Prior to the Recall, In April And May 2021, Philips Launched The DreamStation 2 (Which Does Not Contain PE-PUR Foam). ................... 92

2.     Testing Continued To Confirm The Recalled Devices Were Defective and the FDA Received Additional MDRs............................... 93

3.     Finally, In June 2021, Philips Recalled Its Defective Devices. ............... 95

H.     THE MEASURES TAKEN BY PHILIPS, AND BY ROYAL PHILIPS IN PARTICULAR, TO RECALL AND REPLACE THE DEFECTIVE DEVICES HAVE BEEN INADEQUATE AND INEFFECTIVE. ...................... 98

1.     Many Patients, Providers, And Others Were Not Notified About The Recall. ........................................................................................... 109

2.     Philips' Repair and Replacement Program Has Been Extremely Slow, Inadequate, and Ineffective......................................................... 111

V.     EQUITABLE TOLLING OF STATUTES OF LIMITATIONS .................................... 115

VI.     CAUSES OF ACTION ........................................................................................ 115

COUNT I NEGLIGENCE ................................................................................ 115

COUNT II STRICT LIABILITY: DESIGN DEFECT................................................. 118

COUNT III NEGLIGENT DESIGN ......................................................................... 120

COUNT IV STRICT LIABILITY – FAILURE TO WARN .......................................... 123

COUNT V NEGLIGENT FAILURE TO WARN .......................................... 126

COUNT VI NEGLIGENT RECALL .......................................... 129

COUNT VII BATTERY .......................................... 132

COUNT VIII STRICT LIABILITY - MANUFACTURING DEFECT ........................ 134

COUNT IX NEGLIGENT MANUFACTURING .......................................... 136

COUNT X BREACH OF EXPRESS WARRANTY .......................................... 138

COUNT XI BREACH OF THE IMPLIED WARRANTY OF
        MERCHANTABILITY .......................................... 142

COUNT XII BREACH OF THE IMPLIED WARRANTY OF USABILITY .............. 146

COUNT XIII FRAUD .......................................... 151

COUNT XIV NEGLIGENT MISREPRESENTATION .......................................... 155

COUNT XV NEGLIGENCE PER SE.......................................... 157

COUNT XVI CONSUMER FRAUD AND/OR UNFAIR AND  DECEPTIVE
        PRACTICES UNDER STATE LAW.......................................... 159

COUNT XVII UNJUST ENRICHMENT (IN THE ALTERNATIVE)........................ 164

COUNT XVIII LOSS OF CONSORTIUM.......................................... 166

COUNT XIX SURVIVORSHIP AND WRONGFUL DEATH.................................. 166

COUNT XX MEDICAL MONITORING .......................................... 167

COUNT XXI PUNITIVE DAMAGES .......................................... 171

VII.   PRAYER FOR RELIEF .......................................... 172

VIII.  JURY DEMAND .......................................... 172

## <u>TABLE OF EXHIBITS</u>

Ex. A        Short Form Complaint for Personal Injuries, Damages, and Demand for Jury Trial

Ex. 1        PDF – Royal Philips' Website – About Us Page

Ex. 2        PDF – Royal Philips' Global Website –Displaying Copyright for Royal Philips

Ex. 3        PDF – Philips' USA Website – Displaying Copyright for Royal Philips

Ex. 4        Philips Medical Device Recall Notices

Ex. 5        Redacted FDA 483 Report dated 11/09/2021

Ex. 6        PDF – FDA Website – FDA Form 483 Frequently Asked Questions Page

Ex. 7        Royal Philips Informational PDF – Sleep and Respiratory Care Update – Clinical Information for Physicians dated 06/14/2021

Ex. 8        PDF – FDA Website –Notice – Philips Respironics Recalls Certain Continuous and Non-Continuous Ventilators, including CPAP and BiPAP, Due to Risk of Exposure to Debris and Chemicals

Ex. 9        PDF – Philips Australia's Website – Urgent Product Defect Correction in Australia (Recall for Product Correction in New Zealand)

Ex. 10       Royal Philips Press Release - Philips starts repair and/or replacement program of first-generation DreamStation devices in the U.S. and other markets dated 09/01/2021

Ex. 11       PDF – Philips USA's Website – Voluntary Recall Information – Philips starts repair and/or replacement program of first-generation Trilogy devices in the U.S. and other markets

Ex. 12       Royal Philips 2017 Annual Report

Ex. 13       Royal Philips 2021 Annual Report

Ex. 14       Royal Philips 2021 Form 20-F SEC Filing – With Exhibits

Ex. 15       Royal Philips 2019 Form 20-F SEC Filing – With Exhibits

Ex. 16       Royal Philips 2020 Form 20-F SEC Filing – With Exhibits

Ex. 17       State of Delaware, Department of State, Division of Corporations, Entity Details of Philips North America LLC

Ex. 18       Complaint for Patent Infringement, *Koninklijke Philips N.V., and Philips North America LLC v. Mediatek Inc., and Mediatek USA Inc*., No. 1:20-cv-01246-UNA, ECF No. 1 (D. Del. Sept. 17, 2020)

| Ex. 19 | Royal Philips 2016 Form 20-F SEC Filing – With Exhibits |
| Ex. 20 | Royal Philips 2017 Form 20-F SEC Filing – With Exhibits |
| Ex. 21 | Corporate Disclosure Statement in *Newsome, Jr., et al. v. Philips North America LLC, Koninklijke Philips N.V., Philips RS North America LLC, Respironics, Inc., et al.*, 4:22-cv-04101-HSG, ECF No. 2, (N.D. Cal. Jul. 13, 2022) |
| Ex. 22 | State of Delaware, Department of State, Division of Corporations, Entity Details of Philips Holding USA, Inc. |
| Ex. 23 | State of Delaware, Department of State, Division of Corporations, Entity Details of Philips RS North America LLC |
| Ex. 24 | State of Mississippi, Secretary of State, Certificate for Philips RS North America LLC (Respironics, Inc.) |
| Ex. 25 | WebWire Press Release – Philips Announces Completion of Tender Offer to Acquire Respironics – dated 03/14/2008 |
| Ex. 26 | CPAP Blog – History of BiPAP – Respironics and Philips Respironics by David Repasky – dated 12/09/2021 |
| Ex. 27 | Reuters – Philips in $5 Billion Respironics Deal by Foo Yun Chee, Niclas Mika – dated 12/21/2007 |
| Ex. 28 | Reliable Plant – Philips Makes $5.1B Public Offer to Acquire Respironics by RP News Wires |
| Ex. 29 | PDF – Philips Respironics' Website – About Philips Respironics |
| Ex. 30 | State of Delaware Certificate of Conversion – Respironics, Inc. changes to Philips RS North America, LLC, dated 11/9/2020 |
| Ex. 31 | State of Delaware, Department of State, Division of Corporations, Entity Details of Philips RS North America Holding Corporation |
| Ex. 32 | Complaint, *Philips North America LLC, et al v. 626 Holdings, Inc., and Alexander Kalish*, No. 9:19-cv-81263-RS, ECF No. 1, (S.D. Fla. 2019) |
| Ex. 33 | PDF – Royal Philips' Website – About Us – General Business Principles |
| Ex. 34 | Royal Philips Press Release – Philips Issues Recall Notification* to Mitigate Potential Health Risks Related to the Sound Abatement Foam Component in Certain Sleep and Respiratory Care Devices – dated 06/14/2021 |
| Ex. 35 | Royal Philips Press Release – Philips Provides Update on Earlier Announced Voluntary CPAP, BiPAP and Mechanical Ventilator Recall Notification* - 11/14/2021 |

| | |
|---|---|
| Ex. 36 | PDF – Royal Philips' Website – About Us – Our Brand |
| Ex. 37 | LinkedIn Profile – Lorraine Barber-Miller – Global EVP & E-Commerce Officer at Philips |
| Ex. 38 | LinkedIn Profile – Jan Kimpen – Chief Medical Officer at Royal Philips |
| Ex. 39 | PDF – Royal Philips' Website – About Us – Executive Committee |
| Ex. 40 | Royal Philips – First Quarter 2022 Results – dated 04/25/2022 |
| Ex. 41 | Royal Philips Press Release – Philips announces CEO succession – dated 08/16/2022 |
| Ex. 42 | PDF – Royal Philips' Website – About Us – Executive Committee – Roy Jakobs |
| Ex. 43 | Declaration of William B. Monahan in Support of Motion to Dismiss, Case No. 2:22-mc-0152-JFC, at ECF No. 126-1 |
| Ex. 44 | Philips Respironics' DreamStation Brochure – Sound Performance |
| Ex. 45 | Royal Philips 2020 Annual Report |
| Ex. 46 | Royal Philips 2018 Annual Report |
| Ex. 47 | DreamStation CPAP - User Manual |
| Ex. 48 | REMstar SE - User Manual |
| Ex. 49 | Trilogy100 - Clinical Manual |
| Ex. 50 | Royal Philips Q2 2022 Results |
| Ex. 51 | PDF - ResMed's Website – Information Regarding Philips' Recall – An update from ResMed's CEO – dated 12/06/2021 |
| Ex. 52 | Thomas Reuters – Edited Transcript of Royal Philips' Q1 2017 Earnings Call – dated 04/24/2017 |
| Ex. 53 | Philips Respironics Press Release – Philips Expands Home Healthcare Commitment with Portable Life-Support Ventilator; Offers Ease of Use, Portability and Versatility for Patient – dated 06/02/2009 |
| Ex. 54 | LinkedIn Profile – Steve Kelly – Former Director Global Public Relations – Corporate Communications |
| Ex. 55 | Philips Respironics Press Release – Philips Unveils Intelligent Sleep Apnea Therapy System to Home Healthcare Industry – dated 10/13/2009 |

Ex. 56      Royal Philips Press Release – Philips Raises Awareness for Chronic Obstructive Pulmonary Disease (COPD) with Platinum Sponsorship of Leonard Nimoy Tribute – dated 08/29/2016

Ex. 57      Royal Philips Press Release – Philips Introduces a Wide Range of Connected Personal Health Innovations at IFA 2016 - dated 09/01/2016

Ex. 58      LinkedIn Profile – Elena Calamo Specchia – Royal Philips Global Head of Public Affairs and Sustainability Communications

Ex. 59      LinkedIn Profile – Pieter Nota – Former Royal Philips CEO of Personal Health Businesses, CMO, and Member of the Executive Committee/Board of Management

Ex. 60      Royal Philips Press Release – Philips Highlights Cloud-Based Innovations at the Forefront of Digital Health During CES – dated 01/05/2017

Ex. 61      Thomas Reuters – Edited Transcript of Royal Philips' Q4 2016 Earnings Call – dated 01/24/2017

Ex. 62      Royal Philips Press Release – Philips Expands its Award-Winning DreamStation Platform – dated 03/07/2017

Ex. 63      Royal Philips Press Release – Philips Simplifies Travel for Sleep Apnea Patients with New Compact and Connected DreamStation Go Sleep Therapy Device – dated 04/11/2017

Ex. 64      PDF – Royal Philips' Website – Executive Committee – Abhijit Bhattacharya

Ex. 65      Royal Philips Press Release – Philips Showcases Expanding Respiratory and Sleep Solutions at ERS 2017 – dated 09/08/2017

Ex. 66      Royal Philips Press Release – Philips Innovations at MEDICA 2017 – dated 11/13/2017

Ex. 67      Royal Philips Press Release – Philips Launches Global Education and Empowerment Effort for World COPD Day – dated 11/14/2017

Ex. 68      Royal Philips Press Release – Philips Breaks Health Technology Boundaries at Arab Health 2018 – dated 01/29/2018

Ex. 69      LinkedIn Profile – Joost Maltha – Royal Philips Senior Global Press Officer

Ex. 70      Royal Philips Press Release – Philips Showcases New Opportunities for Home Medical Equipment Providers at Medtrade Spring – dated 04/16/2019

Ex. 71      PDF – Sleepapnea.com – Displaying Copyright for Royal Philips

Ex. 72        Food and Drug Administration – 518(b) Notice Letter to Philips Respironics
              – dated 05/02/2022

Ex. 73        PDF – Philips USA's Website – Products Page – DreamStation BiPAP
              autoSV

Ex. 74        PDF – Philips USA's Website – Products Page – Features – DreamStation
              Go

Ex. 75        Environmental Protection Agency – Health and Environmental Effects of
              Particulate Matter

Ex. 76        Royal Philips Informational PDF – Sleep and Respiratory Care Update –
              Clinical Information for Physicians – updated 07/08/2021

Ex. 77        Philips Respironics – DreamStation Family Brochure

Ex. 78        ███████████████████████████

Ex. 79        ███████████████████████████

Ex. 80        ███████████████████████████

Ex. 81        ███████████████████████████

Ex. 82        ███████████████████████████

Ex. 83        ███████████████████████████

Ex. 84        ██████████████████████

Ex. 85        ███████████████████████████

Ex. 86        ████████████████████████████████████
              ████████████████

Ex. 87        ███████████████████████████████████
              ████████████████

Ex. 88        ██████████████████████████████████
              ██████████████████████████████████
              ████████

Ex. 89        ██████████████████████████

Ex. 90        █████████████████████████████████████
              ████████████████

Ex. 91        ███████████████████████████

Ex. 92        ████████████████████████████████████
              ████████████████

Ex. 93 ████████████████████████████

Ex. 94 Affidavit of Lee Lawler ("Lawler Affidavit"), Technical R&D Manager at Burnett – Filed in MDL No. 3014 – ECF No. 589-1 (Without Exhibits)

Ex. 95 Lawler Affidavit – Exhibit E – ECF No. 589-7 – Email exchange between Bob Marsh of PolyTech and Lee Lawler of Burnett

Ex. 96 ████████████████████████████

Ex. 97 ████████████████████████████

Ex. 98 Lawler Affidavit – Exhibit H – ECF No. 589-10 – Email Exchanges Between Philips and Supply Chain

Ex. 99 PDF – Polymer Technologies' Website – PE-PUR Foam Advertisement

Ex. 100 Lawler Affidavit – Exhibit I – ECF No. 598-11 – Additional Email Exchanges Between Philips and Supply Chain

Ex. 101 PDF – Philips Respironics' Website – Product Library

Ex. 102 PDF – Philips USA's Website – Sleep Therapy Solutions

Ex. 103 HME News – Business News For Home Medical Equipment Provides – dated 03/06/2020

Ex. 104 CPAP Direct – Products Page – SoClean Respironics System One & DreamStation Adapter

Ex. 105 DreamStation Humidifier User Manual

Ex. 106 Royal Philips Announces its 2021 First-Quarter Results – dated 04/26/2021

Ex. 107 Fair Disclosure Wire – Transcript of Royal Philips' 2021 First-Quarter Earnings Call – dated 04/26/2021

Ex. 108 Lawler Affidavit – Exhibit A – ECF No. 589-3 – RJ Lee Analysis of Trilogy Device Foam

Ex. 109 FDA – Recalls Background and Definitions Page

Ex. 110 PDF – ResMed's Website – Information regarding a separate manufacturer's product recall – dated 06/14/2021

Ex. 111 Royal Philips Press Release – Philips Provides Update on Philips Respironics PE-PUR Sound Abatement Foam Test and Research Program – dated 06/28/2022

Ex. 112 Philips' Test and Research Program for PE-PUR Foam

Ex. 113          Letter from Philips Defendants in MDL 3014 Regarding Initial Custodians – dated 09/15/2022

Ex. 114          LinkedIn Profile – Liz Iversen – Global EVP, Chief Quality & Regulatory Officer

Ex. 115          LinkedIn Profile – Carla Kriwet – Royal Philips CEO of Connected Care and Member of the Executive Committee

Ex. 116          Defendant Philips RS North America LLC's Initial Disclosures – dated 05/05/2022

Ex. 117          LinkedIn Profile – Thomas Catalano – Director of Products Marketing at Philips Respironics

Ex. 118          LinkedIn Profile – Francis Kim – EVP, Chief Quality & Regulatory Officer at Philips

Ex. 119          ██████████████████████████

Ex. 120          LinkedIn Profile – Erin Levering – Medical Safety Manager at Philips

Ex. 121          LinkedIn Profile – Vitor Rocha – CEO of Philips North America

Ex. 122          LinkedIn Profile – Jessica Shen – Former Royal Philips SVP, Global Head of Medical Affairs, Clinical Affairs, HEOR & Regulatory Affairs

Ex. 123          Royal Philips 2022 First-Quarter Results Presentation

Ex. 124          Reuters – French Prosecutors Probe Philips Respirator Recall – dated 09/08/2022

Ex. 125          Royal Philips Press Release - Philips Provides Update on the Test and Research Program in Connection with the CPAP, BiPAP and Mechanical Ventilator Recall Notification – dated 12/23/2021

Ex. 126          Royal Philips Press Release – Philips Respironics Provides Update for the US on Ongoing CPAP, BiPAP and Mechanical Ventilator Field Action – dated 03/10/2022

Ex. 127          Royal Philips Press Release – Philips Provides Update on Filed MDRs in Connection with the Voluntary Recall Notification – dated 05/24/2022

Ex. 128          Philips Announces 2021 Second-Quarter Results – dated 07/26/2021

Ex. 129          Philips Announces 2021 Third-Quarter Results – dated 10/18/2021

Ex. 130          Philips Announces 2021 Fourth-Quarter and Annual Results – dated 01/24/2022

Ex. 131          Philips Announces 2022 Second-Quarter Results – dated 07/25/2022

| Ex. 132 | Philips 2021 Fourth-Quarter and Annual Results Presentation – dated 01/24/2022 |
| Ex. 133 | Fair Disclosure Wire – Transcript of Royal Philips Annual Shareholders Meeting – dated 05/10/2022 |
| Ex. 134 | Reuters – FDA Says Faulty Philips Device Reports Accelerating as CEO Departs – dated 08/17/2022 |
| Ex. 135 | Dutch News – Roy Jakobs to Take Over the Helm at Philips as Frans van Houten Steps Down – dated 08/16/2022 |
| Ex. 136 | FDA 518(a) Notification Order to Philips Respironics |
| Ex. 137 | Royal Philips Press Release – Philips Realigns the Composition of its Reporting Segments – dated 01/10/2019 |
| Ex. 138 | Lawler Affidavit – Exhibit B – ECF No. 589-4 – Purchase Order dated 03/12/2021 and Supporting Documentation |
| Ex. 139 | Lawler Affidavit – Exhibit D – ECF No. 589-6 – Additional Email Communications Between Philips and Suppliers |
| Ex. 140 | Lawler Affidavit – Exhibit G – ECF No. 589-9 – Additional Email Communications Between Philips and Suppliers |
| Ex. 141 | Bloomberg – Company Profile for Philips International B.V. |
| Ex. 142 | ███████████████████████ |
| Ex. 143 | FDA – Emergency Use Authorization Letter – dated 03/24/2020 |
| Ex. 144 | Royal Philips 2018 Form 20-F SEC Filing – With Exhibits |
| Ex. 145 | *Method and Apparatus for Providing Positive Airway Pressure to a Patient*, Patent No. US 6,932,084 B2, Aug. 23, 2005 |
| Ex. 146 | Canadian Patent No. 2463488 – Filed by RIC Investments, Inc – owned by Philips RS North America LLC |
| Ex. 147 | Canadian Patent No. 2410248 – Filed by Respironics, Inc. – owned by Philips RS North America LLC |
| Ex. 148 | Canadian Patent No. 2497915 – Filed by RIC Investments, Inc. – owned by Philips RS North America LLC |
| Ex. 149 | Jaffe et. al., *Nasal and Oral Patient Interfaces*, Patent No. US 10,105,099 B2, Oct. 23, 2018 |
| Ex. 150 | Ho et.al., *Textured/Polished Respiratory Mask Seal and Mask*, Patent No. US 9,399,107 B2, Jul. 26, 2016. |

Ex. 151    Shelly et al., *Automatic Pressure Titration*, Patent No. US 9,7344,322 B2, Aug. 29, 2017

Ex. 152    Matthews et al., *Starting Pressure for Respiratory Therapy Devices*, Patent No. US 10,286,165 B2, May 14, 2019

Ex. 153    LinkedIn Profile – Greg Matthews – Philips Respironics Senior Staff Engineer

Ex. 154    LinkedIn Profile – Heather Ressler – Philips Respironics Senior Staff Software Engineer

Ex. 155    *In the Matter of Certain UMTS and LTE Cellular Communication and Products Containing the Same*, Complaint, Inv. No. 337-TA-1240 (USITC Dec. 17, 2020)

Ex. 156    *Koninklijke Philips, N.V. v. Thales DIS AIS USA LLC et. al.*, Complaint, No. 1:20-cv-01713-CFC (D. Del. Dec. 17, 2020)

Ex. 157    ███████████████████████████████

Ex. 158    ███████████████████████████████

Ex. 159    ███████████████████████████████

Ex. 160    Royal Philips Press Release – Philips Unveils New Brand Direction Centered Around Innovation and People – dated 11/13/2013

Ex. 161    PDF - Philips Egypt's Website

Ex. 162    PDF – Philips Australia's Website

Ex. 163    PDF – Philips Chile's Website

Ex. 164    PDF – Royal Philips' Global Website – Philips Wordmark

Plaintiffs file this Amended Master Long Form Complaint for Personal Injuries and Damages, and Demand for Jury Trial ("Master Long Form Complaint" or "Complaint") against Defendants Koninklijke Philips N.V., Philips North America LLC, Philips Holding USA Inc., Philips RS North America LLC, and Philips RS North America Holding Corporation, and Defendants Polymer Technologies, Inc. and Polymer Molded Products LLC, as an administrative method to set forth common facts and potential claims which individual Plaintiffs, on their own behalf, their spouses, estates, or beneficiaries, may assert against Philips in this litigation. It is anticipated that Plaintiffs alleging personal injury and damages arising from the use of Recalled Device(s) will file a Short Form Complaint,[1] and all allegations pleaded in this Master Long Form Complaint are deemed pleaded in any Short Form Complaint. *See* Pretrial Order #28 (ECF No. 783).

The Master Long Form Complaint does not necessarily include all claims or allegations asserted in all of the actions filed in, or transferred to, this Court. Certain Plaintiffs may also add additional Defendant(s) and/or claims, which will be reflected in their respective Short Form Complaints. *Id.* The Master Long Form Complaint does not constitute a waiver or dismissal of any claims that may be asserted in any individual action, nor do any Plaintiffs relinquish the right to move to amend their respective Short Form Complaint to assert additional claims or allegations as discovery may require, to cure any deficiencies, or for any other reason that circumstances may warrant.

Further, pursuant to Pretrial Order #14 (ECF No. 573), entered on May 19, 2022, which sets forth an orderly and efficient process for filing consolidated amended class and master

---

[1] The template for the Short Form Complaint is attached hereto as Exhibit "A." All attached Exhibits and referenced materials are incorporated as if fully stated herein.

1

complaints, this is one of three master complaints being filed in this multi-district litigation. The filing of three master complaints is to streamline the pleadings and issues for the parties' mutual convenience only. The three master complaints contemplated in this MDL are divided, for administrative purposes, into one each for Personal Injury, Medical Monitoring, and Economic Loss.

Plaintiffs filing claims for personal injuries using this Master Long Form Complaint and a Short Form Complaint are also members of the putative class in the Consolidated Third Amended Class Action Complaint for Economic Losses (ECF No. 785) and the Consolidated Second Amended Class Action Complaint for Medical Monitoring (ECF No. 810). Plaintiffs do not waive any of their rights or claims as putative class members in those respective complaints by virtue of filing claims for personal injuries and/or including claims that may be included in either of those two master complaints.

## I.      NATURE OF THE ACTION

1.      Defendant Koninklijke Philips N.V. ("Royal Philips") is a Dutch multinational company that is the global head of the "Philips" enterprise, which bills itself as "a diverse team made up of some 80,000 individuals across over 100 countries, all with different backgrounds, perspectives and experiences."[2] Royal Philips controls and oversees all aspects of the Philips businesses around the world, going to great lengths to ensure there is a unity of purpose and vision, consistent execution of company procedures, policies, and goals, and, importantly, maintenance and protection of the valuable "Philips" brand. In addition to Royal Philips, Defendants, Philips North America LLC ("Philips NA"), Philips Holding USA Inc. ("Philips USA"), Philips RS North

---

[2] *See* Royal Philips "About us" webpage, https://www.philips.com/a-w/about.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "1").

America LLC ("Philips RS"), and Philips RS North America Holding Corporation ("Philips RS Holding") are essential parts of the Philips family that, along with other Philips' entities, engaged in the wrongful conduct at issue in this litigation. These Defendants are referred to collectively herein as "Philips" or the "Philips Defendants." At all relevant times, each Philips Defendant acted in all aspects as the agent and alter ego of one another, and references to "Philips" refer to each Philips Defendant individually and collectively.

2.      Royal Philips boasts on its website, www.philips.com[3]: "Over the past decade we have transformed into a focused leader in health technology…. At Philips, our purpose is to improve people's health and well-being through meaningful innovation."[4] As part of that business, Philips manufactures and sells certain lines of products that are intended to help people breathe. These include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("BiPAP") machines, which are commonly used to treat sleep apnea, and mechanical ventilators ("ventilators"), which treat respiratory failure. The primary function of these devices is to blow air into patients' airways. CPAP and BiPAP machines are intended for use during sleep while ventilators are used continuously when needed.

3.      Because these machines are used during sleep, Philips designed them to include sound-dampening foam intended to reduce noise emitted from the motors in the devices. Unfortunately, Philips designed its devices to include polyester-based polyurethane ("PE-PUR")

---

[3] The landing (*i.e.*, opening) page for Royal Philips' website contains a copyright for Royal Philips. *See* https://www.philips.com/global ("© Koninklijke Philips N.V., 2004 - 2022. All rights reserved.") (last accessed Oct. 3, 2022) (attached hereto as Exhibit "2"). When accessing the Royal Philips website from the United States, users are automatically redirected to https://www.usa.philips.com/ (last accessed Oct. 3, 2022). The redirected page also contains a copyright for Royal Philips. *See* https://www.usa.philips.com/ ("© Koninklijke Philips N.V., 2004 - 2022. All rights reserved.") (last accessed Oct. 3, 2022) (attached hereto as Exhibit "3").

[4] Royal Philips "About us" webpage (Exhibit "1" hereto).

foam, which Philips knew for many years, among other things, is susceptible to hydrolysis, the chemical breakdown of a compound due to reaction with water, particularly in medical applications. This can result in degradation of the foam and off-gassing of volatile organic compounds ("VOCs").

4.      On June 14, 2021, Philips, through multiple of its entities, including Royal Philips and Philips RS, announced a recall of approximately 11 million of its CPAP and BiPAP machines and ventilators in the United States that were manufactured with PE-PUR foam from 2008 until the date of the recall (the "Recall"). All of these recalled products (individually referred to herein as a "Recalled Device," or collectively, as the "Recalled Devices") are defective because they contain PE-PUR foam.

5.      The Recalled Devices are:

- E30

- DreamStation ASV

- DreamStation ST, AVAPS

- SystemOne ASV4

- C Series ASV, S/T, AVAPs

- OmniLab Advanced Plus

- SystemOne (Q Series)

- DreamStation CPAP, Auto CPAP, BiPAP

- DreamStation Go CPAP, APAP

- Dorma 400, 500 CPAP

- REMStar SE Auto CPAP

- Trilogy 100 and 200

4

- Garbin Plus, Aeris, LifeVent

- A-Series BiPAP Hybrid A30

- A-Series BiPAP V30 Auto

- A-Series BiPAP A40

- A-Series BiPAP A30

6.    The use of PE-PUR foam in the Recalled Devices is a defect because the foam is susceptible to breaking down into particles which may then be inhaled or ingested by the user, and may emit VOCs that can also be inhaled, resulting in "serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."[5]

7.    Philips was aware of problems with the PE-PUR foam in the Recalled Devices dating as far back as 2008 when it began receiving numerous complaints from customers including complaints containing the keywords "contaminants, particles, foam, debris, airway, particulate, airpath, and black."[6] In addition, beginning as far back as 2015, Philips conducted and received multiple test reports and additional data confirming that the Recalled Devices pose serious, indeed life-threatening, health risks to users, but Philips failed to timely disclose that they were defective when manufactured and sold.

---

[5] Philips Recall Notices issued June 14, 2021 (attached hereto as Exhibit "4").

[6] *See* FDA 483 Report issued to Philips on November 9, 2021 (hereinafter "483 Report"), redacted version available at: https://www.fda.gov/media/154244/download (last accessed Oct. 3, 2022) (attached hereto as Exhibit "5"), at 12. A 483 Report from the Food and Drug Administration ("FDA") "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts." FDA webpage, FDA Form 483 Frequently Asked Questions, https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last accessed Oct. 3, 2022) (attached hereto as Exhibit "6").

8.      Instead of instituting a recall immediately, Philips waited until June 2021 to issue the Recall and notify the public about the dangers of the Recalled Devices, continuing to sell defective devices and leaving users to breathe in the toxic fumes and risk serious injury. In its Recall, Philips publicly announced that the PE-PUR foam may break down into particles and be inhaled or ingested, and may emit VOCs that can be inhaled, resulting in "serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment"[7] (referred to herein as the "Defect"). Philips stated that the potential risks of exposure due to such chemicals include "headache/dizziness, irritation (eyes, nose respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects."[8] Philips' announcement to doctors advised that these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."[9]

9.      In addition, on July 22, 2021, the U.S. Food and Drug Administration ("FDA") confirmed the severity of the issues described in the Recall and classified the Recall as Class I or "the most serious type of recall," meaning use of the Recalled Devices "may cause serious injuries or death."[10]

10.     As noted above, Philips knew about the serious risks caused by the Recalled Devices long before the Recall.

---

[7] Philips Recall Notices issued June 14, 2021 (Exhibit "4" hereto).

[8] *Id.*

[9] *See* Royal Philips Informational PDF, Sleep and Respiratory Care update: Clinical information for physicians (June 14, 2021), at 2, available at: philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed Oct. 3, 2022) (attached hereto as Exhibit "7").

[10] FDA Notice, "Philips Respironics Recalls Certain Continuous and Non-Continuous Ventilators, including CPAP and BiPAP, Due to Risk of Exposure to Debris and Chemicals," available at: https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-continuous-and-non-continuous-ventilators-including-cpap-and (last accessed Oct. 3, 2022) (attached hereto as Exhibit "8").

11.     On November 9, 2021, the FDA issued a report detailing the findings of an FDA investigation, findings that demonstrate Philips knew that the PE-PUR foam degraded into hazardous substances.[11] The FDA discovered emails, dating back to October 2015, to Philips from the supplier of the raw foam used to make the PE-PUR foam in the Recalled Devices regarding PE-PUR foam degradation issues.[12] Additionally, the FDA found that, in November 2015, Philips engaged in preventative maintenance on certain Recalled Devices in response to PE-PUR foam degradation issues and complaints, yet failed to conduct any "further investigation, health hazard evaluation, risk analysis, or design review" on any of the Recalled Devices that use the same PE-PUR foam.[13] To be sure, the FDA found that "there were at least fourteen instances, assessments, and/or test reports, dated from 04/01/2016 to 01/22/2021, where [Philips] was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions."[14] This is in addition to the detailed customer complaints that existed as far back as 2008 and the additional data Philips collected in 2015.

12.     Despite knowing about the degradation and off-gassing problems with the PE-PUR foam and the associated health risks for users of the affected devices, Philips failed until many years later to disclose the Defect to consumers, hospitals, institutions, doctors, and suppliers, continuing to sell the defective products and allowing patients to use the defective products. In addition, Defendant Polymer Technologies, Inc. ("PolyTech"), a supplier of PE-PUR foam to Philips, worked with Philips to conceal these key facts from consumers so that both could continue to profit from the sales of these defective devices.

---

[11] *See generally,* 483 Report (Exhibit "5" hereto).

[12] *Id.* at 3, 18.

[13] *Id.* at 2.

[14] *Id.* at 3.

13.     It was only after Philips launched its next generation of CPAP/BiPAP machines (the DreamStation 2 devices), machines that do not contain PE-PUR foam and could serve as a replacement for Recalled Devices, that Philips finally disclosed that its Recalled Devices were defective. That is, on April 26, 2021, Philips announced that its previous generation DreamStation products and other CPAP, BiPAP, and ventilator devices posed serious health risks to users. Philips then waited an additional seven weeks before initiating the Recall of the dangerously defective machines in the United States. Shortly thereafter, Philips expanded its recall of defective CPAP, BiPAP, and ventilator devices worldwide.[15]

14.     Because of the increased demand for safe and effective CPAP, BiPAP, and ventilator devices at the time of the Recall, replacement machines were difficult to find and expensive, a situation that was exacerbated by a shortage of microchips for these devices. Thus, many users were forced into a Hobson's choice – continue using their Recalled Devices and expose themselves to risks of serious injury or death or stop using their breathing devices and risk health consequences from their underlying conditions.

15.     When the Recall was first announced on June 14, 2021, Philips did not offer users of the Recalled Devices any option for a replacement device.

---

[15] *See, e.g.,* Philips website, Urgent Product Defect Correction in Australia (Recall for Product Correction in New Zealand), https://www.philips.com.au/healthcare/e/sleep/communications/src-update (last accessed Oct. 3, 2022) (attached hereto as Exhibit "9") (stating that a global recall notification was issued on June 14, 2021 and that recalls specific to Australia and New Zealand were issued on July 2, 2021). As discussed, *infra*, other impacted countries include, but are not limited to Canada, Israel, and Chile.

16.     On September 1, 2021, Philips received authorization from the FDA to begin a repair and/or replacement process for affected DreamStation devices in the United States, and initially, Philips estimated that it would take a year to complete the program.[16]

17.     In announcing the repair/replacement program, Royal Philips CEO Frans van Houten acknowledged that patients using Recalled Devices needed a solution and that delayed relief for them presented a problem: "We fully recognize that the timeframe for remediation of the affected devices places patients in a difficult situation."[17]

18.     Unfortunately for users of the recalled DreamStation devices, the repair and replacement program was negligently implemented and ineffective. DreamStation customers were not given any specifics as to how the replacement program would work nor were they told when they might receive a replacement device (a significant factor for users who relied on the machines for medical conditions). Nor did Philips provide meaningful guidance to DreamStation customers' treating physicians. In addition, the repair and/or replacement program was limited in that it only impacted DreamStation Recalled Devices and not any other Recalled Device.

19.     As noted, the Recalled Devices were intended to be used to help users breathe. But, the degradation and off-gassing of the PE-PUR foam rendered the Recalled Devices defective and unsafe, and not fit for their intended purpose. Each of the Plaintiffs used the Recalled Devices and

---

[16] *See* Royal Philips Press Release, Philips starts repair and/or replacement program of first-generation DreamStation devices in the US and other markets (Sept. 1, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210901-philips-starts-repair-and-replacement-program-of-first-generation-dreamstation-devices-in-the-us-in-relation-to-earlier-announced-recall-notification.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "10"); *see also* Philips "Ventilation News and Updates" webpage, Trilogy Remediation Update for Business Customers (June 1, 2022), https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/ventilation-news-and-updates (last accessed Oct. 7, 2022) (attached hereto as Exhibit "11").

[17] *Id.*

would not have done so had they known that the PE-PUR foam in the Recalled Devices could expose them to life-threatening injuries or cause serious health problems, but instead would have sought alternative means to treat their conditions.

20.     Plaintiffs, who were injured by Defendants' misconduct, seek to recover damages resulting from Defendants wrongful conduct, including: (a) designing a defective product that caused serious injuries to users, (b) failing to warn about serious, and reasonably foreseeable health risks caused by the Recalled Devices, (c) engaging in the deliberate concealment, misrepresentation and obstruction of public and regulatory awareness of serious health risks to users of the Recalled Devices, and (d) failing to utilize reasonable care in, among other things, designing, manufacturing, marketing, selling, distributing, and recalling (or failing to timely recall) the Recalled Devices.[18]

## II.     THE PARTIES

### A.     PLAINTIFFS

21.     Plaintiffs are individuals who used the Recalled Devices and have suffered injuries from the use of the Recalled Devices.

22.     As a result of using the Recalled Devices, Plaintiffs have been diagnosed with cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, inflammation, respiratory issues, asthma, adverse effects to organs; toxic and carcinogenic effects, and other injuries.

---

[18] Plaintiffs reserve the right to amend this Complaint to reflect additional information uncovered through discovery and developed *via* expert testimony.

23.     In addition, in some cases the spouses or minor children of patients are parties with consortium claims, and the estates and survivors of deceased patients are parties with claims arising from the wrongful death of patients who have died due to the use of Recalled Devices.

24.     As a proximate result of Philips' wrongful conduct, Plaintiffs have been severely harmed; and have endured pain, suffering, disability, impairment, disfigurement, cancer diagnoses and/or an increased risk of developing cancer and/or other serious illnesses, loss of enjoyment of life, aggravation or activation of preexisting conditions, scarring, and/or inconvenience; and incurred costs for a defective device, medical care and treatment, loss of wages and wage-earning capacity, death for certain patients, and other economic and non-economic damages. The losses are permanent and continuing in nature.

25.     In addition, each of the Plaintiffs paid for, purchased, leased, or otherwise acquired a Recalled Device. They would not have paid for, purchased, leased, or otherwise acquired the Recalled Device had they known that the PE-PUR foam in the Recalled Device could expose users to life-threatening injuries or cause serious health problems, rendering the Recalled Device defective, unsafe, worthless, and not fit for its intended purpose. As a result, they have suffered additional economic harm including, but not limited to: (a) the difference between the values of the Recalled Devices as represented (their prices paid) and their actual values at the time of purchase or lease ($0.00), or (b) the cost to replace the Recalled Devices, and (c) other miscellaneous incidental and consequential damages.

**B.     DEFENDANTS**

26.     Defendant Royal Philips is a Dutch multinational publicly traded company having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. Royal Philips is the ultimate parent company of the Philips Group of healthcare technology businesses including Connected Care businesses focusing on Sleep & Respiratory

11

Care.[19] "The Company, which started as a limited partnership with the name Philips & Co in Eindhoven, the Netherlands, in 1891, was converted into the company with limited liability N.V. Philips' Gloeilampenfabrieken on September 11, 1912. The Company's name was changed to Philips Electronics N.V. on May 6, 1994, and then to Koninklijke Philips Electronics N.V. on April 1, 1998, and [finally] to Koninklijke Philips N.V. on May 15, 2013."[20] Royal Philips' shares have been listed on the Amsterdam stock exchange since 1912, have been traded in the United States since 1962, and have been listed on the New York Stock exchange since 1987.[21] Royal Philips holds directly or indirectly 100% of its subsidiaries, Philips NA, Philips USA, Philips RS Holding, and Philips RS.[22] As such, Royal Philips controls Philips NA and Philips RS with respect to the manufacturing, selling, distributing, and supplying of the Recalled Devices.[23]

---

[19] Royal Philips Press Release, Philips realigns the composition of its reporting segments (Jan. 10, 2019), https://www.philips.com/a-w/about/news/archive/standard/news/press/2019/20190110-philips-realigns-the-composition-of-its-reporting-segments.html (last accessed Oct. 8, 2022) (attached hereto as Exhibit "137").

[20] Royal Philips 2017 Annual Report (attached hereto as Exhibit "12"), at 84. Note all quarterly and annual reports and SEC 20-F filings from 2009 to the present can be found at this link, under the "All Results" tab: https://www.results.philips.com/publications/ar21 (last accessed Oct. 3, 2022).

[21] *Id.*; *see also* Royal Philips 2021 Annual Report, available for download at https://www.results.philips.com/publications/ar21 (last accessed Oct. 3, 2022) (attached hereto as Exhibit "13"), at 117.

[22] Royal Philips 2021 SEC Form 20-F filing, Exhibit 8, List of Subsidiaries, available at: https://www.sec.gov/Archives/edgar/data/313216/000031321622000008/phg-exhibit8.htm (last accessed Oct. 3, 2022) (attached hereto as Exhibit "14"). In its 2019 SEC Form 20-F filing, Exhibit 8, Royal Philips also lists Respironics, Inc. as a wholly-owned subsidiary (attached hereto as Exhibit "15"). However, Respironics, Inc. is no longer listed as a subsidiary on Royal Philips 2020 SEC Form 20-F filing, Exhibit 8, available at: https://www.sec.gov/ix?doc=/Archives/edgar/data/0000313216/000031321621000008/phg-20201231.htm (last accessed Oct. 3, 2022) (attached hereto as Exhibit "16"); rather, Royal Philips lists Philips RS North America LLC as a subsidiary. *Id.*

[23] *See* Royal Philips 2020 SEC Form 20-F filing, Exhibit 8 (Exhibit "16" hereto).

27.     Defendant Philips NA is a Delaware company that was incorporated on August 6, 1987,[24] having its principal place of business at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA was "formerly known as Philips Electronics North America Corporation."[25] Philips NA is a wholly-owned subsidiary of Royal Philips, managed by Philips USA.[26]

28.     Defendant Philips USA is a Delaware corporation that was incorporated on July 18, 1995,[27] having its principal place of business at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips USA is a holding company that is 100% owned, directly or indirectly, by Royal Philips. Philips USA manages the operations of Royal Philips' various lines of business including Philips RS Holding and through it, Philips RS.[28] Philips USA is also the member/manager of Philips NA.[29]

---

[24] State of Delaware, Dept. of State, Div. of Corporations, Entity Details of Philips North America LLC (attached hereto as Exhibit "17").

[25] *See* Complaint for Patent Infringement in *Koninklijke Philips N.V., et al. v. Meditek, Inc., et al.*, No. 1:20-cv-01246-UNA, ECF No. 1, (D. Del. Sept. 17, 2020) (attached hereto as Exhibit "18"). "Philips Electronics North America Corporation" is listed as a subsidiary of Royal Philips as of its 2016 Annual Report, Exhibit 8, List of Subsidiaries (attached hereto as Exhibit "19"). "Philips North America LLC" is not listed therein. *Id.* However, "Philips North America LLC" is listed as a subsidiary of Royal Philips on the 2017 SEC 20-F filing, Exhibit 8, List of Subsidiaries, available at:   https://www.sec.gov/Archives/edgar/data/313216/000119312517050359/d330553d20f.htm (last accessed Oct. 4, 2022) (attached hereto as Exhibit "20").

[26] Corporate Disclosure Statement in *Newsome, Jr., et al. v. Philips North America LLC, Koninklijke Philips N.V., Philips RS North America LLC, Respironics, Inc., et al*., 4:22-cv-04101-HSG (N.D. Cal. July 13, 2022), ECF No. 2 ("Newsome Corp. Discl. Stmt.") (attached hereto as Exhibit "21").

[27] State of Delaware, Dept. of State, Div. of Corporations, Entity Details of Philips Holding USA Inc. (attached hereto as Exhibit "22").

[28] Newsome Corp. Discl. Stmt. (Exhibit "21" hereto).

[29] *Id.*

29.     Defendant Philips RS is a Delaware company that was incorporated on February

22, 1984,[30] having its principal place of business at 6501 Living Place, Pittsburgh, Pennsylvania

15206. Philips RS is 100% owned by Philips RS Holding, which in turn, is 100% owned by Philips

USA.[31] Philips RS formerly operated under the business name Respironics, Inc. ("Respironics").

Royal Philips acquired Respironics in 2008,[32] creating "Philips Respironics."[33] However, "Philips

Respironics is a fictitious name that is 100% owned by Philips RS [N]orth America LLC."[34] In

---

[30] State of Delaware, Dept. of State, Div. of Corporations, Entity Details of Philips RS North America LLC (attached hereto as Exhibit "23").

[31] *See* Newsome Corp. Discl. Stmt. (Exhibit "21" hereto); *see also*, *e.g.*, State of Mississippi, Secretary of State, certificate for Philips RS North America LLC (Respironics, Inc.), which lists that it is a "Member" of Philips RS North America Holding Corporation. This certificate also states an "intent to dissolve" with an effective date of "04/05/2017" (attached hereto as Exhibit "24").

[32] Philips announces completion of tender offer to acquire Respironics, WebWire (Mar. 14, 2008), https://www.webwire.com/ViewPressRel.asp?aId=61199 (last accessed Oct. 3, 2022) (attached hereto as Exhibit "25").

[33] *See History of BiPAP – Respironics and Philips Respironics, cpap.com, last updated* (Dec. 9, 2021), https://www.cpap.com/blog/history-bipap-respironics-philips/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "26"); *see also* Philips in $5 billion Respironics deal, Reuters (Dec. 21, 2007), https://www.reuters.com/article/us-philips/philips-in-5-billion-respironics-deal-idUSL2131786820071221 (last accessed Oct. 3, 2022) (attached hereto as Exhibit "27"); *see also* Philips makes $5.1B public offer to acquire Respironics, ReliablePlant (undated), https://www.reliableplant.com/Read/9713/philips-makes-$5b-public-offer-to-acquire-respironics (last accessed Oct. 3, 2022) (attached hereto as Exhibit "28").

[34] Newsome Corp. Discl. Stmt. (Exhibit "21" hereto). Yet, Philips Respironics has a dedicated webpage which states, "About Philips Respironics – As a global leader in the sleep and respiratory markets, we're passionate about providing solutions that lead to healthier patients, practices, and businesses." *See* http://www.respironics.com/Philips (last accessed Oct. 3, 2022) (attached hereto as Exhibit "29"). Royal Philips holds the copyright on this webpage as of "2004 – 2022" with "[a]ll rights reserved." *Id.* The webpage has a link to a "Privacy policy" that is titled "Philips Privacy Notice" that states "the controller of your personal data (as well as the controller's representative in the European Union) is Philips International B.V. *Id.* Philips International B.V. was founded in 1994. *See Bloomberg* profile for Philips International B.V., https://www.bloomberg.com/profile/company/1071145D:NA (last accessed Oct. 5, 2022) (attached hereto as Exhibit "141"). Philips International B.V. is a wholly-owned subsidiary of Royal Philips. Royal Philips 2021 SEC Form 20-F filing, Exhibit 8, List of Subsidiaries (Exhibit "14" hereto).

October 2020, shortly before the Recall, Respironics, Inc. was newly registered under the name Philips RS North America, LLC.[35]

30.     Defendant Philips RS Holding is a Delaware corporation that was incorporated on October 31, 2020,[36] having its principal place of business at 222 Jacobs Street, Cambridge, Massachusetts 02141, and is wholly owned by Philips USA. Accordingly, Philips RS Holding is a citizen of Massachusetts and Delaware.

31.     At all relevant times, each Philips Defendant acted in all aspects as the agent and alter ego of one another, and reference to "Philips" refers to each Philips Defendant individually and collectively.

32.     Defendant Polymer Technologies, Inc. ("PolyTech") is a Delaware corporation with its principal place of business at 420 Corporate Boulevard, Newark, Delaware 19702. PolyTech directly or through another intermediary provided Philips with the PE-PUR foam that was used in the Recalled Devices.

33.     Defendant Polymer Molded Products LLC ("PMP") is a Delaware corporation with its principal place of business at 10 Easy Street, Bound Brook, NJ 08805. PMP is a molded polyurethane foam manufacturer. PMP directly or through another intermediary provided Philips with the PE-PUR foam that was used in the Recalled Devices.

34.     At all relevant times, Defendants PolyTech and PMP acted in all respects as the agent and alter ego of one another, and reference hereinafter to "PolyTech" or the "PolyTech Defendants" refers to Defendants PolyTech and PMP individually and collectively.

---

[35] State of Delaware Certificate of Conversion (Nov. 9, 2020) (attached hereto as Exhibit "30").

[36] State of Delaware, Dept. of State, Div. of Corporations, Entity Details of Philips RS North America Holding Corporation (attached hereto as Exhibit "31").

### C.   THE GLOBAL PHILIPS ENTERPRISE, INCLUDING ALL PHILIPS ENTITIES NAMED AS DEFENDANTS, OPERATES AS A UNIFIED ENTITY KNOWN SIMPLY AS "PHILIPS."

35.     Royal Philips controls and oversees all aspects of the Philips businesses around the world, going to great lengths to ensure there is a unity of purpose and vision, consistent execution of company procedures, policies, and goals, and, importantly, maintenance and protection of the valuable "Philips" brand.[37]

36.     On its website and in promotional materials, the Philips conglomerate holds itself out to the world as a unified global company that identifies itself simply as "Philips," without distinguishing between or among the various Philips entities.[38] Indeed, Philips proudly proclaims: "We are a diverse team made up of some 80,000 individuals across over 100 countries, all with different backgrounds, perspectives and experiences."[39]

37.     Royal Philips' effort to unite its various business segments and subsidiaries under one brand and to construct a single Royal Philips image in the public eye is evident in its use of the iconic blue Philips shield:



---

[37] For example, in 2019, Royal Philips, Philips NA, and four other Philips entities, filed suit against a company alleging copyright infringement. In their complaint, the Philips entities held themselves out collectively as "Philips" contending that "[t]he six named plaintiffs … are collectively in the business, *inter alia*, of developing, manufacturing, selling, supporting, maintaining, and servicing Philips' medical imaging systems, including the proprietary hardware and software and related trade secrets that are necessary – and/or may be used – to operate, service, and repair such systems." Complaint in *Philips v. 626 Holdings, Inc*., 9:19-cv-81263-RS (S.D. Fla. 2019), ECF No. 1 (attached hereto as Exhibit "32"), at 5, ¶ 18.

[38] *See generally,* Royal Philips "About us" webpage (Exhibit "1" hereto).

[39] *Id.*

38.     The Philips shield in its present form was debuted in November 2013, as a result of Royal Philips' rebranding campaign and appears on the facade of the company's headquarters in Amsterdam.[40]

39.     That very same Royal Philips shield appears at the bottom of every Philips entity's website, including the Respironics site and the Philips websites that are intended for access by foreign consumers in other countries around the world.[41] It also appears on the user manuals and marketing materials of the Recalled Devices.[42]

40.     Royal Philips similarly uses its Philips "wordmark" to hold out a public image that is seamless among the various Philips entities.



41.     Royal Philips has stated that "[t]he Philips wordmark is our primary and most recognized logo," and commercial use of the wordmark is managed by the Royal Philips Brand

---

[40] *See* Royal Philips Press Release, Philips unveils new brand direction centered around innovation and people (Nov. 13, 2013), https://www.philips.com.qa/a-w/about/news/archive/standard/news/2013/20131113-Philips-unveils-new-brand-direction-centered-around-innovation-and-people.html (last accessed Oct. 8, 2022) (attached hereto as Exhibit "160").

[41] *See, e.g.*, Philips Respironics website – About Philips Respironics (Exhibit "101" hereto); Philips Egypt website, https://www.philips.com.eg/ (last accessed Oct. 7, 2022) (attached hereto as Exhibit "161"); Philips Australia website, https://www.philips.com.au/?locale_code=en_au (last accessed Oct. 7, 2022) (attached hereto as Exhibit "162"); Philips Chile website, https://www.philips.cl/?locale_code=es_cl (last accessed Oct. 7, 2022) (attached hereto as Exhibit "163").

[42] *See, e.g.*, DreamStation User Manual (Exhibit "47" hereto), at 33; REMstar SE User Manual (Exhibit "48" hereto), at 25; Trilogy 100 User Manual (Exhibit "49" hereto), at 2; Philips Respironics DreamStation Brochure (Exhibit "44" hereto), at 4; Philips Respironics DreamStation Family Brochure (Exhibit "77" hereto), at 1.

Team.[43] That same Philips wordmark is featured prominently at the top of the websites of various Philips entities around the world.[44]

42.     In order to achieve consistency and a unified global presence, Royal Philips utilizes "a worldwide communication and training program" that includes "mandatory sign-off on the [company's] General Business Principles."[45] Royal Philips established these "General Business Principles" in order to "set the standard for acting with integrity at Philips."[46] According to the company: these fundamentals "govern all our decisions and actions throughout the world and apply equally to our group actions and to our conduct as individuals."[47]

43.     Additionally, Royal Philips touts "a single standard operating model that defines how we work together effectively to achieve our company objectives – the Philips Business System (PBS).... Having a single business system increases speed and agility, and enhances standardization, quality and productivity, while driving a better, more consistent experience for our customers."[48] PBS is "an interdependent, collaborative operating model that covers all aspects of how we operate,"[49] thereby signaling that Royal Philips intends all of its subsidiaries to depend on each other and function as one.

---

[43] *See* Royal Philips website, Philips Wordmark, https://www.philips.com/a-w/about/news/media-library/20170101-Philips-Wordmark.html (last accessed Oct. 7, 2022) (attached hereto as Exhibit "164").

[44] *See, e.g.,* Philips Egypt website (Exhibit "161" hereto); Philips Australia website (Exhibit "162" hereto); Philips Chile website (Exhibit "163" hereto).

[45] *See* Royal Philips website, General Business Principles, https://www.philips.com/a-w/about/investor-relations/governance/business-principles (last accessed Oct. 3, 2022) (attached hereto as Exhibit "33").

[46] *Id.*

[47] *Id.*

[48] Royal Philips 2021 Annual Report (Exhibit "13" hereto), at 12.

[49] *Id.* at 117.

44.     The PBS "is leveraged to drive operational excellence and removes irregularity caused by various operating models of recently acquired businesses."[50] PBS includes "Governance" as a key aspect: "[c]lear governance, roles and responsibilities empower people to collaborate and act fast."[51]

45.     When Royal Philips first announced the Recall on June 14, 2021, the company stated on its website: "To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam."[52]

46.     Shortly after the Recall, Royal Philips' Chief Executive Officer ("CEO") Frans van Houten announced that: "In connection with the voluntary recall notification in June of this year, the FDA has recently conducted an inspection of a Philips Respironics manufacturing facility in the US."[53] Mr. van Houten assured Philips' shareholders and the public that: "We will work closely with the FDA to clarify and follow up on the inspectional findings and its recent requests related to comprehensive testing. Until we have concluded these discussions, we are not able to publicly provide further details on these responses. We remain fully committed to supporting the

---

[50] *Id.* at 233.

[51] *Id.* at 12.

[52] Royal Philips Press Release, Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices (June 14, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "34").

[53] Royal Philips Press Release, Philips provides update on earlier announced voluntary CPAP, BiPAP and Mechanical Ventilator recall notification* (Nov. 14, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/articles/2021/20211113-philips-provides-update-on-earlier-announced-voluntary-cpap-bipap-and-mechanical-ventilator-recall-notification.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "35").

community of patients who rely on the affected devices, and the physicians and customers who are dedicated to meeting patient needs."[54]

47.     A year later, as part of its response to the Recall, Royal Philips' CEO van Houten announced that the Philips company is "focused on further unifying and centralizing our business processes and systems to ensure that we are driving a patient centric and quality culture mindset throughout the company at all times."[55]

48.     The "Philips" brand is important to the company: "For some 130 years, our meaningful innovations have improved the quality of life for millions of people around the world, creating **a strong and trusted Philips brand**."[56] In fact, Philips advertises that "[w]ith a 2021 brand value in excess of USD 12 billion, as defined by branding agency Interbrand, **Philips is one of the world's strongest brands**."[57]

49.     In support of its contention that the company is a single, global enterprise, Philips boasts: "Over the past decade we have transformed into a focused leader in health technology."[58]

---

[54] *Id.*

[55] *See* Philips video titled "Philips CEO Frans van Houten and Chief Business Leader Connected Care Roy Jakobs talk about the various aspects of the field safety notice*," available at: https://www.philips.com/a-w/about/investor-relations/recall-sleep-and-respiratory/testing.html (last accessed Oct. 3, 2022).

[56] *See* Royal Philips "About us" webpage (Exhibit "1" hereto).

[57] *See* Royal Philips website, https://www.philips.com/a-w/about/our-brand (emphasis added) (last accessed Oct. 3, 2022) (attached hereto as Exhibit "36"). Philips is ranked 57 in the Best Global Brands by Interbrand, *see* https://interbrand.com/best-global-brands/philips/ (*see* the video on this page titled "Global Panel: Business Transformation," where Royal Philips' Lorraine Barber-Miller, EVP and Chief Marketing & E-Commerce Officer, discusses Philips' global branding). In her role, Ms. Barber-Miller "[l]ead[s] 3000+ practitioners globally with an annual budget of $1.3 billion across all…lines of business, and market segments" to "[d]riv[e] enterprise-wide marketing." *See* LinkedIn Profile for Lorraine Barber-Miller, Experience section, https://www.linkedin.com/in/lorrainebarbermiller/ (last accessed Oct. 3, 2022) (attached as Exhibit "37" hereto).

[58] *See* Royal Philips "About us" webpage (Exhibit "1" hereto).

"At Philips, our purpose is to improve people's health and well-being through meaningful innovation. We aim to improve 2.5 billion lives per year by 2030, including 400 million in underserved communities."[59]

50.    Royal Philips employs a Chief Medical Officer to achieve those goals. The Chief Medical Officer performs the following functions:

- "Overall functional leadership for clinical innovation, clinical strategy, medical affairs and health economics activities of the company";

- "work[ing] closely and collaboratively with business and functional leaders across the organization";

- "driv[ing] the development and implementation of Philips' medical strategies across the Health Continuum, from the perspective of consumers, patients, and providers";

- "development of strategic relations with highly respected academic institutions and other strategic partners";

- "clinical trial programs in support of existing and next generation products";

- "provid[ing] clinical guidance for the development and market introduction of all new products, solutions and services"; and

- "advis[ing] Philips' board and management in making decisions on market participation, product development, clinical development programs, business development and product launches."[60]

---

[59] *Id.*

[60] *See* LinkedIn Profile for Royal Philips Chief Medical Officer Jan Kimpen, Experience section, https://www.linkedin.com/in/jankimpen/ (last accessed Oct. 3, 2022) (attached as Exhibit "38" hereto).

51.     Philips is proud of its place in history: "We have a proud heritage of ground-breaking innovation that stretches back almost 130 years. Meaningful innovation – focused on our customers' needs – remains at the heart of everything we do."[61] The company points out that "Products come and go ... Technologies change ... But Philips is still about one thing: Creating meaningful innovation that improves people's health and well-being."[62]

52.     Included as part of its long history of innovation, is Philips' intellectual property rights.[63] Philips tightly controls and protects all of its intellectual property, including that of its CPAP, BiPAP, and ventilator devices, in various ways.

53.     First, Royal Philips touts its Intellectual Property & Standards (IP&S) segment as an "Integrated Intellectual Asset Management" in order to **"manage all forms of IP for each of Philips' business areas."**[64] "Philips' IP&S proactively pursues the creation of new Intellectual Property (IP) and the protection of existing IP in close co-operation with Philips' operating businesses and Innovation & Strategy."[65]

> IP&S is a leading industrial IP organization providing world-class IP solutions to Philips' businesses to support their growth, competitiveness and profitability. Royal Philips' IP portfolio currently consists of 57,000 patent rights, 33,000 trademarks, 114,000 design rights and 2,900 domain names. Philips filed 860 new patents in 2021, with a strong focus on the growth areas in health technology services and solutions. Philips earns substantial annual income from license fees and royalties.[66]

---

[61] *See* Royal Philips "About us" webpage (Exhibit "1" hereto).

[62] *Id.* at 3 (Royal Philips copyrighted webpage representing Royal Philips invested €1.8 billion in R&D in 2021 and holds 57,000 patent rights for its health technology business under the "supervision" of Royal Philips' Executive Committee and Supervisory Board).

[63] *Id.*

[64] *See* Philips IP&S corporate video (Sept. 8, 2016), available at: https://www.youtube.com/watch?v=oXGlmpNSCHQ (last accessed Oct. 3, 2022), at 1:25-1:40.

[65] *See* Philips 2021 Annual Report (Exhibit "13" hereto), at 84.

[66] *Id.* at 22.

54.     Second, Royal Philips used a company named RIC Investments, LLC ("RIC") for its patenting. RIC was, initially, a wholly-owned subsidiary of Respironics, Inc., and an assignee of various patents.[67] Thereafter, RIC became a wholly-owned subsidiary of Royal Philips including, for the last time, in a Royal Philips' 2017 Form 20-F filing.[68] As of 2018, RIC no longer appears on the Form 20-F, but an entity named Philips IP Ventures B.V. is listed as a Royal Philips' subsidiary.[69]

    a.  Early patents believed to be related to Philips' CPAP machines were assigned to RIC.[70] Similarly, early Canadian patents involving CPAP and BiPAP devices were filed by Respironics or RIC Investments and then assigned to Philips RS.[71]

    b.  U.S. patents believed to be related to Philips' CPAP or BiPAP devices that were filed by RIC or by Respironics, Inc. were assigned to Royal Philips.[72]

---

[67] *Respironics, Inc. v. Invacare Corp.*, 437 F. App'x 917, 918 (Fed. Cir. 2011).

[68] *See* Royal Philips 2017 SEC 20-F filing, Exhibit 8, List of subsidiaries (Exhibit "20" hereto).

[69] *See* Royal Philips 2018 SEC Form 20-F filing, Exhibit 8, List of subsidiaries, available at: https://www.results.philips.com/publications/ar18 (last accessed Oct. 7, 2022) (attached hereto as Exhibit "144").

[70] *See*, *e.g.*, Estes, *et al.*, *Method and Apparatus for Providing Positive Airway Pressure to a Patient*, Patent No. US 6,932,084 B2, Aug. 23, 2005 (attached hereto as Exhibit "145"), at 1.

[71] *See, e.g.,* Canadian patents: CA 2463488 filed by RIC Investments, at 1; CA 2410248 filed by Respironics, at 1; and CA 2497915 filed by RIC, at 1. Each of these lists Philips RS North America LLC as owner (attached hereto as Exhibits "146," "147," and "148," respectively).

[72] *See*, *e.g.*, Jaffe, *et al., Nasal and Oral Patient Interfaces*, Patent No. US 10,105,099 B2 (Oct. 23, 2018) (attached hereto as Exhibit "149"), at 1.

    c.  U.S. patents believed to be related to Philips' CPAP or BiPAP devices were filed by Royal Philips and assigned to RIC (inverse of above).[73] These patents reveal the comingling of inventors from Pennsylvania and the Netherlands.[74]

    d.  U.S. patents filed by and assigned to Royal Philips have inventors listed as employees of Philips RS.[75]

55.    Third, Royal Philips and Philips RS jointly prosecute Philips' CPAP patent infringement and unfair competition cases. For example, both Royal Philips and Philips RS were complainants in two related cases, one filed with the U.S. International Trade Commission ("USITC") and another in the District of Delaware, alleging unfair trade practices based upon infringing certain Philips' CPAP patents.[76] The *same* counsel represents both Royal Philips and Philips RS in these actions. Further, the USITC complaint refers to Royal Philips and Philips RS collectively as "Philips" and reflects that Royal Philips and Philips RS act as an integrated unit generally and, specifically, with respect to Philips' Sleep and Respiratory Care business, averring as follows:

> 9. Since its founding in 1891, Philips has dedicated significant resources to research and development for the advancement of technology used around the world through

---

[73] *See*, *e.g.*, Ho, *et al.*, *Textured/Polished Respiratory Mask Seal and Mask*, Patent No. US 9,399,107 B2 (July 26, 2016) (attached hereto as Exhibit "150"), at 1.

[74] *See, e.g., id.*

[75] *See, e.g.*, Shelly, *et al.*, *Automatic Pressure Titration*, Patent No. US 9,7344,322 B2 (Aug. 29, 2017) (attached hereto as Exhibit "151"), at 1 (listing Heather Ressler as an inventor); *see also* Matthews, *et al., Starting Pressure for Respiratory Therapy Devices*, Patent No. US 10,286,165 B2 (May 14, 2019) (attached hereto as Exhibit "152") (listing Gregory Matthews as an inventor); LinkedIn profile for Greg Matthews, https://www.linkedin.com/in/greg-matthews-96a0491/ (attached hereto as Exhibit "153"); LinkedIn profile for Heather Ressler, https://www.linkedin.com/in/heather-ressler-5298716/ (attached hereto as Exhibit "154").

[76] *See In the Matter of Certain UMTS and LTE Cellular Communication and Products Containing the Same*, Inv. No. 337-TA-1240 (USITC Dec. 17, 2020) ("USITC case") (attached hereto as Exhibit "155") and *Koninklijke Philips, N.V. v. Thales DIS AIS USA LLC et. al*., No. 1:20-cv-01713-CFC (D. Del. Dec. 17, 2020) (attached hereto as Exhibit "156").

its business units including those described below. Philips strives to make the world heathier and more sustainable through innovation with the goal of improving the lives of billions of people. Philips approaches healthcare as a continuum where its technologies can be applied across activities of healthy living, prevention, diagnosis, treatment and home care as depicted in this graphic:



\*\*\*

12. Philips as a company is organized through various subsidiaries into four segments. These are: (1) Philips Diagnosis and Treatment; (2) Philips Connected Care and Health Informatics; (3) Philips Personal Health; and (4) an "other" segment that includes central administration and certain miscellaneous operations. *See* https://www.philips.com/a-w/about/news/archive/standard/news/press/2019/20190110-philips-realigns-the-composition-of-its-reporting-segments.html.[77] These four segments are further broken down into several separate entrepreneurial business units. The domestic business unit that is relevant to this investigation is Philips' Sleep ("Philips Sleep"), which is part of Philips RS North America LLC (f/k/a Respironics, Inc.), a wholly owned subsidiary of KPNV. Philips Sleep has made significant domestic investments in plant and equipment, and research and development directed to products practicing one or more claims of each of the Asserted Patents.

13. Philips Sleep falls within the Sleep and Respiratory Care business of the Philips Connected Care Segment. *See* https://www.usa.philips.com/c-e/smartsleep.html.[78] **Philips Sleep developed the hardware and software behind the Continuous Positive Airway Pressure ("CPAP") Devices described herein, including products that have been or are being developed and sold by Philips Sleep in the United States supporting United States domestic industry.**

14. **Through this Philips Sleep business unit, Philips researches and develops sleep therapy devices with monitoring technology, develops and sells products**

---

[77] Last accessed Oct. 7, 2022.

[78] Last accessed Oct. 7, 2022.

that allow individuals to monitor and improve their health, and transfers or licenses its technologies and/or the patents that protect its technologies to customers who use the technologies in their products. As a result of these efforts, Philips has become a world leader in health monitoring technology and innovation, including sleep therapy devices such as its CPAP devices, and a major contributor to the United States economy and jobs.

15. **For example, Philips Sleep produces products that have been or are being developed and sold in the United States, including sleep therapy devices such as CPAP devices, which are used by patients with sleep apnea and which collect various information that can be transmitted, for example, to clinicians and the user's own devices to monitor the patient's progress and manage patient compliance and therapy. The connected care system utilizing the CPAP devices (e.g., DreamStation, DreamStation2, SystemOne, DreamStation Go (DsGo), etc.) integrates UMTS and LTE Cellular Communication Modules to communicate through the cellular network to clinical products such as Care Orchestrator (predecessor EncoreAnywhere) and patient products such as DreamMapper.**
https://philipsproductcontent.blob.core.windows.net/assets/20200424/adf8ec9a99 3041e8a097aba700e2c68e.pdf.[79] Philips enables the care of more than 9.7 million people through cloud-based patient monitoring systems.

16. The Philips Sleep business unit expands Philips' capabilities in personal health management and supports Philips' longstanding commitment to deliver integrated solutions across the health continuum.

17. A domestic industry exists … relating to Philips Sleep's DreamStation, DreamStation2, SystemOne, DreamStation Go (DsGo) protected by the Asserted Patents, including related products, based on **Philips Sleep's large investments made in plant and equipment, employment of labor and capital, domestic manufacturing, assembly, testing, engineering, and research and development, among other activities.**

18. A domestic industry is also in the process of being established … relating to Philips Sleep's DreamStation2 and DreamStation Go products protected by the Asserted Patents. **Philips Sleep has taken concrete steps in the form of significant investments in plant and equipment, labor and capital, testing, engineering and research and development to establish a domestic industry in the DreamStation2 and DreamStation Go products**, which are expected to be commercially released during 2021, and therefore there is a significant likelihood that this industry will be established in the near future.[80]

---

[79] Unable to access link as of Oct. 7, 2022.

[80] *See* USITC case (emphasis added).

56.     Again, much of the information regarding the specific activities involving Philips' intellectual property, including Royal Philips and the individual Philips' units and their employees, is shielded from public view. Formal discovery into Philips' patent research, development, and rights would shed light on Royal Philips' control over and ownership of the intellectual property related to the Recalled Devices. However, from records that are available publicly, Royal Philips was involved with, controlled, prosecuted, and defended the intellectual property of the Recalled Devices.

57.     Philips claims its "management structure combines responsible leadership and independent supervision."[81] The company explains that "[t]he Executive Committee operates under the chairmanship of the Chief Executive Officer and supports the Board of Management in the deployment of Philips' strategy and policies, and the achievement of its objectives and results."[82]

58.     Royal Philips' Executive Committee – its managing body – is in charge of developing the "Risk Appetite" for the whole of the Philips Group.[83] The Executive Committee "identifies and manages the risks Philips face in realizing its objectives,"[84] referring to Royal Philips and its subsidiaries. In performing its risk management, the Executive Committee considers information from both internal and external sources, including from its subsidiaries.

_____

[81] *Id.*

[82] *See* Royal Philips website, https://www.philips.com/a-w/about/executive-committee.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "39"). "Under the chairmanship of the President/Chief Executive Officer (CEO), and supported by the other members of the Executive Committee, the members of the Board of Management drive the company's management agenda and share responsibility for the continuity of the Philips group, focusing on long-term value creation." Philips 2021 Annual Report (Exhibit "13" hereto), at 117.

[83] *See* Royal Philips 2021 Annual Report (Exhibit "13" hereto), at 79.

[84] *Id.*

59.     Since at least 2017, each of the named operating segments of the Philips enterprise has had representation in the form of a "Business Leader" on Royal Philips' Executive Committee.[85] For example, Mr. Roy Jakobs, who is in charge of Philips' Connected Care businesses that include Philips RS[86] (and who is scheduled to become the CEO for Royal Philips on October 15, 2022[87]), sits on the Executive Committee.[88]

60.     In its 2021 Annual Report, Royal Philips discusses the creation of Innovation Hubs "[t]o drive innovation, effectiveness and efficiency, and to enable locally relevant solution creation."[89] The locations of these hubs are in Eindhoven (Netherlands), Cambridge (USA), Bangalore (India), and Shanghai (China).[90] Importantly "[t]he four hubs form a global network, together with the other smaller innovation and research sites in their respective regions, to provide access to each other's capabilities to serve businesses, markets and customers globally."[91]

---

[85] *See* Royal Philips 2017 SEC Filing (Exhibit "20" hereto), at 49, 53, 58.

[86] *See* Royal Philips First-Quarter Results 2022 (Apr. 25, 2022), available at: https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-first-quarter-results-2022.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "40") ("Philips has a strong program management in place led by Roy Jakobs, Chief Business Leader of the Connected Care businesses and member of Philips' Executive Committee, to ensure the Respironics field action is executed with speed and accuracy.").

[87] *See* Royal Philips Press Release, Philips announces CEO succession (Aug. 16, 2022), https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2022/20220816-philips-announces-ceo-succession.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "41").

[88] *See* Royal Philips Chief Business Leader of Connected Care, Roy Jakobs, Profile, https://www.philips.com/a-w/about/executive-committee/roy-jakobs.html (last accessed Oct. 9, 2022) (attached hereto as Exhibit "42").

[89] Royal Philips 2021 Annual Report (Exhibit "13" hereto), at 21.

[90] *Id.* at 22.

[91] *Id.*

61.     According to Royal Philips, the Eindhoven Hub is "Philips' largest cross-functional Innovation Hub, hosting the global headquarters of most of our central innovation organizations. Many of the company's core research programs are also run from here, as well as innovation for solution & services delivery."[92]

62.     The Cambridge Hub is "located at the heart of medical innovation within the North America market. It has innovation partnerships with top engineering institutions like MIT, with top clinical sites, and with government funding agencies like NIH (National Institutes of Health) and BARDA (Biomedical Advanced Research and Development Authority)."[93]

63.     Philips' drive for company-wide standardization extends to other aspects of the Philips enterprise. For example, "Philips runs an Integrated Supply Chain, which encompasses supplier selection and management through procurement, manufacturing across all the industrial sites, logistics and warehousing operations, as well as demand/supply orchestration."[94]

64.     Further, Philips invests in "embedding quality in our organizational culture as well as consolidating and standardizing our Quality Management Systems (QMS). … With consistency of purpose, **top-down accountability**, consolidation, standardization and continuous improvement, we aim to drive the adoption of a quality mindset as well as improved quality and safety outcomes throughout the enterprise. . .Quality is an integral part of the evaluation of all levels of management. We perform extensive programs to monitor and evaluate product performance and correct or remove any product from service that presents harm to patients or

---

[92] *Id.*

[93] *Id.*

[94] *Id.* at 25.

users. In the event of issues we run extensive programs with the goal of recalling, repairing or replacing affected products and attempting to prevent such issues from reoccurring."[95]

65.     Despite conducting and presenting itself as a cohesive, unified company, with uniform business standards and operating procedures designed to maintain and protect the Philips brand, in dealings with customers, suppliers, patients, doctors, and regulatory bodies, Royal Philips has created a complex, confusing, and ever-changing labyrinth of interrelated and interconnected Philips entities and holding companies throughout the world.[96] Much of the information regarding the specific activities of the individual Philips units and their employees is shielded from public view. Formal discovery into Philips' corporate structure would shed light on the level of Royal Philips' control over and ownership of the specific entities involved in the allegations related to the responsibility for the Recalled Devices. However, from records that are available publicly, Royal Philips was involved with and controlled not only the sales and marketing of the Recalled Devices, but also the decisions regarding PE-PUR foam, and the recall of the devices containing PE-PUR foam.

### III.     JURISDICTION AND VENUE

66.     This Court has subject matter jurisdiction over each individual action pursuant to 28 U.S.C. § 1332, because the amount in controversy in each action exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between each Plaintiff and each Defendant.

67.     Each Philips Defendant has significant contacts with the Western District of Pennsylvania such that they are subject to personal jurisdiction of the Court. Further, when

---

[95] *Id.* at 85 (emphasis added).

[96] Royal Philips 2020 SEC filing, Exhibit 8, List of Subsidiaries (Exhibit "16" hereto).

convenient for Royal Philips, the company concedes it is subject to personal jurisdiction of the Court. For example, in the *SoClean, Inc. v. Koninklijke Philips N.V., et al.*, 2:22-cv-542 litigation, transferred to *In re SoClean, Inc. Marketing, Sales Practices and Prod. Liab. Litig.*, MDL No. 3021 (W.D. Pa.), counsel for Royal Philips filed a Declaration stating that "KPNV [Royal Philips] acknowledged and conceded that it was subject to specific personal jurisdiction in Pennsylvania on the claims asserted by SoClean in th[at] action."[97]

68.   This Court has personal jurisdiction over each Philips Defendant for the additional reason that they have engaged in substantial, systematic and continuous contacts with Pennsylvania by, *inter alia*, regularly conducting and soliciting business in Pennsylvania and this District, deriving substantial revenue from products and/or services provided to persons in Pennsylvania and this District.

69.   When this litigation first commenced, the same lawyers represented both Philips NA and Philips RS. Both entities argued in front of the Judicial Panel on Multidistrict Litigation for consolidation in Massachusetts, where Philips NA is headquartered. According to their joint brief, "the District of Massachusetts has the strongest nexus to the litigation." MDL No. 3014, Dkt. No. 47 at 13 (J.P.M.L. July 29, 2021). However, they also argued that alternatively, "a clear nexus to the matter …, the Western District of Pennsylvania is home to the other defendant, Philips RS North America LLC (with headquarters in Murrysville, PA) and is also well-equipped to handle the consolidated actions." *Id*. at 8.

70.   The PolyTech Defendants manufactured, treated, and processed the PE-PUR foam by, among other things, applying an adhesive backing and an acoustic lining to the foam, which

---

[97] *See* Declaration of William B. Monahan in Support of Motion to Dismiss, Case 2:22-mc-0152-JFC, at ECF No. 126-1 (attached hereto as Exhibit "43").

was provided to Philips for integration in the Recalled Devices within the Western District of Pennsylvania.

71.     Each Defendant has significant contacts in each of the States and Territories of the United States, such that personal jurisdiction would be proper in any of them in that they manufactured and supplied materials and Recalled Devices that they knew would be sold to and used by consumers throughout the country.

72.     Venue is proper in this District on account of the MDL designation pursuant to 28 U.S.C. § 1407 and under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     CPAP AND BIPAP MACHINES AND VENTILATORS ARE PRESCRIBED TO TREAT BREATHING DISORDERS.

73.     Sleep apnea is a sleeping disorder in which breathing is disturbed during sleep. These disturbances are called "apneas."

74.     According to the Mayo Clinic, the main types of sleep apnea are obstructive sleep apnea, central sleep apnea, and complex sleep apnea syndrome (also known as treatment-emergent central sleep apnea).

75.     Obstructive sleep apnea is the most common type of sleep apnea. It occurs when the muscles in the back of the throat relax during inhalation, which causes the airway to narrow or close and prevent sufficient air from passing through. This in turn lowers the oxygen level in the blood, which causes the brain briefly to wake the body from sleep to reopen the airway. This reawakening may be so brief that the patient does not remember it, and it may be associated with snorting, choking, or gasping. It can happen anywhere from a few times per hour to once every few minutes, and can prevent the patient from reaching the deep, restful phases of sleep.

76.     Central sleep apnea occurs when the brain fails to transmit signals to the breathing muscles. As a result, the body stops breathing, which can cause waking with shortness of breath, difficulty getting to sleep, or difficulty staying asleep.

77.     Complex sleep apnea syndrome occurs when a patient has both obstructive sleep apnea and central sleep apnea. An image showing how an airway can be blocked as a result of sleep apnea appears below:



78.     CPAP therapy is a common treatment for sleep apnea. In CPAP therapy, a machine delivers a continuous flow of air through a mask that is placed over the nose or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea. The illustration below shows a generic CPAP machine being used by a patient while sleeping.



79.     Another therapy to treat sleep apnea includes use of BiPAP machines, which use two different pressures – one for inhaling and one for exhaling.

80.     Patients customarily place CPAP or BiPAP machines on a nearby nightstand or shelf. A hose connects the unit to a mask, which is worn over the nose or mouth during sleep. Below is an image of a Philips DreamStation machine on a nightstand.



81.     Ventilators are often used to treat respiratory failure. Ventilators push air into and out of the patient's lungs like a bellows, typically through a tube that is connected to the machine on one end and inserted through the patient's nose or mouth into the trachea on the other end. Patients are typically sedated while on ventilation because it can otherwise cause intense pain. Ventilators can also be used in other circumstances, such as during surgery when general

anesthesia may interrupt normal breathing. There are also ventilators for home use. The following

image from the National Institute of Health ("NIH") shows a typical ventilator and how it works:



**B.    THE EVOLUTION OF CPAP, BIPAP, AND VENTILATOR DEVICES CONTAINING PE-PUR FOAM.**

82.    The basic technology used in CPAP and BiPAP devices was developed in 1980 by

an Australian pulmonologist, Dr. Colin Sullivan, who used it to treat dogs with respiratory

problems, before the technology was adapted for humans.

83.    Respironics commercialized this technology and sold the first publicly available

CPAP device in 1985. ResMed, an industry competitor, followed with the release of its CPAP

device in 1989.

84.    These first-generation CPAP and BiPAP devices created a new and commercially

viable field of respiratory therapy. The devices, however, were large and noisy, resulting in an

"arms-race" between manufacturers to develop devices that were smaller, more responsive to patient breathing patterns, and quieter.

85.     The noise level of CPAP and BiPAP devices became a driver of adult consumer preference because loud devices interrupted the peaceful sleep of both the patient and their partner.

86.     To develop the quietest devices on the market with the lowest decibel ratings, some device manufacturers including Philips filled the CPAP, BiPAP, and ventilator devices with sound abating foam to reduce the volume of noise emitted from the devices.

87.     In fact, the alleged relative quiet nature of the DreamStation products with PE-PUR foam factored prominently into Philips' marketing.[98] Philips represents that it extensively studied and measured the amount of sound produced by DreamStation products. Philips even included an infographic indicating DreamStation products are barely louder than a whisper:[99]



---

[98]     *See* Philips Respironics DreamStation Brochure, available at: https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.pdf (last accessed Oct. 3, 2022) (attached hereto as Exhibit "44").

[99] *See id.* at 3.

88.     Other manufacturers did not utilize foam for sound abatement, instead they utilized silencing technology to abate the sound from the devices.

89.     Philips manufactures and sells CPAP and BiPAP machines and ventilators, among other products. According to Royal Philips' 2020 Annual Report,[100] Sleep & Respiratory Care ("SRC") constituted 49% of its total sales in its Connected Care line of business,[101] which, in turn, accounted for 28% of Royal Philips' overall sales of about €19.5 billion. Philips has sold millions of CPAP, BiPAP, and ventilator devices in the United States and elsewhere throughout the globe. In 2021, there was "a 23% decline in [Royal Philips'] Connected Care businesses. This was largely due to the Respironics recall…"[102]

90.     Philips provides a User Manual with its CPAP, BiPAP, and ventilator devices. Royal Philips owns the copyright to all, or most, of those User Manuals.[103]

91.     Philips made the decision to use PE-PUR foam for sound abatement purposes in its CPAP, BiPAP, and ventilator devices. That decision was made for products distributed by Philips' entities throughout the globe including, but not limited to the United States, Australia, Canada, Israel, and Chile.[104]

---

[100]   *See*   Royal   Philips   2020   Annual   Report,   available   at: https://www.results.philips.com/publications/ar20 (last accessed Oct. 7, 2022) (attached hereto as Exhibit "45").

[101]   *Id.* at 18. Prior to 2019, SRC was part of Philips' Personal Health businesses. *See* Royal Philips 2018   Annual   Report,   available   at:   https://www.philips.com/c-dam/corporate/about-philips/sustainability/downloads/other/philips-full-annual-report-2018.pdf (last accessed Oct 4, 2022) (attached hereto as Exhibit "46"), at 5.

[102]   Royal Philips 2021 Annual Report (Exhibit "13" hereto), at 28.

[103]   *See, e.g*., DreamStation User Manual (attached hereto as Exhibit "47"), at 2; REMstar SE User Manual (attached hereto as Exhibit "48"), at 2.

[104]   *See* Royal Philips Q2 2022 Results, available for download at Philips Q2 2022 Quarterly Results | Philips Results (last accessed Oct. 3, 2022) (attached hereto as Exhibit "50"), at 33.

37

92.     Polyurethane is an organic polymer in which urethane groups connect the molecular units. It is usually formed by reacting a diisocyanate or triisocyanate with a polyol. Under certain circumstances, polyurethane may break down into a diisocyanate or triisocyanate.

93.     The two main types of polyurethane are polyester and polyether. Polyester polyurethane has better shock absorption and vibration dampening properties and is commonly used for soundproofing or sound dampening.

94.     It has been known for decades that polyester polyurethane is susceptible to hydrolysis, the chemical breakdown of a compound due to reaction with water, particularly in medical applications. For example, a chapter of a scientific encyclopedia published in 2013 states: "Poly(ester urethanes) were the first generation of PURs used in medical devices but were found unsuitable for long-term implants because of rapid hydrolysis of the polyester soft segment."[105]

95.     Polyether polyurethane, on the other hand, is less prone to hydrolysis. The same scientific encyclopedia chapter notes that polyether polyurethanes "with excellent hydrolytic stability replaced poly(ester urethanes) and have been used in medical devices for the past two decades."[106]

96.     There were readily available alternative designs available to Philips, other than to use PE-PUR foam in CPAP, BiPAP, and ventilator devices for sound abatement. These include, for example, other types of sound abating foam and silencing technologies that do not use foam.

---

[105] Pal Singh Chauhan, N., and Kumari Jangid, N., "Polyurethanes and Silicone Polyurethane Copolymers," Chapter in Encyclopedia of Biomedical Polymers and Polymeric Biomaterials, January 2013, available at: https://www.researchgate.net/publication/236144965_POLYURETHANES_AND_SILICONE_POLYURETHANE_COPOLYMERS (last accessed Oct. 3, 2022).

[106] *Id.*

97.     For example, Philips' principal competitor, ResMed, uses polyether polyurethane foam or silicone-based foam, not PE-PUR foam, for sound dampening.[107]

## C.     PHILIPS DESIGNED, MANUFACTURED, AND MARKETED ADULTERATED CPAP, BIPAP, AND VENTILATOR DEVICES.

### 1.     Royal Philips Was Directly Involved With Launching And Marketing The Recalled Devices.

98.     Philips designed and manufactured CPAP and BiPAP devices and ventilators, including the Recalled Devices.

99.     From as early as 2009, Royal Philips took a lead role in launching and marketing several of the Recalled Devices. It did so by "back[ing] … launches with the requisite support in advertising and promotion"[108]; issuing press releases that promoted the devices; participating in medical device conferences that took place in the United States and elsewhere; and maintaining a sleepapnea.com website that educated consumers and providers on Philips devices. Royal Philips' public statements are replete with examples of this conduct.

100.    On June 2, 2009, Philips Respironics issued a press release stating, "Royal Philips Electronics (NYSE:PHG, AEX: PHI) today introduced the Trilogy100 portable at-home life-support ventilator."[109] The Trilogy 100 is one of the Recalled Devices. That same June 2, 2009

---

[107] *See* ResMed website – An update from ResMed's CEO, https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "51").

[108] Thomson Reuters StreetEvents, Edited Transcript, PHIA.AS – Q1 2017 Koninklike Philips NV Earnings Call (Apr. 24, 2017), https://www.results.philips.com/publications/q117/downloads/files/en/philips-first-quarter-results-2017-transcript.pdf?v=20170723194740 (last accessed Oct. 3, 2022) (attached hereto as Exhibit "52"), at 5.

[109] *See* Philips Respironics Press Release, Philips Respironics, Philips Expands Home Healthcare Commitment with Portable Life-Support Ventilator; Offers Ease of Use, Portability and Versatility for Patient (June 2, 2009), https://web.archive.org/web/20090827084718/http://www.prnewswire.com/mnr/respironics/38626/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "53").

press release directed media inquiries to Steve Kelly,[110] who at the time, was serving as the Director of Global Public Relations and Corporate Communications of Philips Healthcare.[111] While in this position, he "[m]anaged all public relations and corporate communications initiatives on behalf of the largest sector of Philips Electronics while coordinating activities with the HQ team in Amsterdam."[112]

101.    On October 13, 2009, Philips Respironics issued a press release stating, "Royal Philips Electronics (NYSE: PHG, AEX: PHI) today introduced the next generation Philips Respironics Sleep Therapy System at Medtrade 2009, the leading conference and expo for the home medical equipment industry."[113] The Sleep Therapy System referred to in press release was the System One 60,[114] one of the Recalled Devices.

102.    On August 29, 2016, Royal Philips issued a press release that, among other things, stated that Royal Philips "will showcase its latest COPD and respiratory solutions at the upcoming European Respiratory Society International Congress (ERS) in London, from September 3-7."[115]

---

[110] *Id.*

[111] *See* LinkedIn Profile for Steve Kelly (Sept. 22, 2022), https://www.linkedin.com/in/stvkly (last accessed Oct. 3, 2022) (attached hereto as Exhibit "54").

[112] *Id.*

[113] Philips Respironics Press Release, Philips Unveils Intelligent Sleep Apnea Therapy System To Home Healthcare Industry (Oct. 13, 2009), http://multivu.prnewswire.com/mnr/brunner/40190/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "55").

[114] *See id.* (offering media images of the System One 60 device and referring to the "breakthrough System One Humidity Control" and "comfort enhance[ing] System One Resistance Control" features).

[115] *See* Royal Philips Press Release, Philips Raises Awareness for Chronic Obstructive Pulmonary Disease (COPD) with Platinum Sponsorship of Leonard Nimoy Tribute Documentary (Aug. 29, 2016), https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2016/20160829-COPD-awareness-with-platinum-sponsorship-Leonard-Nimoy-tribute-documentary.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "56").

103.    On September 1, 2016, Royal Philips issued a press release regarding its promotion of the DreamStation CPAP, one of the Recalled Devices, at an international trade show:

> At this year's Internationale Funkausstellung (IFA) in Berlin, Germany, Royal Philips (NYSE: PHG, AEX: PHIA) today announced a range of new products . . . Key product innovations being showcased at IFA 2016 that support Philips' commitment to helping consumers stay healthy, live well and enjoy life include: . . . The Dream Family, comprised of the DreamWear mask, DreamStation CPAP (Continuous Positive Airway Pressure) device, and DreamMapper patient engagement app. . . .[116]

The September 1, 2016 press release directed media and others interested in obtaining further information to Netherlands-based Elena Calamo Specchia,[117] who at the time, was working in Royal Philips' Amsterdam office as the Royal Philips Spokesperson and Director of the Royal Philips Group Press Office.[118]

104.    Also on September 1, 2016, Royal Philips held a press conference at the IFA trade show,[119] during which Netherlands-based Pieter Nota (who at the time was Royal Philips' CEO of Personal Health Businesses, Chief Marketing Officer, and Member of the Executive Committee and Board of Management)[120] made a presentation promoting the DreamStation as well as other

---

[116] *See* Royal Philips Press Release, Philips Introduces a Wide Range of Connected Personal Health Innovations at IFA 2016 (Sept. 1, 2016), https://www.philips.com/a-w/about/news/archive/standard/news/press/2016/20160901-philips-introduces-a-wide-range-of-connected-personal-health-innovations-at-ifa-2016.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "57").

[117] *Id.*

[118] *See* LinkedIn Profile for Elena Calamo Specchia (Sept. 29, 2022), https://nl.linkedin.com/in/elena-calamo-specchia-b3a17418 (last accessed Oct. 3, 2022) (attached hereto as Exhibit "58").

[119] Royal Philips Press Release, Philips Introduces a Wide Range of Connected Personal Health Innovations at IFA 2016 (Sept. 1, 2016) (Exhibit "57" hereto).

[120] *See* LinkedIn Profile for Pieter Nota, https://de.linkedin.com/in/pieter-nota-5526a235 (last accessed Oct. 3, 2022) (attached hereto as Exhibit "59").

Philips products that were being showcased at IFA.[121] The press conference was live-streamed on Royal Philips' website, www.ifa.philips.com.[122]

105.    On January 5, 2017, Royal Philips issued a press release announcing that "Royal Philips" was showcasing its products, including the DreamStation Go, at the International Consumer Electronics Show (CES) in Las Vegas.[123] The press release quoted Pieter Nota as stating, "In areas such as oral health, mother and child care, sleep and respiratory care, heart health, and home monitoring, Philips is showcasing its ecosystem of connected products and services at CES, once again demonstrating its leadership in the world of digital health."[124] As with the September 1, 2016 press release, Royal Philips' Elena Calamo Specchia was again listed as the media contact.[125]

106.    On January 24, 2017 in a Royal Philips investor call, CEO Frans van Houten remarked on the "success" of Philips' Dream Family of products and was enthusiastic about introduction of the DreamStation Go, one of the Devices at issue here:

> Building on the success of the Philips' integrated Dream Family solution in the United States, Europe and Japan, we recently introduced a Philips DreamStation

---

[121] *See* TechEvents YouTube video, Philips Press Conference Full at IFA 2016 (Sept. 1, 2016), available at: https://www.youtube.com/watch?v=ZU5PFn91_oU (last accessed Oct. 3, 2022), at 8:28-10:00.

[122] Royal Philips Press Release, Philips Introduces a Wide Range of Connected Personal Health Innovations at IFA 2016 (Exhibit "57" hereto).

[123] Royal Philips Press Release, Philips Highlights Cloud-Based Innovations at the Forefront of Digital Health During CES (Jan. 5, 2017), https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20170105-philips-highlights-cloud-based-innovations-at-the-forefront-of-digital-health-during-ces.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "60").

[124] *Id.*

[125] *Id.*

Go portable CPAP solution. DreamStation Go is a compact and lightweight device designed to provide sleep therapy for travelers with obstructive sleep apnea.[126]

107.    On March 7, 2017, Royal Philips issued a press release in which "Royal Philips . . . announced the expansion of its Dream Family of products with the new DreamStation Advanced Therapies" products, which consisted of "the DreamStation Advanced Therapies BiPAP autoSV and AVAPS devices,"[127] both of which are Recalled Devices at issue in this litigation.

108.    On April 11, 2017, Royal Philips issued a press release in which "Royal Philips . . . announced the launch of DreamStation Go."[128] Royal Philips' Elena Calamo Specchia was again listed as one of the media contacts on the press release.[129]

109.    On April 24, 2017, in a Royal Philips investor call, Royal Philips CFO, EVP and Member of the Board of Management Abhijit Bhattacharya[130] informed investors that Royal Philips would launch the DreamStation Go and provide financial support for the advertising and promotion of the device:

---

[126] Thomson Reuters StreetEvents, Edited Transcript, PHIA.AS – Q4 2016 Koninklike Philips NV Earnings Call (Jan. 24, 2017), available at: http://www.philips.com/static/qr/2016/q4/philips-fourth-quarter-results-2016-transcript.pdf (last accessed Oct. 3, 2022) (attached hereto as Exhibit "61"), at 5.

[127] *See* Royal Philips Press Release, Philips expands its award-winning DreamStation platform to treat patients with most complex sleep and breathing needs (Mar. 7, 2017), https://www.prnewswire.com/news-releases/philips-expands-its-award-winning-dreamstation-platform-to-treat-patients-with-most-complex-sleep-and-breathing-needs-300418735.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "62").

[128] *See* Royal Philips Press Release, Philips Simplifies Travel for Sleep Apnea Patients with New Compact and Connected DreamStation Go Sleep Therapy Device (Apr. 11, 2017), https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20170411-philips-simplifies-travel-for-sleep-apnea-patients-with-new-compact-and-connected-dreamstation-go-sleep-therapy-device.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "63").

[129] *Id.*

[130] *See* Royal Philips webpage for Abhijit Bhattacharya, https://www.philips.com/a-w/about/executive-committee/abhijit-bhattacharya.html (last accessed Oct. 10, 2022) (attached hereto as Exhibit "64"). Mr. Bhattacharya is based in Eindhoven, the Netherlands. *Id.*

As Frans [van Houten] mentioned, in Health & Wellness, we have a solid pipeline of new product introductions . . . We will also launch the Philips DreamStation Go portable CPAP solutions. We will back these launches with the requisite support in advertising and promotion, which will have a dampening effect on the results of Personal Health in the second quarter. However, I hasten to add that we do expect to have continued improvements in operating results for Personal Health.[131]

110.    On September 8, 2017, Royal Philips issued a press release announcing that, "At the European Respiratory Society (ERS) International Congress 2017 in Milan, Italy (September 9-13), Royal Philips (NYSE: PHG, AEX: PHIA), a global leader in health technology, will showcase and announce the global expansion of its suite of cutting-edge connected respiratory and sleep solutions," which included "the brand-new DreamStation Go," and the "DreamStation BiPAP AutoSV and AVAPS solutions."[132]

111.    On November 13, 2017, Royal Philips issued a press release announcing that "Royal Philips" would be showcasing several new medical products, including the DreamStation Go, at the 2017 MEDICA World Forum for Medicine in Düsseldorf, Germany.[133] The press release quoted Frans van Houten as stating that "[t]he intelligent sleep therapy, respiratory care and ultrasound solutions we are showcasing at this year's MEDICA bridge important transitions from healthy living to diagnosis, and clinical treatment to home care and chronic disease management,

---

[131] Thomson Reuters StreetEvents, Edited Transcript, PHIA.AS – Q1 2017 Koninklike Philips NV Earnings Call (Apr. 24, 2017) (Exhibit "52" hereto), at 5.

[132] *See* Royal Philips Press Release, Philips showcases expanding connected respiratory and sleep solutions at ERS 2017 (Sept. 8, 2017), https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20170908-philips-showcases-expanding-connected-respiratory-and-sleep-solutions-at-ers-2017.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "65").

[133] *See* Royal Philips Press Release, Philips innovations at MEDICA 2017 connect people,technology and data across the health continuum (Nov. 13, 2017), https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20171113-philips-innovations-at-medica-2017-connect-people-technology-and-data-across-the-health-continuum.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "66").

allowing patients to return home and enjoy the most out of life as quickly as possible."[134] As with other similar press releases, Royal Philips' Elena Calamo Specchia was listed as the media contact.[135]

112.    On November 14, 2017, Royal Philips issued a press release promoting its involvement in World COPD Day.[136] The press release also promoted the DreamStation Advanced Therapies products and the Trilogy hospital-to-home ventilators.[137] Royal Philips' Elena Calamo Specchia is again listed as the media contact.[138]

113.    On January 29, 2018, Royal Philips issued a press release announcing that "Royal Philips" was participating in the 2018 Arab Health Exhibition and Congress on January 29, 2018 through February 1, 2018, and was showcasing several Philips products, including the DreamStation Go.[139] The press release directed media inquiries to Netherlands-based Joost Maltha,[140] as Royal Philips' Senior Global Press Officer, Director of Communications.[141]

---

[134] *Id.*

[135] *Id.*

[136] *See* Royal Philips Press Release, Philips launches global education and empowerment effort for World COPD Day (Nov. 14, 2017), https://www.philips.com/a-w/about/news/archive/standard/news/press/2017/20171114-philips-launches-global-education-and-empowerment-effort-for-world-copd-day.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "67").

[137] *Id.*

[138] *Id.*

[139] *See* Royal Philips Press Release, Philips Breaks Health Technology Boundaries at Arab Health 2018 (Jan. 29, 2018), https://www.philips.com/a-w/about/news/archive/standard/news/press/2018/20180129-philips-breaks-health-technology-boundaries-at-arab-health-2018.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "68").

[140] *Id.*

[141] *See* LinkedIn Profile for Joost Maltha (Sept. 29, 2022), https://nl.linkedin.com/in/joostmaltha (last accessed Oct. 3, 2022) (attached hereto as Exhibit "69").

114.    On April 16, 2019, Royal Philips issued a press release announcing that Philips would be promoting "its latest offerings" at the Medtrade show in Las Vegas, Nevada in the Spring of 2019.[142] Philips featured its "new, patient-focused DreamStation Go Heated Humidifier and DreamWisp" "designed to further enhance effective and efficient care for patients with chronic respiratory and sleep conditions."[143]

115.    In addition, from as early as September 2014 until the present, Royal Philips has maintained the website SleepApnea.com, which educates consumers and providers on sleep apnea and the various treatment devices offered by Philips.[144]

### 2.      Philips Obtained Clearances For the Recalled Devices.

116.    Philips obtained 510(k) clearance from the Food and Drug Administration ("FDA") for various CPAP, BIPAP and ventilator devices.

117.    510(k) clearance generally only requires the manufacturer to notify the FDA under section 510(k) of the Medical Device Amendments of 1976 to the Food Device Cosmetic Act (MDA) of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then "clear" the new device for sale in the United States.

---

[142] *See* Royal Philips Press Release, Philips showcases new opportunities for Home Medical Equipment providers at Medtrade Spring (Apr. 16, 2019), https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2019/20190416-philips-showcases-new-opportunities-for-home-medical-equipment-providers-at-medtrade-spring.html (last accessed Oct. 9, 2022) (attached hereto as Exhibit "70").

[143] *Id.*

[144] *See* sleepapnea.com landing page, archived on Sept. 28, 2014 at https://web.archive.org/web/20140928073021/http://www.sleepapnea.com/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "71"). The landing page of the website contains a copyright for Royal Philips: "© Koninklijke Philips N.V., 2004 - 2014. All rights reserved.)."

118.     Philips utilized the 510(k) process to receive clearances for each of its Recalled Devices except the E30 ventilator which was marketed under an Emergency Use Authorization (EUA).

119.     With respect to the EUA for the E30 ventilator, on March 24, 2020, in response to "concerns relating to insufficient supply and availability of FDA-cleared ventilators for use in healthcare settings to treat patients during the Coronavirus Disease 2019 (COVID-19) pandemic,"[145] the FDA issued an umbrella EUA of ventilators and related equipment. On April 8, 2020, this EUA was extended to the E30 ventilator.[146] A device may be authorized under this umbrella EUA if it "may be effective" in diagnosing, treating, or preventing COVID-19[147]; and according to the FDA, "[t]he 'may be effective' standard for EUAs provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals."

120.     With respect to the 510(k) process for each of the other Recalled Devices, Philips included data, testing, and biocompatibility results along with its applications to claim substantial equivalence to a predicate device.

121.     Upon reviewing the submissions, the FDA determined Philips' devices were substantially equivalent to a predicate device.

122.     After the devices were sold, Philips had a duty to find, investigate, and report adverse events to the FDA. For example, 21 C.F.R. part 803 requires Philips to conduct a thorough

---

[145]*See* Food and Drug Administration, Ventilators and Ventilator Accessories EUAs, https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/ventilators-and-ventilator-accessories-euas (last accessed Oct. 3, 2022).

[146] *Id.*

[147] *See* Food and Drug Administration, Emergency Use Authorization Letter (Mar. 24, 2020), available at: https://www.fda.gov/media/136423/download (last accessed Oct. 3, 2022) (attached hereto as Exhibit "143").

investigation of each event. This duty is triggered when Philips becomes aware of information from any source that reasonably suggests that its device (1) may have caused or contributed to a death or serious injury, or (2) has malfunctioned, and, this device or a similar device it markets, is likely to cause or contribute to a death or serious injury, if the malfunction were to recur. 21 C.F.R. § 803.50.

123.    Additionally, as a manufacturer, Philips has unique knowledge concerning the frequency, severity and predictability of the complications and risks associated with its devices. Accordingly, Philips has post-market responsibility under the FDA Regulations related to complaint handling, investigation and reporting to the FDA, including but not limited to:

a. 21 C.F.R. § 803.10 (for example, § 803.10(c) requires adverse events to be reported by a manufacturer in set time frames from 5 to 30 days when the event becomes known);

b. 21 C.F.R. § 803.17 ("Medical device manufacturers must develop and implement standardized medical device reporting procedures so that timely evaluation of events and communication of findings can occur.");

c. 21 C.F.R. § 803.18 (§ 803.18(d)(1) requires a device distributor to maintain complaint files and records, including any written, electronic or oral communication, either received or generated by the distributor, that alleges deficiencies related to the identity (e.g., labeling), quality, durability, reliability, safety, effectiveness, or performance of a device.);

d. 21 C.F.R. § 803.20 ("Manufacturers must timely communicate a reportable event. Any information, including professional, scientific, or medical facts, observations, or opinions, may reasonably suggest that a device has caused or may have caused or contributed to an MDR reportable event. An MDR reportable event is a death, a serious injury, or, if you are a manufacturer or importer, a malfunction that would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.");

e. 21 C.F.R. § 803.3 ("If you are a manufacturer, you are considered to have become aware of an event when any of your employees becomes aware of a reportable event that is required to be reported within 30 calendar days or that is required to be reported within 5 work days because we had requested reports in accordance with 803.53(b). You are also considered to have become aware of an event when any of your employees with management or supervisory

responsibilities over persons with regulatory, scientific, or technical responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, including any trend analysis, that a reportable MDR event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.");

f.  21 C.F.R. § 803.50 ((a) "If you are a manufacturer, you must report to the FDA information required by 803.52 in accordance with the requirements of 803.12(a), no later than 30 calendar days after the day that you receive or otherwise become aware of information, from any source, that reasonably suggests that a device that you market: (1) May have caused or contributed to a death or serious injury or (2) Has malfunctioned and this device or a similar device that you market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur." Subsection (b) defines information reasonably known to a manufacturer to include: "[a]ny information that you can obtain by contacting a user facility, importer, or other initial reporter; . . . [a]ny information in your possession; or . . . [a]ny information that you can obtain by analysis, testing, or other evaluation of the device." Section 803.50 continues: "(2) You are responsible for obtaining and submitting to us information that is incomplete or missing from reports submitted by user facilities, importers, and other initial reporters. (3) You are also responsible for conducting an investigation of each event and evaluating the cause of the event. If you cannot submit complete information on a report, you must provide a statement explaining why this information was incomplete and the steps you took to obtain the information. If you later obtain any required information that was not available at the time you filed your initial report, you must submit this information in a supplemental report under 803.56 in accordance with the requirements of 803.12(a).");

g.  21 C.F.R. § 803.52 (detailed individual and device information must be submitted for each adverse event);

h.  21 C.F.R. § 803.53 (information regarding detailed individual and device information must be submitted in a timely manner when remedial action may be required);

i.  21 C.F.R. § 803.56 (supplemental reporting must be done if additional information is learned that became known after the initial report was submitted); and

j.  21 C.F.R. § 820.198 ("Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by 820.198(e), records of investigation under this paragraph shall include a determination of: (1) Whether

49

the device failed to meet specifications; (2) Whether the device was being used for treatment or diagnosis; and (3) The relationship, if any, of the device to the reported incident or adverse event").

124.    In addition, there are state law duties to monitor, investigate, evaluate and timely report injuries and other important safety information regarding a medical device, which Philips violated when it failed to: monitor, investigate and report PE-PUR foam degradation risk and incidents; take the necessary steps to continually evaluate the safety, effectiveness and reliability of its Recalled Devices; and take necessary steps to warn, strengthen its warnings, and take other measures to assure compliance with its obligations.

### 3.    The Recalled Devices Are "Adulterated" According To The FDA's Findings And, Therefore, They Are Worthless.

125.    The FDA determined that the Recalled Devices failed to comply with "current good manufacturing practice" requirements ("GMPs") codified in FDA regulations.[148] Devices that are not manufactured in compliance with FDA's GMPs "shall be deemed adulterated." 21 U.S.C. § 351(h); *see id.* § 360j(f)(1) (authorizing FDA to issue regulations prescribing GMP requirements). Title 21 of the U.S. Code prohibits the sale, receipt, or delivery of "adulterated" devices. *See* 21 U.S.C. § 331(a) & (c). Accordingly, the Recalled Devices were adulterated and prohibited for sale, receipt, or delivery.

126.    Specifically, the FDA determined that Philips' manufacture of the Recalled Devices failed to comply with the GMPs imposed by FDA's "Quality System Regulation" ("QSR") "since at least November 2015."[149] The QSR required Philips to "establish and maintain

---

[148] *See* Food and Drug Administration 518(b) Notice Letter to Philips Respironics, May 2, 2022 (hereinafter "518(b) Notice"), available for download at https://www.fda.gov/media/158129/download (attached hereto as Exhibit "72"), at 6 (citing 21 CFR § 820.100).

[149] *Id.* at 6, 10.

procedures for implementing corrective and preventative action" for the Recalled Devices that satisfy seven criteria. 21 C.F.R. § 820.100(a)(1)-(7).

127.    In addition to the FDA's determination that the Recalled Devices violated the QSR requirements codified at 21 C.F.R. § 820.100, the Recalled Devices were "adulterated," and their sale prohibited, under 21 U.S.C. § 351(c), which bans a device as adulterated if its "purity or quality falls below[] that which it purports or is represented to possess." 21 U.S.C. § 351(c).

128.    There is no dispute that the Recalled Devices "fall[] below" their represented quality. *See* 21 U.S.C. § 351(c). Philips sold the Recalled Devices as, *inter alia*, "clinically proven" treatments for sleep disorders.[150] But in its Recall and elsewhere, Philips admits that their use may cause "serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment."[151] As such, the Recalled Devices were undisputedly adulterated and unsalable pursuant to 21 U.S.C. § 351(c).

129.    Further, the FDA's investigation revealed that Philips' incorporation of PE-PUR foam in the Recalled Devices at all times violated other subdivisions of the QSR, minimally including:

   a. 21 C.F.R. § 820.70(h) (requiring manufacturers to "establish and maintain procedures for the use and removal of" manufacturing materials that "could reasonably be expected to have an adverse effect on product quality");

---

[150] *See, e.g.,* Philips US Product page, DreamStation BiPAP autoSV ("DreamStation BiPAP autoSV['s] . . . clinically proven algorithm provides support when needed."), https://www.usa.philips.com/healthcare/product/HCAHX900T15/dreamstation-bipap-autosv-servo-ventilation-system (last accessed Oct. 4, 2022) (attached hereto as Exhibit "73"); Philips US DreamStation Go - Features ("DreamStation Go includes the same clinically-proven Flex pressure-relief technologies, therapy algorithms and event detection found in our DreamStation and System One PAP therapy devices."), https://www.usa.philips.com/healthcare/product/HCEUG502S15/dreamstation-go-portable-pap-therapy-system#features (last accessed Oct. 5, 2022) (attached hereto as Exhibit "74").

[151] Philips Recall Notices issued June 14, 2021 (Exhibit "4" hereto).

b.  21 C.F.R. § 820.30(c) (requiring manufacturers to "establish and maintain procedures to ensure that the design requirements relating to a device are appropriate and address the intended use of the device"); and

c.  21 C.F.R. § 820.30(g) (requiring manufacturers to "establish and maintain procedures for validating the device design," including "that devices conform to defined user needs and intended uses").

130.    Philips' failure to comply with the FDA's QSR (and, concomitantly the FDA's GMPs) establishes that the Recalled Devices were "adulterated" and should not have been sold in the first instance. Each violation of the QSR furnishes an independent basis to find the Recalled Devices were "adulterated" within the meaning of Title 21. *See* 21 U.S.C. §§ 351(h) & 360j(f)(1).

131.    Adulterated devices that put users at risk of life-threatening injuries, like the Recalled Devices here, are worthless because they can neither be demanded nor supplied: they cannot be legally sold, received, or delivered in interstate commerce. 21 U.S.C. § 331(a) & (c).

### D.    PE-PUR FOAM POSES SERIOUS HEALTH RISKS TO USERS OF PHILIPS DEVICES.

132.    Philips has belatedly revealed that the PE-PUR foam in the Recalled Devices degrades and exposes patients to toxic particles and gases. Such exposure has harmed hundreds of thousands of patients across the United States who used the Recalled Devices.

133.    Patients who used Recalled Devices, including all of the individual Plaintiffs, are now at risk of developing cancer and other serious health conditions in the future.

134.    On the same day as the Recall – June 14, 2021 – Philips released an announcement entitled "Clinical information for physicians." In this announcement, Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and mask)."[152] The PE-PUR foam is

---

[152] *See* Royal Philips Informational PDF, Sleep and Respiratory Care update: Clinical Information for physicians (June 14, 2021) (Exhibit "7" hereto), at 4.

black, and when it breaks down, it can release black particles.[153] The announcement stated that the

foam breakdown "may lead to patient harm and impact clinical care,"[154] explaining:

> While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, ***it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.***[155]

135.    The announcement mentioned two types of hazards from the foam in the devices:

dangers from foam degradation and dangers from release of VOCs.

136.    First, the announcement described dangers arising from foam degradation

exposure:

> **Potential Hazard:** Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation.

> The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:

> - Toluene Diamine

> - Toluene Diisocyanate

> - Diethylene glycol.[156]

137.    The inhalation of extremely fine particulates, even non-toxic particulates, can lead

---

[153] *Id.* at 3.

[154] *Id.* at 1.

[155] *Id.* at 2 (emphasis added).

[156] *Id.* at 3-4.

to adverse health outcomes. The Environmental Protection Agency ("EPA") notes that exposure to particles less than 10 micrometers can be linked to a variety of health problems including: aggravated asthma, decreased lung function, increased respiratory symptoms, and cardiac related diseases."[157]

138.    On July 8, 2021, Philips released an update to a global supplemental clinical information document that contained results based on its own testing of the affected devices, stating that: "According to analysis performed by Philips, the majority of particulates are of a size (>8 μm) . . . Smaller particulates (<1-3 μm) are capable of diffusing into deep lung tissue and deposit into the alveoli. During testing performed by an outside laboratory on lab degraded foam, the smallest particulate size identified was 2.69 μm."[158]

139.    The purity of the air coming from a breathing device to a patient is highly important and material. Indeed, Philips advertises the filtration systems in its devices, for example, noting them on a diagram in its DreamStation Family Brochure.[159] Philips' filtration system, however, does not filter out the particles described above.

140.    In addition to the hazards created by the inhalation of extremely fine particulates, Philips has admitted that the particulates created via PE-PUR foam degradation contain toxic compounds such as toluene diamine, toluene diisocyanate, and diethylene glycol.[160] As discussed

---

[157] *See* Health and Environmental Effects of Particulate Matter (PM) | US EPA (last accessed Oct. 3, 2022) (attached hereto as Exhibit "75").

[158] *See* Royal Philips Informational PDF, Sleep and Respiratory Care update, Clinical Information (July 8, 2021), available at: philips-global-supplemental-clinical-information-document.pdf (last accessed Oct. 3, 2022) (attached hereto as Exhibit "76"), at 2.

[159] *See* Philips Respironics DreamStation Family Brochure, available at: https://www.documents.philips.com/assets/20180205/15ef65ad106d4ddc88fca87e0134dc60.pdf (last accessed Oct. 9, 2022) (attached hereto as Exhibit "77").

[160] *See* Royal Philips Informational PDF, Sleep and Respiratory Care update, Clinical Information (July 8, 2021) (Exhibit "76" hereto), at 1.

in more detail below, these compounds are toxic and/or carcinogenic when inhaled or ingested.

141.    Philips concluded in its Health Hazard Evaluations ("HHEs") regarding the PE-PUR foam degradation risk that "[b]ased on the cytotoxicity and genotoxicity results and toxicological risk assessment, combined with [the] conclusion that particles are likely to reach the upper airway and potentially the lower respiratory track [*sic*], a reasonable worst-case estimate for the general and higher risk (e.g., patient populations with preexisting conditions or comorbidities) patient populations is a severity level 3 (Crucial) for both short/intermediate and long term exposure."[161]

142.    ███████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████  ███████████

143.    Further, ████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████  █████████

144.    Philips' HHEs note that the harm due to foam degradation "'may not be immediately recognizable and may not be something that the customer would/could report,' adding that certain harms 'may not be easily linked to the hazardous situation or device use in general'—

---

[161] 518 (b) Notice (Exhibit "72" hereto), at 3-4.



and that in the case of genetic mutations in particular, 'a presumed lag time from exposure to harm development may make it difficult for patients to attribute their individual harm to the device usage.'"[164]

145.    The second hazard is the release of VOCs, that is, toxic and carcinogenic chemical emissions from the PE-PUR foam. Philips explained:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long-term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> - Dimethyl Diazine
>
> - Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl).[165]

146.    In addition to these two compounds, Philips has also found high levels of formaldehyde, a known carcinogen, in analyses of the Recalled Devices. Collectively, these compounds released by PE-PUR foam—formaldehyde, toluene diamine, toluene diisocyanate, diethylene glycol, dimethyl diazine, and phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)— are referred to herein as the "Foam Toxins."

147.    Philips admitted that the risks of these VOCs include: "irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and

---

[164] 518 (b) Notice (Exhibit "72" hereto), *Id.* at 5.

[165] *See* Royal Philips Informational PDF, Sleep and Respiratory Care update: Clinical Information for physicians (June 14, 2021) (Exhibit "7" hereto), at 4-5.

carcinogenic effects," as well as "adverse effects to other organs" such as kidney and liver.[166]

148.    It is beyond reasonable dispute that patients using the Recalled Devices were exposed to harmful particulates and the toxic Foam Toxins. As detailed below, each of the Foam Toxins poses a serious health hazard to users of the Recalled Devices.

### 1.    Formaldehyde Is A Known Carcinogen.

149.    Although Philips has not publicly acknowledged that formaldehyde is used in the manufacturing process for PE-PUR foam or is a byproduct of PE-PUR foam degradation, Philips' internal testing (dated May 22, 2019) reported the presence of formaldehyde in analyses of its DreamStation 1 devices, finding "tolerable limits of the Formaldehyde compound were exceeded during initial operation, as well as at the [redacted]."[167]

150.    Formaldehyde has been classified as carcinogenic to humans (Group 1)[168] by the International Agency for Research on Cancer ("IARC") since 2006.[169] Governmental authorities in the United States have reached similar conclusions: the National Toxicology Program in the United State Department of Health and Human Services ("NTP") has classified formaldehyde as

---

[166] *Id.* at 4, 5.

[167] *See* 483 Report (Exhibit "5" hereto), at 6.

[168] The IARC, an agency of the World Health Organization, groups carcinogenic and potentially carcinogenic substances into five categories: Group 1, carcinogenic to humans; Group 2A, probably carcinogenic to humans; Group 2B, possibly carcinogenic to humans; Group 3, not classifiable as to its carcinogeneity to humans; and Group 4, probably not carcinogenic to humans. International Agency for Research on Cancer, *Agents Classified by the IARC Monographs, Volumes 1–129*, IARC (last updated July 1, 2022), available at: http://monographs.iarc.fr/ENG/Classification/index.php (last accessed Oct. 3, 2022). The EPA uses an equivalent grouping system of five categories (Groups A-E). *See Risk Assessment for Carcinogenic Effects*, EPA.com, available at: https://www.epa.gov/fera/risk-assessment-carcinogenic-effects (last accessed Oct. 3, 2022).

[169] *Formaldehyde*, IARC Monograph – 100F, IARC, available at: https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono100F-29.pdf (last accessed Oct. 3, 2022).

a known human carcinogen since 2011[170]; and the EPA has considered formaldehyde to be a probable human carcinogen (Group B1) since 1989.[171]

151.    There is extensive research, including dozens of human epidemiological studies, showing an association between formaldehyde exposure and numerous forms of cancer, including: nasopharyngeal cancer; sinonasal cancer; leukemia; lung cancer; lymphohematopoietic cancers (other than leukemia); nasal, oral, and throat cancers (other than nasopharyngeal and sinonasal cancers); brain cancer; hepatic cancer; esophageal cancer; thyroid cancer; and pancreatic cancer.[172] Additionally, exposure to formaldehyde appears to have a strong causal relationship to asthma.[173]

## 2.    Toluene Diisocyanate Is A Likely Carcinogen.

152.    Toluene diisocyanates ("TDIs") are used primarily to manufacture flexible polyurethane foams such as PE-PUR foam. Philips has recognized that PE-PUR foam releases TDIs as it degrades.[174]

---

[170]    *Formaldehyde*, Report on Carcinogens, NTP, available at: https://ntp.niehs.nih.gov/ntp/roc/content/profiles/formaldehyde.pdf (last accessed Oct. 3, 2022).

[171]    *See* https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet#r1 (last accessed Oct. 3, 2022).

[172]    *See, e.g.*, *Formaldehyde*, Report on Carcinogens, NTP, available at: https://ntp.niehs.nih.gov/ntp/roc/content/profiles/formaldehyde.pdf; *1910.1048 App C - Medical surveillance – Formaldehyde*, OSHA.com, available at: https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1048AppC (last accessed Oct. 3, 2022).

[173]    *See, e.g.*, *1910.1048 App C - Medical surveillance – Formaldehyde*, OSHA.com, available at: https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1048AppC (last accessed Oct. 3, 2022).

[174]    *See* Royal Philips Informational PDF, Sleep and Respiratory Care update: Clinical information for physicians (June 14, 2021) (Exhibit "7" hereto), at 4; Royal Philips Informational PDF, Sleep and Respiratory Care update: Clinical Information (July 8, 2021) (Exhibit "76" hereto), at 1 ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include … toluene diisocyanate isomers (TDI)").

153.    TDI is classified as possibly carcinogenic to humans (Group 2B) by IARC.[175] The United States Center for Disease Control ("CDC"), Occupational Safety and Health Administration ("OSHA"), and National Institute for Occupational Safety and Health ("NIOSH") also regard TDI as a potential human carcinogen based on tumorigenic responses in TDI treated rats and mice.[176] The EPA has taken action under the Toxic Substances Control Act to allow oversight of the use of TDI in consumer products.[177] NTP classifies TDI as "reasonably anticipated to be a human carcinogen" based on sufficient evidence of carcinogenicity from studies in experimental animals.[178] The European Union warns that TDI "is fatal if inhaled."[179]

154.    Administration of TDI by stomach tube caused liver tumors (hepatocellular adenoma) in female rats and mice, benign tumors of the mammary gland (fibroadenoma) and pancreas (islet-cell adenoma) in female rats, and benign tumors of the pancreas (acinar-cell adenoma) in male rats. It also increased the combined incidences of benign and malignant tumors of subcutaneous tissue (fibroma and fibrosarcoma) in rats of both sexes and of the blood vessels

---

[175] *Toluene diisocyanates*, IARC Monographs Vol. 71, IARC, available for download at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c 5a04f82cac60.pdf (last accessed Oct. 3, 2022).

[176] *See, e.g.*, *Toluene diisocyanates*, Report on Carcinogens, NTP, available at: https://ntp.niehs.nih.gov/ntp/roc/content/profiles/toluenediisocyanates.pdf (last accessed Oct. 3, 2022); *Current Intelligence Bulletin 53, Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, NIOSH Pub. No. 90-101 (Dec. 1989), available at: https://www.cdc.gov/niosh/docs/90-101/default.html (last accessed Oct. 3, 2022).

[177] *See* https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-toluene-diisocyanate-tdi-and-related#action (last accessed Oct. 3, 2022).

[178] *See* https://ntp.niehs.nih.gov/ntp/roc/content/profiles/toluenediisocyanates.pdf (last accessed Oct. 3, 2022).

[179] https://echa.europa.eu/substance-information/-/substanceinfo/100.043.369 (last accessed Oct. 3, 2022).

(hemangioma and hemangiosarcoma) in female mice.[180] Exposure to TDI also has been documented to cause respiratory irritation, asthma, and lung damage.[181]

### 3. Toluene Diamine Is A Likely Carcinogen.

155.    Philips has recognized that PE-PUR foam releases toluene diamine ("TDA") as it degrades.[182] Additionally, TDA is a hydrolysis product of TDI.

156.    IARC has classified TDA as possibly carcinogenic to humans (Group 2B),[183] and the EPA classifies it as a probable human carcinogen.[184] The European Union has concluded that TDA "cannot be considered safe for use" even as a hair dye, let alone breathed into the lungs for many hours each night.[185] The NTP classifies TDA as reasonably anticipated to be a human carcinogen based on animal studies.[186]

157.    Available data on TDA primarily comes from animal studies. These studies

---

[180] *See* https://ntp.niehs.nih.gov/ntp/roc/content/profiles/toluenediisocyanates.pdf. (last accessed Oct. 3, 2022).

[181] *See, e.g.*, *Toluene diisocyanates*, IARC Monographs Vol. 71, IARC, available for download at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c5a04f82cac60.pdf (last accessed Oct. 3, 2022).

[182] *See* Royal Philips Informational PDF, Sleep and Respiratory Care update: Clinical Information (July 8, 2021) (Exhibit "76" hereto), at 1 ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include … toluene diamine isomers (TDA)").

[183] *See Toluene diisocyanates*, IARC Monographs Vol. 71, IARC, available for download at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c5a04f82cac60.pdf (last accessed Oct. 3, 2022).

[184] *See Toluene 2,4 diamine*, EPA (Jan. 2000), available at: https://www.epa.gov/sites/default/files/2016-09/documents/toluene-2-4-diamine.pdf (last accessed Oct. 3, 2022).

[185] https://ec.europa.eu/health/scientific_committees/consumer_safety/docs/sccs_o_093.pdf (last accessed Oct. 3, 2022), at 5.

[186] *2,4-Diaminotoluene*, Report on Carcinogens, NTP, available at: https://ntp.niehs.nih.gov/ntp/roc/content/profiles/diaminotoluene.pdf (last accessed Oct. 3, 2022).

strongly support an association between TDA and hepatic cancer.[187] There is evidence of a link between TDA exposure and pulmonary fibrosis based on in vitro studies in which human lung fibroblasts were exposed to TDI and TDA.[188] The EPA has determined that acute exposure to TDA can produce severe skin and eye irritation, sometimes leading to permanent blindness, respiratory problems (*e.g.*, asthma), rise in blood pressure, dizziness, convulsions, fainting, and coma.[189] Exposure to TDA can also cause irritation of the skin, nose, and throat, damage to reproductive and neurological systems, eye irritation, dermatitis, ataxia, tachycardia, respiratory depression, stomach gas, hypertension, nausea, vomiting, methemoglobinemia, cyanosis, headache, weakness, exhaustion, dizziness, convulsions, fainting, and coma.[190]

### 4.   Diethylene Glycol Is Toxic To Humans.

158.   Diethylene glycol ("DEG") is a widely used solvent. It is a colorless and odorless liquid with a sweetish taste and has often been a contaminant in consumer products, resulting in numerous epidemics of poisoning. DEG is used in the production of polyester polyurethane foam,

---

[187] *Id.*

[188] It is well established that TDI is converted to TDA through hydrolysis (a reaction caused by exposure to water). *See Current Intelligence Bulletin 53, Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity*, NIOSH Pub. No. 90-101 (Dec. 1989), available at: https://www.cdc.gov/niosh/docs/90-101/default.html (last accessed Oct. 3, 2022). Thus, ingested TDI may react with saliva and/or gastrointestinal fluids and convert to TDA. Additionally, there is evidence that inhaled TDI is converted into TDA by reaction with a substance (gluthathione) present in the lungs. As a result, observed effects ascribed to TDI may be due to unmeasured conversion to TDA after exposure.

[189] *Id.*

[190] *See Toluene 2,4 diamine*, EPA (Jan. 2000), available at: https://www.epa.gov/sites/default/files/2016-09/documents/toluene-2-4-diamine.pdf (last accessed Oct. 3, 2022).

and Philips has admitted that DEG is a byproduct of PE-PUR foam degradation.[191]

159.    DEG has a historical involvement in mass poisonings around the world. Famously, DEG caused the death of 100 people across 15 states in the 1937 Elixir Sulfanilamide Incident, which served as a catalyst for the enactment of the Federal Food, Drug, and Cosmetic Act ("FDCA") in 1938.[192]

160.    DEG is a toxic substance with a mean fatal dose of 1 mL/kg of pure DEG.[193] Ingesting only a small amount may result in gastrointestinal distress and stupor.[194] Exposure may cause irritation of the eyes, skin, and mucous membranes.[195] DEG has also been shown to have damaging toxic, irritating, and inflammatory properties when inhaled.[196]

**5.    Dimethyl Diazine Is A Precursor To A Known Carcinogen.**

161.    Dimethyl diazene ("DD"), also known as azomethane, is "associated with the production process of the [PE-PUR] foam."[197] Philips has admitted that DD is emitted from PE-

---

[191] *See* Royal Philips Informational PDF, Sleep and Respiratory Care update: Clinical Information (July 8, 2021) (Exhibit "76" hereto), at 1 ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include diethylene glycol (DEG) ….").

[192]     https://www.fda.gov/files/about%20fda/published/The-Sulfanilamide-Disaster.pdf     (last accessed Oct. 3, 2022).

[193] L.J. Schep, *et al.*, *Diethylene glycol poisoning*, Clin. Toxicol. 47(6):525-35 (July 2009).

[194]    *See    Ethylene    Glycol:    Systemic    Agent*,    NIOSH,    available    at: https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750031.html (last accessed Oct. 9, 2022).

[195] *Id.*

[196] *See*, *e.g.*, C.J. Hardy, *et al.*, *Twenty-eight-day repeated-dose inhalation exposure of rats to diethylene glycol monoethyl ether*, Fundam. Appl. Toxicol. 38(2):143-7 (Aug. 1997).

[197] *See* Royal Philips Informational PDF, Sleep and Respiratory Care update: Clinical Information (July 8, 2021) (Exhibit "76" hereto), at 3 (finding that during "testing which ran a device at 35°C ± 2°C for 168 hours, two compounds of concern were emitted from the device: dimethyl diazene and phenol 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)").

PUR foam under normal conditions and possibly also as the result of degradation.[198]

162.   IARC has not yet evaluated the potential carcinogenicity of DD to humans, as there is scant data concerning the effects of DD on humans and animals. However, DD is a member of a family of carcinogenic substances: 1,2-dimethylhydrazine (a Group 2A probable human carcinogen that exhibits hepatotoxic effects along with injuries to other organs in animal experiments[199]) dehydrogenates into DD, which then oxidizes into azoxymethane (a known carcinogen that has not yet been classified by the EPA or IARC). Azoxymethane further oxidizes into methylazoxymethanol, a Group 2B possible human carcinogen.[200] Both methylazoxymethanol and 1,2-dimethylhydrazine have been found to metabolize into formaldehyde, a Group 1 known carcinogen.[201] Thus, an individual regularly exposed to DD may also have been exposed to 1,2-dimethylhydrazine, azoxymethane, methylazoxymethanol, and/or formaldehyde—each of which is recognized as a known or probable carcinogen—as these

---

[198] *Id.*

[199] G. Choudary, *Toxicological Profile for Hydrazines*, Agency for Toxic Substances and Disease Registry (1997); R.B. Wilson, *Species variation in response to dimethylhydrazine, Toxicology and Applied Pharmacology*, 38:3 (1976); M.A. Bedell, *et al.*, *Cell Specificity in Hepatocarcinogenesis: Preferential Accumulation of O6 Methylguanine in Target Cell DNA during Continuous Exposure of Rats to 1,2-Dimethylhydrazine*, Cancer Res 42:3079-3083 (1982); W.J. Visek, *et al.*, *Dietary protein and chronic toxicity of 1,2-dimethylhydrazine fed to mice*, Journal of Toxicology and Environmental Health, 32:4, 383-413 (1991).

[200] E. Fiala, *Investigations into the metabolism and mode of action of the colon carcinogen 1, 2-dimethylhydrazine*, Cancer, 36:2407-12 (Dec. 1975); S. Wolter, N. Frank, *Metabolism of 1,2-dimethylhydrazine in isolated perfused rat liver*, Chemico-Biological Interactions, 42:3, 335-344 (1982); IARC Monograph – 71-42, IARC (1987); IARC Monograph Supplement 7, IARC (1987); H. Druckrey, *Production of colonic carcinomas by 1,2-dialkylhydrazines and azoxyalkanes*, Carcinoma of the Colon and Antecedent Epithelium 267-279 (1970).

[201] P. Harbach, *et al.*, *Effects of selenium on 1,2-dimethylshydrazine metabolism and DNA alkylation* (1981); S.N. Newaz, *et al.*, *Metabolism of the Carcinogen 1,2Dimethylhydrazine by Isolated Human Colon Microsomes and Human Colon Tumor Cells in Culture* (1983); J. Erikson, *et al.*, *Oxidative Metabolism of Some Hydrazine Derivatives by Rat Liver and Lung Tissue Fractions* (1986).

compounds are oxidized and metabolized.

163.    DD is clearly linked to colorectal cancer in mice. Azoxymethane, the product of oxidized DD, is used to induce colorectal cancer in animals and has been shown to cause hepatic lesions, intestinal tumors, and renal tumors.[202]    Oxidized azoxymethane produces methylazoxymethanol, which is known to cause DNA damage and has been associated with amyotropic lateral sclerosis, parkinsonism, dementia, colon cancer, liver cancer, and prostate cancer.[203] Exposure to DD—as the precursor to these carcinogenic compounds—means exposure to these other compounds and the health risks they pose.

### 6.    Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl) Is A Toxic Compound.

164.    Phenol, 2,6-bis(1,1-dimethylethyl)-4-(1-methylpropyl) ("DTBSBP") is "associated with the production process of the foam."[204] According to Philips, DTBSBP is emitted from PE-PUR foam under normal conditions and possibly also as the result of degradation.[205]

165.    In 2010, the Canadian government determined that DTBSBP was a Schedule 1 toxic substance under the Canadian Environmental Protection Act "based on available information regarding possible persistence, accumulation in organisms and potential to cause harm to

---

[202] M. Kobaek-Larsen, *et al*., *Secondary effects induced by the colon carcinogen azoxymethane in BDIX rats*, APMIS 112(6):319-29 (2004 June).

[203] P. Spencer, *et al*., *Unraveling 50-Year-Old Clues Linking Neurodegeneration and Cancer to Cycad Toxins: Are microRNAs Common Mediators?*, Frontiers in Genetics 3 (2012).

[204] *See* Royal Philips Informational PDF, Sleep and Respiratory Care Update: Clinical Information (July 8, 2021) (Exhibit "76" hereto), at 3 (finding that during "testing which ran a device at 35°C ± 2°C for 168 hours, two compounds of concern were emitted from the device: dimethyl diazene and phenol 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)").

[205] *Id.*

organisms."[206] These findings prompted Canadian regulators to propose "virtual elimination" of DTBSBP.[207]

**E.      PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM FOR MANY YEARS PRIOR TO THE RECALL.**

166.    At the time it installed PE-PUR foam into the Recalled Devices, Philips was required to test the devices in accordance with various international standards, including ISO 18562-2:2017, ISO 18562-3:2017, ISO 10993-13, and ISO 10993-9.

167.    At that time, Philips should have known the PE-PUR foam posed a safety risk to users.

168.    The FDA concluded after an investigation of Philips' Recalled Devices that beginning in at least 2008, and over time, Philips received hundreds of thousands of customer complaints regarding foam degradation in the Recalled Devices and, years later, received data from a variety of sources confirming foam degradation.

169.    The FDA's findings were based, in part, on twenty-one (21) site inspections of Philips' Murrysville, Pennsylvania facility between August 26, 2021 and November 9, 2021. The lead FDA investigator, Katelyn A. Staub-Zamperini, memorialized the agency's findings in a 29-page FDA 483 Report issued on November 9, 2021.[208] The FDA delivered the 483 Report to Rodney Mell, Head of Quality at Philips Respironics, on or around November 9, 2021.[209]

---

[206] *Phenol, 2,6-bis(1,1-dimethylethyl)-4-(1-methylpropyl)- (DTBSBP)*, Government of Canada, Canada.ca, available at: https://www.canada.ca/en/health-canada/services/chemical-substances/challenge/batch-8/1-methylpropyl.html. (last accessed Oct. 3, 2022).

[207] *Id.*

[208] *See generally,* 483 Report (Exhibit "5" hereto).

[209] *Id.* at 1, 29.

170.    A 483 Report "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts."[210] These observations are made in a 483 Report "when in the investigator's judgment, conditions or practices observed would indicate that any food, drug, device or cosmetic has been . . . or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health."[211]

171.    In connection with the FDA's investigation for its 483 Report, the FDA learned that Philips received hundreds of thousands of complaints from customers about degradation of the foam in its Recalled Devices beginning at least as early as 2008:

> [A] query of your firm's consumer complaints from 01/01/2008 to current, for the keywords contaminants, particles, foam, debris, airway, particulate, airpath, and black, **resulted in over 222,000 complaints, and over 20,000 of which occurred between 2008 to 2017 and involved Trilogy devices**. Additionally, your firm performed a foam related complaint data analysis in April 2021 on complaints confirmed to be related to or involve foam degradation issues. The raw complaint data documents that **30 Trilogy related complaints were received from 2014 to 2017, and 1,254 related complaints were received across all products containing the affected foam, from 2014 to 2021**.[212]

172.    Yet, "[n]o formal investigation, risk analysis, or CAPA were initiated, performed, or documented [by or on behalf of Philips], in response to the at least 222,000 complaints that could potentially be related to foam degradation and received from 2008 to 2017 . . . ."[213]

173.    A Corrective and Preventative Action ("CAPA") refers to procedures that medical device manufactures must follow to identify and attempt to correct a quality problem after one is detected. *See* 21 C.F.R. § 820.100. A CAPA is designed "to collect information, analyze

---

[210] *See* FDA Form 483 Frequently Asked Questions (Exhibit "6" hereto).

[211] *Id.*

[212] 483 Report (Exhibit "5" hereto), at 12 (emphasis added).

[213] *Id.* at 16.

information, identify and investigate product and quality problems, and take appropriate and effective corrective and/or preventive action to prevent their recurrence."[214]

174.    The FDA also found that Philips "was made aware of polyester polyurethane [PE-PUR] foam degradation issues in/around October 2015 . . . ."[215] ████████████████████



175.    In fact, an adverse event report from the FDA Manufacturer and User Facility Device Experience ("MAUDE") database shows that, as early as 2011, Philips knew that a patient discovered "black dust" on her nose when she awoke after using a Philips RemStar CPAP device and subsequently underwent treatment for "intoxication" and "chest tightness."[217]

176.    Philips investigated this report and confirmed that the device contained "evidence of an unk[nown] black substance in the air path and on internal components . . . present throughout both the intake and exhaust portions of the air path . . . ."[218]

---

[214] *See* Food and Drug Administration, *Corrective and Preventative Actions (CAPA)*, https://www.fda.gov/corrective-and-preventive-actions-capahttps://www.fda.gov/corrective-and-preventive-actions-capa (last accessed Oct. 3, 2022).

[215] 483 Report (Exhibit "5" hereto), at 18.

[216] ████████████████████████████████

[217] MAUDE Adverse Event Report: RESPIRONICS, INC. REMSTAR PRO INTERNATIONAL, http://www.fdable.com/advanced_maude_query/324fd08a137ce36c2d5faf453ee26f2f (last accessed Oct. 3, 2022).

[218] *Id.*

177.    The FDA found that Philips' analysis of consumer complaints was itself defective in that it "was not adequately performed to identify or detect quality problems."[219] The FDA concluded that "potential foam degradation in Trilogy ventilator devices is not an isolated incident, and you [Philips] also have not documented a detailed rationale for why harm is not likely to occur again, as required by your Health Hazard Evaluation's instructions."[220] In light of this, the FDA concluded that Philips' "risk analysis is inadequate or was not performed when appropriate or within an appropriate time frame of your firm becoming aware" of these issues.[221]

178.    Company documents show that



179.

---

[219] 483 Report (Exhibit "5" hereto), at 16.

[220] *Id.* at 13.

[221] *Id.* at 3.

[222]

[223]

[224]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████

180.    Indeed, ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████

181.    The FDA has concluded that:

Beginning in 2015, Philips received data from a variety of sources regarding degradation of the PE-PUR foam contained within the recalled devices, including complaints, test reports, information from suppliers, and information from another entity owned by Philips' parent company. Philips failed to adequately evaluate this data and incorporate it into its CAPA [Corrective and Preventive Actions] system for further investigation and potential mitigation, as required by current good manufacturing practice requirements codified in 21 C.F.R. § 820.100.[228]

182.    The FDA 483 Report notes that "an incorrect and non-specified polyester polyurethane, raw foam product, sourced from your [Philips'] raw foam supplier resulted in [redacted] non-conforming Trilogy Evo ventilatory finished devices being approved, released, and



[225] ████████████████████████████████████████████

[226] ███████████

[227] █████████████████████████████████████████████

[228] 518(b) Notice (Exhibit "72" hereto), at 6.

distributed, which further resulted in the ongoing correction and removal."[229] The correction and removal "were established as part of [Philips'] response to failed VOC and ISO 18562 testing of related Trilogy EVO ventilatory medical devices … which resulted from the presence of the non-specified polyester polyurethane foam component, incorrectly supplied by [Philips'] raw foam supplier."[230]

183.    Company documents show that from at least as early as 2016, Royal Philips has demonstrated a systematic level of involvement in and control over testing the PE-PUR foam in the Recalled Devices and investigating the problems with that foam.

184.    For example, there is evidence that



185.    In addition,

---

[229] 483 Report (Exhibit "5" hereto), at 25.

[230] *Id.*

[231] ███████████████████████████████████

[232] ██

[233] ████████████████████████████████████████
████████████████



186.     Philips explains that "Innovation & Strategy advances innovation together with Philips' businesses, markets and partners. This entails cooperation between research, design, medical affairs, professional services, marketing, strategy and businesses in a multi-disciplinary fashion, from early exploration to first-of-a-kind offerings."[238] The I&S Hub is also responsible for providing engineering solutions to all of Philips businesses, which is "accountable for bringing engineering capabilities in Philips to world-class level to realize innovations that deliver on our customers' needs. . .Taking a customer-first approach, Engineering Solutions turns ideas into working innovations by providing deep engineering expertise, cross-business product platforms,



[238] *See* Royal Philips 2021 Annual Report (Exhibit "13" hereto), at 21.

and innovation processes and tools. Engineering Solutions also works for selected external companies in the healthcare, high-tech and semiconductor industries."[239]

187.    Additionally, "The role of Innovation & Strategy is to listen to the voice of the customer and, in collaboration with the operating businesses and the markets, direct the company strategy and innovation roadmap to achieve our growth and profitability ambitions. The various components of Innovation & Strategy include: the Chief Technology Office (CTO), Research, HealthSuite Platform, the Chief Medical Office, Engineering Solutions, Experience Design, Healthcare Transformation Services, Strategy, and Partnerships. Our four largest Innovation Hubs are in Eindhoven (Netherlands), Cambridge (USA), Bangalore (India) and Shanghai (China)."[240] While the Hub appears to be centered in Eindhoven, Philips also has employees ████████████ ████████████████████████████

188.    Later in 2016, ████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████  █████████████████████

---

[239] *Id.*

[240] *Id.*

[241] ██████████████████████████████████

[242] ████████████████████████████████████████████
████████████████████████

189.   In December 2018, ███████████████████████████████

190.   In May 2020, ████████████████████████████████████

---

243 ███████████████████████████████████

244 ██████████████████████████████

245 ████████████████████████████████████

246 ███████████████

247 █████

248 ████████████████████████████████████████

249 ██████



191.    On May 2, 2022, the FDA issued a formal notice to Philips pursuant to Section 518(b) of the FDCA, 21 U.S.C. § 360h(b) (the "518(b) Notice").[254] The 518(b) Notice stated that the FDA's "Center for Devices and Radiological Health (CDRH) is proposing that an order should be issued pursuant to section 518(b)" of the FDCA "to require Philips to submit a plan for the repair, replacement, and/or refund of the purchase price of devices subject to the recall that were manufactured after November 2015, sufficient to assure that the unreasonable risk of substantial



[250]

[251]

[252]

[253]

[254] 518(b) Notice (Exhibit "72" hereto).

harm to the public health presented by those devices will be eliminated."[255] This notice was directed to Thomas J. Fallon, Head of Quality, Sleep and Respiratory Care, for Philips Respironics, Inc.

192.    The 518(b) Notice stated that "there is sufficient evidence for FDA to determine that the devices subject to the recall present an unreasonable risk of substantial harm to the public health" and "that there are reasonable grounds to believe that the recalled devices that Philips manufactured after November 2015 were not properly manufactured with reference to the state of the art as it existed at the time of the devices' manufacture."[256]

193.    The FDA concluded that "patients and providers cannot readily mitigate the unreasonable risk associated with the recalled devices."[257]

194.    The FDA also concluded that "[t]his risk is not the unavoidable byproduct of current ventilator, CPAP machine, and BiPAP machine technologies. Indeed, Philips and its competitors market ventilators, CPAP machines, and BiPAP machines that do not use PE-PUR foam."[258]

**1.    In 2015, Philips Communicated With Its Foam Suppliers About The Problem Of PE-PUR Foam Degradation.**

195.    The PE-PUR foam that Philips used in its Recalled Devices was manufactured by William T. Burnett & Co. ("Burnett"), a bulk foam manufacturer. Burnett produces foam in sheets that are between approximately four feet to more than six feet wide and may be as long as one hundred or two hundred feet.

---

[255] *Id.* at 1.

[256] *Id.* at 2.

[257] *Id.*

[258] *Id.* at 6.

196.    Burnett sells its bulk foam to intermediaries, including PolyTech and The SoundCoat Company ("SoundCoat"). PolyTech and SoundCoat then sell the foam to Philips, either directly or through another intermediary, such as Paramount Die Corporation, which may modify the foam.

197.    According to the FDA, "email correspondence between [Philips] and its raw foam supplier [PolyTech] beginning 10/30/2015 and forward, document that [Philips] was made aware of polyester polyurethane [PE-PUR] foam degradation issues in/around October 2015, which was later confirmed by [Philips'] foam supplier on 08/05/2016, via email."[259]

198.    On August 5, 2016, Bob Marsh, a PolyTech employee, wrote to Lee Lawler,[260] an employee of Burnett, referencing a concern expressed by one of its customers, Philips, in the Fall of 2015 regarding foam degradation in its medical devices.[261] Mr. Marsh stated: "They [Philips] are asking again, and wondered if we could give them any estimate on lifespan of the foam when exposed to 40 C and high humidity."[262] Mr. Lawler responded that, under those conditions, he "would not be surprised if ester foam . . . would exhibit signs of hydrolysis in as short a time as a year."[263] He added: "that is not a good environment for polyester foam. Polyether foam could last years in that environment."[264] Presumably referring to Philips, Mr. Marsh responded that he would

---

[259] 483 Report (Exhibit "5" hereto), at 18.

[260] The Affidavit of Lee Lawler, Technical and R&D Manager at Burnett ("Lawler Aff."), is filed in MDL No. 3014, Case 2:21-mc-01230-JFC, at ECF No. 589-7, and attached hereto, without exhibits, as Exhibit "94."

[261] *See* Email exchange between Bob Marsh at PolyTech and Lee Lawler at Burnett (Lawler Aff. Exh. E) (attached hereto as Exhibit "95"), at WTB 000056.

[262] *Id.*

[263] *Id.*

[264] *Id.*

"let them know they'd be better off with the ether."[265] ███████████████████

████████████████████████████████████████████████████████████████

██████████████████████████

199.    Indeed, ███████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

200.    Knowing about these issues with the PE-PUR foam, Philips tested the foam material used in its Recalled Devices. According to the FDA, "this testing spoke only to the limited finding that in the case of the [redacted] foam samples 'returned from service in a Pacific rim location,' spectroscopy results were 'consistent with an environmental/chemical exposure causing base polymer cleavage and embrittlement of the material.'"[268] Nonetheless, based on the results of this limited testing, Philips concluded that no escalation to a CAPA process was required.[269]

201.    According to the FDA, "no further investigation, health hazard evaluation, risk analysis, or design review was performed or documented by Philips at that time . . . and no preventative maintenance procedures were implemented," other than a limited "preventative maintenance procedure" instituted by a Philips "entity owned by the parent company of Philips Respironics … to replace the air intake assembly of Trilogy ventilator products, due to complaints

---

[265] *Id.*

[266] ████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

[267] ██

[268] 518(b) Notice (Exhibit "72" hereto), at 7.

[269] *Id.*

that had been received regarding degradation of the PE-PUR foam contained in the products."[270] And even then, "Philips did not verify the effectiveness of this measure."[271]

202.     As Philips continued to ask its supplier about the properties of the PE-PUR foam and encountered more warning signs, it continued to put that foam in medical devices that millions of its customers were breathing through daily.

203.     Testing conducted for Philips in 2016 confirmed that Mr. Lawler from Burnett was correct. According to the FDA, this testing "determined that the PE-PUR foam was susceptible to degradation, resulting in the conclusion at that time that 'polyester urethanes show bad resistance against high humidity in combination with high temperature.'"[272] Additional testing "determined that, compared to PE-PUR foam, another type of foam, polyether urethane, 'show[s] a far better resistance against high humidity at high temperature.'"[273]

204.     The 483 Report identified "at least fourteen instances, assessments, and/or test reports, dated from 04/01/2016 to 01/22/2021, where [Philips] was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions, with various Sleep and Respiratory care devices."[274] It listed the specific analyses and tests, including one which concluded that "contrary to polyester urethane foams, [redacted] foams shows a far better resistance against high humidity at high temperature."[275]

---

[270] *Id.* at 6-7.

[271] *Id.* at 8.

[272] *Id.* at 7-8.

[273] *Id.* at 8.

[274] 483 Report (Exhibit "5" hereto), at 3.

[275] *Id.* at 4.

205.     Philips received at least 110 complaints confirmed to be related to foam degradation between 2014 and 2017.[276] Approximately 80 of these complaints concerned CPAP and BiPAP devices.[277]

206.     Nonetheless, Philips continued manufacturing and selling the now Recalled Devices containing PE-PUR foam and failed to warn prescribing physicians, durable medical equipment companies and the patient consumers of this problem.

### 2.   Philips Opened An Internal Investigation Into Foam Degradation In Mid-2018 That Confirmed PE-PUR Foam Is Prone To Degradation.

207.     In April 2018, Philips opened a precursor to a formal CAPA, referred to by Philips as a CAPA INV 0988, "to investigate complaints related to potential foam degradation for the Trilogy devices in Australia and to determine what actions should be taken."[278] Philips reported that "[u]nits were returned from the field where the Trilogy Removable Air Path Foam [redacted] and the foam in the Inlet Air Path Assembly [redacted] was degrading, and getting into the motor/air path, causing at least 1 Trilogy unit to fail."[279]

208.     On April 20, 2018, Vincent Testa, a Project Mechanical Engineer at Philips RS, emailed Bonnie Peterson, a Project Manager at PolyTech. Mr. Testa stated, "We use the PAFS

---

[276] 518(b) Notice (Exhibit "72" hereto), at 7.

[277] *Id.* at 8.

[278] *Id.* ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████
████████████████████████

[279] 483 Report (Exhibit "5" hereto), at 14.

foam in the air path of our Trilogy family of ventilators as a means for noise reduction . . . ."[280] PAFS foam is PolyTech's open cell, flexible acoustical grade PE-PUR foam.[281] Mr. Testa at Philips continued: "Recently weve [*sic*] received a few complaints from our customers that the foam is disintegrating . . . . The material sheds and is pulled into the ventilator air path. As you can imagine, this is not a good situation for our users."[282] Mr. Testa asked, "what could cause this material to break down."[283]

209.    On April 23, 2018, Mr. Marsh from PolyTech forwarded Philips' April 20, 2018 email to Mr. Lawler from Burnett, reporting that "[t]he customer [Philips] is finding degradation of the ester foam and the urethane film in their device, such that particles are breaking off and flowing in the airstream."[284]

210.    On May 2, 2018, Mr. Marsh added in an email to Mr. Lawler that "Philips gave us another bit of information. They tested ether vs ester in high heat and humidity and found ether to be the better performer. It validated what we (you) had conveyed."[285] Mr. Marsh asked whether exposure to oxygen, higher temperature, and higher humidity could accelerate deterioration of PE-PUR foam.[286]

---

[280] *See* Email from Vincent Testa at Philips to Bonnie Peterson at PolyTech (Lawler Aff. Exh. H) (attached hereto as Exhibit "98"), at WTB 000070.

[281]    *See* PolyTech website, https://www.polytechinc.com/products/acoustic-foamhttps://www.polytechinc.com/products/acoustic-foam (last accessed Oct. 3, 2022).

[282] *See* Email from Vincent Testa at Philips to Bonnie Peterson at PolyTech (Lawler Aff. Exh. H) (Exhibit "98" hereto), at WTB 000070.

[283] *Id.*

[284] *See* Email from Bob Marsh to Lee Lawler dated 4/23/2018 (Lawler Aff. Exh. H) (Exhibit "98" hereto), at WTB 000069-70.

[285] *See* Email from Bob Marsh to Lee Lawler dated 5/2/2018 (Lawler Aff. Exh. H) (Exhibit "98" hereto), at WTB 000069.

[286] *Id.*

211.    Mr. Lawler responded that he did "not believe that exposure to oxygen will cause any significant damage to polyurethane foam unless elevated temperature and/or humidity is also present."[287]

212.    On May 3, 2018, Mr. Testa from Philips admitted in a follow-up email to Mr. Marsh from PolyTech, that:

> We [Philips] are evaluating our options regarding the foam. We could switch to the PAF [ether-based foam], or we could indicate a preventative maintenance cycle in which they would replace the PAFS [ester-based] foam pieces. . . . The environmental conditions for our device are a maximum of 40C and 95% R.H. Note the difference in temperature.[288]

213.    Mr. Testa at Philips asked Mr. Marsh from PolyTech the following:

1. Please ask your foam supplier to calculate the service life based on this higher temperature (40C vs. 27C).

> a. It would also be useful if they could provide a graph depicting failure over time. For example, if tensile strength reduced over time, they would plot strength vs. time.

2. At the end of the service life, what is the failure mode of this material?[289]

214.    Mr. Marsh again forwarded these questions to Mr. Lawler at Burnett, who responded:

> I am unable to answer Question Number 1. We would not recommend using **polyester** foam in such an environment and have no direct data to use to calculate the rate of hydrolysis. **Polyether** foam lifetime would not be expected to reduce significantly at the stated conditions. Use with pure oxygen could shorten the lifetime some by promoting more rapid oxidation. I do not know the extent of the reduction, but do not expect it to be overly significant.

---

[287] *See* Email from Lee Lawler to Bob Marsh dated 5/2/2018 (Lawler Aff. Exh. H) (Exhibit "98" hereto), at WTB 000069.

[288] *See* Email from Vincent Testa to Bob Marsh dated 5/3/2018 (Lawler Aff. Exh. H) (Exhibit "98" hereto), at WTB 000068-69).

[289] *Id.*

Polyester foam will lose tensile strength and overall integrity as it hydrolyzes. It will eventually decompose to a sticky powder. That will happen very rapidly at 40C, 95% R.H.[290]

215.   Mr. Lawler from Burnett added: "Is it one of our data sheets that states foam lifetime being 10 years at 95% R.H? I do not think I have seen a sheet with that statement."[291] Mr. Marsh at PolyTech responded that he would pass along the information to Philips and that "[w]e have no idea where that statement came from. It has been on our data sheets for probably 20 years. We are removing it."[292]

216.   On May 23, 2018, Mr. Marsh from PolyTech forwarded to Mr. Lawler from Burnett another question from Mr. Testa at Philips, about the degradation of the foam it was using in its Recalled Devices.[293] Mr. Testa explained that Philips had "sent samples to a local lab for analysis."[294] The local lab concluded that the degradation was a result of cleavage of the bonds in the base polymer, and Mr. Testa stated that "[f]urther investigation concluded that prolonged exposure to high humidity causes the foam to degrade."[295] Mr. Testa noted that "[a]s the foam

---

[290] *See* Email from Lee Lawler to Bob Marsh dated 5/4/2018 (Lawler Aff. Exh. H) (Exhibit "98" hereto), at WTB 000067-68 (emphasis in original).

[291] *Id.* at WTB 000068.

[292] *See* Email from Bob Marsh at PolyTech to Lee Lawler at Burnett dated 5/4/2018 (Lawler Aff. Exh. H) (Exhibit "98" hereto), at WTB 000067. Notably, PolyTech still advertises on its website that PE-PUR foam is resistant to heat and humidity. *See* PolyTech "Acoustic Foam for Sound Adsorption" webpage, https://www.polytechinc.com/products/polymer-acoustic-foam (last accessed Oct. 7, 2022) ("Ester foams have superior physical properties and offer excellent resistance to heat, moisture, and chemicals.") (attached hereto as Exhibit "99").

[293] *See* Email from Bob Marsh to Lee Lawler dated 5/23/2018 (Lawler Aff. Exh. H) (Exhibit "98" hereto), at WTB 000066-67.

[294] *Id.* at WTB 000066.

[295] *Id.* at WTB 000067.

degrades it breaks down into small particulate" and asked whether the foam "maintain[s] its UL 94 Flame Resistance rating if it is broken down into particulate?"[296]

217.     Mr. Lawler replied: "I am sure the degraded foam will not perform well in UL94 testing, though I cannot imagine how one would actually perform the test on such degraded material."[297]

218.     On June 7, 2018, Mr. Testa at Philips again emailed Mr. Marsh at PolyTech:

> As we continue our investigation of the deterioration of the PAFS foam, a few questions has [*sic*] been posed regarding the material. Can you please reach out to your foam supplier regarding the following.
>
> 1. What is the actual composition of the polyurethane-ester foam PAFS-038? (CAS #s/percentages/weight percent/reactive groups etc. any chemistry is very appreciated)
>
> 2. What kind of diisocynate is used in the polyurethane foam synthesis process and how much?
>
> 3. Is diethylene glycol or another polyol utilized in the foam synthesis process?
>
> 4. Have you tested to see if all diisocyanate groups are reacted in your foam or are there unreacted groups even after manufacturing?[298]

219.     Mr. Marsh (PolyTech) forwarded the questions to Mr. Lawler (Burnett), who asked why Mr. Testa (Philips) needed this information. Mr. Marsh did not provide a definitive answer but said, "What Vince [Testa] told us is that they are investigating alternatives to polyurethane

---

[296] *Id.*

[297] *See* Email from Lee Lawler to Bob Marsh dated 5/23/2018 (Lawler Aff. Exh. H) (Exhibit "98" hereto), at WTB 000066.

[298] *See* Email from Vincent Testa to Bob Marsh dated 6/7/2018 (Lawler Aff. Exh. I) (attached hereto as Exhibit "100"), at WTB 000076-77.

foam (ester and ether)."[299] Mr. Lawler ultimately did not answer Mr. Testa's questions because they touched on Burnett's confidential, proprietary information.

220.    On June 20, 2018, Philips closed CAPA INV 0988.[300] According to the FDA, Philips implemented "a preventative maintenance procedure for Trilogy devices, but Philips did not verify the effectiveness of this measure."[301] Yet, "after CAPA INV 0988, Philips modified its CAPA procedures to include 'requirements to help ensure that CAPAs are fully complete [and] appropriately scoped,' and that 'processing the issue [that was the subject of CAPA INV 0988] through the current CAPA program would have result[ed] in an appropriate horizontal assessment.'"[302]

221.    The FDA pointed out that Philips' informal CAPA INV[303] related to these Trilogy devices did "not include, investigate, or examine all of [Philips'] CPAP and BiPAP medical devices, which also include similar air path assemblies and/or the affected polyester polyurethane [PE-PUR] foam, which is susceptible to degradation."[304] But Philips had acknowledged to the FDA that it had "received approximately eighty complaints related to foam degradation, **on non-Trilogy ventilator devices**, from 2014 to 2017."[305]

---

[299] *See* Email from Bob Marsh to Lee Lawler dated 6/14/2018 (Lawler Aff. Exh. I) (Exhibit "100" hereto), at WTB 000075.

[300] 483 Report (Exhibit "5" hereto), at 15.

[301] 518(b) Notice (Exhibit "72" hereto), at 8.

[302] *Id.*

[303] The 483 Report explained that Philips' practice at the time was to first open CAPA requests—called "CAPA INVs"—as a precursor to a formal CAPA, but this could only occur if approved by a "CAPA Review Board" or delegate. *See* 483 Report (Exhibit "5" hereto), at 14-15.

[304] *Id.* at 15.

[305] *Id.* at 16 (emphasis added).

222.    The FDA concluded that Philips had not "adequately established" a process for initiating CAPA procedures.[306] Specifically, the FDA faulted Philips for not initiating a "formal" CAPA after receiving "various complaints alleging foam degradation in Trilogy ventilator devices" and then closing its informal investigation just two months later without "verify[ing] the effectiveness" of the limited "preventative maintenance procedure for Trilogy devices."[307]

223.    Philips continued to receive more information suggesting that the PE-PUR foam was prone to degradation. According to the FDA, "[a] follow-up email amongst [Philips'] personnel, dated 08/24/2018, states that testing confirmed that the affected foam breaks down in high heat and high humidity environments, which concurred with Trilogy ventilator related complaints . . . ."[308]

224.    Further, "[o]n December 12, 2018, several months after CAPA INV 0988 was closed, a report from additional testing conducted for Philips found that '[p]olyester polyurethane foam showed clear disintegration after 2 weeks.'"[309]

225.    Nonetheless, Philips continued manufacturing and selling the Recalled Devices containing PE-PUR foam.

226.    Philips failed to apprise the FDA of the facts and problems it learned from its foam suppliers about premature foam degradation risks.

227.    Philips failed to apprise the FDA of consumer, medical provider and durable medical equipment company reports of the presence of foam particles and other device failures.

---

[306] *Id.* at 14.

[307] 518(b) Notice (Exhibit "72" hereto), at 8.

[308] 483 Report (Exhibit "5" hereto), at 18.

[309] 518(b) Notice (Exhibit "72" hereto), at 8.

### 3.   Philips Finally Opened A Formal CAPA In 2019 – But Did Not Initiate A Recall For Two More Years.

228.   In April 2019, Philips received two complaints that "sound abatement foam 'is degrading and entering the air path.'"[310]

229.   In response, in June 2019, Philips finally initiated a formal CAPA, numbered CAPA 7211, related to the issues associated with the PE-PUR foam. But as the FDA explains:

> Even then, that CAPA failed to evaluate all relevant data. Philips' search of FDA's Manufacturer and User Facility Device Experience (MAUDE) database in connection with CAPA 7211 identified only three medical device reports (MDRs) associated with potential foam degradation involving Trilogy ventilators between January 2011 and January 2021. Yet an MDR analysis conducted by Philips in 2018 had already identified 17 documented complaints related to foam degradation in Trilogy ventilators, and at least 14 of those 17 complaints had related MDRs. Similarly, Philips' analysis of foam degradation-related complaints conducted in connection with CAPA 7211 identified 1,254 complaints confirmed to be related to foam degradation between 2014 and April 2021 across all affected products, yet this analysis failed to include several complaints confirmed to be related to foam degradation in Trilogy ventilators that were documented in 2018 in connection with CAPA INV 0988.[311]

230.   Philips continued to test the PE-PUR foam while the CAPA was underway. A Biological Risk Assessment dated July 2, 2020, found that "the biological and toxicological risks from exposure to degraded PE-PUR foam are of concern…."[312]

231.   Another internal "Biological Risk Assessment" dated December 10, 2020 – and "conducted as a result of field reports/complaints regarding degraded sound abatement foam in

---

[310] *Id.*

[311] *Id.* at 8-9.

[312] 483 Report (Exhibit "5" hereto), at 7 ("Philips Respironics Inc. (PRI) was made aware in May 2019 that four CPAP units were returned to a service center with degraded sound abatement foam.") (quoting July 2, 2020 Biological Risk Assessment).

various CPAP and ventilator products"[313] – described the risks that degraded polyurethane foam posed to humans in no uncertain terms:

> The cytotoxicity and positive genotoxicity results observed from degraded PE-PUR foam samples **indicate a potential patient risk. Potential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure.** Overall, based on an understanding of the toxicological significance of the foam degradants and the results of the ISO 10993 testing to include mutagenic responses in both a bacterial and mammalian system, **the degraded PE-PUR foam is not considered biocompatible and presents a significant biological risk to those patient populations who are exposed to degraded PE-PUR foam.**[314]

232.    An additional Philips' Biocompatibility Risk Assessment dated January 11, 2021, concurred that degraded PE-PUR foam "presents a significant biological risk to patients," and admitted that "[p]otential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure."[315]

233.    Ultimately, in CAPA 7211, Philips concluded that "the cause of the foam degradation condition is long-term exposure to environmental conditions of high temperature combined with high humidity" and reiterated that "the cause of degradation was due to chemical breakdown of the foam due to exposure to water caused by long-term exposure to environmental conditions."[316]

234.    Based on its investigation, the FDA concluded that Philips' upper management was aware of the foam degradation issues, discussed it at numerous management review meetings, and yet delayed doing anything to rectify or mitigate the hazards:

> [F]irm management, including management with executive responsibility, were aware of potential foam degradation issues concerning CPAPs, BiPAPs, and

---

[313] *Id.* at 8-9.

[314] *Id.* at 7-8 (emphasis added).

[315] *Id.* at 8.

[316] 518(b) Notice (Exhibit "72" hereto), at 10.

Trilogy ventilators since at least 01/31/2020, or earlier, and implemented no further corrective actions until April 2021.

Polyester polyurethane foam degradation issues concerning CPAPs, BiPAPs, and Trilogy Ventilators were discussed at all [redacted] management review meetings, since the 2019 [redacted], dated 01/31/2020 . . . . Additionally, your firm [Philips] became aware of this issue and related field complaints in at least 2015 or earlier.[317]

## F.   PHILIPS CONSISTENTLY MARKETED ITS BREATHING MACHINES AS SAFE AND EFFECTIVE EVEN WHEN IT KNEW OF THE PROBLEMS WITH PE-PUR FOAM DEGRADATION AND ASSOCIATED HEALTH RISKS.

### 1.   Philips Never Hinted at the Dangerous Condition of the Recalled Devices.

235.   At no point prior to April 2021, when Philips first disclosed foam issues to its shareholders, did Philips even hint that there was a dangerous condition in its recalled CPAP, BiPAP, and ventilator devices. Instead, Philips held itself out as a trusted brand and "global leader in the sleep and respiratory markets."[318] Its branding promises consumers that they will "[b]reath easier, sleep more naturally."[319] Philips further assures consumers that its "sleep therapy systems are designed with the needs of care practitioners and patients in mind," and that its "quality systems reflect [Philips'] commitment to providing enhanced patient comfort," among other things.[320] And it has long advertised its CPAP and BiPAP Machines as "clinically proven" treatment for sleep disorders.[321]

---

[317] 483 Report (Exhibit "5" hereto), at 24.

[318]   *See*   Philips   Respironics   website   –   About   Philips   Respironics, http://www.respironics.com/product_libraryhttp://www.respironics.com/product_library   (last accessed Oct. 3, 2022) (attached hereto as Exhibit "101").

[319] *Id.*

[320] *See* https://www.usa.philips.com/healthcare/solutions/sleep/sleep-therapy (last accessed Oct. 3, 2022) (Exhibit "102" hereto).

[321] *Id.*

236.     Philips boasts that it has the "most prescribed CPAP systems by U.S. sleep physicians."[322] The CPAP and BiPAP machines routinely cost from seven or eight hundred dollars to thousands of dollars per machine, and the ventilators cost more than several thousands of dollars per machine.

### 2. Philips Knew Some of its Customers Were Using the SoClean Ozone Cleaning Technology with its Devices and Assented to Such Use.

237.     Philips was fully cognizant that many users were utilizing the So-Clean Ozone product in conjunction with its device.

238.     For example, on March 6, 2020, in a letter responding to a customer's request for written guidance, Philips Respironics said using SoClean on its DreamStation will not automatically void the warranty, but the company "reserves the right to void a warranty if it is determined that the use of SoClean caused a defect for which a device otherwise under warranty was returned."[323] The company said in a statement to HME News that it "does not formally validate the use of SoClean with the DreamStation, but as of Jan. 6, Philips has not denied a warranty claim associated with the use of SoClean with a DreamStation."[324] Philips told HME News it wrote the letter "to limit confusion and misinformation."[325] The article in HME News further quoted Philips stating that "Philips is in communication with SoClean to further analyze the potential

---

[322] *Id.*

[323] *Business News For Home Medical Equipment Providers* (March 6, 2020), at https://www.hmenews.com/article/cpap-manufacturers-address-certain-cleaning-devices (last accessed Oct. 3, 2022) (attached hereto as Exhibit "103").

[324] *Id.*

[325] *Id.*

compatibility of the SoClean with DreamStation therapy devices, and will provide further information as it becomes available," the company told HME News.[326]

239.    By virtue of that communication to a trade journal, Philips not only acknowledged its awareness of the use of the product, but also acknowledged it received warranty complaints amongst users of the DreamStation who also used SoClean, and honored the warranties and communicated with SoClean.

240.    Additional evidence that Philips was aware that SoClean was selling a product specifically designed to be used in conjunction with the DreamStation is the website of CPAPDIRECT.COM, a major internet provider of CPAP machines and related paraphernalia which advertised an express adapter kit for So Clean and Dream Station products.[327] Similarly numerous other internet and durable medical equipment companies and retail suppliers of Philips CPAP devices also sold SoClean to be used in conjunction with the Devices, and Philips expressly and impliedly was aware of this combined use.

241.    Given that Philips was on notice since at least 2008 of a foam degradation concern, and was also aware of the combined use of its Devices with SoClean, to the extent there is any validity to Philips recent claims attributing foam degradation to SoClean ozone treatment, Philips should have and could have made the same attributions and affirmatively stepped up to expressly warn medical providers, Durable Medical Equipment companies and patients against the combined use of the products in allegedly contributing to premature foam degradation.

---

[326] *Id.*

[327] *See* CPAP Direct Products Page – SoClean Respironics System One & DreamStation Adapter, https://www.cpapdirect.com/cleaning/soclean-respironics-system-one-and-dreamstation-adapter (last accessed Oct. 3, 2022) (attached hereto as Exhibit "104").

242.     Instead, recognizing that SoClean consumers seemingly liked having this additional cleaning modality, Philips declined to dissuade patients and customers from the combined use due to a concern that they would lose business to alternative CPAP manufacturers who also tacitly or expressly condoned such joint use.

### 3.      Philips Sold Its Humidifier Accessory Allowing Warm Storage Conditions and Contributing to Humidity of the Foam.

243.     Philips sold humidifiers to accompany its CPAP devices,[328] especially the DreamStation, stating in the humidifier's User Manual under the heading "Intended Use": "The DreamStation Heated Humidifier is an accessory for the Philips Respironics DreamStation therapy devices to provide moisture to the patient circuit."[329]

244.     The humidifier manual quoted above had, under the heading "DreamStation Heated Humidifier Specifications" had environmental specifications that included an "Operating Temperature: 5° to 35° C (41° to 95° F")" as well as "Storage Temperature: -20° to 60° C (-4° to 140° F)" and "Relative Humidity (operating & storage): 15 to 95% (non-condensing)."[330]

245.     Philips provided the humidifier option explaining in the DreamStation User Manual that "[y]ou can use the heated humidifier and the heated tube with your device. They are available from your home care provider. A humidifier may reduce nasal dryness and irritation by adding moisture to the airflow."[331]

---

[328] Philips' humidifiers are not compatible with CPAP devices manufactured by other companies like ResMed.

[329]      *See*      DreamStation      Humidifier      User      Manual, https://www.documents.philips.com/doclib/enc/11410694/DreamStation_Humidifier_User_Manual.pdf, at 1 (last accessed Oct. 3, 2022) (attached hereto as Exhibit "105").

[330] *Id.* at 12.

[331] *See, e.g.*, DreamStation User Manual (Exhibit "47" hereto), at 22.

246.     Philips not only knew but recommended the use of the humidifier, and also advised that the device could be stored in a room as warm as 140° F despite their knowledge that warm, hot and humid conditions contributed to rapid degradation of its sound insulating foam.

247.     The vast majority of DreamStation patients use the Philips humidifier with their devices.

## G.     PHILIPS FINALLY RECALLED ITS DEFECTIVE DEVICES CONTAINING HAZARDOUS PE-PUR FOAM, BUT ONLY AFTER LAUNCHING ITS NEWEST DEVICE WITHOUT PE-PUR FOAM.

### 1.     Prior to the Recall, In April And May 2021, Philips Launched The DreamStation 2 (Which Does Not Contain PE-PUR Foam).

248.     Two months prior to the Recall, Philips announced on April 13, 2021, that it was launching the DreamStation 2, a next-generation machine in its DreamStation product family. The DreamStation 2 does not contain PE-PUR foam.

249.     Less than two weeks after its launch of the DreamStation 2, on April 26, 2021, Philips announced that its previous generation of DreamStation products and other Recalled Devices posed serious health risks to users. In the same release, Philips tried to convince consumers to purchase and use its new DreamStation 2 device:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone,* and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the

estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.[332]

250.    Even when making this announcement, Royal Philips downplayed the significance of the problem claiming "the occurrence rate is very, very low."[333] At the same time, Royal Philips assured its shareholders that any adverse impact on sales due to the safety risks posed by the Recalled Devices was minimized by introduction of the DreamStation 2: "The good thing is, is that we have launched DreamStations 2."[334]

### 2.    Testing Continued To Confirm The Recalled Devices Were Defective and the FDA Received Additional MDRs.

251.    Even as it launched the DreamStation 2 device and announced publicly that its previous generation DreamStation products posed serious health risks to users, Philips continued to conduct tests that confirmed some of its breathing products were defective.

252.    For example, on May 17, 2021, Ken Cole from RJ Lee, an industrial forensics analytical laboratory and scientific consulting firm, produced a presentation analyzing the foam in Philips' Trilogy EVO devices. The presentation states that the investigation was "prompted by staff observation of color variance across both current production and previous builds."[335]

253.    The analysis involved six samples of foam, two from units built in 2018 and four taken from Philips' current production stock in May 2021.[336] Some of the samples from 2021

---

[332] *See* Royal Philips announces its 2021 First-Quarter Results (Apr. 26, 2021), https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html (last accessed Oct. 9, 2022) (attached hereto as Exhibit "106").

[333] Transcript of Koninklijke Philips NV Earnings Call for First Quarter 2021 Results (April 26, 2021), Fair Disclosure Wire (attached hereto as Exhibit "107").

[334] *Id.*

[335] *See* RJ Lee Analysis Review of Trilogy EVO Foam (Lawler Aff. Exh. A) (WTB000001-14) (attached as Exhibit "108" hereto), at WTB000003.

[336] *Id.* at WTB 000006.

showed "differing cell structure" which is an "[i]ndication of poor process control."[337] The 2021 foam had "significant contaminants."[338] The foam was supposed to be ether-based,[339] but testing revealed indications that some of the foam was actually ester-based.[340]

254.   In addition, MDRs associated with the PE-PUR foam breakdown increased significantly.[341] From 2011 to April 2021 when Philips first notified the FDA of their intention to conduct a field action due to concerns pertaining to foam degradation (breakdown) in certain ventilators, BiPAP machines, and CPAP machines, Philips submitted only 30 MDRs that they identified as associated with the PE-PUR foam breakdown and there were no reports of patient injury or death among those 30 MDRs.[342] Eight of those reports were from the United States.

255.   After Philips notified the FDA of its intention to conduct a field action in April 2021 through July 31, 2022, the amount of MDRs the FDA received increased significantly as did

---

[337] *Id.* at WTB 000008.

[338] *Id.* at WTB 000009; *see also* WTB 000010 ("Indication of poor process control and/or contamination.").

[339] *Id.* at WTB 000002.

[340] *Id.* at WTB 000013.

[341] As stated above, manufacturers, such as Philips, are required to submit medical device reports (MDRs) when information reasonably suggests that their device may have caused or contributed to a death or serious injury, or has malfunctioned, and that device or a similar device they manufacture would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. Health professionals, consumers, and patients may voluntarily submit reports of device adverse events and malfunctions to the FDA. *See, e.g.*, 21 C.F.R. § 803.20.

[342] The FDA's latest information about medical device reports (MDRs) associated with the Recalled Devices on August 16, 2022 is available here: https://www.fda.gov/medical-devices/safety-communications/update-certain-philips-respironics-ventilators-bipap-machines-and-cpap-machines-recalled-due?utm_medium=email&utm_source=govdelivery#mdr (last accessed Oct. 3, 2022) ("FDA MDR Update").

the "reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown."[343] Specifically, the FDA reported:

- From April 2021 through April 30, 2022, the FDA received more than 21,000 MDRs, including 124 reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown.

- From May 1, 2022, through July 31, 2022, the FDA received more than 48,000 MDRs, including 44 reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown.

256.    The FDA continued: "A wide range of injuries have been reported in these MDRs, including cancer, pneumonia, asthma, other respiratory problems, infection, headache, cough, dyspnea (difficulty breathing), dizziness, nodules, and chest pain."[344]

### 3.    Finally, In June 2021, Philips Recalled Its Defective Devices.

257.    Finally, on June 14, 2021, Royal Philips issued a press release announcing a recall notice directed to its customers in the United States, and a field safety notice for the rest of the world, stating:

> To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone, and high heat and high humidity environments may also contribute to foam degradation.

---

[343] *Id.* (stating "The MDRs received included both mandatory reports from Philips and voluntary reports from health professionals, consumers, and patients.").

[344] *Id.*

Therefore, Philips has decided to voluntarily issue a recall notification to inform patients and customers of potential impacts on patient health and clinical use related to this issue, as well as instructions on actions to be taken.[345]

258.    Philips stated that "[t]he majority of the affected devices within the advised 5-year service life are in the first-generation DreamStation product family."[346] Philips elaborated:

Based on the latest analysis of potential health risks and out of an abundance of caution, the recall notification advises patients and customers to take the following actions:

- For patients using affected BiLevel PAP and CPAP devices: Discontinue use of your device and work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment. To continue use of your device due to lack of alternatives, consult with your physician to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.

- For patients using affected life-sustaining mechanical ventilator devices: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.

**Possible health risks**

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity,

---

[345] Royal Philips Press Release, Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices (June 14, 2021) (Exhibit "34" hereto) (asterisks and footnotes omitted).

[346] *Id.*

nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.[347]

259.    Corroborating the dangerous nature of the Recalled Devices, on July 22, 2021, the FDA upgraded Philips' recall of the Recalled Devices to its most serious classification, Class I, which according to the FDA means: "A situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death."[348]

260.    Philips' Recall announcement instructed users to not use the Recalled Devices because of the health risks. This confirmed the true nature of the recalled products, which at all times were adulterated and worthless.

261.    Philips took similar action with respect to its defective CPAP, BiPAP, and ventilator devices across the globe.

262.    Shortly after Philips' recall announcement, Philips' main competitor, ResMed, issued a message regarding the recall, stating that "ResMed devices are not subject to this recall and are safe for patients to use. ResMed devices use a different material for sound reduction than the material used by the other manufacturer."[349]

---

[347] *Id.* (asterisks and footnotes omitted).

[348] *See* FDA – Recalls Background and Definitions, https://www.fda.gov/safety/industry-guidance-recalls/recalls-background-and-definitions (last accessed Oct. 3, 2022) (attached hereto as Exhibit "109").

[349] *See* ResMed webpage, Information regarding a separate manufacturer's product recall (June 2021), archived at: https://web.archive.org/web/20210617041516mp_/https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed Oct. 7, 2022) (attached hereto as Exhibit "110").

263.     ResMed devices and ventilators use polyether polyurethane or silicone-based foam, not PE-PUR foam, for sound abatement purposes.[350]

### H.     THE MEASURES TAKEN BY PHILIPS, AND BY ROYAL PHILIPS IN PARTICULAR, TO RECALL AND REPLACE THE DEFECTIVE DEVICES HAVE BEEN INADEQUATE AND INEFFECTIVE.

264.     From the outset, Royal Philips has directly overseen and managed the Recall announced on June 14, 2021.

265.     Royal Philips tasked a member of its Executive Committee, Roy Jakobs, with leading the company's repair and remediation program.[351] Mr. Jakobs is in charge of Philips' Connected Care businesses that include Philips RS.[352] Royal Philips claims that "[s]ince taking on

---

[350] *See* ResMed "Other Manufacturer Recall 2021" webpage, An update from ResMed's CEO (Dec. 6, 2021), https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed Oct. 4, 2022) (Exhibit "51" hereto).

[351] *See* Royal Philips Press Release, Philips announces CEO succession (Aug. 16, 2022) (Exhibit "41" hereto); *see also* video titled "Philips CEO Frans van Houten and Chief Business Leader Connected Care Roy Jakobs talk about the various aspects of the field safety notice," available at: https://www.philips.com/a-w/about/news/archive/standard/news/press/2022/20220628-philips-provides-update-on-philips-respironics-pe-pur-sound-abatement-foam-test-and-research-program.html (last accessed Oct. 3, 2022). With respect to the Recall, Mr. Jakobs has said: "I have a dedicated team of over 1,000 colleagues fully focused on this [the repair and replacement program], supported by many more across the company." *See also* Royal Philips Press Release, Philips provides update on Philips Respironics' PE-PUR sound abatement foam test and research program (June 28, 2022), https://www.usa.philips.com/healthcare/e/sleep/communications/src-update/news/philips-provides-update-on-philips-respironics-pe-pur-sound-abatement-foam-test-and-research-program (last accessed Oct. 3, 2022) (attached hereto as Exhibit "111").

[352] *See* Royal Philips First-Quarter Results 2022 (Apr. 25, 2022), available at: https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-first-quarter-results-2022.html (last accessed Oct. 3, 2022) (Exhibit "40" hereto) ("Philips has a strong program management in place led by Roy Jakobs, Chief Business Leader of the Connected Care businesses and member of Philips' Executive Committee, to ensure the Respironics field action is executed with speed and accuracy."); *see also* Royal Philips Investor Call Transcript regarding "Test and research program Respironics PE-PUR sound abatement foam" (June 28, 2022), available at: https://www.philips.com/c-dam/corporate/newscenter/global/standard/resources/healthcare/2022/podcast-healthier-future/Transcript_-_Philips_Test_and_research_program_Respironics_PE-PUR_sound_abatement_foam.pdf (last accessed Oct. 3, 2022) (attached hereto as Exhibit "112").

responsibility for the voluntary recall notification/field safety notice for specific Respironics devices on behalf of Philips, substantial progress has been made under his [Mr. Jakobs'] leadership in the execution of the comprehensive program aimed at delivering a resolution to affected patients as fast as possible in consultation with the relevant competent authorities."[353]

266.    In addition to Mr. Jakobs, Royal Philips' Technical Project Manager Jan Bennik "head[s] up the polyester-polyurethane sound abatement foam test and research program."[354] He has spoken publicly on behalf of Philips about the recalled devices.

267.    Further, the following additional Royal Philips employees are believed to have knowledge of the Recall of the devices[355]: a) Liz Iversen, Former Chief Quality and Regulatory

---

[353] *Id.*

[354] Technical Project Manager Jan Bennik speaks about the test and research program, video available at: https://www.philips.com/a-w/about/investor-relations/recall-sleep-and-respiratory/testing.html (last accessed Oct. 3, 2022).

[355] *See* Letter dated September 15, 2022, from all Philips Defendants (attached hereto as Exhibit "113"), at 3-6 (section regarding agreed-upon initial custodians from which to pull responsive discovery).

Officer[356]; b) Jan Kimpen, Chief Medical Officer (Netherlands-based)[357]; and c) Carla Kriwet, Former Chief Business Leader Connected Care (Netherlands-based).[358]

268.    Upon information and belief, Philips NA has also been involved with the Recalled Devices and the Recall.[359] For example:

a.  Tom Reimann, Head of Quality of Connected Care, likely "has knowledge regarding the manufacture, regulatory evaluation, and quality assurance review of certain devices and the recall of the devices."[360]

b.  Thomas Catalano, Director of Product Marketing, is "Lead global product management team in $1 bill sleep business unit."[361] His prior role with Philips was as a Global product Manager, involved with "Development product/service pipeline for next generation of CPAP therapy to treat obstructive apnea."[362]

---

[356] Liz Iversen had "global executive responsibility and accountability" for Royal Philips. On LinkedIn, she described her role with Royal Philips as follows: "Global executive responsibility and accountability for Quality, Regulatory, Clinical, Medical and Compliance to ensure delivery of safe and effective products across the enterprise while executing regulatory and quality strategies in support of business growth." LinkedIn Profile for Liz Iversen, Experience section, https://www.linkedin.com/in/ediversen/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "114").

[357] As Chief Medical Officer Jan Kimpen "worked collaboratively with business and functional leaders across the organization" including "provid[ing] clinical guidance for the development and market introduction of all new product...[and] advis[ing] Philips' board and management in making decisions on market participation, product development, …and product launches." *See* LinkedIn profile for Jan Kimpen, Experience section (Exhibit "38" hereto).

[358] Ms. Kriwet's LinkedIn Profile states she was the "CEO, Connected Care, Member of the Royal Philips Executive Committee" from 2017-2020. *See* LinkedIn Profile for Carla Kriwet, Experience section, https://www.linkedin.com/in/dr-carla-kriwet/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "115").

[359] *See* Letter dated September 15, 2022, from all Philips Defendants (Exhibit "113" hereto), at 3-6 (section regarding agreed-upon initial custodians from which to pull responsive discovery).

[360] Philips RS North America LLC's Initial Disclosures, dated May 5, 2022 (attached hereto as Exhibit "116").

[361] *See* LinkedIn Profile for Thomas Catalano, https://www.linkedin.com/in/thomas-catalano-5a66552/ (last accessed Oct. 4, 2022) (attached hereto as Exhibit "117").

[362] *Id.*

    c.   Francis Kim, EVP Chief Quality & Regulatory Officer[363];

    d.   Erin Levering, Medical Safety Manager, was responsible for working "with the Post-Market Surveillance team to assess individual complaints for safety concerns and regulatory reporting requirements."[364];

    e.   Vitor Rocha, Chief Market Leader – "CEO North America, EVP at Philips…responsible for driving growth, expanding market share and advancing Philips' position…"[365];

    f.   Drilon Saliu, former Connected Care Head of Regulatory Affairs, October 2019 – September 3, 2021[366]; and

    g.   Jessica Shen, Former Senior Vice President, Global Head of Medical Affairs, Clinical Affairs, HEOR & Regulatory Affairs. April 2015 – August 13, 2021.[367] – "Responsible for pre-market, regulatory approval for commercialization of products and solutions, including the development of key regulatory and clinical strategies to bring new technologies to market with the shortest possible cycle time; and the harmonization of regulatory/clinical processes across all Philips product lines; Work closely with global regulatory officials to further advance Philips' relationship and reputation among these important groups; and continue to build out our core internal competencies and strengthen our regulatory, Medical & clinical team."[368]

269.    While the Recall began in the United States, it has been expanded worldwide.[369]

---

[363] *See* LinkedIn Profile for Francis Kim, https://www.linkedin.com/in/francis-k-2b32a111a (last accessed Oct. 7, 2022) (attached hereto as Exhibit "118"); *see also* ██████████████████████

[364] *See* LinkedIn Profile for Erin Levering, https://www.linkedin.com/in/erin-levering-bs-rn-certified-nurse-practitioner-034920178/?trk=public_post_comment-text (last accessed Oct. 5, 2022) (attached hereto as Exhibit "120").

[365] *See* LinkedIn Profile for Vitor Rocha, https://www.linkedin.com/in/vitor-rocha-98582124/ (last accessed Oct. 4, 2022) (attached hereto as Exhibit "121").

[366] ██████████████████████████████████████

[367] *Id.*

[368] *See* LinkedIn Profile for Jessica Shen, https://www.linkedin.com/in/jessica-shen-md-ms-b386016/ (last accessed Oct. 4, 2022) (attached hereto as Exhibit "122").

[369] *See* Philips website, Urgent Product Defect Correction in Australia (Recall for Product Correction in New Zealand) (Exhibit "9" hereto) (stating that a global recall notification was issued on June 14, 2021 and that recalls specific to Australia and New Zealand were issued on July 2, 2021). Other impacted countries include, but are not limited to, Canada, Israel, and Chile. In

270.    Since June 2021, Royal Philips has issued numerous press releases specifically providing information about the worldwide recall.[370]

---

addition to the litigation initiated against Philips in the United States, "Philips or its affiliates are also defendants in litigation in Australia, Canada, Chile, and Israel, as well as in smaller or individual actions in other countries." Royal Philips First Quarter Results 2022 - Presentation at 37 (Apr. 25, 2022), available for download at https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-first-quarter-results-2022.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "123"). In a video produced by Royal Philips, Chief Business Leader of the Connected Care businesses Roy Jakobs said: "We have more than 5.5 million patients from over 100 countries who need a replacement." *See* Philips video, available at: https://www.philips.com/a-w/about/investor-relations/recall-sleep-and-respiratory/testing.html (last accessed Oct. 3, 2022). For example, there are 350,000 affected Philips CPAP devices and 29,500 affected Philips ventilators in France. ANSM (France) – Public Hearing Comité Scientifique Temporaire (June 8, 2022) video, available at: https://www.youtube.com/watch?v=ctvL0TcmWO8 (last accessed Oct. 3, 2022). In France, the Agence nationale de sécurité du médicament et des produits de santé (ANSM) had public hearings regarding the recall on June 8, 2022. Technical Project Manager Jan Bennik of Royal Philips was among the representatives of Philips who spoke at the hearings. *Id.* CEO van Houten has said that Philips is "[i]n close dialogue with regulators across the world." Philips 2021 Annual Report at 5 (Exhibit "13" hereto). French prosecutors have opened a preliminary investigation into Philips' recall. A spokesperson for the Paris public prosecutor's office said the office had "taken up, as of June 20, 2022, complaints filed on the grounds of aggravated deception, involuntary attacks on physical integrity, endangerment of life of others and administration of harmful substances." Charlotte Van Campenhout, French Prosecutors Probe Philips Respirator Recall, Reuters (Sept. 9, 2022), https://www.reuters.com/business/healthcare-pharmaceuticals/french-prosecutors-probe-philips-respirator-recall-france-info-reports-2022-09-08/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "124").

[370] *See, e.g.,* Royal Philips Press Release, Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices (June 14, 2021) (Exhibit "34" hereto); Philips Press Release, Philips starts repair and replacement program of first-generation DreamStation devices in the US in relation to earlier announced recall notification* (Sept. 1, 2021) (Exhibit "10" hereto); Royal Philips Press Release, Philips provides update on earlier announced voluntary CPAP, BiPAP and Mechanical Ventilator recall notification* (Nov. 14, 2021) (Exhibit "35" hereto); Royal Philips Press Release, Philips provides update on the test and research program in connection with the CPAP, BiPAP and Mechanical Ventilator recall notification* (Dec. 23, 2021), https://www.philips.com/a-w/about/news/archive/standard/news/press/2021/20211223-philips-provides-update-on-the-test-and-research-program-in-connection-with-the-cpap-bipap-and-mechanical-ventilator-recall-notification.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "125"); Royal Philips Press Release, Philips Respironics provides update for the US on ongoing CPAP, BiPAP and Mechanical Ventilator field action (Mar. 10, 2022), https://www.philips.com/a-w/about/news/archive/standard/news/press/2022/20220311-philips-respironics-provides-update-

271.     Royal Philips also discusses the Recall and the alleged Defect in the products in other communications and press releases such as those about its quarterly results.[371]

272.     For example, when the problems with the Recalled Devices were first announced to Philips' shareholders, Royal Philips included in its April 26, 2021 press release regarding First Quarter 2021 results, the following statement from CEO Frans van Houten: "Regretfully, we have identified a quality issue in a component that is used in certain sleep and respiratory care products, and are initiating all precautionary actions to address this issue, for which we have taken a EUR 250 million provision."[372]

---

for-the-us-on-ongoing-cpap-bipap-and-mechanical-ventilator-field-action.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "126"); Royal Philips Press Release, Philips Respironics provides update on filed MDRs in connection with the voluntary recall notification/field safety notice* for specific CPAP, BiPAP and mechanical ventilator devices (May 24, 2022), https://www.philips.com/a-w/about/news/archive/standard/news/press/2022/20220524-philips-respironics-provides-update-on-filed-mdrs-in-connection-with-the-voluntary-recall-notification-field-safety-notice.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "127"); Royal Philips Press Release, Philips provides update on Philips Respironics' PE-PUR sound abatement foam test and research program (June 28, 2022) (Exhibit "111" hereto).

[371]     Philips announcement of 2021 First-Quarter Results (Apr. 26, 2021), https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html (last accessed Oct. 3, 2022) (Exhibit "106" hereto); Philips announcement of 2021 Second-Quarter Results (July 26, 2021), https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-second-quarter-results-2021.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "128"); Philips announcement of 2021 Third-Quarter Results (Oct. 18, 2021), https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-third-quarter-results-2021.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "129"); Philips announcement of Fourth Quarter and Annual Results 2021 (Jan. 24, 2022), https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-fourth-quarter-results-2021.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "130"); Philips announcement of First-Quarter Results 2022 (Apr. 25, 2022), https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-first-quarter-results-2022.html (last accessed Oct. 3, 2022) (Exhibit "40" hereto); Philips announcement of Second-Quarter Results 2022 (July 25, 2022), https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-second-quarter-results-2022.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "131").

[372] Philips announces its 2021 First-Quarter Results (Apr. 26, 2021) (Exhibit "106" hereto).

273.    In the same press release, Royal Philips said: "Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone, and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks."[373]

274.    In a June 14, 2021 press release, Royal Philips said: "Philips is initiating a voluntary recall notification to ensure patient safety in consultation with regulatory agencies."[374] Royal Philips CEO van Houten said: "In consultation with the relevant regulatory agencies and in close collaboration with our customers and partners, we are working hard towards a resolution, which includes the deployment of the updated instructions for use and a comprehensive repair and replacement program for the affected devices."[375]

275.    This announcement from Royal Philips further stated that "Philips determined based on testing that there are possible risks to users related to this type of foam"; "Philips" decided to issue the recall notification; "Philips has received reports of possible patient impact due to foam degradation"; "Philips is providing the relevant regulatory agencies with required information

---

[373] *Id.* (footnote omitted).

[374] Royal Philips Press Release, Philips issues recall notification* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices (June 14, 2021) (Exhibit "34" hereto) (asterisk and footnote omitted).

[375] *Id.*

related to the launch and implementation of the projected correction"; and "Philips' recently launched next-generation CPAP platform" is not affected by the foam degradation issues.[376]

276.    Mr. van Houten also stated in the Recall announcement on June 14, 2021: "We deeply regret any concern and inconvenience that patients using the affected devices will experience because of the proactive measures we are announcing today to ensure patient safety."[377]

277.    Later in 2021, Royal Philips emphasized its involvement in the Recall program in various publications. For example, a presentation on Royal Philips' Fourth Quarter 2021 Results noted: "Regular review cadence with Respironics field action Program Management and Executive Committee."[378] The same presentation said: "Philips' experts as well as certified labs and qualified third-party experts are working closely with the Respironics team."[379] The presentation also indicated an effort to "step-up company-wide program."[380]

278.    The 2021 Philips Annual Report shows that in addition to Royal Philips' Management, Royal Philips' Supervisory Board and Royal Philips' Quality and Regulatory Committee were also involved in the Recall. For example, the Royal Philips Supervisory Board reported: "In view of the Philips Respironics voluntary recall notification related to the sound abatement foam in certain sleep and respiratory care products (announced on June 14, 2021), the Supervisory Board regularly discussed this issue and the progress made with respect to the repair

---

[376] *Id.*

[377] *Id.*

[378] Philips Fourth Quarter and Full Year 2021 Results – Presentation at 39 (Jan. 24, 2022), available for download at https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2022/philips-fourth-quarter-results-2021.html (last accessed Oct. 3, 2022) (attached hereto as Exhibit "132").

[379] *Id.*

[380] *Id.* at 36.

and replacement program with Management."[381] Further, the Royal Philips Quality and Regulatory Committee reported that, at its meetings, it discussed "matters associated with [the recall], such as interactions with regulatory authorities globally, engagement with patients, physicians, customers and durable medical equipment providers, testing, health hazard evaluations, and the status of the repair and remediation plan."[382]

279.    At the May 2022 shareholders meeting for Royal Philips, CEO van Houten said: "Our team is laser-focused on resolving the sleep recall."[383] He added, regarding the recall: "We have established a dedicated team of 1,000 colleagues working under the direct supervision of the Executive Committee."[384] He explained: "I can tell you that the Philips Board of Management became aware of the issue and its potential significance in the first quarter of 2021 and took adequate and immediate action. This resulted in the issuance of the field safety notice and start of the remediation actions in the first half of 2021."[385] Van Houten further stated that

> [Royal Philips] took a lot of actions. We have, for example, onboarded new top management in the Sleep & Respiratory Care business. We strengthened quality and regulatory affairs leadership for the group for Connected Care, and for the Sleep & Respiratory care business. And we've also added resources to strengthen specific capabilities, all as the consequence of finding out about this issue.[386]

280.    Royal Philips' CEO van Houten made frequent statements about the Recall. For example, in the 2021 Royal Philips Annual Report, Mr. van Houten said: "We identified – through our post-market surveillance processes – that **the sound abatement foam used since 2008 in**

---

[381] Philips 2021 Annual Report (Exhibit "13" hereto), at 95.

[382] *Id.* at 115-16.

[383] Koninklijke Philips NV Annual Shareholders Meeting Transcript (May 10, 2022), Fair Disclosure Wire (attached hereto as Exhibit "133"), at 2.

[384] *Id.*

[385] *Id.*

[386] *Id.* at 8.

**certain of our sleep and respiratory care products may degrade under certain circumstances**. Subsequently, we issued a voluntary recall notification for affected devices to address potential health risks."[387] In July 2021, he said: "We have mobilized the necessary resources across the company to address the component quality issue in certain of our sleep and respiratory care products."[388] In a January 24, 2022 press release, he said, "we remain extremely focused on repairing and replacing the devices related to the Philips Respironics recall notification."[389] And in April 2022, he said, "[w]e have a strong program management in place overseeing every aspect of the remediation."[390]

281.     On the same day that the FDA announced that reports of faulty Philips ventilators and sleep apnea machines had risen, Royal Philips announced that CEO van Houten would be stepping down.[391] CEO van Houten's departure announcement followed a May 2022 Royal Philips shareholders meeting where 80% of shareholders voted against giving Mr. van Houten a bonus. Shareholders were "unhappy about delivery problems and issues with the company's widely used sleep apnea machines."[392]

---

[387] Philips 2021 Annual Report (Exhibit "13" hereto), at 5 (emphasis added).

[388] Philips Second-Quarter Results 2021 (July 26, 2021) (Exhibit "128" hereto).

[389] Philips Fourth Quarter and Annual Results 2021 (Jan. 24, 2022) (Exhibit "130" hereto).

[390] Philips First Quarter Results 2022 (Apr. 25, 2022) (Exhibit "40" hereto).

[391] Toby Sterling and Bart H. Meijer, FDA says faulty Philips device reports accelerating as CEO departs, Reuters, Aug. 17, 2022, https://www.reuters.com/business/healthcare-pharmaceuticals/fda-says-faulty-philips-device-reports-accelerating-ceo-departs-2022-08-17/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "134").

[392] Roy Jakobs to take over the helm at Philips as Frans van Houten steps down, DutchNews.nl (Aug. 16, 2022), https://www.dutchnews.nl/news/2022/08/roy-jakobs-to-take-over-the-helm-at-philips-as-frans-van-houten-steps-down/ (last accessed Oct. 3, 2022) (attached hereto as Exhibit "135").

282.    Royal Philips' public statements demonstrate that it has been involved with U.S. regulatory authorities since the announcement of the Recall. In press releases and other statements, Royal Philips has discussed working with the FDA. For example, in a September 1, 2021 press release, Royal Philips said: "Philips received authorization from the US Food and Drug Administration (FDA) for the rework of the affected first-generation DreamStation devices, which consists of replacement of the PE-PUR sound abatement foam with a new material. Philips anticipates rework to commence in the course of September 2021. In addition to the rework, the company has already started replacing certain affected first-generation DreamStation CPAP devices in the US with DreamStation 2 CPAP devices. Philips remains in dialogue with the FDA with respect to other aspects of the recall notification and mitigation plan in the US."[393]

283.    Royal Philips issued the following statement in a November 14, 2021 press release: "'In connection with the voluntary recall notification in June of this year, the FDA has recently conducted an inspection of a Philips Respironics manufacturing facility in the US,' said Frans van Houten, CEO of Royal Philips. 'We will work closely with the FDA to clarify and follow up on the inspectional findings and its recent requests related to comprehensive testing.'"[394]

284.    Royal Philips has also stated that it is involved in discussions with the Department of Justice relating to a Proposed Consent Decree. In its press release on Second Quarter 2022 results, Royal Philips said, "the US Department of Justice, acting on behalf of the FDA, recently

---

[393] Philips Press Release, Philips starts repair and/or replacement program of first-generation DreamStation devices in the US and other markets (Sept. 1, 2021) (Exhibit "10" hereto) (footnote omitted).

[394] Royal Philips Press Release, Philips provides update on earlier announced voluntary CPAP, BiPAP and Mechanical Ventilator recall notification* (Nov. 14, 2021) (Exhibit "35" hereto).

began discussions with Philips regarding the terms of a proposed consent decree to resolve the identified issues [in inspection of U.S. facilities]."[395]

285.    Unfortunately, Philips' "recall" was a recall in name only. It did not effectively provide patients with notice of the risks of the Recalled Devices, nor did it provide them with new Philips CPAP, BiPAP, or ventilator devices.

### 1.    Many Patients, Providers, And Others Were Not Notified About The Recall.

286.    On March 10, 2022, the FDA issued a Notification Order under § 518(a) of the FDCA.[396] The Notification Order stated that the "FDA has received a number of calls from patients and consumers who contacted FDA to report problems and/or concerns regarding the Recalled Products, but were unaware of the recall and had not been informed of the health risks presented by the Recalled Devices."[397]

287.    The FDA estimated that, after nine months of the Recall, only "approximately 50% of patients and consumers who have purchased or received the Recalled Products (excluding ventilators) within the last five years (the service life of the devices) have registered with Philips to obtain a replacement device."[398] But it was "unclear whether the remaining patients and consumers have not registered because they are unaware of the need to register, or because they do not want or need a replacement device from Philips."[399]

---

[395] Philips Second-Quarter Results 2022 (July 25, 2022) (Exhibit "131" hereto).

[396] *See* 518(a) Notification Order, available at: https://www.fda.gov/media/156811/download (last accessed Oct. 3, 2022) (attached hereto as Exhibit "136").

[397] *Id.* at 2.

[398] *Id.*

[399] *Id.*

288.     The FDA surveyed 182 consignees to determine whether they had been notified of the Recall and found 28 "who had reported to FDA that they were not aware of the recall."[400] The FDA reported its results to Philips on September 8, 2021, and October 29, 2021, but Philips did not promptly respond. Almost a month later, on November 22, 2021, Philips stated that it had notified 23 of the 28 consignees of the Recall, but Philips did not "indicate whether the consignees identified by FDA had been sent notification before, or only after, they had been identified by FDA as being unaware of the recall."[401] Moreover, Philips' evidence of notification consisted of delivery confirmation receipts, reflecting that written correspondence was delivered to the consignees. As the FDA explained, "[t]ypically, firms demonstrate the effectiveness of its recall communications through evidence more meaningful than a delivery confirmation receipt, such as a returned response form or a documented telephone conversation."[402]

289.     Throughout the Recall, the FDA "on multiple occasions has informed Philips that FDA was concerned that Philips' efforts to notify patients and consumers, healthcare providers, and consignees regarding the recall have been insufficient," and has expressed concern that "it is likely that a significant portion of patients and consumers using the Recalled Products are unaware of the health risks presented by those products."[403]

290.     Noting "Philips' failure to timely provide effective notice to health professionals who prescribe or use the Recalled Products and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products," the FDA issued an order under Section 518(a) of the FDCA ordering

---

[400] *Id.*

[401] *Id.*

[402] *Id.* at 3.

[403] *Id.*

Philips to give adequate notice.[404] Specifically, the FDA ordered Philips to "notify all health professionals who prescribe or use the Recalled Products, and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products **within the next 45 days**."[405]

### 2.   Philips' Repair and Replacement Program Has Been Extremely Slow, Inadequate, and Ineffective.

291.   Those patients who registered their Recalled Devices with Philips for the Recall did not immediately receive replacement devices and were not told when a replacement device would be provided.

292.   As Philips' June 14, 2021 announcement explained:

**Repair and replacement program**

Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already begun the preparations, which include obtaining the relevant regulatory clearances. Philips aims to address all affected devices in scope of this correction as expeditiously as possible.

As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.[406]

293.   In reality, patients may register their DreamStation Recalled Device with Philips for the Recall, but Philips has not immediately replaced the defective PE-PUR foam in the

---

[404] *Id.* at 4.

[405] *Id.* (emphasis in original).

[406] *See* Food and Drug Administration, Philips Issues a Recall Notification\*, https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/philips-issues-recall-notification-mitigate-potential-health-risks-related-sound-abatement-foam (last accessed Oct. 3, 2022).

DreamStation Recalled Devices. Rather, patients have had to wait, sometimes for many months, for Philips to repair or replace their devices, and many patients are still waiting for a replacement device.

294.    As of the date of this Complaint—over a year after the Recall was announced—Philips continues to repair or replace defective DreamStation 1 Recalled Devices. In other words, the Recall remains ongoing.

295.    The replacement program for the Trilogy devices has been even slower. Philips has only just begun the rework of affected Trilogy 100/200 devices and Philips projects that the process will take approximately 12-14 months to complete.[407]

296.    There is no repair or replacement program for any of the other Recalled Devices recalled by Philips.

297.    Due to the design of the Recalled Devices, it is prohibitively difficult for patients to remove or replace the PE-PUR foam themselves. Also, the FDA warns:

> Do **not** try to remove the foam from your device. Trying to or successfully removing the foam may damage the device or change how the device works. It may also lead to more foam or chemicals entering the air tubing of the device.[408]

298.    As a result, the Recall leaves patients without safe, free options. Instead, patients may simply be or were forced to buy Philips' next-generation product or a competitor's product—at full price, and indeed, thousands of patients, have already done so.

---

[407] *See* Philips "Ventilation News and Updates" webpage, Trilogy Remediation Update for Business Customers (June 1, 2022) (Exhibit "11" hereto).

[408]         https://www.fda.gov/medical-devices/safety-communications/faqs-philips-respironics-ventilator-bipap-machine-and-cpap-machine-recalls (emphasis in original) (last accessed Oct. 3, 2022).

299.     Thus, Philips intends to, and is, profiting from its "recall" by selling more of its

next generation product, the DreamStation 2, whose launch appears intentionally timed to coincide

with the "recall."

300.     The FDA also believes that the Recall is not proceeding quickly enough. It recently

stated:

> Based on the status of Philips' recall as of the date of this letter [May 2, 2022],
> CDRH believes that, if an order were to be issued to Philips under section 518(b),
> the plan submitted by Philips in response to that order should provide for significant
> improvements to Philips' ongoing repair and replacement activities to speed the
> pace of remediation and address other deficiencies identified by CDRH and
> communicated to Philips, to the extent such improvements are achievable by
> Philips.[409]

* * *

301.     As stated above, each Philips Defendant acted as part of one joint enterprise in

connection with the design, development, testing, marketing, promotion, and sale of the defective

and unreasonably dangerous Recalled Devices. Each Philips Defendant is also independently,

directly responsible for the design, development, testing, marketing, promotion and sale of the

defective and unreasonably dangerous Recalled Devices.

302.     Royal Philips has directly been involved with and independently contributed to, for

example, the quality, regulatory, and medical compliance functions for Philips; the Recall both

globally and in the United States (which it effectively controlled, managed and coordinated); a

research program into the hazards posed by the PE-PUR foam; and through its Chief Medical

Officer provides guidance for the development and market introduction of all new product

development and launches. Royal Philips made the decision to purchase Philips RS (then

Respironics) for $5.6 billion, made the decision to pursue expansion of the CPAP, BiPAP, and

---

[409] 518(b) Notice (Exhibit "72" hereto), at 13.

ventilator product lines; uses and adheres to a worldwide mandatory training program, General Business Principles, and the Philips Business System to govern the activities of the other Philips Defendants; owns the intellectual property rights that cover the Recalled Devices and tightly controls and protects all of its intellectual property, including that of its CPAP, BiPAP, and ventilator devices, in its own name and in conjunction with Philips RS; and owns and is listed as the copyright holder for the User Manuals for the Recalled Devices. Until the Recall was announced in June 2021, Royal Philips failed to disclose the existence, scope, and material safety risks of the Defect in the Recalled Devices despite its obligations pursuant to the federal securities laws. And through Philips USA, Royal Philips has controlled and managed Philips RS and Philips NA while distributing profits accrued from the Recalled Devices to shareholders of Royal Philips' stock.

303.     Philips NA has also been directly involved with and independently contributed to, for example, the design, development, and sale of the Recalled Devices through employees with responsibility for quality and regulatory functions, including pre- and post-market regulatory compliance, and by participating in multiple HHEs relating to customer complaints of foam degradation. Philips NA also had a leading role in the marketing and new product development as it relates to the Recalled Devices. What's more, ████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████████ Until the Recall was announced in June 2021, Philips NA failed to disclose the existence, scope, and material safety risks of the Defect in the Recalled Devices.

304.     Philips RS likewise designed, manufactured, promoted, and sold the Recalled Devices. Philips RS further received and managed complaints relating to the Recalled Devices;

tested and failed to test the biocompatibility of PE-PUR foam as an element of medical devices; and ultimately implemented the Recall. Philips RS also jointly coordinated with Royal Philips to protects all of Royal Philips' intellectual property, including that related to its CPAP, BiPAP, and ventilator devices. Until the Recall was announced in June 2021, Philips RS failed to disclose the existence, scope, and material safety risks of the Defect in the Recalled Devices.

## V.     EQUITABLE TOLLING OF STATUTES OF LIMITATIONS

305.    The running of any statute of limitations has been equitably tolled by Defendants' fraudulent concealment and/or omissions of critical safety information. Through its affirmative misrepresentations and omissions, Philips actively concealed from Plaintiffs and physicians the true risks associated with the Recalled Devices.

306.    As a result of Defendants' actions, Plaintiffs were unaware, and could not have reasonably known or learned through reasonable diligence, that the Recalled Devices were defective and exposed users to the risks and harms set forth here and that those risks and harms were the direct and proximate result of Defendants' acts and omissions.

307.    Plaintiffs did not have the technical, scientific or medical knowledge and information sufficient to ascertain the cause of their injury prior to learning of the recall and the basis for the recall.

## VI.     CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

308.    Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

309.    This claim is brought against the Philips Defendants and the PolyTech Defendants.

310.    Philips and PolyTech owed a duty to Plaintiffs to use and exercise reasonable and

due care in the design, materials procurement, manufacturing, testing, distribution, labeling, marketing, warnings, instructions for use and storage, disclosures, regulatory compliance, and sale of the Recalled Devices.

311.    Philips and PolyTech owed a duty to Plaintiffs to ensure that the Recalled Devices they sold in the United States were safe, did not expose patients using the devices to toxic substances, and/or complied with current best manufacturing practices and regulatory requirements.

312.    Philips and PolyTech owed a duty of care to Plaintiffs; because they were the foreseeable, reasonable, and probable users of the Recalled Devices. Philips and PolyTech knew, or should have known, that the Recalled Devices were not safe, exposed their users to toxic and carcinogenic compounds, and/or did not comply with best manufacturing practices and regulatory requirements. Philips and PolyTech were in the best position to uncover and remedy these shortcomings.

313.    Philips and PolyTech negligently designed and manufactured the Recalled Devices, causing patients using the Recalled Devices to be exposed to the Foam Toxins and degraded particulate matter which are harmful, carcinogenic and/or toxic.

314.    Philips and PolyTech failed to discharge their duties of reasonable care. Philips and PolyTech inadequately conducted and/or oversaw the design, materials procurement, manufacturing, testing, labeling, distribution, marketing, warnings, disclosures, instructions for use and storage, regulatory compliance and sale of the Recalled Devices. Philips and PolyTech knew or should have known that the aforesaid wrongdoing would damage Plaintiffs.

315.    Philips and PolyTech negligently failed to promptly and immediately warn and disclose to Plaintiffs, and the medical and regulatory communities, of the potential and actual

116

danger posed by the PE-PUR foam in the Recalled Devices as soon as it was discovered, delaying notice of this harmful and potentially fatal toxic exposure to carcinogens and thus causing continued exposure to the carcinogenic and/or hazardous compounds, and delaying cessation of use, necessary medical testing, examinations, surveillance, and treatment.

316.    Philips and PolyTech failed to discharge their duties of reasonable care. Philips and PolyTech failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions; and that warm temperatures and humidity would hasten the degradation of the foam, and make the Recalled Devices especially dangerous; and further failed to warn or instruct that the Recalled Devices should not be used in conjunction with the SoClean ozone cleaning system which Philips now claims can hasten or cause the degradation of the foam and make the Recalled Devices especially dangerous.

317.    Philips' and PolyTech's negligent or grossly negligent conduct created and then exacerbated an unreasonable and dangerous condition for Plaintiffs.

318.    Philips and PolyTech acted with recklessness and willful and wanton disregard for the health of Plaintiffs.

319.    Philips' and PolyTech's unreasonable, negligent actions and inactions were taken or not taken with willful and wanton disregard for the health of Plaintiffs and created a foreseeable risk of harm to Plaintiffs.

320.    As a direct and proximate result of Philips' and PolyTech's negligence, Plaintiffs have suffered serious and debilitating injuries.

321.    In addition, as a direct and proximate cause of Philips' and PolyTech's negligence, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

322.     Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT II
## STRICT LIABILITY: DESIGN DEFECT

323.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

324.     This claim is brought against the Philips Defendants and the PolyTech Defendants.

325.     At all times mentioned herein, Philips and PolyTech were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, which were defective and unreasonably dangerous.

326.     Plaintiffs were foreseeable users of the Recalled Devices and Philips and PolyTech knew that Plaintiffs would use the Recalled Devices.

327.     The Recalled Devices are defective in design because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release particles and off-gas chemicals, including TDA, TDI, DEG. These chemicals and particles are then inhaled and ingested by Plaintiffs using the Recalled Devices and cause, among other problems, cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

328.     Philips and PolyTech knew or should have known that the defective conditions of the Recalled Devices made the Recalled Devices unreasonably dangerous to Plaintiffs.

329.     The Recalled Devices were unreasonably dangerous when used by ordinary users, such as Plaintiffs, who used the Recalled Devices as they were intended to be used.

118

330.     The Recalled Devices are dangerous to an extent beyond what would be contemplated by the ordinary user of the Recalled Devices.

331.     The defective condition of the subject Recalled Devices rendered them unreasonably dangerous and/or not reasonably safe, and the devices were in this defective condition at the time they left the hands of Philips and PolyTech. The Recalled Devices reached Plaintiffs without substantial change in the condition in which they were designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied, and otherwise released into the stream of commerce.

332.     Plaintiffs were not able to discover, nor could they have discovered through the exercise of reasonable diligence, the defective nature of the subject devices. Further, in no way could Plaintiffs have known that Philips had designed, developed, and manufactured the subject devices in a way as to make the risk of harm or injury outweigh any benefits.

333.     Safer alternative machines and designs were available which did not have an unreasonable risk of harm that the Recalled Devices and their unsafe PE-PUR foam did; for example, devices that included non-PE-PUR foam and designs that included other types of sound abatement technologies.

334.     At the time the Recalled Devices left Philips' and PolyTech's possession and continuing through when they were used by Plaintiffs, the Recalled Devices were in a condition that made them unreasonably dangerous to Plaintiffs.

335.     The Recalled Devices used by Plaintiffs were expected to, and did, reach Plaintiffs without substantial change in the condition in which the Recalled Devices were manufactured, sold, distributed, and marketed by Philips and PolyTech.

336.     At all relevant times, Plaintiffs used the Recalled Devices in the manner in which the devices were intended to be used.

337.     Philips and PolyTech researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed the defective Recalled Devices which, when used in their intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiffs, and Philips is therefore strictly liable for the injuries sustained by Plaintiffs.

338.     As a direct and proximate cause of Philips' and PolyTech's conduct, Plaintiffs have suffered serious and debilitating injuries.

339.     In addition, as a direct and proximate cause of Philips' and PolyTech's conduct, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

340.     Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## COUNT III
## NEGLIGENT DESIGN

341.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

342.     This claim is brought against the Philips Defendants and the PolyTech Defendants.

343.     At all times mentioned herein, Philips and PolyTech were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices.

344.     At all times relevant to this action, Philips and PolyTech had a duty to design, manufacture, formulate, test, package, label, produce, create, make, construct, assemble, market,

advertise, promote, distribute, and sell the Recalled Devices with reasonable and due care for the safety and well-being of users, including Plaintiffs who used the Recalled Devices.

345. Plaintiffs were foreseeable users of the Recalled Devices, and Philips and PolyTech knew that Plaintiffs would use the Recalled Devices.

346. It was foreseeable that the Recalled Devices would be used with the Accessory Humidifiers contributing to humidity; and that they could be used in many climates, and stored in very warm settings, as noted by their own environmental specifications, with said condition contributing to rapid foam degradation.

347. The Recalled Devices are defective in design because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles, including but not limited to TDA, TDI, and DEG. These chemicals and particles are then inhaled and ingested by Plaintiffs using the Recalled Devices and cause, among other problems, cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

348. The foreseeable risks of using the Recalled Devices, particularly respiratory illnesses up to and including death, significantly outweigh the benefits conferred upon patients using the subject devices.

349. Philips and PolyTech knew or should have known that the defects of the Recalled Devices made the Recalled Devices unreasonably dangerous.

350. Philips and PolyTech continued to manufacture and distribute the Recalled Devices after Philips and PolyTech knew or should have known of the Recalled Devices adverse effects or the availability of safer designs.

351.    The Recalled Devices were unreasonably dangerous when used by Plaintiffs, who followed the instructions provided by Philips and used the Recalled Devices with common knowledge of their characteristics and according to their common usage.

352.    At the time the Recalled Devices left Philips' and PolyTech's possession and continuing through when they were used by Plaintiffs, the Recalled Devices were in a condition that made them unreasonably dangerous to Plaintiffs.

353.    The Recalled Devices used by Plaintiffs were expected to and did reach Plaintiffs without substantial change in the condition in which the Recalled Devices were manufactured, sold, distributed, and marketed by Philips and PolyTech.

354.    At all relevant times, Plaintiffs used the Recalled Devices in the manner in which the Recalled Devices were intended to be used.

355.    Philips and PolyTech had superior knowledge of the Recalled Devices and owed a duty of care to Plaintiffs.

356.    Reasonable alternative designs existed for the Recalled Devices which would have eliminated or reduced the risk of inhalation of carcinogenic materials and VOCs including, but not limited to the use of non-PE-PUR foam or other sound abatement technologies such as those used by other manufacturers.

357.    Philips and PolyTech failed to exercise reasonable and due care under the circumstances and breached their duty of care.

358.    As a direct and proximate cause of Philips' and PolyTech's negligence, Plaintiffs have suffered serious and debilitating injuries.

359.     In addition, as a direct and proximate cause of Philips' and PolyTech's negligence, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

360.     Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

### COUNT IV
### STRICT LIABILITY – FAILURE TO WARN

361.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

362.     This claim is brought against the Philips Defendants and the PolyTech Defendants.

363.     At all times mentioned herein, Philips and PolyTech designed, manufactured, and sold the Recalled Devices.

364.     Plaintiffs were foreseeable users of the Recalled Devices.

365.     The Recalled Devices are defective because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles, including but not limited to TDA, TDI, DEG. These chemicals and particles are then inhaled and ingested by Plaintiffs using the Recalled Devices and cause, among other problems, cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

366.     Philips and PolyTech knew that the defective condition of the Recalled Devices made the devices unreasonably dangerous to users such as Plaintiffs.

123

367.    The Recalled Devices were dangerous when used by ordinary users, such as Plaintiffs, who used the devices as they were intended to be used.

368.    The Recalled Devices are dangerous to an extent beyond what would be contemplated by the ordinary user of the device.

369.    Philips and PolyTech knew or should have known of the defects in the Recalled Devices at the time Philips and PolyTech sold or provided the Recalled Devices that were used by Plaintiffs.

370.    At the time the Recalled Devices left Philips' and PolyTech's possession, the Recalled Devices were defective and in a condition that made them unreasonably dangerous to Plaintiffs.

371.    At the time Plaintiffs used the Recalled Devices, the devices were defective and in a condition that made them unreasonably dangerous to Plaintiffs.

372.    The Recalled Devices used by Plaintiffs were expected to, and did, reach Plaintiffs without substantial change in the condition in which the devices were manufactured, sold, distributed, and marketed by Philips and PolyTech.

373.    At all relevant times, Plaintiffs used the Recalled Devices in the manner in which the devices were intended to be used.

374.    The Recalled Devices are defective because Philips and PolyTech failed to warn or instruct that the PE-PUR foam in the Recalled Devices can degrade and off-gas dangerous and carcinogenic chemicals and particles, posing a serious risk to users.

375.    Philips and PolyTech further failed to warn or instruct that the Recalled Devices had been adequately or properly tested.

376.    The warning and instructions that accompanied the Recalled Devices failed to provide the level of information that ordinary consumers, including Plaintiffs, would expect when using the product in a manner reasonably foreseeable to Philips and PolyTech.

377.    Philips and PolyTech further failed to warn or instruct that the Recalled Devices, when used in conjunction with the Accessory Humidifiers, would hasten the degradation of the foam and make the Recalled Devices especially dangerous.

378.    Philips and PolyTech further failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions, and that warm temperatures and humidity would hasten the degradation of the foam, and make the Recalled Devices especially dangerous.

379.    Philips and PolyTech further failed to warn or instruct that the Recalled Devices should not be used in conjunction with the SoClean ozone cleaning system which Philips now claims can hasten or cause the degradation of the foam and make the Recalled Devices especially dangerous.

380.    Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using the Recalled Devices, Plaintiffs would not have used the Recalled Devices.

381.    Had Plaintiffs received proper or adequate warnings or instructions as to the storage, climate and cleaning conditions and protocols, they would have heeded such warnings to mitigate the risk of premature foam degradation.

382.    Philips and PolyTech researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed the defective Recalled Devices which, when used in their intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiffs, and Philips and PolyTech are therefore strictly liable for the injuries sustained by Plaintiffs.

383.    As a direct and proximate cause of Philips' and PolyTech''s conduct, Plaintiffs have suffered serious and debilitating injuries.

384.    In addition, as a direct and proximate cause of Philips' and PolyTech's conduct, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

385.    Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT V
## NEGLIGENT FAILURE TO WARN

386.    Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

387.    This claim is brought against the Philips Defendants and the PolyTech Defendants.

388.    At all times mentioned herein, Philips and PolyTech designed, manufactured, and sold the Recalled Devices.

389.    At all times relevant to this action, Philips and PolyTech had a duty to manufacture, design, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the Recalled Devices with reasonable and due care for the safety and well-being of Plaintiffs, who were subject to and used the devices.

390.    In addition, Philips and PolyTech owed a duty of care to Plaintiffs because, among other things, it had superior knowledge with respect to the Recalled Devices including, but not limited to critical safety issues associated with foam degradation, off-gassing, and related health risks.

391.    Plaintiffs were foreseeable users of the Recalled Devices.

392.    The Recalled Devices are defective because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles, including but not limited to TDA, TDI, DEG. These chemicals and particles are then inhaled and ingested by Plaintiffs using the Recalled Devices and cause, among other problems, cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, , inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

393.    The foreseeable risks of using the Recalled Devices significantly outweigh the benefits conferred upon patients using the Recalled Devices.

394.    Philips and PolyTech knew that the defective condition of the Recalled Devices made the devices unreasonably dangerous to users such as Plaintiffs.

395.    The Recalled Devices were unreasonably dangerous when used by ordinary users, such as Plaintiffs, who used the devices as they were intended to be used.

396.    The Recalled Devices are dangerous to an extent beyond what would be contemplated by the ordinary user of the device.

397.    Philips and PolyTech knew or should have known of the defects in the Recalled Devices at the time Philips sold or provided the Recalled Devices that were used by Plaintiffs.

398.    At the time the Recalled Devices left Philips' and PolyTech's possession and continuing through when they were used by Plaintiffs, the Recalled Devices were defective and in a condition that made them unreasonably dangerous to Plaintiffs.

399.    The Recalled Devices used by Plaintiffs were expected to, and did, reach Plaintiffs without substantial change in the condition in which the devices were manufactured, sold, distributed, and marketed by Philips and PolyTech.

400.     At all relevant times, Plaintiffs used the Recalled Devices in the manner in which the devices were intended to be used.

401.     Philips and PolyTech breached their duty to Plaintiffs by failing to warn of the risks and dangers of using the Recalled Devices as they are intended to be used. The Recalled Devices did not contain warnings of the risks of the PE-PUR foam and the risks of degradation, off-gassing, and related health risks.

402.     Philips and PolyTech further breached their duty to Plaintiffs because it failed to warn or instruct that the Recalled Devices had not been adequately or properly tested.

403.     Philips and PolyTech further failed to warn or instruct that the Recalled Devices, when used in conjunction with the Accessory Humidifiers would hasten the degradation of the foam and make the Recalled Devices especially dangerous.

404.     Philips and PolyTech further failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions; and that warm temperatures and humidity would hasten the degradation of the foam, and make the Recalled Devices especially dangerous.

405.     Philips and PolyTech further failed to warn or instruct that the Recalled Devices should not be used in conjunction with the SoClean ozone cleaning system which Philips now claims can hasten or cause the degradation of the foam and make the Recalled Devices especially dangerous.

406.     The warnings and instructions of the Recalled Devices did not provide the amount of information that ordinary consumers, including Plaintiffs, would expect when using the devices in a reasonably foreseeable manner.

407.     Had Plaintiffs received proper or adequate warnings or instructions as to the risks of using the Recalled Devices, Plaintiffs would not have used the Recalled Devices.

408.     Had Plaintiffs received proper or adequate warnings or instructions as to the storage, climate and cleaning conditions and protocol, they would have heeded such warnings to mitigate the risk of premature foam degradation.

409.     As a direct and proximate cause of Philips' and PolyTech's conduct, Plaintiffs have suffered serious and debilitating injuries.

410.     In addition, as a direct and proximate cause of Philips' and PolyTech's conduct, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

411.     Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

**COUNT VI**
**NEGLIGENT RECALL / NEGLIGENT FAILURE TO RECALL**

412.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

413.     This claim is brought against the Philips Defendants.

414.     Despite being aware of the Defect in the Recalled Devices as far back as 2008, Philips did not initiate a recall of the Recalled Devices until June 14, 2021.

415.     At all times relevant hereto, Philips manufactured, marketed, distributed, and sold the Recalled Devices.

416.     As set forth in detail above, as far back as 2008 (and in no event later than 2015), Philips knew or reasonably should have known that the Recalled Devices were defective and exposed users to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam in the Recalled Devices.

417.    Despite that knowledge, Philips did not attempt to recall or retrofit the Recalled Devices prior to June 14, 2021, long after any reasonable manufacturer, distributor and/or seller under the same circumstances would have instituted a recall or retrofitted the Recalled Devices.

418.    Because of the delay in instituting a recall, Plaintiffs continued to use and pay for the Recalled Devices when, without their knowledge, they were being exposed to substantial health risks.

419.    Had Philips instituted a recall when the risks to potential users of using the Recalled Devices were first made clear, Plaintiffs would have not used or paid for the defective devices and would have sought alternative methods to treat their breathing-related illnesses.

420.    Philips was aware that Plaintiffs would make such a choice. That is why Philips waited until it announced the launch of the DreamStation 2, which does not contain PE-PUR foam, before it publicly disclosed that its previous generation of DreamStation products and other Recalled Devices posed serious health risks to users, and before Philips finally instituted a recall.

421.    Even after Philips finally announced it was instituting a voluntary recall of the Recalled Devices, it implemented the Recall negligently.

422.    Royal Philips took charge of and responsibility for the Recall. Royal Philips has interfaced with regulatory agencies in the U.S. and worldwide but has not adequately notified users and their doctors about the recall or the options for obtaining a replacement device.

423.    First, when the Recall was announced on June 14, 2021, Philips did not adequately provide notice to users or their doctors about the risks of using the Recalled Devices, nor did Philips offer users of the Recalled Devices any option for a replacement device. In fact, the FDA issued a Notification Order to Philips under § 518(a) of the FDCA, documenting that the FDA "on multiple occasions has informed Philips that FDA was concerned that Philips' efforts to notify

patients and consumers, healthcare providers, and consignees regarding the recall have been insufficient," and has expressed concern that "it is likely that a significant portion of patients and consumers using the Recalled Products are unaware of the health risks presented by those products."[410]

424.    Then, when Philips received authorization from the FDA to begin a repair and/or replacement process for affected DreamStation devices in the United States, Philips estimated that it would take a year to complete the program. Philips was aware that this time frame was untenable for patients, many of whom relied on the machines to treat medical conditions.

425.    In addition, DreamStation customers were not given any specifics as to how the replacement program would work nor were they told when they might receive a replacement device (a significant factor for users who, again, relied on the machines for medical conditions) nor were their treating physicians given any meaningful guidance by Philips.

426.    Still, the repair/replacement program only applied to affected DreamStation devices and did not impact any of the other Recalled Devices. Later, Philips instituted a repair program for the Trilogy devices, which has only just recently begun.

427.    Despite the estimated one-year timeline originally announced by Philips to replace recalled DreamStation devices, Philips has not performed the Recall according to its own projections, and many users are still waiting for repaired or replaced devices.

428.    In issuing a voluntary recall, Philips assumed duties to exercise reasonable care in issuing and implementing the Recall. Philips' conduct constitutes a breach of its duties by failing to adequately warn and notify users of the risks of using the Recalled Devices and failing to promptly replace the Recalled Devices.

---

[410] 518(a) Notification Order (Exhibit "136" hereto), at 6.

429.     As a result of Philips breach of duty, Plaintiffs continued to use Recalled Devices. At all relevant times, Plaintiffs used the Recalled Devices in the manner in which the devices were intended to be used

430.     As a direct result of Philips' breach of duty, Plaintiffs have suffered serious and debilitating injuries.

431.     In addition, as a direct and proximate cause of Philips' breach of duty, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of continued exposure to the Foam Toxins.

432.     Plaintiffs demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT VII
## BATTERY

433.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

434.     This claim is brought against the Philips Defendants.

435.     Philips engaged in acts that resulted in  harmful and offensive contact with Plaintiffs.

436.     Plaintiffs each used a Recalled Device and unknowingly had unwanted and dangerous particles and gases blown into their bodies, including into their respiratory systems.

437.     Philips designed, manufactured, marketed, and sold the Recalled Devices with the defects discussed herein including foam degradation and resulting off-gassing. Thus, Philips did acts that caused the harmful and offensive touching of Plaintiffs to occur.

438. The acts engaged in by Philips that caused the unwanted and dangerous particles and gases to touch and enter Plaintiffs' bodies were all done intentionally, and with full knowledge that they would result in harmful and offensive contact.

439. The touching was harmful and offensive to Plaintiffs because they are dangerous and can cause serious health problems. Any reasonable person in Plaintiffs' situation would have been offended by the touching under the circumstances.

440. Plaintiffs did not consent to the touching. Any ostensible "consent" provided was not done knowingly and was otherwise vitiated under the circumstances and not effective.

441. Plaintiffs agreed to use the Recalled Devices and have air circulated through their respiratory systems, but, as alleged herein, they each did so without knowledge of the dangerous particles and gases caused by the Defect in the Recalled Devices.

442. As alleged herein, Philips knew about the Defect and that it was substantially certain to result in the harmful touching of Plaintiffs. Despite this knowledge, Philips did not disclose the Defect to Plaintiffs, their doctors, the FDA, or others.

443. As alleged herein, while Philips knew of the Defect for many years, Philips failed to disclose and concealed it from Plaintiffs and the public. Philips thus knew the offensive touching would occur and that Plaintiffs were under the mistaken impression that the products were safe and that no such offensive touching would occur.

444. Philips willfully, knowingly and tortiously battered Plaintiffs.

445. Plaintiffs were harmed and injured by this harmful and offensive touching.

446. As a foreseeable, proximate, and direct result of Philips' conduct, Plaintiffs each have suffered a battery and have been damaged, including as otherwise set forth in this Complaint and the individual Short Form Complaints, and by invasion of their privacy and bodily integrity

without their consent, severe emotional stress and anxiety, and harm to their human dignity and corresponding damages therefrom.

447.    Plaintiffs demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT VIII
## STRICT LIABILITY - MANUFACTURING DEFECT

448.    Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

449.    This claim is brought against the Philips Defendants and the PolyTech Defendants.

450.    At all times mentioned herein, Philips and PolyTech were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, which were unreasonably dangerous, unsafe and defective in their manufacturing when they left Philips' and PolyTech's possession.

451.    The Recalled Devices were expected to, and did, reach the Plaintiffs without substantial change or adjustment to their mechanical function and condition in which they were sold.

452.    Plaintiffs used the Recalled Devices as directed and for the purpose for which they were intended.

453.    The Recalled Devices are inherently dangerous for their intended used due to manufacturing defects. Philips and PolyTech therefore are strictly liable.

454.    Philips failed to ensure that a subset of the purchased, or otherwise received, Recalled Devices and services conformed to specified requirements.

134

455.     Specifically, Philips used defective, incorrect and non-specified PE-PUR, raw foam product, not intended for use in Recalled Devices, to manufacture some of the Recalled Devices including certain recalled Trilogy Evo ventilators.

456.     This incorrect and non-specified PE-PUR foam was sourced from Philips' raw foam supplier, used in the muffler assembly of the affected Recalled Devices, including Trilogy Evo ventilators, and resulted in non-conforming Recalled Devices being approved, released and distributed by Philips to Plaintiffs.

457.     Per design specifications, this foam was required to be polyether based, not polyester based foam.

458.     Upon information and belief, the Recalled Devices contain a manufacturing defect that differed from other typical units of the same product line.

459.     Philips sold the Recalled Devices in this defective condition.

460.     Philips failed to conduct proper and regular quality control sampling and testing.

461.     The Recalled Devices, as manufactured, were unsafe and unreasonably dangerous to Plaintiffs.

462.     The Recalled Devices did not perform as safely as an ordinary consumer would expect.

463.     Philips and PolyTech knew or should have known of the manufacturing defects and the risks of serious bodily injury exceeded the benefits associated with the Recalled Devices.

464.     Furthermore, the Recalled Devices and their defects presented an unreasonably dangerous risk beyond what the ordinary consumer would reasonably expect.

465.     As a direct and proximate cause of Philips' and PolyTech's manufacturing defect, Plaintiffs have suffered serious and debilitating injuries.

466.     In addition, as a direct and proximate cause of Philips' and PolyTech's manufacturing defect, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of their exposure to the Foam Toxins.

467.     Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT IX
## NEGLIGENT MANUFACTURING

468.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

469.     This claim is brought against the Philips Defendants and the PolyTech Defendants.

470.     At all times mentioned herein, Philips and PolyTech were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices.

471.     At all times relevant to this action, Philips and PolyTech had a duty to design, manufacture, formulate, test, package, label, produce, create, make, construct, assemble, market, advertise, promote, distribute, and sell the Recalled Devices with reasonable and due care for the safety and well-being of users, including Plaintiffs who used the Recalled Devices.

472.     The Recalled Devices were expected to, and did, reach the Plaintiffs without substantial change or adjustment to their mechanical function and condition in which they were sold.

473.     Plaintiffs were foreseeable users of the Recalled Devices, and Philips and PolyTech knew that Plaintiffs would use the Recalled Devices.

474.     It was foreseeable that the Recalled Devices would be used with the Accessory Humidifiers contributing to humidity; and that they could be used in many climates, and stored in

136

very warm settings, as noted by their own environmental specifications, with said condition contributing to rapid foam degradation.

475.    The Recalled Devices are defective in manufacture because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles, including but not limited to TDA, TDI, and DEG. These chemicals and particles are then inhaled and ingested by Plaintiffs using the Recalled Devices and cause, among other problems, cancer, kidney injuries, cardiac injuries, headaches, inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

476.    The foreseeable risks of using the Recalled Devices, particularly respiratory illnesses up to and including death, significantly outweigh the benefits conferred upon patients using the subject devices.

477.    The Recalled Devices, as manufactured, were unsafe and unreasonably dangerous to Plaintiffs.

478.    The Recalled Devices did not perform as safely as an ordinary consumer would expect.

479.    At all relevant times, Plaintiffs used the Recalled Devices in the manner in which the Recalled Devices were intended to be used.

480.    Philips and PolyTech had superior knowledge of the Recalled Devices and owed a duty of care to Plaintiffs.

481.    Philips and PolyTech knew or should have known that the manufacturing defects and the attendant risks of serious bodily injury exceeded the benefits associated with the Recalled Devices.

482.    Philips and PolyTech failed to exercise reasonable and due care under the circumstances and breached their duty of care.

483.    As a direct and proximate cause of Philips' and PolyTech's negligent manufacture, Plaintiffs have suffered serious and debilitating injuries.

484.    In addition, as a direct and proximate cause of Philips' and PolyTech's negligent manufacture, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

485.    Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT X
## BREACH OF EXPRESS WARRANTY

486.    Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

487.    This claim is brought against the Philips Defendants.

488.    As set forth more fully above, Philips marketed and sold the Recalled Devices as machines that would help users breathe by, among other things, pumping air into users' lungs. When they sold the Recalled Devices, Philips knew that they were defective in that they posed serious health risks to users who would be exposed to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam.

489.    At the time of sale, Philips provided a User Manual with its CPAP, BiPAP, and ventilator devices. Royal Philips owns the copyright to all, or most, of those User Manuals.

490.    Philips' User Manuals for the Recalled Devices contained an express warranty providing that the Recalled Devices "shall be free from defects of workmanship and materials and

will perform in accordance with the product specifications for a period of two (2) years from the date of sale."[411]

491.    Philips breached this express warranty in connection with the sale and distribution of Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth in more detail above, rendering them unsuitable and unsafe for personal use.

492.    Further, through Philips' public statements, descriptions, and promises relating to the Recalled Devices, Philips expressly warranted that the products were safe and effective for their intended use.

493.    Had Plaintiffs known the Recalled Devices were unsafe for use, they would not have used them.

494.    Plaintiffs reasonably expected that the Recalled Devices were safe for their ordinary and intended use. Had Plaintiffs known the Recalled Devices were defective, unsafe for use, and exposed them to the Foam Toxins, they would not have used them.

495.    Philips has breached its warranty and refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices.

496.    To the extent privity may be required, Plaintiffs can establish privity with Philips or alternatively, Plaintiffs can establish that they fall into an exception to a privity requirement.

497.    Plaintiffs relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

---

[411] *See, e.g.,* Warranty Exemplars: DreamStation (Exhibit "47" hereto), at 29; REMstar SE (Exhibit "48" hereto), at 21; Trilogy 100 (Exhibit "49" hereto), at 163.

498.     Plaintiffs were foreseeable and intended third-party beneficiaries of Philips' sale of the Recalled Devices, and/or of contracts between Philips and the distributors or sellers of the Recalled Devices.

499.     The Recalled Devices are medical devices that affect human health and life; and therefore, they implicate the broad public policy of protecting human health and life.

500.     Enforcement of a privity requirement would unfairly prejudice Plaintiffs, who relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

501.     In addition, any purported durational limit to the warranties would be procedurally and substantively unconscionable and otherwise unenforceable.

502.     An attempted durational limit would be procedurally unconscionable because Philips unilaterally imposed the time limitation on the warranties, without affording Plaintiffs any bargaining authority. Indeed, the limitation was drafted by Philips unilaterally, and it was presented to Plaintiffs as a settled term in the User Manual issued for each Recalled Device on a "take it or leave it" basis. As such, Plaintiffs had no meaningful choice in setting any temporal limitation on the warranty.

503.     Such a limitation would be substantively unconscionable because there was a substantial disparity in the parties' relative bargaining power, which Philips used to craft a warranty that unreasonably favors it over the Plaintiff.  As Plaintiffs allege, prior to and at the time it sold the Recalled Devices to Plaintiffs, Philips was aware of the latent defect regarding PE-PUR foam degradation in the Recalled Devices. Yet, Philips suppressed information concerning the latent defect from Plaintiffs. If a durational limit were enforceable, it would mean Philips had abused its superior knowledge of the Defect to manipulate the temporal limits of the warranties in

such a manner so that it could avoid coverage relating to the latent defect while it continued manufacturing and selling the Recalled Devices containing PE-PUR foam, including to Plaintiffs. Plaintiffs had no notice or ability to detect the latent defect.

504.    Relatedly, due to Philips' knowing concealment of facts and information concerning the latent defect in the Recalled Devices, any purported durational limitation on the warranties would be tolled or waived. Philips' affirmative acts of concealment were designed to prevent any inquiry concerning the Recalled Devices and to induce Plaintiffs, who did not have notice of or the ability to detect the latent defect, to purchase, lease, and/or use the Recalled Devices that purportedly had the temporal limitation on the warranties.

505.    In addition, any attempt by Philips to limit the term of the warranties should not be enforced given that the language purporting to set forth the limitation was not presented to Plaintiffs in a clear and conspicuous manner.

506.    Plaintiffs are not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for over a year. Further, at a minimum on September 8, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements.

507.    Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs reasonably expected that the Recalled Devices were safe for their ordinary and intended use.

508.    As a direct and proximate result of Philips' breach of its express warranties, Plaintiffs have suffered serious and debilitating injuries.

509.    In addition, as a direct and proximate cause of Philips' breach of its express warranties, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

510.    Plaintiffs demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XI
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY

511.    Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

512.    This claim is brought against the Philips Defendants.

513.    The implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in each state. *See, e.g.*, Ala. Code § 7-2-314, *et seq.*; Alaska Stat. § 45.02.314, *et seq.*; Ariz. Rev. Stat. Ann. § 47-2314, *et seq.*; Ark. Code Ann. § 4-2-314, *et seq.*; Cal. Com. Code § 2314, *et seq.*; Colo. Rev. Stat. § 4-2-314, *et seq.*; Conn. Gen. Stat. Ann. § 42a-2-314, *et seq.*; Del. Code Ann. tit. 6, § 2-314, *et seq.*; D.C. Code Ann. § 28:2-314, *et seq.*; Fla. Stat. Ann. § 672.314, *et seq.*; O.C.G.A. § 11-2-314, *et seq.*; Haw. Rev. Stat. § 490:2-314, *et seq.*; Idaho Code § 28-2-314, *et seq.*; Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.*; Ind. Code Ann. § 26-1-2-314, *et seq.*; Iowa Code Ann. § 554.2314, *et seq.*; Kan. Stat. Ann. § 84-2-314, *et seq.*; Ky. Rev. Stat. Ann. § 355.2-314, *et seq.*; La. Civ. Code Ann. art. 2520, *et seq.*; Me. Rev. Stat. Ann. tit. 11, § 2-314, *et seq.*; Md. Code Ann., Com. Law § 2-314, *et seq.*; Mass. Gen. Laws Ann. Ch. 106, § 2-314, *et seq.*; Mich. Comp. Laws Ann. § 440.2314, *et seq.*; Minn. Stat. Ann. § 336.2-314, *et seq.*; Miss. Code Ann. § 75-2-314, *et seq.*; Mo. Rev. Stat. § 400.2-314, *et seq.*; Mont. Code Ann. § 30-2-314, *et seq.*; Neb. Rev. Stat. § 2-314, *et seq.*; Nev. Rev. Stat. § 104.2314, *et seq.*; N.H. Rev. Stat. Ann. § 382-

A:2-314, *et seq.*; N.J. Stat. Ann. § 12A:2-314, *et seq.*; N.M. Stat. Ann. § 55-2-314, *et seq.*; N.Y. U.C.C. Law § 2-314, *et seq.*; N.C. Gen. Stat. Ann. § 25-2-314, *et seq.*; N.D. Cent. Code § 41-02-31, *et seq.*; Ohio Rev. Code Ann. § 1302.27, *et seq.*; Okla. Stat. tit. 12A, § 2-314, *et seq.*; Or. Rev. Stat. § 72.3140, *et seq.*; 13 Pa. Stat. Ann. § 2314, *et seq.*; R.I. Gen. Laws § 6A-2-314, *et seq.*; S.C. Code Ann. § 36-2-314, *et seq.*; S.D. Codified Laws § 57A-2-314, *et seq.*; Tenn. Code Ann. § 47-2-314, *et seq.*; Tex. Bus. & Com. Code § 2.314, *et seq.*; Utah Code Ann. § 70A-2-314, *et seq.*; Va. Code Ann. § 8.2-314, *et seq.*; Vt. Stat. Ann. tit. 9A, § 2-314, *et seq.*; Wash. Rev. Code § 62A.2-314, *et seq.*; W. Va. Code § 46-2-314, *et seq.*; Wis. Stat. Ann. § 402.314, *et seq.*; and Wyo. Stat. Ann. § 34.1-2-314, *et seq.*

514.    Philips has, at all times, been a merchant with respect to the products which were sold to Plaintiffs, under U.C.C. §§ 2-104 and 2-314, as codified in each state; and was in the business of selling such products.

515.    Pursuant to U.C.C. § 2-314, as codified in each state, each Recalled Device sold by Philips comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

516.    The ordinary intended purpose of the Recalled Devices—and the purpose for which they were marketed, promoted, and sold—was to help people breathe. The Recalled Devices were not fit for that use—or any other use—because using the Recalled Device for breathing assistance exposed the user to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam. When used as intended, the Recalled Devices were unsuitable and unsafe for personal use.

517.    Philips breached its implied warranty of merchantability because the Recalled Devices were not in merchantable condition when sold, were defective when sold, and/or did not possess even the most basic degree of fitness for ordinary use.

518.    Plaintiffs were injured as a direct and proximate result of Philips' breach of its implied warranty of merchantability because, had they been aware of the unmerchantable condition of the Recalled Devices, they would not have bought them, leased them, and/or used them and jeopardized their health.

519.    To the extent that privity may be required, Plaintiffs can establish privity with Philips, or, alternatively, can establish that they fall into an exception to a privity requirement.

520.    Plaintiffs relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

521.    Plaintiffs were foreseeable and intended third-party beneficiaries of Philips' sale of the Recalled Devices, and/or of contracts between Philips and the distributors or sellers of the Recalled Devices.

522.    The Recalled Devices are products such medical devices that affect human health and life; and therefore, they implicate the broad public policy of protecting human health and life.

523.    Enforcement of a privity requirement would unfairly prejudice Plaintiffs, who relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

524.    In addition, any purported durational limit to the implied warranty of merchantability would be procedurally and substantively unconscionable and otherwise unenforceable.

525.    An attempted durational limit would be procedurally unconscionable because Philips unilaterally imposed the time limitation on the implied warranty of merchantability, without affording Plaintiffs any bargaining authority. Indeed, the limitation was drafted by Philips, without any input or consent from Plaintiffs, and it was presented to Plaintiffs as a settled term in

the User Manual issued for each Recalled Device. As such, Plaintiffs had no meaningful choice in setting any temporal limitation on the warranty.

526.     Such a limitation would be substantively unconscionable because there was a substantial disparity in the parties' relative bargaining power. As Plaintiffs allege, prior to and at the time it sold the Recalled Devices to Plaintiffs, Philips was aware of the latent defect regarding PE-PUR foam degradation in the Recalled Devices. Yet, Philips suppressed information concerning the latent defect from Plaintiffs. If a durational limit existed, it would mean Philips had abused its superior knowledge of the Defect to manipulate the temporal limits of the implied warranty of merchantability in such a manner so that it could avoid coverage relating to the latent defect while it continued manufacturing and selling the Recalled Devices containing PE-PUR foam, including to Plaintiffs. Plaintiffs had no notice or ability to detect the latent defect.

527.     Relatedly, due to Philips' knowing concealment of facts and information concerning the latent defect in the Recalled Devices, any purported durational limitation on the implied warranty of merchantability would be tolled or waived. Defendants' affirmative acts of concealment were designed to prevent any inquiry concerning the Recalled Devices and to induce Plaintiffs, who did not have notice of or the ability to detect the latent defect, to purchase, lease, and/or use the Recalled Devices that purportedly had the temporal limitation on the implied warranty of merchantability in place.

528.     In addition, any attempt by Philips to limit the term of the implied warranty of merchantability should not be enforced given that the language purporting to set forth the limitation was not presented to Plaintiffs in a clear and conspicuous manner.

529.     Plaintiffs are not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for over a year. Further, at a

minimum on September 8, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements.

530.     Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs reasonably expected that the Recalled Devices were safe for their ordinary and intended use.

531.     As a direct and proximate result of Philips' breach of its implied warranties, Plaintiffs have been injured and suffered damages, in that their use of the Recalled Devices increased their risk of developing cancer, cardiac injuries, respiratory issues, kidney injuries, adverse effects to other organs, and other illnesses.

532.     As a direct and proximate cause of Philips' breach of its implied warranties, Plaintiffs have suffered serious and debilitating injuries.

533.     In addition, as a direct and proximate cause of Philips' conduct, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

534.     Plaintiffs demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XII
## BREACH OF THE IMPLIED WARRANTY OF USABILITY

535.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

536.     This claim is brought against the Philips Defendants.

537.    The implied warranty of usability arises under U.C.C. § 2-314 which has been codified in each state. *See, e.g.*, Ala. Code § 7-2-314, *et seq.*; Alaska Stat. § 45.02.314, *et seq.*; Ariz. Rev. Stat. Ann. § 47-2314, *et seq.*; Ark. Code Ann. § 4-2-314, *et seq.*; Cal. Com. Code § 2314, *et seq.*; Colo. Rev. Stat. § 4-2-314, *et seq.*; Conn. Gen. Stat. Ann. § 42a-2-314, *et seq.*; Del. Code Ann. tit. 6, § 2-314, *et seq.*; D.C. Code Ann. § 28:2-314, *et seq.*; Fla. Stat. Ann. § 672.314, *et seq.*; O.C.G.A. § 11-2-314, *et seq.*; Haw. Rev. Stat. § 490:2-314, *et seq.*; Idaho Code § 28-2-314, *et seq.*; Ill. Comp. Stat. Ann. Ch. 810, 5/2-314, *et seq.*; Ind. Code Ann. § 26-1-2-314, *et seq.*; Iowa Code Ann. § 554.2314, *et seq.*; Kan. Stat. Ann. § 84-2-314, *et seq.*; Ky. Rev. Stat. Ann. § 355.2-314, *et seq.*; La. Civ. Code Ann. art. 2520, *et seq.*; Me. Rev. Stat. Ann. tit. 11, § 2-314, *et seq.*; Md. Code Ann., Com. Law § 2-314, *et seq.*; Mass. Gen. Laws Ann. Ch. 106, § 2-314, *et seq.*; Mich. Comp. Laws Ann. § 440.2314, *et seq.*; Minn. Stat. Ann. § 336.2-314, *et seq.*; Miss. Code Ann. § 75-2-314, *et seq.*; Mo. Rev. Stat. § 400.2-314, *et seq.*; Mont. Code Ann. § 30-2-314, *et seq.*; Neb. Rev. Stat. § 2-314, *et seq.*; Nev. Rev. Stat. § 104.2314, *et seq.*; N.H. Rev. Stat. Ann. § 382-A:2-314, *et seq.*; N.J. Stat. Ann. § 12A:2-314, *et seq.*; N.M. Stat. Ann. § 55-2-314, *et seq.*; N.Y. U.C.C. Law § 2-314, *et seq.*; N.C. Gen. Stat. Ann. § 25-2-314, *et seq.*; N.D. Cent. Code § 41-02-31, *et seq.*; Ohio Rev. Code Ann. § 1302.27, *et seq.*; Okla. Stat. tit. 12A, § 2-314, *et seq.*; Or. Rev. Stat. § 72.3140, *et seq.*; 13 Pa. Stat. Ann. § 2314, *et seq.*; R.I. Gen. Laws § 6A-2-314, *et seq.*; S.C. Code Ann. § 36-2-314, *et seq.*; S.D. Codified Laws § 57A-2-314, *et seq.*; Tenn. Code Ann. § 47-2-314, *et seq.*; Tex. Bus. & Com. Code § 2.314, *et seq.*; Utah Code Ann. § 70A-2-314, *et seq.*; Va. Code Ann. § 8.2-314, *et seq.*; Vt. Stat. Ann. tit. 9A, § 2-314, *et seq.*; Wash. Rev. Code § 62A.2-314, *et seq.*; W. Va. Code § 46-2-314, *et seq.*; Wis. Stat. Ann. § 402.314, *et seq.*; and Wyo. Stat. Ann. § 34.1-2-314, *et seq.*

538.    Philips has, at all times, been a merchant with respect to the products which were sold to Plaintiffs, under U.C.C. §§ 2-104 and 2-314, as codified in each state; and was in the business of selling such products.

539.    By operation of law, Philips, as the manufacturer of the Recalled Devices and as the providers of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiffs that the Recalled Devices were usable for their ordinary and intended use.

540.    Such implied warranty arises under U.C.C. § 2-314(3) as adopted in each state.

541.    Through usage of trade, manufacturers of medical devices, such as the Recalled Devices, impliedly warrant that their products are usable for the end consumer.

542.    The ordinary intended use of the Recalled Devices was to help people breathe. The Recalled Devices were not fit for that use—or any other use—because using the Recalled Device for breathing assistance exposed the user to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam. When used for their ordinary and intended use, the Recalled Devices were unsuitable and unsafe, and, thus, adulterated.

543.    Philips breached its implied warranty of usability because the Recalled Devices were not usable for their ordinary and intended use and were not usable for the end consumer. At the point of sale, the Recalled Devices while appearing normal—contained the Defect rendering them unusable.

544.    Philips, its agents and employees knew, or should have known, that the Recalled Devices suffered from a defect that causes negative health effects and/or places persons at risk for negative health effects to such an extent that the products are unusable.

545.    Philips' Recall announcement instructed Plaintiffs to not use Recalled Devices because of the health risks illustrating that the Recalled Devices are unusable and worthless.

546.     Philips has refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiffs reasonably expected that the Recalled Devices were usable for their ordinary and intended use.

547.     Had Plaintiffs known that Philips had breached the implied warranty of usability for their Recalled Devices, they would not have used the Recalled Devices nor would they have purchased or leased the Recalled Devices.

548.     To the extent privity may be required, Plaintiffs can establish privity with Philips, or, alternatively, can establish that they fall into an exception to a privity requirement.

549.     Plaintiffs relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

550.     Plaintiffs were foreseeable and intended third-party beneficiaries of Philips' sale of the Recalled Devices, and/or of contracts between Philips and the distributors or sellers of the Recalled Devices.

551.     The Recalled Devices are products such as medical devices that affect human health and life; and therefore, they implicate the broad public policy of protecting human health and life.

552.     Enforcement of a privity requirement would unfairly prejudice Plaintiffs, who relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

553.     In addition, any purported durational limit to the implied warranty of usability would be procedurally and substantively unconscionable and otherwise unenforceable.

554.     An attempted durational limit would be procedurally unconscionable because Philips unilaterally imposed the time limitation on the implied warranty of usability, without affording Plaintiffs any bargaining authority. Indeed, the limitation was drafted by Philips, without

any input or consent from Plaintiffs, and it was presented to Plaintiffs as a settled term in the User Manual issued for each Recalled Device. As such, Plaintiffs had no meaningful choice in setting any temporal limitation on the warranty.

555.    Such a limitation would be substantively unconscionable because there was a substantial disparity in the parties' relative bargaining power. As Plaintiffs allege, prior to and at the time it sold the Recalled Devices to Plaintiffs, Philips was aware of the latent defect regarding PE-PUR foam degradation in the Recalled Devices. Yet, Philips suppressed information concerning the latent defect from Plaintiffs. If a durational limit existed, it would mean Philips had abused its superior knowledge of the Defect to manipulate the temporal limits of the implied warranty of usability in such a manner so that it could avoid coverage relating to the latent defect while it continued manufacturing and selling the Recalled Devices containing PE-PUR foam, including to Plaintiff. Plaintiffs had no notice or ability to detect the latent defect.

556.    Relatedly, due to Philips' knowing concealment of facts and information concerning the latent defect in the Recalled Devices, any purported durational limitation on the implied warranty of usability would be tolled or waived. Defendants' affirmative acts of concealment were designed to prevent any inquiry concerning the Recalled Devices and to induce Plaintiffs, who did not have notice of or the ability to detect the latent defect, to purchase and/or use the Recalled Devices that purportedly had the temporal limitation on the implied warranty of usability in place.

557.    In addition, any attempt by Philips to limit the term of the implied warranty of usability should not be enforced given that the language purporting to set forth the limitation was not presented to Plaintiffs in a clear and conspicuous manner.

558.    Plaintiffs are not required to give notice to Philips, a remote manufacturer and

Philips has had notice of the type and source of claims in this matter for over a year. Further, at a minimum on September 8, 2021, and on May 16, 2022, Plaintiffs involved in this multi-district litigation, through counsel, sent Philips a letter complying with any required pre-suit notification requirements.

559.     As a direct and proximate result of Philips' breach of its implied warranties, Plaintiffs have been injured and suffered damages, in that their use of the Recalled Devices increased their risk of developing cancer, cardiac injuries, respiratory issues, kidney injuries, adverse effects to other organs, and other illnesses

560.     As a direct and proximate cause of Philips' breach of its implied warranties, Plaintiffs have suffered serious and debilitating injuries.

561.     In addition, as a direct and proximate cause of Philips' conduct, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

562.     Plaintiffs demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XIII
## FRAUD

563.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

564.     This claim is brought against the Philips Defendants.

565.     At all relevant times, Philips knew that the Recalled Devices posed serious health risks to users.

566.     As set forth more fully above, Philips marketed and sold the Recalled Devices as machines that would help users breathe by, among other things, pumping air into users' lungs. While selling and profiting from the Recalled Devices, Philips knew that they were defective in that they posed serious health risks to users who would potentially be inhaling toxic fumes as they used the machines due to the degradation and off-gassing of the PE-PUR foam. Philips intentionally concealed this material information from consumers, users, payors, prescribers, and other healthcare providers, including Plaintiffs and their physicians, because to do otherwise would have resulted in users seeking safer alternatives to treat their breathing issues.

567.     Philips concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that the Recalled Devices were defective and would expose users to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam. These material omissions were misleading and deceptive standing alone and were particularly deceptive in light of the fact that the Recalled Devices were sold as breathing assistance devices.

568.     Philips concealed from Plaintiffs and failed to disclose to them material information regarding the serious health risks posed to users of the Recalled Devices by, among other things, failing to include material information in its packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures. Instead, Philips misrepresented to Plaintiffs that the Recalled Devices were safe for use.

569.     Philips was under a duty to disclose to, among others, Plaintiffs and their physicians, the serious health risks posed to users of the Recalled Devices because: (a) Philips was in a superior position to know the risks associated with the use of the Recalled Devices; (b) Philips was in a superior position to determine whether or not to disclose or conceal information regarding

the Recalled Devices in its packaging, labels, advertising, websites, and other communications and disclosures; (c) Philips had a duty to fully disclose all facts related to the serious health risks to users posed by the Recalled Devices; (d) Philips knew that Plaintiffs and their physicians could not reasonably have been expected to learn or discover the serious health risks posed by use of the Recalled Devices prior to using, purchasing, leasing, paying for, and/or recommending the Recalled Devices in general, and particularly given the representations, concealed material information, and omissions by Philips in its packaging, labels, advertising, websites, and other communications and disclosures; and (e) Philips has a duty to disclose information related to the health and safety of its products, including the Recalled Devices.

570.    By concealing and failing to disclose the Defect, Philips intentionally, knowingly, and recklessly allowed its packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures to mislead Plaintiffs, and their physicians, into believing that the Recalled Devices were safe for use.

571.    Philips knew that its concealment and omissions regarding the Defect in its packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures were false, deceptive, inadequate, and misleading.

572.    The information undisclosed and concealed by Philips was material. A reasonable person, including Plaintiffs, would find information that impacted on users' health and well-being, such as the serious adverse health risks associated with the use of the Recalled Devices, to be important when deciding whether to use the Recalled Devices.

573.    As a result of such deceptive packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures, Plaintiffs justifiably and reasonably believed the Recalled Devices were safe for use.

574.     Philips intentionally, knowingly, and recklessly concealed and omitted information about the Defect and its related serious health effects in its packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures regarding the Recalled Devices to induce Plaintiffs to use, purchase, lease, and pay for the Recalled Devices.

575.     Plaintiffs justifiably and reasonably relied on the omissions by Philips and used the Recalled Devices. Reasonable consumers would have been expected to rely on these omissions, in part, because they are omissions that seriously impact users' health and well-being.

576.     Philips' fraudulent conduct actually and proximately caused harm to Plaintiffs because absent Philips' concealment and omissions, Plaintiffs would have behaved differently and would not have used the Recalled Devices

577.     As a direct and proximate result of Philips' material omissions, misrepresentations, and concealment of material information regarding the adverse health effects to users of the Recalled Devices, Plaintiffs have been injured and suffered damages, in that their use of the Recalled Devices increased their risk of developing cancer, respiratory disease, cardiovascular disease, and other illnesses.

578.     As a direct and proximate result of Philips' material omissions, misrepresentations, and concealment of material information regarding the adverse health effects to users of the Recalled Devices, Plaintiffs have suffered serious and debilitating injuries and other economic harm.

579.     In addition, as a direct and proximate cause of Philips' material omissions, misrepresentations, and concealment of material information regarding the adverse health effects to users of the Recalled Devices, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

580.     Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XIV
## NEGLIGENT MISREPRESENTATION

581.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

582.     This claim is brought against the Philips Defendants.

583.     As set forth more fully above, Philips marketed and sold the Recalled Devices as machines that would help users breathe by, among other things, pumping air into users' lungs. While selling and profiting from the Recalled Devices, Philips knew, or should have known, that they were defective in that they posed serious health risks to users who would potentially be inhaling toxic fumes as they used the machines due to the degradation and off-gassing of the PE-PUR foam. Philips intentionally concealed this material information from consumers, users, payors, prescribers, and other healthcare providers, including Plaintiffs and their physicians, because to do otherwise would have resulted in users seeking safer alternatives to treat their breathing issues.

584.     Philips concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that the Recalled Devices were defective and would expose users to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam. These material omissions were misleading and deceptive standing alone and were particularly deceptive in light of the fact that the Recalled Devices were sold as breathing assistance devices.

585.     Philips had a duty to tell Plaintiffs and the public the truth about the risks and harms

155

associated with the Recalled Devices.

586.    Philips concealed from Plaintiffs and failed to disclose to them material information regarding the serious health risks posed to users of the Recalled Devices by, among other things, failing to include material information in its packaging, labels, advertisements, promotional materials, websites, and other communications and disclosures. Instead, Philips misrepresented to Plaintiffs that the Recalled Devices were safe for use.

587.    Philips was under a duty to disclose to, among others, Plaintiffs and their physicians, the serious health risks posed to users of the Recalled Devices because: (a) Philips was in a superior position to know the risks associated with the use of the Recalled Devices; (b) Philips was in a superior position to determine whether or not to disclose or conceal information regarding the Recalled Devices in its packaging, labels, advertising, websites, and other communications and disclosures; (c) Philips had a duty to fully disclose all facts related to the serious health risks to users posed by the Recalled Devices; (d) Philips knew that Plaintiffs and their physicians could not reasonably have been expected to learn or discover the serious health risks posed by use of the Recalled Devices prior to using, purchasing, leasing, paying for, and/or recommending the Recalled Devices in general, and particularly given the representations, concealed material information, and omissions by Philips in its packaging, labels, advertising, websites, and other communications and disclosures; and (e) Philips has a duty to disclose information related to the health and safety of its products, including the Recalled Devices.

588.    Philips breached its duty by falsely representing to Plaintiffs and the public that the Recalled Devices were safe for use when Defendants knew or should have known that the Recalled Devices were defective, and had not been properly or adequately tested.

589.     Philips failed to exercise ordinary care in the representation of the Recalled Devices during its manufacturing, sale, testing, quality assurance, quality control, and/or distribution into interstate commerce, in that Philips negligently misrepresented the safety and efficacy of the devices.

590.     As a direct and proximate result of Philips' material omissions, misrepresentations, and concealment of material information regarding the adverse health effects to users of the Recalled Devices, Plaintiffs have suffered serious and debilitating injuries and other economic harm.

591.     In addition, as a direct and proximate cause of Philips' material omissions, misrepresentations, and concealment of material information regarding the adverse health effects to users of the Recalled Devices, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

592.     Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XV
## NEGLIGENCE PER SE

593.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

594.     This claim is brought against the Philips Defendants.

595.     At all times, Philips had an obligation to comply with applicable statutes and regulations, including relevant and applicable statues and regulations promulgated by the FDA.

596.     Philips utilized the 510(k) process to receive clearances for each of its Recalled Devices except the E30 ventilator which was marketed under an EUA.

597.    Philips' actions as described herein violated applicable statutes and regulations related to, at a minimum, the 510(k) application process, including but not limited to 21 C.F.R. § 807 *et seq.*, and parallel state law requirements.

598.    Philips' actions as described herein violated applicable statutes and regulations related to its duty to monitor, investigate, evaluate and timely report issues with foam degradation, including 21 C.F.R. part 803 and 21 C.F.R. § 820.198, and parallel state law requirements.

599.    Plaintiffs are within the class of persons that these statutes and regulations are intended to protect.

600.    Plaintiffs' injuries and/or symptoms are the type of harm that these statutes and regulations are intended to prevent.

601.    Philips' violations of the foregoing statutes and regulations, among others, constitutes negligence per se.

602.    As a direct and proximate result of Philips' negligence per se, Plaintiffs have suffered serious and debilitating injuries.

603.    In addition, as a direct and proximate cause of Philips' negligence per se, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of exposure to the Foam Toxins.

604.    Plaintiffs demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XVI
## CONSUMER FRAUD AND/OR UNFAIR AND
## DECEPTIVE PRACTICES UNDER STATE LAW

605.   Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

606.   Certain Plaintiffs herein will bring a cause of action for consumer fraud and/or unfair and deceptive trade practices under applicable state law.

607.   This claim is brought against the Philips Defendants.

608.   Philips is on notice that such claims may be asserted by those Plaintiffs.

609.   Plaintiffs used the Recalled Devices and suffered ascertainable losses as a result of Philips' actions in violation of these consumer protection laws.

610.   Philips marketed and advertised the Recalled Devices to consumers, physicians, and other healthcare entities in each jurisdiction. In addition, in those jurisdictions, Philips sold the Recalled Devices, shipped Recalled Devices, and otherwise engaged in trade or commerce, or conducted business, related to the Recalled Devices.

611.   As set forth more fully above, Philips marketed and sold the Recalled Devices as machines that would help users breathe by, among other things, pumping air into the users' lungs. While selling and profiting from the Recalled Devices, Philips knew that they were defective in that they posed serious health risks to users who would potentially be inhaling toxic fumes as they used the machines due to the degradation and off-gassing of the PE-PUR foam. Philips intentionally concealed this material information from consumers, users, payors, prescribers, and other healthcare providers because to do otherwise would have resulted in purchasers and/or users seeking safer alternatives to treat their breathing issues. Instead, Philips misrepresented to Plaintiffs that the Recalled Devices were safe for use.

159

612.     Philips concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that the Recalled Devices were defective and would expose users to toxic gas as a result of the degradation and off-gassing of the PE-PUR foam. This material omission was misleading and deceptive standing alone and was particularly deceptive in light of the fact that the Recalled Devices were sold as breathing assistance devices.

613.     Philips' conduct described herein with respect to the Recalled Devices constitutes unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce and thus is unlawful under consumer protection laws.

614.     Had Philips not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased, leased, or used the Recalled Devices nor would Plaintiffs have incurred related medical costs and injuries from using the Recalled Devices.

615.     Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include, among others, the following: (a) representing that goods or services have approval, characteristics, uses, or benefits that they do not have; (b) advertising goods or service with the intent not to sell them as advertised; and (c) engaging in fraudulent or deceptive conduct that creates a likelihood of confusion.

616.     Plaintiffs were injured and suffered ascertainable losses of money or property by Philips' unlawful conduct.

617.     Philips' deceptive, unconscionable, unfair, and/or fraudulent representations and material omissions to Plaintiffs constitute consumer fraud and/or unfair and deceptive acts and trade practices in violation of consumer protection statutes, including but not limited to:

  a.      Ala. Code § 8-19-1, *et seq.*;

  b.      Alaska Stat. § 45.50.471, *et seq.*;

c.      Ariz. Rev. Stat. Ann. § 44-1521, *et seq.*;

d.      Ark. Code Ann. § 4-88-101, *et seq.*;

e.      Cal. Civ. Code § 1770, *et seq.*;

f.      Cal. Bus. & Prof. Code § 17200, *et seq.*;

g.      Cal. Bus. & Prof. Code § 17500, *et seq.*;

h.      Colo. Rev. Stat. § 6-1-101, *et seq.*;

i.      Conn. Gen. Stat. § 42-110a, *et seq.*;

j.      Del. Code Ann. tit. 6, § 2511, *et seq.*, § 2531, *et seq.*;

k.      D.C. Code Ann. § 28-3901, *et seq.*;

l.      Fla. Stat. Ann. § 501.201, *et seq.*;

m.      Fla. Stat. Ann. § 817.06, 817.41, *et seq.*;

n.      Ga. Code Ann. § 10-1-390, *et seq.*;

o.      Ga. Code. Ann. § 10-1-370, *et seq.*;

p.      Haw. Rev. Stat. § 480-1, *et seq.*;

q.      Id. Code Ann. § 48-601, *et seq.*;

r.      Ill. Comp. Stat. Ann. Ch. 815, 505/1, *et seq.*;

s.      815 Ill. Comp. Stat. Ann. § 510/1, *et seq.*;

t.      Ind. Code Ann. § 24-5-0.5-1, *et seq.*;

u.      Iowa Code Ann. § 714H.1, *et seq.*;

v.      Kan. Stat. Ann. § 50-623, *et seq.*;

w.      Ky. Rev. Stat. Ann. § 367.110, *et seq.*;

x.      La. Rev. Stat. Ann. § 51:1401, *et seq.*;

y.      La. Civ. Code art. 2520, *et seq.*;

z.      Me. Rev. Stat. Ann. tit. 5, § 205A, *et seq.*;

aa.     10 Me. Rev. Stat. tit. § 1211, *et seq.*;

bb.     Md. Code Ann., Com. Law § 13-101, *et seq.*;

cc.     Mass. Gen. Laws Ann. Ch. 93A, *et seq.*;

dd.     Mich. Comp. Laws § 445.901, *et seq.*;

ee.     Minn. Stat. § 325D.43, *et seq.*, §§ 325F.67-325F.69, *et seq.*;

ff.     Miss. Code Ann. § 75-24-1, *et seq.*;

gg.     Mo. Ann. Stat. § 407.010, *et seq.*;

hh.     Mont. Code Ann. § 30-14-101, *et seq.*;

ii.     Neb. Rev. Stat. § 59-1601, *et seq.*;

jj.     Neb. Rev. Stat. § 87-301, *et seq.*;

kk.     Nev. Rev. Stat. § 598.0915, *et seq.*;

ll.     N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*;

mm.     N.J. Stat. Ann. § 56:8-2, *et seq.*;

nn.     N.M. Stat. Ann. § 57-12-1, *et seq.*;

oo.     N.Y. Gen. Bus. Law § 349, *et seq.*, § 350-e, *et seq.*;

pp.     N.C. Gen. Stat. § 75-1.1, *et seq.*;

qq.     N.D. Cent. Code § 51-12-01, *et seq.*, § 51-15-01, *et seq.*;

rr.     Ohio Rev. Code Ann. § 1345.01, *et seq.*;

ss.     Okla. Stat. tit. 15 § 751, *et seq.*;

tt.     Or. Rev. Stat. § 646.605, *et seq.*;

uu.     73 Pa. Stat. § 201-1, *et seq.*;

vv.     R.I. Gen. Laws § 6-13.1-1, *et seq.*;

162

ww.    S.C. Code Ann. § 39-5-10, *et seq.*;

xx.    S.D. Codified Laws § 37-24-1, *et seq.*;

yy.    Tenn. Code Ann. § 47-18-101, *et seq.*;

zz.    Tex. Bus. & Com. Code Ann. §17.41, *et seq.*;

aaa.   Utah Code Ann. § 13-11-1, *et seq.*;

bbb.   Utah Code Ann. § 13-11a-1, *et seq.*;

ccc.   Vt. Stat. Ann. tit. 9, § 2451, *et seq.*;

ddd.   Va. Code Ann. § 59.1-196, *et seq.*;

eee.   Wash. Rev. Code § 19.86.010, *et seq.*;

fff.   W. Va. Code § 46A-6-101, *et seq.*;

ggg.   Wis. Stat. Ann. § 100.18, *et seq.*;

hhh.   Wyo. Stat. Ann. § 40-12-101, *et seq.*

618.   Under these and other consumer protection statutes, Philips is the supplier, manufacturer, advertiser, and seller of the Recalled Devices, subject to liability under such legislation from fraudulent, unfair, deceptive, and unconscionable consumer sales practices.

619.   The actions and omissions of Philips are uncured or incurable.

620.   Philips was put on notice of these issues by the investigation of the FDA, numerous complaints filed against Philips, and individual letters and communications from certain Plaintiffs and others within a reasonable amount of time after Philips' conduct was publicly disclosed.

621.    Philips had actual knowledge of the defective and dangerous condition of the Recalled Devices and failed to take any action to cure those conditions.

622.   Plaintiffs relied upon Philips' misrepresentations and omissions in deciding to use the Recalled Devices.

623.     By reason of the fraudulent, deceptive, unfair, and/or otherwise unlawful acts engaged in by Philips, and as a direct and proximate result thereof, Plaintiffs have sustained injuries and other damages.

624.     Plaintiffs demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XVII
## UNJUST ENRICHMENT (in the alternative)

625.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

626.     This claim is brought against the Philips Defendants and the PolyTech Defendants.

627.     As set forth more fully above, Philips marketed and sold the Recalled Devices as machines that would help users breathe by, among other things, pumping air into users' lungs. While selling and profiting from the Recalled Devices, Philips and PolyTech knew that they were defective in that they posed serious health risks to users who would potentially be inhaling toxic fumes as they used the machines due to the degradation and off-gassing of the PE-PUR foam. Philips and PolyTech intentionally concealed this material information from consumers, users, payors and health professionals because to do otherwise would have resulted in purchasers and/or users seeking safer alternatives to treat their breathing issues. Instead, Philips and PolyTech misrepresented to Plaintiffs that the Recalled Devices were safe for use.

628.     Philips and PolyTech concealed and failed to disclose in any of its marketing materials, advertising, packaging, and/or any other communication that the Recalled Devices were defective and would expose users to Foam Toxins as a result of the degradation and off-gassing of the PE-PUR foam. These material omissions were misleading and deceptive standing alone and

were particularly deceptive in light of the fact that the Recalled Devices were sold as breathing assistance devices.

629.    Philips and PolyTech were unjustly enriched as a result of their wrongful conduct.

630.    Plaintiffs conferred a tangible and material economic benefit upon Philips and PolyTech by using the Recalled Devices that were purchased or leased on their behalf. Plaintiffs would not have used the Recalled Devices had they known about the Defect and the true risks of using the Recalled Devices.

631.    Philips and PolyTech readily accepted and retained these benefits. Philips and PolyTech profited from the sales and leases of the Recalled Devices to the detriment and expense of Plaintiffs.

632.    Philips and PolyTech appreciated these benefits which were the expected result of Philips and PolyTech acting in their pecuniary interest at the expense of their customers and users of the Recalled Devices. Philips and PolyTech knew they was acting to the detriment of Plaintiffs because they were aware of the Defect, they failed to disclose this knowledge, and thereby misled Plaintiffs regarding the nature and quality of the Recalled Devices while profiting from this deception.

633.    There is no justification for Philips' and PolyTech's enrichment. Under these circumstances, it would be unjust, inequitable, and unconscionable for Philips and PolyTech to retain the economic benefits it received at the expense of Plaintiffs because they were procured as a result of Philips' and PolyTech's wrongful conduct. Failing to require Philips and PolyTech to provide remuneration under these circumstances would result in them being unjustly enriched at the expense of Plaintiffs who endure being exposed to the risk of developing serious medical conditions and can no longer use their machines safely.

634.     Philips' and PolyTech's retention of the benefits conferred upon it by Plaintiffs would be unjust and inequitable.

635.     Plaintiffs are entitled to restitution of the benefits Philips and PolyTech unjustly retained and/or any amounts necessary to return Plaintiffs to the position they occupied prior to dealing with Philips and PolyTech, such amounts to be determined at trial.

636.     Plaintiffs plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

**COUNT XVIII**
**LOSS OF CONSORTIUM**

637.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

638.     This claim is brought against the Philips Defendants and the PolyTech Defendants.

639.     At all relevant times, certain Plaintiffs were married to spouses or had minor children.

640.     As a result of the injuries and damages sustained by certain Plaintiffs, their spouses and minor children have suffered the loss of care, comfort, society, and affection from Plaintiffs.

641.     Plaintiffs demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

**COUNT XIX**
**SURVIVORSHIP AND WRONGFUL DEATH**

642.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

643.     This claim is brought against the Philips Defendants and the PolyTech Defendants.

644.     Certain Plaintiffs suffered and incurred a premature and untimely death as a result of the Recalled Devices.

645.     Plaintiff-Decedent would not have used the Recalled Devices but for the wrongful conduct of Philips and PolyTech. Similarly, as alleged throughout this Master Long Form Complaint and as incorporated herein, Philips and PolyTech are liable for the Plaintiff-Decedent's suffering and death, for each Plaintiff-Decedent's survivors' damages, for damages sustained by the Plaintiff-Decedent's estate, and all other injuries and damages flowing from Plaintiff-Decedent's death.

646.     Plaintiff-Decedent's demand judgment against Philips and PolyTech and request compensatory damages, punitive damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## COUNT XX
## MEDICAL MONITORING

647.     Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

648.     This claim is brought against the Philips Defendants and the PolyTech defendants.

649.     Plaintiffs bring an independent claim of medical monitoring against Philips and PolyTech.

650.     As alleged above, Philips' and PolyTech's Recalled Devices contained defective PE-PUR foam that exposed patients using the devices to the Foam Toxins. The Foam Toxins are hazardous, life-threatening, toxic substances that are known to cause cancer and other illnesses, diseases, and disease processes in humans.

651.     Philips and PolyTech understood, at all relevant times, that a chemical that causes cancer in animal studies must be presumed to present a risk of cancer to humans, except in

extraordinarily limited circumstances; specifically, when (1) the precise mechanism of action that causes tumors is known, and (2) it is also known that the mechanism of action is either not operative or cannot occur in humans. That extraordinary circumstance does not exist here.

652.    Studies show that the persistent exposure to the Foam Toxins results in their presence, accumulation, toxic invasion, and/or persistence in the human bloodstream, including the bloodstream of Plaintiffs; resulting in injurious, physically harmful, unwanted, unconsented-to, and deleterious alterations, changes, and/or other presently-existing physical injuries and/or adverse impacts to the blood and/or bodies of Plaintiffs, including but not limited to subcellular injuries.

653.    Moreover, based on available scientific literature, exposure to the Foam Toxins places Plaintiffs at risk of developing a number of serious illnesses and diseases, including but not limited to the following: cancer, including cancer as of the head, neck, kidneys, liver, brain, pancreas, blood-forming tissue, respiratory system, gastrointestinal system, reproductive system, and lymphatic system; respiratory diseases such as asthma, chronic bronchitis, chronic obstructive pulmonary disease, constrictive bronchiolitis or obliterative bronchiolitis, emphysema, interstitial lung disease, pleuritis, pulmonary fibrosis, sarcoidosis; and chronic sinusitis, chronic rhinitis, and other forms of chronic inflammation. The Foam Toxins are cytotoxic and genotoxic; as such, exposure causes widespread damage to DNA as well as the reproductive system, neurological system, and other critical systems.

654.    Plaintiffs have been significantly exposed to the proven hazardous Foam Toxins released by PE-PUR foam in the Recalled Devices. Plaintiffs have inhaled and/or ingested these Foam Toxins through their respiratory tract and gut, where they were absorbed into tissue and into Plaintiffs' bloodstream, producing subcellular or other physiological changes in Plaintiffs.

655.     Philips and PolyTech did not seek or obtain permission or consent from Plaintiffs before engaging in such acts and/or omissions that caused, allowed, and/or otherwise resulted in the contamination of Plaintiffs' bloodstream and/or bodies with the Foam Toxins.

656.     As a proximate result of Philips' and PolyTech's acts and omissions, Plaintiffs are at an increased risk of developing cancer and other illnesses, diseases, and disease processes above the normal base-level risk.

657.     Plaintiffs are at this increased risk of cancer and other serious health conditions because they were exposed to, inhaled, consumed, and/or ingested the Foam Toxins in quantities, and over periods of time, sufficient to establish levels of exposure that are hazardous to health; and sufficient to cause cancer and other serious ailments; or increase the risk of developing cancer and other serious ailments.

658.     Plaintiffs may not develop all, or some, of the forms of cancer or various adverse health conditions for many years.

659.     In addition to the injuries they have already suffered, Plaintiffs are reasonably concerned and fearful of the worsening, or additional, effects from exposure to the Foam Toxins. This includes the synergistic effects of having multiple toxic and carcinogenic materials in their blood at the same time; and what such effects will and/or are reasonably likely or probable to do to them and their children, including the well-founded and reasonable fear of cancer and other serious diseases that have long latency periods after such exposures.

660.     The exposure was solely and proximately caused by Philips' and PolyTech's acts and omissions, including: their failure to adequately design and manufacture their Recalled Devices to satisfy applicable standards imposed by law and regulation; their failure to address known issues with the PE-PUR foam during quality control testing; their material

misrepresentations, false statements, and other deceptive practices in continuing to claim that the Recall Devices were safe for use.

661.    Philips and PolyTech owed duties to the Plaintiffs: to ensure and warrant that the Recalled Devices were indeed designed and manufactured to satisfy applicable standards imposed by law and regulation; to disclose to Plaintiffs any defect or other potential health hazard known or discoverable by Philips; and to ensure that the Recalled Devices were safe, reliable, and non-hazardous for human consumption-their intended purpose.

662.    As alleged in this Complaint, Philips' and PolyTech's negligent acts and omissions resulted in an increased risk for all Plaintiffs of developing cancer or other serious health conditions. Cancer is a serious disease that causes life-threatening illness and debilitating cellular, genetic, and physical injury. Technology, analytical tools, test and/or monitoring procedures exist and are readily available to detect cancer and other deleterious health conditions in patients. These technologies, tools tests and/or monitoring procedures are accepted and widely used by the scientific and medical community. The existing scientific methods include, but are not limited to: blood and laboratory tests; physical examinations; imaging; colonoscopies, endoscopies, and other similar methods for examination; biopsies; pathologic, histologic, and oncologic evaluations; and oncologic, histologic, surgical and other necessary medical consultations.

663.    Early detection of cancer and other serious health conditions in patients is one of the best, and sometimes the only, means to treat cancer and other ailments such that they do not cause lasting, permanent injury, illness, or death.

664.    Early detection of cancer and other serious health conditions in patients necessarily allows patients to avail themselves of myriad forms of treatment, each of which is capable to

altering the course of the illness, such as bringing the cancer into remission, removal of any malignant tumors, and other treatment to alleviate injury.

665.    The tests and treatments for the early detection and treatment of cancer and other serious health conditions must be prescribed by a qualified physician, and are conducted according to the latest, contemporary, and widely accepted scientific principles. Because screenings for cancer and other serious health conditions associated with the Foam Toxins may not be conducted with the frequency necessary to identify those illnesses in the absence of exposure to the Foam Toxins, the prescribed monitoring regime is different from that normally recommended in the absence of exposure. Further, Plaintiffs require more frequent screenings not within the purview of routine medical exams.

666.    Plaintiffs seek injunctive and monetary relief, including compensatory damages for, and the creation of a fund to adequately finance the costs of: (1) providing necessary testing, evaluations, examinations, screenings, and other necessary medical consultations; (2) providing all necessary medical and surgical procedures including consultation, diagnosis, and treatment; and (3) providing for all necessary attorneys' fees, costs, interest, and such further relief as the Court deems equitable and just.

## COUNT XXI
## PUNITIVE DAMAGES

667.    Plaintiffs re-allege and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

668.    This claim is brought against the Philips Defendants and the PolyTech Defendants.

669.    Philips' and PolyTech's conduct as set forth herein constitutes intentional, fraudulent, malicious and/or reckless conduct; and wanton and willful disregard of the rights and health of the Plaintiffs.

171

670.     Plaintiffs are thus entitled to punitive damages.

671.     Plaintiffs demand judgment against Philips and PolyTech and request punitive damages, and such other relief as the Court deems equitable and just.

## VII.     PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that this Court:

A.     award all damages to which Plaintiffs are entitled (including, without limitation, compensatory damages for pain and suffering, emotional distress damages, past and future medical expenses, past and future loss of wages and wage earning capacity, and other economic damages; loss of consortium, medical monitoring; statutory damages; punitive, exemplary and treble damages; and loss of services, support and consortium);

B.     award pre-judgment and post-judgment interest on such monetary relief;

C.     award reasonable attorneys' fees and costs; and

D.     grant such further and other relief that this Court deems appropriate.

## VIII.   JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Dated:  October 24, 2022                          Respectfully submitted,

*/s/ Sandra L. Duggan*                             */s/ Kelly K. Iverson*
Sandra L. Duggan, Esquire                         Kelly K. Iverson, Esquire
**LEVIN SEDRAN & BERMAN LLP**       **LYNCH CARPENTER, LLP**
510 Walnut Street, Suite 500                      1133 Penn Avenue, 5th Floor
Philadelphia, PA 19106                            Pittsburgh, PA 15222
(215)592-1500 (phone)                             (412) 322-9243 (phone)
(215)592-4633 (fax)                               kelly@lcllp.com
sduggan@lfsblaw.com

172

*/s/ Christopher A. Seeger*
Christopher A. Seeger, Esquire
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
(973) 639-9100 (phone)
cseeger@seegerweiss.com

*/s/ Steven A. Schwartz*
Steven A. Schwartz, Esquire
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041
(610) 642-8500 (phone)
steveschwartz@chimicles.com

*Plaintiffs' Co-Lead Counsel*

William Audet, Esquire
**AUDET & PARTNERS, LLP**
711 Van Ness, Suite 500
San Francisco, CA 94102
(415) 568-2555 (phone)
(415) 568-2556 (fax)
waudet@audetlaw.com

Ron Anthony Austin, Esquire
**RON AUSTIN LAW, LLC**
400 Manhattan Blvd.
Harvey, LA 70058
(504) 227-8100 (phone)
(504) 227-8122 (fax)
raustin@ronaustinlaw.com

Shanon J. Carson, Esquire
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
(215) 875-4656 (phone)
(215) 875-4604 (fax)
scarson@bm.net

Lauren Sanderson Miller, Esquire
**HAGENS BERMAN SOBOL SHAPIRO
LLP**
1301 2nd Ave, Suite 2000
Seattle, WA 98101
(206) 623-7292 (phone)
laurenm@hbsslaw.com

Michael J. Blakely, Jr., Esquire
**POPE MCGLAMRY, P.C.**
3391 Peachtree Road, NE, Suite 300
Atlanta, GA 30326
(404) 523-7706 (phone)
mjblakely@pmkm.com

Virginia Marie Buchanan, Esquire
**LEVIN, PAPANTONIO, RAFFERTY,
PROCTOR, BUCHANAN, O'BRIEN,
BARR & MOUGEY, P.A.**
316 S Baylen Street, Suite 600
Pensacola, FL 32502
(850) 435-7023 (phone)
(850) 436-6023 (fax)
vbuchanan@levinlaw.com

Jason Rathod, Esquire
**MIGLIACCIO & RATHOD LLP**
412 H St NE, Suite 302
Washington, DC 20002
(202) 509-5951 (phone)
(202) 800-2730 (fax)
jrathod@classlawdc.com

Joyce Chambers Reichard, Esquire
**KELLEY & FERRARO, LLP**
Ernst & Young Tower
950 Main Avenue, Suite 1300
Cleveland, OH 44113
(216) 575-0777 (phone)
(216) 575-0799 (fax)
jreichard@kelley-ferraro.com

Michael F. Ram, Esquire
**MORGAN & MORGAN**
Complex Litigation Group
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
(415) 358-6913 (phone)
(415) 358-6293 (fax)
MRam@forthepeople.com

David S. Stellings, Esquire
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
250 Hudson St., 8th Floor
New York, NY 10013
(212) 355-9500 (phone)
dstellings@lchb.com

Dena C. Sharp, Esquire
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
(415) 981-4800 (phone)
dsharp@girardsharp.com

*Plaintiffs' Steering Committee*

/s/ D. Aaron Rihn
D. Aaron Rihn, Esquire
**ROBERT PIERCE & ASSOCIATES, P.C.**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 (phone)
(412) 281-4229 (fax)
arihn@peircelaw.com

Peter St. Tienne Wolff, Esquire
**PIETRAGALLO GORDON ALFANO**
**BOSICK & RASPANTI, LLP**
One Oxford Centre - 38th Floor
Pittsburgh, PA 15219
(412) 263-2000 (phone)
(412) 263-2001 (fax)
psw@pietragallo.com

*Co-Liaison Counsel*

Miriam Fresco Agait, Esquire
**RUBENSTEIN LAW, P.A.**
9130 S. Dadeland Blvd, Suite PH
Miami, FL 33156
(305) 661-6000 (phone)
(305) 670-7555 (fax)
mfagrait@rubensteinlaw.com

Kristina Anderson, Esquire
**HENSLEY LEGAL GROUP, PC**
117 E. Washington Street, Ste 200
Indianapolis, IN 46204
(317) 472-3333 (phone)
kanderson@hensleylegal.com

Ava Cavaco, Esquire
**MESHBESHER & SPENCE**
1616 Park Avenue
Minneapolis, MN 55404
(612) 339-9121 (phone)
(612) 339-9188 (fax)
acavaco@meshbesher.com

Syreeta Defrance-Poindexter, Esquire
**BABIN LAW, LLC**
22 E. Gay Street, Suite 200
Columbus OH 43215
(614) 761-8800 (phone)
(614) 706-1775 (fax)
syreeta.poindexter@babinlaws.com

Claire E. Kreider, Esquire
**GAINSBURGH, BENJAMIN, DAVID,**
**MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163
(504) 522-2304 (phone)
cberg@gainsben.com

Kathryn L. Harrison, Esquire
**CAMPBELL & LEVINE, LLC**
1700 Grant Building, Ste. 1700
Pittsburgh, PA 15219
(412) 261-0310 (phone)
(412) 261-5066 (fax)
kharrison@camlev.com

Inez Johnson Ross, Esquire
**ONDER LAW, LLC**
110 East Lockwood, 2nd Floor
St. Louis, MO 63119
(314) 227-7674 (phone)
(314) 963-1700 (fax)
iross@onderlaw.com

Ashley B. DiLiberto, Esquire
**MESSA & ASSOCIATES, P.C.**
123 S. 22nd Street
Philadelphia, PA  19103
(215) 568-3500 (phone)
(215) 568-3501 (fax)
adiliberto@messalaw.com

Ian W. Sloss, Esquire
**SILVER GOLUB & TEITELL LLP**
One Landmark Square, 15th Floor
Stamford, CT 06901
(203) 325-4491 (phone)
isloss@sgtlaw.com

Kevin W. Tucker, Esquire
**EAST END TRIAL GROUP LLC**
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
(412) 877-5220 (phone)
ktucker@eastendtrialgroup.com

*Leadership Development Committee*

Roberta D Liebenberg, Esquire (Chair)
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
(215) 567-6565 (phone)
(215) 568-5872 (fax)
rliebenberg@finekaplan.com

Arthur H. Stroyd, Jr., Esquire (Vice Chair)
**DEL SOLE CAVANAUGH STROYD LLC**
3 PPG Place, Suite 600
Pittsburgh, PA 15222
(412) 261-2172 (phone)
(412) 261-2110 (fax)
astroyd@dscslaw.com

Lisa Ann Gorshe, Esquire (Vice Chair)
**JOHNSON BECKER PLLC**
444 Cedar Street, Ste 1800
Saint Paul, MN 55101
(612) 436-1852 (phone)
(612) 436-1801 (fax)
lgorshe@johnsonbecker.com

*Settlement Committee*

175

Alyson L. Oliver, Esquire
**OLIVER LAW GROUP PC**
1647 W. Big Beaver Road
Troy, MI 48084-5380
(248) 327-6556 (phone)
(248) 436-3385 (fax)
aoliver@oliverlawgroup.com

*Time & Expenses Subcommittee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was filed via the Court's CM/ECF system on this 24th day of October 2022 and is available for download by all counsel of record.

*/s/ D. Aaron Rihn*
D. Aaron Rihn, Esquire
PA I.D. No.: 85752
ROBERT PEIRCE & ASSOCIATES, P.C.
707 Grant Street
Suite 125
Pittsburgh, PA 15219
Tel: 412-281-7229
Fax: 412-281-4229
arihn@peircelaw.com