## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **IN RE: PHILIPS RECALLED CPAP, BI-LEVEL PAP, AND MECHANICAL VENTILATOR PRODUCTS LITIGATION**<br><br>**This Document Relates to:**<br>*All Actions* | **Master Docket: Misc. No. 21-mc-1230-JFC**<br><br>**MDL No. 3014** |

## PLAINTIFFS' BRIEF IN OPPOSITION TO THE PHILIPS DEFENDANTS' <u>MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>

## <u>TABLE OF CONTENTS</u>

Table of Authorities ........................................................................................................ ii

I.       INTRODUCTION ................................................................................................ 1

II.      FACTUAL BACKGROUND .............................................................................. 3

         A.       All of the Philips Defendants Function as a Unified Enterprise
                  Tightly Controlled by Royal Philips ...................................................... 3

         B.       Royal Philips Was Directly Involved with Launching and Marketing
                  the Recalled Devices. .............................................................................. 6

         C.       Philips NA was Directly Involved with and Independently Contributed
                  to the Design, Development, and Sales of the Recalled Devices. ........ 11

III.     LEGAL STANDARD .......................................................................................... 12

         A.       General Pleading Standards ................................................................... 12

         B.       Fed. R. Civ. P. 9(b) Standards ............................................................... 13

IV.      ARGUMENT ....................................................................................................... 13

         A.       The Non-Philips RS Defendants are Sufficiently on Notice of the
                  Specific Allegations Against Them. ...................................................... 13

         B.       Plaintiffs Set Forth Specific Allegations of Liability for Each of the
                  Claims Against Royal Philips and Philips NA ...................................... 17

                  1.       Fraud Claims. ............................................................................. 17

                  2.       RICO Claim. .............................................................................. 21

                  3.       Warranty Claims. ....................................................................... 22

                  4.       Unjust Enrichment. .................................................................... 23

                  5.       Negligent Failure to Recall/Negligent Recall Claim. ............... 24

         C.       The Non-Philips RS Defendants and Philips RS Are Alter Egos and Agents
                  of One Another. ...................................................................................... 26

V.       CONCLUSION .................................................................................................... 30

i

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

**Cases**

*Amos v. Franklin Fin. Servs. Corp.*,
　509 F. App'x 165 (3d Cir. 2013) ...................................................................... 21

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009) ...................................................................................... 12

*Behr v. Fed. Home Loan Mortg. Corp.*,
　2015 WL 5123656 (W.D. Pa. July 29, 2015), *report and recommendation adopted as
　modified*, 2015 WL 5132519 (W.D. Pa. Sept. 1, 2015) ........................................ 29

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007) ...................................................................................... 12

*Binder v. Weststar Mortgage, Inc.*,
　2016 WL 3762710 (E.D. Pa. July 13, 2016) ..................................................... 16

*Blair v. Infineon Technologies*,
　720 F. Supp. 2d 462 (D. Del. 2010) ........................................................... 27, 28

*BPI Sports, LLC v. ThermoLife International, LLC*,
　2020 WL 10180910 (S.D. Fla. Jan. 9, 2020) ..................................................... 27

*Brit. Telecommunications PLC v. IAC/InteractiveCorp*,
　356 F. Supp. 3d 405 (D. Del. 2019) ................................................................. 28

*Brocious Trucking, Inc. v. BFL, Inc.*,
　2010 WL 569559 (W.D. Pa. Feb. 11, 2010) ..................................................... 28

*Brotherhood of Locomotive Engineers v. Springfield Terminal Ry. Co.*,
　210 F.3d 18 (1st Cir. 2000) ............................................................................ 28

*Brown v. Dynamic Pet Prod. and Frick's Meat Prod., Inc.*,
　2017 WL 4680125 (S.D. Cal. Oct. 18, 2017) ................................................... 15

*Chambers v. SD Holdings, LLC*,
　2017 WL 6026428 (W.D. Pa. Dec. 5, 2017) ..................................................... 28

*Craftmatic Sec. Litig. v. Kraftsow*,
　890 F.2d 628 (3d Cir. 1989) ........................................................................... 15

*Dassault Falcon Jet Corp. v. Oberflex, Inc.*,
　909 F. Supp. 345 (M.D.N.C. 1995) ................................................................. 23

ii

*Feldman v. Mercedes-Benz USA, LLC*,
   2012 WL 6596830 (D.N.J. Dec.18, 2012) ........................................................................ 18

*Hisey v. QualTek USA, LLC*,
   2019 WL 3936555 (E.D. Pa. Aug. 16, 2019) .................................................................... 16

*In re Delta Dental Antitrust Litig.*,
   509 F. Supp. 3d 1377 (J.P.M.L. 2020) ............................................................................. 27

*In re JUUL Labs, Inc., Mktg., Sales Pracs., and Prod. Liab. Litig.*,
   533 F. Supp. 3d 858 (N.D. Cal. 2021) ............................................................................. 22

*In re Milo's Dog Treats Consol. Cases*,
   9 F. Supp. 3d 523 (W.D. Pa. 2014) ......................................................................... 21, 23

*In re Terazosin Hydrochloride*,
   220 F.R.D. 672 (S.D. Fla. 2004) ..................................................................................... 23

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2011 WL 4501223 (N.D. Cal. Sept. 28, 2011) ................................................................. 24

*In re Volkswagen Timing Chain Prod. Liab. Litig.*,
   2017 WL 1902160 (D.N.J. May 8, 2017) ......................................................................... 15

*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2009) ........................................................................................... 21

*Intell. Ventures I LLC v. Toshiba Corp.*,
   66 F. Supp. 3d 495 (D. Del. 2014) .................................................................................. 28

*Kearney v. Bayerische Motoren Werke Aktiengesellschaft*,
   2018 WL 4144683 (D.N.J. Aug. 29, 2018) ...................................................................... 14

*Kehr Packages, Inc. v. Fidelcor, Inc.*,
   926 F.2d 1406 (3d Cir. 1991) ......................................................................................... 22

*Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*,
   723 F. Supp. 2d 676 (D. Del. 2010) ............................................................................... 29

*Lasche v. New Jersey*,
   2022 WL 604025 (3d Cir. Mar. 1, 2022) ........................................................................ 12

*M.B. v. Schuylkill Cty.*,
   375 F. Supp. 3d 574 (E.D. Pa. 2019) ........................................................................ 14, 16

*Majdipour v. Jaguar Land Rover N. Am.*, LLC,
   2013 WL 5574626 (D.N.J. Oct. 9, 2013) ........................................................................ 17

*McElroy v. FirstEnergy Corp.*,
   824 F. App'x 97 (3d Cir. 2020) ............................................................................. 27

*Montich v. Miele USA, Inc.*,
   849 F. Supp. 2d 439 (D.N.J. 2012) ........................................................................ 18

*Munning v. Gap, Inc.*,
   2016 WL 6393550 (N.D. Cal. Oct. 28, 2016) ....................................................... 16

*Nasdaq, Inc. v. IEX Group, Inc.*,
   2019 WL 102408 (D.N.J. Jan. 4, 2019) ................................................................... 3

*Old Orchard Urban Ltd. Partnership v. Harry Rosen, Inc.*,
   904 N.E.2d 1050 (Ill. App. Ct.), *appeal denied*, 919 N.E.2d 355 (Ill. Sup. Ct. 2009) ............ 27

*Opheim v. Aktiengesellschaft*,
   2021 WL 2621689 (D.N.J. June 25, 2021) ............................................................ 15

*Powell v. Subaru of Am., Inc.*,
   502 F. Supp. 3d 856 (D.N.J. 2020) ........................................................................ 23

*PPG Indus., Inc. v. Generon IGS, Inc.*,
   760 F. Supp. 2d 520 (W.D. Pa. 2011) .................................................................... 13

*Realmark, Inc. v. American Financial Corp.*,
   171 B.R. 692 (Bankr. N.D. Ga. 1994) .................................................................... 27

*Schechter v. Hyundai Motor Am.*,
   2020 WL 1528038 (D.N.J. Mar. 31, 2020) ............................................................ 18

*Scott v. NG U.S. 1, Inc.*,
   881 N.E. 2d 1125 (Mass. 2008) ............................................................................. 27

*Seven Springs Mt. Resort, Inc. v. Hess*,
   2022 WL 1004178 (W.D. Pa. Apr. 4, 2022) .......................................................... 28

*Seville Indus. Mach. Corp. v. Southmost Machinery Corp.*,
   742 F.2d 786 (3d Cir. 1984) .................................................................................. 13

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
   737 F. Supp. 2d 380 (E.D. Pa. 2010) .................................................................... 24

*Slippery Rock Area Sch. Dist. v. Tremco, Inc.*,
   2016 WL 3198122 (W.D. Pa. 2016) ...................................................................... 17

*Stewart v. Beam Glob. Spirits & Wine, Inc.*,
   877 F. Supp. 2d 192 (D.N.J. 2012) ........................................................................ 24

iv

*Stewart v. Smart Balance, Inc.*,
  2012 WL 4168584 (D.N.J. June 26, 2012) ........................................................ 22, 23

*TAC-Critical Systems, Inc. v. Integrated Facility Systems, Inc.*,
  808 F. Supp. 2d 60 (D.D.C. 2011) ............................................................................ 28

*Tatel v. Mt. Lebanon Sch. Dist.*,
  2022 WL 15523185 (W.D. Pa. Oct. 27, 2022)........................................................... 12

*Trustees of Nat.'l Elevator Indus. Pension Fund v. Lutyk*,
  332 F.3d 188 (3d Cir. 2003).......................................................................................... 28

*United States v. Bruno*,
  2014 WL 1788910 (E.D. Pa. May 6, 2014) ............................................................. 22

*Winner v. Etkin & Co.*,
  2007 WL 2616084 (W.D. Pa. Sept. 6, 2007) ........................................................... 29

**Statutes**

18 U.S.C. §1962(c) ................................................................................................................ 21

**Rules**

Fed. R. Civ. P. 8................................................................................................................ 14, 17

Fed. R. Civ. P. 9(b) ............................................................................................................. i, 13

**Other Authorities**

Restatement (First) of Restitution §1 (1937) ................................................................... 23

Restatement (Second) of Conflicts §302 (1971)............................................................... 27

## I.    **INTRODUCTION**

Philips[1] designs, manufactures, markets, and sells CPAP, BiPAP, and ventilator devices that are intended to help people breathe. ¶ 3.[2] Philips sold 11.3 million of these Devices in the United States from 2008 until June 14, 2021, when they were recalled because they contained toxic polyester polyurethane ("PE-PUR") foam. ¶ 5. Philips knew that these Devices were defective because the foam is "susceptible to breaking down into particles which may then be inhaled or ingested by the user, and may emit volatile organic compounds ("VOCs") that can also be inhaled, resulting in 'serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment.'" ¶ 7.

Despite having functioned for more than a decade as a single, unified Philips entity maximizing profits from sales of the Devices by concealing their defect while marketing them to unsuspecting users, the non-Philips RS Defendants[3] filed a Motion to Dismiss[4] seeking dismissal of Plaintiffs' claims against them in an effort to shift all accountability for their misconduct to Philips RS. In support of this effort, the non-Philips RS Defendants mischaracterize or ignore the allegations in the Complaint, and distort the applicable law.

The non-Philips RS Defendants begin with false hyperbole, arguing the Complaint "rests on the conduct of Respironics *alone*" and "Plaintiffs offer *nothing at all*" regarding the pre-recall involvement of the non-Philips RS Defendants. Br. at 1 (emphasis in original). However, Plaintiffs

---

[1] "Philips" or "Defendants" refers collectively to Koninklijke Philips N.V. ("Royal Philips"), Philips North America LLC ("Philips NA"), Philips Holding USA Inc., Philips RS North America Holding Corporation, and Philips RS North America LLC, f/k/a Respironics, Inc. ("Philips RS" or "Respironics").

[2] Paragraph citations ("¶" or "¶¶") refer to the Consolidated Third Amended Class Action Complaint for Economic Losses (ECF 785) ("Complaint"). "Recalled Devices" or "Devices" refers to the devices at issue.

[3] The term "non-Philips RS Defendants" refers to all Philips Defendants *except* Philips RS.

[4] ECF 918 ("Motion to Dismiss") & ECF 919 ("Br."). Philips RS has also moved to dismiss the Complaint (ECF 915), in which the non-Philips RS Defendants have joined. Br. at 3 n.2.

allege, through entity-specific facts and inferences, that both Royal Philips and Philips NA were directly involved in many aspects of the design, marketing, sales and recall of the Devices; and that the entire Philips organization operated as an integrated global enterprise. They minimize the fact that many of Royal Philips' public pronouncements say as much. They also admit that they had direct involvement in the recall. Along with the numerous allegations discussed below, these allegations are more than sufficient to survive a motion at the pleading stage where Plaintiffs have limited access to information that is mostly in the hands of the Defendants.

The non-Philips RS Defendants argue that the Complaint has a "'sloppy' group pleading" problem, Br. at 1, but these bald statements are belied by the allegations and misstate the pleading requirements governing this Motion. Plaintiffs set forth detailed allegations against each of the Philips entities throughout their 470-page Complaint (there are over 300 references to Royal Philips and 19 references to Philips NA) spanning the period from 2008, when the defective Devices were first sold, through the recall, which is ongoing. The non-Philips RS Defendants simply ignore the allegations recounting their direct involvement. For example, Plaintiffs allege that "[f]rom as early as 2009, Royal Philips took a lead role in launching and marketing several of the Recalled Devices," ¶ 222, and "Philips NA has also been directly involved with and independently contributed to, for example, the design, development, and sale of the Recalled Devices," ¶ 426. The non-Philips RS Defendants' argument that they should escape accountability for any harms caused by the Devices is unmoored from the allegations of the Complaint.

Plaintiffs also specifically allege that "each Philips Defendant acted in all aspects as the agent and alter ego of one another." ¶¶ 2, 156. Plaintiffs provide substantial detail about their corporate relationship alleging, among other things, that Royal Philips, as "the global head of the 'Philips' enterprise, … controls and oversees all aspects of the Philips businesses around the world,

2

going to great lengths to ensure there is a unity of purpose and vision, consistent execution of company procedures, policies, and goals, and, importantly, maintenance and protection of the valuable 'Philips' brand." ¶ 2. To effectuate its unity of purpose and vision, "Royal Philips has created a complex, confusing, and ever-changing labyrinth of interrelated and interconnected Philips entities and holding companies throughout the world. Much of the information regarding the specific activities of the individual Philips units and their employees is shielded from public view." ¶ 190. Because the Philips entities operate and present themselves to the public as a single unified "Philips" enterprise, which is strictly controlled by Royal Philips, the collective allegations against all the Philips entities for the conduct giving rise to Plaintiffs' claims are sufficient at the pleading stage. *See, e.g., Nasdaq, Inc. v. IEX Group, Inc.*, 2019 WL 102408, at *14 (D.N.J. Jan. 4, 2019) (rejecting group pleading argument when, among other things, "publicly-available materials are not forthcoming about which entity does what").

Accepting all allegations as true and construing all reasonable inferences in Plaintiffs' favor, as the Court is required to do at this juncture, the non-Philips RS Defendants, specifically Royal Philips and Philips NA, were directly involved in key aspects of the alleged wrongdoing including the design, marketing and launching of the Devices *in addition to* the recall. Their efforts to recast the alleged wrongdoing so that Philips RS acted *alone* should not be credited at this stage. Simply put, Plaintiffs have adequately pled direct liability on the part of Royal Philips and Philips NA, as well as alter ego and agency liability for all non-Philips RS Defendants.

## II.    FACTUAL BACKGROUND

### A.    All of the Philips Defendants Function as a Unified Enterprise Tightly Controlled by Royal Philips

Royal Philips is a Dutch multinational company that is the global head of the "Philips" enterprise, which bills itself as "a diverse team made up of some 80,000 individuals across over

3

100 countries, all with different backgrounds, perspectives and experiences." ¶¶ 2, 161. All the other Philips Defendants are essential parts of this Philips family. ¶ 2. Royal Philips directly or indirectly holds 100% ownership in the other Philips Defendants. ¶ 151.

Royal Philips controls and oversees all aspects of the Philips businesses around the world, going to great lengths to ensure there is a unity of purpose and vision, consistent execution of company procedures, policies, and goals, and, importantly, maintenance and protection of the valuable "Philips" brand. ¶¶ 2, 160. Indeed, Royal Philips openly admits that the "Philips" brand is important to the company: "For some 130 years, our meaningful innovations have improved the quality of life for millions of people around the world, creating a strong and trusted Philips brand." ¶ 173. In fact, Royal Philips advertises that "[w]ith a 2021 brand value in excess of USD 12 billion, as defined by branding agency Interbrand, Philips is one of the world's strongest brands." *Id.*

The non-Philips RS Defendants fault Plaintiffs for "lumping" them together as simply "Philips," but that is how they hold themselves out to the public for business reasons. ¶¶ 3, 161, 174. Royal Philips' website, www.philips.com, boasts: "Over the past decade we have transformed into a focused leader in health technology…. At Philips, our purpose is to improve people's health and well-being through meaningful innovation." ¶ 3. All of Philips' businesses globally, including its Connected Care and Sleep & Respiratory Care segments, are part of the Philips enterprise.

To further construct a single public image for Philips, Royal Philips uses the iconic blue Philips shield logo and "Philips" wordmark for all its business segments and subsidiaries.



¶¶ 161-66. The Philips shield logo and wordmark appear on the websites of all Royal Philips' subsidiaries worldwide, including Philips RS. ¶¶ 164, 166. These branding images also appear on

the user manuals and marketing materials for Recalled Devices. ¶¶ 164, 210. Royal Philips has stated that "[t]he Philips wordmark is our primary and most recognized logo," and commercial use of the wordmark is managed by the Royal Philips Brand Team. ¶ 166.

Philips similarly presents itself as a single entity when it suits their purpose in litigation. For example, in one copyright case filed by Royal Philips, Philips NA, and four other Philips entities, they held themselves out collectively as "Philips" contending that "[t]he six named plaintiffs … are collectively in the business, *inter alia*, of developing, manufacturing, selling, supporting, maintaining, and servicing Philips' medical imaging systems, including the proprietary hardware and software and related trade secrets that are necessary—and/or may be used—to operate, service, and repair such systems." ¶ 160 n.38.

Royal Philips exercises considerable control over its subsidiaries, dictating comprehensive business practices and systems in order to ensure they function as one cohesive "Philips" enterprise. *See* ¶ 167 ("to achieve consistency and a unified global presence, Royal Philips utilizes 'a worldwide communication and training program' that includes 'mandatory sign-off on the [company's] General Business Principles.' Royal Philips established these 'General Business Principles' in order to 'set the standard for acting with integrity at Philips.' According to the company: these fundamentals 'govern all our decisions and actions throughout the world and apply equally to our group actions and to our conduct as individuals.'"); ¶¶ 168-69 ("Additionally, Royal Philips touts 'a single standard operating model that defines how we work together effectively to achieve our company objectives—the Philips Business System (PBS)'").

The Philips entities share uniform standards and procedures, dictated by Royal Philips, for both an integrated supply chain and quality management systems. ¶¶ 188-89. ■■■■■■
■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

███████████. The quest for unity included Royal Philips' CEO announcing, as part of its response to the recall, that the Philips company is "focused on further unifying and centralizing our business processes and systems to ensure that we are driving a patient centric and quality culture mindset throughout the company at all times." ¶ 172.

Royal Philips' Executive Committee—its managing body—further exercises control over all aspects of the collective Philips business, including determining the "risk appetite" for the entire Philips enterprise. ¶¶ 182-84. This Executive Committee includes the heads of each operating segment of the Philips enterprise. ¶ 184. These operating segments, each headed by a Royal Philips employee, cut across multiple subsidiaries. *Id.* For example, prior to becoming CEO of Royal Philips, Mr. Roy Jakobs was in charge of Philips' Connected Care business line, which includes Philips RS, along with other supposedly separate entities. *Id.*

Royal Philips controls intellectual property rights for the entire Philips enterprise. ¶¶ 177-80. Royal Philips also holds the copyright for Respironics' website, and the privacy policy indicates another wholly-owned international subsidiary of Royal Philips is the controller of users' personal data. ¶ 154 n.35. Further, ████████████████████ ████. Royal Philips even owns the copyright to the User Manuals for the Recalled Devices. ¶ 213.

**B.    Royal Philips Was Directly Involved with Launching and Marketing the Recalled Devices.**

The Complaint contains more than sufficient allegations and reasonable inferences of direct involvement by Royal Philips with the Devices, both before and after the recall.[5]

First, Royal Philips plays an active role in the research, development, and testing of its subsidiaries' products. Royal Philips' Chief Medical Officer has extensive duties overseeing

---

[5] Royal Philips has conceded it is subject to personal jurisdiction in Pennsylvania with respect to Plaintiffs' negligent failure to recall/negligent recall claim. *See* ¶ 192 (referring to concession made in related *SoClean* MDL 3021); Royal Philips' Br. in support of 12(b)(2) motion (ECF 914 at 2).

Philips' products. ¶ 175. These duties include: "Overall functional leadership for clinical innovation, clinical strategy, medical affairs and health economic activities," "working closely and collaboratively with business and functional leaders across the company," "clinical trial programs in support of existing and next generation products," and "providing clinical guidance for the development and market introduction of all new products[.]" *Id.* Royal Philips also created four "Innovation Hubs" to "drive innovation, effectiveness and efficiency, and to enable locally relevant solution creation." ¶ 185. The Innovation Hubs are located in Eindhoven, Netherlands, Cambridge, Massachusetts (where Philips NA is based), India, and China. *Id.* Royal Philips describes Eindhoven as the largest hub, hosting the global headquarters of most of Philips' central innovation organizations. "Many of the company's core research programs are also run from here." ¶ 186. ███████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

The Recalled Devices were marketed and sold, and then recalled, not just in the United States, but worldwide. ¶¶ 214, 392. It can be inferred for Rule 12 purposes that Royal Philips was involved in the activities giving rise to Plaintiffs' claims, since Philips RS did not, and could not, independently control either the worldwide marketing or the worldwide recall of the Devices. Nonetheless, the Complaint contains numerous allegations of direct involvement by Royal Philips in the launch and marketing of the Recalled Devices.

From as early as 2009, Royal Philips took a lead role in launching and marketing the Recalled Devices. Royal Philips admits to having done so by "back[ing] … launches with the requisite support in advertising and promotion," issuing press releases promoting the devices, participating in medical device conferences in the United States and elsewhere, and maintaining a

website, SleepApnea.com, educating consumers and providers on Recalled Devices. ¶ 222.

On June 2, 2009, Respironics issued a press release stating: "Royal Philips Electronics (NYSE:PHG, AEX: PHI) today introduced the Trilogy100 portable at-home life-support ventilator." ¶ 223. The Trilogy 100 is a Recalled Device. This press release directed media inquiries to an employee of another Royal Philips' subsidiary, Philips Healthcare, whose job was to coordinate "activities with the HQ team in Amsterdam." *Id.* Similar Respironics press releases announced that Royal Philips was launching other Recalled Devices. ¶ 224.

Numerous additional Royal Philips press releases and press conferences promoted the Devices. ¶¶ 225-28, 230-31, 233-36. These press releases describe Recalled Devices as Royal Philips' products, they direct media inquiries to Royal Philips' employees, and they demonstrate that Royal Philips attended numerous trade shows to showcase the Devices. *Id.* In one example from 2017, Royal Philips referred to all of its health-related products across subsidiaries and divisions as the Philips "ecosystem" of products. ¶ 228. Several of the trade shows Royal Philips attended to promote Recalled Devices took place in the United States. ¶¶ 228, 236. In 2016, a Royal Philips employee conducted a press conference promoting DreamStation products, which was livestreamed on Royal Philips' website. ¶ 227. Royal Philips likewise touted Recalled Devices on investor calls dating back to at least 2017. *See, e.g.*, ¶¶ 229, 232 (indicating Royal Philips would provide financial support for the advertising and promotion of the DreamStation Go).

From as least September 2014 until the present, Royal Philips has maintained the website SleepApnea.com, which educates consumers and providers on sleep apnea and the various treatment devices offered by Philips (primarily the Recalled Devices). ¶ 238. The Philips shield logo and a 2016 Royal Philips copyright appear on the back of a brochure specifically touting the noise abatement performance (the purported purpose of the PE-PUR foam) of Recalled Devices.

¶ 210. Below the Royal Philips logo and copyright, consumers are directed not to Respironics' website but to a page for Respironics on Royal Philips' website (philips.com/Respironics). *Id.*

Company documents show that from at least as early as 2016, Royal Philips has demonstrated a systematic level of involvement in and control over testing the PE-PUR foam in the Recalled Devices and investigating degradation problems. ¶ 306. For example, ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

On April 26, 2021 (still many weeks before the recall), Royal Philips announced possible health risks associated with degradation of PE-PUR foam and urged consumers to purchase Philips' just-launched DreamStation 2, which does not contain PE-PUR foam. ¶ 372. In this statement, Royal Philips referred only to Philips, saying "Philips" launched DreamStation 2, "Philips" was working with regulatory agencies, and "Philips" was setting aside 250 million euros

for remediation programs. *Id.* Even when making this announcement, Royal Philips downplayed the significance of the foam degradation problems, claiming "the occurrence rate is very, very low." ¶ 373. Royal Philips and the other Philips Defendants proceeded to wait seven additional weeks before initiating the recall. At the same time, Royal Philips assured its shareholders that any adverse impact on sales due to the safety risks posed by the Recalled Devices was minimized by introduction of the DreamStation 2. *Id.* ("The good thing is, is that we have launched DreamStations 2.").

Royal Philips finally announced the recall on June 14, 2021. ¶¶ 5, 396-98. From the outset, Royal Philips has directly overseen and managed the recall. ¶ 387. Royal Philips tasked a member of its Executive Committee and the then-head of Philips' Connected Care businesses that include Respironics, Roy Jakobs (now CEO of Royal Philips), with leading the company's repair and remediation program. ¶ 388. Royal Philips' Technical Project Manager Jan Bennik "head[s] up the polyester-polyurethane sound abatement foam test and research program." ¶ 389. The Complaint identifies at least three other employees of Royal Philips involved in the recall, ¶ 390, along with Royal Philips' Management, Supervisory Board, and Quality and Regulatory Committee. ¶¶ 401-02. Once again, Royal Philips' statements about the recall frequently refer to simply "Philips" and "we." *See, e.g.*, ¶¶ 396-98, 402-03. Royal Philips' then-CEO Frans van Houten also stated in the recall announcement: "We deeply regret any concern and inconvenience that patients using the affected devices will experience because of the proactive measures we are announcing today to ensure patient safety." ¶ 399.

Royal Philips' management of the recall included taking the lead in dealing with U.S. regulatory authorities. ¶¶ 405-06. Royal Philips also confirmed its involvement in discussions with the Department of Justice. ¶ 407. In its press release on Second Quarter 2022 results, Royal Philips

said, "the US Department of Justice, acting on behalf of the FDA, recently began discussions with Philips regarding the terms of a proposed consent decree . . ." *Id.*

Royal Philips readily admits that Recalled Devices are a significant piece of its business and revenue. ¶ 212 ("According to Royal Philips' 2020 Annual Report, Sleep & Respiratory Care … constituted 49% of its total sales in its Connected Care line of business, which, in turn, accounted for 28% of Royal Philips' overall sales of about €19.5 billion."). Royal Philips' then-CEO stepped down in 2022, following a May 2022 meeting of Royal Philips shareholders where 80% of them voted against giving the former CEO a bonus. ¶ 404. Shareholders were "unhappy about delivery problems and issues with the company's widely used sleep apnea machines." *Id.* Royal Philips' Executive Committee member Roy Jacobs, who led the company's recall and remediation program, become Royal Philips' new CEO. ¶ 388, 404 & n.393.

C.     **Philips NA was Directly Involved with and Independently Contributed to the Design, Development, and Sales of the Recalled Devices.**

Plaintiffs detail the specific and significant involvement of Philips NA and its employees with the Recalled Devices. ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████ In total, the Complaint names seven Philips NA employees with knowledge and involvement in the recall. ¶ 391. ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████

In addition, when this litigation first commenced, the same lawyers represented both Philips NA and Philips RS. Both entities argued before the Judicial Panel on Multidistrict Litigation in favor of consolidation of the claims in this litigation in Massachusetts, where Philips NA is headquartered. According to their joint brief, "the District of Massachusetts has the *strongest nexus* to the litigation." MDL 3014 (ECF 47) at 13 (J.P.M.L. July 29, 2021) (emphasis added). ¶ 194. They argued alternatively as a second choice for consolidation in this District, but admitted nonetheless that Philips NA and Massachusetts have a strong connection to the claims at issue.

III.    **LEGAL STANDARD**

   A.    **General Pleading Standards**

At the motion to dismiss stage, the Court reviews the facts alleged in the complaint, "assuming their veracity, construing them in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor." *Tatel v. Mt. Lebanon Sch. Dist.*, 2022 WL 15523185, at *7 (W.D. Pa. Oct. 27, 2022) (Conti, J.) (quoting *Lasche v. New Jersey*, 2022 WL 604025, at *3 (3d Cir. Mar. 1, 2022)). A complaint "plausibly pleads a claim" when it "alleges 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of' the necessary elements of a claim[.]" *Id.* "The court cannot consider the additional facts set forth in defendants' motions and briefs." *Id.*; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 555, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)) (Rule 8 pleading standard "does not require 'detailed factual allegations'" but complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'").

B.     **Fed. R. Civ. P. 9(b) Standards**

"There is no formula for pleading fraud with particularity: '[a]llegations of date, place, or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud.'" *PPG Indus., Inc. v. Generon IGS, Inc.*, 760 F. Supp. 2d 520, 527 (W.D. Pa. 2011) (quoting *Seville Indus. Mach. Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3d Cir. 1984)). The primary purpose of Rule 9(b) is to "place the defendants on notice of the precise misconduct with which they are charged[.]" *See id.*

IV.    **ARGUMENT**

A.     **The Non-Philips RS Defendants are Sufficiently on Notice of the Specific Allegations Against Them.**

The non-Philips RS Defendants argue that Plaintiffs have impermissibly grouped them together with Philips RS into a fictional entity called "Philips" and that Plaintiffs' use of the "omnibus tag of 'Philips'" fails to put Defendants on notice of their wrongdoing. *See, e.g.*, Br. at 7. This argument fails at the pleading stage for several reasons.

First, the Complaint distinguishes among Defendants and alleges considerable specific conduct engaged in not only by Philips RS but also by Royal Philips and Philips NA. From these allegations, all of the Philips Defendants are on notice of the claims against them, and the Court can infer wrongdoing by each of the Philips Defendants. Second, group pleading concerns are lessoned in the case of interrelated companies. On this point, Plaintiffs plead in the Complaint numerous examples of how the Philips entities appear from the outside as hopelessly interrelated. Plaintiffs further allege in detail that Royal Philips and its subsidiaries not only function as a unified entity but go to great lengths to present themselves to the public (and courts) that way.

Improper group pleading occurs only in circumstances when defendants are incapable of

13

determining what they are alleged to have done wrong. To comply with Fed. R. Civ. P. 8's requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief," a complaint need only "give[] the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *See M.B. v. Schuylkill Cty.*, 375 F. Supp. 3d 574, 587 (E.D. Pa. 2019).

Plaintiffs have alleged, with particularity, what each individual Defendant has done, including specific conduct in excess of what courts require when considering a motion to dismiss based on improper group pleading.[6] The Complaint differentiates the roles played by each Defendant and puts them on notice of the alleged wrongdoing. *See Kearney v. Bayerische Motoren Werke Aktiengesellschaft*, 2018 WL 4144683, at *9 (D.N.J. Aug. 29, 2018) (Plaintiffs "achieved some level of differentiation among Defendants by specifying their corporate relationship, location, and respective responsibilities.... By identifying the Defendants' respective roles in

---

[6] *See, e.g.*, ¶¶ 160-90, 221-38, 301-13, reflecting that: Royal Philips, through numerous of its Netherlands-based officers and employees, controls and oversees all aspects of the Philips businesses around the world and holds itself out as a single unified company using the iconic blue Royal Philips shield logo, ¶¶160-66; Royal Philips utilizes "a worldwide communication and training program" that includes "mandatory sign-off on the [company's] General Business Principles" and "a single standard operating model that defines how we work together effectively to achieve our company objectives," ¶¶ 167-69; Royal Philips' "Risk Appetite" is managed worldwide with "top-down accountability," ¶¶ 182-89; Royal Philips announced and controlled the Recall, ¶¶ 170-72; Royal Philips stressed its global brand with respect to its healthcare business in general and its CPAP/BiPAP/Ventilator business in particular, ¶¶ 173-74, under the leadership of Royal Philips' Chief Medical Officer, ¶ 175; Royal Philips employs an "Integrated Intellectual Asset Management" in order to "manage all forms of intellectual property for each of Philips' business areas–including its CPAP/BiPAP/Ventilator business *via* various subsidiaries—and has jointly prosecuted with Philips RS CPAP patent infringement and unfair competition cases, ¶¶ 177-81; Royal Philips has created a complex, confusing, and ever-changing labyrinth of interrelated and interconnected Philips entities and holding companies throughout the world, and much of the information regarding the specific activities of the individual Philips units and their employees is shielded from public view, ¶¶ 181, 190; Royal Philips took a lead role in launching and marketing several of the Recalled Devices, ¶¶ 221-38; and since at least as early as 2016, Royal Philips had a systematic level of involvement in and control over testing the PE-PUR foam in the Recalled Devices and investigating the problems with that foam, ¶¶ 301-13.

designing, producing, marketing, and selling the [products], Plaintiffs have avoided a pleading issue where plaintiffs do not allege how specific defendants are involved with a particular product.").

In addition to identifying a multitude of specific actions by Royal Philips and Philips NA, the Complaint also properly refers to "Philips" generally when discussing the actions taken either by multiple Philips entities in concert or, in instances where, due to Philips' labyrinth of wholly-owned subsidiaries and holding companies that function as one entity, it cannot be gleaned publicly and without discovery, which of the mostly private Philips entities were involved.[7] ¶ 190. *See Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (at the pleading stage, plaintiffs are not required to obtain information within the exclusive control of the defendant).

Accordingly, Plaintiffs have sufficiently distinguished among the various Defendants in the Complaint to the extent possible to put them on notice of specific allegations against them, especially considering that "[m]uch of the information regarding the specific activities of the individual Philips units and their employees is shielded from public view," ¶ 190, and discovery has just begun. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *9 (D.N.J. May 8, 2017) (denying dismissal motion where "[t]he allegations against each entity are clear, and, as Plaintiffs explain, 'to the extent Plaintiffs assert common allegations as to [Defendants collectively],' it is because the entities are intertwined through a complex corporate structure. Plaintiffs cannot be expected to know the exact corporate structure and degree of each Defendant's involvement, at this stage in the litigation and prior to discovery."); *Opheim v. Aktiengesellschaft,* 2021 WL 2621689, at *7 (D.N.J. June 25, 2021) (same); *see also Brown v. Dynamic Pet Prod. and Frick's Meat Prod., Inc.*, 2017 WL 4680125, at *3 (S.D. Cal. Oct. 18,

---

[7] Of the Defendants, only Royal Philips is a public company.

2017) (allowing collective allegations where the plaintiff alleged that the defendants "worked in concert as parent and subsidiary entities in the marketing and selling" of the product); *Munning v. Gap, Inc.*, 2016 WL 6393550, at *3 (N.D. Cal. Oct. 28, 2016) (group pleading standards relaxed when defendants are parents and subsidiaries).[8]

The authority cited by the non-Philips RS Defendants does not suggest otherwise. *Bret Binder v. Weststar Mortgage, Inc.* is cited for the proposition that "allegation[s] against multiple defendants that [are] bereft of specific wrongdoing by those proposed defendants [are] insufficient to state a claim." Br. at 7 (quoting *Binder*, 2016 WL 3762710, at *3 (E.D. Pa. July 13, 2016)). That case, however, did not involve corporate defendants entangled in a single complex corporate structure, as the instant case does. *See Binder*, at *1-3 (describing defendants, making it clear they are completely distinct corporate entities not connected through any form of ownership). Additionally, the allegations in the Complaint are vastly more detailed and individualized than the type of "shotgun" pleading decried in *Hisey v. QualTek USA, LLC*, 2019 WL 3936555, at *17 n.11 (E.D. Pa. Aug. 16, 2019) (describing shotgun pleading as "a complaint that asserts multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against") (quoting *M.B. v. Schuylkill Cty.*, 375 F. Supp. 3d 574, 586 (E.D. Pa. 2019)). At bottom, because the Complaint is filled with entity-specific allegations laying out in detail both the non-Philips RS Defendants' conduct at issue and how Philips functions and presents itself as one integrated entity, Plaintiffs

---

[8] This Court has held similarly. *See Slippery Rock Area Sch. Dist. v. Tremco, Inc.*, Civil No. 15-1020-JFC (ECF 56), at 24-26 (W.D. Pa. Mar. 3, 2016) (MTD Hearing Tr.) ("But when there are allegations of conspiracy among the persons and specifics with respect to exactly what the roles of the different parties were in this transaction at issue or in the conduct at issue; and when there are the alter ego issues at play, where they were essentially saying they are one and the same, so it doesn't really matter whether you lump them together or not. I think at this stage, you know, that would be sufficient to pass muster.").

have satisfied Rule 8 and the Motion to Dismiss should be denied.

**B.    Plaintiffs Set Forth Specific Allegations of Liability for Each of the Claims Against Royal Philips and Philips NA**

The Complaint contains allegations of specific conduct by both Royal Philips and Philips NA to establish their liability for Plaintiffs' claims. The non-Philips RS Defendants challenge each set of claims on narrow and specific grounds.[9] For the following reasons, all arguments made in the Motion to Dismiss fail.

**1.    Fraud Claims.**

Plaintiffs properly allege each element of common law fraud by omission. ¶¶ 661-75.[10] *See Slippery Rock Area Sch. Dist. v. Tremco, Inc*., 2016 WL 3198122, *8 (W.D. Pa. 2016) (Conti, J.) (citing elements). In response, the non-Philips RS Defendants attack Plaintiffs' fraud claims on two grounds: (1) the Complaint lacks any allegations that the non-Philips RS Defendants made an actionable misrepresentation about the Devices; and (2) the Complaint fails to allege that they had the requisite knowledge of PE-PUR foam degradation prior to the recall. Br. at 10-15. Their first argument is off-point because Plaintiffs' fraud claims are based on omissions not affirmative misrepresentations. Similarly, Philips' second argument ignores not only the actual allegations made, but also every reasonable inference that can and must be drawn from the Complaint as a whole at this stage.

First, the non-Philips RS Defendants argue for a heightened pleading standard, but "Rule 9(b)'s 'heightened standard is somewhat relaxed in a case based on a fraudulent omission,' rather than one based on misrepresentation." *Majdipour v. Jaguar Land Rover N. Am*., LLC, 2013 WL

---

[9] For a more fulsome discussion of the elements of each claim, *see* Plaintiffs' Br. in Opp. to Philips RS' Motion to Dismiss for Failure to State a Claim Pursuant to Rule 12(b)(6), filed February 6, 2023, and incorporated herein by reference ("Opp. to Philips RS' MTD").

[10] For additional discussion related to Plaintiffs' fraud claims, *see* Opp. to Philips RS' MTD at Section IV.E.

5574626, at *15 (D.N.J. Oct. 9, 2013) (quoting *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 451 (D.N.J. 2012)); *Feldman v. Mercedes-Benz USA, LLC*, 2012 WL 6596830, at *10 (D.N.J. Dec.18, 2012) ("[P]laintiffs pleading a fraud by omission claim are not required to plead fraud as precisely as they would for a false representation claim."). "[W]ithin the context of omission-based claims, such as the one here, district courts should 'apply the rule with some flexibility and should not require plaintiffs to plead issues that may have been concealed by the defendants.'" *Schechter v. Hyundai Motor Am.*, 2020 WL 1528038, at *8 (D.N.J. Mar. 31, 2020).

Second, at a general level, Royal Philips made billions of dollars from extensively and globally marketing the Devices for years after becoming aware of, and actively studying, the PE-PUR foam degradation and consequent release of toxic particles and fumes, and it concealed the defect from everyone including consumers and physicians. ¶¶ 175, 185, 186, 214, 222-23, 308-10, 392. Likewise, Philips NA was directly involved in "the design, development, and sale of the Recalled Devices," was aware of "customer complaints of foam degradation," has been involved with the recall of the Devices, and has admitted it has a strong nexus to the case. ¶¶ 194, ████, 391, 426.

Plaintiffs allege that Philips RS had extensive knowledge about the foam degradation problems for many years prior to the recall. ¶¶ 289-357. Since Philips used PE-PUR foam in its Devices worldwide, and the foam degradation posed severe health risks and raised the possibility of massive worldwide recall liability, it is reasonable to infer that Philips RS shared its extensive knowledge of the defect with Royal Philips and the other non-Philips RS entities. It is *not* plausible that, in the face of serious health-related safety concerns about its breathing devices, everyone at Philips RS remained quiet, especially considering Royal Philips' insistence on a mandatory "worldwide communication" program, "a single standard operating model that defines how we

work together effectively to achieve our company objectives," "top-down accountability," ¶¶ 167-69, 182-89, and Royal Philips' proclamation that the Philips company is "focused on further unifying and centralizing our business processes and systems to ensure that we are driving a patient centric and quality culture mindset throughout the company at all times." ¶ 172.

The non-Philips RS Defendants acknowledge that the Complaint contains allegations regarding Royal Philips' involvement in foam degradation testing, but argue those tests were conducted solely by Philips RS. Br. at 14-15. Where Plaintiffs identify individuals who claim publicly on LinkedIn to be employees of one of the non-Philips RS Defendants, they contend that their employees' LinkedIn pages must be wrong. Such arguments are inappropriate at the pleading stage, particularly given the allegations reflecting Royal Philips' company-wide control.

Plaintiffs also allege that Royal Philips extensively marketed the Recalled Devices to the public for over a decade. It issued numerous press releases claiming credit for Devices and directing inquiries to its own personnel. So considerable was Royal Philips' involvement and control that it had *Philips RS* issue press releases announcing that *Royal Philips* was launching the Devices. ¶¶ 223-24. Royal Philips attended trade shows, including several in the United States, to promote the Devices, and maintained a website about sleep apnea and the Recalled Devices. ¶¶ 222, 238 & n.145. Royal Philips' copyright, logo, and website appear on the user manuals and marketing materials for the Devices, including a 2016 brochure specifically touting the PE-PUR foam that is toxic to users. ¶¶ 3 & n.2, 164 & n.43, 210, 213, 425, 574. As discussed above, Royal Philips began promoting Devices as early as 2009 and continued to do so until just before the recall on June 14, 2021, when it began marketing the DreamStation 2.

At the same time, ███████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████. Given that Royal

Philips was involved in these tests dating back to 2016 and then took charge of the recall in 2021,

the only reasonable inference is that Royal Philips was aware of the defect in the Devices. After

all, Royal Philips would not begin studying foam degradation without a reason.

Prior to the recall, Royal Philips was earning billions of dollars from the sale of Devices

and making them a major focus on calls with investors. ¶ 212. Royal Philips did not disclose the

foam degradation problem to the public until 2021. Notably, most of the named Plaintiffs

purchased Devices after 2016 ███████████████████████████████

████████████████. This omission and concealment is more than sufficient to plead a claim for

fraudulent omission by Royal Philips.

Although there is less publicly available evidence on Philips NA's role in the matter, this

entity also participated in the alleged fraud and concealment. ███████████████████████

████████████████████████████████████████. At least seven

Philips NA employees are involved in the recall. ¶¶ ███, 391. Philips NA, which initially shared

lawyers with Philips RS, admitted to the JPML that its headquarters in Cambridge, Massachusetts

has a strong nexus to the litigation. ¶ 194. These facts are sufficient at the pleading stage to allege

Philips NA participated in the alleged fraud and is on notice of the accusations against it.

Plaintiffs have adequately alleged conduct by Royal Philips and Philips NA to support their

fraud claims.

## 2.  RICO Claim.[11]

To state a RICO claim, plaintiffs must plead: (1) conduct (2) of an enterprise (3) through a pattern of racketeering activity (known as predicate acts) (4) causing (5) injury to plaintiffs' business or property. 18 U.S.C. §1962(c); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 362 (3d Cir. 2009). The non-Philips RS Defendants argue that Plaintiffs fail to allege they committed any "predicate acts" to establish a pattern of racketeering activity. Br. at 15-16. A "pattern of racketeering activity" is established by showing defendants engaged in at least two predicate acts, in this case, instances of mail and wire fraud, within ten years of each other. *Amos v. Franklin Fin. Servs. Corp.*, 509 F. App'x 165, 168 (3d Cir. 2013).

Plaintiffs allege the non-Philips RS Defendants committed numerous predicate acts to further the RICO scheme including (1) sending misleading representations through mail and wire, and (2) sending seemingly "innocent" mailings (like shipments and receipts) that furthered the scheme to sell defective Devices and to profit from the same. ¶¶ 515-19. The non-Philips RS Defendants argue that Plaintiffs only allege that each predicate act was committed collectively "by every [d]efendant." Br. at 15. However, the Complaint spells out each Defendant's involvement in each type of mailing. *See* ¶¶ 518, 519 (describing misleading April 26, 2021 press release from Royal Philips). And again, Royal Philips and Philips NA knew about the PE-PUR foam degradation at the same time they were extensively marketing the Devices to the public. This is more than sufficient information for Philips to "defend against the charge." *In re Milo's Dog Treats Consol. Cases*, 9 F. Supp. 3d 523, 533 (W.D. Pa. 2014) (citation omitted).

Second, Philips is wrong to imply Plaintiffs must plead individualized instances of each

---

[11] For a more detailed discussion of Plaintiffs' RICO claims, *see* Opp. to Philips RS' MTD at Section IV.B. and their Br. in Opp. to PolyTech's Motion to Dismiss, filed February 6, 2023, incorporated herein by reference.

entity's use of the mail and wire. Rather, each entity is liable for the foreseeable predicate acts of its RICO co-schemers. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1415 (3d Cir. 1991) (recognizing one defendant "would have been liable for the misrepresentations" of others); *United States v. Bruno*, 2014 WL 1788910, at *11 (E.D. Pa. May 6, 2014) ("While it is not alleged that Bruno himself mailed the 'receipts,' as an alleged co-schemer, Bruno, as a knowing participant the scheme, can be held legally liable for his co-schemers [*sic*] use of the mails."); *In re JUUL Labs, Inc., Mktg., Sales Pracs., and Prod. Liab. Litig.*, 533 F. Supp. 3d 858, 871-72 (N.D. Cal. 2021) ("Plaintiffs are not required to show that each RICO defendant … personally committed at least two acts of mail or wire fraud to establish a pattern of racketeering."). As such, the non-Philips RS Defendants' challenge to the RICO count also fails.

### 3.  Warranty Claims.

Plaintiffs state claims for Defendants' breach of express and implied warranties as well as warranties provided under the Magnusson-Moss Warranty Act ("MMWA"). The non-Philips RS Defendants do not challenge the adequacy of these claims in general, they argue only that they cannot be brought against them because it was Philips RS that "sold and warranted the [D]evices." Br. at 9-10. According to the non-Philips RS Defendants, warranties can only be enforced against an entity that signs and is referenced in the warranty itself. Not so. Express and implied warranty claims may lie against associated entities. *See Stewart v. Smart Balance, Inc.*, 2012 WL 4168584, *16 (D.N.J. June 26, 2012) (allowing express warranty claims against a parent company where there were sufficient allegations that the parent company was involved in the alleged wrongdoing, noting: "At the motion to dismiss stage, these allegations are sufficient because it is entirely plausible that both companies were involved in acts that form the basis of Plaintiffs' claims, such as the 'creation or approval of labeling, creation or approval of other marketing and the website.'"). Likewise, implied warranty claims may be maintained against companies not on the express

warranty. *See Dassault Falcon Jet Corp. v. Oberflex, Inc.*, 909 F. Supp. 345, 354 (M.D.N.C. 1995) (denying summary judgment on implied warranty claims to parent company not listed on the warranty because state law did not have a privity requirement). The same is true for MMWA claims. *See Milo's Dog Treats*, 9 F. Supp. 3d, at 527, 530-31, 546 (denying motion to dismiss against manufacturer and parent company for MMWA claim where plaintiffs alleged direct involvement by parent company).

Royal Philips attempts to minimize its role in the alleged misconduct to secure dismissal. But its copyright appears on the warranties and user manuals for the Devices, ¶¶ 574-75, and it extensively marketed the Devices, to the point of taking credit for them. Royal Philips also profited significantly from sales of the Devices. These allegations are sufficient to state a claim for breach of express warranty at the motion to dismiss stage. *See Stewart*, 2012 WL 4168584, at *16 (express warranties); *Dassault*, 909 F. Supp. at 354 (implied warranties). In fact, even the case cited by the non-Philips RS Defendants for the proposition that express warranty claims cannot be maintained against a parent company where it is not a party to the written warranty, Br. at 9, declined to dismiss the implied warranty claims against the parent. *See Powell v. Subaru of Am., Inc.*, 502 F. Supp. 3d 856, 882 (D.N.J. 2020). Accordingly, Plaintiffs have sufficiently alleged express, implied, and MMWA warranty claims against the non-Philips RS Defendants.

### 4.  Unjust Enrichment.

Plaintiffs allege they conferred a tangible and material economic benefit on the non-Philips RS Defendants by purchasing, leasing, renting and/or reimbursing payment for the Devices. ¶ 682. Plaintiffs would not have acquired the Devices if they had known about the defect and the risks of using them. In this way, the non-Philips RS Defendants profited from the sales and leases of the Devices to the detriment and expense of Plaintiffs. ¶¶ 683-84. The allegations are sufficient to state a claim for unjust enrichment. *See* Restatement (First) of Restitution §1 (1937) (elements); *In re*

*Terazosin Hydrochloride*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004) (unjust enrichment elements are materially the same in all states). In a footnote, the non-Philips RS Defendants make a cursory argument that they did not sell the Devices (Philips RS did) and thus were not unjustly enriched in the profits from the same. Br. at 10 n.8. This simply rehashes the "privity," or "direct benefit," argument addressed in Philips RS's Motion to Dismiss and fails again here for the same reasons.[12] A customer can unjustly enrich a defendant without purchasing a product directly from that defendant. *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2011 WL 4501223, at *7 (N.D. Cal. Sept. 28, 2011) (courts look to the relationship between the plaintiffs' injury and the defendants' conduct rather than the relationship between the parties); *Stewart v. Beam Glob. Spirits & Wine, Inc.*, 877 F. Supp. 2d 192, 201 (D.N.J. 2012) (unjust enrichment was not precluded because the benefit passed through a third party); *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 444 (E.D. Pa. 2010) (analyzing unjust enrichment claims in multiple states and rejecting direct benefit arguments).

## 5.  Negligent Failure to Recall/Negligent Recall Claim.

Plaintiffs have adequately pled a claim for negligent recall and failure to recall. ¶¶ 551-70. The essence of Plaintiffs' claim is that (i) Defendants owed a duty to promptly notify and warn users of the Devices' serious health and safety defect, and (ii) Defendants' failure to recall the Devices and the delay of the recall until a time that was convenient to the Defendants was a breach of that duty that caused harm to Plaintiffs. ¶¶ 555-58, 568-70. In addition, once Defendants undertook the recall, they assumed duties to exercise reasonable care in issuing and implementing the recall, which they breached when they failed to notify users of the risks of using the Recalled Devices and by failing to promptly replace the Devices when they knew that the proposed timelines

---

[12] *See* Opp. to Philips RS' MTD at Section IV.G.

for replacement were untenable for many users who were using the Devices as critical therapy for ongoing health issues. ¶¶ 561-70.

In response, the non-Philips RS Defendants inexplicably argue that Plaintiffs "rely almost exclusively on allegations lumping all of the Philips entities together" and make no allegations of involvement in the recall of any Philips entity besides Philips RS. *See* Br. at 16. They seem to ignore that Plaintiffs allege that Royal Philips controlled the recall, ¶¶ 387, 561, which is backed by countless, specific allegations of involvement and control by Royal Philips: Royal Philips announced the recall, ¶¶ 5, 396-98; a member of Royal Philips' management (and its CEO) is *in charge of* the recall, ¶ 388; and another Royal Philips employee heads up foam testing and research for the recall, ¶ 389. In addition, the Complaint specifies the involvement in the recall of additional Royal Philips employees, its CEO, and its Management, Supervisory Board, and Quality and Regulatory Committee. ¶¶ 390, 395, 397, 399, 401-03. Furthermore, Royal Philips' management of the recall has included taking the lead in dealing with U.S. regulatory authorities. ¶¶ 405-07. Royal Philips announced it was earmarking 250 million euros for remediation programs for the Recalled Devices. ¶ 372. And, Royal Philips has conceded jurisdiction related to these claims and has previously acknowledged that it has stepped in to oversee the recall.

Likewise, the Complaint identifies seven employees of Philips NA with knowledge and involvement in the recall. ¶ 391. It also alleges that Philips NA ███████████████████████ ████████████████████████████████████████████████████████████ ████████████████████. And Philips NA has stated in court filings that there is a strong nexus between its headquarters in Massachusetts and the litigation spawned from the recall. ¶ 194.

Tellingly, while the non-Philips RS Defendants fault Plaintiffs for "lumping" them together as "Philips," they do just that in many of their own communications about the recall. *See, e.g.*, ¶¶

396-98, 402-03. That some recall documents are from Philips RS does not undercut Plaintiffs' allegations. Plaintiffs do not claim that Philips RS has no role in the recall, only that Royal Philips and Philips NA do as well.

Defendants completely ignore that Plaintiffs bring the claim not just for conducting a negligent recall, but also for a negligent failure to issue a recall sooner. *See* ¶¶ 551-70. As discussed above, Royal Philips, with significant involvement from Philips NA, controlled the recall. Further,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██. Royal Philips took the lead in announcing the dangers associated with foam degradation seven weeks *before* the recall was instituted. ¶¶ 372-73. It may easily be inferred that if Royal Philips had the power to initiate the recall in June of 2021 and oversee it thereafter, it had the power to do so many years earlier when it first became aware of the foam degradation dangers.

*** 

For the foregoing reasons, Plaintiffs sufficiently allege direct liability for each of their claims against both Royal Philips and Philips NA.

### C.     The Non-Philips RS Defendants and Philips RS Are Alter Egos and Agents of One Another.

In addition to direct liability for their own conduct, all of the Defendants are liable for all of Plaintiffs' claims because they are each other's alter egos and agents. Despite their corporate form, Defendants function and present themselves to the public as a single "Philips" entity controlled to an unusual degree by their ultimate parent, Royal Philips.

Defendants argue that Delaware law applies to Plaintiffs' allegations of alter ego and agency liability since Philips RS was incorporated in that state, Br. at 17, as was Philips NA and the two holding company Defendants. In making this determination, this Court should adopt the

26

choice of law rules of each of the transferor courts. *In re Delta Dental Antitrust Litig.*, 509 F. Supp. 3d 1377, 1380-81 (J.P.M.L. 2020). Generally, the law of the state of incorporation of the subsidiary applies to these claims,[13] however, depending on the circumstances, the law of the forum state may be applicable.[14]

Without engaging in a multi-state analysis here, Plaintiffs have adequately pled that Defendants are alter egos and/or agents of one another under Delaware law, where Plaintiffs are not required to allege alter ego as a separate cause of action, but rather to allege facts sufficient to support a claim that the non-Philips RS Defendants may be liable for the conduct of their subsidiary. *See Blair v. Infineon Technologies*, 720 F. Supp. 2d 462, 470 (D. Del. 2010) ("The alter ego doctrine for piercing the corporate veil allows derivative liability.").

To set forth a claim under the alter ego theory on the part of the non-Philips RS Defendants, Plaintiffs need only allege that the Philips Defendants functioned as a single entity and, therefore, can be treated as equally liable for the conduct of the other. *Id.* ("An alter ego relationship may arise where a corporate parent exercises complete domination and control over its subsidiary."). Plaintiffs meet this standard by alleging that Royal Philips exercised control over its subsidiary, as well as alleging some element of fraud or injustice. *Id.* Plaintiffs are not required to allege actual fraud. Instead "merely an element of injustice or fundamental unfairness" in the use of the

---

[13]  *See* Restatement (Second) of Conflicts §302 (1971); *BPI Sports, LLC v. ThermoLife International, LLC*, 2020 WL 10180910, at *11 (S.D. Fla. Jan. 9, 2020) (Florida); *Realmark, Inc. v. American Financial Corp.*, 171 B.R. 692, 695 (Bankr. N.D. Ga. 1994) (Georgia); *Scott v. NG U.S. 1, Inc.*, 881 N.E. 2d 1125, 1131 n.13 (Mass. 2008) (Massachusetts); *McElroy v. FirstEnergy Corp.*, 824 F. App'x 97, 99 (3d Cir. 2020) ("Under Pennsylvania choice of law principles, a court must look to the law of the state in which an entity is incorporated to determine whether a plaintiff may pierce that entity's corporate veil) (citations omitted).

[14] *See Old Orchard Urban Ltd. Partnership v. Harry Rosen, Inc.*, 904 N.E.2d 1050, 1061 (Ill. App. Ct.), *appeal denied*, 919 N.E.2d 355 (Ill. Sup. Ct. 2009) (noting that where personal jurisdiction is involved in an alter ego analysis, "the majority of federal decisions that have examined this issue have applied the law of the forum state and not the state of incorporation").

Defendants' corporate forms would be sufficient to meet the standard of alter ego. *Id.* (quoting *Trustees of Nat.'l Elevator Indus. Pension Fund v. Lutyk*, 332 F.3d 188, 193-94 (3d Cir. 2003)); *see also Brit. Telecommunications PLC v. IAC/InteractiveCorp*, 356 F. Supp. 3d 405, 410 (D. Del. 2019) ("[T]the requisite 'evidence of agency required at the pleading stage is minimal.... Although this corporate closeness may not be sufficient to succeed on agency theory at later stages in litigation, it is sufficient to survive a motion to dismiss, if the parties are properly and individually identified.'") (citation omitted); *Intell. Ventures I LLC v. Toshiba Corp.*, 66 F. Supp. 3d 495, 499 (D. Del. 2014) (finding agency allegations sufficient, court ruled it "must take plaintiffs' factual allegations as true, especially where, as here, the information resides with defendants who, in turn, have provided only a general denial of [claims] rather than facts about the organization and relationships between the various defendant entities.").[15]

Courts in this District regularly stress that the alter ego and veil piercing analysis is fact-intensive and better left for summary judgment as long as the plaintiff has alleged plausible factual allegations to support its veil piercing claim. *See Seven Springs Mt. Resort, Inc. v. Hess*, 2022 WL 1004178, at *6 (W.D. Pa. Apr. 4, 2022) (surveying cases and concluding "in the vast majority of these cases, the court relied on an evidentiary record"); *Chambers v. SD Holdings, LLC*, 2017 WL 6026428, at *3 (W.D. Pa. Dec. 5, 2017) (denying motions to dismiss on veil-piercing claims without prejudice to evaluate at summary judgment); *Brocious Trucking, Inc. v. BFL, Inc.*, 2010

---

[15] Plaintiffs agree with the non-Philips RS Defendants that federal common law would apply to Plaintiffs' claims brought under the MMWA and RICO. *See Brotherhood of Locomotive Engineers v. Springfield Terminal Ry. Co.*, 210 F.3d 18 (1st Cir. 2000) (holding that federal common law of alter ego/piercing the corporate veil applies in cases where the government has an interest in uniformity in its laws). The federal common law standard for alleging liability under federal law as a result of alter ego/veil piercing requires a similar inquiry: (1) whether the entities' separate identities no longer exist; and (2) the existence of an inequity or injustice. *See TAC-Critical Systems, Inc. v. Integrated Facility Systems, Inc.*, 808 F. Supp. 2d 60 (D.D.C. 2011).

WL 569559, at *3-4 (W.D. Pa. Feb. 11, 2010) (denying motion to dismiss because the plaintiff

had stated sufficient veil-piercing allegations); *Winner v. Etkin & Co.*, 2007 WL 2616084, at *2

(W.D. Pa. Sept. 6, 2007) (denying motion to dismiss because "[t]he veil-piercing doctrine requires

a multi-factor, factually-intensive inquiry and is not to be presumed lightly"); *Behr v. Fed. Home

Loan Mortg. Corp.*, 2015 WL 5123656, at *11 (W.D. Pa. July 29, 2015) ("[B]ecause of the fact-

intensive nature of the agency inquiry, the Third Circuit Court of Appeals has stated that discovery

is often times necessary to the preparation of an agency theory argument."), *report and

recommendation adopted as modified*, 2015 WL 5132519 (W.D. Pa. Sept. 1, 2015); *see also Kuhn

Const. Co. v. Ocean & Coastal Consultants, Inc.*, 723 F. Supp. 2d 676, 690 (D. Del. 2010)

("Additionally, an agency relationship is determinable only after appropriate discovery and, thus,

is not appropriate for a motion to dismiss.").

 Here, accepting as true all of the allegations in the Complaint, Plaintiffs have sufficiently

alleged that Philips RS is the alter ego, or a mere "sham" for the non-Philips RS Defendants. As

set forth above, and in the Complaint, Royal Philips, by itself and through other of its subsidiaries

such as Philips NA, functioned as a single entity. In fact, not only do they function as one entity,

but they go to great lengths to hold themselves out to the public as a single "Philips" entity. As

explained above, Royal Philips controls all aspects of its subsidiaries' business functions. *See, e.g.*,

¶¶ 167-69, 172, 177-80, 182-84 188-89, ███. The Philips family projects one unified "Philips"

brand for all of its subsidiaries and products. *See, e.g.*, ¶¶ 2-3, 160-67, 173-74, 210, 228. Despite

manufacturing no products of its own, Royal Philips employs a Chief Medical Officer to oversee

many aspects of the healthcare products manufactured by its subsidiaries, and operates research

hubs used to develop these products. ¶¶ 175, 185-86, ████.

 In the case of Recalled Devices, Royal Philips was even involved in studying foam

degradation for years. While it claims now that these products are the sole dominion of Philips RS, Royal Philips marketed them and profited billions of dollars from their sale. Likewise, Philips NA was involved in ███████████████████████. Moreover, through conduct related to the promotion of the Devices and their subsequent recall, Royal Philips exercised control of all relevant matters and held itself out as the entity responsible for the recall. As such, Royal Philips' conduct evidences a lack of corporate formalities among the Defendants and a lack of any control by Philips RS over its own operations. The non-Philips RS Defendants' argument that Philips RS is not simply an alter ego of its parent Royal Philips is belied by the actions Royal Philips took in the control and communications related to the Recalled Devices, and Royal Philips' conduct with the FDA related to the recall. Likewise, if one were to accept as true the non-Philips RS Defendants' version of their corporate form, there is no reason seven employees of Philips NA would be involved in the recall. *See* ¶¶ ██, 391, 426.

Allegations of Royal Philips' control of its subsidiaries and the unambiguous degree to which the Philips enterprise functions and appears as one "Philips" entity are sufficient to plausibly allege that Defendants are alter egos of one another. It would be fundamentally unfair for Royal Philips to avoid any legal responsibility for its role in the marketing and sale of the Recalled Devices, its role in studying the PE-PUR foam degradation, and its subsequent role in its belated and inadequate recall, after holding itself out to be a responsible party.

## V.   <u>CONCLUSION</u>

For the forgoing reasons, Plaintiffs have alleged adequately at the pleading stage that Royal Philips and Philips NA had significant direct involvement in the claims at issue, and that all of the Defendants, including Philips RS, were alter egos and agents of one another. Therefore, the Motion to Dismiss should be denied in its entirety. If the Court should grant any portion of the Motion to Dismiss, Plaintiffs respectfully request leave to file an amended complaint.

DATED:  February 6, 2023                              Respectfully submitted,

*/s/ Sandra L. Duggan*
Sandra L. Duggan
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
(215) 592-1500 (phone)
sduggan@lfsblaw.com

*/s/ Christopher A. Seeger*
Christopher A. Seeger
**SEEGER WEISS LLP**
55 Challenger Road, 6th Floor
Ridgefield Park, NJ  07660
(973) 639-9100 (phone)
cseeger@seegerweiss.com

*/s/ Steven A. Schwartz*
Steven A. Schwartz
**CHIMICLES SCHWARTZ KRINER &
DONALDSON-SMITH LLP**
361 West Lancaster Avenue
One Haverford Centre
Haverford, PA 19041
(610) 642-8500 (phone)
steveschwartz@chimicles.com

*/s/ Kelly K. Iverson*
Kelly K. Iverson
**LYNCH CARPENTER, LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
(412) 322-9243 (phone)
kelly@lcllp.com

*Plaintiffs' Co-Lead Counsel*

*/s/ D. Aaron Rihn*
D. Aaron Rihn
**ROBERT PEIRCE & ASSOCIATES,
P.C.**
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 (phone)
(412) 281-4229 (fax)
arihn@peircelaw.com

Peter St. Tienne Wolff
**PIETRAGALLO GORDON ALFANO
BOSICK & RASPANTI, LLP**
One Oxford Centre - 38th Floor
Pittsburgh, PA 15219
(412) 263-2000 (phone)
(412) 263-2001 (fax)
psw@pietragallo.com

*Plaintiffs' Co-Liaison Counsel*

31

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document was filed via the

Court's CM/ECF system on February 6, 2023, and is available for download by all counsel of

record.

*/s/ D. Aaron Rihn*
D. Aaron Rihn
