**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: PHILIPS RECALLED CPAP, BI-LEVEL PAP, AND MECHANICAL VENTILATOR PRODUCTS LITIGATION | : : : : | Master Docket: No. 21-mc-1230-JFC |
| | : | MDL No. 3014 |
| | : | (Oral Argument Requested) |
| This Document Relates to: | : : | |
| *All Actions* | : : | |

**KPNV'S REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS**
**MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Michael H. Steinberg
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067

Tracy Richelle High
William B. Monahan
Elizabeth N. Olsen
Bethany S. Labrinos
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ...................................................................................1

**LEGAL STANDARDS GOVERNING THIS MOTION** ..........................................4

**EVIDENCE DEVELOPED IN JURISDICTIONAL DISCOVERY** ...........................6

    A.    The Structure and Organization of KPNV..............................................6

    B.    Reporting Segments Within the Philips Group.......................................8

    C.    Company-Wide Policies and Intercompany Agreements .....................10

        1.    Philips Group Policies ............................................................10

        2.    Intercompany Agreements.......................................................12

            a)    Services Agreements ....................................................13

            b)    In-House Banking ("IHB") Agreements .......................14

    D.    Philips RS ............................................................................................16

        1.    Acquisition of Philips RS .......................................................16

        2.    Conversion of Respironics, Inc. to Philips RS North America LLC.........19

        3.    Philips RS's Business Post-Acquisition ..................................20

        4.    The Recall ...............................................................................20

            a)    Pre-Recall ....................................................................21

            b)    KPNV Has Provided Support to Philips RS in Connection with Its Recall ...........................................22

**ARGUMENT** ..........................................................................................................23

I.    FOLLOWING EXTENSIVE DISCOVERY, PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROVING AN ALTER EGO RELATIONSHIP..........................23

    A.    Threshold Issues..................................................................................23

        1.    Choice of Law.........................................................................23

        2.    Relevant Legal Standard.........................................................24

        3.    The Required Entity-by-Entity Analysis .................................25

B.   Jurisdictional Discovery Confirms that Neither Philips RS Nor Philips NA Is an Alter Ego of KPNV Under the Applicable Enterprise Factors. ..................26

    1.   Factor 1:  KPNV Indirectly Owns Both Philips RS and Philips NA. ........28

    2.   Factor 2:  Plaintiffs Cannot Identify a Single Shared Officer or Director Between KPNV and Philips RS or Philips NA Who Acted Exclusively on Behalf of KPNV. ..........................................................28

    3.   Factor 7:  Plaintiffs Cannot Identify a Single Manager or Supervisor Between KPNV and Either Philips RS or Philips NA. ..........30

    4.   Factor 5:  Plaintiffs Do Not Identify a Single Shared Employee Between KPNV and Philips RS or Philips NA. ........................................32

    5.   Factors 3 & 4:  Plaintiffs Fail to Establish Any Control with Respect to the "Philips" Branding. ............................................................32

    6.   Factor 6:  Neither Philips RS nor Philips NA Share the Same Sales and Distribution System with KPNV. ........................................................34

    7.   Factor 10:  Plaintiffs Fail to Establish that KPNV Exercised Improper Control. .....................................................................................36

    8.   Factors 8 & 9:  Plaintiffs Concede that Two of the Factors Weigh Against Finding an Alter Ego Relationship. ................................................40

    9.   Plaintiffs' Non-Enterprise "Other" Considerations Do Not Save Their Failed Alter Ego Theory. ......................................................................41

C.   The Declaration Plaintiffs Have Submitted Consists Entirely of Improper Legal Conclusions and Unsupported Factual Contentions. ...................................44

II.   PLAINTIFFS' SECONDARY "DIRECT JURISDICTION" THEORY OVER KPNV HAS NO SUPPORT IN THE FACTS OR THE LAW. ........................................48

A.   Pre-Recall Claims ...................................................................................................48

B.   Negligent Recall Claims ........................................................................................51

**CONCLUSION** ...............................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action Mfg.* v. *Simon Wrecking,*
  375 F. Supp. 2d 411 (E.D. Pa. 2005) .................................................................27, 29

*Am. Bell* v. *Fed'n of Tel. Workers,*
  736 F.2d 879 (3d Cir. 1984).............................................................................24

*Arch* v. *Am. Tobacco,*
  984 F. Supp. 830 (E.D. Pa. 1997) ...................................................................40, 41

*In re Asbestos Prods. Liab. Litig. (No. VI),*
  2014 WL 5394310 (E.D. Pa. 2014) ..................................................................23

*Atiyeh* v. *Hadeed,*
  2007 WL 853816 (E.D. Pa. 2007) ....................................................................6

*Beemac.* v. *Republic Steel,*
  2021 WL 2018681 (W.D. Pa. 2021) .................................................................50

*Cent. States, Se. & Sw. Areas Pens. Fund* v. *Reimer Express World,*
  230 F.3d 934 (7th Cir. 2000) ...........................................................................35

*In re Chocolate Confectionary Antitrust Litig.,*
  602 F. Supp. 2d 538 (M.D. Pa. 2009) [*In re Chocolate I*] ...................................5, 6

*In re Chocolate Confectionary Antitrust Litig.,*
  641 F. Supp. 2d 367 (M.D. Pa. 2009) [*In re Chocolate II*]........................26, 32, 38

*Clientron* v. *Devon IT,*
  2016 WL 1255218 (E.D. Pa. 2016) ..................................................................45

*Croyle* v. *Tex. E. Corp.,*
  464 F. Supp. 377 (W.D. Pa. 1979) ...................................................................28, 29

*D'Jamoos* v. *Pilatus Aircraft,*
  566 F.3d 94 (3d Cir. 2009)...............................................................................51

*Deardorff* v. *Cellular Sales of Knoxville,*
  2022 WL 309292 (E.D. Pa. 2022) ....................................................................38, 40

*E.I. du Pont.* v. *Agfa-Gavaert NV,*
  335 F. Supp. 3d 657 (D. Del. 2018)..................................................................31

*In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*,
  735 F. Supp. 2d 277 (W.D. Pa. 2010) (Conti, J.) ............................................................*passim*

*Simeone ex rel. Est. of Albert Francis Simeone, Jr.* v. *Bombardier-Rotax GmbH*,
  360 F. Supp. 2d 665 (E.D. Pa. 2005) ...........................................................25, 38, 39, 40

*Fagan* v. *Fischer*,
  2019 WL 5587286 (D.N.J. 2019) ...........................................................................42

*G.O. Am. Shipping Comp.* v. *China COSCO Shipping*,
  2017 WL 6026959 (W.D. Wash. 2017)....................................................................26

*Genzyme* v. *Novartis Gene Ther.*,
  2023 WL 1965090 (D. Del. 2023)...........................................................................49

*Habas Sinai Ve Tibbi Gazlar Istihsal A.S.* v. *Int'l Tech. & Knowledge*,
  2021 WL 1088987 (W.D. Pa. 2021) ..........................................................................4

*Hartle* v. *FirstEnergy Generation*,
  2014 WL 1117930 (W.D. Pa. 2014) (Conti, J.)......................................................45

*Hooper* v. *Safety-Kleen Sys.*,
  2016 WL 7212586 (W.D. Pa. 2016) ...........................................................36, 39, 50

*J. McIntyre Mach.* v. *Nicastro*,
  564 U.S. 873 (2011).................................................................................................51

*J.L.B. Equities* v. *Ocwen Fin.*,
  131 F. Supp. 2d 544 (S.D.N.Y. 2001) ....................................................................48

*Kinetics Noise* v. *ECORE Int'l*,
  2011 WL 13217669 (C.D. Cal. 2011)......................................................................49

*Lapine* v. *Materion*,
  2016 WL 3959081 (E.D. Pa. 2016) ...................................................................33, 37

*Licea* v. *Curaco Drydock*,
  952 F.3d 207 (5th Cir. 2015) .............................................................................26, 31

*Lutz* v. *Rakuten*,
  376 F. Supp. 3d 455 (E.D. Pa. 2019) ......................................................................40

*Mid-State Sur.* v. *E. Bethlehem Twp. Mun. Auth.*,
  2005 WL 8174473 (W.D. Pa. 2005) (Conti, J.)......................................................45

*Miller* v. *EME Homer City Generation*,
  2013 WL 5972382 (W.D. Pa. 2013) ........................................................................49

*Pearson* v. *Component Tech.*,
    247 F.3d 471 (3d Cir. 2001) .................................................................*passim*

*Poe* v. *Babcock Int'l*,
    662 F. Supp. 4 (M.D. Pa. 1985)..............................................................29

*Publicker* v. *Roman Ceramics*,
    603 F.2d 1065 (3d Cir. 1979)..................................................................24

*Ranza* v. *Nike*,
    793 F.3d 1059 (9th Cir. 2015) ................................................................31

*Reverse Vending Assocs.* v. *Tomra Sys. US*,
    655 F. Supp. 1122 (E.D. Pa. 1987) .........................................................24

*Reynolds* v. *Turning Point Holding*,
    2020 WL 953279 (E.D. Pa. 2020) ...........................................................38

*Riad* v. *Porsche*,
    2023 WL 2227692 (E.D. Pa. 2023) ....................................................*passim*

*Rice* v. *First Energy Corp.*,
    339 F. Supp. 3d 523 (W.D. Pa. 2018).............................................33, 41, 47, 48

*Rocke* v. *Pebble Beach*,
    541 F. App'x 208 (3d Cir. 2013) .........................................................4, 48

*Savin* v. *Heritage Copy Prod.*,
    661 F. Supp. 463 (M.D. Pa. 1987)........................................................29, 41

*Seltzer* v. *I.C. Optics*,
    339 F. Supp. 2d 601 (D.N.J. 2004) ..................................................31, 32, 39

*Shuker* v. *Smith & Nephew*,
    885 F.3d 760 (3d Cir. 2018)....................................................................51

*Shuman* v. *Lauren Kim, Inc.*,
    2015 WL 1472003 (D.N.J. 2015) ............................................................45

*Solta Med.* v. *Lumenis.*,
    454 F. Supp. 3d 107 (D. Mass. 2020) .....................................................51

*Tatung* v. *Shu Tze Hsu*,
    217 F. Supp. 3d 1138 (C.D. Cal. 2016) ..................................................25

*Thornton* v. *Bayerische Motoren Werke AG*,
    439 F. Supp. 3d 1303 (N.D. Ala. 2020)...................................................51

*Trinity* v. *Greenlease Holding*,
　2014 WL 1766083 (W.D. Pa. 2014) ..............................................................29, 35, 36

*UHS* v. *United Health Servs.*,
　2013 WL 12086321 (M.D. Pa. 2013) ...........................................................30, 33, 44

*United Dairy*. v. *Bayshore Indus.*,
　2015 WL 5311297 (W.D. Pa. 2015) (Conti, J.) .....................................................50

*United States* v. *Bestfoods*,
　524 U.S. 51 (1998) ..............................................................................................27, 29

*Vacaflor* v. *Penn. State Univ.*,
　2014 WL 3573593 (M.D. Pa. 2014) .........................................................................34

*Zombeck* v. *Amada*,
　2007 WL 4105231 (W.D. Pa. 2007) .........................................................................28

## Rule

Fed. R. Civ. P. 1006 ...................................................................................................... 6

## PRELIMINARY STATEMENT

Failing to identify sufficient direct contacts between Koninklijke Philips N.V. ("KPNV") and the United States, Plaintiffs ask this Court to exercise personal jurisdiction over KPNV based on the fiction that a parent holding company in the Netherlands, with investments in nearly 300 subsidiaries worldwide, was actively exerting pervasive levels of control over its subsidiary in Murrysville, Pennsylvania such that it ceased to exist independently for years. After KPNV challenged this wildly implausible theory, Plaintiffs claimed an immediate need for extensive jurisdictional discovery into "Philips' complex corporate structure that is largely hidden from public view," from which they hoped to be able to show this complete domination by KPNV with "precision." (ECF No. 754 at 4.) Plaintiffs got their wish, but only in terms of the breadth and scope of discovery they asked for. On the substance, the evidence only underscores that KPNV has never exercised the type of pervasive, day-to-day control of Philips RS North America LLC ("Philips RS") necessary for Plaintiffs to be able to treat it as an "alter ego" of KPNV for purposes of personal jurisdiction (let alone liability). Nor does it support Plaintiffs' fallback position that Philips North America LLC ("Philips NA") was KPNV's "alter ego."

Plaintiffs bear an incredible burden here. "In deciding whether to apply the alter ego theory" in the personal jurisdiction context, "the Court must start from the general rule that the corporate entity should be upheld unless specific, unusual circumstances call for an exception." *Riad* v. *Porsche*, 2023 WL 2227692, at *3 (E.D. Pa. 2023). To meet their high burden, Plaintiffs must show that "the parent controls the *day-to-day operations* of the subsidiary such that the subsidiary can be said to be *a mere department* of the parent" rather than a standalone entity. *In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 735 F. Supp. 2d 277, 318 (W.D. Pa. 2010) (Conti, J.) (emphasis added).

Plaintiffs received no evidence during jurisdictional discovery that substantiated their "day-to-day" control theory (not to mention the more than a million documents produced by Defendants—including the supposedly controlled Philips RS and Philips NA—during merits discovery).  Rather, discovery revealed nothing more than unexceptional parent/subsidiary relationships—run by separate managements and documented by corporate minutes, intercompany agreements, and extensive records—which is presumably why Plaintiffs utilized very little of it in their Opposition.  Not surprisingly, Plaintiffs identify no one at KPNV secretly running Philips RS or Philips NA.

Despite Plaintiffs' acknowledgment that whether an alter ego relationship exists "depends on 'the entirety of the relationship'" between the two companies (Opp. at 22 n.23), they conveniently omit most of the information provided to them during the course of jurisdictional discovery.  As merely a few examples:

- Before its acquisition by KPNV in 2008, Philips RS had a successful global operation, and was a market leader in sleep apnea products at the time of the acquisition.  In fact, KPNV's entire investment thesis for the Philips RS acquisition was to let it thrive independently with its proven management, a theory now directly contrary to the assertion of Plaintiffs.
- Philips RS is governed by its own, separate Board of Directors that manages the operations of the company.
- Underscoring the lack of KPNV domination, KPNV never had a single shared executive, director, or employee with Philips RS *at any level*, and had only *one* shared executive with Philips NA.
- The corporate entities within the Philips Group, including KPNV, Philips RS and Philips NA, are subject to numerous intercompany agreements between them, and those written agreements define their rights and obligations with respect to one another, ranging from cash management, to intellectual property usage, to payments for various intercompany services.

- Services performed pursuant to these intercompany agreements (*e.g.*, Philips NA performs a service for Philips RS, or vice versa)  (*E.g.*, KPNV Ex. 18, at 16.)

  (*Id.* at 2.)

- By written agreement, all subsidiaries, including Philips RS and Philips NA, maintain separate bank balances and at all times have control and responsibility over their finances.

- KPNV has memorialized as policy that "[g]iven the diverse nature of our businesses and markets we cannot have a 'one size fits all' operational design of our company system." (KPNV Ex. 12, at 3.)

Attempting to obscure their evidentiary deficit, throughout their brief, Plaintiffs rely on unsupported statements and misleading characterizations of their exhibits, contorting them well beyond what their most generous reading could allow. But even if Plaintiffs' characterizations were accurate and complete, they still would not be sufficient to meet their "notoriously difficult" burden. *Riad*, 2023 WL 2227692, at *3. Plaintiffs' fixation on KPNV's high-level group-wide policies, which are principally enforced at the local level, and coordination between sister companies in similar industries falls dramatically short of proving that KPNV exceeded the "incidental control" that "naturally flows from . . . the parent-subsidiary relationship." *In re Enterprise*, 735 F. Supp. 2d at 323. There is nothing sinister about a parent exercising high level oversight and guidance of its subsidiaries, nor in obtaining information about their operations. "[A] parent corporation is entitled to establish group-wide financial protocols, monitor the performance of its subsidiaries and reap financial benefits from their profits," and "common

marketing, various aspects of the interrelationships [] are quite typical in modern multisubsidiary parent relationships." (Dec. 14, 2022 CMC Tr. at 18.)

Finally, tacitly recognizing that the evidence did not support their indirect theory of personal jurisdiction, Plaintiffs pivot to their previously jettisoned direct jurisdictional theory, which fares no better. Stretching to find any conceivable connection between KPNV and the relevant forums, Plaintiffs offer a number of purported contacts related to visits to the United States by KPNV personnel and intercompany agreements with its U.S. subsidiaries, apparently hoping that this Court overlooks the fact that Plaintiffs' pre-recall claims relate to the *design, manufacture, and sale of the recalled devices*. Failing to show how their original purchase or acquisition claims (*i.e.*, all claims except their negligent recall claim) "arise out of or relate to" any of KPNV's supposed U.S. contacts, their specific jurisdiction theory has no chance either. *Rocke* v. *Pebble Beach*, 541 F. App'x 208, 211 (3d Cir. 2013).

As set forth in KPNV's opening brief, KPNV has conceded that it is subject to personal jurisdiction in Pennsylvania with respect to Plaintiffs' negligent recall claim for those Plaintiffs who filed suit originally in Pennsylvania. KPNV recognizes that once it stepped in to assist its indirect subsidiary, Philips RS, with its recall, it availed itself of limited personal jurisdiction in Pennsylvania, where Philips RS is headquartered. But, in all other respects, and particularly in light of the extensive discovery Plaintiffs have sought and received, KPNV asks the Court to dismiss it from these cases for lack of personal jurisdiction.

## LEGAL STANDARDS GOVERNING THIS MOTION

"The parent-subsidiary relationship itself is not sufficient to establish in personam jurisdiction over the parent entity." *Enterprise*, 735 F. Supp. 2d at 317-18. Proving that a corporation is merely an alter ego is a burden that is "notoriously difficult" for plaintiffs to meet. *Riad*, 2023 WL 2227692, at *3; *Habas Sinai Ve Tibbi Gazlar Istihsal A.S.* v. *Int'l Tech. &*

*Knowledge*, 2021 WL 1088987, at *8 (W.D. Pa. 2021).  Plaintiffs must show that KPNV had "*actual* control over the *daily* affairs of [its] subsidiaries," *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 571 (M.D. Pa. 2009) [*In re Chocolate I*] (emphasis added), such that "the subsidiary can be said to be *a mere department* of the parent."  *Enterprise*, 735 F. Supp. 2d at 318 (emphasis added).

Courts in this Circuit look to ten factors in deciding whether a subsidiary should be treated as the parent company's alter ego in the personal jurisdiction analysis.  Those factors consider whether:

> (1) the parent owns all or a significant majority of the subsidiary's stock, (2) commonality of officers or directors exists between the two corporations, (3) the corporate family possesses a unified marketing image, including common branding of products, (4) corporate insignias, trademarks, and logos are uniform across corporate boundaries, (5) corporate family members share employees, (6) the parent has integrated its sales and distribution systems with those of its subsidiaries, (7) the corporations exchange or share managerial or supervisory personnel, (8) the subsidiary performs business functions that would ordinarily be handled by a parent corporation, (9) the parent uses the subsidiary as a marketing division or as an exclusive distributor, and (10) the parent exercises control or provides instruction to the subsidiary's officers and directors.

*Enterprise*, 735 F. Supp. 2d at 318-19 (the "*Enterprise* factors").  "No single factor is dispositive."  *In re Chocolate I*, 602 F. Supp. 2d at 570.  But, to be sure, these factors are to assess whether the parent so dominates the subsidiary as to have effective day-to-day control.

In ruling on this motion, "[t]he Court may proceed either based upon affidavits and sworn documents or conduct an evidentiary hearing."  *Atiyeh* v. *Hadeed*, 2007 WL 853816, at *4 (E.D. Pa. 2007).  Where the Court conducts an evidentiary hearing, plaintiffs cannot meet their burden by simply presenting a prima facie case, but rather must meet "the more substantial burden of *proving* that personal jurisdiction is proper *by a preponderance of the evidence*."  *Id.* (emphasis added).

The vast majority of Plaintiffs' claims (*i.e.*, all claims other than the negligent recall claim) relate to conduct *prior* to the recall. For those claims, the question is whether Plaintiffs have met their burden of *proving* that Philips RS (or, for their fallback, Philips NA) was KPNV's alter ego by a preponderance of the evidence. With respect to the negligent recall claim, however, the question is ultimately a legal one: whether, as a matter of law, KPNV submitted to jurisdiction in all 50 states (as opposed to solely in Pennsylvania, where Philips RS is headquartered) when it assisted its Pennsylvania subsidiary with a recall of products sold across the United States.

**EVIDENCE DEVELOPED IN JURISDICTIONAL DISCOVERY**[1]

### A.  The Structure and Organization of KPNV

Founded more than a century ago (in 1891), KPNV is a Dutch holding company (a *naamloze vennootschap* (N.V.)) headquartered in Amsterdam. As a publicly traded holding company, KPNV owns, directly or indirectly, all of the subsidiaries within the Philips Group. (KPNV Ex. 1, at 124.) ████████████████████████████████████████

████████████████ (*See* KPNV Ex. 7 (Resp. to Juris. Rog. No. 18).) KPNV is responsible for overseeing the Philips Group, which consists of nearly 300 companies participating in a wide range of industries in over 100 different countries. (KPNV Ex. 1, at 23, 83.)[2] The subsidiaries are independent companies that run their own operations, but there is an expectation that KPNV,

---

[1]    Plaintiffs attach a number of materials to their Opposition that do not comply with the Federal Rules of Evidence, in particular Rule 1006, or are otherwise inadmissible. (*E.g.*, Duggan Decl. ¶ 137.) Consistent with the Court's direction at the April 20, 2023 status conference, KPNV will raise relevant objections to their admissibility as part of the parties' submissions for the evidentiary hearing.

[2]    From 2008 (when KPNV acquired Philips RS) through 2021, the companies within the Philips Group employed between 74,000 and 121,000 employees, with an average of 110,000 employees in any given year. (*E.g.*, KPNV Ex. 1, at 59; KPNV Ex. 2, at 21; KPNV Ex. 3, at 55.)

as the owner, will receive periodic updates on their performance, not only for its own governance purposes, but because KPNV is a publicly held company with disclosure obligations to its shareholders.   To be an effective parent, KPNV is organized such that it can learn the information necessary to support its subsidiaries in their respective markets, while ensuring each of the businesses operate independently to optimize performance within diverse industries across diverse regions throughout the world, including by remaining compliant with the laws of the relevant jurisdictions.   KPNV leaves the day-to-day operations to its subsidiaries, which have particular expertise and experience within their respective industries and markets.[3]

To manage risk and to oversee important matters related to its ownership, KPNV utilizes a two-tiered board structure, consisting of a Board of Management and a Supervisory Board— each of which answers ultimately to KPNV's shareholders.  (KPNV Ex. 1, at 117.)  KPNV's Board of Management, which consists of the CEO, CFO and General Counsel, assumes KPNV's ownership and management responsibilities, and certain key officers are selected to support the Board of Management in these duties.  (*Id.*; KPNV Ex. 8, at 112.)  Together, the Board of Management and those key officers constitute KPNV's Executive Committee.  (KPNV Ex. 1, at 117.)  The Board of Management and Executive Committee "drive the company's management agenda and share responsibility for the continuity of the Philips group, focusing on long-term value creation."  (*Id.*)

The Board of Management and Executive Committee are, in turn, overseen by the Supervisory Board, which is responsible for the "policies, management and general affairs of Philips, and assists the Board of Management and the Executive Committee with advice on

---

[3]   *E.g.*, Opp. Ex. 22, at 16; KPNV Ex. 3, at 69; KPNV Ex. 4; KPNV Ex. 5, at 34; KPNV Ex. 6, at 20.

general policies related to the activities of the company." (*Id.* at 118; *see* KPNV Ex. 9, at 1-3.) The Supervisory Board meets to "discuss the general strategy of the Company and the Philips group, as well as the main risks associated with their business activities." (KPNV Ex. 9, at 5.) The Supervisory Board delegates certain responsibilities to four specialized committees, including an Audit Committee and a Quality and Regulatory Committee. (KPNV Ex. 1, at 119.)

**B.     Reporting Segments Within the Philips Group**

The almost 300 subsidiaries that comprise the Philips Group sell thousands of different products all over the world, including diagnostic imaging devices (*e.g.*, x-rays), oral healthcare products, emergency care equipment, personal health products, audio products, sleep and respiratory care products, kitchen appliances, and many others. (KPNV Ex. 1, at 15-23.) To comply with the various applicable legal regimes and meet the needs of different consumer bases, the Philips Group is divided into four main Business Clusters (sometimes also called Segments), which, as of 2022, are (1) Diagnosis & Treatment; (2) Connected Care; (3) Personal Health; and (4) Other. (KPNV Ex. 10, at 15.)[4]

To serve consumer needs more specifically, each Business Cluster is subdivided into specific Businesses, which are responsible for their individual products lines and for ensuring compliance with quality and regulatory requirements. (KPNV Ex. 11, at 11.)[5] Philips RS's products—including the products at issue in this litigation—fall within the Sleep & Respiratory

---

[4]     The names of the Business Clusters have changed over time. (*E.g.*, KPNV Ex. 11, at 9.)

[5]     As of 2022, the Diagnosis & Treatment Segment includes Diagnostic Imaging, Ultrasound, Enterprise Diagnostic Informatics, and Image Guided Therapy. The Connected Care Segment includes Hospital Patient Monitoring, Emergency Care, Sleep & Respiratory Care, and Connected Care Informatics. The Personal Health Segment includes Oral Healthcare, Mother & Child Care, and Personal Health. Finally, the Other Segment includes Innovation, IP Royalties, Central Costs, and Other. (KPNV Ex. 10, at 15.)

Care ("SRC") Business, which falls within the Connected Care Business Cluster.  (KPNV Ex. 10, at 18.)[6]

In addition to being organized by business types, the Philips Group operates in 17 "Markets" based on geographic regions through local marketing subsidiaries, one of which is Philips North America ("Philips NA").  (KPNV Ex. 11, at 9.)  The purpose of the Markets is to better address local needs and foster long-term relationships with customers located in specific regions.  (*Id.* at 12.)  Although the Markets structure is separate from the Business Clusters, both structures work closely together through Business-Market Combinations ("BMCs").  (*Id.*)  These BMCs allow the Philips Group to "take decisions that are locally relevant and as close to the customer as possible."  (KPNV Ex. 8, at 119.)

### C.    Company-Wide Policies and Intercompany Agreements

To lower costs, permit operating efficiencies, and ensure legal compliance (including tax compliant allocations supporting transfer pricing), the companies in the Philips Group transact and negotiate arm's-length agreements with each other, including with KPNV, as stand-alone companies.[7]  At the same time, the companies are still part of the larger Philips Group, and accordingly, there are certain minimum basic standards that apply group-wide, with the opportunity for case-specific deviation at a localized level as appropriate.

---

[6]    SRC was initially created as a sub-group under a more general "Patient Care & Monitoring Solutions" Business, until it became its own standalone Business under the "Personal Health" Business Cluster in 2016.  (KPNV Ex. 4; KPNV Ex. 2, at 32.)  In 2019, the SRC Business was moved to the "Connected Care" Business Cluster, which is where it remains today. (KPNV Ex. 6, at 14.)

[7]    Given the number of companies in the Philips Group and the volume of intercompany agreements, producing all of these agreements would have been untenable and, considering many of them have nothing to do with Philips RS, unnecessary.  As agreed between the parties in jurisdictional discovery negotiations, KPNV produced to Plaintiffs only the intercompany agreements between KPNV, on the one hand, and any of the Defendant subsidiary companies, on the other.

1.    *Philips Group Policies*

One strategy KPNV uses, as an owner, to manage its risk and to encourage operating efficiencies is through group-wide policies that set certain high-level goals and minimum corporate standards.  This is done principally through the Philips Business System ("PBS"), which is an "interdependent, collaborative model" that provides generally applicable standards for various business, strategy, quality, ethical, and culture-related issues.  (KPNV Ex. 11, at 3; Opp. Ex. 5, at 3, 7.)  The PBS does not broach matters that are specific to any particular company's day-to-day operations, business models, or industries.  The PBS does not, for example, impose upon a subsidiary's ability to make lawful business decisions in accordance with its own institutional expertise and informed judgment.

The PBS was instituted in 2012 to address the concern that the "organization is over-complex and too costly for the size of the company[,]" which was "detract[ing] from agile entrepreneurship."  (KPNV Ex. 12, at 1.)  The PBS was "designed to make Philips a simpler, faster, customer-focused, learning organization that aspires to the highest standards of quality" (KPNV Ex. 11, at 3), and describes the general "spirit" of how Philips Group leaders are to run the organization (KPNV Ex. 13, at 4).  The PBS serves a risk management function, as the Executive Committee seeks to ensure minimum levels of performance.  (KPNV Ex. 12, at 2.)

Against this unremarkable background, Plaintiffs repeatedly suggest that the PBS policy somehow eviscerates corporate boundaries.  (Opp. at 8-9, 10-11, 26.)  Notably, each of Plaintiffs' references to an "integrated operating company" comes from documents describing the PBS specifically.  (*See* Opp. at 3, 8.)  On its face, however, the PBS explicitly disclaims the control Plaintiffs claim to exist by recognizing that, "[g]iven the diverse nature of our businesses and markets *we cannot have a 'one size fits all' operational design* of our company system." (KPNV Ex. 12, at 3 (emphasis added).)  What's more, KPNV relies on market leaders to oversee

the implementation and enforcement of the PBS.  Any difference or conflicts that arise with respect to the PBS are to be resolved on a local level in the first instance.  (KPNV Ex. 14, at 2-3.) The PBS contemplates escalation to the KPNV Executive Committee only when there are "[r]emaining differences—for example between group market leaders and sectors[.]"  (*Id.*)

Within the PBS framework, there are other group-wide policies that are tailored to individual matters of general concern across the Philips Group.[8]  Plaintiffs' favorite is apparently the General Business Principles ("GBP"), which "set the standard for acting with integrity[.]" (Opp. Ex. 27, at 3.)  The GBP operates as a code of conduct, requiring that employees and leaders act ethically in all aspects of their business dealings.  (*Id.* at 14.)  Because the businesses "operate[] in [] highly regulated industr[ies]" (KPNV Ex. 15, at 5), the GBP also serves as a tool for risk management.  (KPNV Ex. 16.)

The GBP is implemented at a local level by GBP Compliance Officers, who are designated "at market, country, site, business and functional level."  (KPNV Ex. 17, at 7.)  These local Compliance Officers are "responsible for the effective deployment of the GBP within their markets."  (*Id.*)  Part of their job description is to "advis[e] management and employees on GBP-related matters" and to "coordinat[e] and monitor[] . . . the processing of GBP concerns in his/her own area of responsibility[.]"  (*Id.* at 8.)  Compliance Officers[9] are instructed to understand their "basic responsibilities," but also to "translate[]" them to their "respective

---

[8]    One example is the "Quality Policy," which sets out minimum standards related to quality for compliance certification purposes.  Another is the "Enterprise Information Security Policy," which pertains to the governance of information security.  (KPNV Ex. 11, at 16.)

[9]

Business, Function or Site." (KPNV Ex. 15, at 6.)  Importantly, KPNV recognizes that in order

for GBP Compliance Officers to "effectively function" in their role, they "need to have sufficient

autonomy." (KPNV Ex. 15, at 7.) Accordingly, the GBP Charter was written in order "to

strengthen the independency of [their] position[s]." (*Id.*)

        **2.**     ***Intercompany Agreements***

        In part to take advantage of the Philips Group's resources throughout the world, the

various subsidiaries in the Philips Group are subject to a multitude of specific intercompany

agreements defining their rights and obligations with respect to one another, a few of which are

described below. Payments pursuant to these intercompany arrangements ██████████

██████████████████████████████████████

██████████████████ (KPNV Ex. 18, at 16.)[10]  It is no surprise that this

requirement is front and center in KPNV's Transfer Pricing Policy, because the amount and

fairness of charges associated with intercorporate transactions are often the subject of tax

challenges in any number of taxing jurisdictions. To ensure compliance with this policy, ██████

██████████████████████████████████████

██████████████████████████████████████

████████████████████ (Opp. Ex. 128, at 2.)  It is ████████

██████████████████████████████████████

██████████████████████████████████████

██████████████ (KPNV Ex. 19, at 2; KPNV Ex. 20, at 2.)[11]

---

[10]     When a subsidiary makes a claim for payment for its services provided, that is referred to as a "counterclaim."

[11]     Almost identical language is contained within the transfer pricing policies throughout the relevant period. (*See, e.g.*, KPNV Ex. 21, at 3; KPNV Ex. 22, at 4; KPNV Ex. 23, at 4.)

### a)    *Services Agreements*

By agreement, KPNV coordinates the provision of services to its subsidiaries around the globe by contracting its other subsidiaries that specialize in the relevant services. Pursuant to these agreements, through other subsidiary companies, KPNV agrees to make available to the signatory subsidiary services related to IT, marketing, accounting, auditing, human resources, and insurance, among other group-wide services. In exchange, ██████████████████████ ████████████████████████████████████████████[12] ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████[13]   In other words, as a parent holding company, KPNV coordinates the provision of services from subsidiary to subsidiary.

Plaintiffs suggest that ████████████████████████████████████ ████████████████████ (Opp. at 6), but, as demonstrated by the agreements themselves, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████

Additionally, ████████████████████████████████████████. For example, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[12]    *E.g.*, Opp. Ex. 109, at 1, 10; Opp. Ex. 13, at 1, 3-4.  The 1997 General Services Agreement between KPNV and Philips Holding USA, Inc. ("PHUSA"), which PHUSA entered into "on behalf of itself and its direct and indirect subsidiaries" (including Philips RS), governed these services from 1997 until 2014, at which point KPNV and PHUSA entered into the 2014 agreement largely providing for the same services and terms.  *Id.*

[13]    *See, e.g.*, Opp. Ex. 109, at 1, 10; KPNV Ex. 25, at 3-5; KPNV Ex. 26, at 3, 14-15.

█████████████████ (See, *e.g.*, Opp. Ex. 11, at 2-3, 6.)  Additionally, ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ (Opp. Ex.

12, at 3, 4-5; KPNV Ex. 27, at 3, 4-6.) ███████████████████████

████████████ (Opp. Ex. 12, at 4; KPNV Ex. 27, at 4.) █████████████

████████████████████████████████████████████████████████████

While Plaintiffs oddly suggest these agreements reflect some lack of respect for corporate

boundaries, they demonstrate precisely the opposite.

### b)    *In-House Banking ("IHB") Agreements*

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ (*E.g.*, KPNV Ex. 28.) ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ (Opp. Ex. 128, at 2.) ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

(*See* KPNV Ex. 28.) ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ (*Id.*; KPNV Ex. 7 (Resp. to Juris. Rog. 1).) ████████

████████████████████████████████████████████████████████████

█████████████ (Opp. Ex. 128, at 2; KPNV Ex. 28, at 10-11.)

Functionally, ████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ (*See* KPNV Ex. 7

(Resp. to Juris. Rog. 1).) ████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████ (*See* KPNV Ex. 7 (Resp. to Juris. Rog. 1 & 4); KPNV

Ex. 28, at 5-6.) █████████████████████████████████████████

████████████████████████████████ (*Id.*)

████████████████████████████████████████████████████

███ (*id.* at 6), ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ (*Id.*)   As a result, █████████

████████████████████████████████████████████████████████

███████████ (*Id.*)   Further, the agreement ██████████████████████████

████████████████████████████ (KPNV Ex. 28, at 6.)

Contrary to Plaintiffs' incorrect assertion, ████████████████████████

█████████████ (Opp. at 6.) ████████████████████████████████

████████████████████████████████████████████████████████

(KPNV Ex. 28, at 10.) ████████████████████████████████████

(Opp. Ex. 128, at 2; KPNV Ex. 28, at 13-14.) ████████████████████████

████████████████████████████████████████████████████████

████████ (*See* KPNV Ex. 29.) ████████████████████████████████

███████████████████████████████████████████████████

(KPNV Ex. 28, at 15.)

## D.    Philips RS

### 1.    *Acquisition of Philips RS*

Before Philips RS—at the time, Respironics, Inc.—was acquired by KPNV, it had been operating around the world (with various subsidiaries of its own) for 24 years. Respironics began to experience consistent economic growth starting in 1999, which continued in the years leading up to the acquisition.[14] Respironics' success was a significant factor in KPNV's interest in Respironics. (*See* KPNV Ex. 32 ████████████████████████████████

████████████████████████████████████████████).)

In 2008, KPNV acquired Respironics as part of its broader strategy to expand into the consumer sleep and respiratory care market. (KPNV Ex. 33, at 2.) Respironics' already-successful business was an attractive opportunity, as it was at the time the "leading developer, manufacturer, and distributor of [respiratory] products," and it was the "market leader" in the sleep apnea market specifically. (KPNV Ex. 34, at 1; *see also* KPNV Ex. 35 ("Respironics already has a well-established brand in the market[.]").)

The Respironics acquisition was, by design, meant to be a "bolt on" arrangement. KPNV intended for Respironics to maintain its existing organizational structure and management post-acquisition, and to become an indirect wholly-owned subsidiary of KPNV.[15]   KPNV was

---

[14]    From 1999 to 2007, Respironics experienced a 430% growth in net income, starting at $23 million in 1999 and reaching over $122 million in 2007. (*See* KPNV Ex. 30, at 19 (indicating a net income in 1999 of approximately $23 million); KPNV Ex. 31, at 31 (noting a net income in 2007 of approximately $122 million).)

[15]    At all relevant times, KPNV was the direct parent of PHUSA. Prior to its conversion into an LLC in 2020, Respironics was a direct subsidiary of PHUSA. (Opp. Ex. 9, at 2.) After its

specifically interested in the fact that, with Respironics, it would "acquire a very strong and experienced management team." (KPNV Ex. 32, at 3.)  In fact, retaining existing Respironics management was "*conditional* to this transaction[.]"  (*Id.* (emphasis added); *see also* KPNV Ex. 34, at 9 ("Moonlight has a strong management team that is critical to the business' success[,]" noting that the transaction would involve offering "retention package[s]" to existing management); *id.* ("[R]etention of Moonlight's key management is a prerequisite for a successful transaction and will for that reason by (sic) a key condition to come to a transaction with Moonlight.").)

The purchase price for Respironics was approximately \$5.1 billion.



(KPNV Ex. 37.)

[16]   (Opp. Ex. 18, at 2.)

(Opp. Ex. 19; KPNV Ex. 38.)

[17]   (Opp. Ex. 20; KPNV Ex. 40.)

conversion to an LLC in 2020, Philips RS became the direct subsidiary of a new holding company Philips RS North America Holding Corp., which was in turn the direct subsidiary of PHUSA.  (*Id.* at 3; KPNV Ex. 36.)

---

[16] (*See* KPNV Ex. 37 .").)

[17] (KPNV Ex. 39, at 2.)

████████████████████████████████████████████████████████

████████████████████████████████████████ (KPNV Ex. 41; KPNV Ex. 42.)

KPNV's plan to integrate Respironics into the Philips Group was simple:  leverage KPNV's global infrastructure to fuel Respironics' growth while maintaining Respironics' independence and management to sustain the existing success of its business.  (KPNV Ex. 34, at 9.)  Striking the right balance "allow[ed] the preservation of unique capabilities available within [Respironics] whilst Philips capabilities are leveraged." (*Id.*)  This balance was illustrated by the fact that Respironics maintained its organizational structure, management, employees, and business plan post-acquisition.  (*See id.*)

To be sure, there was some degree of integration.  In the years following the acquisition,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████[18] ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ (KPNV Ex. 43, at 2.) ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ (KPNV Ex. 34, at 3.) ████

████████████████████████████████████████████████████████

███████████████████████ (*E.g.*, KPNV Ex. 44.)

---

[18]    *See*, *e.g.*, KPNV Ex. 7 (Resp. to Juris. Rog. No. 11); KPNV Exs. 45-47.

### 2.    *Conversion of Respironics, Inc. to Philips RS North America LLC*

In 2020, Respironics, Inc. was converted from a Delaware corporation to a Delaware limited liability company, renamed Philips RS North America LLC.  In connection with this conversion, Philips RS North America Holding Corp. was created to function as the holding company parent for Philips RS.

Plaintiffs pretend that the conversion was motivated by a "drive" to "increase quality and compliance," suggesting (incorrectly) that the conversion somehow shows that KPNV was then aware of a quality and compliance problem affecting the at-issue Philips RS devices.  (Opp. at 5.)  In fact, the conversion was done for tax purposes, as Plaintiffs know from the documents produced in jurisdictional discovery.  Under U.S. tax laws, an LLC can be treated as a "disregarded entity" for U.S. income tax purposes, such that its taxable profits can be treated as part of its parent's taxable profits for income tax purposes.  (KPNV Ex. 7 (Resp. to Juris. Rog. No. 12).)[19]  The conversion simply "had nothing to do with any issues relevant to this litigation." (*Id.*; *see* Opp. Ex. 7, at 5 ("[It would] achieve significant tax savings by converting Respironics, Inc. from a corporation to a limited liability company.").)[20]

### 3.    *Philips RS's Business Post-Acquisition*

Post-acquisition, Philips RS continued to conduct its business in much the same manner as it had before.  It had its own Board of Directors, which met on a quarterly basis.  (KPNV Ex. 48, at 7; *see also* Opp. Ex. 20, at 1.)  And, since 2017, Philips RS's Board has included an

---

[19]    Other PHUSA subsidiaries were converted to LLCs for the same fundamental reason, including Philips NA in 2017.  (KPNV Ex. 7 (Resp. to Juris. Rog. No. 13).)

[20]    Financial data for the various U.S.-based subsidiaries roll up into PHUSA, which publishes consolidated financial reports on behalf of itself and its subsidiaries.  (*See, e.g.*, Opp. Ex. 117 (Consolidated Financial Statements of PHUSA and Its Subsidiaries).)

independent director. (KPNV Ex. 49.)  No one from KPNV has ever sat on Philips RS's Board. (*See* Opp. Ex. 135.)  Nor has anyone from KPNV ever been an officer of Philips RS.  (*Id.*)

Philips RS designed and manufactured its own products, including all of the devices at issue in this litigation. (TAC Exs. 44 at 1; 47 at 29; 48 at 21; 49 at 163-64.)  As jurisdictional discovery confirmed, KPNV had "no role in the design choices and decisions" related to those devices, including the choices regarding foam selection.  (*E.g.*, KPNV Ex. 7 (Resp. to Juris. Rog. No. 9).)

**4.** **The Recall**

*a)* *Pre-Recall*



(KPNV Ex. 7 (Resp. to Juris. Rog. Nos. 10 & 22).)

---

21 ⬛⬛⬛ (KPNV Ex. 50, at 33.) ⬛ (KPNV Ex. 51, at 3.)



(KPNV Ex. 7 (Resp. to Juris. Rog. No. 10).)

on April 26, 2021—in

an abundance of caution until further tests could be completed—KPNV notified the public of

"possible risks to users related to the sound abatement foam."  (Opp. Ex. 2 at 2.)  Thereafter,

Philips RS issued a voluntary recall on June 14, 2021.[24]

---

[22]     KPNV Ex. 52.  Plaintiffs attach as an exhibit to their Opposition
(Opp. Ex. 53),

(Opp. at

16.)  Plaintiffs are incorrect.

(See also

KPNV Ex. 7 (Resp. to Juris. Rog. No. 10).)

[23]     KPNV Ex. 51, at 2-3; KPNV Ex. 53, at 2.

[24]     Since then, with the assistance of KPNV, Philips RS "has been conducting a
comprehensive test and research program" on the foam to evaluate potential health risks.
(KPNV Ex. 54, at 3.)  Whereas the preliminary test results from prior to the recall misidentified
and mischaracterized certain VOCs, a more updated toxicological risk assessment has "found no

*b) KPNV Has Provided Support to Philips RS in Connection with Its Recall*

Philips RS's recall is one of the largest medical device recalls in recent history. Approximately 15 million affected devices were sold globally over time, including about 10 million in the U.S. alone. (*See* KPNV Ex. 55, at 15; KPNV Ex. 56, at 3.) Given the scope of the recall, Philips RS needed the help of its parent company, and KPNV has been providing assistance to Philips RS with its recall ever since.[25] As a parent company, KPNV has provided Philips RS with oversight and guidance with respect to its recall. (KPNV Ex. 8, at 242; Opp. Ex. 96 at 2 ("[KPNV] will provide executive oversight and guidance to Respironics regarding remediation efforts.").) KPNV has utilized its global reach to spread Philips RS's warnings. (*See, e.g.*, Opp. Ex. 4 at 1.) KPNV has also formed an executive steering committee that meets regularly "to receive detailed reports on Respironics' progress in implementing the remediation plan." (KPNV Ex. 8, at 242; Opp. Ex. 96 at 2.) At bottom, while Philips RS is responsible for implementing the recall and its associated repair and replacement program,[26] KPNV has attempted to be a consistent resource for Philips RS throughout this challenging process.

---

risk concern for adverse health effects in patients" resulting from VOCs off-gassed from the foam in the DreamStation-1 devices. (*Id.* at 13.) Likewise, the "various lines of scientific evidence collectively demonstrate that exposure to particulate from degraded Type A foam in DS1 devices is unlikely to result in an appreciable harm to health in patients." (*Id.* at 26.)

[25]    Plaintiffs' assertion that KPNV "initiated . . . the ongoing recall program" (Opp. at 4) is entirely unsubstantiated by Plaintiffs' cited exhibit, which mentions nothing about the decision to initiate the recall. (KPNV Ex. 8, at 239-42.) Notably, KPNV was not involved in any pre-recall discussions with the FDA. (KPNV Ex. 7 (Resp. to Juris. Rog. No. 20).)

[26]    *See, e.g.*, Opp. Ex. 96 at 3 ("A [committee] consisting of senior leadership from Respironics[] will oversee the daily activities of the remediation plan, including the work-stream activities, and ensure that adequate resources are available"); *id.* ("Respironics is reinforcing its commitment to complete the Recalls as quickly as possible.").

ARGUMENT

## I.   FOLLOWING EXTENSIVE DISCOVERY, PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROVING AN ALTER EGO RELATIONSHIP.

### A.   Threshold Issues

#### 1.   *Choice of Law*

As addressed in KPNV's opening brief (Econ. Loss 12(b)(2) Mot. at 5), "[i]n the MDL setting, the transferee court applies the personal jurisdiction law of the state where the case was filed." *E.g., In re Asbestos Prods. Liab. Litig. (No. VI)*, 2014 WL 5394310, at *1 (E.D. Pa. 2014). The parties are in agreement that the relevant transferor courts sit in seven states— California, Georgia, Massachusetts, Oregon, Pennsylvania, Texas, and West Virginia—thus implicating the law of the First, Third, Fourth, Fifth, Ninth, and Eleventh Circuits. (Econ. Loss 12(b)(2) Mot. at 1 n 1; Opp. at 19.) As demonstrated in Appendix A to KPNV's opening brief, the requirements for establishing personal jurisdiction by way of alter ego do not meaningfully differ. Nor do Plaintiffs dispute this. As a result, KPNV will continue to primarily cite Third Circuit precedent, just as Plaintiffs did in their brief. (Opp. at 19.)

#### 2.   *Relevant Legal Standard*

Whether seeking to establish an alter ego relationship for either personal jurisdiction or liability, "[the Court] must start from the general rule that the corporate entity should be upheld unless specific, unusual circumstances call for an exception." *Riad*, 2023 WL 2227692, at *3 (jurisdiction); *see also Am. Bell* v. *Fed'n of Tel. Workers*, 736 F.2d 879, 886 (3d Cir. 1984) (liability). In either context, "[t]he burden of proof for the application of the alter ego theory rests with the party attempting to negate the existence of a separate entity." *Reverse Vending Assocs.* v. *Tomra Sys. US*, 655 F. Supp. 1122, 1128 (E.D. Pa. 1987) (jurisdiction); *Publicker* v. *Roman Ceramics*, 603 F.2d 1065, 1069 (3d Cir. 1979) (liability).

Differences exist between the alter ego analyses for jurisdiction versus liability. The *Enterprise* factors apply principally in the personal jurisdiction context, but can aid in the assessment of control for liability purposes. To show liability, however, Plaintiffs have to meet their burden as to the eight non-exclusive "single entity" factors. *Pearson* v. *Component Tech.*, 247 F.3d 471, 484-85 (3d Cir. 2001).[27] Further, the standard for establishing alter ego for purposes of liability is even higher than it is for personal jurisdiction. *Enterprise*, 735 F. Supp. 2d at 319. But whether the goal is to establish liability or personal jurisdiction, the burden is on Plaintiffs to show that the companies actually have a "single functional and organic identity." *Simeone ex rel. Est. of Albert Francis Simeone, Jr.* v. *Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 676 (E.D. Pa. 2005). Under this framework, Plaintiffs come nowhere close to showing that KPNV "controls the day-to-day operations of" any of its subsidiaries such that they "can be said to be [] mere department[s] of the parent." *Id.* at 675.

### 3. *The Required Entity-by-Entity Analysis*

To satisfy their "notoriously difficult burden," *Riad*, 2023 WL 2227692, at *3, Plaintiffs must present evidence focused on the "unique relationship" between the allegedly controlling and controlled companies. *Enterprise*, 735 F. Supp. 2d at 317. Here, Plaintiffs' focus has always been on the relationship between KPNV and Philips RS, but in their recent papers, Plaintiffs appear to now focus also on the relationship between KPNV and Philips NA. (*E.g.*, Opp. at 11-12, 23, 25.)

---

[27]     These factors include: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." *Pearson*, 247 F.3d at 484-85.

Plaintiffs know they cannot satisfy their burden with respect to either of these individual relationships, so they present the facts in a confusing, collective fashion—*i.e.*, by mixing together evidence touching on (i) KPNV's relationship with Philips RS; (ii) KPNV's relationship with Philips NA; and (iii) even Philips NA's relationship with Philips RS.[28]  But each of these relationships are independent from one another for purposes of the alter ego analysis; in other words, *even if* any evidence showed that Philips NA was an alter ego of KPNV (it does not), that evidence would have no bearing on whether Philips RS is also an alter ego of KPNV.  *See, e.g.*, *Tatung* v. *Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1181 (C.D. Cal. 2016) (even if "the alter ego theory makes a parent liable for the actions of a subsidiary[, that] does not mean that where a parent controls several subsidiaries each subsidiary then becomes liable for the actions of all other subsidiaries"); *G.O. Am. Shipping Comp.* v. *China COSCO Shipping*, 2017 WL 6026959, at *4 (W.D. Wash. 2017) (evidence relating to relationship between parent and subsidiary could only establish alter ego between those two entities, not other entities in the corporate family).

Plaintiffs' collective theory of alter ego has no basis in fact or law.  There is no such thing as a generally applicable alter ego relationship between KPNV and multiple subsidiaries. "In determining whether an alter ego relationship exists, the court should focus on the relationship between the corporation and the entity . . . that allegedly abused corporate formalities."  *Licea* v. *Curaco Drydock*, 952 F.3d 207, 214 (5th Cir. 2015); *see also In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 395 (M.D. Pa. 2009) [*In re Chocolate II*] (conducting an entity-by-entity analysis and finding no alter ego jurisdiction over two defendants who operated within the established corporate structure, but finding alter ego

---

[28]     Evidence regarding Philips NA's relationship with Philips RS has no relevancy to the question of personal jurisdiction over *KPNV*.

jurisdiction over one defendant that failed to do so).[29]  Plaintiffs cannot evade their high burden by combining features of multiple relationships to attempt to achieve some cumulative effect to avoid the fact that they do not have sufficient evidence of any alter ego relationship, let alone on the required entity-by-entity basis.

### B.   Jurisdictional Discovery Confirms that Neither Philips RS Nor Philips NA Is an Alter Ego of KPNV Under the Applicable *Enterprise* Factors.

Under *Enterprise*, the focus of this Court's inquiry is what evidence Plaintiffs have that KPNV controlled the "day-to-day" operations of Philips RS or Philips NA.  One would expect Plaintiffs to be able to show a constant level of communication between KPNV and Philips RS or Philips NA, instructing them on how to run their businesses.  Or there would likely be frequent and constant intervention by KPNV into Philips RS's or Philips NA's operational choices—or even merely evidence illustrating KPNV's regular granular assessment of these entities' decision-making.  Yet, despite extensive jurisdictional discovery—not to mention the millions of additional documents Plaintiffs have received as part of merits discovery—Plaintiffs have nothing of the kind.

Because of this, Plaintiffs instead focus on the ordinary aspects of control present in *any* investment relationship.  But, as the U.S. Supreme Court has held, "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures" is entirely "consistent with the parent's investor status." *United States* v. *Bestfoods*, 524 U.S. 51, 72 (1998); *Action Mfg.* v. *Simon Wrecking*, 375 F. Supp. 2d 411, 425 (E.D. Pa. 2005).  As this Court explained in *Enterprise*, the

---

[29]  In *UHS* v. *United Health Servs.*, a case Plaintiffs cite, the district court had to assess whether various parent entities "exercise[d] such invasive control over the daily operations of" the relevant subsidiary.  2015 WL 539736, at *4 (M.D. Pa. 2015).  The court noted that this "discrete inquiry" had to be conducted "separately," and jurisdiction had to be established "over each" of the relevant parent companies. *Id.*

ten factors identified in that case "offer[] a discretely individuated and functional framework" that courts look to "in evaluating the control of the parent over the subsidiary." 735 F. Supp. 2d at 318. The point of this multi-factor approach is to allow the Court to assess "whether 'the degree of control exercised by the parent is greater than normally associated with common ownership. . . ' and whether 'the parent controls the day-to-day operations of the subsidiary.'" *Id.* (quoting *Action Mfg.*, 375 F. Supp. 2d at 422).

Plaintiffs (even nominally) address only eight out of the ten factors, thus forfeiting the unaddressed two (Factors 8 and 9).[30] (*See infra* pp. 39-40.) And even when turning to the factors Plaintiffs do address, they have come nowhere close to establishing anything other than the typical parent-subsidiary relationship. Nor have Plaintiffs established that the companies did not "generally deal with each other as separate legal entities." *Croyle* v. *Tex. E. Corp.*, 464 F. Supp. 377, 379 (W.D. Pa. 1979).

### 1. *Factor 1: KPNV Indirectly Owns Both Philips RS and Philips NA.*

KPNV does not contest that it indirectly owns Philips RS and Philips NA. But "[o]ne hundred percent 'stock ownership . . . [is] not alone sufficient to establish an alter ego relationship between two corporations.'" *Zombeck* v. *Amada*, 2007 WL 4105231, at *8 (W.D. Pa. 2007).

---

[30] As described *supra* p. 5, the ten *Enterprise* factors look to whether: "(1) the parent owns all or a significant majority of the subsidiary's stock, (2) commonality of officers or directors exists between the two corporations, (3) the corporate family possesses a unified marketing image, including common branding of products, (4) corporate insignias, trademarks, and logos are uniform across corporate boundaries, (5) corporate family members share employees, (6) the parent has integrated its sales and distribution systems with those of its subsidiaries, (7) the corporations exchange or share managerial or supervisory personnel, (8) the subsidiary performs business functions that would ordinarily be handled by a parent corporation, (9) the parent uses the subsidiary as a marketing division or as an exclusive distributor, and (10) the parent exercises control or provides instruction to the subsidiary's officers and directors." *Enterprise*, 735 F. Supp. 2d at 318-19.

**2.   *Factor 2:  Plaintiffs Cannot Identify a Single Shared Officer or Director Between KPNV and Philips RS or Philips NA Who Acted Exclusively on Behalf of KPNV.***

To exercise the requisite control, this Court should expect Plaintiffs to identify the KPNV executives who are in charge of Philips RS's and Philips NA's day-to-day operations.  Although Plaintiffs vaguely claim that "[c]ommon officers and directors" exist "between Royal Philips *and its U.S. subsidiaries*" (Opp. at 23 (emphasis added)), Plaintiffs nowhere identify a single officer or director that KPNV actually shares—or ever shared—with Philips RS.  (In fact, as described below for Factor 5, Plaintiffs do not identify a single shared *employee* between KPNV and Philips RS.)  Nor could Plaintiffs have done so, as jurisdictional discovery has confirmed.  (*Compare* Opp. Ex. 135, *with* KPNV Ex. 7 (Resp. to Juris. Rog. No. 18).)  None of the evidence cited by Plaintiffs purports to show otherwise.  (*See* Opp. at 23.)

As for the other relationships, Plaintiffs seek to establish "day-to-day control" through (1) *one* shared executive from 2018 to 2023 between KPNV and Philips NA and (2) a few examples of shared officers among various U.S. subsidiaries (not KPNV).  (Opp. at 23.)  Even if relevant, this minimal overlap of a handful of individuals is a far cry from the level of pervasive infiltration required to justify finding an alter ego relationship.  *See Poe* v. *Babcock Int'l*, 662 F. Supp. 4, 6 (M.D. Pa. 1985) (no alter ego jurisdiction despite "several" overlapping directors because "[w]here a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are common to the boards of both"); *Croyle*, 464 F. Supp. at 379 (no alter ego jurisdiction despite "significant over-lapping of directors and officers"); *Savin* v. *Heritage Copy Prod.*, 661 F. Supp. 463, 470 (M.D. Pa. 1987) (overlap of four directors "is no more significant than is to be expected in a situation where a holding company owns a majority interest in a subsidiary").

Further, it is a "well established principle [of corporate law]" that individuals "holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Bestfoods*, 524 U.S. at 69; *see also Action Mfg.*, 375 F. Supp. 2d at 424 (stating that it is "normal for a parent and subsidiary to have identical directors and officers"). Plaintiffs, therefore, bear the burden of *additionally* showing that any overlapping officers or directors "purportedly acting for the benefit of the subsidiary corporation were—in actuality—acting *solely* for the benefit of the parent corporation." *Trinity* v. *Greenlease Holding*, 2014 WL 1766083, at *15 (W.D. Pa. 2014) (emphasis added). And even then, the operative question is whether the KPNV actor was exerting undue influence and control over the subsidiary for KPNV's *exclusive* benefit. *Id.* ("Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, it cannot be enough to establish liability that dual officers and directors made policy decisions and supervised activities at the [subsidiary]") (quoting *Bestfoods*, 524 U.S. at 69); *UHS* v. *United Health Servs.*, 2013 WL 12086321, at *8 (M.D. Pa. 2013) (plaintiffs must show that any shared "directors continue to represent the parent when serving on the board of an affiliate," rather than merely having multiple responsibilities).

Even setting aside the minimal overlap Plaintiffs identify at the Philips NA level (none at the Philips RS level), Plaintiffs nowhere argue that this one overlapping individual ▮▮▮▮▮▮ exerted undue influence and control over Philips NA for the exclusive benefit of KPNV. Plaintiffs have failed to meet their burden for this additional reason.

### 3. *Factor 7: Plaintiffs Cannot Identify a Single Manager or Supervisor Between KPNV and Either Philips RS or Philips NA.*

Tellingly, despite spending pages describing (often inaccurately) various reporting lines within the SRC business, Plaintiffs do not identify a single individual with a managerial or

supervisory role who was exchanged between, or shared by, KPNV and either Philips RS or Philips NA. (*See* Opp. at 11-14, 24-25.) The best Plaintiffs can do is imply that KPNV executives were *de facto* managers at Philips RS or Philips NA because certain Philips RS or Philips NA employees had reporting lines that reached KPNV's CEO. *Id.* For example, Plaintiffs spill a lot of ink describing vague connections between some Philips RS manager to some Philips NA manager, who in turn reported to the CEO of KPNV—apparently suggesting that this indicates shared management across the entities at a "day-to-day" operational level.[31] But even for the employees with a more direct reporting line to KPNV, Plaintiffs cite no support for their novel *de facto* manager theory.[32]

Reporting lines have zero legal traction. At best, Plaintiffs' reliance on reporting lines and a collection of "organizational charts" (some even created by Plaintiffs) "demonstrate mere affiliation" between individuals and not "the functional relationship" between them. *Licea* v. *Curaco Drydock*, 952 F.3d 207, 214 (5th Cir. 2015). Again, the alter ego inquiry demands a showing of day-to-day control over Philips RS or Philips NA by KPNV, but Plaintiffs say nothing about how these reporting lines were utilized—or, as their burden requires, *abused*. "The simple fact that there are lines on a chart connecting various persons does not make the

---

[31]     Plaintiffs do not identify a single Philips RS employee who reported directly to the CEO of KPNV and only two Philips RS employees who reported directly to anyone at KPNV. Furthermore, they only identify three Philips NA employees or officers that reported directly to anyone at KPNV. Even if there were a notable number of direct reporting lines (clearly, there is not), merely reciting these lines is insufficient to demonstrate the requisite level of control. *See Seltzer*, 339 F. Supp. 2d at 605 (declining to find alter ego despite subsidiary employees reporting "directly to" the parent company "on various management matters").

[32]     Despite Plaintiffs' statements otherwise, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*See* KPNV Ex. 7 (Resp. to Juris. Rog. No. 18) (listing all KPNV personnel from 2008 through 2022).) Similarly, Plaintiffs' own exhibit demonstrates—contrary to their claim—▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ (*See* Opp. Ex. 40.) All of this is a bit of a sideshow in any event, given Plaintiffs' total failure to identify *control*. *See Seltzer*, 339 F. Supp. 2d at 605.

requisite showing" that KPNV "w[as] directing" these subsidiaries' respective businesses. *E.I. du Pont.* v. *Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 672 (D. Del. 2018). Plaintiffs also provide no practical context for these relationships,[33] including whether any of these Philips RS or Philips NA individuals ever met or spoke with those more senior to them in Amsterdam, and if so, how often or about what.

Ultimately, the mere existence of a "dotted-line" reporting relationship does not prove that KPNV "dictate[d] every facet of [Philips RS's or Philips NA's] business[es]" or "routine matters of day-to-day operation." *Ranza* v. *Nike*, 793 F.3d 1059, 1074 (9th Cir. 2015). And even for direct reporting lines, Plaintiffs' evidence as to three Philips NA employees who reported to KPNV's CEO still falls far short of pervasive control. *See Seltzer* v. *I.C. Optics*, 339 F. Supp. 2d 601, 605 (D.N.J. 2004) (declining to find alter ego despite subsidiary employees reporting "directly to" the parent company "on various management matters"); *In re Chocolate II*, 641 F. Supp. 2d at 392 (no corporate control where managers of subsidiary reported directly to executives of parent because executives' involvement was minimal and "[the subsidiary's] managers oversee its operations on a daily basis").

### 4. *Factor 5: Plaintiffs Do Not Identify a Single Shared Employee Between KPNV and Philips RS or Philips NA.*

Relatedly, Plaintiffs do not identify a single individual who was employed *at any level* by KPNV and Philips RS at the same time. (Opp. at 24-25, 11-14.) Nor do they provide an example of a non-executive or non-managerial employee shared with Philips NA.[34] (*Id.*)

---

33    Notably, Plaintiffs contradict themselves by admitting that ███████████████████████ ██████████████████████████████████████████████████████████████████████ while simultaneously maintaining their position that KPNV retained pervasive authority over these functions. (*See* Opp. at 9.)

34    For Philips NA, they only identify *one* overlapping executive, ████████████. (Opp. at 23.)

Plaintiffs obscure these points by combining the "shared employee" factor with the "shared managerial" factor in their brief.  (*See* Opp. at 24-25.)

5.  ***Factors 3 & 4:   Plaintiffs Fail to Establish Any Control with Respect to the "Philips" Branding.***

Plaintiffs suggest that the two factors related to branding—whether there is a "unified marketing image" or "uniform insignias, trademarks, and logos"—"heavily" suggest the existence of an alter ego relationship because (i) Philips Group employees' email addresses use the "@philips.com" domain; and (ii) Philips RS and Philips NA use the "Philips" logo.  (Opp. at 24.)  This is a flawed effort from inception.

*First,* "use of [the] same email address . . . by the employees of the parent corporation and its subsidiaries does not show that [the parent] exercises greater than normal control over its subsidiaries" as "this is a common practice among consolidated companies."  *Rice* v. *First Energy Corp.*, 339 F. Supp. 3d 523, 538 n.9 (W.D. Pa. 2018).  *Second*, with respect to Philips RS, Plaintiffs conveniently omit that it operated under its pre-acquisition name—Respironics— for the vast majority of the relevant period.  It was not until 2020—more than a decade after it was acquired by KPNV—that "Philips" was included in its name.  And courts do "not undermine fundamental corporate theory by attributing a subsidiary's contacts to its parent simply because both operate under the same brand name."  *Lapine* v. *Materion*, 2016 WL 3959081, at *5 (E.D. Pa. 2016).

But even assuming *arguendo* that the entities projected a "unified public image," for that to be indicative of control for alter ego purposes, Plaintiffs still need to provide evidence of an improper "degree of control" by KPNV over Philips RS's and Philips NA's marketing.  *See UHS*, 2015 WL 539736, at *7-8 (unified marketing factor weighed in favor of control where "decision to implement this centralized marketing plan was reached" by "exclu[ding] []

subsidiary entities' boards of directors or management teams").   As this Court stated in *Enterprise*, "Enterprise Rent-A-Car is portrayed as a single brand to the public, but this evidence does not demonstrate the necessary control by defendant parent over the subsidiaries."   735 F. Supp. 2d at 323.   Here, Philips RS and Philips NA, not KPNV, each controlled their own respective marketing, and Plaintiffs do not even claim otherwise.

Nor does the Brand License Agreement help Plaintiffs' position.   Subsidiaries, including Philips RS and Philips NA, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████   (Opp. Ex. 11, at 2-3, 6.)   And Philips RS did just that here.   As Plaintiffs are well aware—considering they append many of these examples to their master complaints[35]—Philips RS often used *its own logo* on its branding in addition to the Philips logo.   This is fatal to Plaintiffs' contention.   *See Vacaflor* v. *Penn. State Univ.*, 2014 WL 3573593, at *5 (M.D. Pa. 2014) (use "of a parent corporation's logo with the subsidiary corporation's in a common marketing image does not demonstrate the level of control sufficient to render the subsidiary the alter ego of the parent corporation").[36]   Even further, Philips RS trademarks its own logos with respect to its products and uses those logos in its branding, and those marks are not shared across corporate boundaries.[37]

In a desperate attempt to find *something*, Plaintiffs point to KPNV's consolidated financial reporting as somehow indicative of a "unified marketing image."   (Opp. at 24.)   This

---

[35]   *See, e.g.*, Economic Loss Complaint Exs. 44, 47-49, 55, 77, 102, 105.

[36]   *See, e.g.*, KPNV Ex. 57, 58, 59, 60, 61, 62, 63, 64, and 65.

[37]   *See, e.g.*, KPNV Ex. 66 ("Trilogy is a trademark of Respironics, Inc.   AVAPS is a trademark of Respironics, Inc."); KPNV Ex. 67, at 2 ("REMstar, Whisper Swivel, Encore Pro, and Encore Pro SmartCard are trademarks of Respironics, Inc."); KPNV Ex. 68, at 2 ("BiPAP, Whisper Swivel, Encore Pro, and Encore Pro SmartCard are trademarks of Respironics, Inc.").

makes no sense, as the common practice of consolidated *financial* reporting is not probative of whether there is a unified *marketing* image.   Of course, none of this matters:  "[a] parent corporation is entitled to establish group-wide financial protocols, monitor the performance of its subsidiaries [and] reap financial benefits from their profits."  *Enterprise*, 735 F. Supp. 2d at 323.

### 6. *Factor 6:   Neither Philips RS nor Philips NA Share the Same Sales and Distribution System with KPNV.*

As a holding company, KPNV has never sold or distributed Philips RS's or Philips NA's products.   Despite pointing to no evidence to the contrary, Plaintiffs say that "this factor evidences an alter ego relationship" because KPNV "provides its subsidiaries with an integrated *IT infrastructure*."   (Opp. at 26 (emphasis added).)   Of course, Plaintiffs never explain how shared IT infrastructure shows that the companies' sales and distribution systems were integrated in a way that suggests pervasive control.  *See Enterprise*, 735 F. Supp. 2d at 323 ("[S]ervices from defendant parent's IT and HR departments . . . merely show the resources defendant parent provided to its operating subsidiaries" and not "a high-level of operational control over the operating subsidiaries.").

Plaintiffs then attempt to rely on a non-*Enterprise* factor—"shared services"—by pointing to an "array of" services that they claim KPNV "provides" to its subsidiaries.  (Opp. at 25-26.)   As evidence of these "shared services" supposedly evincing the necessary minute control over the day-to-day operations of Philips RS or Philips NA by KPNV, Plaintiffs point *only* to the PBS.  (*Id.*)  But as detailed above (*supra* pp. 10-12), the PBS is a high level group-wide policy that sets minimum standards for ethics, behavior, quality and business practices, which are primarily enforced at the local level.  (KPNV Ex. 14, at 3; KPNV Ex. 17, at 7.)  And the shared services that the PBS identifies—related to "business transformation, strategy, new business development . . . public affairs and government relations," among others (Opp. at 25)—

are nothing extraordinary or atypical for a large global group of companies, *especially* considering they are governed by intercompany agreements.

Even assuming that some form of shared services could itself demonstrate pervasive control, the PBS on which Plaintiffs rely says *nothing* about what services KPNV, Philips RS or Philips NA *actually* provide to one another—much less the terms under which any such services were provided such that there would be any basis to infer that "the provision of these services from a parent to a subsidiary runs afoul of normal corporate behavior." *Trinity*, 2014 WL 1766083, at *16; *see Pearson*, 247 F.3d at 485 (observing that "courts have refused to pierce the veil even when subsidiary corporations . . . accept administrative support from the parent"); *Cent. States, Se. & Sw. Areas Pens. Fund* v. *Reimer Express World*, 230 F.3d 934, 945 (7th Cir. 2000) ("Parent corporations regularly provide certain services to their subsidiaries . . . . [S]uch standard services are not sufficient minimum contacts to support the exercise of jurisdiction.").

Additionally, as Plaintiffs are forced to acknowledge (Opp. at 26), the services KPNV *does* provide to Philips RS and Philips NA (and vice versa) are formally agreed upon, documented and paid for pursuant to intercompany agreements. Courts, including in a case cited by Plaintiffs, distinguish between situations where, as here, "the subsidiaries paid for the administrative services provided by the parent" (which is completely proper) and situations in which a parent or affiliate "provides corporate services without cost to the subsidiaries" (which may weigh in favor of a finding of improper control). *Hooper* v. *Safety-Kleen Sys.*, 2016 WL 7212586, at *8 (W.D. Pa. 2016). Here, for the services that Philips RS or Philips NA provide to KPNV or KPNV's other subsidiaries,[38] ███████████████████████████████ ████████████████████████████████ (KPNV Ex. 25, at 3.)

---

[38]    This would also include services that Philips RS provided to Philips NA, and vice versa.

██████████████████████████████████████████████████████

██  (Opp. Ex. 13, at 3-4.) ███████████████████████████████

██████████████████████████████████████████████████  (*Id.*)

### 7. *Factor 10: Plaintiffs Fail to Establish that KPNV Exercised Improper Control.*

This Court has made clear that, as an owner, "[i]t is assumed to be the norm that a parent will have *not only the potential* to exercise control [over the subsidiary], *but to exercise it to a substantial degree.*" *Trinity*, 2014 WL 1766083, at *16 n.9 (emphasis added). Nonetheless, Plaintiffs' entire theory of "control" relies on their unsupported and misleading characterizations of the evidence, the PBS, and the fact that KPNV's Executive Committee met "more frequently than" quarterly. (Opp. at 26-27.) Neither the case law nor Plaintiffs' scant evidence comes close to supporting their theory that KPNV exceeded the "incidental control" that "naturally flows from . . . the parent-subsidiary relationship." *Enterprise*, 735 F. Supp. 2d at 323. Plaintiffs' general lack of evidence of control is especially probative against the existence of an alter ego relationship. *See Lapine*, 2016 WL 3959081, at *5 ("Plaintiff provides evidence satisfying the first four factors as well as the sixth, but these considerations are outweighed by the lack of support for the remaining, more significant factors which address the level of control a parent company exercises over its subsidiary's day-to-day operations.").

To start, Plaintiffs simply provide no evidence that KPNV "executives are the day-to-day managers of Philips RS and Philips NA." (Opp. at 26.) Nor do Plaintiffs identify any support for their statement that KPNV ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████  (Opp. at 26.) ███████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████   (KPNV Ex. 8, at 242.)   ████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████   (KPNV

Ex. 7 (Resp. to Jurisdictional Interrogatory No. 20).)   The fact that KPNV has been assisting Philips RS with its recall involving 15 million devices globally, as well as receiving reports on the recall's progress, hardly demonstrates control.

Plaintiffs' reliance on the PBS to attempt to establish pervasive control is essentially a nonstarter.   As here, where a group-wide manual or policy merely sets minimum business standards and does not supplant the subsidiary's autonomy with respect to day-to-day decisions, the manual or policy does not evidence control.   For example, in *In re Chocolate II*, the court determined that there was no alter ego relationship for purposes of jurisdiction, despite the existence of "group-wide accounting, finance, and sales protocols," because "[u]niformity in finance procedure is a practical necessity for global conglomerates to monitor corporate growth and maximize efficiency."   641 F. Supp. 2d at 386.   Furthermore—as is the case with the PBS, *see supra* pp. 10-12—the parent company "encourage[d] subsidiaries to vary the way in which corporate principles [were] applied in practice," and "to implement operating plans at the local level."   *Id.* at 387; *see also Reynolds* v. *Turning Point Holding*, 2020 WL 953279, at *3 (E.D. Pa. 2020) ("[A]rticulation of general policies and procedures do not establish an alter ego relationship."); *Deardorff* v. *Cellular Sales of Knoxville*, 2022 WL 309292, at *7 (E.D. Pa. 2022) ("[E]ven if Plaintiffs did show that [the parent] directed these policies, they do not explain how the employee handbooks transcend the bounds of the level of supervision present in typical parent-subsidiary relationship.").

Plaintiffs' authority is of no help to them. Unlike here, the policy manual at issue in *Simeone* (Opp. at 26) comprehensively governed the subsidiary's "communications and public relations; incentive plans' bids and proposals; inventory valuation; [and] internal control procedures." 360 F. Supp. 2d at 677. "Of particular note," the manual contained disclosure policies that "effectively precluded [the subsidiary] from giving a speech or public presentation on its own behalf unless previously approved by [the parent]." *Id.* The specific features of the *Simeone* manual—reflecting particulars on "wide-ranging matters such as products, pricing, communication and distribution"—in combination with substantial overlap among the officers and directors, *plus* invasive decision-making by the parent in matters of the subsidiary's operation to the exclusion of the subsidiary's own management, was held to be sufficient for the exercise of personal jurisdiction on an alter ego theory. *Id.* Plaintiffs do not explain how this decision in any way supports their theory that the PBS is in any way comparably invasive.

Similarly, in *Hooper* (*see* Opp. at 26), the court expressly noted that—unlike the corporate structure at issue in *Enterprise*, where "the subsidiaries had authority over the [particular conduct] that led to [the] claims in that case"—the subsidiaries "act[ed] as branches of one functionally-integrated organization." 2016 WL 7212586, at *8. Even still, Judge Fischer noted that it was nonetheless "possible that [the subsidiary] ha[d] preserved sufficient independence to defeat the alter ego doctrine, but the present record [wa]s not sufficient to make that determination as a matter of law." *Id.*; *see Seltzer*, 339 F. Supp. 2d at 611 ("Although the record does show that [the parent's executive and manager] did exert a considerable amount of influence and control over [the subsidiary], even if this Court accepts all of [plaintiff's] assertions as true, their activities did not deviate from the normal amount of control a parent has over its subsidiary.").

Plaintiffs never explain why they believe it is relevant, let alone meaningful, that KPNV's Executive Committee met more than quarterly.  Plaintiffs point to one ████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████ (Opp. at 26.) ████████████████████████ ████████████████████████████████ and thus has no probative value on the vast majority of Plaintiffs' claims (*i.e.*, all but the negligent recall claims).  KPNV has previously acknowledged that it stepped in to provide support and guidance to Philips RS with its global recall involving approximately 15 million devices, so post-recall meetings are hardly surprising, nor are they relevant to Plaintiffs' pre-recall claims.

Plaintiffs again cite *Simeone*, which involved "thorough quarterly reviews of [the relevant subsidiary] by [the parent's] executives."  360 F. Supp. 2d at 676; *see* Opp. at 26.  But in *Simeone*, executives from the parent company "would visit [the subsidiary] and other divisions in order to do a review of the divisions' performance."  *Id.*  "Intertwined with this review process was a bottoms-up process by which [the parent] determined [the subsidiary's] budget and design," as well as specific requirements with respect to financial reporting, budgets, and strategic plans, all of which would be discussed with and ultimately approved by the parent's executives.  *Id.* at 676-77.  Plaintiffs have no similar evidence here.

8. ***Factors 8 & 9:  Plaintiffs Concede that Two of the Factors Weigh Against Finding an Alter Ego Relationship.***

Plaintiffs do not dispute that Philips RS and Philips NA do not "perform[] business functions that would ordinarily be handled by" KPNV (Factor 8), or that KPNV does not use either entity "as marketing division[s] or as [] exclusive distributor[s]" (Factor 9).  As a result, both of these factors weigh in favor of corporate separateness.  *See Deardorff.*, 2022 WL

309292, at *6 & n.10 (where plaintiffs "declin[e] to address [a] factor," they "concede" that "this factor weighs against a finding of alter ego jurisdiction").

Plaintiffs' silence is a clear attempt to minimize the significance of KPNV's holding company status. In circumstances where, as here, the parent operates as a holding company, courts are less likely to impute a subsidiary's contacts to the parent. *See Arch* v. *Am. Tobacco*, 984 F. Supp. 830, 839 (E.D. Pa. 1997) ("However, in the case of a holding company . . . the subsidiary is not performing a function that the parent would otherwise have had to perform itself (the holding company simply could hold another type of subsidiary). In such a case, imputing jurisdictional contacts would be improper."); *Enterprise*, 735 F. Supp. 2d at 324 (same); *Lutz* v. *Rakuten*, 376 F. Supp. 3d 455, 471 (E.D. Pa. 2019) ("These companies' functions are also not normal functions that Rakuten would perform, as a holding company."). It would be no less problematic to do so here, given that the evidence corroborates that KPNV's existence is merely "to fulfill two goals of a holding company: (1) transferring knowledge to a subsidiary from the holding company, to the holding company from a subsidiary, and between subsidiaries and (2) improving coordination among the different subsidiaries." *Arch*, 984 F. Supp. at 839. This type of "influence is consistent with a typical holding company/subsidiary relationship." *Id.*

### 9. *Plaintiffs' Non-Enterprise "Other" Considerations Do Not Save Their Failed Alter Ego Theory.*

Plaintiffs point to three additional facts that do not fall under any of the *Enterprise* factors. None saves their alter ego theory.

*First*, Plaintiffs suggest that KPNV executives "regularly visited the U.S. subsidiaries and Pennsylvania in particular." (Opp. at 27.) So what? Yet again, Plaintiffs provide no basis upon which to infer that these visits were part of KPNV's exertion of pervasive control over Philips RS or Philips NA, as opposed to the type of check-ins and oversight one would expect from

parent company executives.[39]  *See Savin Corp.*, 661 F. Supp. at 470 (fact that parent's officer "came once weekly to the United States to oversee [the parent's] investment in [the subsidiary]" was "no more than what would be expected from a majority shareholder," and did "not convince the court that [the parent] exercised the type of control . . . which would evidence an alter-ego relationship").

     *Second*, Plaintiffs claim ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮[40] but this is demonstrably false.  As shown above (*supra* pp. 17-18) and in the Philips Defendants' Rule 12(b)(6) brief, ▮▮▮▮▮▮▮▮▮▮▮▮▮



                  (Opp. Ex. 18, at 2.)

                                    (Opp. Ex. 20; KPNV Ex. 40; KPNV Ex. 41; KPNV Ex. 42.)

     In any event, Plaintiffs have "not cited any authority to stand for the proposition that the mere transfer of funds amongst related entities is a sufficient basis to pierce the corporate veil." *Fagan* v. *Fischer*, 2019 WL 5587286, at *24 (D.N.J. 2019).[41]

---

[39]    *Williams by Williams* v. *OAO Severstal* is inapposite.  In that case, "[the subsidiary]'s purpose was to produce metallurgical coal for [the parent's] *in-house consumption*" and those visits were part and parcel of the parent's "oversight of [the subsidiary's] mining operations for its *internal consumption*."  2019 WL 4888570, at *3 (Pa. Super. Ct. 2019) (emphasis added).

[40]    Here, Plaintiffs appear to be conflating the single-entity factors relevant to the alter ego *liability* analysis with the *Enterprise* factors relevant to the alter ego *jurisdiction* analysis.  Plaintiffs' arguments fail either way.

[41]    *Williams* is, again, inapposite:  the court there made clear that the existence of a loan itself was "consistent with a parent corporation's typical governance of a subsidiary."  2019 WL 4888570, at *12.  The *Williams* court found alter-ego jurisdiction primarily because the "[the subsidiary] was little more than a source of coal for [the parent]," "[the parent] acquired [the

*Third*, Plaintiffs identify ███████████████████████████████████████

████████████████████████████████████████████████████████ (Opp.

Ex. 128, at 1.)   The policy provides various high-level requirements, such as ███████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████ (*Id.* at 2.)   But a

parent company telling its subsidiaries that it expects them not to operate in a financially careless

way is a far cry from the crippling control Plaintiffs must show here.  *See Enterprise*, 735 F.

Supp. 2d at 323 (quoting *In re Chocolate II*, 641 F. Supp. 2d at 386) ("A parent corporation is

entitled to establish group-wide financial protocols, monitor the performance of its subsidiaries

[and] reap financial benefits from their profits."); *Pearson*, 247 F.3d at 503 (noting that courts

had "refus[ed] to find 'inadequate capitalization' in alter ego inquiry where parent repeatedly

infused subsidiary with cash in an ultimately unsuccessful attempt to resurrect a failing

company").

    *Finally*, Plaintiffs conclude their alter ego analysis with a forced flourish, calling this the

"archetypal case for alter ego jurisdiction" because KPNV operated its subsidiaries as "vertical

strategic business units" and "conscripted employees of subsidiaries to discharge group-wide

management functions."   (Opp. at 28-30.)   Rhetoric aside, Plaintiffs offer zero evidentiary

support.[42]   And, although they attempt to offer legal support for their assertions, their cases

---

subsidiary] to mine an essential element in its steel-making operation," and the subsidiary "was
not an independently-viable company" and "was dependent upon [the parent's] financial
assistance."  *Id.*

[42]    Predictably, Plaintiffs' other assertions are not supported by the cited exhibits.   For
instance, ████

   (Opp. at 14, 28, 33).  ████████████████████████████████

-42-

directly refute their proposition that the mere existence of business units organized around product lines is sufficient to evidence alter-ego control.

For example, in *In re Chocolate II*, one of Plaintiffs' cases, directly refutes their claim that the mere existence of business units organized around product lines is sufficient to evidence alter-ego control. There, made clear that merely asserting that business units were "managed centrally out of Vevey, Switzerland" or that the business units "report[ed] to the [parent's] head of [the business units]" was insufficient. 641 F. Supp. at 392. Instead, the court explained that plaintiffs needed to describe "what 'combination' of [the parent] and [an intermediary subsidiary] managed the [business units]" to establish that "[the parent] use[d] the [business units] to exert *autocratic control* over other members of the corporate group" *Id.* (emphasis added). Plaintiffs there met this high threshold by showing that the senior executives of the parent company "*double[d]* as both the leaders of business units and as the heads of *production activities*." *Id.* at 401 (emphasis added). For example, the parent company's CEO served as "head of [the subsidiary's] American Confectionary business unit," and was "accountable for all confectionaries produced in the United States, Canada, and Mexico." *Id.*[43] Plaintiffs offer no

As another example,

Plaintiffs rely on Exhibits 73-95 to state that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮ (Opp. at 29.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[43] Plaintiffs' other cases do not help them: in *UHS*, there were several examples of executives of operating entities also serving as heads of business lines and on "system-wide management committee[s]." 2015 WL 539736, at *15. Similarly, in *In re Latex Gloves*, several employees of one subsidiary were responsible for "management of the production of the product" at the plant of a *different subsidiary*. 2001 WL 964105, at *6 (E.D. Pa. 2001). Combined with evidence that heads of business units were also responsible for "selling and marketing and R&D functions," the court there "found that the business units cut managerially across corporate lines from the parent through the subsidiaries." *Id.* at n. 18. *Directory Dividends* does not even discuss business units. Rather, the court there primarily relied on the "considerable overlap in the officers and directors," including that "eight officers of [the parent]

similar evidence.  Their "failure to do so preclude[d] them from invoking the [business units] as a corporate control between [the parent] and [the subsidiary]."  *Id.* at 606.

### C.   The Declaration Plaintiffs Have Submitted Consists Entirely of Improper Legal Conclusions and Unsupported Factual Contentions.

Seeking to avoid the facts, Plaintiffs attempt to create their own.  Throughout their brief, Plaintiffs rely heavily on the declaration of Matthew Dundon.  (ECF No. 1695.)  KPNV objects to this declaration because it has no evidentiary value.  While it is unclear whether Plaintiffs intend Mr. Dundon to serve as a fact or expert witness, his declaration is impermissibly "rife with legal conclusions and statements not within [the declarant's] personal knowledge."  *Shuman* v. *Lauren Kim, Inc.*, 2015 WL 1472003, at *1 n.4 (D.N.J. 2015).  Regardless of Mr. Dundon's personal experience in law and finance in matters unrelated to the Philips Group, he is "not allowed to offer testimony regarding the legal standards for piercing the corporate veil . . . or to offer legal conclusions based on [defendant's] failure to respect corporate formalities."  *Clientron* v. *Devon IT*, 2016 WL 1255218, at *3 (E.D. Pa. 2016).  Mr. Dundon's declaration is an impermissible attempt by Plaintiffs to outsource the alter ego analysis, and the Court should disregard it entirely.  *See Hartle* v. *FirstEnergy Generation*, 2014 WL 1117930, at *2 (W.D. Pa. 2014) (Conti, J.) ("[A]lthough a district court has discretion to determine whether expert testimony will help the trier of fact, in exercising that discretion, the District Court must ensure that an expert does not testify as to the governing law of the case."); *Mid-State Sur.* v. *E.*

_____

are also officers and/or directors of [its subsidiaries]."  2003 WL 21961448, at *4 (E.D. Pa. 2003).  Likewise, *Williams* includes no discussion of business units, and the court emphasized that "[the subsidiary] shared two of its four directors with [the parent, including [the parent's] CEO and its Director of Raw Material Procurement," that "the [subsidiary] did not convene any board meetings," and that "[the parent] maintained daily contact with the legal department of [the subsidiary] . . . and mandated that other departments submit regular financial and performance reports as often as once per week."  2019 WL 4888570, at *12.  Plaintiffs provide no facts even remotely similar to the ones relied on by the courts in these cases.

*Bethlehem Twp. Mun. Auth.*, 2005 WL 8174473, at \*8 n.20 (W.D. Pa. 2005) (Conti, J.) (striking "expert report with respect to those portions of the report that contained legal conclusions").

In any event, Mr. Dundon's contentions are unsupported and flatly contradicted either by the evidence he did review or by the evidence Plaintiffs chose not to provide to him. Mr. Dundon first opines that neither Philips RS nor PHUSA could have "ha[d] an independent business identity" from KPNV. (Dundon Decl. ¶ 12.) In making this legal conclusion, Mr. Dundon reviewed a grand total of 16 documents: an organizational chart; the transcript of KPNV's Rule 30(b)(6) deposition; and 14 financial documents. (*Id.* ¶ 7 ns. 3-9.)[44] Among other things, he did not review KPNV's public filings, any of the intercompany or IHB agreements, or any of the many other documents available to Plaintiffs that are necessary for someone to create an informed opinion on this topic. (*Id.*) Nor did Mr. Dundon even consider the fact that Philips RS (then, Respironics) was a standalone company for 24 years before KPNV acquired it.

Worse, Mr. Dundon misrepresents the exhibits he did review. For example, he claims the

██████████████████████████████████████████████████████████████

██████████████████████████████████ (*Id.* ¶ 11.)[45] ███████████

██████████████████████████████████████████████████████████████

---

[44] It is worth noting at the outset that several of the exhibits Mr. Dundon purportedly relied on were not provided to the Court in a comprehensible format, rendering an assessment of the accuracy of his statements about them nearly impossible without the native documents produced to Plaintiffs. (*See, e.g.*, Opp. Exs. 114 & 115.) For instance, at several points throughout his Declaration, Mr. Dundon references row numbers in Philips RS's general ledger that simply do not exist in the underlying exhibit provided to the Court. (*See, e.g.*, Dundon Decl. ¶ 11.) KPNV attaches the general ledger with the row numbers, as well as a "cheat sheet" KPNV provided to Plaintiffs to assist them in understanding the key aspects of the general ledger, as KPNV Exs. 69 and 70, respectively.

[45] Plaintiffs make a similar misrepresentation in their brief when they suggest that ████████

██████████████ (Opp. at 6 (emphasis added).)

████████████████████████████████████████████████████

████████████████████  (KPNV Ex. 69 at Rows 269-271.)  As demonstrated above, Philips

RS had intercompany agreements with many entities in the Philips Group,[46] ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████[47]  But Mr. Dundon did not review the intercompany agreements.

██████  Mr. Dundon next claims that ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████  (Dundon

Decl. ¶¶ 8, 10.)  Yet, he does not explain how he arrived at either of these figures or which

documents support these assertions. ████████████████████████████████████

████████████████████████████████████████  (*see supra* pp. 12-13),

████████████████████████████████  (Dundon Decl. ¶ 8), ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  (Opp. Ex. 119,

---

[46]   *E.g.*, KPNV Ex. 71; Opp. Ex. 11; KPNV Ex. 72; KPNV Ex. 73.

[47]   *See, e.g.,* Opp. Ex. 13; Opp. Ex. 109; KPNV Ex. 25.

at 4; *see also supra* at pp. 12-16 (describing intercompany agreements).)  Ultimately, however, it is not at all clear what Mr. Dundon is talking about.

Next, Mr. Dundon opines that because ██████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████ [48]

███████████████████████████████████████████████████

(Opp. Ex. 114; Dundon Decl. ¶ 12 (emphasis added).)  Despite Mr. Dundon's suggestions otherwise, there is nothing untoward about a subsidiary's finances being reported by its parent in consolidated financial statements.  *See Rice*, 339 F. Supp. 3d at 536 ("Nor does the fact that a parent corporation filed consolidated financial statements with its subsidiary mandate a finding of an alter ego relationship."); *J.L.B. Equities* v. *Ocwen Fin.*, 131 F. Supp. 2d 544, 550 (S.D.N.Y. 2001) ("[B]ecause 'consolidated financial reporting is typical in a parent-subsidiary relationship, a mere department relationship cannot be established solely on the basis of such reporting.").

## II.    PLAINTIFFS' SECONDARY "DIRECT JURISDICTION" THEORY OVER KPNV HAS NO SUPPORT IN THE FACTS OR THE LAW.

Plaintiffs' attempt to resuscitate their direct jurisdiction theory fares no better than their alter ego theory.  *First*, in support of their **pre**-recall claims, Plaintiffs vaguely refer to the "ongoing business relationships [KPNV has] in those states through its contracts with its subsidiaries," (Opp. at 31.), failing to explain how those supposed contacts "arise out of or relate to" Philips RS's design, manufacture, and sale of the recalled devices.  *Second*, in support of their **post**-recall claims, Plaintiffs argue that KPNV's assistance of Philips RS in its recall efforts subjected KPNV to personal jurisdiction in 50 states, because the recall involves the repair and remediation of devices from those states.  (Opp. at 33-34.)  But Plaintiffs cannot twist KPNV's

---

[48]    KPNV's consolidated financial statements are audited.

targeted assistance of its Pennsylvania-headquartered subsidiary into "purposeful availment" of all 50 states.

### A.      Pre-Recall Claims

Fundamentally, Plaintiffs do not address how their original purchase or acquisition claims "'arise out of or relate to' at least one of [KPNV's] activities" in the forum state. *Rocke*, 541 F. App'x at 211 (quoting *Helicopteros*, 466 U.S. at 414). Plaintiffs state that KPNV is subject to personal jurisdiction on the pre-recall claims because it "directly provides services to its U.S. subsidiaries" and "sends and receives money to and from" the states in which these subsidiaries are located. (Opp. at 32.) Even assuming Plaintiffs had the facts correct,[49] the intercompany provision of services and affiliated payments here cannot provide the basis for the exercise of specific jurisdiction for their claims, which relate to the design, manufacture, and sale of the recalled devices. *See Miller* v. *EME Homer City Generation*, 2013 WL 5972382, at *13 (W.D. Pa. 2013) (parent company "perform[ing] insurance services for its subsidiaries, including risk assessment and management," do not amount to sufficient minimum contacts for specific personal jurisdiction for personal injury claim).

The fact that KPNV owns much of the Philips Group's intellectual property, including for the subsidiaries that are located in the relevant jurisdictions, does not demonstrate sufficient contacts or purposeful availment. Personal jurisdiction cannot be based on "the ownership of intellectual property by the parent . . . the bare minimum of what would be expected between any parent and subsidiary." *Genzyme* v. *Novartis Gene Ther.*, 2023 WL 1965090, at *4 (D. Del. 2023) (ownership insufficient even for patent infringement claim). Nor can it be based on the

---

[49]      As discussed above, it is just not true that KPNV itself provides these services. As a holding company, it coordinates the provision of these services between the various subsidiaries within the Philips Group. (*See, e.g.,* Opp. Ex. 13; Opp. Ex. 109; KPNV Ex. 25.)

fact that a handful of KPNV personnel resided in the United States or visited the United States. (Opp. at 33.)  *See Kinetics Noise* v. *ECORE Int'l*, 2011 WL 13217669, at \*4 (C.D. Cal. 2011) ("[T]he fact that Defendant's employees attended trade shows does not establish this Court's personal jurisdiction over Defendant.").  This is *especially* true given that neither of these facts have any relation to the claims at issue, including the fact that Plaintiffs do not have evidence tying these visits to Philips RS.  (KPNV Ex. 7 (Resp. to Juris. Rog. 15).)

Plaintiffs advance the unsubstantiated notion that ████████████████████████ ████████████████████ (Opp. at 33.)  Setting aside Plaintiffs failure to produce evidence to this effect,[50] the court in *Hooper* rejected this very argument.  2016 WL 7212586, at \*5.  There, the parent company issued mandatory safety policies that the subsidiary had to follow "regarding the precise safety issue that caused [the individual plaintiffs'] injury."  *Id.* at \*7.  Plaintiffs there contended that the parent company "had direct authority to correct the unsafe conditions . . . and that its failure to do so had a direct relationship to [the plaintiff's]" claims for purposes of specific jurisdiction, an argument Judge Fischer outright rejected.  *Id.*  Similarly here, Plaintiffs have pointed, at most, "only to *omissions*—the alleged failures to prevent and/or fix safety problems—rather than to any affirmative actions [KPNV] took to avail itself of Pennsylvania." *Id.* (emphasis in original).

Ultimately, Plaintiffs acknowledge that their allegations as to KPNV are predicated on the actions of its U.S.-based subsidiaries.  (*See, e.g.*, Opp. at 34 ("[The evaluation of health risks] was led by Royal Philips' *through contact with Philips NA and Philips RS*.") (emphasis added).)

---

[50]    In fact, the evidence affirmatively shows the opposite.  (*See* KPNV Ex. 74, at 23 ████████████████████████████████████████████████████████ ████████████████████████████████████████████████

Plaintiffs' repeated use of the words "oversaw," "managed" and "managerial authority" (*Id.*) highlights their inability to plead any fact showing that KPNV *itself* had any relevant contacts with the forum states, and certainly none relating to the design, manufacture, or sale of the devices.[51]  This is why Plaintiffs' case for jurisdiction over KPNV on the vast majority of their claims begins and ends with their failed alter ego theory.[52]

### B.    Negligent Recall Claims

For their post-recall negligent recall claims, Plaintiffs still fail to provide any basis for specific personal jurisdiction over KPNV in any relevant forum other than Pennsylvania.  Philips RS, *not KPNV*, conducted the recall.[53]  And as Plaintiffs acknowledge, the recall was *nationwide*. This fact alone defeats their claim that KPNV purposefully "directed its activities" to California, Georgia, Massachusetts, Oregon, Texas, and West Virginia.  There must have been "deliberate targeting" of these specific forums.  *Shuker* v. *Smith & Nephew*, 885 F.3d 760, 780 (3d Cir. 2018) (holding that "nationally directed efforts" by non-U.S. defendant to "s[ell] its products

---

[51]    Plaintiffs' cases (Opp. at 32) concern relationships between two unrelated businesses, but even more importantly, each of them also explicitly links the contacts to the underlying claim. *E.g., United Dairy.* v. *Bayshore Indus.*, 2015 WL 5311297, at *9 (W.D. Pa. 2015) (Conti, J.) (assessing the sufficiency of the asserted contacts on a claim by claim basis); *Beemac.* v. *Republic Steel*, 2021 WL 2018681, at *6 (W.D. Pa. 2021) ("[I]t is evident and material that the parties had an ongoing business relationship—one concerning the same shipping and transportation services at issue in this action.").  And for one of the cases, Plaintiffs conveniently omit that the foreign parent company "manufacture[d] [the products]" and "applied for FDA approval to market the allegedly infringing product in the United States."  *Solta Med.* v. *Lumenis*, 454 F. Supp. 3d 107, 111, 113 (D. Mass. 2020).

[52]    For the same reasons, Plaintiffs fail to establish the requisite nationwide contacts with the United States for their RICO claim.

[53]    This is confirmed by the very exhibit Plaintiffs cite.  (*See* Opp. Ex. 96 at 4 ("*Respironics* is reinforcing its commitment to complete the Recalls as quickly as possible"; "*Respironics* voluntarily suspended New Product Introduction projects on Sleep and Respiratory Care hardware platforms beyond those activities required to support the Recalls, as of 24 April 2021, to focus resources on remediation of recalled devices and production of new devices for use to replace recalled devices.") (emphasis added).)

through [a U.S. distributor] in Pennsylvania" that are "part of its efforts to sell products in the United States generally—not in Pennsylvania specifically . . . do not meet [the Third] Circuit's requirement of purposeful availment").[54]

Plaintiffs rely on *Rodriguez-Rivera* v. *Allscripts Healthcare Sols.* for the proposition that "engaging a third party to operate the recall demonstrates availment." (Opp. at 33 n.29.) Nowhere in *Rodriguez-Rivera* was a recall even mentioned. In fact, that case says the exact opposite: there, the First Circuit affirmed the dismissal of claims against the ultimate parent on personal jurisdictional grounds because "[the parent] itself does not manufacture, market, or sell any goods or services," and personal jurisdiction over the subsidiary was based on the fact that "[the subsidiary] contracted with a Puerto Rico company to sell *its* products." 43 F.4th 150, 160, 161-62 (1st Cir. 2022).

## CONCLUSION

With the sole exception of the claim for negligent recall, and only for those Plaintiffs who filed suit asserting that claim originally in Pennsylvania, the Court should dismiss all claims against KPNV for lack of personal jurisdiction.

---

[54] *See also, e.g.*, *J. McIntyre Mach.* v. *Nicastro*, 564 U.S. 873, 886 (2011) (plurality op.) (holding that "direct[ing] marketing and sales efforts at the United States" that "reveal an intent to serve the U.S. market . . . do not show that [non-resident defendant] purposefully availed itself of the [forum] market"); *D'Jamoos* v. *Pilatus Aircraft*, 566 F.3d 94, 104 (3d Cir. 2009) ("[E]fforts to exploit a national market [that] necessarily included Pennsylvania as a target . . . simply do not constitute the type of deliberate contacts within Pennsylvania that could amount to purposeful availment."); *Thornton* v. *Bayerische Motoren Werke AG*, 439 F. Supp. 3d 1303, 1311 (N.D. Ala. 2020) (holding that Alabama courts could not exercise jurisdiction over BMW AG for nationwide "airbag recall" because "target[ing] the United States market for sales of its vehicles . . . is not sufficient to demonstrate minimum contacts with Alabama or to show that BMW AG purposely availed itself of the privilege of doing business in Alabama").

Dated: May 1, 2023

Respectfully submitted,

*/s/ Michael H. Steinberg*
Michael H. Steinberg
steinbergm@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, CA 90067
Tel: 310.712.6670

Tracy Richelle High
hight@sullcrom.com
William B. Monahan
monahanw@sullcrom.com
Elizabeth N. Olsen
olsene@sullcrom.com
Bethany S. Labrinos
labrinosb@sullcrom.com
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Tel: 212.558.4000

*Counsel for Defendant Koninklijke Philips N.V.*