## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN RE: PHILIPS RECALLED CPAP, BI-LEVEL PAP, AND MECHANICAL VENTILATOR PRODUCTS LITIGATION<br><br>This Document Relates to:<br><br>*All Actions* | : <br> : Master Docket: No. 21-mc-1230-JFC <br> : <br> : MDL No. 3014 <br> : <br> : (Oral Argument Requested) <br> : <br> : <br> : <br> : |

## KONINKLIJKE PHILIPS N.V.'S RENEWED REPLY MEMORANDUM IN FURTHER SUPPORT OF ITS MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Michael H. Steinberg
SULLIVAN & CROMWELL LLP
1888 Century Park East
Los Angeles, CA 90067

Tracy Richelle High
William B. Monahan
Elizabeth N. Olsen
Bethany S. Labrinos
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ..................................................................... 1

**EVIDENCE DEVELOPED IN JURISDICTIONAL DISCOVERY** ...................................... 3

    A.    **The Structure and Organization of KPNV** ..................................... 3

    B.    **The Philips Group** .................................................................. 4

        1.    Parent/Subsidiary Structure ................................................. 4

        2.    Company-Wide Policies and Intercompany Agreements ......................... 7

        3.    Reporting Segments and Business Units ................................. 13

    C.    **Philips RS** ........................................................................ 16

        1.    Acquisition of Philips RS .................................................. 16

        2.    Conversion of Respironics, Inc. to Philips RS North America LLC ...... 17

        3.    Philips RS's Recall ....................................................... 18

**ARGUMENT** ....................................................................................... 20

I.    **PLAINTIFFS' NOVEL AND BELATED PIVOT TO SPECIFIC PERSONAL JURISDICTION FAILS** ......................................................... 20

    A.    KPNV Is Not Subject to Specific Personal Jurisdiction in Pennsylvania or Massachusetts on the Non-Recall Claims ........................................ 22

        1.    The Intercompany Agreements Do Not Demonstrate that KPNV Engaged in Any Relevant Services or Performed Any Relevant Obligations in the Two Forum States ..................................... 22

        2.    Plaintiffs Cannot Meet Their Burden of Proving that KPNV Reached Into Pennsylvania or Massachusetts Through Organizational Charts and Reporting Lines ........................... 25

        3.    Plaintiffs' Reliance on Purported Communications Into Pennsylvania and Massachusetts Fails as a Matter of Law ................... 28

    B.    The Fact of a Nationwide Recall Does Not Subject KPNV to Jurisdiction Across the Nation on Plaintiffs' Negligent Recall Claim ................................... 28

II.  **PLAINTIFFS HAVE NOT MET THEIR HIGH BURDEN OF PROVING ALTER EGO** ............................................................................................. 29

    A.  Jurisdictional Discovery Confirms that Neither Philips RS Nor Philips NA Is an Alter Ego of KPNV Under the Applicable Enterprise Factors .................. 31

        1.  Factor 10:  Plaintiffs Fail To Establish that KPNV Exercised Improper Control ...................................................................... 32

        2.  Factor 2:  Plaintiffs Cannot Identify a Single Shared Officer or Director Between KPNV and Philips RS or Philips NA Who Acted Exclusively on Behalf of KPNV ............................................... 42

        3.  Factor 7:  Plaintiffs Cannot Identify a Single Manager or Supervisor Between KPNV and Either Philips RS or Philips NA .......... 44

        4.  Factor 5:  Plaintiffs Do Not Identify a Single Shared Employee Between KPNV and Philips RS or Philips NA ....................................... 45

        5.  Factors 3 & 4:  Plaintiffs Fail to Establish Any Control with Respect to the "Philips" Branding .......................................... 45

        6.  Factor 6:  Neither Philips RS Nor Philips NA Share the Same Sales and Distribution System with KPNV ....................................... 48

        7.  Factor 8:  No Evidence that Philips RS or Philips NA Perform Functions KPNV Would Otherwise Perform ......................................... 49

**CONCLUSION** ...................................................................................................... 50

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Action Mfg.* v. *Simon Wrecking*,
    375 F. Supp. 2d 411 (E.D. Pa. 2005) ................................................................. 32, 45, 48, 49

*Arch* v. *Am. Tobacco*,
    984 F. Supp. 830 (E.D. Pa. 1997) ........................................................................... 50

*Bristol-Myers* v. *Sup. Ct.*,
    582 U.S. 255 (2017) ........................................................................................ 21, 25

*Burger King* v. *Rudzewicz*,
    471 U.S. 462 (1985) ........................................................................................ 21, 23

*C. States, S.E. & S.W. Areas Pension Fund* v. *Reimer Express World*,
    230 F.3d 934 (7th Cir. 2000) ........................................................................ 22, 24, 48

*Carteret Sav. Bank* v. *Shushan*,
    954 F.2d 141 (3d Cir. 1992) ................................................................................. 30

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    2017 WL 5972721 (N.D. 2017) .............................................................................. 36

*Chlebda* v. *H.E. Fortna & Bro.*,
    609 F.2d 1022 (1st Cir. 1979) ............................................................................... 27

*In re Chocolate Confectionary Antitrust Litig. ("Chocolate II")*,
    641 F. Supp. 2d 367 (M.D. Pa. 2009) .............................................................. *passim*

*Churchill* v. *Trinity Universal Ins. Co.*,
    2010 WL 11468358 (D. Mon. 2010) ....................................................................... 35

*Cleaver* v. *Honeywell Int'l*,
    2022 WL 2442804 (E.D. Pa. 2022) ......................................................................... 20

*Composite* v. *Am. Intern.*,
    988 F. Supp. 2d 61 (D. Mass. 2013) ....................................................................... 26

*Copia Comms* v. *AMResorts*,
    2017 WL 4012687 (E.D. Pa. 2017) ......................................................................... 30

*Croyle* v. *Texas Eastern*,
    464 F. Supp. 377 (W.D. Pa. 1979) .......................................................................... 43

*Deardorff* v. *Cellular Sales of Knoxville*,
   2022 WL 309292 (E.D. Pa. 2022) ............................................................ 33, 41, 50

*Directory Dividends* v. *SBC Comm'ns*,
   2003 WL 21961448 (E.D. Pa. 2003) .................................................................. 36

*E.I. du Pont* v. *Agfa-Gavaert*,
   335 F. Supp. 3d 657 (D. Del. 2018) ............................................................ 26, 45

*In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.*,
   735 F. Supp. 2d 277 (W.D. Pa. 2010) ........................................................ *passim*

*EQT Prod. Co.* v. *Aspen Flow Control*,
   2020 WL 6545997 (W.D. Pa. 2020) ................................................................. 26

*D'Jamoos ex rel Estate of Weingeroff* v. *Pilatus Aircraft*,
   566 F.3d 94 (3d Cir. 2009) ............................................................................... 29

*Ezell* v. *Medtronic*,
   2018 WL 1100901 (W.D. La. 2018) ................................................................. 37

*Ford* v. *Montana*,
   141 S. Ct. 1017 (2021) ............................................................................... 21, 25

*G.O. Am. Shipping Comp.* v. *China COSCO Shipping*,
   2017 WL 6026959 (W.D. Wash. 2017) ............................................................ 30

*Gammimo* v. *Verizon*,
   2005 WL 3560799 (E.D. Pa. 2005) .................................................................. 33

*Grand Entm't* v. *Star Media*,
   988 F.2d 476 (3d Cir. 1993) ...................................................................... 22, 28

*Guy Chem.* v. *Romaco S.p.A.*,
   2009 WL 840386 (W.D. Pa. 2009) ................................................................... 26

*Hepp* v. *Facebook*,
   14 F.4th 204 (3d Cir. 2021) ............................................................................. 25

*Hooper* v. *Safety-Kleen Sys.*,
   2016 WL 7212586 (W.D. Pa. 2016) ...................................................... 26, 27, 48

*Katz* v. *Am. Council*,
   2021 WL 4551399 (D.N.J. 2021) ............................................................ 22, 23, 25

*Lapine* v. *Materion*,
   2016 WL 3959081 (E.D. Pa. 2016) .................................................................. 46

*In re Latex Gloves Prod. Liab. Litig.*,
  2001 WL 964105 (E.D. Pa. 2001) ........................................................................ 35

*Licea* v. *Curaco Drydock*,
  952 F.3d 207 (5th Cir. 2015) ............................................................................... 44

*Linus* v. *Mark Line*,
  376 F. Supp. 3d 417 (D.N.J. 2019) ...................................................................... 31, 34

*Lloyd* v. *Retail Eq.*,
  2022 WL 18024208 (D.N.J. 2022) ........................................................................ 21, 23

*MacQueen* v. *Union Carbide*,
  2014 WL 6809811 (D. Del. 2014) ......................................................................... 47

*Martinez* v. *Union Officine Meccaniche*,
  2023 WL 3336644 (3d Cir. 2023) .......................................................................... 24

*Mellon Bank* v. *Farino*,
  960 F.2d 1217 (3d Cir. 1992) ............................................................................... 22, 25

*In re Methyl Teritary Butyl Ether ("MTBE" Prod. Liab. Litig.*,
  2021 WL 3371938 (S.D.N.Y. 2021) ...................................................................... 49, 50

*Miller* v. *EME Homer City Gen.*,
  2013 WL 5972382 (W.D. Pa. 2013) ...................................................................... 24

*O'Connor* v. *Sandy Lane*,
  496 F.3d 312 (3d Cir. 2007) ................................................................................. 24, 26, 27

*PPG Indus.* v. *Jiangsu Tie Mao Glass*,
  2020 WL 1526940 (W.D. Pa. 2020) ...................................................................... 28

*Pearson* v. *Component Tech.*,
  247 F.3d 471 (3d Cir. 2001) ................................................................................. 48

*Poe* v. *Babcock*,
  662 F. Supp. 4 (M.D. Pa. 1985) ........................................................................... 43

*Ranza* v. *Nike*,
  793 F.3d 1059 (9th Cir. 2015) .............................................................................. 38, 45

*Reverse Vending.* v. *Tomra Sys.*,
  655 F. Supp. 1122 (E.D. Pa. 1987) ...................................................................... 29

*Reynolds* v. *Turning Point*,
  2020 WL 953279 (E.D. Pa. 2020) ........................................................................ 33, 38, 41

*Riad* v. *Porsche*,
    2023 WL 2227692 (E.D. Pa. 2023 ...................................................................... 29

*Rice* v. *First Energy*,
    339 F. Supp. 3d 523 (W.D. Pa. 2018) ........................................................... 46, 47

*RNC Sys.* v. *MTG*,
    2017 WL 1135222 (D.N.J. 2017) ...................................................................... 38

*Savin* v. *Heritage Copy Prod.*,
    661 F. Supp. 463 (M.D. Pa. 1987) .................................................................... 43

*Seltzer* v. *I.C. Optics*,
    339 F. Supp. 2d 601 (D.N.J. 2004) ............................................................. 38, 45

*Shuker* v. *Smith*,
    885 F.3d 760 (3d Cir. 2018) .............................................................................. 29

*Smith* v. *Avon Products*,
    2019 WL 921461 (N.D. Ala. 2019) .................................................................... 37

*Tatung* v. *Shu Tze Hsu*,
    217 F. Supp. 3d 1138 (C.D. Cal. 2016) ............................................................. 30

*Trinity* v. *Greenlease*,
    2014 WL 1766083 (W.D. Pa. 2014) .................................................. 32, 43, 44, 48

*UHS* v. *United Health*,
    2013 WL 12086321 (M.D. Pa. 2013) ................................................................. 44

*UHS* v. *United Health*,
    2015 WL 539736 (M.D. Pa. 2015) ............................................................... 38, 46

*United Dairy* v. *Bayshore Indus.*,
    2015 WL 5311297 (W.D. Pa. 2015) ............................................................. 28, 29

*United States* v. *Bestfoods*,
    524 U.S. 51 (1998) ..................................................................... 2, 32, 44, 45

*Vacaflor* v. *Penn. State*,
    2014 WL 3573593 (M.D. Pa. 2014) ................................................................... 47

*In re W. States Wholesale Natural Gas Antitrust Litig.*,
    2009 WL 455653 (D. Nev. 2009) ...................................................................... 36

*Williams by Williams* v. *OAO Severstal*,
    2019 WL 4888570 (Pa. Super. Ct. 2019) ........................................................... 36

*Zombeck* v. *Amada*,
    2007 WL 4105231 (W.D. Pa. 2007) .................................................................................. 42

**OTHER AUTHORITIES**

17 C.F.R. § 240.3b-4(c) .............................................................................................. 14

Fed. R. Civ. P. 12 ............................................................................................ *passim*

SEC. EXCH. COMMISSION, S-X Rule 4-01(a)(2); Final Rule: Acceptance from
    Foreign Private Issuers of Financial Statements Prepared in Accordance with
    IFRS Without Reconciliation to US GAAP, Release No. 33-8879 (Dec. 21,
    2007) ................................................................................................................... 14

## PRELIMINARY STATEMENT

Plaintiffs' fundamental fight is against the bedrock legal principle that "[t]he parent-subsidiary relationship itself is not sufficient to establish in personam jurisdiction over the parent entity." *In re Enterprise*, 735 F. Supp. 2d 277, 317 (W.D. Pa. 2010). To avoid this black-letter rule, Plaintiffs' jurisdictional arguments present this Court with an ever-moving target. In the beginning, before Koninklijke Philips N.V. ("KPNV") filed its Rule 12(b) motions, Plaintiffs used "group pleading" to pretend that KPNV *directly* had some role in the design and manufacture of Philips RS North America LLC's ("Philips RS") devices. Plaintiffs lumped KPNV into a group-pled "Philips," a defined term they used to refer to all Philips Defendants (including Philips RS). After this Court chided Plaintiffs for their "sloppy" pleading, Plaintiffs could no longer sidestep their inability to plead specific, direct jurisdiction over KPNV through group pleading. Because KPNV did not design or manufacture the recalled devices (critical points because Plaintiffs' underlying products liability claims *require* such conduct), Plaintiffs then told the Court they were all-in on an alter-ego theory of personal jurisdiction. Why? Because this was Plaintiffs' only way to impute *Philips RS's design and manufacture* of the devices to *KPNV*.

For the past nine months (well past the 45-day period ordered by the Court), Plaintiffs have asked for and received more-and-more jurisdictional discovery as they have advanced one flawed whack-a-mole jurisdictional theory after another. But that discovery only underscored (a) the extensive corporate formalities observed by KPNV, Philips RS and the other Philips Defendants, and (b) that KPNV did not "control[] the day-to-day operations of [Philips RS] such that [Philips RS] can be said to be a mere department of [KPNV]." *Enterprise*, 735 F. Supp. 2d at 318. When discovery did not help them, Plaintiffs enlisted the help of two "experts" to argue that Philips RS could not have been run as a standalone business because of the absence of documents Plaintiffs

never sought.  But after those materials were produced, and Plaintiffs' experts conceded there was no evidence of any disregard of the corporate form, Plaintiffs have all but abandoned their experts.

So, time for Plaintiffs' next pivot.  Relegating the alter-ego theory to the back of their latest brief, Plaintiffs now argue that KPNV, a Dutch holding company, is subject to *specific, direct* personal jurisdiction, purportedly based on *KPNV's own* contacts with the forum states.  In coming full circle, Plaintiffs run into the same brick wall that they sought to avoid when they first advanced an alter-ego theory:  KPNV, as a parent, is not liable for the design and manufacturing conduct of its subsidiaries, so their claims against KPNV must fail on the merits.  *See United States* v. *Bestfoods*, 524 U.S. 51, 61 (1998).  Plaintiffs' latest flip-flop back to specific, direct jurisdiction closes the very escape-hatch they needed (*i.e.*, alter-ego) to state some merits claim against KPNV.

Plaintiffs' ever shifting positions are all for naught.  Other than the negligent recall cause of action (which KPNV has conceded personal jurisdiction on in Pennsylvania), no specific, direct jurisdiction exists over KPNV in Massachusetts or Pennsylvania on Plaintiffs' claims.  Plaintiffs now argue that the use of business *segments*, grouped together by product lines to create efficiencies, somehow overrides the clear respect for the corporate form followed by the Philips Defendants and conceded by Plaintiffs' experts.  But this theory was doomed from inception:  as Plaintiffs' experts agree, segments are "████████████████████████████" and are not "██████████████████████████." (DX022, at 86, 117; DX023, at 66.) Plaintiffs then cling to reporting lines and organizational charts as a panacea.  But as this Court has already told Plaintiffs, "[w]hat's important is not necessarily who was reporting to who." (Aug. 8 Hearing Tr. at 47.)  Plaintiffs needed to show "[w]hat [KPNV] actually d[id]." (*Id.*)  After nine months of jurisdictional discovery, Plaintiffs still have failed to point to any instance of KPNV directing, let alone pervasively controlling, the day-to-day operations of Philips RS.

Worse still, Plaintiffs now seek to transform conduct designed to *respect the corporate form*, including corporate minutes, an array of intercompany agreements, and extensive financial records, into a basis to assert direct personal jurisdiction over KPNV. The primary directive when KPNV acquired Respironics in 2008 was to let management continue to successfully run its business, but KPNV took steps to integrate Philips RS through various intercompany agreements. Plaintiffs attempt to transform these agreements into jurisdictionally relevant contacts, suggesting that simply because Philips RS and Philips NA are in Pennsylvania and Massachusetts, KPNV is subject to specific jurisdiction in those states. But those agreements (governed by Dutch law) do not contemplate that KPNV would provide *any* services, into those forum states or otherwise. Plaintiffs simply fail to point to a *single* jurisdictionally relevant contact between KPNV and *any* of the forum states.

Finally, with respect to Plaintiffs' negligent recall claim, KPNV has already conceded jurisdiction in Pennsylvania, because that is where the affiliate that needed KPNV's direct help (Philips RS) is headquartered. Philips RS issued a global recall involving approximately 15 million devices, and since 2021, KPNV has been providing oversight and guidance to its subsidiary in need. None of that transforms that assistance into some sort of alter-ego relationship; Philips RS has managed the day-to-day execution of the recall and its own ongoing business operations.

Plaintiffs' constant moving targets have wasted the Court's and the parties' time, but as this Court has stated, "[if] there's no jurisdiction, there's no jurisdiction." (Aug. 8, 2023 Hearing Tr. at 8.) "[I]t has to come to an end." (*Id.*)

## EVIDENCE DEVELOPED IN JURISDICTIONAL DISCOVERY

### A.   The Structure and Organization of KPNV

KPNV is a Dutch holding company (a *naamloze vennootschap*, or "N.V."), headquartered in Amsterdam. It is the ultimate parent of the various subsidiaries in the Philips Group, which is

comprised of nearly 300 companies participating in a wide range of industries in over 100 countries.  (JX234, at 23, 83, 117.)[1]  From 2008 (when KPNV acquired Respironics) to the present, KPNV has had between 20 and 30 directors or officers at any given time.  (JX015 (No. 18).) During this same period, the Philips Group companies employed between 74,000 and 121,000 employees globally.  (*E.g.*, JX234, at 59; JX239, at 21; JX242, at 55.)

KPNV utilizes a two-tiered board structure, consisting of a Board of Management and a Supervisory Board—each of which answers ultimately to KPNV's shareholders.  (JX234, at 117.) KPNV's Board of Management, which consists of the CEO, CFO and General Counsel, is responsible for managing the Philips Group, and certain key officers are selected to support it in fulfilling this duty.  (*Id.*)  Together, the Board of Management and those key officers constitute KPNV's Executive Committee.  (JX234, at 117.)  The Board of Management and Executive Committee are, in turn, overseen by the Supervisory Board, which is responsible for the "policies, management and general affairs of Philips, and assists the Board of Management and the Executive Committee with advice on general policies."  (*Id.* at 118; *see* JX248, at 1-3.)

## B.    The Philips Group

### 1.    *Parent/Subsidiary Structure*

KPNV's subsidiaries run their own day-to-day operations, but as with any multinational company with multiple subsidiaries, KPNV, as the ultimate owner, receives periodic performance updates, not only for its own governance purposes, but because KPNV is a publicly held company with disclosure obligations.  Even though KPNV sets generalized group-wide policies, it leaves

---

[1]    *See, e.g.*, JX235, at 149-50 (listing the Philips Group's "material subsidiaries" for 2020); JX238, at 128 (same for 2017); JX240, at 127-28 (same for 2015).

the day-to-day operations and specific details to its subsidiaries and their management, which have

particular expertise and experience within their respective industries and markets.[2]

KPNV's subsidiaries are active in a wide range of industries, many of which are regulated.

(*E.g.*, JX234, at 23.)  With the exception of the subsidiaries that operate as holding companies, the

individual subsidiaries employ and support their own employees, have their own management

teams,[3] directors and officers,[4] pursue their own business ventures[5] and acquisitions,[6] actively

monitor their own finances and internal controls,[7] accrue their own assets and liabilities,[8] operate

under their own governing bylaws,[9] and design and manufacture their own products,[10] among

other things.   These individual subsidiaries also regularly monitor their own financial health,

operations, and quality controls.[11]  Tellingly, after reviewing thousands of pages of jurisdictional

discovery, Plaintiffs' experts confirmed that they "█████████████████████████████████

█████████████████████"[12]

---

[2]      *E.g.*, JX022, at 16; JX242, at 69; JX240, at 62; JX238, at 34; JX236, at 20; DX009, at 62, 91-93, 95-97, 99-100, 112, 115.

[3]      *E.g.*, DX010, at 3-4 (████████████████████████████████████████████████ ████████████████████████████████████████████").

[4]      *E.g.*, JX041 (list of officers, managers and directors of Philips RS since 2008).

[5]      *E.g.*, DX011; DX012.

[6]      *E.g.*, DX013; DX014; DX015; DX016.

[7]      *E.g.*, JX421 (example of embedded financials reviewed at Philips NA's *monthly* trial statement review); JX422 & JX423 (same for Philips RS).

[8]      JX113 (Philips RS's balance sheet, income statement, and other financial information for fiscal years 2008–2022); JX115 (same for Philips NA).

[9]      *E.g.*, DX001 (bylaws of Respironics as of March 14, 2008); JX302 (same for Philips Holding USA).

[10]     *E.g.*, JX156, at 1; JX 157, at 29; JX158, at 21; JX159, at 163-64.

[11]     *E.g.*, JX099; JX113; JX115; DX009, at 91, 93, 110, 130-31.

[12]     DX022, at 117 (Garbe); *see also* DX023, at 13 (Dundon: ███████████████████ █████████████████████████████████████████████████).

Philips RS is no different.  Located in Pennsylvania, until it converted into an limited liability company in 2020, Philips RS was governed by its own Board of Directors,[13] which meets quarterly and, since 2017, has included an *independent* director.  (DX001, at 5; JX282, at 7; JX283; JX020, at 1.)  Philips RS now has members.  (DX047.)  No one from KPNV has ever served as a member of Philips RS or sat on Philips RS's Board.  (*See* JX133.)  Nor has anyone from KPNV ever been an officer of Philips RS.  (*Id.*)  Philips RS has its own internal functions to monitor its own operations, including marketing, human resources, engineering, strategy and business development, and quality.  (JX301, at 14; *see also* JX397; JX405.)  In fact, that the foam quality issues underlying this litigation were unknown to KPNV for years was specifically attributed in part to ███████████████████ (JX374, at 38.)  With regards to operations and finance, the individual managers of Philips RS conduct *monthly* meetings to review its financial condition.  (DX002, at 97-101.)[14]  Records from these meetings are recorded in minutes, which are audited by an outside accounting firm.  (*Id.*)

In addition, Philips RS's management receives regular updates on finance and internal controls.  For example, Philips RS's management regularly monitors accruals, ensuring that purchase orders are closed out upon completion.  (DX003; DX004.)  This includes an account of debits and credits for individual purchase orders.  (*Id.*)  Additionally, Philips RS's management ██████████████████████████.  (DX005; DX006.)[15]  Philips RS's management also monitors internal controls quarterly.  (DX007; DX008.)

---

[13]     *E.g.*, JX020; JX276; DX014; DX017.  So too is Philips NA.  (DX018.)

[14]     *See, e.g.*, JX422; JX 423.  Philips NA's leadership does the same.  (*E.g.,* JX421.)

[15]     For purposes of record keeping, each entity in the Philips Group is assigned an "organizational reporting unit" number ("ORU") to account for each entity's operations and tax obligations.  (JX392, at 28, 31, 42-43, 48, 57-58.)  Multiple ORUs can "roll-up" into their parent company's ORU, but each entity maintains its own unique ORU.  (*Id.* at 42-43, 48.)  ORUs in the

Philips RS has its own account and cash balance through the Philips Group's centralized banking system, known as the In-House Bank ("IHB"), which is governed by an intercompany agreement.  (JX263; *see also* JX264.)[16]  Philips RS's IHB account balance is credited, or debited, according to the specific transactions it conducts with third parties or affiliates.  The governing agreement " ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████ .  (JX263, at 6, 15.)

### 2.    *Company-Wide Policies and Intercompany Agreements*

To lower costs, permit operating efficiencies, monitor risk, and ensure legal compliance (including tax-compliant allocations supporting transfer pricing), the Philips Group companies transact and negotiate arm's-length agreements with each other, including with KPNV.  In addition, when it comes to policies, KPNV insists upon certain minimum basic standards that apply group-wide, with specific standards to be created, instituted and overseen at the local level.  A paradigmatic example is Quality & Regulatory ("Q&R"), as discussed further below.

### a)    *Philips Group Policies*

One strategy KPNV uses, as an owner, to manage risk and encourage operating efficiencies is group-wide policies that set high-level goals and minimum corporate standards.  One example is the Philips Business System ("PBS"), ███████████████████████████████████████

---

U.S. report their finances on a consolidated basis at the PHUSA level.  (JX116-JX126, JX406-JX413.)

[16]    Pursuant to Payment Factory Agreements with its various affiliates, KPNV provides a centralized banking system for ease of accounting, debiting/crediting, and financing intercompany and external transactions.  (JX127, at 2; JX263, at 10-11.)  The reason is driven by basic business logic:  banking with KPNV (as opposed to a third-party bank) ensures a *lower* cost of financing and *higher* interest income, which is beneficial to the local subsidiary.  (JX127, at 2.)  It also enables affiliates to more easily conduct transactions with each other and with third parties, especially foreign transactions in other currencies.  (JX263.)

███████████████████████████████████████████████████████████

███. (JX024, at 3; JX005, at 3, 7.)  By design, the PBS does not broach matters that are specific

to any particular entity's day-to-day operations, business models, or industries.  Instead, the PBS

(instituted in 2012) addresses the concern that the "████████████████████████████████████████

████████████████████," which was "████████████████████████."  (JX249, at

1.)   The PBS was "████████████████████████████████████████████████████

████████████████████████████████████" (JX024, at 3), and describes the

general ████████ of how Philips Group leaders are to run their organizations (JX250, at 4).  The

Executive Committee ████████████████████████████████████████████████

████████████████████████████████.  (JX249, at 2.)   This is customary for large

companies.  In fact, the Philips Group developed its PBS ████████████████████████████

████████████████████████████████.  (JX005, at 4, 28.)[17]

     Against this unremarkable backdrop, Plaintiffs suggest that the PBS somehow eviscerates

corporate boundaries.  (Renew. Br. at 7.)  Notably, each of Plaintiffs' references to an "████████

████████████████████████████████████████.  (*Id.* at 7, 22, 46.)  Yet, *on its*

*face*, the PBS disclaims the "control" Plaintiffs claim exists, recognizing that ████████████████

████████████████████████████████████████████████████████████████

████████████████."  (JX249, at 3 (emphasis added).)   What's more, ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.  (JX251, at

---

[17]    Ms. Iversen, who worked for General Motors, Johnson & Johnson, Northrop Grunman, and General Electric, testified that "[m]ost companies have one."  (DX009, at 20, 101-02.)

2-3.)    The PBS contemplates █████████████████████████████████████
███████████████████████████████████████████████████." (*Id.*)

Under the general PBS framework, there are other group-wide policies for matters of general concern.  One of Plaintiffs' favorites is the General Business Principles ("GBP"), which "████████████████████████." (JX027, at 3.)  The GBP is a code of conduct requiring that ████████████████████████████████████████████. (*Id.* at 14.) Because the businesses "████████████████████████████" (JX252, at 5), the GBP also serves as a risk management tool.  (JX235, at 74.)  The GBP is designed to be implemented at a local level by Compliance Officers, who are designated "████████████████████████████ ███████████." (DX019, at 7.)   These local Compliance Officers are ████████████████ ███████████████████████████" (*Id.*)   For Compliance Officers to "████████████," they "████████████████████████." (JX252, at 7.)  The GBP Charter was thus written "████████████████████████████" (*Id.*)

### b)    *Quality and Regulatory*

Plaintiffs pretend that Q&R is managed from the top-down on a day-to-day basis by KPNV's CEO and Executive Committee.  In reality, there is a ████████████████████ ███████████████████████████████████,[18] which is led by a Philips NA employee who reports to KPNV's CEO regarding quality issues of particular importance as they arise.[19]  But the day-to-day Q&R work is done at the business level, where the subsidiaries and

---

[18]    Contrary to Plaintiffs' assertions, Q&R is not a Business Unit or a Reporting Segment. (Renew. Br. at 7.)  It is a group-wide function that broadly services all businesses—toothbrushes, imaging devices, kitchen devices, and medical devices, to name a few.  (DX009, at 61-62.)

[19]    Liz Iversen was the Head of Q&R from 2014 to 2020, succeeded by Francis Kim.  Plaintiffs have tried to establish KPNV employed Ms. Iversen.  To begin with, ████████████████████ ████████  (DX009, at 90, 120.)                                                          (*Id.*

their Q&R teams are tasked with developing, monitoring, implementing, and enforcing Q&R standards—and detailed Quality Manuals—for the individual businesses.

**Q&R Function.**   The Philips Group utilizes various functions to streamline skills and expertise for the benefit of the entire group of companies.  (JX024, at 16.)  One of these functions is Q&R, which is a global function that services Philips Group subsidiaries throughout the world.[20] The Q&R function is "████████████████████████" and ████████████████████████ ████████████.  (JX371, at 5.)  The independent Q&R function provides assistance to local businesses as particular issues arise, but ultimately "████████████████████████ ██████████" (*Id.*)  In practice, the various businesses provide updates to the Head of Q&R monthly or quarterly, or as issues arise.  (DX009, at 91-93, 99-100.)  But, as the former Head of Q&R testified last week, ████████████████████████████████████████████ ████████████████████████████████████████████████.  (*Id.* at 62.)  Just as Q&R ████████████████████████████████████ ████████████████████████████████.  (*Id.* at 62, 91-100.)  Instead, the Head of Q&R ████████████████████████████████████.  (*Id.* at 92-93, 129-30.)

**Group-Wide Quality Policy.**   One of the Philips Group's policies under the PBS is the Quality Policy, a one-page document that provides, in full, as follows:



at 120.) ████████████████████████████████████████████
████████████████████████. (*Id.* at 119-20.) ████
████████████████████████████████████████████████
████████████████████████████ (*Id.* at 130-31.)

---

[20]      Other examples of these group-wide functions are Legal, Audit, Sustainability, and Security.  (JX005, at 9; JX024, at 16.)

█████████████████████████████████████
█████████████████████████

(DX020.)  This is the █████████████████████████████████

█████████████  (DX009, at 107.)  The real day-to-day work of monitoring quality and

regulatory was at the operating subsidiary levels.

  ***Business-Level Quality Systems and Manuals.*** There is no such thing as a generally

applicable "Quality Management System" ("QMS").  (DX009, at 110.)  With the number of

regulated industries that the Philips Group participates in, plus the related array of legal and

regulatory demands, each business is ████████████████████████████████

███████████████████████████████████████████████.

(JX374, at 7.)  Thus, the "████████████████████." (*Id.* at 15.)  This allows the various

entities to "████████████████████████████████████████

████████████████████████████." (*Id.* at 9.)

  Philips RS was, again, no different. ██████████████████████████

████████████████████████████. (JX301, at 1; DX009, at 112-13.)  Philips

RS's ████████████████████████████████████████████

███████████████████████████████████████████████.

(JX301.)  For example, ████████████████████████████████████

███████████████████████████████████████████. (*Id.* at

37-38.)  The ██████████████████████████████████████

███████████████████████████████████. ████████████████

████████████████████████████████████████████████

███████████████████████████████. (*E.g.* DX021.)



. (DX009, at 113-15, 132.)  At any given time, ███████████

███████████████████████████████████

████ . (*Id.*) ████████████████████████

███████████████████████████████████

███████████████████████ ." (*Id.* at 127.)

### c)  *Intercompany Agreements*

To best make use of the Philips Group's global resources, the various subsidiaries have entered into a multitude of intercompany agreements defining their rights and obligations with respect to KPNV and one another.  Payments pursuant to these arrangements "████████

███████████████████████████████████

███████████████ " (JX253, at 16.)[21]  Similarly, KPNV ████████████

███████████████████████████████████

███████████████████████████████████

██████ ."  (JX127, at 2; *see* JX254, at 2; JX255, at 2; JX256, at 3; JX257, at 4; JX258, at 4; JX259, at 22-23.)

KPNV coordinates the provision of services to each of its subsidiaries by contracting with its other subsidiaries that specialize in those particular services.  KPNV thus agrees to make services available to its subsidiaries, including relating to IT, accounting, marketing, auditing, human resources, and insurance, by separately contracting with its other subsidiaries to provide those services, to the extent requested by the service-receiving entity.  In exchange, the subsidiary ███████████████████████████████████ . (*E.g.,*

---

[21]    When a subsidiary makes a claim for payment for its services provided, that is referred to as a "counterclaim."

JX109, at 1, 10; JX013, at 1, 3-4.)  That ███████████████████████████

███████████████████████████████████████████████████████████

██████████████.  (*E.g.*, JX109, at 1, 10; JX260, at 3-5; JX261, at 3, 14-15.)  In other words,

as the parent holding company, KPNV does not itself provide any of these services, but rather

facilitates the provision of services from subsidiary to subsidiary by acting as a pass-through.

Plaintiffs misleadingly assert that █████████████████████████████████

████████████████████████████████████████████"  (Renew. Br. at

20.)  They inexplicably omit that KPNV ██████████████████████████

███████████████████████████████████████████████████

█████████████████.[22]

Separately, KPNV contracts with its affiliates for the use of its "████████████

███████████████████████████████████████████

██████████████"  (JX011, at 1.)  In ████████████████████████

███████████████████████████████████████████████████

████████████████████████████.  (JX011, at 2-3, 6.)

3.    *Reporting Segments and Business Units*

Since filing their last brief, Plaintiffs have suddenly become "shocked, shocked" by the use

of entirely unremarkable "Reporting Segments" and "Business Units" at the Philips Group.

Separate from the parent-subsidiary structure, the Philips Group also organizes its various

businesses into these structures.  Why?  The approximately 300 subsidiaries that comprise the

---

[22]    For example, ████████████████████████  (JX012, at 1; JX262, at 4-5.)
For the benefit of its various other affiliates, KPNV has an ████████████████
█████, pursuant to which ██████████████████████████████████
█████████████████.  Those affiliates ████████████████████████
██████████████████████████  (*E.g.*, JX012, at 5-7; JX262, at 5-7.)

Philips Group sell thousands of very different types of products globally, including diagnostic imaging devices (*e.g.*, x-rays), oral healthcare products (*e.g.*, toothbrushes), emergency care equipment, personal health products (*e.g.*, shavers), audio products, sleep and respiratory care products, kitchen appliances, and many others.  (JX234, at 15-23.)  To comply with the various applicable legal regimes and create synergies to help meet the needs of different customer bases, the Philips Group divides the businesses into four main "Reporting Segments":  (1) Diagnosis and Treatment; (2) Connected Care; (3) Personal Health; and (4) Other.  (JX233, at 15.)  Each Segment is, in turn, divided into specific "Business Units" (sometimes called "Business Clusters") based on synergistic product lines.  (JX024, at 11.)  Philips RS's products—including the CPAP and other devices at issue in this litigation—fall within the Sleep & Respiratory Care ("SRC") Business Unit, which falls within the Connected Care Segment.  (JX233, at 18.)[23]

Beyond the obvious practicalities of selling similar types of goods through the same Segments and Business Units, under the International Financial Reporting Standards ("IFRS"),[24] reporting financial information at the Business Unit level is *required*.  The IFRS requires that an "entity shall disclose information to enable users of its financial statements to evaluate the nature and financial effects of the business activities in which it engages and the economic environments in which it operates."  (DX041, at 8(1).)  To do so, an "entity shall report separate[] information about each operating segment."  (*Id*., at 8(11).)  Because KPNV is *required* to provide Business Unit-level data to the SEC and investors (a point Plaintiffs' experts concede (DX022, at 86-88)),

---

[23]    None of this should have been surprising to Plaintiffs, as it is all laid out in KPNV's Annual Reports.  (*E.g.*, JX233, at 15, 17-18; JX234, at 15, 17-18; JX235, at 13, 15-16.)

[24]    KPNV is a foreign private issuer under 17 C.F.R. § 240.3b-4(c), and has elected to prepare its financial statements under IFRS.  (JX234, at 62, 126; *see* S-X Rule 4-01(a)(2); Final Rule: Acceptance from Foreign Private Issuers of Financial Statements Prepared in Accordance with IFRS Without Reconciliation to US GAAP, Release No. 33-8879 (Dec. 21, 2007); DX046 (Items 17 and 18); DX022, at 86-88, 117-18.)

KPNV seeks to ensure that these Business Units perform and are managed efficiently, and this structure encourages strong Business Unit outcomes (*in addition to* strong entity-level results). From a pure operations perspective, the Business Unit structure allows the Philips Group to "████████████████████████." (JX024, at 11.)  The "████████████████████

████████████████████████████████████████████████

████████████████████████" (*Id.*)

Contrary to Plaintiffs' assertions (Renew. Br. at 7), none of this means that corporate boundaries and legal separateness were eradicated by the *simultaneous* and complementary existence of Business Units—as Plaintiffs' own experts conceded.  (*See supra* at 2.)  The Segment/Business Unit structure complements a subsidiary's ability to manage its performance by using a market-specific metric.  Viewing the businesses through industry- and product-specific groupings provides greater insight into performance in particular markets, which is useful where multiple subsidiaries are selling products in the same Business Unit or where a subsidiary sells products in multiple markets.[25]

For example, seven U.S.-based subsidiaries (including Philips RS) sell products grouped in the SRC market, such as respirators, humidifiers, and CPAPs.[26]  Philips RS's ████████████

████████████████████████████████████.[27]   Given Philips RS's strong

---

[25]     The Philips Group also operates in 17 "Markets" based on geographic regions through local marketing subsidiaries, such as Philips NA.  (JX024, at 10.)  The purpose of the Markets is to address local needs and foster long-term relationships with customers located in specific regions. (*Id.* at 12.)  Although the Markets structure is separate from the Business Units, both structures work together through Business-Market Combinations ("BMCs").  (*Id.*)  These BMCs allow for "quick decisions that are locally relevant and as close to the customer as possible." (*Id.* at 15.)

[26]     The other products are listed on pages 3 and 4 of JX301.  These U.S. subsidiaries also had distribution agreements with foreign subsidiaries so that their products could be sold globally.  (*See* JX279 (example of distribution agreement); JX404 (sources of revenue for global SRC).)

[27]     DX026 (see row 2; ████████████████████████).

representation in the SRC business, Philips RS management has significant involvement in the SRC business.[28]  Philips RS's " (JX301, at 3, 6.)  For similar reasons, . (DX024; DX025; JX372; JX401-403.)

### C.     Philips RS

#### 1.     *Acquisition of Philips RS*

Before Philips RS—at the time, Respironics, Inc.—was acquired by KPNV, it had been operating around the world for 24 years.  Respironics' success was a significant factor in KPNV's interest.  (JX267, JX272.)  In 2008, KPNV acquired Respironics for approximately $5.1 billion to expand into the consumer sleep and respiratory care business.  (JX268, at 2; *see* JX270, at 2 ("Respironics already has a well-established brand in the market . . . .").)  The Respironics acquisition was, by design, a "bolt on" arrangement.  KPNV was specifically interested in the fact that it would "acquire a very strong and experienced management team."  (JX267, at 4.)  To that end, retaining Respironics' management was "conditional to this transaction."  (*Id.*; *see* JX269, at 9 ("[Respironics] has a strong management team that is critical to the business' success," noting that the transaction would involve offering "retention package[s]" to existing management); *id.* ("[R]etention of [Respironics'] key management is a prerequisite for a successful transaction and will for that reason by (sic) a key condition to come to a transaction with [Respironics].").)[29]

---

[28]     For example, David Ferguson (a Philips RS employee) is the Business Leader of SRC.

[29]     Twice in their brief, Plaintiffs rely on corporate puffery from a 2016 slide deck that stated " (JX014, at 5; *see*

KPNV's plan to integrate Respironics into the Philips Group was simple: leverage KPNV's global infrastructure to fuel Respironics' growth while maintaining Respironics' independence to sustain its success. (JX269, at 9.) Post-acquisition, Respironics continued to conduct its business in much the same manner as it had before: it designed, manufactured and sold its own products to third-party DMEs (who in turn sold those products to consumers), including the devices at issue in this litigation. (JX156, at 1; JX 157, at 31; JX158, at 23; JX159, at 170-71.) As jurisdictional (and millions of documents of merits) discovery has confirmed, KPNV had no role in the design, manufacture or sale of the devices, including the choices regarding foam selection. (*E.g.*, DX027 (No. 9).)

### 2. *Conversion of Respironics, Inc. to Philips RS North America LLC*

In 2020, Respironics, Inc. was converted from a Delaware corporation into a Delaware limited liability company, renamed Philips RS North America LLC. (JX271, JX282.) As part of this conversion, Philips RS North America Holding Corp. was created as the holding company parent for Philips RS. (JX271.) Plaintiffs pretend that the conversion was motivated by a "█████" to ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████ (Renew. Br. at 7.) In fact, ██████████████████████████

██████████████████.[30]  ████████████ further rebutted Plaintiffs' narrative at her deposition ████████

Renewed Br. at 9, 44.) Even setting aside that this slide was merely describing the fact of the parties' merger, ████████████████████████████████████████████████████

████████████████████████████████████████ (JX374, at 38.)

---

[30]   Under U.S. tax laws, an LLC can be treated as a "disregarded entity" for income tax purposes, such that its taxable profits can be treated as part of its parent's taxable profits. (DX027 (No. 12); JX007, at 6 ("[It would] achieve significant tax savings by converting Respironics, Inc. from a corporation to a limited liability company.").) Other subsidiaries were converted to LLCs for the same fundamental reason. (DX027 (No. 13).)

███████████████████████████████████████████████████

███████████████████████████████" (DX009, at 103.)

       **3.**    ***Philips RS's Recall***

████████████████████████████████████████████████

█████[31]  With the ████████████████████████████████

███████████████████████████████████. (DX027 (Nos. 10 & 22).)

In 2020, complaints began to increase, and in late 2020, on the basis of limited testing, ████████

████████████████████████████████████████████████

██████████████████████████. (*See* DX030, at 4.)

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████" (JX329, at 1.) ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████. (JX328, at 2-3; JX330, at 2.) ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████. (DX027 (No. 10).)  This ███████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████. On the back of

these (still preliminary) test results, on April 26, 2021—in an abundance of caution until further

---

[31]     Philips RS ███████████████████████████████████████ (JX134, at 34.)  Even as late as ███████████████████████████████████████████████ (JX328, at 3.)

tests could be completed—KPNV notified the public of "possible risks to users related to the sound abatement foam." (JX002, at 2.) Following consultations with FDA, Philips RS initiated a voluntary recall on June 14, 2021.

Philips RS's recall has involved a number of different layers, including designing and executing a repair and replacement program, interfacing with consumers and DMEs, conducting additional testing, and communicating regularly with the FDA. Philips RS maintained autonomy with respect to the decisions. As a few examples:

- ███████████████████████████████████████████
  ███████████████████████████████████████████
  ████████████████████ (*E.g.*, JX096, at 4.)

- Philips RS handled the direct correspondence to patients and DMEs. (*E.g.*, JX136; JX189, at 4; DX031; DX032.)

- Philips RS ███████████████████████████████████
  ██████. (DX010, at 2.)

- Philips RS contracted with third parties for recall-related services and supplies. (*E.g.*, DX012; DX033; DX034.)

- Customers from around the world were instructed to send any inquiries regarding the recall program—including with respect to returning devices—to a customer services group at Philips RS. (DX035, at 47.)[32]

- The ██████████████████████████████████████
  ██████. (*See* DX040 ██████████████████████
  ███████████████████████████████.)[33]

---

[32]      Where, however ████████████████████████████
████████████ (JX414-JX420.)

[33]      The topics included, ████████████████████████
████ (DX036) and █████████████████ (DX037). Philips RS management████████████████████████████████████████
██████ (DX010, at 3.) Of those calls, ████████████████████
██████████████ (*See* DX027 (No. 20).)

Still, Philips RS's recall is one of the largest medical device recalls in recent history. Approximately 15 million devices were sold globally over more than a decade, including about 11 million in the United States alone. Given the breadth and scope of the recall, combined with the additional testing to assess patient safety, Philips RS needed the help of its parent company. As a parent company, KPNV has provided "███████████████████████████████████ ███████████████." (JX096 at 3.) KPNV has utilized its global reach to spread Philips RS's recall warnings. (*E.g.*, JX004 at 2.) KPNV has also formed ███████████████████████ ████████████████████████████████████████████████████████████ ███████████" (JX096, at 3.) Despite Plaintiffs' attempts to contort the evidence, KPNV's support never pervaded or overwhelmed Philips RS's day-to-day decision-making. (*See, e.g.*, JX130, at 11.) But because KPNV has been assisting its Pennsylvania subsidiary with its recall— and Plaintiffs claim negligence in connection with the recall's execution—KPNV conceded to specific personal jurisdiction in Pennsylvania on the negligent recall claim.

## ARGUMENT

## I.   PLAINTIFFS' NOVEL AND BELATED PIVOT TO SPECIFIC PERSONAL JURISDICTION FAILS.

Realizing the futility of their alter-ego theory, Plaintiffs claim that KPNV's alleged contacts with Pennsylvania and Massachusetts establishes specific personal jurisdiction in those two states on all their claims. [34] But to satisfy due process, Plaintiffs must prove by a

---

[34]   With respect to the negligent recall claim, Plaintiffs argue that KPNV is subject to personal jurisdiction in *all* states. KPNV has already consented to specific personal jurisdiction on that claim in Pennsylvania. In its opening briefs, KPNV was clear that it conceded jurisdiction in Pennsylvania *only* for Count 3 of the Economic Loss Complaint, Count 9 of the Medical Monitoring Complaint, and Count 6 of the Personal Injury Master Complaint, not Plaintiffs' "separate and distinct claims." (*See* ECF Nos. 914 & 1353.) Particularly given that Pennsylvania does not recognize a "negligent failure to recall" claim, *see, e.g., Cleaver* v. *Honeywell Int'l*, 2022 WL 2442804, at *4 (E.D. Pa. 2022), as distinct from a negligence claim *in the execution of a recall,*

preponderance of the evidence that KPNV both "*directed [its] activities at residents of the forum*," and "the litigation results from alleged injuries that *arose out of or relate to those activities*." *Burger King* v. *Rudzewicz*, 471 U.S. 462, 472 (1985) (emphasis added).  Here, Plaintiffs rely on a hodgepodge of made-up contacts and repackaged alter ego theories, none of which establishes the "minimum contacts" necessary to justify the exercise of specific personal jurisdiction over KPNV. *Enterprise*, 735 F. Supp. 2d at 308.

Even more, the purported KPNV-forum "contacts" do not demonstrate the required "strong relationship among the defendant, the forum, *and the litigation*—the essential foundation of specific jurisdiction." *Ford* v. *Montana*, 141 S. Ct. 1017, 1028 (2021) (emphasis added).  "When there is no such connection, specific jurisdiction is lacking regardless of the extent of a defendant's *unconnected* activities in the State." *Bristol-Myers* v. *Sup. Ct.*, 582 U.S. 255, 264 (2017); *Ford*, 141 S. Ct. at 1028 ("[I]n the sphere of specific jurisdiction, the phrase 'relates to' incorporates real limits, as it must adequately protect defendants foreign to a forum.").  "[I]t is not enough that a defendant's contacts with a forum relate to the same *general subject matter* as the claim"; rather, "the valid exercise of personal jurisdiction requires a *meaningful link*" between "a legal obligation that arose in the forum and the *substance* of the plaintiffs' claim." *Lloyd* v. *Retail Eq.*, 2022 WL 18024208, at *5 (D.N.J. 2022) (emphasis added).[35]

---

KPNV's concession for that one count was not a "waiver as to all claims in Pennsylvania . . . for the entire 2008-2021 period," as Plaintiffs now attempt to manufacture.  (Renew. Br. at 28).

[35]    For similar reasons, Plaintiffs have not established that KPNV is subject to specific personal jurisdiction for their RICO claim, which is *only* asserted in the Economic Loss Complaint, *not* the Medical Monitoring or Personal Injury Complaints.

A.     **KPNV Is Not Subject to Specific Personal Jurisdiction in Pennsylvania or Massachusetts on the Non-Recall Claims.**

1.     *The Intercompany Agreements Do Not Demonstrate that KPNV Engaged in Any Relevant Services or Performed Any Relevant Obligations in the Two Forum States.*

There is no specific jurisdiction over a parent corporation just because its subsidiary is present in the forum.  *Enterprise*, 735 F. Supp. at 318.  Yet, Plaintiffs now claim that the intercompany agreements, such as the Brand License Agreement and Intra-Group Services Agreements, are jurisdictionally significant contacts that subject KPNV to jurisdiction in Pennsylvania and Massachusetts simply because Philips RS and Philips NA are located there. (Renew. Br. at 19-20; *see, e.g.*, JX011, JX013, JX109.)  If that were true, every foreign parent company that respects the corporate form through arms-length intercompany agreements would be subject to jurisdiction wherever its affiliates reside for any dispute related to that subsidiary. Of course, that is not the law.  *See Mellon Bank* v. *Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) ("The fact that a non-resident has contracted with a resident of the forum state is not by itself sufficient to justify personal jurisdiction over the nonresident."); *Grand Entm't* v. *Star Media*, 988 F.2d 476, 482 (3d Cir. 1993) ("[A] contract alone does not automatically establish sufficient minimum contacts."); *C. States, S.E. & S.W. Areas Pension Fund* v. *Reimer Express World*, 230 F.3d 934, 945 (7th Cir. 2000) ("Parent corporations regularly provide certain services to their subsidiaries [and] [s]uch parents do not expect that performing these activities may subject them to liability because of the actions of the subsidiaries.  Thus, such standard services are not sufficient minimum contacts to support the exercise of jurisdiction.").[36]

---

[36]     *Mellon Bank* was a "close case" that "consider[ed] the borders of personal jurisdiction," and involved far more contacts with the forum state than here.  960 F.2d at 1219, 1223; *see Katz* v. *Am. Council*, 2021 WL 4551399, at *5 (D.N.J. 2021) ("[T]he court's characterization of the *Mellon Bank* contract as a 'close case' suggests that the agreement there reached the outer limits of what the Third Circuit considers minimum contacts based on contracts.").  In *Mellon Bank*,

Plaintiffs ignore that it is not the existence of a contract, but the "contemplated future consequences . . . and the parties' actual course of dealing[] that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King*, 471 U.S. at 479. Contractual relationships are not sufficient unless the contracts contemplate "continuing and wide-reaching contacts[,]" *id.* at 480, with the forum state, such as "required regular payments to the forum state" and subjecting the foreign defendant to "exacting regulation under the forum state's laws" *Katz*, 2021 WL 4551399, at *5. And even then, there still must be a "meaningful link" between those continuing and wide-reaching contacts and "the substance of the plaintiffs' claim." *Id.*; *Lloyd*, 2022 WL 18024208, at *5.

The agreements upon which Plaintiffs rely—all governed by Dutch law—do not subject KPNV to any continuing contractual obligations, such as the performance of services, in the forum states. (And even if they did, Plaintiffs have no evidence that any such services were actually performed in the forum states.) For example, the Brand License Agreement provides that ████ ████████████████████████████████████████████████████ (JX011, at 2.) ████████████ ██████████████████████████████████████████████████. (*Id.*) ████ ████████████████████████████████████████████████████ *See Katz*, 2021 WL 4551399, at *5 (contract did not establish minimum contacts where "contract [] only suggests a long-term commitment and does not appear to subject [defendant] to [forum state] regulations[,]"

---

defendants submitted "personal net worth documentation to [a third party Pennsylvania citizen] . . . in the hope that [the Pennsylvania citizen] . . . would approve the financing that the partnership sought," were required to submit monthly payments into Pennsylvania, and negotiated extensions of payment deadlines and debt restructuring with the Pennsylvania third party. 960 F.2d at 1223. Plaintiff's claims there arose *directly out of* a note "delivered in Pennsylvania." *Id.* at 1220. On these facts, the Court found a *prima facie* showing of specific jurisdiction, a burden far lower than Plaintiffs' burden of proof by a preponderance of the evidence here. *Id.* at 1223.

and the services "would occur in various international locations, not the [forum state]"). Also, this is not an intellectual property case where the brand has any "meaningful link" to Plaintiffs' claims.

The Intra-Group Services Agreements also do not contemplate any continuing contractual obligations or performance by KPNV directed to the forum states. ████████████████████ ████████████████████████████████████████████. (*See supra* at 12-13.) ████████████████████████████████████████ ████████████████████. (*Id.*)  In any event, courts in this Circuit (and others) have squarely held that the provision of services among affiliated companies does not establish the requisite minimum contacts.  *See, e.g., Miller* v. *EME Homer City Gen.*, 2013 WL 5972382, at *13 (W.D. Pa. 2013); *C. States*, 230 F.3d 934, 945 (7th Cir. 2000).

The "meaningful link" to Plaintiffs' claims is missing in any event.  Plaintiffs' claims are premised on a design choice—*i.e.*, the selection of the specific PE-PUR foam for the recalled devices—which allegedly exposed them to personal injury or the risk of it.  *See Martinez* v. *Union Officine Meccaniche*, 2023 WL 3336644, at *2 (3d Cir. 2023) (explaining in the context of whether contacts were related to plaintiffs' claims that the "core characteristics" of a "products liability claim" are the "design and manufacture of the [device] or any of its parts").[37]  But Plaintiffs have no evidence that KPNV participated in any decisions relating to design, let alone in Massachusetts or Pennsylvania.  At best, Plaintiffs rely on the fact that ████████████████████ ██████████████████████████████████ (Renew. Br. at 20, 26), but this argument suffers from five fatal flaws:  *First*, as discussed above, KPNV does not actually provide

---

[37]    Plaintiffs rely on *O'Connor* v. *Sandy Lane*, which held that tort claims related to contractual contacts where the defendant breached a social "duty that is *identical* to a contractual duty" presented "[s]o intimate a link" as to justify the exercise of personal jurisdiction.  496 F.3d 312, 324 (3d Cir. 2007).  No such "intimate [] link" is present or even alleged here.

any services (marketing or otherwise) under these agreements.  *Second*, the agreements say nothing about KPNV involvement (or even other affiliates' involvement) in *design* choices, such as foam selection.  *Third*, Plaintiffs point to no evidence that any services actually rendered under the agreements concerning *the recalled devices*.  *See Bristol-Myers*, 582 U.S. at 262 ("[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction.").  *Fourth*, even under Plaintiffs' (factually incorrect) theory, Philips RS would have paid KPNV, so funds would have been leaving the forum states, not the other way around.  *See Katz*, 2021 WL 4551399, at *5 (distinguishing *Mellon Bank* on the basis that the defendant in that case made "payments to the forum state").  *Finally*, funds are not leaving the forum states in any event, because Philips RS's IHB account balance is simply credited, or debited, based on the specific transaction at issue.  (JX263, at 24-27.)

> **2.**     ***Plaintiffs Cannot Meet Their Burden of Proving that KPNV Reached Into Pennsylvania or Massachusetts Through Organizational Charts and Reporting Lines.***

Plaintiffs next hope to show that KPNV had sufficient minimum contacts based on the "business relationships" it had with Philips RS (apparently a synonym for the "Pennsylvania market") and Philips NA (the same for the "Massachusetts market") by virtue of being their ultimate parent company.  According to Plaintiffs, KPNV subjected itself to jurisdiction in these states because segments (such as the now-defunct Philips Healthcare) or functions (such as Q&R) were allegedly "led" (*i.e.*, reported to) at some point by someone from KPNV.  ( Renew. Br. at 21-22.)  But for specific jurisdiction, it makes no difference who "led," "managed" or "helmed" a particular segment or function, as allegedly reflected on an organizational chart, unless that "who" (a) had actual contacts with the forum states on behalf of KPNV to justify the exercise of personal jurisdiction, and (b) there is a "strong relationship" between those contacts and Plaintiffs' claims. *Ford*, 141 S. Ct. at 1028; *Hepp* v. *Facebook*, 14 F.4th 204, 208 (3d Cir. 2021) (no specific personal

jurisdiction where "the alleged contacts do not relate to [plaintiff's claims]"); *Hooper* v. *Safety-Kleen Sys.*, 2016 WL 7212586, at *5 (W.D. Pa. 2016) (alleged contacts "have no connection to the accident that caused [plaintiff's] injuries"); *O'Connor*, 496 F.3d at 317 (defendant must "deliberate[ly] target[]" the forum states).[38]

Plaintiffs have no evidence on either point.  In fact, Plaintiffs' argument essentially seeks to turn organizational charts with reporting lines – that cross entities and are normal in any large enterprise – into some suggestion of forum contact.  *See E.I. du Pont* v. *Agfa-Gavaert*, 335 F. Supp. 3d 657, 672 (D. Del. 2018) ("The simple fact that there are lines on a chart connecting various persons does not make the request showing that [these individuals] were actually reporting to [others.]").  Plaintiffs claim that ███████████████████████████████████ (pointing only to organizational charts and reporting lines), and ███████████████████████ ████████████████████████████████████████████████ (Renew. Br. at 21-22.)  Under Plaintiffs' logic, ████████████████ makes KPNV amenable to suit in any forum its subsidiaries touch because ██████████████████████████████████████ ████████████████████████.  So bound to this jurisdiction through upwards reporting theory are Plaintiffs that they fail to point to even a single contact between either ████ ████████████████████████████ let alone a contact related to the recalled devices.

---

[38]     Plaintiffs' cases miss the mark.  Plaintiffs do not even argue that KPNV was a "nonresident manufacturer" whose employees "assist[ed] or even visit[ed] customers of [its product's] line[,]" as was the case in *Guy Chem.* v. *Romaco S.p.A.*, 2009 WL 840386, at *9-11 (W.D. Pa. 2009).  Plaintiffs also have no evidence of KPNV "selling custom [products] to be utilized by [plaintiffs] . . . in Pennsylvania[.]"  *EQT Prod. Co.* v. *Aspen Flow Control*, 2020 WL 6545997, at *1 (W.D. Pa. 2020).  And, as explained *supra* at 24, Plaintiffs have no evidence that KPNV "provided at least a large portion of the services required under" any contract.  *Composite* v. *Am. Intern.*, 988 F. Supp. 2d 61, 73 (D. Mass. 2013).

(*Id.*)[39]  While Plaintiffs argue that their claims arise out of the "negligent administration of Philips'

Quality Management System" (*Id.* at 24), Plaintiffs have failed to show even a single contact ███

████████████████ had with Pennsylvania or Massachusetts concerning *Philips RS's* QMS.

Nor could they:  as ██████████ explained during her deposition, ████████████████████████

████████████████ (DX009, at 127.)[40]  But even worse, *not* acting by "fail[ing] to prevent and

or fix [] problems"—the basis for negligence—are not "affirmative actions" purposefully directed

toward a forum, and thus are insufficient contacts for specific personal jurisdiction.  *Hooper*, 2016

WL 7212586, at *5; *Chlebda* v. *H.E. Fortna & Bro.*, 609 F.2d 1022, 1023-24 (1st Cir. 1979) ("[A]n

omission, viz., a failure to act," cannot "furnish the minimum contact with the state needed to

confer jurisdiction" as "[t]he whole thrust of plaintiff's claim is that there was no contact at all.").

---

[39]     At her deposition, ████████████████████████████████████████████████████
███████████████████████████████████████████████████ (DX009, at 136.)

[40]     Plaintiffs demonstrate a basic, and yet fundamental, misunderstanding of the requirements of *specific* personal jurisdiction throughout their entire brief.  Perhaps one of the most egregious examples is their heavy reliance ██████████████████████████████████████████████████
████████████████████████████ (*See* JX371; DX009, at 104 ("But by no means did we discuss SRC.")).  ████████████████ is thus "irrelevant to a specific jurisdiction analysis because" it has "no connection" to Plaintiffs' claims.  *Hooper*, 2016 WL 7212586, at *5; *see O'Connor*, 496 F. 3d at 317 ("[T]he defendant must have purposefully directed its activities at the forum [and] the litigation must arise out of or relate to at least one of those activities.").  Similarly, pointing to a hodgepodge of SEC filings, resumes and an offer letter, Plaintiffs claim that ████████████████████
████████████████████████████████████████████████████ (Renew. Br. at 21-23.)  Again, Plaintiffs fail to show *any* conduct taken by these individuals in these roles at all, let alone conduct targeted at Pennsylvania or Massachusetts, conduct relating to the recalled devices, or decision-making relating to the selection of the foam.  For the same reason, it is of no difference that ██████ was based in Massachusetts, as Plaintiffs have pointed to no evidence of actions she took while concerning the recalled devices at all, let alone the selection of the foam.

3.    *Plaintiffs' Reliance on Purported Communications Into Pennsylvania and Massachusetts Fails as a Matter of Law.*

As a jurisdictional "hail Mary," Plaintiffs argue that "Royal Philips' *communications* into Pennsylvania and Massachusetts" establish the necessary minimum contacts.  (Renew. Br. at 23-24.)  To begin with, several of the cited exhibits do not involve communications sent *by* KPNV personnel but rather are emails *to*, or emails *discussing*, KPNV personnel.  (*See, e.g.,* JX047-049, JX058.)  Stripping those plainly irrelevant emails out, Plaintiffs are left with just over *ten* communications (hardly forum-targeting), all of which are related to the recall or the lead-up to it, and thus cannot be the basis for specific jurisdiction with respect to Plaintiffs' claims other than the negligent recall claim.

In any event, where courts in this Circuit have found communications to provide a basis for minimum contacts, *the very communications at issue* are what gave rise to the suit.  *See, e.g.,* *United Dairy* v. *Bayshore Indus.*, 2015 WL 5311297, at *9-10 (W.D. Pa. 2015) (communications into the forum state were the alleged misrepresentations); *Grand Entm't* v. *Star Media*, 988 F.2d 476, 483 (3d Cir. 1993) (defendant's "intentional communications gave rise to the underlying suit"); *PPG Indus.* v. *Jiangsu Tie Mao Glass*, 2020 WL 1526940, at *6, *8 (W.D. Pa. 2020) (in a trade secret misappropriation case, defendant sent "many emails . . . about obtaining [plaintiff's] trade secrets").  There is nothing of the sort here.

**B.    The Fact of a Nationwide Recall Does Not Subject KPNV to Jurisdiction Across the Nation on Plaintiffs' Negligent Recall Claim.**

On the negligent recall claim, Plaintiffs lack evidence of any specific contacts with any state other than Pennsylvania.[41]  And so, Plaintiffs ask the Court to assume jurisdiction simply

---

[41]    One of Plaintiffs' most blatant attempts to fabricate a contact is buried in a footnote (*see* Renew. Br. at 30 n.15), in which Plaintiffs say tha ███████████████████████████████████ ███████████████████████  (*Id.*)  Plaintiffs' argument is based solely on the fact that ███████

because KPNV allegedly "has directly overseen and managed" a recall that is "national (indeed global)" in scope.  (Renew. Br. at 28-30.)  This is just repackaging the repeatedly rejected legal argument that a parent company is subject to jurisdiction for the conduct of its subsidiary.  (*See infra* Section II.)  Worse still, Plaintiffs must affirmatively present evidence that KPNV engaged in "purposeful conduct *directed at the forum*."  *United Dairy*, 2015 WL 5311297, at *8 (emphasis added).  Here, however, Plaintiffs point to national efforts (overseen, but not actually executed, by the parent company), such as "the creation [] of interactive [patient] portal[s]" to register for the recall.  (Renew. Br. at 30.)  But none of this targeted any specific state, and "nationally directed efforts" do "not meet [the Third] Circuit's requirement of purposeful availment[.]"  *Shuker* v. *Smith*, 885 F.3d 760, 780 (3d Cir. 2018); *see D'Jamoos ex rel Estate of Weingeroff* v. *Pilatus Aircraft*, 566 F.3d 94, 104 (3d Cir. 2009) ("[Defendant's] efforts to exploit a national market necessarily included Pennsylvania as a target, but those efforts simply do not constitute the type of deliberate contacts with Pennsylvania that could amount to purposeful availment[.]").

## II.   PLAINTIFFS HAVE NOT MET THEIR HIGH BURDEN OF PROVING ALTER EGO.

For a subsidiary's jurisdictional contacts to be imputed to the parent, a plaintiff must prove that the subsidiary was the parent company's alter ego, a "notoriously difficult burden."  *Riad* v. *Porsche*, 2023 WL 2227692, at *3 (E.D. Pa. 2023).  Courts "must start from the general rule that the corporate entity should be upheld unless specific, unusual circumstances call for an exception."  *Id.*  "The burden of proof for the application of the alter ego theory rests with the party attempting to negate the existence of a separate entity."  *Reverse Vending.* v. *Tomra Sys.*, 655 F. Supp. 1122,

---

(JX073-095.)  This is hardly a basis for Plaintiffs' false suggestion that ███████████████

1128 (E.D. Pa. 1987).[42]  Thus, "[P]laintiffs bear[] the burden to prove" by "a preponderance of the evidence[.]"  *Carteret Sav. Bank* v. *Shushan*, 954 F.2d 141, 146 (3d Cir. 1992).[43]

As in *Enterprise*, this Court's inquiry focuses on what evidence Plaintiffs have, if any, that KPNV controlled and totally dominated the "day-to-day" operations of Philips RS or Philips NA to such a pervasive extent that those subsidiaries lacked a "separate corporate existence."  735 F. Supp. 2d at 324.  Ordinary intervention by the parent into the affairs of its subsidiaries is insufficient:  "even if there was control exercised by [a parent] in the context of [one aspect of a subsidiary], it is not the type of *day-to-day dominion* that is required to show that they were alter egos[.]"  *Copia Comms* v. *AMResorts*, 2017 WL 4012687, at *7 (E.D. Pa. 2017) (emphasis added).

The Court should also consider the actual corporate forms at issue.  Since 2017 and 2020, respectively, Philips NA and Philips RS have been LLCs.  As this Court has stated, "LLC managers can be granted more direct control over the operations of a limited liability company[,]" and "limited liability companies are permitted to use an informal management structure."  *Enterprise*, 735 F. Supp. at 294 n.9.  Plaintiffs do not address this point in their brief.  As one court explained in dismissing for lack of alter-ego jurisdiction, "[p]laintiff's contentions with respect to the managerial and ownership structure of [the entities] do not account for their designations as

---

[42]    KPNV agrees with Plaintiffs that each relevant transferor court "analyzes alter ego . . . in substantially the same manner."  (Renew. Br. Table 2.)  As a result, KPNV will continue to primarily cite Third Circuit precedent, just as Plaintiffs did.

[43]    Additionally, Plaintiffs must present evidence specific to the "unique relationship" between the allegedly controlling and controlled companies.  *Enterprise*, 735 F. Supp. 2d at 317.  Plaintiffs principally seek to establish that Philips RS is the alter ego of KPNV.  (Renew. Br. at 35.)  Yet, Plaintiffs then mix around with the evidence, including by addressing KPNV's relationship with Philips NA, and even Philips NA's relationship with Philips RS.  (*E.g.*, *id.* at 43.)  Each of these relationships is distinct for purposes of the alter ego analysis; in other words, *even if* any evidence somehow showed that Philips NA was the alter ego of KPNV (it does not), that evidence is irrelevant to whether Philips RS is the alter ego of KPNV.  *See, e.g., Enterprise*, 735 F. Supp. 2d at 317; *Tatung* v. *Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1181 (C.D. Cal. 2016); *G.O. Am. Shipping Comp.* v. *China COSCO Shipping*, 2017 WL 6026959, at *4-5 (W.D. Wash. 2017).

LLCs. . . .  [A]s LLCs, these entities are deliberately provided with organizational flexibility, and . . . need not function as a formally run corporation."  *Linus* v. *Mark Line*, 376 F. Supp. 3d 417, 428 (D.N.J. 2019); *see Mark IV,* 2014 WL 7073088, at *6 (no alter-ego jurisdiction where plaintiff pointed to subsidiary LLC's "failure to adhere to corporate formalities," as "[i]n the realm of LLCs . . . informality of organization and operation is both common and desired.").

To show "day-to-day dominion," one would have expected Plaintiffs to point to a constant and extraordinary level of communication between KPNV and Philips RS (or Philips NA) in which KPNV instructed Philips RS and Philips NA on how to run their day-to-day businesses.  Or that Plaintiffs would show some embedded employee, operating Philips RA completely at KPNV's behest, or by frequent and constant intervention by KPNV into Philips RS's or Philips NA's operational choices.  Or even, at the very least, evidence demonstrating KPNV's regular, granular assessment of these entities' decision-making.  Despite extensive jurisdictional discovery and multiple depositions—not to mention the *millions* of additional documents Plaintiffs have received in merits discovery—Plaintiffs offer this Court nothing of the kind.

### A.   Jurisdictional Discovery Confirms that Neither Philips RS Nor Philips NA Is an Alter Ego of KPNV Under the Applicable *Enterprise* Factors.

To meet their notoriously difficult burden, Plaintiffs advance the following:

- the Philips Group organizes itself and aspects of its financial reporting by Segments and Business Units, in which comparable products are grouped together (Renew. Br. at 36-38);

- certain non-KPNV employees report (directly or indirectly) to KPNV's CEO (*id.* at 38-39);

- a handful of communications between Philips RS/Philips NA and the FDA that copied KPNV executives, mostly when addressing the recall (*id.*);

- ███████████████████████████████████████████████████████ (*id*. at 40-42);

- ████████████████████████████████████████████████████████ (*not* KPNV) (*id.* at 43-44);

- ███████████████████████████████ (*id.* at 44); and

- KPNV's press releases sometimes promote products that have the Philips brand (*id.*).

Even taken together, this evidence falls spectacularly short of showing that KPNV ever exercised "pervasive control" over Philips RS's or Philips NA's day-to-day operations.  When Plaintiffs' rhetoric and factual overstatements are stripped away, all that Plaintiffs have is the control present and allowed in *any* ownership relationship.  As the U.S. Supreme Court has held, "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures" is entirely "consistent with the parent's investor status."  *United States* v. *Bestfoods*, 524 U.S. 51, 72 (1998); *see Action Mfg.* v. *Simon Wrecking*, 375 F. Supp. 2d 411, 425 (E.D. Pa. 2005).

1.   ***Factor 10:  Plaintiffs Fail To Establish that KPNV Exercised Improper Control.***

This Court has made clear that "[i]t is assumed to be the norm that a parent will have *not only . . . the potential* to exercise control [over the subsidiary], *but to exercise it to a substantial degree*[,]" all without creating an alter-ego relationship.  *Trinity*, 2014 WL 1766083, at *16 n.9 (emphasis added).  Plaintiffs' scant evidence comes nowhere close to supporting their theory that KPNV exceeded the "incidental control" that "naturally flows from . . . the parent-subsidiary relationship[.]"  *Enterprise*, 735 F. Supp. 2d at 323.

***Existence of Segments and Business Units Is Not Evidence of Improper Control.***
Changing the subject away from the corporate separateness shown by intercompany agreements, individualized bank accounts, separate balance sheets and income statements, and separate boards of directors, Plaintiffs pivot to what they call "vertical strategic business units" that are part of an

"integrated operating" model that "operate[s] across . . . legal boundaries." (Renew. Br. at 36-37, 46.)  Asking the Court to disregard the fact that the corporate form was respected, Plaintiffs argue that "[t]he Recalled Devices may be manufactured by Philips RS, but management including the tracking of financials are done on a cross-entity basis[,]" and "this vertical, cross-entity management is apparent in the Philips Defendants' financials[.]"  (*Id.* at 37.)  Plaintiffs never explain why organizing an enterprise and reporting financial results based on comparability of products and product lines somehow shows pervasive and improper control.[44]  For one thing, Plaintiffs disregard (as discussed *supra* at 14) that IFRS *requires* the use of business segments along product lines.  (DX045; DX022 at 86 (Plaintiffs' expert agreeing that "███████████

████████████████████████████████████████

██████████████████"); *Gammimo* v. *Verizon*, 2005 WL 3560799, at *4 (E.D. Pa. 2005) ("subsidiaries are legally required" to abide by particular operating structure).)[45]  Reporting on a business segment basis does not mean that the corporate form has not been followed, a point Plaintiffs' experts conceded when they agreed that KPNV needed to report by segment and that they "███████████████████████████████████."  (DX022 at 116-17; DX023 at 77-78; *see also* DX022 at 85-86 ███████████████

████████████████████████████████████████

---

[44]     Contrary to Plaintiffs argument otherwise, that "[KPNV] reports earnings on a consolidated basis" (Renew. Br. at 44) does not weigh in favor of a finding of alter ego.  *See Deardorff* v. *Cellular Sales of Knoxville*, 2022 WL 309292, at *8 (E.D. Pa. 2022) (acknowledging that the parent company's CFO "compiles consolidated financial statements of [parent's] subsidiaries" and "the financial statements of the [the subsidiaries], are consolidated under the holding company for tax return and financial reporting purposes, [b]ut *this does not establish that [the parent] exercised daily control over [the subsidiary]*."; *Reynolds* v. *Turning Point*, 2020 WL 953279, at *1, *4 (E.D. Pa. 2020) (no alter-ego jurisdiction over parent company that files consolidated income tax return for all of its subsidiaries).

[45]     Plaintiffs' experts agreed that SRC was a material business segment for accounting purposes under IFRS.  (DX022 at 86-88, 117-18; DX023 at 58-59, 66.)

██████████████████████████████████████████████████████████████████

███████████████

     Plaintiffs' strategy is merely to point to the *existence* of these Business Units and suggest

that, since some financial records were maintained and analyzed on a Business Unit level, "Philips

RS's business is managed by SRC and Connected Care." (Renew. Br. at 37-38.) Plaintiffs never

explain how this demonstrates pervasive control by KPNV, but in any event, Plaintiffs' concept is

inherently nonsensical since SRC and Connected Care are not entities with employees but

organizational segments.[46] It is thus no surprise that Plaintiffs never tell the Court that ████████

██████████████████████████████████████████████████████████████████

███████████████████  As explained above, *supra* at 6-7, every month, ████████████████

██████████████████████████████████████████████████████████████████

███████.  And ████████████████████████████████████████████. (*See supra*

at 5.) That ██████████████████████████████████, including to

understand the performance of the entire array of sleep and respiratory care products, hardly

demonstrates pervasive control or disregard of the corporate form.[47]

---

[46]    Plaintiffs say that ██████████████████████████████████████████
███████████." (Renew. Br. at 37.) ████████████████████████████ Plaintiffs never
explain how this demonstrates KPNV's control, let alone pervasive control, over either Philips NA
or Philips RS.

[47]    Additionally, courts have rejected attempts to show an alter-ego relationship based on the
allegedly controlled subsidiary LLC's informal management structure and lack of corporate
formalities. As one court explained, "[p]laintiff's contentions with respect to the managerial and
ownership structure of [the entities] do not account for their designations as LLCs. . . . [A]s LLCs,
these entities are deliberately provided with organizational flexibility, and . . . need not function
as a formally run corporation." *Linus*, 376 F. Supp. 3d 417 at 428; *see Mark IV,* 2014 WL 7073088,
at *6 (no alter-ego personal jurisdiction where plaintiff pointed to subsidiary LLC's "failure to
adhere to corporate formalities," as "[i]n the realm of LLCs . . . informality of organization and
operation is both common and desired").

Plaintiffs' position has no basis in the law.  In *Enterprise*, this Court explained that "[a] key fact in [*In re Latex* and *Chocolate II*] that resulted in the finding of alter-ego jurisdiction was *the failure to adhere to corporate boundaries*," and "[t]his key factor was particularly evidenced in *Chocolate Confectionary II*, in which the court found alter-ego jurisdiction did not exist over the two defendants who operated *within the established corporate structure*, but found alter-ego jurisdiction existed over the defendant that failed to do so."  735 F. Supp. 2d at 324 (emphasis added).  As the court in *Chocolate II* explained, plaintiffs must identify how "[the parent] use[d] the [business units] to exert *autocratic control* over other members of the corporate group."  641 F. Supp. at 392 (emphasis added).  Plaintiffs in *Chocolate II* met this high threshold by showing, as to one defendant, that the senior executives of the parent company "*double[d]* as both the leaders of business units and as the heads of *production activities*."  *Id.* at 401 (emphasis added).  With respect to the other defendant, however, as this Court explained in discussing *Chocolate II*:

> Even though "the [other defendant] parent managed products, brand images, and operations through **strategic business units that were constructed around product lines** rather than along geographic or corporate boundaries . . . the court held that the operating subsidiary within the forum was not the alter ego of the parent," as "**the parent's executive officers did not manage the day to day operations of the subsidiary, and the operating subsidiary exercised a significant degree of autonomy over its daily affairs**."

*Enterprise*, 735 F. Supp. at 321-22 (citing *Chocolate II*).

Similarly, in *Churchill* v. *Trinity*, the court rejected plaintiffs' argument that "the segment structure by which the [defendants] do business . . . is proof that the subsidiaries are alter egos of [the parent]," including plaintiffs' reliance on "the use of employees who work for multiple businesses in their segment and perform similar functions for each as evidence of an alter ego relationship."  2010 WL 11468358, at *5 (D. Mon. 2010).  The court explained that, as here, "[d]efendants have not tried to conceal their business structure by use of the segments," and the segmentation was "done for proper business purposes, such as . . . improving business efficiency."

*Id.*; *see In re W. States Wholesale Natural Gas Antitrust Litig.*, 2009 WL 455653, at *9-13 (D.

Nev. 2009) (no alter-ego jurisdiction where parent "described itself as an integrated energy

company," "integrate[d] the skills and assets of its business units to obtain optimal returns and

provide expansion opportunities," "promulgat[ed] general policies for its subsidiaries," and

received "daily reporting of information from [its subsidiary]").[48]

For these reasons, segmentation and organization around business units does not move the

needle on alter ego.  Segment reporting and organization is "a ███████████████

███████████" and not "██████████████████████████████████" (DX022, at 86,

---

[48]      Plaintiffs' cases do not help them.  In *In re Latex Gloves*, several employees of one
subsidiary were responsible for "management of the production of the product" at the plant of a
*different* subsidiary.  2001 WL 964105, at *6 (E.D. Pa. 2001).  *Directory Dividends* does not even
discuss business units.  Rather, the court there primarily relied on the "considerable overlap in the
officers and directors," including that "eight officers of [the parent] are also officers and/or
directors of [its subsidiaries]."  2003 WL 21961448, at *4 (E.D. Pa. 2003).  As explained below,
*infra* at 43-44, that is not true here.  Likewise, *Williams* includes no discussion of business units,
and the court emphasized that "[the subsidiary] shared two of its four directors with [the parent],
including [the parent's] CEO and its Director of Raw Material Procurement," that "the [subsidiary]
did not convene any board meetings," and that "[the parent] maintained daily contact with the legal
department of [the subsidiary] . . . and mandated that other departments submit regular financial
and performance reports as often as once per week."  2019 WL 4888570, at *12 (Pa. Super. Ct.
2019).  Again, no such facts exist here.  *In re CRT*, which Plaintiffs incorrectly claim "examined"
the "Philips' organizational structure (at issue here)," is inapposite in every way.  (Renew. Br. at
36.)  The *CRT* court was evaluating a summary judgment motion brought by KPNV and other
defendants (none of whom is named in this litigation) concerning claims of an alleged Sherman
Act conspiracy related to televisions that supposedly ran from 1995 to 2007.  2017 WL 5972721
(N.D. Cal. 2017).  Plaintiffs' own claim that the Philips Group's organizational structure changed
*beginning in 2012*—five years after the end of the relevant period in *CRT*—by itself shows *CRT*'s
irrelevance here.  In any event, given (a) the procedural differences (Plaintiffs here have the burden
of proving that personal jurisdiction exists over KPNV by a preponderance of evidence, not just
showing a triable issue of material fact for a jury), and (b) that *CRT* did not involve any of the
same U.S. subsidiary defendants—instead it concerned *a joint venture*—and did not concern SRC
or any business segment related to this litigation, *CRT* provides no support for Plaintiffs' veil-
piercing argument.  Significantly, the court in *CRT declined to reach the question of alter ego*,
noting that "the Court need not decide that question because the jury could find KPNV liable for
LPD's [the joint venture's] actions on a different theory—that LPD's participation in the CRT
conspiracy was merely a continuation of KPNV's participation."  *Id.*

117; DX023, at 66.)  In fact, this type of unremarkable "█████████████████████" is utilized by a number of "████████████████" (*e.g.*, Renew. Br. at 46, citing JX005), and courts reviewing that type of business model have not found that it creates alter-ego jurisdiction.  For instance, Medtronic plc (a KPNV competitor) utilizes "[an] integrated operating model" (JX005) and "functions in four operating segments," with Medtronic Vascular Galway within one of those segments.  *Ezell* v. *Medtronic*, 2018 WL 1100901, at *1 n.1 (W.D. La. 2018).  Yet, plaintiffs in *Ezell* failed "to overcome the presumption of corporate separateness of Medtronic plc and Medtronic Vascular Galway to warrant jurisdiction over Medtronic plc," even though "[t]he performance and major business plans of Medtronic Vascular Galway may be subject to review by Medtronic plc," and "[i]mportant actions taken by management of Medtronic Vascular Galway are reported to Medtronic plc." *Id*. at *7.  The pertinent fact was that "Medtronic Vascular Galway has independent responsibilities for the management of its business, including control over its day-to-day operations and employees." *Id*.[49]

   ***No Evidence KPNV Impermissibly Controlled Employees of Philips RS or Philips NA.***
Lacking any meaningful overlap of directors, officers or employees between KPNV, on the one hand, and Philips RS or Philips NA, on the other, Plaintiffs pretend that various employees were involuntarily "conscripted" into doing KPNV's bidding.  (Renew. Br. at 38.)[50]  This argument is

---

[49]    The "business and market structure" that Plaintiffs rely on as supposedly showing pervasive control is utilized by other large companies (*see* JX005, at 28), with such structure not resulting in alter ego personal jurisdiction.  *See, e.g., Smith* v. *Avon Products*, 2019 WL 921461, at *12 (N.D. Ala. 2019) (J&J's subsidiary JJCI was not alter ego for jurisdiction, explaining that "JJCI as a 'business unit' or 'division' of J&J does not demonstrate J&J's control and dominion over JJCI," as "JJCI develops its own business strategies, *while J&J examines those strategies on a more global level in the context of the health of the company as a whole*.") (emphasis added).

[50]    Plaintiffs incorrectly claim that Exhibit 1 to their brief is "a list of Royal Philips' relevant officers and directors."  (Renew. Br. at 6.)  In fact, Exhibit 1 includes individuals employed by Philips NA or Philips International B.V., *not KPNV*.

a simple retread of the "integrated enterprise" and "joint employer" arguments rejected by this Court in *Enterprise*.  735 F. Supp. 2d at 327-28 (citing *United Elec., Radio & Machine Workers* v. *163 Pleasant St.*, 960 F.2d 1080, 1096 (1st Cir. 1992)).

In any event, Plaintiffs fail to point to any evidence showing that KPNV "conscript[ed] employees of [its] subsidiaries."  (Renew. Br. at 36.)  The "support" for Plaintiffs' argument consists of reporting lines on organizational charts.  (*Id.* at 38-39.)  But reporting lines, including lines that cross over to the parent company, are not probative of pervasive or even actual control, much less compulsory enlistment by KPNV.  It is well-established that the existence of "common management" is insufficient for veil-piercing.  *RNC Sys.* v. *MTG*, 2017 WL 1135222, at *5 (D.N.J. 2017); *see Reynolds*, 2020 WL 953279, at *4 (E.D. Pa. 2020) ("common corporate control" is "not enough to overcome the presumption that wholly-owned subsidiaries are separate and distinct from their parent companies").  The mere existence of a reporting relationship does not prove that KPNV "dictate[d] every facet of [Philips RS's or Philips NA's] business[es]" or "routine matters of day-to-day operation."  *Ranza* v. *Nike*, 793 F.3d 1059, 1074 (9th Cir. 2015); *see Seltzer* v. *I.C. Optics*, 339 F. Supp. 2d 601, 605 (D.N.J. 2004) (declining to find alter ego despite subsidiary employees reporting "directly to" the parent company "on various management matters").[51]

Plaintiffs next point to the fact that employees from various entities ████████████ ████████████████████████████████████████████████████████████████████████████ ████.  (Renew. Br. at 38.)  This is yet another "reporting lines argument"; it too does not

---

[51]      In both *UHS* and *Chocolate II*, the evidence was more than mere reporting lines, but instead that "leaders of business and . . . heads of production activities" were placed on committees that "exercise[d] *centralized control over the day-to-day management of all*" entities.  *Chocolate II*, 641 F. Supp. 2d at 401 (emphasis added); *UHS*, 2015 WL 539736, at *15.  As this Court stated, those cases involved the "exercise of managerial power over the operations and functions of one . . . group of subsidiaries by employees of a separate but affiliated corporation."  *Enterprise*, 735 F. Supp. 2d at 324-25.

demonstrate pervasive control or that anyone at KPNV abused their position to exert undue influence over Philips RS or Philips NA.[52]  As explained above, ████████████████████ ████████████████████████.  (DX009, at 91-92.)  ████████████████████ ████████████████████████.  .  (*Id.*, at 92-93, 100.)   This is unremarkable and standard reporting, not control.  Plaintiffs do not argue that ████████████ ████ had *dual roles*, *i.e.*, that they exercised *managerial* control over both Q&R *and also* a business's operations (*e.g.*, SRC).   *Cf. Chocolate II*, 641 F. Supp. 2d at 401 ("These dual responsibilities of senior executives provide strong evidence of an alter ego relationship.").  While some employees of ████████████████████████ ████████████   (*See, e.g.*, JX036-37, JX371, at 5 ("Q&R is independent of Philips' businesses."); JX374, at 15 ("Q&R function is independent.").)   And this is precisely how the structure is designed to work.  These reporting lines thus reflect "operat[ion] *within the established corporate structure*."  *Enterprise*, 735 F. Supp. 2d at 324.

Turning to a more flamboyant tact, Plaintiffs claim that "Royal Philips has . . . stripped hiring and firing power from its subsidiaries."  (Renew. Br. at 2.)  But in their 50 pages of briefing, based on 15 years' worth of discovery, and with more than 100,000 employees at the Philips Group every year, Plaintiffs point to one occasion where KPNV purportedly acted on its seconded hiring and firing power.  According to Plaintiffs, the ████████████████████████ ████████████████████████"  and ████████████████████████ ████████████████████████"  (*Id.* at 39)  Even setting aside that ████

---

[52]    *See also* Aug. 8, 2023 Hearing Tr. at 47 ("What's important is not necessarily who was reporting to who.  It was the level of control they could exert over the person down the line . . . . [I]in many multi-national corporations, somebody has to know what's going on below, and it's more of a reporting thing, this is what's happening here[.]").



In fact,

" (JX354 (emphasis added).)[54]

***No Evidence of KPNV's Day-to-Day Control.***  Plaintiffs' assertion that the PBS is evidence of KPNV's "pervasive control" over *all* of its subsidiaries defies credulity and ignores the operative legal standards.  As here, where a group-wide policy sets minimum business standards and does not supplant the subsidiary's autonomy with respect to day-to-day decisions, the policy is not evidence of "pervasive control."

For example, in *Chocolate II*, the court determined that there was no alter-ego relationship despite the existence of "group-wide accounting, finance, and sales protocols," because "[u]niformity in finance procedure is a practical necessity for global conglomerates to monitor corporate growth and maximize efficiency."  641 F. Supp. 2d at 386.  Furthermore—as is the case with the PBS, *see supra* at 8-9—the parent in *Chocolate II* "encourage[d] subsidiaries to vary the way in which corporate principles [were] applied in practice" and "to implement operating plans

---

[53]    KPNV disclosed this fact to Plaintiffs more than eight months ago (in KPNV's jurisdictional interrogatory responses) and reiterated it again in its Rule 12(b)(2) brief in May 2023. (JX015 (No. 18); ECF No. 1850 at 30 n.32.)  Perhaps now realizing the absence of jurisdiction over KPNV, Plaintiffs go back to their moving target playbook, suggesting that they intend to move the target again:  this time,

    (Renew. Br. at 13 n.9.)  What claims they have against Philips International B.V. is left unsaid, but after two-plus years of litigation, substantial jurisdictional and merits discovery, and multiple amendments to their pleadings, the Philips Defendants would oppose any attempt to further amend.

[54]    Putting aside the fact that this has nothing to do with Philips RS, this event happened in late in 2021, during a time where                              (JX096.)
                                                                                                              (*Id.*)

at the local level." *Id.* at 387; *see Reynolds*, 2020 WL 953279, at *3 ("[A]rticulation of general policies and procedures do not establish an alter ego relationship."); *Deardorff*, 2022 WL 309292, at *7 ("[E]ven if Plaintiffs did show that [parent] directed these policies, they do not explain how the employee handbooks transcend the bounds of the level of supervision present in typical parent-subsidiary relationship.").

Although Plaintiffs identify the Quality Policy as an example of how KPNV supposedly "controls its subsidiaries through mandatory policies" (Renew. Br. at 11), as Plaintiffs themselves admit, the group-wide Quality Policy—a one-page document—merely "███████████████████ ███████" (*Id.*)  As explained *supra* at 10-12, the ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████. (JX301, at 37-38; DX009, at 110-14.)

Finally, in the post-recall-announcement world—in connection with a recall of approximately 15 million devices around the globe—an LLC receiving assistance from its parent companies hardly means that the LLC is the parent's alter-ego.  As described more fully *supra* at 18-21, KPNV provided assistance and support to Philips RS with its recall, but Philips RS executed and managed the recall efforts.  Various Philips RS and Philips NA employees were placed in charge of different facets of the recall effort—including patient care, recall administration, testing, etc.—and each provided updates to KPNV and the Head of Q&R throughout the process.  Plaintiffs point to no evidence that elevates KPNV's assistance to its subsidiary into pervasive control over Philips RS's day-to-day operations.

Plaintiffs deceptively suggest that "████████████████████████████████████████ ████████████████████████████████████████████████." (Renew. Br. at 39 (citing PX-C).)

As their sole support, Plaintiffs point to an ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████ (*See* PX-C at 5 ██████████████████████████████████ ████████████████████████████████████████████████████")█.) ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████ (*Id.*) ███████████████████████████████████████████ *See Chocolate II*, 641 F. Supp. 2d

at 386 ("As the controlling shareholder of [subsidiary], [parent] is entitled to . . . approve budgets.

These activities typify standard parent-subsidiary interactions and do not reflect daily, operational

control that is the sine qua non of an alter ego relationship.").

Similarly, with regard to the recall, Plaintiffs suggest KPNV involvement with the FDA

that simply did not exist.  As reflected in DX040, ████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████ After the recall was well underway, ████████████████ ██████████████████████ (*See* DX027 (No. 20).) Plaintiffs fail to explain how

this limited involvement amounts to control, much less pervasive control.

2.      ***Factor 2:  Plaintiffs Cannot Identify a Single Shared Officer or Director Between KPNV and Philips RS or Philips NA Who Acted Exclusively on Behalf of KPNV.***[55]

To make a showing of pervasive control, Plaintiffs must *first* identify the KPNV executives

who allegedly were in charge of Philips RS's and Philips NA's day-to-day operations.  Although

Plaintiffs vaguely claim that "[c]ommon officers and directors" exist "between Royal Philips *and*

---

[55]     As to factor 1, KPNV does not contest that it indirectly owns Philips RS and Philips NA, but "[o]ne hundred percent stock ownership . . . [is] not alone sufficient to establish an alter ego relationship."  *Zombeck* v. *Amada*, 2007 WL 4105231, at *8 (W.D. Pa. 2007).

*its U.S. subsidiaries*" (Renew. Br. at 43 (emphasis added)), they nowhere identify a single officer or director that KPNV actually shares—or ever shared—with Philips RS.  (In fact, as described below for Factor 5, Plaintiffs do not identify a single shared *employee* between KPNV and Philips RS.)  The evidence shows there are none.  (*Compare* JX041 & JX133 *with* JX015 (No. 18).)

As for the other relationships, Plaintiffs seek to establish "day-to-day control" through (1) ███████████████████████████████████████████████████████████

██████████████████████████████████████████ (Renew. Br. at 43.)

This minimal overlap is a far cry from the level of infiltration required to find an alter-ego relationship.  *See Poe* v. *Babcock*, 662 F. Supp. 4, 6 (M.D. Pa. 1985) (no alter-ego jurisdiction despite "several" overlapping directors, because "[w]here a parent company constitutes one hundred percent of the stockholders of the subsidiary, it is to be expected that there will be directors which are common to the boards of both"); *Croyle* v. *Texas Eastern*, 464 F. Supp. 377, 379 (W.D. Pa. 1979) (no alter-ego jurisdiction despite "significant over-lapping of directors and officers"); *Savin* v. *Heritage Copy Prod.*, 661 F. Supp. 463, 470 (M.D. Pa. 1987) (overlap of four directors "is no more significant than is to be expected in a situation where a holding company owns a majority interest in a subsidiary").[56]

Even beyond that fatal defect, Plaintiffs bear the high burden of *additionally* showing that any overlapping officers or directors "purportedly acting for the benefit of the subsidiary corporation were—in actuality—acting *solely for the benefit of the parent corporation*."  *Trinity*

---

[56]    Plaintiffs' efforts to diminish KPNV's status as a holding company is premised on their inaccurate claim that it is unlike "the typical-parent subsidiary relationship (holding company model) that the Court saw in *Enterprise*."  (Renew. Br. at 5.)  But as the Court stated of the parent in *Enterprise*, "ERAC–Missouri is not a pure holding company, because it is a provider of a variety of administrative services to the operating subsidiaries and entered into national car rental contracts."  735 F. Supp. 2d at 314 n.15.  There is nothing atypical about the KPNV model.

v. *Greenlease*, 2014 WL 1766083, at *15 (W.D. Pa. 2014) (emphasis added). And even then, the operative question is whether the KPNV actor was exerting undue influence and control over the subsidiary for KPNV's *exclusive* benefit. *Id.* ("Since courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, it cannot be enough to establish liability that dual officers and directors made policy decisions and supervised activities at the [subsidiary]." (quoting *Bestfoods*, 524 U.S. at 69)); *UHS* v. *United Health*, 2013 WL 12086321, at *8 (M.D. Pa. 2013) (plaintiffs must show that any shared "directors continue to represent the parent when serving on the board of an affiliate," rather than merely having multiple responsibilities). Setting aside the minimal overlap Plaintiffs identify at the Philips NA level (none at the Philips RS level), Plaintiffs have not shown that either overlapping individual exerted undue influence and control over Philips NA for the exclusive benefit of KPNV.

### 3. Factor 7: Plaintiffs Cannot Identify a Single Manager or Supervisor Between KPNV and Either Philips RS or Philips NA.

Plaintiffs do not identify a single individual with a managerial or supervisory role who was exchanged between, or shared by, KPNV and either Philips RS or Philips NA. (*See* Renew. Br. at 45-46.) The best Plaintiffs can muster is to imply that KPNV executives were *de facto* managers because certain Philips RS or Philips NA employees had *reporting lines* that reached KPNV's CEO. (*Id.*)

KPNV as owner, however, is entitled to financial reports and reports on Philips RS's operations. As explained above, reporting lines thus have zero legal traction. At best, they "demonstrate mere affiliation" between individuals and not "the functional relationship" between them. *Licea* v. *Curaco Drydock*, 952 F.3d 207, 214 (5th Cir. 2015). The alter-ego inquiry demands a showing of day-to-day control, but Plaintiffs say nothing about how these reporting lines were utilized—or, as their burden requires, *abused*. "The simple fact that there are lines on a chart

-44-

connecting various persons does not make the requisite showing" that KPNV "w[as] directing" these subsidiaries' businesses. *E.I. du Pont.* v. *Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 672 (D. Del. 2018).[57]  The mere existence of a reporting relationship does not prove that KPNV "dictate[d] every facet of [Philips RS's or Philips NA's] business[es]" or "routine matters of day-to-day operation." *Ranza* v. *Nike*, 793 F.3d 1059, 1074 (9th Cir. 2015).[58]

### 4. Factor 5: Plaintiffs Do Not Identify a Single Shared Employee Between KPNV and Philips RS or Philips NA.

Plaintiffs do not identify a single individual who was employed at any level by KPNV and Philips RS at the same time.  (Renew. Br. at 44-45.)  Nor do they provide an example of a non-executive or non-managerial employee shared between KPNV and Philips NA.[59]

### 5. Factors 3 & 4: Plaintiffs Fail to Establish Any Control with Respect to the "Philips" Branding.

Plaintiffs suggest that the two factors related to branding—whether there is a "unified marketing image" or "uniform insignias, trademarks, and logos"—"heavily" suggest the existence of an alter-ego relationship, because (i) Philips Group employees' email addresses use the "philips.com" domain, (ii) Philips RS and Philips NA use the "Philips" logo, and (iii) KPNV

---

[57]    Plaintiffs also contradict themselves by admitting that KPNV "delegated" "essential functions" to management employees within the SRC business, while simultaneously maintaining that KPNV retained pervasive authority over these functions.  (Renew. Br. at 9-10.)

[58]    *See also, e.g., Seltzer* v. *I.C. Optics*, 339 F. Supp. 2d 601, 605 (D.N.J. 2004) (declining to find alter-ego relationship despite subsidiary employees reporting "directly to" the parent company "on various management matters"); *Chocolate II*, 641 F. Supp. 2d at 392 (no alter ego where managers of subsidiary reported directly to executives of parent because "[subsidiary's] managers oversee its operations on a daily basis").

[59]    For ██████████████████████████████████████████████████  ██████  (Renew. Br. at 43.)  But so what?  It is a "well established principle [of corporate law]" that individuals "holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Bestfoods*, 524 U.S. at 69; *see Action Mfg.*, 375 F. Supp. 2d at 424 (stating that it is "normal for a parent and subsidiary to have identical directors and officers").

supposedly "touted its role in command of Philips RS and its other U.S. subsidiaries." (Renew. Br. at 44.) This is a flawed effort from inception.

*First,* "use of [the] same email address . . . by the employees of the parent corporation and its subsidiaries does not show that [the parent] exercises greater than normal control over its subsidiaries," as "this is a common practice." *Rice* v. *First Energy*, 339 F. Supp. 3d 523, 538 n.9 (W.D. Pa. 2018). *Second*, with respect to Philips RS, Plaintiffs conveniently omit that it operated under its pre-acquisition name—Respironics—for the vast majority of the relevant period. It was not until 2020—more than a decade after it was acquired by KPNV—that "Philips" was included in Respironics' name. And courts do "not undermine fundamental corporate theory by attributing a subsidiary's contacts to its parent simply because both operate under the same brand name." *Lapine* v. *Materion*, 2016 WL 3959081, at *5 (E.D. Pa. 2016).

Even assuming *arguendo* that the entities projected a "unified public image," for that to be indicative of control for alter-ego purposes, Plaintiffs still need to provide evidence of an improper "degree of control" by KPNV over Philips RS's and Philips NA's marketing. *See UHS*, 2015 WL 539736, at *7-8 (unified marketing factor weighed in favor of control where "decision to implement this centralized marketing plan was reached" by "*exclu[ding] [] subsidiary entities' boards of directors or management teams*" (emphasis added)). As this Court stated in *Enterprise*, "Enterprise Rent-A-Car is portrayed as a single brand to the public, but this evidence does not demonstrate the necessary control by defendant parent over the subsidiaries." 735 F. Supp. 2d at 323. Here, Plaintiffs do not even claim—much less point to evidence showing—that Philips RS and Philips NA's marketing was controlled by KPNV.

Nor does the Brand License Agreement help Plaintiffs. Subsidiaries, including Philips RS and Philips NA, may use different branding, ██████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████.”  (JX11, at 2-3.)  Philips RS did just that

here.  As Plaintiffs are well aware—considering they append these examples to their master

complaints (*see, e.g.*, Economic Loss Complaint Exs. 44, 47-49, 55, 77, 102, 105) [60]—Philips RS

often used *its own logo* on its branding in addition to the Philips logo.  *See Vacaflor* v. *Penn. State*,

2014 WL 3573593, at *5 (M.D. Pa. 2014) (use "of a parent corporation's logo with the subsidiary

corporation's in a common marketing image does not demonstrate the level of control sufficient

to render the subsidiary the alter ego of the parent corporation"); JX285-296.  Even further, Philips

RS trademarks its own logos with respect to its products and uses those logos in its branding, and

those marks are not shared across corporate boundaries.[61]

Plaintiffs' claim that KPNV "touted its role in command of Philips RS and its other U.S.

subsidiaries" grossly misrepresents the underlying exhibits, which are merely press releases

advertising products and a product manual.  (*See* JX43-44, 132.)  Although KPNV has referred to

itself or Philips generally in discussing its subsidiaries' products, "courts have rejected a plaintiff's

attempt to rely on a press release in which the parent company consolidated its subsidiary's actions

with its own."  *Rice*, 339 F. Supp. 3d at 539; *MacQueen* v. *Union Carbide*, 2014 WL 6809811, at

*7 (D. Del. 2014) ("[A] statement like this in an SEC filing—in which a parent corporation is in

some way consolidating by description its subsidiary's efforts and its own—is not atypical, and

certainly does not suggest that . . . the parent corporation has become indistinguishable from the

---

[60]     These exhibits are JX156-JX159, JX162, JX181, DX038, and DX039.

[61]     *See, e.g.*, JX294 ("Trilogy is a trademark of Respironics, Inc.  AVAPS is a trademark of
Respironics, Inc."); JX295, at 2 ("REMstar, Whisper Swivel, Encore Pro, and Encore Pro
SmartCard are trademarks of Respironics, Inc."); JX296, at 2 (same).

subsidiary.").  Moreover, Plaintiffs incorrectly conflate Philips Healthcare, which is a now-defunct Philips *segment*, with KPNV.  (*See* JX021, at 309 (Philips Healthcare is a "[r]eportable segment").)

### 6. *Factor 6:  Neither Philips RS Nor Philips NA Share the Same Sales and Distribution System with KPNV.*

Even assuming that some form of shared services could itself demonstrate pervasive control, the PBS on which Plaintiffs rely says *nothing* about what services KPNV, Philips RS or Philips NA *actually* provide to one another—much less the terms under which any such services were provided—such that there would be any basis to infer that "the provision of these services from a parent to a subsidiary runs afoul of normal corporate behavior."  *Trinity*, 2014 WL 1766083, at *16; *see Pearson* v. *Component Tech*., 247 F.3d 471, 485 (3d Cir. 2001)(observing that "courts have refused to pierce the veil even when subsidiary corporations . . . accept administrative support from the parent"); *C. States*, 230 F.3d at 945 ("Parent corporations regularly provide certain services to their subsidiaries . . . .  [S]uch standard services are not sufficient minimum contacts to support the exercise of jurisdiction.").   Courts distinguish between situations where "the subsidiaries paid for the administrative services provided by the parent" (which is completely proper) and situations in which a parent or affiliate "provides corporate services without cost to the subsidiaries" (which may weigh in favor of control).  *Compare Hooper*, 2016 WL 7212586, at *8, *with Action Mfg.*, 375 F. Supp. 2d at 425 ("This reimbursement indicates that [the subsidiary and parent] are maintaining their corporate separateness and observing corporate formalities.").  As explained above at 12, the entities within the Philips Group have entered into a variety of formal agreements providing that every entity is charged (and counterclaims) for any services it receives from (or provides to) any other entity within the Philips Group.  And, these agreements are all expressly designed to act on an arms' length basis.

7.      ***Factor 8:  No Evidence that Philips RS or Philips NA Perform Functions KPNV Would Otherwise Perform.***

Plaintiffs fail to show that Philips RS and Philips NA are performing functions KPNV would otherwise have to perform itself.  Instead, this is a case where "the holding company could simply hold another type of subsidiary," and consequently "imputing jurisdictional contacts would be improper."  *Action Mfg.*, 375 F. Supp. 2d at 422.  Plaintiffs' sole legal support for this factor having any weight is inapposite.  In *In Re MTBE*, the court recognized that "although jurisdictional contacts are imputed when a subsidiary is engaged in activities that the parent would have to undertake itself, that rule does not typically apply when the parent company is a holding company." 2021 WL 3371938, at *16 (S.D.N.Y. 2021).  But there, because "LAC was not merely a generic holding company, but rather was used by [LAC's parent company] . . . to advance a specific business objective . . . the fact that [LAC] did not maintain its own substantive operations" did not weigh against an alter ego relationship with LAC's subsidiary, particularly given the "nearly complete overlap among the officers and directors" between LAC and the subsidiary at issue.  *Id* at *14, *16.

Unlike in *MTBE*, KPNV is not an intermediary holding company being used by some ultimate parent to conduct its affairs.  Even if KPNV had "expressly taken responsibility for Quality and Regulatory efforts," it is not correct that the "daily activities" carried out by Philips RS and Philips NA employees would fall onto KPNV in their absence.  KPNV's role in Q&R (high-level policy setting and dealing with specific, serious issues as they are reported to KPNV) differs dramatically from the role of its subsidiaries (establishing, implementing and enforcing specific Quality Management Systems on a day-to-day basis).  (*See* JX301 at 13 ("████████████ ████████████████████████████████████████████████████████████████ ████████████████); JX374 at 15 ("████████████████████.").)  In the absence

of Philips RS and Philips NA, KPNV "could [and would] simply hold another type of subsidiary." *MTBE*, 2021 WL 3371938, at *16; JX15 at 38-44.  The exhibits upon which Plaintiffs rely show clearly defined roles for each entity in the Philips Group, not interchangeable functions that would be performed by KPNV in its subsidiaries' absence.  (*See* JX5 at 8 ██████████████████████

████████████████████████); JX24 at 10 (████████████████████████████████

██████████████████████)

The evidence corroborates that KPNV's existence is "to fulfill two goals of a holding company:  (1) transferring knowledge to a subsidiary from the holding company, to the holding company from a subsidiary, and between subsidiaries and (2) improving coordination among the different subsidiaries."  *Arch* v. *Am. Tobacco*, 984 F. Supp. 830, 839 (E.D. Pa. 1997).  This type of "influence is consistent with a typical holding company/subsidiary relationship."  *Id.*[62]

## CONCLUSION

With the sole exception of the single claim for negligent recall, and only for those Plaintiffs who filed suit asserting that claim originally in Pennsylvania, the Court should dismiss all claims against KPNV for lack of personal jurisdiction.

---

[62]    Plaintiffs do not dispute that KPNV does not use Philips RS or Philips NA as "marketing division[s] or as [] exclusive distributor[s]" (Factor 9).  (Renew. Br. at 47.)  As a result, this factor also weighs against a finding of alter ego.  *See Deardorff.*, 2022 WL 309292, at *6 & n.10.

Dated: September 5, 2023

Respectfully submitted,

*/s/ Michael H. Steinberg*
Michael H. Steinberg
steinbergm@sullcrom.com
**SULLIVAN & CROMWELL LLP**
1888 Century Park East
Los Angeles, CA 90067
Tel: 310.712.6670

Tracy Richelle High
hight@sullcrom.com
William B. Monahan
monahanw@sullcrom.com
Elizabeth N. Olsen
olsene@sullcrom.com
Bethany S. Labrinos
labrinosb@sullcrom.com
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, NY 10004
Tel: 212.558.4000