# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYVANIA
### *Pittsburgh Division*

| | |
|---|---|
| IN RE: PHILIPS RECALLED CPAP, Bi-PAP, AND MECHANICAL VENTILATOR PRODUCTS LIABILITY LITIGATION | Master Docket No. **2:21-mc-01230-JFC** |
| | **MDL No. 3014** |
| This Document Relates To: | Judge **JOY FLOWERS CONTI** |
| *King v. Koninklijke Philips N.V., et al.* Case No. 2:23-cv-02040-JFC | |

**BRIEF IN SUPPORT OF PLAINTIFF DERRICK MARTIN KING'S MOTION TO COMPEL DISCOVERY OR IN THE ALTERNATIVE MOTION TO REMOVE CASE FROM THE CLASS ACTION PROCEDDINGS AND REMAND CASE TO THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, THE SUMMIT COUNTY (OHIO) COURT OF COMMON PLEAS, OR TO THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA IN CASE NO. 2:23-cv-02040 *KING vs. KONINKLIJKE PHILIPS N.V., et al.***

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ..................................................................i

**TABLE OF AUTHORITIES** ......................................................... ii

**INTRODUCTION**..........................................................................1

**STATEMENT OF THE CASE**......................................................1

**STATEMENT OF THE FACTS** ...................................................3

**ARGUMENT** ..................................................................................4

A.      Motion to Compel Discovery. ........................................................4

      1.      Applicable Law. ........................................................ 4

      2.      Plaintiff King's attempts to informally resolve this dispute with the parties............................................. 10

            *a.*      *Co-Plaintiffs and Liaison Counsel*......................*10*

            *b.*      *Philips and PolyTech Defendants*.......................*17*

B.      Plaintiff King Requests that Sanctions are Assessed against Attorneys for Each Defendant. ........................................................17

C.      In the Alternative, This Court Should Allow Plaintiff King to Opt-Out of any Proposed Class Action Litigation and Remand the Case to one of the following locations: (1) the United States District Court for the Northern District of Ohio; (2) the Summit County (Ohio) Court of Common Pleas; or (3) remain within the Western District of Pennsylvania as a Separate Action. .................................................18

**CONCLUSION**................................................................................24

**CERTIFICATE OF SERVICE** .....................................................26

**DECLARATION OF PLAINTIFF DERRICK MARTIN KING** .....................27

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Caisson Corp. v. Cnty. W. Bldg. Corp.,*
   62 F.R.D. 331 (E.D. Pa. 1974) ...........................................................10

*Chrisler v. Johnson*
   796 F. Supp.2d 632 (W.D. Pa. 2011) ....................................................9

*In re Lehman Bros. Sec. & Erisa Litig.,*
   655 Fed.Appx. 13, (2d Cir. 2016), *affirmed sub nom. California Pub.*
   *Employees' Ret. Sys. v. ANZ Sec., Inc.,* 582 U.S. 497, 137 S. Ct. 2042, 198
   L.Ed.2d 584 (2017)...........................................................................24

*Montgomery v. Beneficial Consumer Disc. Co.,*
   2005 U.S. Dist. LEXIS 3249, 2005 WL 497776 (E.D. Pa. Mar. 2, 2005)...........19

*Mullane v. Central Hanover Bank & Trust,*
   339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950) ...............................18

*Pearson v. Miller,*
   211 F.3d 57 (3d Cir. 2000) .................................................................10

*Reppert v. Marvin Lumber & Cedar Co., Inc.,*
   359 F.3d 53 (1st Cir. 2004) .................................................................19

## <u>Statutes</u>

28 U.S.C. § 1332 ....................................................................................3

28 U.S.C. § 1407 ....................................................................................2

28 U.S.C. § 1441 ....................................................................................3

28 U.S.C. § 1446 ....................................................................................3

## <u>Court Rules</u>

Fed.R.Civ.P. 23(d)(1)(B) ........................................................................18

Fed.R.Civ.P. 26(a)(1)..............................................................................4

Fed.R.Civ.P. 26(a)(2)..............................................................................7

Fed.R.Civ.P. 26(b)(1)...............................................................................7, 9

Fed.R.Civ.P. 26(b)(2)(C) ................................................................................9

Fed.R.Civ.P. 37(a)(1)...................................................................................10

Fed.R.Civ.P. 53 ...............................................................................................2

## **Other Authorities**

Burch, Elizabeth Chamblee. *Does Multidistrict Litigation Deny Plaintiffs
   Due Process?* (Jun. 9, 2019), Law360.com, available online at
   https://www.law360.com/articles/1166461 (last accessed Dec. 31, 2023)..........24

## INTRODUCTION

Plaintiff Derrick Martin King (hereinafter "Plaintiff King") respectfully moves this Honorable Court for the entry of an Order which compels the other parties in this case to produce all discovery that has previously been propounded and produced. In the alternative, Plaintiff King seeks an Order that removes this cause from the multidistrict litigation in Case No. 2:21-cv-01230-JFC, MDL-3014 and remand the case to one of the following jurisdictions: (1) the United States District Court for the Northern District of Ohio in Case No. 5:23-cv-02042-PAB; (2) the Summit County (Ohio) Court of Common Pleas in Case No. CV-2023-09-2475; or (3) the United States District Court for the Western District of Pennsylvania in Case No. 2:23-cv-02040-JFC.

## STATEMENT OF THE CASE

On June 14, 2021, a recall of approximately 11 million of its CPAP and BiPAP machines and ventilators in the United States that were manufactured with PE-PUR foam from 2008 until the date of the recall, including the following: E30 (Emergency Use Authorization); DreamStation ASV; DreamStation ST; AVAPS, SystemOne ASV4; C Series ASV; C Series S/T and AVAPS; OmniLab Advanced Plus; SystemOne (Q Series); DreamStation; DreamStation GO; Dorma 400; Dorma 500; REMStar SE Auto; Trilogy 100 Ventilator; Trilogy 200 Ventilator; Garbin Plus, Aeris, LifeVentVentilator; A-Series BiPAP Hybrid A30; Philips A-Series BiPAP

V30 Auto; Philips A-Series BiPAP A40; and Philips A-Series BiPAP A30. The devices were manufactured by Philips Respironics, which is a wholly owned subsidiary of the Dutch corporation Koninklijke Philips N.V. All of these recalled products are defective because they contain PE-PUR foam, which is a defect because the foam is susceptible to breaking down into particles which may then be inhaled or ingested by the user, and may emit VOCs that can also be inhaled, resulting in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment.

There were several lawsuits filed in various courts across the country following the recall. Pursuant to 28 U.S.C. § 1407, Thomas R. Starner filed a motion with the Judicial Panel on Multidistrict Litigation to create an MDL action and transfer cases into one district. On October 8, 2021, the Judicial Panel on Multidistrict Litigation entered an Order which created a multidistrict litigation case and transferred ten cases to this Court. As of December 27, 2023, there have been 297 additional cases that have become part of this multidistrict litigation.

On May 4, 2022, this Court an Order which appointed Carol Katz as Special Master for General and E-Discovery matters pursuant to Fed.R.Civ.P. 53. W.D. Pa. ECF No. 540.

## STATEMENT OF THE FACTS

On September 21, 2023, Plaintiff King filed a civil complaint in the Summit County (Ohio) Court of Common Pleas. *King v. Philips North America, LLC., et al.,* Case No. CV-2023-09-3575. See the annexed declaration of Plaintiff Derrick Martin King (hereinafter "King Declaration") at ¶ 3. The case was assigned to the Honorable Judge Allison Breaux. *Id.*

On October 18, 2023, attorney Wendy West Feinstein (hereinafter "Attorney Feinstein") filed a *Notice of Removal* with the Clerk of the United States District Court for the Northern District of Ohio. *King v. Koninklijke Philips N.V., et al.,* Case No. 5:23-cv-02042-PAB. The filing was made pursuant to. 28 U.S.C. §§ 1332, §1441, and §1446. The case was assigned to the Honorable Judge Pamala A. Barker.

On October 25, 2023, Attorney Feinstein filed a motion to stay proceedings pending transfer to the multidistrict litigation pending in the United States District Court for the Western District of Pennsylvania. King Declaration at ¶ 8. Included in the filing is a copy of a notice of tag along action that was filed in the Judicial Panel on Multidistrict Litigation (hereinafter "JPML"). *Id.* On October 27, 2023, the JPML issued a conditional transfer order (CTO-84) which transferred the case to the multidistrict litigation in the United States District Court for the Western District of Pennsylvania. King Declaration at ¶ 9. On November 29, 2023, the United States District Court for the Western District of Pennsylvania formally accepted the

3

transfer. *King v. Koninklijke Philips N.V., et al.,* Case No. 2:23-cv-02040-JFC and

assigned it to the Honorable Judge Joy Flowers Conti. King Declaration at ¶ 14.

## **ARGUMENT**

A.    Motion to Compel Discovery.

1.    Applicable Law.

The Federal Rules of Civil Procedure is the governing process for discovery.

Fed.R.Civ.P. 26(a)(1) governs the required initial disclosures and states:

(1)    Initial Disclosure.

    (A)    **In General.** Except as exempted by Rule 26(a)(1)(B) or as otherwise stipulated or ordered by the court, a party must, without awaiting a discovery request, provide to the other parties:

        (i)    the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment;

        (ii)    a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;

        (iii)    a computation of each category of damages claimed by the disclosing party—who must also make available

for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered; and

(iv)    for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.

(B)    **Proceedings Exempt from Initial Disclosure.** The following proceedings are exempt from initial disclosure:

(i)    an action for review on an administrative record;

(ii)    a forfeiture action in rem arising from a federal statute;

(iii)    a petition for habeas corpus or any other proceeding to challenge a criminal conviction or sentence;

(iv)    an action brought without an attorney by a person in the custody of the United States, a state, or a state subdivision;

(v)    an action to enforce or quash an administrative summons or subpoena;

(vi)    an action by the United States to recover benefit payments;

        (vii)   an action by the United States to collect on a student loan guaranteed by the United States;

        (viii)  a proceeding ancillary to a proceeding in another court; and

        (ix)   an action to enforce an arbitration award.

(C)   **Time for Initial Disclosures—In General.** A party must make the initial disclosures at or within 14 days after the parties' Rule 26(f) conference unless a different time is set by stipulation or court order, or unless a party objects during the conference that initial disclosures are not appropriate in this action and states the objection in the proposed discovery plan. In ruling on the objection, the court must determine what disclosures, if any, are to be made and must set the time for disclosure.

(D)   **Time for Initial Disclosures—For Parties Served or Joined Later.** A party that is first served or otherwise joined after the Rule 26(f) conference must make the initial disclosures within 30 days after being served or joined, unless a different time is set by stipulation or court order.

(E)   **Basis for Initial Disclosure; Unacceptable Excuses.** A party must make its initial disclosures based on the information then reasonably available to it. A party is not excused from making its disclosures because it has not fully investigated the case or because it challenges the sufficiency of another party's disclosures or because another party has not made its disclosures.

With regard to the information that is discoverable, the Federal Rules of Civil Procedure defines what is considered to be discoverable. Fed.R.Civ.P. 26(b)(1) states that:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

In addition, Fed.R.Civ.P. 26(a)(2) governs the disclosure of expert witnesses. This rule states that:

> (2)   Disclosure of Expert Testimony.
>
> (A)   **In General.** In addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.
>
> (B)   **Witnesses Who Must Provide a Written Report.** Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
>
> (i)   a complete statement of all opinions the witness will express and the basis and reasons for them;

(ii)   the facts or data considered by the witness in forming them;

(iii)   any exhibits that will be used to summarize or support them;

(iv)   the witness's qualifications, including a list of all publications authored in the previous 10 years;

(v)   a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and

(vi)   a statement of the compensation to be paid for the study and testimony in the case.

(C)   **Witnesses Who Do Not Provide a Written Report.** Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:

(i)   the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and

(ii)   a summary of the facts and opinions to which the witness is expected to testify.

(D)   **Time to Disclose Expert Testimony.** A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:

(i)   at least 90 days before the date set for trial or for the case to be ready for trial; or

(ii)    if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

(E)    **Supplementing the Disclosure.** The parties must supplement these disclosures when required under Rule 26(e).

The rules of civil procedure do have some limitations. For example, Fed.R.Civ.P. 26(b)(2)(C) states:

> On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

> (i)    the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;

> (ii)    the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or

> (iii)    the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Parties may obtain discovery pertaining to any relevant information, even if that information is not admissible at trial. *Chrisler v. Johnson,* 796 F. Supp.2d 632, 638 (W.D. Pa. 2011) (*citing* Fed.R.Civ.P. 26(b)(1). As an initial matter, therefore, all relevant material is discoverable unless an applicable evidentiary privilege is asserted. The presumption that such matter is discoverable, however, is defeasible. The Federal Rules of Procedure grants federal judges the discretion to issue

protective orders that impose restrictions on the extent and manner of discovery where necessary "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Pearson v. Miller,* 211 F.3d 57, 65 (3d Cir. 2000) (*citing* Fed.R.Civ.P. 26(c)). Discovery can be limited "for good cause to protect a person from embarrassment, oppression, or harassment." *Caisson Corp. v. Cnty. W. Bldg. Corp.,* 62 F.R.D. 331, 333 (E.D. Pa. 1974).

Fed.R.Civ.P. 37(a)(1) imposes a requirement upon a party seeking an order compelling disclosure or discovery "must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action."

2.    Plaintiff King's attempts to informally resolve this dispute with the parties.

a.    *Co-Plaintiffs and Liaison Counsel*

On September 28, 2023, Plaintiff King sent an email to the administrator of the MDL-3014 website.[1] King Declaration ¶ 28; Exhibit A. In his email, Plaintiff King wrote:

Dear Sir or Madam:

My name is Derrick M. King and I am a pro se plaintiff in a case filed against Philips Respironics in an Ohio state court. The complaint deals with the CPAP recall. I was diagnosed with sleep apnea in January 2018 and was prescribed the use of a CPAP machine. I was eventually issued a Philips Respironics first-generation DreamStation CPAP device. I

---

[1] The MDL-3014 website (www.mdl3014.com) is operated by the law firm of Pietragallo Gordon Alfano Bosick and Raspanti, LLP (a law firm which employs one of the co-liaison counsel for the class action plaintiffs in the multidistrict litigation).

used the device between April 2018 and June 2023. I was never informed of the problems concerning the Philips Respironics CPAP device recall until my device was replaced by a ResMed device.

In May 2023, I was diagnosed with severe aortic stenosis. I was subsequently hospitalized and open-heart surgery was done. I have reason to believe that the daily use of the first-generation Philips Respironics DreamStation CPAP device contributed to my condition and subsequent surgery.

I recently discovered your website www.mdl3014.com and I noticed the tab marked "plaintiffs' only". Because of the likeliehood that my case in

state court will end up part of the Philips multidistrict litigation in PA, I am requesting access to the "Plaintiff's Only" section of your website.

I have attached a copy of the complaint filed in the Summit County (Ohio) Court of Common Pleas.

Thank you for your time.

Derrick Martin King

On September 28, 2023, Plaintiff King received an email from Zach Gordon (hereinafter "Mr. Gordon")[2], the case manager for the MDL-3014 website. Id. Plaintiff King was told that he would eligible for access to the MDL-3014 website and would be provided with a username and password upon registration. Id. Plaintiff King registered with the MDL-3014 website and received a username and password. King Declaration at ¶ 6.

---

[2] Mr. Gordon is employed by Robert Peirce and Associates, P.C., which also employs the other co-liaison counsel for the class action plaintiffs in this multidistrict litigation.

On October 27, 2023, I sent an email to plaintiffs' co-liaison counsel D. Aaron Rihn (hereinafter "Attorney Rihn") and Peter St. Tienne Wolff (hereinafter "Attorney Wolff"). King Declaration at ¶ 10; Exhibit B. Plaintiff King wrote the following in his email:

> Mr. Rihn and Mr. Wolff,
>
> My name is Derrick Martin King and I am a pro se plaintiff in a personal injury products liability complaint against the Philips and PolyTech defendants. The complaint was initially filed in state court, then removed to the Northern District of Ohio. Philips RS North America filed a notice of potential tag along with the JPML, and on October 26, 2023 the JPML entered a conditional transfer order I have attached a copy of the conditional transfer order.
>
> The reason for my email is twofold, First, I am requesting that I be provided with a copy of all documents that have been filed with the court. Since I am pro se, production of those court documents will be essential so that I do not submit something that may have already been adjudicated by the Court. I do have access to Adobe Acrobat and can download the documents either as a PDF file or a ZIP file.
>
> My second request is for access to all the discovery that has occurred in this case to date. From what I understand, there is some online portal where the discovery documents and ESI is placed (that is password protected).
>
> Any assistance you could provide me in this would be greatly appreciated.
>
> On November 13, 2023, Plaintiff King received an email from Mr. Gordon.

King Declaration at ¶ 13; Exhibit C. The text of Mr. Gordon's email stated:

> Mr. King,
>
> I am contacting you on behalf of Aaron Rihn, one of the co-liaisons in MDL 3014. Our office is in receipt of the attached fax.

12

To respond to your initial email from 11/5:

1. Please find the majority of the documents from the MDL 3014 public docket (2:21-mc-01230) available for download at this Dropbox link:

   https://www.dropbox.com/scl/fo/qnz0nsz07nuv2e2bblq10/h?rlkey=gmph9rk4npp8wanu3cgt7ntb1&dl=0

   Please note this is only updated through 11.7.2023 – the most recent items can be added to the folder if you need them. There are 2,326 document numbers in the folder (plus document 2336), but 2,128 PDF documents in this folder, due to the fact that some of the orders (and miscellaneous corrections from the clerk, etc.) are "text only" entries in which no document was issued. The court website has all text orders (and all Pretrial Orders, available for download for free) here:

   https://www.pawd.uscourts.gov/mdl-3014-re-philips-recalled-cpap-bi-level-pap-andmechanical-ventilator-products-litigation

   You can also access e-filing/docket via PACER yourself, you will need to review the Pro Se materials for the Western District of Pennsylvania for instructions, or call the clerk's office for information on how to get registered:

   https://www.pawd.uscourts.gov/filing-without-attorney

2. Access to discovery materials is not available to non-MDL leadership at this time.

Mr. Rihn recommends that you familiarize yourself with all of the Pretrial Orders (PTOs). In particular, these are some of the most relevant for individual plaintiffs: PTO 1 regarding general filing procedures, PTO 28 regarding the filing procedures for Short Form Complaints, PTO 26(b) regarding the Fact Sheets, and PTO 27 authorizing service through MDL Centrality. All pretrial orders can be found both on the court website linked above as well as in the Dropbox link.

Service of the Short Form Complaint (and the fact sheet) is done through the MDL Centrality platform, run by BrownGreer. PTO#27

can walk you through the details. If you haven't already, you should contact BrownGreer about setting up an account for yourself – their dedicated email address for all inquiries related to this MDL is CPAP@BrownGreer.com. MDL Centrality houses many documents that will be helpful for you, including the Short Form Complaint and the Plaintiff Fact Sheet, in easy-to-use formats. The link to the website is here (you will need your account set up prior to accessing the materials):

https://www.mdlcentrality.com/

We also have a plaintiff's website that has all of the Pretrial Orders as well as news and plaintiffs-only resources: https://mdl3014.com/

In the future, please direct liaison inquiries to the dedicated MDL 3014 liaison email address: liaisons.mdl3014@pietragallo.com, copied here, so that the liaisons and their teams also get the email. This email address also copies MDL leadership. Please let us know if you have any additional questions we might be able to assist with.

Best,
Zach Gordon
Case Manager
Robert Peirce & Associates, P.C.
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 Phone
(800) 543-9859 Toll-Free
(412) 281-4229 Fax
zgordon@peircelaw.com

On November 29, 2023, Plaintiff King sent an email to counsel for the Philips and PolyTech defendants. King Declaration at ¶ 15; Exhibit E. The text of Plaintiff King's email stated:

Lady and Gentlemen,

Please find attach my Notice of Case Status that was filed today in the Summit County (Ohio) Court of Common Pleas. The notice merely

14

notifies that court of the transfer to the Western District of Pennsylvania.

Now that I am formally a part of the MDL litigation, we need to discuss discovery. I am formally requesting a copy of all discovery that has been provided to the other plaintiffs. After that information is provided, I can then provide you with a supplemental discovery request to cover anything that was not previously provided but may be relevant. Please be advised that I have attached my signed agreement to be bound by the December 21, 2021 stipulated protective order (ECF No. 104).

I look forward to hearing from you in the very near future.

Derrick Martin King

On November 30, 2023, Plaintiff King received an email from John P. Lavalle, Jr. (hereinafter "Attorney Lavalle"), co-counsel for Philips RS North America LLC. King Declaration at ¶ 16; Exhibit F. The text of Attorney Lavalle's email stated:

Mr. King-

Please see attached Pretrial Order No. 8 entered by Judge Conti in MDL 3014 appointing plaintiffs' co-lead counsel and steering committee. Under the Court's Order, plaintiffs' leadership coordinates and conducts all pretrial discovery on behalf of plaintiffs in the MDL. You should direct your requests for discovery materials produced in the MDL directly to plaintiffs' leadership. I have copied them on this email so they are aware of your request.

John P. Lavelle Jr.
Morgan, Lewis & Bockius LLP
2222 Market Street | Philadelphia, PA 19103-3007
Direct: +1.215.963.4824 | Main: +1.215.963.5000 | Mobile: +1.610.331.3910 | Fax: +1.215.963.5001
Assistant: Teresa G. Helm | +1.215.963.5590 | teresa.helm@morganlewis.com

502 Carnegie Center | Princeton, NJ 08540-6241
Direct:    +1.609.919.6688    |    Main:    +1.609.919.6600    |    Fax:
+1.609.919.6701
john.lavelle@morganlewis.com | www.morganlewis.com

On November 30, 2023, Plaintiff King responded to Attorney Lavalle's email.

King Declaration at ¶ 17; Exhibit F. The text of Plaintiff King's response stated:

> Be advised that you have twenty-four hours to indicate whether you
> wish to cooperate or a motion to compel with sanctions will be filed
> with the trial court.
>
> This will be your final notice!

On December 1, 2023, I received an email from Mr. Gordon which indicated

that Attorney Rihn attempted to contact him via telephone. King Declaration at ¶ 18.

Plaintiff King and Attorney Rihn subsequently spoke via telephone King Declaration

at ¶ 19. Attorney Rihn inquired into exactly what Plaintiff King was seeking (as the

discovery produced was enormous). *Id.* Attorney Rihn asked Plaintiff whether or not

he was willing to sign a participation agreement in order to receive common benefit

work. King Declaration at ¶ 20. Plaintiff King indicated that he was willing to sign

such an agreement. King Declaration at ¶ 21.

On December 1, 2023, Plaintiff King received an email from Mr. Gordon

which contained a DocuSign attachment (the participation agreement). King

Declaration ¶ 22. Plaintiff signed the participation agreement. King Declaration and

on December 4, 2023, Mr. Gordon sent an email indicating that he had received the

signed document. King Declaration at ¶¶ 23-24; Exhibit G.

16

       *b.*       *Philips and PolyTech Defendants.*

The November 29, 2023 email was also sent to Eric Scott Thompson (hereinafter "Attorney Thompson") counsel for the PolyTech defendants. King Declaration at ¶ 15; Exhibit E. Attorney Thompson has never responded or had any communication with Plaintiff King. King Declaration at ¶ 26.

B.    Plaintiff King Requests that Sanctions are Assessed against Attorneys for Each Defendant.

Plaintiff King is requesting that this Court impose sanctions against the attorneys representing each defendant in this case. Plaintiff King is NOT seeking the imposition of sanctions against the co-liaison counsel for the class action plaintiffs in this matter (it is Plaintiff King's belief that Attorney Rihn, Attorney Wolff, and Mr. Gordon have been most helpful).

The most egregious thing occurring in this dispute is a failure to even acknowledge the request for discovery materials. While counsel for the Philips defendants did not provide the requested discovery, at least they responded. This is more than what the PolyTech defendants have done (which is absolutely nothing). For this reason, any sanctions that may be imposed should be more severe for Attorney Thompson.

C.   In the Alternative, This Court Should Allow Plaintiff King to Opt-Out of any Proposed Class Action Litigation and Remand the Case to one of the following locations: (1) the United States District Court for the Northern District of Ohio; (2) the Summit County (Ohio) Court of Common Pleas; or (3) remain within the Western District of Pennsylvania as a Separate Action.

Plaintiff King argues that should this Court not provide him with the discovery that has already taken place, this Court should allow Plaintiff King to immediately opt-out of any proposed class and remand the matter to the originating courts (either the United States District Court for the Northern District of Ohio or the Summit County (Ohio) Court of Common Pleas). Fed.R.Civ.P. 23(d)(1)(B) states:

> In conducting an action under this rule, the court may issue orders that:
>
> > require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:
> >
> > (i)    any step in the action;
> >
> > (ii)   the proposed extent of the judgment; or
> >
> > (iii)  the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

Due process requires notice "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 314-15, 70 S. Ct. 652, 94 L. Ed. 865 (1950). After appropriate notice is given, if absent class members do not opt out of the class action, they are

18

bound by the court's actions--including settlement--with no requirement of actual notice. *Reppert v. Marvin Lumber & Cedar Co., Inc.,* 359 F.3d 53, 56-7 (1st Cir. 2004) (citations omitted); *see also Montgomery v. Beneficial Consumer Disc. Co.,* 2005 U.S. Dist. LEXIS 3249, 2005 WL 497776 at *6 (E.D. Pa. Mar. 2, 2005) (Surrick, J.) (actual notice not required).

Elizabeth Chamblee Burch, the Fuller E. Callaway Chair of Law at the University of Georgia School of Law, authored an article for Law360.com which discussed whether or not multidistrict litigation denies plaintiffs of their right to due process under the law. Burch wrote that:

> 154,771 babies. That's a conservative estimate of the number of opioid-dependent children born in the United States since 2014. Every day, 75 more babies join that group.

> These babies enter the world as addicts. Their withdrawals are immediate and devastating — tremors, trouble sleeping, seizures, an inability to eat and sometimes even death. Their needs extend past their hospital stays: Effects on learning, cognition and behavior are long-term.

> Lawyers representing these babies have been jostling for a seat at the decision-making table in the federal opioid multidistrict litigation, which includes more than 1,600 suits by cities, counties, states and Native American tribes.

> "[B]abies in this case have a meaningful right to be heard, in a meaningful way, in a timely manner," attorney Scott Bickford argued at proceedings in 2018. "The MDL has chosen not to accommodate these babies' cases. And these babies essentially are now locked out of any kind of settlement discussions that are going on in the MDL."

"[Leaders] will not even provide us with notices of depositions. ... [W]e have asked to participate or even listen to depositions, but we can't even get the notice," Bickford explained.

Multidistrict proceedings, which place a single judge in charge of similar lawsuits filed across the country, consume a substantial portion of the federal courts' civil caseload. Federal judges certify some of these proceedings as class actions, which explicitly builds in due process protections.

Under Rule 23(b)(3), judges must consider whether class counsel adequately represents class members; notify class members; allow members to object to a settlement or opt-out; and ensure that class settlements are fair, reasonable and adequate. But judges rarely certify personal-injury classes.

Worries about inadequate representation, self-dealing and the chance to have a say in suits that affect your health and safety don't evaporate just because mass litigation can't be certified as a class. As plaintiffs become one of many, referred to as a number and not by name, they face significant risks: Their lawyer may sell them out, and the jury trials they've come to expect are even rarer than the Perry Mason reruns that feature them.

Yet they cannot opt out of an MDL. And judges consistently appoint leaders based on their experience, war chests and ability to get along with everyone — not their ability to provide adequate representation. Some judges communicate only with those leaders, leaving attorneys like Scott Bickford in the dark.

Creating an MDL simply requires that dispersed lawsuits share a common factual question. That question needn't predominate, as common questions must in a Rule 23(b)(3) class. So, plaintiffs' discovery needs and requested remedies may differ substantially.

For Bickford and his team to prove that opioid babies are entitled to ongoing medical monitoring, for example, they need information about drug companies' marketing efforts to obstetricians and gynecologists. They want to know what those companies knew about the harmful effects babies might experience in utero from opioid-addicted mothers.

But those aren't issues that relate to states' and counties' focus on government reimbursement. So Bickford requested that the Judicial Panel on Multidistrict Litigation create a separate MDL just for them. The current opioid MDL is a jumble of cases with tangled interests spearheaded by a group of repeat players.

That repeat players consistently occupy lucrative leadership positions is no surprise, given the factors that judges use to appoint them. One would hope that they'd use their expertise and connections to generate better outcomes for the plaintiffs. Evidence, however, suggests otherwise: The deals they make are often riddled with self-interest, and laced with provisions that goad plaintiffs into consenting.

Repeat players play the long game — which means that they can develop working relationships with their opponents, such that each side can use private settlement to bargain for what matters to them most from a self-interested standpoint. Corporate defendants and their lawyers want to end lawsuits with the least cost. And lead plaintiffs lawyers profit substantially from attorneys' fees — specifically common-benefit fees (the money they receive for the work they do on the whole group's behalf).

In all but one of the private settlements I examined, plaintiffs' leadership used their dealmaking authority to increase their common-benefit fees. Every deal likewise contained at least one settlement provision designed to strong-arm plaintiffs into settling, thereby ending the suits for defendants.

Of course, negotiating for a raise with one's opponent prompts questions about what plaintiffs' leaders may concede in return — clauses that pressure plaintiffs to settle, stringent claims criteria or less money to plaintiffs? It also severs the contingent-fee link that intertwines the fates of lawyers and clients. That uncoupling can cause mischief.

Take the lawsuits over the acid-reflux medicine Propulsid, for instance. The lead plaintiffs' lawyers in Propulsid (two of whom are also leaders in the opioid MDL — Peter Mougey and Chris Seeger) negotiated their common-benefit fees directly with the defendant, Johnson & Johnson (also a defendant in the opioid MDL).

21

Johnson & Johnson paid plaintiffs' leaders $27 million in common-benefit fees. But out of the 6,012 claimants who entered into the settlement program, only 37 received any money. Collectively, those claimants recovered little more than $6.5 million. Much of the remaining money in the settlement fund then reverted back to Johnson & Johnson.

Propulsid's lead plaintiffs' lawyer Russ Herman said, "Johnson & Johnson's express wish was to have all cases resolved. ... One of the issues was that Johnson & Johnson insisted that unused funds would have 100% reversion to J&J." Consequently, he continued, "the [plaintiffs steering committee] and the state liaison folks who negotiated Propulsid II insisted that ... J&J should pay [them] a reasonable attorney's fee, which was agreed to." The deal was, in Herman's words, a "quid pro quo."

Propulsid's not a one-off. Its leaders announced that they were creating a template for all future deals — and they did. Every subsequent settlement I examined replicated and refined its cramdown mechanisms. Here's how they worked: First, unless lawyers convinced 85% of clients with death claims to enroll, then the deal was off. Johnson & Johnson could walk away, and neither plaintiffs' attorneys nor their clients would receive a dime.

Second, plaintiffs' lawyers had to recommend that all of their clients enter the settlement program. Entering the program required clients to dismiss their lawsuit without knowing what, if anything, they'd receive. Third, if a client chose not to settle, plaintiffs' lawyers designed an "opt-out" form — not to opt them out of the settlement, but to allow the attorney to get out of the attorney-client relationship. Settle your lawsuit, in other words, or I can no longer represent you.

Judges assume that because plaintiffs have their own counsel, no adequate-representation concerns exist. In Scott Bickford's argument for a separate MDL, Judge Lewis Kaplan said, "If there's a settlement and you don't like the settlement and it affects your clients, you have the right to object, isn't that true?"

Is it true? Settlements are ubiquitous; less than 3% of the cases centralized through MDL ever return to the courts where plaintiffs filed them. And as Propulsid shows, most settlements require that lawyers

22

treat their clients uniformly, not as the individuals that they are. Even if the Bickfords of the world could "object," who would they object to?

Most mass-tort MDLs conclude in private settlements. Are disgruntled lawyers to object to the same leaders who refused to grant them access to discovery and settlement negotiations? To the judge?

Judges are pro-settlement. Judge Dan Polster, who presides over the opioid MDL, made it clear in his first hearing that he wanted a settlement by the year's end. He took a similar stance when he presided over the Gadolinium-Based Contrast Agents proceeding a few years earlier: "[T]he cases should be settled, all right? ... They can be settled and they should be settled," he declared.

Polster is not an outlier. The judges who preside over products liability proceedings nudge plaintiffs into private settlements in many different ways: They appoint claims administrators or settlement masters to formally preside over private deals, thereby stamping them with a judicial imprimatur; they allow attorneys to withdraw from representing clients who refuse to settle; and they issue "Lone Pine orders," which impose evidentiary burdens on nonsettling plaintiffs — sometimes with short deadlines attached.

The panel denied Bickford's request for a separate MDL. As a judge on the panel concluded at the end of Bickford's hearing: "There is no authority for the due process argument."

That's true when it comes to creating an MDL, but not in conducting one. There, transferee judges must do more to protect due process. As I elaborate in my new book, judges should select cognitively diverse leaders via a competitive process that explicitly considers adequate representation, open channels for dissenting voices to chime in and episodically remand cases that centralization no longer serves.

By tying common-benefit fees to the actual benefit that leaders confer on plaintiffs (not the sticker price of a settlement fund) and opening the courthouse doors to hear directly from affected clients, judges not only check self-dealing, they also empower plaintiffs who are faceless and nameless no more.

23

Elizabeth Chamblee Burch, *Does Multidistrict Litigation Deny Plaintiffs Due Process?* (Jun. 9, 2019), Law360.com, available online at https://www.law360.com/articles/1166461 (last accessed Dec. 31, 2023) (footnotes omitted). Plaintiff King asserts that any restrictions on discovery amounts to a denial of his constitutional right of due process under the law.

Plaintiff King has a clear right to opt-out of any class action. "[T]he opt-out right merely ensures that each putative class member retains the ability to act **independently** of the class action if she so elects.... The opt-out right does not confer extra benefits to a plaintiff's independent action." *In re Lehman Bros. Sec. & Erisa Litig.,* 655 Fed.Appx. 13, 16 (2d Cir. 2016) (emphasis added), *affirmed sub nom. California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.,* 582 U.S. 497, 137 S. Ct. 2042, 198 L.Ed.2d 584 (2017). Plaintiff King acted independently by filing his complaint as an individual action in state court. One of the defendants exercised their rights to remove the action to a federal court. If Plaintiff King wanted to participate in the class action litigation, he would have filed his complaint in this Court.

## CONCLUSION

Plaintiff King has demonstrated that he should be provided with the previously produced discovery materials and that denial of production amounts to a violation of his constitutional right of due process under the law. In the alternative, Plaintiff King seeks to opt out of the potential class action litigation and have the

24

case remanded to one of three jurisdictions: (1) the United States District Court for the Northern District of Ohio; (2) the Summit County (Ohio) Court of Common Pleas; or (3) the Western District of Pennsylvania as an individual action.

For the above stated reasons, Plaintiff King prays the Court grant the relief requested herein. This matter should be referred to Special Master Katz for a Report and Recommendation.

Dated:  January 3, 2024.                    Respectfully Submitted,

*/s/ Derrick Martin King*

**DERRICK MARTIN KING**
1445 Crestview Avenue
Akron, Ohio 44320-4049
Phone: (330) 867-3979
Email: dmking12370@hotmail.com

*Pro se Plaintiff*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document was tendered for filing with the Clerk of the Court. Upon receipt by the Clerk, the document will immediately be scanned into the Court's electronic filing system and served upon the parties either through the CM/ECF filing system or through the MDL Centrality website.

Dated: <u>January 3, 2024.</u>

*/s/ Derrick Martin King*

**DERRICK MARTIN KING**
*Pro se Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYVANIA
### *Pittsburgh Division*

| | |
|---|---|
| IN RE: PHILIPS RECALLED CPAP, Bi-PAP, AND MECHANICAL VENTILATOR PRODUCTS LIABILITY LITIGATION | Master Docket No. **2:21-mc-01230-JFC** |
| | **MDL No. 3014** |
| This Document Relates To: | Judge **JOY FLOWERS CONTI** |
| *King v. Koninklijke Philips N.V., et al.* Case No. 2:23-cv-02040-JFC | |

### <u>DECLARATION OF PLAINTIFF DERRICK MARTIN KING</u>

Pursuant to 28 U.S.C. 1746, I hereby declare as follows:

1.     I am an adult over the age of 18 and competent to testify as to the matters contained herein based upon my own personal knowledge.

2.     I am the plaintiff in the case of *Derrick Martin King v. Koninklijke Philips N.V., et al.,* No. 2:23-cv-02040-JFC. (opened on November 29, 2023 in the United States District Court for the Western District of Pennsylvania and assigned to the Honorable Judge Joy Flowers Conti). This case is a member case of the multidistrict litigation in the United States District Court for the Western District of Pennsylvania. *In re: Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products Litigation,* No. 2:21-mc-01230-JFC, MDL No. 3014.

27

3.      This case originated in the Summit County (Ohio) Common Pleas Court on the September 21, 2023 filing of a complaint. *King v. Philips North America LLC, et al.* No. CV-2023-09-3575. The case was assigned to the Honorable Judge Alison Breaux.

4.      On September 28, 2023, I sent an email to the administrator of the MDL-3014 website ([www.mdl3014.com](www.mdl3014.com))[3] informing them of the litigation filed in state court and requesting access to the "plaintiffs only" portion of the website. I explained the likelihood that my case would likely be transferred to the multidistrict litigation. A copy of the email is annexed hereto and marked as **<u>Exhibit A</u>**.

5.      On September 28, 2023, I received an email from Zach Gordon (hereinafter "Mr. Gordon"), the case manager for Robert Peirce and Associates, P.C.[4] Mr. Gorden informed me that I was eligible to access the plaintiffs only portion of the MDL-3014 website and that I needed to register my information on the website and I would receive my username and password. A copy of the September 28, 2023 email is annexed herein and marked as **<u>Exhibit B</u>**.

6.      On September 28, 2023, I registered my information with the MDL-3014 website and received a username and password.

---

[3] It should be noted that the MDL 3014 website is operated by Pietragallo Gordon Alfano Bosick and Raspanti, LLP (a law firm which employs one of the co-liason counsel for the class action plaintiffs).

[4] Robert Pierce and Associates, P.C. employs D. Aaron Rihn (hereinafter "Mr. Rihn") one of the attorneys appointed as co-liaison counsel for the class-action plaintiffs by this Court. *See Pretrial Order # 8,* W.D. Pa. ECF No. 395.

7.     On October 18, 2023, attorney Wendy West Feinstein (hereinafter "Ms. Feinstein"), who represents Philips RS North America LLC. filed a notice of removal and the case was transferred to the United States District Court for the Norther District of Ohio and assigned to the Honorable Judge Pamela A. Barker. The *Notice of Removal* is filed as *King v. Koninklijke Philips N.V., et al.*, No. 5:23-cv-02042-PAB (N.D. Ohio ECF No. 1).[5]

8.     On October 25, 2023, Ms. Feinstein filed a motion for stay of proceedings pending transfer to this MDL. N.D. Ohio ECF No. 4.

9.     On October 27, 2023, the Judicial Panel on Multidistrict Litigation issued the Conditional Transfer Order (CTO-84).

10.    On November 5, 2023, I sent an email to BrownGreer PLC (which administers the MDL Centrality web portal) introducing myself and requesting access to MDL Centrality. A copy of the November 5, 2023 email is annexed herein and marked as **<u>Exhibit C</u>**.

11.    I was provided with a username and password to the MDL Centrality web portal on November 6, 2023.

---

[5] References to "N.D. Ohio ECF No." refers to the electronic case filing docket of the United States District Court for the Northern District of Ohio in the case of *King v. Koninklijke Philips N.V.,* et al., No. 5:23-cv-02042-PAB. References to "W.D. Pa. ECF No." refers to the electronic case filing docket of the United States District Court for the Western District of Pennsylvania in the case of *In re: Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Product Litigation,* No. 2:21-mc-01230-JFC. References to "MDL ECF No." refers to the electronic case filing docket of the United States Judicial Panel on Multidistrict Litigation in the case of *In re: Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Product Litigation,* MDL No. 3014.

12.     On November 5, 2023, I sent an e-mail to Mr. Rihn and Peter St. Tienne Wolff (hereinafter "Mr. Wolff")[6] in which I introduced myself, requested all court documents filed to date in the multidistrict litigation, and requested a copy of all discovery that has been produced to date. A copy of the November 5, 2023 email is annexed herein and marked as **Exhibit D**.

13.     On November 13, 2023, I received an email from Mr. Gordon which provided me a link to a dropbox that contained all of the filings in the MDL. Mr. Gordon also informed me that access to discovery materials is not available to non-MDL leadership at this time. Finally, Mr. Gordon referred me to the MDL-3014 website. A copy of the November 13, 2023 email is annexed hereto and marked as **Exhibit E**.

14.     On November 29, 2023, this Court formally accepted the conditional transfer order. W.D. Pa. ECF No. 2364.

15.     On November 29, 2023, I sent an email to Ms. Feinstein and Mr. Lavelle (who represent Philips RS North America LLC). The email was also sent to William B. Monahan (hereinafter Mr. Monahan") and Michael H. Steinberg (hereinafter "Mr. Steinberg") (who represents Koninklijke Philips N.V., Philips North America LLC, Philips Holding USA, and Philips RS North America Holding

---

[6] Mr. Wolff is employed with Pietragallo Gordon Alfano Bosick and Raspanti, LLP and was appointed as the other co-liaison counsel for the class-action plaintiffs. *See Pretrial Order # 8,* W.D. Pa. ECF No. 395.

Corporation). The email was also sent to Eric Scott Thompson (hereinafter "Mr. Thompson") (who represents Polymer Technologies Inc. and Polymer Molded Products LLC). In the email, I served the attorneys a copy of a document filed with the Summit County (Ohio) Common Pleas Court which gave that court an update on the case status. I also formally requested a copy of all discovery materials that has been previously provided to the other plaintiffs. I also included a signed agreement to be bound by the stipulated protective order (W.D. Pa. ECF No. 104, Exhibit A). The November 29, 2023 email is annexed hereto and marked as **Exhibit F**

16.    On November 30, 2023, I received an email from attorney Mr. Lavelle indicating that no discovery material would be provided to me. A copy of the November 30, 2023 email is annexed herein and marked as **Exhibit G**.

17.    On November 30, 2023, I replied to Mr. Lavelle and indicated that he had twenty-four (24) hours to indicate cooperation with my efforts to obtain discovery or that I would be filing a motion to compel production with this Court. A copy of the November 30, 2023 email is annexed hereto and marked as **Exhibit H**.

18.    On December 1, 2023, I received an email from Mr. Gordon which indicated that Mr. Rihn attempted to contact me via telephone.

19.    On December 1, 2023, Mr. Rihn and I spoke via telephone. Mr. Rihn inquired as to what specifically I was seeking (as the discovery produced so far is enormous).

20.    Mr. Rihn asked me whether or not I would sign a participation agreement in order to be provided with any common benefit work.

21.    I indicated to Mr. Rihn that I would sign such an agreement.

22.    On December 1, 2023, I received an email from Mr. Gordon which contained a participation agreement for me to sign.

23.    I immediately signed and returned the participation agreement.

24.    On December 4, 2023, I received an email from Mr. Gordon indicating that he received the signed agreement. A copy of the December 4, 2023 email is attached herein and marked as **Exhibit I**.

25.    As of this date, I have not had any further communication with Mr. Gordon, Mr. Rihn, Mr. Lavelle, or Ms. Feinstein.

26.    As of this date, I have never had any communication with Mr. Thompson.

I declare that the foregoing information is true and correct under penalty of perjury.

Executed on January 3, 2024 at Akron, Ohio.

/s/ Derrick Martin King

**DERRICK MARTIN KING**
*Declarant and Pro se Plaintiff*

**dmking12370@hotmail.com**

PLAINTIFF'S
EXHIBIT

A

| | |
|---|---|
| **From:** | Derrick Martin King |
| **Sent:** | Thursday, September 28, 2023 2:38 PM |
| **To:** | liaisons.mdl3014@pietragallo.com |
| **Subject:** | Philips CPAP Litigation |

Dear Sir or Madam:

My name is Derrick M. King and I am a pro se plaintiff in a case filed against Philips Respironics in an Ohio state court. The complaint deals with the CPAP recall. I was diagnosed with sleep apnea in January 2018 and was prescribed the use of a CPAP machine. I was eventually issued a Philips Respironics first-generation DreamStation CPAP device. I used the device between April 2018 and June 2023. I was never informed of the problems concerning the Philips Respironics CPAP device recall until my device was replaced by a ResMed device.

In May 2023, I was diagnosed with severe aortic stenosis. I was subsequently hospitalized and open-heart surgery was done. I have reason to believe that the daily use of the first-generation Philips Respironics DreamStation CPAP device contributed to my condition and subsequent surgery.

I recently discovered your website www.mdl3014.com and I noticed the tab marked "plaintiffs' only". Because of the likeliehood that my case in state court will end up part of the Philips multidistrict litigation in PA, I am requesting access to the "Plaintiff's Only" section of your website.

I have attached a copy of the complaint filed in the Summit County (Ohio) Court of

2023-09-21
Complaint.pdf

Common Pleas.

Thank you for your time.

Sincerely yours,

DERRICK MARTIN KING
Phone: (330) 867-3979 or (330) 459-1122
E-Mail: dmking12370@hotmail.com or
dmking12370@gmail.com

NOTICE TO RECIPIENT: The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential, and/or privileged material. If you are not the intended recipient of this message, be aware that any use, review, retransmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.

## IN THE SUMMIT COUNTY COMMON PLEAS COURT
### *General Division*

| | |
|---|---|
| **DERRICK M. KING**<br>1445 Crestview Ave<br>Akron, OH 44320-4049 | Case No. |
| | Judge: |
| Plaintiff | **COMPLAINT:** |
| vs. | *Strict Liability—Design Defect* |
| **PHILIPS NORTH AMERICA, LLC.**<br>c/o Corp. Service Company, S/A<br>3366 Riverside Dr., Ste. 103<br>Upper Arlington, OH 43221-1734 | *Strict Liability—Failure to Warn*<br><br>*Strict Liability—Manufacturing Defect*<br><br>*Breach id Express Warranty* |
| and | *Breach of Implied Warranty of*<br>*Merchantability* |
| **PHILIPS RS NORTH AMERICA, LLC.**<br>222 Jacobs St., FL 3<br>Cambridge, MA 02141-2296 | *Breach of the Implied Warranty of Usability* |
| and | *Negligence* |
| **KONINKLIJKE PHILIPS N.V.**<br>Philips Center<br>Amstelplein 2<br>1096 BC Amsterdam, The Netherlands | *Violation of the Ohio Consumer Sales*<br>*Practices Act*<br><br>**JURY DEMAND ENDORSED** |
| and | |
| **POLYMER TECHNOLOGIES, INC.**<br>420 Corporate Blvd.<br>Newark, DE 19702-3330 | |
| and | |
| **POLYMER TECHNOLOGIES, INC.,**<br>**MOLDED PRODUCTS DIVISION**<br>420 Corporate Blvd.<br>Newark, DE 19702-3330 | |

and

**POLYMER TECHNOLOGIES INC.,
ELASTOMETRIC SOLUTIONS
DIVISION**
76 Astor Ave.
Norwood, MA 02062-5099

Defendants.

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

PRELIMINARY STATEMENT ....................................................................................1

PARTIES ........................................................................................................................6

JURISDICTION AND VENUE.....................................................................................7

FACTUAL ALLEGATIONS REGARDING DEFENDANTS' ACTIONS ............................8

I.      CPAP AND BIPAP MACHINES AND VENTILATORS ARE PRESCRIBED TO TREAT BREATHING DISORDERS.........................8

II.     THE EVOLUTION OF CPAP, BIPAP, AND VENTILATOR DEVICES CONTAINING PE-PUR FOAM. ...........................................11

III.    PHILIPS' USE OF PE-PUR FOAM POSES SERIOUS HEALTH RISKS TO USERS OF ITS RECALLED DEVICES.............................18

        A.    Formaldehyde is a Known Carcinogen.............................23

        B.    Toluene Diisocyanate is a Likely Carcinogen. ..................24

        C.    Toluene Diamine is a Likely Carcinogen. ........................26

        D.    Diethylene Glycol is Toxic to Humans.............................28

        E.    Dimethyl Diazine is a Precursor to a Known Carcinogen. ......................................................................29

IV.     PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM FOR MANY YEARS PRIOR TO THE RECALL.............................................31

        A.    In 2015, Philips Communicated with its Foam Suppliers About the problem of PE-PUR Foam Degradation........................................................................36

        B.    Philips Opened an Internal Investigation into Foam Degradation in Mid-2018 that Confirmed PE-PUR Foam is Prone yo Degradation............................................39

        C.    Philips Finally Opened a Formal CAPA in 2019 – But Did Not Initiate a Recall for Two More Years. ..........45

V.      PHILIPS CONSISTENTLY MARKETED ITS BREATHING MACHINES AS SAFE AND EFFECTIVE EVEN WHEN IT

i

KNEW OF THE PROBLEMS WITH PE-PUR FOAM DEGRADATION AND ASSOCIATED HEALTH RISKS.....................47

    A.    Philips Never Hinted at the Dangerous Condition of the Recalled Devices..........................................................47

    B.    Philips Sold its Humidifier Accessory Allowing Warm Storage Conditions and Contributing to Humidity of the Foam........................................................48

VI.    PHILIPS FINALLY RECALLED ITS DEFECTIVE DEVICES CONTAINING HAZARDOUS PE-PUR FOAM, BUT ONLY AFTER LAUNCHING ITS NEWEST DEVICE WITHOUT PE-PUR FOAM. ................................................................49

    A.    Prior to the Recall, in April and May 2021, Philips Launched the DreamStation 2 (which does not Contain PE-PUR Foam).....................................................49

    B.    Testing Continued to Confirm the Recalled Devices were Defective and the FDA received additional MDRs.................................................................................50

    C.    Finally, in June 2021, Philips Recalled its Defective Devices.............................................................................51

VII.    THE MEASURES TAKEN BY PHILIPS TO RECALL THE DEFECTIVE DEVICES WERE INEFFECTIVE. ...................................54

    A.    Many Patients, Providers, and Others Were Not Notified About the Recall. ...................................................54

    B.    Philips' Repair/Replacement Program Has Been Extremely Slow.................................................................56

**PLAINTIFF'S INJURIES AS RESULT OF DEFENDANTS' ACTIONS ............................58**

**CAUSES OF ACTION ......................................................................................61**

    I.    Strict Liability: Design Defect ................................................61

    II.    Strict Liability (Failure to Warn) ............................................63

    III.    Strict Liability (Manufacturing Defect) ....................................66

    IV.    Breach of Express Warranty ..................................................68

    V.    Breach of the Implied Warranty of Merchantability.................................70

ii

VI.     Breach of the Implied Warranty of Usability ............................................71

VII.    Negligence ..............................................................................................73

VIII.   Unfair and Deceptive Practices in Violation of the Ohio Consumer
        Sales Practices Act .................................................................................75

**PRAYER FOR RELIEF.......................................................................................76**

<u>Exhibits to the Complaint</u>

**EXHIBIT A**—June 14, 2021 *Urgent Medical Device Recall*

**EXHIBIT B**—July 21, 2021 *Philips Respironics Recalls Certain Continuous and Non-Continuous Ventilators, including CPAP and BiPAP, Due to Risk of Exposure to Debris and Chemicals.*

**EXHIBIT C**—November 9, 2021 *FDA Form 483 Inspectional Observations* (redacted)

**EXHIBIT D**—September 1, 2021 *Voluntary Recall Information Philips Respironics Sleep and Respiratory Care devices: Philips starts repair and/or replacement program of first-generation DreamStation devices in the US and other markets.*

**EXHIBIT D**—September 7, 2023 *Unopposed Motion of Proposed Settlement Class Representatives for a Preliminary Approval of Class Settlement Agreement and Release of Economic Loss Claims and to Direct Notice to the Proposed Settlement Class* (filed in the case of *In re: Philips Recalled CPAP, Bi-PAP, and Mechanical Ventilator Litigation,* MDL No. 3014 (W.D. Pa.)

**EXHIBIT E**—September 7, 2023 Brief in Support of *Unopposed Motion of Proposed Settlement Class Representatives for a Preliminary Approval of Class Settlement Agreement and Release of Economic Loss Claims and to Direct Notice to the Proposed Settlement Class* (filed in the case of *In re: Philips Recalled CPAP, Bi-PAP, and Mechanical Ventilator Litigation,* MDL No. 3014 (W.D. Pa.)

**EXHIBIT F**—*2016 Philips Respironics DreamStation CPAP Device User Manual.*

**EXHIBIT G**—June 14, 2021 *Philips Sleep and Respiratory Care update: Clinical information for physicians.*

**EXHIBIT H**—July 8, 2021 *Philips Sleep and Respiratory Care update: Clinical information for physicians.*

**EXHIBIT I**—March 10, 2022 Letter from Malvina Eydelman (Office of Product Evaluation and Quality, Center for Devices and Radiological Health) to Thomas Fallon (Philips Respironics)

**EXHIBIT J**— April 6, 2018 *FDA 518(b) Notice of Opportunity for a Hearing.*

**EXHIBIT K**—April 6, 2018 *Delivery Ticket from CornerStone Medical Services*

*Sandra Kurt, Summit County Clerk of Courts*

Plaintiff Derrick M. King brings this Complaint against Defendants Philips North America, LLC., Philips RS North America, LLC (collectively "Philips" or the "Philips Defendants"), and Defendants Polymer Technologies, Inc., Polymer Technologies Inc., Molded Products Division, and Polymer Technologies, Inc., Elastometric Solutions Division (collectively "PolyTech" or the "PolyTech Defendants").

## PRELIMINARY STATEMENT

1.      Philips designs, manufactures, and sells certain lines of products that are intended to help people breathe. These include Continuous Positive Airway Pressure ("CPAP") and Bilevel Positive Airway Pressure ("BiPAP") machines, which are commonly used to treat sleep apnea, and mechanical ventilators ("ventilators"), which treat respiratory failure. The primary function of these devices is to blow air into patients' airways. CPAP and BiPAP machines are intended for use during sleep, and ventilators are used continuously when needed.

2.      On June 14, 2021, Philips announced a recall of millions of its CPAP and BiPAP machines and ventilators (the "Recall") in the United States. Each of these recalled products (referred to herein as a "Recalled Device" or collectively as the "Recalled Devices") contain polyester-based polyurethane ("PE-PUR") foam for sound abatement. Despite knowing for many years that PE-PUR foam would degrade and that this foam should not be used in the Recalled Devices, Philips waited until June 2021 to issue the Recall and notify the public. In its Recall, Philips announced that the PE-PUR foam may break down into particles and be inhaled or ingested, and may emit volatile organic compounds ("VOCs") that may be inhaled, resulting in "serious injury, which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment"[1] (referred to herein as the "Defect"). Philips

---

[1] Koninklijke Philips N.V. (Jun. 14, 2021). *URGENT: Medical Device Recall.* Available online at https://www.usa.philips.com/c-dam/b2bhc/master/landing-

1

stated that the potential risks of exposure due to such chemicals include "headache/dizziness, irritation (eyes, nose respiratory tract, skin), hypersensitivity, nausea, vomiting, toxic and carcinogenic effects."[2] Philips' announcement to doctors advised that these hazards could result in "serious injury which can be life-threatening or cause permanent impairment."[3]

      3.     On July 22, 2021, the U.S. Food and Drug Administration ("FDA") confirmed the severity of the problem and classified the Recall as Class I or "the most serious type of recall," meaning use of the Recalled Devices "may cause serious injuries or death."[4]

      4.     Philips should have known about the risks caused by PE-PUR foam degradation when it was testing the foam pursuant to FDA regulations. And certainly, Philips knew as far back as 2008 that there were serious problems with the foam in the Recalled Devices because Philips received customer complaints about "contaminants, particles, foam, debris, airway, particulate, airpath, and black."[5]

      5.     Then, according to the FDA, beginning in 2015, Philips received additional data from a variety of sources, including customer complaints, test reports, information from suppliers,

---

pages/src/update/documents/en_US/philips-recall-letter-2021-11-16-a-cpap-a-ventilator-recall-letter-us-revised.pdf (last accessed Sept. 4, 2023) (annexed hereto and marked as **EXHIBIT A**).
[2] *Id.*
[3] *Id.*
[4] U.S. Food and Drug Administration (Jul. 21, 2021). *Philips Respironics Recalls Certain Continuous and Non-Continuous Ventilators, including CPAP and BiPAP, Due to Risk of Exposure to Debris and Chemicals.* Available online at https://www.fda.gov/medical-devices/medical-device-recalls/philips-respironics-recalls-certain-continuous-and-non-continuous-ventilators-including-cpap-and (last accessed Aug 12, 2022) (annexed hereto and marked as **EXHIBIT B**).
[5] U.S. Food and Drug Administration (Nov. 9, 2021). *FDA Form-483 Inspectional Observations* (hereinafter "483 Report). Available online at https://www.fda.gov/media/154244/download (last accessed Aug. 12, 2022) (annexed hereto and marked as **EXHIBIT C**). The redactions done to the document are original to the online version.

2

and information from another entity owned by the ultimate parent company of Philips, confirming the problem of degradation of the PE-PUR foam contained within the Recalled Devices.

6.     Yet, Philips failed to disclose that the Recalled Devices were defective when manufactured and sold until many years later. In fact, it was only after Philips launched its next generation of CPAP/BiPAP machines – the DreamStation 2 devices – which do not contain PE-PUR foam, that Philips announced to their shareholders in a Quarterly Report on April 26, 2021 that its previous generation DreamStation products and other CPAP, BiPAP, and ventilators posed serious health risks to users. Philips then waited an additional seven weeks before it initiated the Recall of the dangerously defective machines in the U.S. Shortly thereafter Philips expanded its recall of defective CPAP, BiPAP, and ventilators worldwide.[6]

7.     Philips' flagship line and top seller of its CPAP Recalled Devices are its DreamStation devices. On September 1, 2021, Philips received authorization from the FDA to begin a repair and/or replacement process for affected DreamStation devices in the United States.[7] DreamStation customers, however, were not told when they might receive a replacement device, nor were they given any specifics as to how the replacement program would work. Moreover, the

---

[6] *See* Koninklijke Philips N.V. (Jul. 2, 2021). *Urgent Product Defect Correction in Australia (Recall for Product Correction in New Zealand): Philips Sleep and Respiratory Care Devices – Australia and New Zealand.* Available online at https://www.philips.com.au/healthcare/e/sleep/communications/src-update (last accessed Aug. 29, 2023) (other impacted countries include, but are not limited to Australia, Canada, Israel, and Chile).

[7] *See* Koninklijke Philips N.V. (Sept. 1, 2021). *Philips starts repair and/or replacement program of first-generation DreamStation devices in the US and other markets.* Available online at https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/philips-starts-repair-and-replacement-program-of-first-generation-dreamstation-devices-in-the-us-and-other-markets (last accessed Aug. 29, 2023) (annexed hereto and marked as **EXHIBIT D**).

repair and/or replacement process was only for DreamStation Recalled Devices and did not encompass any other Recalled Device.

8.      The Recalled Devices are:

- E30
- DreamStation ASV
- DreamStation ST, AVAPS
- SystemOne ASV4
- C Series ASV, S/T, AVAPs
- OmniLab Advanced Plus
- SystemOne (Q Series)
- DreamStation CPAP, Auto CPAP, BiPAP
- DreamStation Go CPAP, APAP
- Dorma 400, 500 CPAP
- REMStar SE Auto CPAP
- Trilogy 100 and 200
- Garbin Plus, Aeris, LifeVent
- A-Series BiPAP Hybrid A30
- A-Series BiPAP V30 Auto
- A-Series BiPAP A40
- A-Series BiPAP A30

9.      All of the Recalled Devices are defective because they contain PE-PUR foam.

10.     This action arises from Philips's wrongful conduct, including: (a) designing a defective product that caused serious injuries to users, (b) failing to warn about serious, and

4

reasonably foreseeable health risks caused by the Recalled Devices, (c) engaging in the deliberate concealment, misrepresentation and obstruction of public and regulatory awareness of serious health risks to users of the Recalled Devices, and (d) failing to utilize reasonable care in, among other things, designing, manufacturing, marketing, selling, distributing, and recalling the Recalled Devices.

11.     Philips and others are the defendants in a multidistrict federal court lawsuit that seeks class action status. On October 8, 2021, the Judicial Panel on Multidistrict Litigation granted a motion for transfer and consolidation. *In re: Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products Litigation,* MDL No. 3014, Case No. 2:21-mc-01230-JFC (W.D. Pa.) (hereinafter "the Philips Recalled CPAP Litigation").

12.     On September 7, 2023, the proposed plaintiffs' co-lead counsel filed a motion of proposed settlement class representatives for preliminary approval of class settlement agreement and release of economic loss claims and to direct notice to the proposed settlement class. A copy of the filing is annexed hereto and marked as **EXHIBIT E** and the brief in support is annexed herein and marked as **EXHIBIT F**.

13.     Under the proposed settlement agreement, the Philips defendants will pay a minimum of $445,000,000 for Device payment Awards and Device Return Awards for Eligible Users and $34,000,000 for Payer Awards for Eligible Payers.

14.     Specifically, eligible users will receive $100 for each Device that they return to Philips, plus a payment of between $55.63 to $1,552.25 per recalled device (depending on the recalled device at issue).

5

## PARTIES

15.    Plaintiff **DERRICK M. KING** is a resident of the City of Akron, County of Summit, and the State of Ohio who used the Recalled Devices and has suffered injuries from the use of the Recalled Devices.

16.    Defendant **PHILIPS NORTH AMERICA, LLC.** ("Philips NA") is a Delaware company with its principal place of business at 222 Jacobs Street, Floor 3, Cambridge, Massachusetts 02141. Philips NA is a wholly owned subsidiary of Koninklijke Philips N.V. Philips NA manages the operation of Koninklijke Philips N.V.'s various lines of business, including Philips RS North America, LLC.

17.    Defendant **PHILIPS RS NORTH AMERICA, LLC.** ("Philips RS") is a Delaware company with its principal place of business at 6501 Living Place, Pittsburgh, Pennsylvania 15206. Philips RS was formerly operated under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.

18.    Defendant **KONINKLIJKE PHILIPS N.V.** ("Royal Philips") is a Dutch multinational company having its principal executive offices at Philips Center, Amstelplein 2, 1096 BC Amsterdam, The Netherlands. Royal Philips is the parent company of the Philips group of healthcare technology businesses including Connected Care businesses focusing on Sleep & Respiratory Care. Royal Philips holds directly or indirectly 100% of its subsidiaries, Philips North America LLC and Philips RS North America LLC.  As such, Royal Philips controls Philips North America LLC and Philips RS North America LLC with respect to the manufacturing, selling, distributing, and supplying of the Recalled Devices.  Royal Philips can be served with process via the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Service Convention"). Defendant Royal Philips is subject to the jurisdiction and venue of this Court.

6

19.     At all relevant times, each Philips Defendant acted in all aspects as the agent and alter ego of one another, and reference to "Philips" refers to each Philips Defendant individually and collectively.

20.     Defendant **POLYMER TECHNOLOGIES, INC.** ("Polymer Tech") is a Delaware corporation with its principal place of business at 420 Corporate Blvd, Newark, DE 19702. Polymer Tech directly or through another intermediary manufactured, treated, processed, and provided Philips with the PE-PUR foam that was used in the Recalled Devices.

21.     Defendant **POLYMER TECHNOLOGIES INC., MOLDED PRODUCTS DIVISION** ("MPD") is a Delaware corporation with its principal place of business at 10 Easy Street, Bound Brook, NJ 08805. MPD is a molded polyurethane foam manufacturer. MPD directly or through another intermediary manufactured, treated, processed, and provided Philips with the PE-PUR foam that was used in the Recalled Devices.

22.     Defendant **POLYMER TECHNOLOGIES, INC. ELASTOMERIC SOLUTIONS DIVISION** ("ESD") is a Delaware corporation with its principal place of business at 76 Astor Ave #101, Norwood, MA 02062. ESD specializes in shock and vibration isolation materials for products including medical devices. ESD directly or through another intermediary manufactured, treated, processed, and provided Philips with the PE-PUR foam that was used in the Recalled Devices.

23.     At all relevant times, Defendants Polymer Tech, PMP, and ESD acted in all respects as the agent and alter ego of one another, and reference hereinafter to "PolyTech" or the "PolyTech Defendants" refers to Defendants Polymer Tech, PMP, and ESD individually and collectively.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over the Parties as the amount in controversy exceeds $25,000.00, exclusive of interest and costs.

7

25.     This Court has personal jurisdiction over Defendants pursuant to and consistent with the Constitutional requirements of Due Process because Defendants conduct substantial business in Summit County, the events giving rise to Plaintiff's claims arise out of and relate to defendant's contacts with Summit County. Defendants' affiliations with Summit County are so continuous and systematic as to render them essentially at home in this forum State. The unlawful acts of defendants have been directed at, targeted to, and effectively caused injury to persons residing in, located in or doing business in Summit County.

26.     This Court has proper venue as the events giving rise to Plaintiff's claims arise out of and relate to Defendants' contacts with Summit County, Ohio.

**FACTUAL ALLEGATIONS REGARDING DEFENDANTS' ACTIONS**

I.     CPAP AND BIPAP MACHINES AND VENTILATORS ARE PRESCRIBED TO TREAT BREATHING DISORDERS.

27.     Sleep apnea is a sleeping disorder in which breathing is disturbed during sleep. These disturbances are called "apneas."

28.     According to the Mayo Clinic, the main types of sleep apnea are obstructive sleep apnea, central sleep apnea, and complex sleep apnea syndrome (also known as treatment-emergent central sleep apnea).

29.     Obstructive sleep apnea is the most common type. It occurs when the muscles in the back of the throat relax during inhalation, which causes the airway to narrow or close and prevent sufficient air from passing through. This, in turn, lowers the oxygen level in the blood, which causes the brain to briefly wake the body from sleep to reopen the airway. This reawakening may be so brief that the patient does not remember it, and may be associated with snorting, choking, or gasping. It can happen anywhere from a few times per hour to once every few minutes, and can prevent the patient from reaching the deep, restful phases of sleep.

8

30.   Central sleep apnea occurs when the brain fails to transmit signals to the breathing muscles. As a result, the body stops breathing, which can cause waking with shortness of breath or difficulty getting to sleep or staying asleep.

31.   Complex sleep apnea syndrome occurs when a patient has both obstructive sleep apnea and central sleep apnea. An image showing how an airway can be blocked as a result of sleep apnea appears below:



32.   CPAP therapy is a common treatment for sleep apnea. In CPAP therapy, a machine delivers a flow of air through a mask over the nose or mouth, which increases air pressure in the throat so that the airway does not collapse during inhalation. CPAP therapy assists breathing during sleep and can successfully treat sleep apnea. The illustration below shows a generic CPAP machine being used by a patient while sleeping.

9



33.     Another therapy to treat sleep apnea includes use of BiPAP machines, which use two different pressures – one for inhaling and one for exhaling.

34.     Patients customarily place the CPAP or BiPAP machines on a nearby nightstand or shelf. A hose connects the unit to the mask, which is worn over the nose or mouth during sleep. Below is an image of a Philips DreamStation machine on a nightstand.



35.     Ventilators are often used to treat respiratory failure. Ventilators push air into and out of the patient's lungs like a bellows, typically through a tube that is connected to the machine on one end and inserted through the patient's nose or mouth into the trachea on the other end. Patients are typically sedated while on ventilation because it can otherwise cause intense pain. Ventilators can also be used in other circumstances, such as during surgery when general anesthesia may interrupt normal breathing. There are also ventilators for home use. The following image from the National Institute of Health ("NIH") shows a typical ventilator and how it works:

10



II.    THE EVOLUTION OF CPAP, BIPAP, AND VENTILATOR DEVICES CONTAINING PE-PUR FOAM.

36.    The basic technology used in CPAP and BiPAP devices was developed in 1980 by an Australian pulmonologist, Dr. Colin Sullivan, who used it to treat dogs with respiratory problems, before the technology was adapted for humans.

37.    Respironics commercialized this technology and sold the first publicly available CPAP device in 1985. ResMed, an industry competitor, followed with the release of its CPAP device in 1989.

38.    These first-generation CPAP and BiPAP devices created a new and commercially viable field of respiratory therapy. The devices, however, were large and noisy, resulting in an "arms-race" between manufacturers to develop devices that were smaller, more responsive to patient breathing patterns, and quieter.

39.    The noise level of CPAP and BiPAP devices became a driver of adult consumer preference because loud devices interrupt the peaceful sleep of both the patient and their partner.

40.    To develop the quietest devices on the market with the lowest decibel ratings, some device manufacturers including Philips swathed the CPAP, BiPAP, and ventilator devices with sound abating foam to reduce the volume of noise emitted from the devices.

11

41.     In fact, the alleged relative quiet nature of the DreamStation products with PE-PUR foam factored prominently into Philips' marketing.[8] Philips represented that it extensively studied



and measured the amount of sound produced by DreamStation products. Philips even included an infographic indicating DreamStation products are barely louder than a whisper:[9]

42.     Other manufacturers did not utilize foam for sound abatement, instead they utilized silencing technology to abate the sound from the devices.

43.     Philips manufactures and sells CPAP and BiPAP machines and ventilators, among other products. According to Royal Philips' 2020 Annual Report,[10] Sleep & Respiratory Care constituted 49% of its total sales in its Connected Care line of business, which, in turn, accounted

---

[8] Koninklijke Philips N.V. (2016). *Philips Respironics DreamStation: Rediscovering dreams.* Available online at
https://www.documents.philips.com/assets/20170523/62e4f43a1349489ba3cca77c0169c6ef.pdf
(last accessed Aug. 1, 2023).
[9] *Id.* at 3.
[10] Koninklijke Philips N.V. (Feb. 23, 2021). *Philips 2020 Annual Report: Innovating to address global health challenges.* Available online at
https://www.results.philips.com/publications/ar20?type=annual-report&origin=2_us_en_5250933_Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29_mixedtype_cj&utm_source=5250933&utm_medium=affiliate&utm_campaign=cj&cjevent=ec08e4671a4811ed838f01650a82b821&utm_term=Microsoft+Shopping+%28Bing+Rebates%2C+Coupons%2C+etc.%29&cjdata=MXxOfDB8WXww

for 28% of Royal Philips' overall sales of about €19.535 billion. Philips has sold millions of CPAP, BiPAP, and ventilator devices in the United States and elsewhere throughout the globe.

44.     Philips provides a User Manual with its CPAP, BiPAP, and ventilator devices. Royal Philips owns the copyright to all, or most, of those User Manuals. A copy of the user manual for the Philips Respironics DreamStation CPAP Device is annexed hereto and marked as **EXHIBIT G**.

45.     Philips made the decision to use PE-PUR foam for sound abatement purposes in its CPAP, BiPAP, and ventilator devices. That decision was made for products distributed by Philips' entities throughout the globe including, but not limited to the United States, Australia, Canada, Israel, and Chile.[11]

46.     Polyurethane is an organic polymer in which urethane groups connect the molecular units and is usually formed by reacting a diisocyanate or triisocyanate with a polyol. Under certain circumstances, polyurethane may break down into a diisocyanate or triisocyanate.

47.     The two main types of polyurethane are polyester and polyether. Polyester polyurethane has better shock absorption and vibration dampening properties and is commonly used for soundproofing or sound dampening.

48.     It has been known for decades that polyester polyurethane is susceptible to hydrolysis, the chemical breakdown of a compound due to reaction with water, particularly in medical applications. For example, a chapter of a scientific encyclopedia published in 2013 states:

---

[11] *See* Koninklijke Philips N.V. (Jul. 25, 2022). *Philips Q2 2022 Quarterly Report,* at p. 33. Available online at https://www.results.philips.com/publications/q222/downloads/pdf/en/philips-second-quarter-results-2022-report.pdf?v=20230725135335 (last accessed Aug. 29, 2023).

"Poly(ester urethanes) were the first generation of PURs used in medical devices but were found unsuitable for long-term implants because of rapid hydrolysis of the polyester soft segment[.]"[12]

49.     Polyether polyurethane, on the other hand, is less prone to hydrolysis. The same scientific encyclopedia chapter notes that polyether polyurethanes "with excellent hydrolytic stability replaced poly(ester urethanes) and have been used in medical devices for the past two decades."[13]

50.     There were readily available alternative designs available to Philips, other than to use PE-PUR foam in CPAP, BiPAP, and ventilators for sound abatement; including, without limitation, other types of sound abating foam and silencing technologies that do not use foam.

51.     For example, Philips' principal competitor, ResMed, uses polyether polyurethane foam or silicone-based foam, not PE-PUR foam, for sound dampening.[14]

52.     Defendants obtained 510(k) clearance from the Food and Drug Administration ("FDA") for various CPAP, BIPAP and ventilator devices.

53.     510(k) clearance is distinct from the FDA's pre-market approval ("PMA") process in that clearance does not require clinical confirmation of safety and effectiveness and as such the manufacturer retains all liability for the assertions of safety and effectiveness.

54.     510(k) clearance generally only requires the manufacturer to notify the FDA under section 510(k) of the Medical Device Amendments of 1976 to the Food Device Cosmetic Act

---

[12] N. Pal Singh Chauhan and N. Kumari Jangid (Jan. 2013). *Polyurethanes and Silicone Polyurethane Copolymers.* Chapter in Encyclopedia of Biomedical Polymers and Polymeric Biomaterials. Available online at https://www.researchgate.net/publication/236144965_POLYURETHANES_AND_SILICONE_POLYURETHANE_COPOLYMERS (last accessed Aug. 12, 2022).
[13] *Id.*
[14] ResMed (Updated Dec. 6, 2021). *Information regarding Philips' recall.* Available online at https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed Aug. 28, 2023).

14

(MDA) of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then "clear" the new device for sale in the United States.

55.     Philips utilized the 510(k) process to receive clearances for each of its Recalled Devices except the E30 ventilator which was marketed under an Emergency Use Authorization (EUA).

56.     With respect to the EUA for the E30 ventilator, on March 24, 2020, in response to "concerns relating to insufficient supply and availability of FDA-cleared ventilators for use in healthcare settings to treat patients during the Coronavirus Disease 2019 (COVID-19) pandemic[,]" the FDA issued an umbrella EUA of ventilators and related equipment. On April 8, 2020, this EUA was extended to the E30 ventilator. A device may be authorized under this umbrella EUA if it "may be effective" in diagnosing, treating, or preventing COVID-19; and according to the FDA, "[t]he 'may be effective' standard for EUAs provides for a lower level of evidence than the 'effectiveness' standard that FDA uses for product approvals."

57.     With respect to the 510(k) process for each of the other Recalled Devices, Philips included data, testing, and biocompatibility results along with its applications to claim substantial equivalence to a predicate device.

58.     Upon reviewing the submissions, the FDA determined Philips' devices were substantially equivalent to a predicate device.

59.     After the devices were sold, Philips had a duty to find, investigate, and report adverse events to the FDA. For example, 21 C.F.R. part 803 requires Philips to conduct a thorough investigation of each event. This duty is triggered when Philips becomes aware of information from any source that reasonably suggests that its device (1) may have caused or contributed to a

15

death or serious injury, or (2) has malfunctioned, and, this device or a similar device it markets, is likely to cause or contribute to a death or serious injury, if the malfunction were to recur. 21 C.F.R. § 803.50.

60.     Additionally, as a manufacturer, Philips has unique knowledge concerning the frequency, severity and predictability of the complications and risks associated with its devices. Accordingly, there is a post-market responsibility under the FDA Regulations related to complaint handling, investigation and reporting to the FDA, including but not limited to:

a.     21 C.F.R. § 803.10 (for example, § 803.10(c) requires adverse events to be reported by a manufacturer in set time frames from 5 to 30 days when the event becomes known);

b.     21 C.F.R. § 803.17 ("Medical device manufacturers must develop and implement standardized medical device reporting procedures so that timely evaluation of events and communication of findings can occur.");

c.     21 C.F.R. § 803.18 (§ 803.18(d)(1) requires a device distributor to maintain complaint files and records, including any written, electronic or oral communication, either received or generated by the distributor, that alleges deficiencies related to the identity (e.g., labeling), quality, durability, reliability, safety, effectiveness, or performance of a device.);

d.     21 C.F.R. § 803.20 ("Manufacturers must timely communicate a reportable event. Any information, including professional, scientific, or medical facts, observations, or opinions, may reasonably suggest that a device has caused or may have caused or contributed to an MDR reportable event. An MDR reportable event is a death, a serious injury, or, if you are a manufacturer or importer, a malfunction that would be likely to cause or contribute to a death or serious injury if the malfunction were to recur.");

e.     21 C.F.R. § 803.3 ("If you are a manufacturer, you are considered to have become aware of an event when any of your employees becomes aware of a reportable event that is required to be reported within 30 calendar days or that is required to be reported within 5 work days because we had requested reports in accordance with 803.53(b). You are also considered to have become aware of an event when any of your employees with management or supervisory responsibilities over persons with regulatory, scientific, or technical

16

responsibilities, or whose duties relate to the collection and reporting of adverse events, becomes aware, from any information, including any trend analysis, that a reportable MDR event or events necessitates remedial action to prevent an unreasonable risk of substantial harm to the public health.");

f.       21 C.F.R. § 803.50 ((a) "If you are a manufacturer, you must report to the FDA information required by 803.52 in accordance with the requirements of 803.12(a), no later than 30 calendar days after the day that you receive or otherwise become aware of information, from any source, that reasonably suggests that a device that you market:(1) May have caused or contributed to a death or serious injury or (2) Has malfunctioned and this device or a similar device that you market would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur." Subsection (b) defines information reasonably known to a manufacturer to include: "[a]ny information that you can obtain by contacting a user facility, importer, or other initial reporter; . . . [a]ny information in your possession; or . . . [a]ny information that you can obtain by analysis, testing, or other evaluation of the device." Section 803.50 continues: "(2) You are responsible for obtaining and submitting to us information that is incomplete or missing from reports submitted by user facilities, importers, and other initial reporters. (3) You are also responsible for conducting an investigation of each event and evaluating the cause of the event. If you cannot submit complete information on a report, you must provide a statement explaining why this information was incomplete and the steps you took to obtain the information. If you later obtain any required information that was not available at the time you filed your initial report, you must submit this information in a supplemental report under 803.56 in accordance with the requirements of 803.12(a).");

g.       21 C.F.R. § 803.52 (detailed individual and device information must be submitted for each adverse event);

h.       21 C.F.R. § 803.53 (information regarding detailed individual and device information must be submitted in a timely manner when remedial action may be required);

i.       21 C.F.R. § 803.56 (supplemental reporting must be done if additional information is learned that became known after the initial report was submitted);

j.       21 C.F.R. § 814.82(a)(2) (manufacturer has a duty of "[c]ontinuing evaluation and periodic reporting on the safety, effectiveness, and reliability of the device for its intended use. FDA will state in the PMA approval order the reason or purpose for such requirement and

17

the number of patients to be evaluated and the reports required to be submitted.");

k.   21 C.F.R. § 814.84 (the periodic reports required by law must contain the reports in the scientific literature that pertain to the device which are known or should be known to the manufacturer); and

l.   21 C.F.R. § 820.198 ("Any complaint that represents an event which must be reported to FDA under part 803 of this chapter shall be promptly reviewed, evaluated, and investigated by a designated individual(s) and shall be maintained in a separate portion of the complaint files or otherwise clearly identified. In addition to the information required by 820.198(e), records of investigation under this paragraph shall include a determination of: (1) Whether the device failed to meet specifications; (2) Whether the device was being used for treatment or diagnosis; and (3) The relationship, if any, of the device to the reported incident or adverse event").

61.   In addition, there are state law duties to monitor, investigate, evaluate and timely report injuries and other important safety information regarding a medical device, which Philips violated when it failed to: monitor, investigate and report PE-PUR foam degradation risk and incidents; take the necessary steps to continually evaluate the safety, effectiveness and reliability of its Recalled Devices; and take necessary steps to warn, strengthen its warnings, and take other measures to assure compliance with its obligations.

III.   PHILIPS' USE OF PE-PUR FOAM POSES SERIOUS HEALTH RISKS TO USERS OF ITS RECALLED DEVICES.

63.   Philips has belatedly revealed that the PE-PUR foam in the Recalled Devices degrades and exposes patients to toxic particles and gases. Such exposure has harmed hundreds of thousands of patients across the United States who used the Recalled Devices.

64.   On the same day as the Recall, Philips released an announcement entitled "Clinical information for physicians." In this announcement, Philips disclosed that it "has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending

18

from the device outlet, humidifier, tubing, and mask)."[15] The PE-PUR foam is black, and when it breaks down, it can release black particles.[16] The announcement stated that the foam breakdown "may lead to patient harm and impact clinical care,"[17] explaining:

> While there have been limited reports of headache, upper airway irritation, cough, chest pressure and sinus infection that may have been associated with the foam, based on lab testing and evaluations, it may be possible that these potential health risks could result in a wide range of potential patient impact, from transient potential injuries, symptoms and complications, as well as possibly serious injury which can be life-threatening or cause permanent impairment, or require medical intervention to preclude permanent impairment.[18]

65.     The announcement mentioned two types of hazards from the foam in the devices: dangers from foam degradation and dangers from release of VOCs.

66.     First, the announcement described dangers arising from foam degradation exposure:

> **Potential Hazard:** Philips has determined from user reports and lab testing that under certain circumstances the foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user of its Continuous Positive Airway Pressure (CPAP), BiLevel Positive Airway Pressure (BiLevel PAP) and Mechanical Ventilator devices. The foam degradation may be exacerbated by environmental conditions of higher temperatures and humidity in certain regions. Unauthorized cleaning methods such as ozone may accelerate potential degradation.
>
> The absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including:
>
> -     Toluene Diamine

---

[15] Koninklijke Philips N.V. (Jul. 8, 2021). *Sleep and respiratory care update: Clinical information for physicians* (hereinafter "Jul. 8 Update")*.* Available online at https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed Aug. 28, 2023).
[16] *Id.*
[17] *Id.*
[18] *Id.*

-    Toluene Diisocyanate

-    Diethylene glycol.[19]

67.    This particulate matter can harm a patient using a Recalled Device in multiple ways including, but not limited to damaging the respiratory system and by transmitting toxic compounds into the respiratory and gastrointestinal systems.

68.    The inhalation of extremely fine particulates, even non-toxic particulates, can lead to adverse health outcomes. The Environmental Protection Agency ("EPA") notes that exposure to particles less than 10 micrometers can be linked to a variety of health problems including: aggravated asthma, decreased lung function, increased respiratory symptoms, and cardiac related diseases."[20]

69.    On July 8, 2021, Philips released a global supplemental clinical information document that was based on their own testing of the affected devices, stating that, "According to analysis performed by Philips, the majority of particulates are of a size (>8 μm) . . . Smaller particulates (<1-3 μm) are capable of diffusing into deep lung tissue and deposit into the alveoli. During testing performed by an outside laboratory on lab degraded foam, the smallest particulate size identified was 2.69 μm."[21]

70.    The purity of the air coming from a breathing device to a patient is highly important and material. Philips advertises the filtration systems in its devices, for example, noting them on a

---

[19] *Id.*

[20] U.S. Environmental Protection Agency. *Health and Environmental Effects of Particulate Matter (PM).* Available online at https://www.epa.gov/pm-pollution/health-and-environmental-effects-particulate-matter-pm (last accessed Aug. 15, 2023).

[21] *See* Jul. 8 Update

20

diagram in its DreamStation Family Brochure.[22] Philips' filtration system, however, does not filter out the particles described above.

71.     In addition to the hazards created by the inhalation of extremely fine particulates, Philips has stated that the particulates created via PE-PUR foam degradation contain toxic compounds such as toluene diamine, toluene diisocyanate, and diethylene glycol.[23] As discussed in more detail below, these compounds are toxic and/or carcinogenic when inhaled or ingested.

72.     Philips concluded in its Health Hazard Evaluations ("HHEs") regarding the PE-PUR foam degradation risk that "[b]ased on the cytotoxicity and genotoxicity results and toxicological risk assessment, combined with [the] conclusion that particles are likely to reach the upper airway and potentially the lower respiratory track [sic], a reasonable worst-case estimate for the general and higher risk (e.g., patient populations with preexisting conditions or comorbidities) patient populations is a severity level 3 (Crucial) for both short/intermediate and long term exposure."[24]

73.     Philips' HHEs note that the harm due to foam degradation "'may not be immediately recognizable and may not be something that the customer would/could report,' adding that certain harms 'may not be easily linked to the hazardous situation or device use in general'—

---

[22] Koninklijke Philips N.V. (2016). *DreamStation Sleep therapy system: Rediscovering Dreams.* Available online at https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed Aug. 1, 2023).
[23] *See* Jul. 8 Update.
[24] U.S. Food and Drug Administration (May 2, 2022). *PROPOSAL FOR FDA TO ISSUE AN ORDER FOR DEVICE REPAIR, REPLACEMENT, AND/OR REFUND: NOTICE OF OPPORTUNITY FOR A HEARING* (hereinafter "518(b) Notice). Available online at https://www.fda.gov/media/158129/download (last accessed Aug. 28, 2023).

21

and that in the case of genetic mutations in particular, 'a presumed lag time from exposure to harm development may make it difficult for patients to attribute their individual harm to the device.[25]

74.     The second hazard is the release of VOCs, that is, toxic and carcinogenic chemical emissions from the PE-PUR foam. Philips explained:

> **Potential Hazard:** Lab testing performed for and by Philips has also identified the presence of VOCs which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long-term adverse health effects.
>
> Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The compounds identified are the following:
>
> - Dimethyl Diazine
>
> - Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl).[26]

75.     In addition to these two compounds, Philips has also found high levels of formaldehyde, a known carcinogen, in analyses of the Recalled Devices. Collectively, these compounds released by PE-PUR foam—formaldehyde, toluene diamine, toluene diisocyanate, diethylene glycol, dimethyl diazine, and phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)— are referred to herein as the "Foam Toxins."

76.     Philips admitted that the risks of these VOCs include: "irritation and airway inflammation, and this may be particularly important for patients with underlying lung diseases or reduced cardiopulmonary reserve" and may lead to the following symptoms: "headache/dizziness,

---

[25] *Id.* at 5.

[26] Koninklijke Philips N.V. (Jun. 14, 2021). *Sleep and Respiratory Care update: Clinical information for physicians* (hereinafter "Jun. 14 Clinical Update"). Available online at https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf (last accessed Aug. 28, 2023).

22

irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects," as well as "adverse effects to other organs such as kidney and liver."[27]

77.    It is beyond reasonable dispute that patients using the Recalled Devices were exposed to harmful particulates and the toxic Foam Toxins. As detailed below, each of the Foam Toxins poses a serious health hazard to users of the Recalled Devices.

A.    Formaldehyde is a Known Carcinogen.

78.    Although Philips has not publicly acknowledged that formaldehyde is used in the manufacturing process for PE-PUR foam or is a byproduct of PE-PUR foam degradation, Philips' internal testing (dated May 22, 2019) reported the presence of formaldehyde in analyses of DreamStation 1 devices, finding "tolerable limits of the Formaldehyde compound were exceeded during initial operation, as well as at the [redacted]."[28]

79.    Formaldehyde has been classified as carcinogenic to humans (Group 1)[29] by the International Agency for Research on Cancer ("IARC") since 2006.[30] Governmental authorities in the United States have reached similar conclusions: the National Toxicology Program in the United State Department of Health and Human Services ("NTP") has classified formaldehyde as a known

---

[27] *Id.*

[28] *See* 483 Report at 6.

[29] The IARC, an agency of the World Health Organization, groups carcinogenic and potentially carcinogenic substances into five categories: Group 1, carcinogenic to humans; Group 2A, probably carcinogenic to humans; Group 2B, possibly carcinogenic to humans; Group 3, not classifiable as to its carcinogeneity to humans; and Group 4, probably not carcinogenic to humans. International Agency for Research on Cancer (last updated Jul. 1, 2022). *Agents Classified by the IARC Monographs, Volumes 1–129.* Available online at http://monographs.iarc.fr/ENG/Classification/index.php (last accessed Aug. 24, 2023). The EPA uses an equivalent grouping system of five categories (Groups A-E). See U.S. Environmental Protection Agency (last updated Nov. 21, 2022). *Risk Assessment for Carcinogenic Effects.* Available online at https://www.epa.gov/fera/risk-assessment-carcnogenic-effects (last accessed Aug. 28, 2023).

[30] International Agency for the Research on Cancer (last updated Jul. 1, 2022). *Formaldehyde,* IARC Monograph – 100F. Available online at https://monographs.iarc.who.int/wp-content/uploads/2018/06/mono100F-29.pdf (last accessed Aug. 28, 2023).

human carcinogen since 2011[36]; and the EPA has considered formaldehyde to be a probable human carcinogen (Group B1) since 1989.[31]

80.     There is extensive research, including dozens of human epidemiological studies, showing an association between formaldehyde exposure and numerous forms of cancer, including: nasopharyngeal cancer; sinonasal cancer; leukemia; lung cancer; lymphohematopoietic cancers (other than leukemia); nasal, oral, and throat cancers (other than nasopharyngeal and sinonasal cancers); brain cancer; hepatic cancer; esophageal cancer; thyroid cancer; and pancreatic cancer.[32] Additionally, exposure to formaldehyde appears to have a strong causal relationship to asthma.[33]

B.     Toluene Diisocyanate is a Likely Carcinogen.

81.     Toluene diisocyanates ("TDIs") are used primarily to manufacture flexible polyurethane foams such as PE-PUR foam. Philips has recognized that PE-PUR foam releases TDIs as it degrades.[34]

---

[31] U.S. Department of Health and Human Services, National Toxicology Program (Dec. 21, 2021). *Formaldehyde.* 15th Report on Carcinogens. Available online at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/formaldehyde.pdf. (last accessed Aug. 28, 2023).

[32] *See* National Cancer Institute (Jun. 10, 2011). *Formaldehyde and Cancer Risk.* Available online at https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/formaldehyde/formaldehyde-fact-sheet#r1 (last accessed Aug. 28, 2023).

[33] *See, e.g.,* U.S. Department of Health and Human Services, National Toxicology Program (Dec. 21, 2021). *Formaldehyde.* 15th Report on Carcinogens. Available online at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/formaldehyde.pdf (last accessed Aug. 28, 2023); U.S. Department of Labor, Occupational Health and Safety Administration (Mar. 14, 2001). *Appendix C to § 1910.1048 - Medical Surveillance – Formaldehyde.* Available online at https://www.osha.gov/laws-regs/regulations/standardnumber/1910/1910.1048AppC (last accessed Aug. 15, 2022).

[34] *See* Jul. 8 Update ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include … toluene diisocyanate isomers (TDI)").

82.     TDI is classified as possibly carcinogenic to humans (Group 2B) by IARC.[35] The U.S. Centers for Disease Control ("CDC"), Occupational Safety and Health Administration ("OSHA"), and National Institute for Occupational Safety and Health ("NIOSH") also regard TDI as a potential human carcinogen based on tumorigenic responses in TDI treated rats and mice.[36] The EPA has taken action under the Toxic Substances Control Act to allow oversight of the use of TDI in consumer products.[37] NTP classifies TDI as "reasonably anticipated to be a human carcinogen" based on sufficient evidence of carcinogenicity from studies in experimental animals.[38] The European Union warns that TDI "is fatal if inhaled."[39]

83.     Administration of TDI by stomach tube caused liver tumors (hepatocellular adenoma) in female rats and mice, benign tumors of the mammary gland (fibroadenoma) and pancreas (islet-cell adenoma) in female rats, and benign tumors of the pancreas (acinar-cell

---

[35] International Agency on Cancer Research (Dec. 21, 2022). *Toluene diisocyanates.* IARC Monographs Vol. 71. Available online at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c5a04f82cac60.pdf (last accessed Aug. 25, 2023).

[36] *See, e.g.,* U.S. Department of Health and Human Services, National Toxicology Program (Dec. 21, 2021). *Toluene diisocyanates.* 15th Report on Carcinogens. Available online at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/toluenediisocyanates.pdf (last accessed Aug. 28, 2023); U.S. Centers for Disease Control, National Institute for Occupational Safety and Health (Dec. 1989). *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.* Current Intelligence Bulletin 53: NIOSH Pub. No. 90-101. Available online at https://www.cdc.gov/niosh/docs/90-101/default.html (last accessed Aug. 15, 2022).

[37] U.S. Environmental Protection Agency (last updated Mar. 7, 2023). *Fact Sheet: Toluene Diisocyanate (TDI) and Related Compounds.* Available online at https://www.epa.gov/assessing-and-managing-chemicals-under-tsca/fact-sheet-toluene-diisocyanate-tdi-and-related#action (last accessed Aug. 28, 2023).

[38] U.S. Department of Health and Human Services, National Toxicology Program (Dec. 21, 2021). *Toluene diisocyanates.* 15th Report on Carcinogens. Available online at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/toluenediisocyanates.pdf (last accessed Aug. 28, 2023).

[39] European Chemicals Agency (n.d.). *Substance Infocard: m-tolylidene diisocyanate.* Available online at https://echa.europa.eu/substance-information/-/substanceinfo/100.043.369 (last accessed Aug. 28, 2023).

25

adenoma) in male rats. It also increased the combined incidences of benign and malignant tumors of subcutaneous tissue (fibroma and fibrosarcoma) in rats of both sexes and of the blood vessels (hemangioma and hemangiosarcoma) in female mice.[40] Exposure to TDI also has been documented to cause respiratory irritation, asthma, and lung damage.[41]

       C.    Toluene Diamine is a Likely Carcinogen.

       84.    Philips has recognized that PE-PUR foam releases toluene diamine ("TDA") as it degrades.[42] Additionally, TDA is a hydrolysis product of TDI.

       85.    IARC has classified TDA as possibly carcinogenic to humans (Group 2B),[43] and the EPA classifies it as a probable human carcinogen.[44] The European Union has concluded that TDA "cannot be considered safe for use" even as a hair dye, let alone breathed into the lungs for

---

[40] U.S. Department of Health and Human Services, National Toxicology Program (Dec. 21, 2021). *Toluene diisocyanates.* 15th Report on Carcinogens. Available online at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/toluenediisocyanates.pdf (last accessed Aug. 28, 2023).

[41] International Agency on Cancer Research (Dec. 21, 2022). *Toluene diisocyanates.* IARC Monographs Vol. 71. Available online at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c5a04f82cac60.pdf (last accessed Aug. 25, 2023).

[42] European Chemicals Agency (n.d.). *Substance Infocard: m-tolylidene diisocyanate.* Available online at https://echa.europa.eu/substance-information/-/substanceinfo/100.043.369 (last accessed Aug. 29, 2023).

[43] International Agency on Cancer Research (Dec. 21, 2022). Toluene diisocyanates. IARC Monographs Vol. 71. Available online at https://publications.iarc.fr/_publications/media/download/2317/fb198ec8e8f32d0a60294331930c5a04f82cac60.pdf (last accessed Aug. 28, 2023).

[44] U.S. Environmental Protection Agency (last updated Jan. 2000). Toluene-2, 4-Diamine. Available online at https://www.epa.gov/sites/default/files/2016-09/documents/toluene-2-4-diamine.pdf (last updated Aug. 28, 2023).

many hours each night.[45] The NTP classifies TDA as reasonably anticipated to be a human carcinogen based on animal studies.[46]

      86.    Available data on TDA primarily comes from animal studies. These studies strongly support an association between TDA and hepatic cancer.[47] There is evidence of a link between TDA exposure and pulmonary fibrosis based on in vitro studies in which human lung fibroblasts were exposed to TDI and TDA.[48] The EPA has determined that acute exposure to TDA can produce severe skin and eye irritation, sometimes leading to permanent blindness, respiratory problems (e.g., asthma), rise in blood pressure, dizziness, convulsions, fainting, and coma.[49] Exposure to TDA can also cause irritation of the skin, nose, and throat, damage to reproductive and neurological systems, eye irritation, dermatitis, ataxia, tachycardia, respiratory depression,

---

[45] European Commission, Health and Sciences Committees (Sep. 18, 2012). *OPINION ON Toluene-2,5-diamine and its sulfate.* Available online at https://ec.europa.eu/health/scientific_committees/consumer_safety/docs/sccs_o_093.pdf (last accessed Aug. 28, 2023).

[46] U.S. Department of Health and Human Services, National Toxicology Program (Dec. 21, 2021). 2,4-Diaminotoluene. 15th Report on Carcinogens. Available online at https://ntp.niehs.nih.gov/ntp/roc/content/profiles/diaminotoluene.pdf (last accessed Aug. 28, 2023).

[47] *Id.*

[48] It is well established that TDI is converted to TDA through hydrolysis (a reaction caused by exposure to water). See U.S. Centers for Disease Control, National Institute for Occupational Safety and Health (Dec. 1989). *Toluene Diisocyanate (TDI) and Toluenediamine (TDA): Evidence of Carcinogenicity.* Current Intelligence Bulletin 53, NIOSH Pub. No. 90-101. Available online at https://www.cdc.gov/niosh/docs/90-101/default.html (accessed Aug. 28, 2023). Thus, ingested TDI may react with saliva and/or gastrointestinal fluids and convert to TDA. Additionally, there is evidence that inhaled TDI is converted into TDA by reaction with a substance (gluthathione) present in the lungs. As a result, observed effects ascribed to TDI may be due to unmeasured conversion to TDA after exposure.

[49] *Id.*

27

stomach gas, hypertension, nausea, vomiting, methemoglobinemia, cyanosis, headache, weakness, exhaustion, dizziness, convulsions, fainting, and coma.[50]

     D.     Diethylene Glycol is Toxic to Humans.

     87.     Diethylene glycol ("DEG") is a widely used solvent. It is a colorless and odorless liquid with a sweetish taste and has often been a contaminant in consumer products, resulting in numerous epidemics of poisoning. DEG is used in the production of polyester polyurethane foam, and Philips has advised that DEG is a byproduct of PE-PUR foam degradation.[51]

     88.     DEG has an historical involvement in mass poisonings around the world. Famously, DEG caused the death of 100 people across 15 states in the 1937 Elixir Sulfanilamide Incident, which served as a catalyst for the enactment of the Federal Food, Drug, and Cosmetic Act ("FDCA") in 1938.[52]

     89.     DEG is a toxic substance with a mean fatal dose of 1 mL/kg of pure DEG.[53] Ingesting only a small amount may result in gastrointestinal distress and stupor.[54] Exposure may

---

[50] U.S. Environmental Protection Agency (last updated Jan. 2000). *Toluene-2, 4-Diamine.* Available online at https://www.epa.gov/sites/default/files/2016-09/documents/toluene-2-4-diamine.pdf (last updated Aug. 28, 2023).

[51] *See* Jul. 8 Update ("[T]he degradative by-products of a PE-PUR foam after a humid ageing experiment were found to include diethylene glycol (DEG) … .").

[52] U.S. Food and Drug Administration (Jul. 1981). *Sulfanilamide Disaster.* FDA Consumer Magazine. Available online at https://www.fda.gov/files/about%20fda/published/The-Sulfanilamide-Disaster.pdf (last accessed Aug. 28, 2023).

[53] L.J. Schep, et al. (Jul.2009). *Diethylene glycol poisoning.* Clinical Toxicology 47(6):525-35.

[54] U.S. Centers for Disease Control and Prevention, National Institute for Occupational Safety and Health (last updated Oct. 20, 2021). *Ethylene Glycol: Systemic Agent.* Available online at https://www.cdc.gov/niosh/ershdb/emergencyresponsecard_29750031.html#:%7E:text=Agent%20Characteristics&text=DESCRIPTION%3A%20Ethylene%20glycol%20is%20a,also%20be%20a%20pharmaceutical%20vehicle (last accessed Aug. 28, 2023).

28

cause irritation of the eyes, skin, and mucous membranes.[55] DEG has also been shown to have damaging toxic, irritating, and inflammatory properties when inhaled.[56]

      E.      Dimethyl Diazine is a Precursor to a Known Carcinogen.

      90.      Dimethyl diazene ("DD"), also known as azomethane, is "associated with the production process of the [PE-PUR] foam."[57] Philips has admitted that DD is emitted from PE-PUR foam under normal conditions and possibly also as the result of degradation.[58]

      91.      IARC has not yet evaluated the potential carcinogenicity of DD to humans, as there is scant data concerning the effects of DD on humans and animals. However, DD is a member of a family of carcinogenic substances: 1,2-dimethylhydrazine (a Group 2A probable human carcinogen that exhibits hepatotoxic effects along with injuries to other organs in animal experiments[59]) dehydrogenates into DD, which then oxidizes into azoxymethane (a known carcinogen that has not yet been classified by the EPA or IARC). Azoxymethane further oxidizes into methylazoxymethanol, a Group 2B possible human carcinogen.[60] Both methylazoxymethanol

---

[55] *Id.*

[56] *See, e.g.,* C.J. Hardy, et al. (Aug. 1997). *Twenty-eight-day repeated-dose inhalation exposure of rats to diethylene glycol monoethyl ether.* Fundamental Applied Toxicology 38(2):143-47.

[57] *See* Jul. 8 Update (finding that during "testing which ran a device at 35°C ± 2°C for 168 hours, two compounds of concern were emitted from the device: dimethyl diazene and phenol 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)").

[58] *Id.*

[59] G. Choudary (1997). *Toxicological Profile for Hydrazines.* Agency for Toxic Substances and Disease Registry; R.B. Wilson (1976). *Species variation in response to dimethylhydrazine.* Toxicology and Applied Pharmacology, 38:3; M.A. Bedell, et al. (1982). *Cell Specificity in Hepatocarcinogenesis: Preferential Accumulation of O6 Methylguanine in Target Cell DNA during Continuous Exposure of Rats to 1,2-Dimethylhydrazine.* Cancer Res 42:3079-3083; W.J. Visek, et al. (1991). *Dietary protein and chronic toxicity of 1,2-dimethylhydrazine fed to mice.* Journal of Toxicology and Environmental Health, 32:4, 383-413.

[60] E. Fiala (Dec. 1975) *Investigations into the metabolism and mode of action of the colon carcinogen 1, 2-dimethylhydrazine.* Cancer, 36:2407-12; S. Wolter, N. Frank (1982). *Metabolism of 1,2-dimethylhydrazine in isolated perfused rat liver.* Chemico-Biological Interactions, 42:3, 335-344; International Agency on Cancer Research (1987). *IARC Monograph – 71-42*; International Agency on Cancer Research (1987). *IARC Monograph Supplement 7*; H. Druckrey

and 1,2-dimethylhydrazine have been found to metabolize into formaldehyde, a Group 1 known carcinogen.[61] Thus, an individual regularly exposed to DD may also have been exposed to 1,2-dimethylhydrazine, azoxymethane, methylazoxymethanol, and/or formaldehyde—each of which is recognized as a known or probable carcinogen—as these compounds are oxidized and metabolized.

92.     DD is clearly linked to colorectal cancer in mice. Azoxymethane, the product of oxidized DD, is used to induce colorectal cancer in animals and has been shown to cause hepatic lesions, intestinal tumors, and renal tumors.[62] Oxidized azoxymethane produces methylazoxymethanol, which is known to cause DNA damage and has been associated with amyotropic lateral sclerosis, parkinsonism, dementia, colon cancer, liver cancer, and prostate cancer.[63] Exposure to DD—as the precursor to these carcinogenic compounds—means exposure to these other compounds and the health risks they pose.

F.     Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl) is a Toxic Compound.

93.     The substance Phenol, 2,6-bis(1,1-dimethylethyl)-4-(1-methylpropyl) ("DTBSBP") is "associated with the production process of the foam."[64] According to Philips,

---

(1970). *Production of colonic carcinomas by 1,2-dialkylhydrazines and azoxyalkanes. Carcinoma of the Colon and Antecedent Epithelium 267-279.*
[61] P. Harbach, et al. (1981) *Effects of selenium on 1,2-dimethylshydrazine metabolism and DNA alkylation*; S.N. Newaz, et al. (1983). *Metabolism of the Carcinogen 1,2Dimethylhydrazine by Isolated Human Colon Microsomes and Human Colon Tumor Cells in Culture*; J. Erikson, et al. (1986). *Oxidative Metabolism of Some Hydrazine Derivatives by Rat Liver and Lung Tissue Fractions.*
[62] M. Kobaek-Larsen, et al. (Jun. 2004) *Secondary effects induced by the colon carcinogen azoxymethane in BDIX rats.* APMIS 112(6):319-29.
[63] P. Spencer, et al. (2012). *Unraveling 50-Year-Old Clues Linking Neurodegeneration and Cancer to Cycad Toxins: Are microRNAs Common Mediators?.* Frontiers in Genetics 3.
[64] See July 8 Update (finding that during "testing which ran a device at 35°C ± 2°C for 168 hours, two compounds of concern were emitted from the device: dimethyl diazene and phenol 2,6-bis (1,1-dimethylethyl)-4-(1-methylpropyl)").

30

DTBSBP is emitted from PE-PUR foam under normal conditions and possibly also as the result of degradation.[65]

94.     In 2010, the Canadian government determined that DTBSBP was a Schedule 1 toxic substance under the Canadian Environmental Protection Act "based on available information regarding possible persistence, accumulation in organisms and potential to cause harm to organisms."[66] These findings prompted Canadian regulators to propose "virtual elimination" of DTBSBP.[67]

IV.     PHILIPS KNEW OF THE DANGERS OF PE-PUR FOAM FOR MANY YEARS PRIOR TO THE RECALL.

95.     At the time it installed PE-PUR foam into the Recalled Devices, Philips was required to test the devices in accordance with ISO 18562-2:2017 and ISO 18562-3:2017.

96.     At that time, Philips should have known the PE-PUR foam posed a safety risk to users.

97.     The FDA concluded after an investigation of Philips' Recalled Devices that beginning in at least 2008, and over time, Philips received hundreds of thousands of customer complaints regarding foam degradation in the Recalled Devices and, years later, received data from a variety of sources confirming foam degradation.

98.     The FDA's findings were based, in part, on twenty-one (21) site inspections of Philips' Murrysville, Pennsylvania facility between August 26, 2021 and November 9, 2021. The lead FDA investigator, Katelyn A. Staub-Zamperini, memorialized the agency's findings in a 28-

---

[65] *Id.*
[66] Government of Canada (last modified Oct. 31, 2022). Phenol, 2,6-bis(1,1-dimethylethyl)-4-(1-methylpropyl)- (DTBSBP). Available online at https://www.canada.ca/en/health-canada/services/chemical-substances/challenge/batch-8/1-methylpropyl.html (last accessed Aug. 28, 2023).
[67] *Id.*

31

page FDA-483 Report issued on November 9, 2021.[68] The FDA delivered the 483 Report to Rodney Mell, Head of Quality and Regulatory at Philips Respironics, on or around November 9, 2021.[69]

99.     A 483 Report "is issued to firm management at the conclusion of an inspection when an investigator(s) has observed any conditions that in their judgment may constitute violations of the Food Drug and Cosmetic (FD&C) Act and related Acts."[70] These observations are made in a 483 Report "when in the investigator's judgment, conditions or practices observed would indicate that any food, drug, device or cosmetic has been . . . or is being prepared, packed, or held under conditions whereby it may become adulterated or rendered injurious to health."[71]

100.     In connection with its investigation for its 483 Report, the FDA learned that Philips received hundreds of thousands of complaints from customers about degradation of the foam in its Recalled Devices beginning at least as early as 2008:

> [A] query of your firm's consumer complaints from 01/01/2008 to current, for the keywords contaminants, particles, foam, debris, airway, particulate, airpath, and black, **resulted in over 222,000 complaints, and over 20,000 of which occurred between 2008 to 2017 and involved Trilogy devices.** Additionally, your firm performed a foam related complaint data analysis in April 2021 on complaints confirmed to be related to or involve foam degradation issues. The raw complaint data documents that **30 Trilogy related complaints were received from 2014 to 2017, and 1,254 related complaints were received across all products containing the affected foam, from 2014 to 2021.**[72]

---

[68] *See* 483 Report.
[69] *Id.* at 1, 28.
[70] U.S. Food and Drug Administration (last updated Jan. 9, 2020). *FDA Form 483 Frequently Asked Questions.* Available online at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-references/fda-form-483-frequently-asked-questions (last accessed Aug. 28, 2023).
[71] *Id.*
[72] 483 Report at 12 (emphasis added).

32

101.    Yet, "[n]o formal investigation, risk analysis, or CAPA were initiated, performed, or documented [by or on behalf of Philips], in response to the at least 222,000 complaints that could potentially be related to foam degradation and received from 2008 to 2017 . . . ."[73]

102.    A Corrective and Preventative Action ("CAPA") refers to procedures that medical device manufactures must follow to identify and attempt to correct a quality problem after one is detected. See 21 C.F.R. § 820.100. A CAPA is designed "to collect information, analyze information, identify and investigate product and quality problems, and take appropriate and effective corrective and/or preventive action to prevent their recurrence."[74]

103.    The FDA also found that Philips "was made aware of polyester polyurethane [PE-PUR] foam degradation issues in/around October 2015 . . . ."[75]

104.    In fact, an adverse event report from the FDA Manufacturer and User Facility Device Experience ("MAUDE") database shows that, as early as 2011, Philips knew that a patient discovered "black dust" on her nose when she awoke after using a Philips RemStar CPAP device and subsequently underwent treatment for "intoxication" and "chest tightness."[76]

105.    Philips investigated this report and confirmed that the device contained "evidence of an unk[nown] black substance in the air path and on internal components . . . present throughout both the intake and exhaust portions of the air path . . . ."[77]

---

[73] *Id.* at 16.
[74] U.S. Food and Drug Administration (last updated Mar. 28, 2023). *Corrective and Preventive Actions (CAPA).* Available online at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection-guides/corrective-and-preventive-actions-capa (last accessed Aug. 28, 2023).
[75] 483 Report at 18.
[76] U.S. Food and Drug Administration. *MAUDE Adverse Event Report: RESPIRONICS, INC. REMSTAR PRO INTERNATIONAL.* Retrieved online from http://www.fdable.com/advanced_maude_query/324fd08a137ce36c2d5faf453ee26f2f (last accessed Aug. 28, 2022).
[77] *Id.*

106.    The FDA found that Philips' analysis of consumer complaints was itself defective in that it "was not adequately performed to identify or detect quality problems."[78] The FDA concluded that "potential foam degradation in Trilogy ventilator devices is not an isolated incident, and you [Philips] also have not documented a detailed rationale for why harm is not likely to occur again, as required by your Health Hazard Evaluation's instructions."[79] In light of this, the FDA concluded that Philips' "risk analysis is inadequate or was not performed when appropriate or within an appropriate time frame of your firm becoming aware" of these issues.[80]

107.    The FDA has concluded that:

> Beginning in 2015, Philips received data from a variety of sources regarding degradation of the PE-PUR foam contained within the recalled devices, including complaints, test reports, information from suppliers, and information from another entity owned by Philips' parent company. Philips failed to adequately evaluate this data and incorporate it into its CAPA [Corrective and Preventive Actions] system for further investigation and potential mitigation, as required by current good manufacturing practice requirements codified in 21 C.F.R. § 820.100.[81]

108.    The FDA 483 Report also noted, that "an incorrect and non-specified polyester polyurethane, raw foam product, sourced from your [Philips'] raw foam supplier resulted in non-conforming Trilogy Evo ventilatory finished devices being approved, released, and distributed which further resulted in the ongoing correction and removal."[82] The correction and removal "were established as part of [Philips'] response to failed VOC and ISO 18562 testing of related Trilogy EVO ventilatory medical devices, which resulted from the presence of the non-specified polyester polyurethane foam component, incorrectly supplied by [Philips'] raw foam supplier."[83]

---

[78] 483 Report at 16.
[79] *Id.* at 13.
[80] *Id.* at 3.
[81] 518(b) Notice, at 6.
[82] 483 Report at 25.
[83] *Id.*

*Sandra Kurt, Summit County Clerk of Courts*

109.    On May 2, 2022, the FDA issued a formal notice to Philips pursuant to Section 518(b) of the FDCA, 21 U.S.C. § 360h(b) (the "518(b) Notice").[84] The 518(b) Notice stated that the FDA's "Center for Devices and Radiological Health (CDRH) is proposing that an order should be issued pursuant to section 518(b)" of the FDCA "to require Philips to submit a plan for the repair, replacement, and/or refund of the purchase price of devices subject to the recall that were manufactured after November 2015, sufficient to assure that the unreasonable risk of substantial harm to the public health presented by those devices will be eliminated."[85] This notice was directed to Thomas J. Fallon, Head of Quality, Sleep and Respiratory Care, for Philips Respironics, Inc.

110.    The 518(b) Notice stated that "there is sufficient evidence for FDA to determine that the devices subject to the recall present an unreasonable risk of substantial harm to the public health" and "that there are reasonable grounds to believe that the recalled devices that Philips manufactured after November 2015 were not properly manufactured with reference to the state of the art as it existed at the time of the devices' manufacture."[86]

111.    The FDA concluded that "patients and providers cannot readily mitigate the unreasonable risk associated with the recalled devices[.]"[87]

112.    The FDA also concluded that "[t]his risk is not the unavoidable byproduct of current ventilator, CPAP machine, and BiPAP machine technologies. Indeed, Philips and its competitors market ventilators, CPAP machines, and BiPAP machines that do not use PE-PUR foam."[88]

---

[84] 518(b) Notice.
[85] 518(b) Notice at 1.
[86] *Id.* at 2.
[87] *Id.*
[88] *Id.*

35

    A.    In 2015, Philips Communicated with its Foam Suppliers About the problem of PE-PUR Foam Degradation.

113.    The PE-PUR foam that Philips used in its Recalled Devices was manufactured by Defendant William T. Burnett & Co. ("Burnett"), a bulk foam manufacturer. Burnett produces foam in sheets that are between approximately four feet to more than six feet wide and may be as long as one hundred or two hundred feet.

114.    Burnett sells its bulk foam to intermediaries, including PolyTech and The SoundCoat Company ("SoundCoat"). PolyTech and SoundCoat then sell the foam to Philips, either directly or through another intermediary, such as Paramount Die Corporation, which may modify the foam.

115.    According to the FDA, "email correspondence between [Philips] and its raw foam supplier [PolyTech] beginning 10/30/2015 and forward, document that [Philips] was made aware of polyester polyurethane [PE-PUR] foam degradation issues in/around October 2015, which was later confirmed by [Philips'] foam supplier on 08/05/2016, via email."[89]

116.    On August 5, 2016, Bob Marsh, a PolyTech employee, wrote to Lee Lawler,[90] an employee of Burnett, referencing a concern expressed by one of its customers [Philips] in the Fall of 2015 regarding foam degradation in its medical devices.[91] Mr. Marsh stated: "They [Philips] are asking again, and wondered if we could give them any estimate on lifespan of the foam when exposed to 40°C and high humidity."[92] Mr. Lawler responded that, under those conditions, he "would not be surprised if ester foam . . . would exhibit signs of hydrolysis in as short a time as a

---

[89] 483 Report at 18.
[90] *See* Apr. 1, 2022 Affidavit of Lee F. Lawler, who is the Research & Development Manager at Burnett filed in the Philips Recalled CPAP Litigation, at ECF No. 589-1)
[91] *See* August 5, 2016 e-mail exchange between Lawler and Bob Marsh, who is employed by Defendant Polymer Technologies, Inc. (filed in the Philips Recalled CPAP Litigation, ECF No. 589-7) at WTB 00056).
[92] *Id.*

year."[93] He added that "that is not a good environment for polyester foam. Polyether foam could last years in that environment."[94] Presumably referring to Philips, Mr. Marsh responded that he would "let them know they'd be better off with the ether."[95]

117.    Knowing about these issues with the PE-PUR foam, Philips tested the foam material used in its Recalled Devices. According to the FDA, "this testing spoke only to the limited finding that in the case of the [redacted] foam samples 'returned from service in a Pacific rim location,' spectroscopy results were 'consistent with an environmental/chemical exposure causing base polymer cleavage and embrittlement of the material.'"[96] Nonetheless, based on the results of this limited testing, Philips concluded that no escalation to a CAPA process was required.[97]

118.    According to the FDA, "no further investigation, health hazard evaluation, risk analysis, or design review was performed or documented by Philips at that time . . . and no preventative maintenance procedures were implemented[,]" other than a limited "preventative maintenance procedure" instituted by a Philips "entity owned by the parent company of Philips Respironics . . . to replace the air intake assembly of Trilogy ventilator products, due to complaints that had been received regarding degradation of the PE-PUR foam contained in the products."[98] And even then, "Philips did not verify the effectiveness of this measure."[99]

119.    As Philips continued to ask its supplier about the properties of the PE-PUR foam and encountered more warning signs, it continued to put that foam in medical devices that millions of its customers were breathing through daily.

---

[93] *Id.*
[94] *Id.*
[95] *Id.*
[96] 518(b) Notice at 7.
[97] *Id.*
[98] *Id.* at 6-7
[99] *Id.* at 8.

120.    Testing conducted for Philips in 2016 confirmed that Mr. Lawler from Burnett was correct. According to the FDA, this testing "determined that the PE-PUR foam was susceptible to degradation, resulting in the conclusion at that time that 'polyester urethanes show bad resistance against high humidity in combination with high temperature.'"[100] Additional testing "determined that, compared to PE-PUR foam, another type of foam, polyether urethane, 'show[s] a far better resistance against high humidity at high temperature.'"[101]

121. The 483 Report identified "at least fourteen instances, assessments, and/or test reports, dated from 04/01/2016 to 01/22/2021, where [Philips] was aware of issues and concerns related to potential foam degradation and/or Volatile Organic Compound (VOC) emissions, with various Sleep and Respiratory care devices."[102] It listed the specific analyses and tests, including one which concluded that "contrary to polyester urethane foams, [redacted] foams shows a far better resistance against high humidity at high temperature."[103]

122.    Philips received at least 110 complaints confirmed to be related to foam degradation between 2014 and 2017.[104] Approximately 80 of these complaints concerned CPAP and BiPAP devices.[105]

123.    Nonetheless, Philips continued manufacturing and selling the now Recalled Devices containing PE-PUR foam and failed to warn prescribing physicians, durable medical equipment companies and the patient consumers of this problem.

---

[100] *Id.* at 7-8.
[101] *Id.* at 8.
[102] 483 Report at 3.
[103] *Id.* at 4.
[104] 518(b) Notice at 7.
[105] *Id.* at 8.

     B.     Philips Opened an Internal Investigation into Foam Degradation in Mid-2018 that Confirmed PE-PUR Foam is Prone yo Degradation.

124.     In April 2018, Philips opened a precursor to a formal CAPA, referred to by Philips as a CAPA INV 0988, "to investigate complaints related to potential foam degradation for the Trilogy devices in Australia and to determine what actions should be taken."[106] Philips reported that "[u]nits were returned from the field where the Trilogy Removable Air Path Foam [redacted] and the foam in the Inlet Air Path Assembly [redacted] was degrading, and getting into the motor/air path, causing at least 1 Trilogy unit to fail."[107]

125.     On April 20, 2018, Vincent Testa, a Project Mechanical Engineer at Philips, emailed Bonnie Peterson, a Project Manager at PolyTech. Mr. Testa stated, "We use the PAFS foam in the air path of our Trilogy family of ventilators as a means for noise reduction . . . ."[108]

126     PAFS foam is PolyTech's open cell, flexible acoustical grade PE-PUR foam.115 Mr. Testa at Philips continued: "Recently weve [sic] received a few complaints from our customers that the foam is disintegrating . . . . The material sheds and is pulled into the ventilator air path. As you can imagine, this is not a good situation for our users."116 Mr. Testa asked, "what could cause this material to break down."[109]

127.     On April 23, 2018, Mr. Marsh from PolyTech forwarded Philips' April 20, 2018 email to Mr. Lawler from Burnett, reporting that "[t]he customer [Philips] is finding degradation of the ester foam and the urethane film in their device, such that particles are breaking off and flowing in the airstream."[110]

---

[106] *Id.*

[107] 483 Report at 14.

[108] *See* Email from Vincent Testa at Philips to Bonnie Peterson at PolyTech (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000070.

[109] *Id.*

[110] *See* April 23, 2018 email from Bob Marsh to Lee Lawler (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000069-000070.

128.    On May 2, 2018, Mr. Marsh added in an email to Mr. Lawler that "Philips gave us another bit of information. They tested ether vs ester in high heat and humidity and found ether to be the better performer. It validated what we (you) had conveyed."[111] Mr. Marsh asked whether exposure to oxygen, higher temperature, and higher humidity could accelerate deterioration of PE-PUR foam.[112]

129.    Mr. Lawler responded that he did "not believe that exposure to oxygen will cause any significant damage to polyurethane foam unless elevated temperature and/or humidity is also present."[113]

130.    On May 3, 2018, Mr. Testa from Philips admitted in a follow-up email to Mr. Marsh from PolyTech, that:

> We [Philips] are evaluating our options regarding the foam. We could switch to the PAF [ether-based foam], or we could indicate a preventative maintenance cycle in which they would replace the PAFS [ester-based] foam pieces. . . . The environmental conditions for our device are a maximum of 40C and 95% R.H. Note the difference in temperature.[114]

131.    Mr. Testa at Philips asked Mr. Marsh from PolyTech the following:

1.    Please ask your foam supplier to calculate the service life based on this higher temperature (40C vs. 27C).

    a.    It would also be useful if they could provide a graph depicting failure over time. For example, if tensile strength reduced over time, they would plot strength vs. time.

---

[111] *See* May 2, 2018 email from Bob Marsh to Lee Lawler (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000069.

[112] *Id.*

[113] *See* May 2, 2018 email from Bob Marsh to Lee Lawler (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000069.

[114] *See* May 3, 2018 email from Vincent Testa to Bob Marsh (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000068-69).

2.      At the end of the service life, what is the failure mode of this material?[115]

132.    Mr. Marsh again forwarded these questions to Mr. Lawler at Burnett, who responded:

> I am unable to answer Question Number 1. We would not recommend using **polyester** foam in such an environment and have no direct data to use to calculate the rate of hydrolysis. **Polyether** foam lifetime would not be expected to reduce significantly at the stated conditions. Use with pure oxygen could shorten the lifetime some by promoting more rapid oxidation. I do not know the extent of the reduction, but do not expect it to be overly significant.
>
> Polyester foam will lose tensile strength and overall integrity as it hydrolyzes. It will eventually decompose to a sticky powder. That will happen very rapidly at 40C, 95% R.H.[116]

133.    Mr. Lawler from Burnett added: "Is it one of our data sheets that states foam lifetime being 10 years at 95% R.H? I do not think I have seen a sheet with that statement."[117] Mr. Marsh at PolyTech responded that he would pass along the information to Philips and that "[w]e have no idea where that statement came from. It has been on our data sheets for probably 20 years. We are removing it."[118]

134.    On May 23, 2018, Mr. Marsh from PolyTech forwarded to Mr. Lawler from Burnett another question from Mr. Testa at Philips about the degradation of the foam it was using in its

---

[115] *Id.*

[116] *See* May 4, 2018 email from Lee Lawler to Bob Marsh (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000067-68 (emphasis in original).

[117] *Id.* at WTB 00068.

[118] *See* May 4, 2018 email from Bob Marsh at PolyTech to Lee Lawler at Burnett (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000067. Notably, PolyTech still advertises on its website that PE-PUR foam is resistant to heat and humidity. *See* Polymer Technologies, Inc. (n.d.). *Acoustic Foam for Sound Absorption.* Available online at https://www.polytechinc.com/products/polymer-acoustic-foam (last accessed Aug. 29, 2022) ("Ester foams have superior physical properties and offer excellent resistance to heat, moisture, and chemicals.").

41

Recalled Devices.[119] Mr. Testa explained that Philips had "sent samples to a local lab for analysis."[120] The local lab concluded that the degradation was a result of cleavage of the bonds in the base polymer, and Mr. Testa stated that "[f]urther investigation concluded that prolonged exposure to high humidity causes the foam to degrade."[121] Mr. Testa noted that "[a]s the foam degrades it breaks down into small particulate" and asked whether the foam "maintain[s] its UL 94 Flame Resistance rating if it is broken down into particulate?"[122]

135.    Mr. Lawler replied: "I am sure the degraded foam will not perform well in UL94 testing, though I cannot imagine how one would actually perform the test on such degraded material."[123]

136.    On June 7, 2018, Mr. Testa at Philips again emailed Mr. Marsh at PolyTech:

> As we continue our investigation of the deterioration of the PAFS foam, a few questions has [sic] been posed regarding the material. Can you please reach out to your foam supplier regarding the following.
>
> 1.    What is the actual composition of the polyurethane-ester foam PAFS-038? (CAS #s/percentages/weight percent/reactive groups etc. any chemistry is very appreciated)
>
> 2.    What kind of diisocynate is used in the polyurethane foam synthesis process and how much?
>
> 3.    Is diethylene glycol or another polyol utilized in the foam synthesis process?

---

[119] *See* May 23, 2018 email from Bob Marsh to Lee Lawler (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000066-67.
[120] Id. at WTB 00066.
[121] *Id.* at WTB 00067.
[122] *Id.*
[123] *See* May 2, 2018 email from Lee Lawler to Bob Marsh (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000066.

> 4.  Have you tested to see if all diisocyanate groups are reacted in your foam or are there unreacted groups even after manufacturing?[124]

137.    Mr. Marsh (PolyTech) forwarded the questions to Mr. Lawler (Burnett), who asked why Mr. Testa (Philips) needed this information. Mr. Marsh did not provide a definitive answer but said, "What Vince [Testa] told us is that they are investigating alternatives to polyurethane foam (ester and ether)."[125]

138.    Mr. Lawler ultimately did not answer Mr. Testa's questions because they touched on Burnett's confidential, proprietary information.

139.    On June 20, 2018, Philips closed CAPA INV 0988.[126] According to the FDA, Philips implemented "a preventative maintenance procedure for Trilogy devices, but Philips did not verify the effectiveness of this measure."[127] Yet "after CAPA INV 0988, Philips modified its CAPA procedures to include 'requirements to help ensure that CAPAs are fully complete [and] appropriately scoped,' and that 'processing the issue [that was the subject of CAPA INV 0988] through the current CAPA program would have result[ed] in an appropriate horizontal assessment.'"[128]

140.    The FDA pointed out that Philips' informal CAPA INV[129] related to these Trilogy devices did "not include, investigate, or examine all of [Philip's] CPAP and BiPAP medical devices, which also include similar air path assemblies and/or the affected polyester polyurethane

---

[124] *See* June 7, 2018 email from Vincent Testa to Bob Marsh (the Philips Recalled CPAP Litigation, ECF No. 589-11) at WTB 000076-77.
[125] *See* June 14, 2018 email from Bob Marsh to Lee Lawler (the Philips Recalled CPAP Litigation, ECF No. 589-10) at WTB 000075.
[126] 483 Report at 15
[127] 518(b) Notice at 8.
[128] *Id.*
[129] The 483 Report explained that Philips's practice at the time was to first open CAPA requests—called "CAPA INVs"—as a precursor to a formal CAPA, but this could only occur if approved by a "CAPA Review Board" or delegate. *See* 483 Report at 14-15.

[PE-PUR] foam, which is susceptible to degradation."[130] But Philips had acknowledged to the FDA that it had "received approximately eighty complaints related to foam degradation, **on non-Trilogy ventilator devices,** from 2014 to 2017."[131]

141.    The FDA concluded that Philips had not "adequately established" procedures for initiating CAPA procedures.[132] Specifically, the FDA faulted Philips for not initiating a "formal" CAPA after receiving "various complaints alleging foam degradation in Trilogy ventilator devices" and then closing its informal investigation just two months later without "verify[ing] the effectiveness" of the limited "preventative maintenance procedure for Trilogy devices."[133]

142.    Philips continued to receive more information suggesting that the PE-PUR foam was prone to degradation. According to the FDA, "[a] follow-up email amongst [Philips'] personnel, dated 08/24/2018, states that testing confirmed that the affected foam breaks down in high heat and high humidity environments, which concurred with Trilogy ventilator related complaints . . . ."[134]

143.    Further, "[o]n December 12, 2018, several months after CAPA INV 0988 was closed, a report from additional testing conducted for Philips found that '[p]olyester polyurethane foam showed clear disintegration after 2 weeks."[135]

144.    Nonetheless, Philips continued manufacturing and selling the Recalled Devices containing PE-PUR foam.

---

[130] *Id.* at 15.
[131] *Id.* at 16 (emphasis added).
[132] *Id.* at 14.
[133] .518(b) Notice at 8
[134] 483 Report at 18.
[135] 518(b) Notice at 8.

44

145.   Philips failed to apprise the FDA of the facts and problems it learned from its foam suppliers about premature foam degradation risks.

146.   Philips failed to apprise the FDA of consumer, medical provider and durable medical equipment company reports of the presence of foam particles and other device failures.

C.   Philips Finally Opened a Formal CAPA in 2019 – But Did Not Initiate a Recall for Two More Years.

147.   In April 2019, Philips received two complaints that "sound abatement foam 'is degrading and entering the air path[.]'"[136]

148.   In response, in June 2019, Philips finally initiated a formal CAPA, numbered CAPA 7211, related to the issues associated with the PE-PUR foam. But as the FDA explains:

> Even then, that CAPA failed to evaluate all relevant data. Philips' search of FDA's Manufacturer and User Facility Device Experience (MAUDE) database in connection with CAPA 7211 identified only three medical device reports (MDRs) associated with potential foam degradation involving Trilogy ventilators between January 2011 and January 2021. Yet an MDR analysis conducted by Philips in 2018 had already identified 17 documented complaints related to foam degradation in Trilogy ventilators, and at least 14 of those 17 complaints had related MDRs. Similarly, Philips' analysis of foam degradation-related complaints conducted in connection with CAPA 7211 identified 1,254 complaints confirmed to be related to foam degradation between 2014 and April 2021 across all affected products, yet this analysis failed to include several complaints confirmed to be related to foam degradation in Trilogy ventilators that were documented in 2018 in connection with CAPA INV 0988.[137]

149.   Philips continued to test the PE-PUR foam while the CAPA was underway. A Biological Risk Assessment dated July 2, 2020, found that "the biological and toxicological risks from exposure to degraded PE-PUR foam are of concern…."[138]

---

[136] *Id.*
[137] *Id.* at 8-9.
[138] 483 Report at 7; *see also id.* ("Philips Respironics Inc. (PRI) was made aware in May 2019 that four CPAP units were returned to a service center with degraded sound abatement foam.").

45

150.    Another internal "Biological Risk Assessment" dated December 10, 2020 – and "conducted as a result of field reports/complaints regarding degraded sound abatement foam in various CPAP and ventilator products"[139] – described the risks that degraded polyurethane foam posed to humans in no uncertain terms:

> The cytotoxicity and positive genotoxicity results observed from degraded PE-PUR foam samples indicate a potential patient risk. Potential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure. Overall, based on an understanding of the toxicological significance of the foam degradants and the results of the ISO 10993 testing to include mutagenic responses in both a bacterial and mammalian system, the degraded PE-PUR foam is not considered biocompatible and presents a significant biological risk to those patient populations who are exposed to degraded PE-PUR foam.[140]

151.    An additional Philips' Biocompatibility Risk Assessment dated January 11, 2021, concurred that degraded PE-PUR foam "presents a significant biological risk to patients," and goes on to state that "[p]otential cytotoxicity and genotoxicity leading to carcinogenicity are possible outcomes from degraded PE-PUR foam exposure."[141]

152.    Ultimately, in CAPA 7211, Philips concluded that "the cause of the foam degradation condition is long-term exposure to environmental conditions of high temperature combined with high humidity" and restated that "the cause of degradation was due to chemical breakdown of the foam due to exposure to water caused by long-term exposure to environmental conditions."[142]

153.    Based on its investigation, the FDA concluded that Philips' upper management was aware of the foam degradation issues, discussed it at numerous management review meetings, and yet delayed doing anything about it:

---

[139] *Id.* at 8.
[140] *Id.* at 7-8 (emphasis added).
[141] *Id.* at 8.
[142] 518(b) Notice at 10.

46

> [F]irm management, including management with executive responsibility, were aware of potential foam degradation issues concerning CPAPs, BiPAPs, and Trilogy ventilators since at least 01/31/2020, or earlier, and implemented no further corrective actions until April 2021.
>
> Polyester polyurethane foam degradation issues concerning CPAPs, BiPAPs, and Trilogy Ventilators were discussed at all [redacted] management review meetings, since the 2019 [redacted], dated 01/31/2020 . . . . Additionally, your firm [Philips] became aware of this issue and related field complaints in at least 2015 or earlier.[143]

V.    PHILIPS CONSISTENTLY MARKETED ITS BREATHING MACHINES AS SAFE AND EFFECTIVE EVEN WHEN IT KNEW OF THE PROBLEMS WITH PE-PUR FOAM DEGRADATION AND ASSOCIATED HEALTH RISKS.

A.    Philips Never Hinted at the Dangerous Condition of the Recalled Devices.

154.    At no point prior to April 2021, when Philips first disclosed foam issues to its shareholders, did Philips even hint that there was a dangerous condition in its recalled CPAP, BiPAP, and ventilator devices. Instead, Philips held itself out as a trusted brand and "global leader in the sleep and respiratory markets."[144] Its branding promises consumers that they will "[b]reath easier, sleep more naturally[.]"[145] Philips further assures consumers that its "sleep therapy systems are designed with the needs of care practitioners and patients in mind," and that its "quality systems reflect [Philips'] commitment to providing enhanced patient comfort," among other things.[146] And it has long advertised its CPAP and BiPAP Machines as "clinically proven" treatment for sleep disorders.

---

[143] 483 Report at 24.
[144] Koninklijke Philips N.V. (2004-2023). *Breathe easier, sleep more naturally: innovation and you.* Available online at http://www.respironics.com/product_library (last accessed Aug. 30, 2023).
[145] *Id.*
[146] *Id.*

*Sandra Kurt, Summit County Clerk of Courts*

155.    Philips boasts that it has the "most prescribed CPAP systems by U.S. sleep physicians."[147]

B.    Philips Sold its Humidifier Accessory Allowing Warm Storage Conditions and Contributing to Humidity of the Foam.

156.    Philips sold humidifiers to accompany its CPAP devices, especially the DreamStation, stating in the humidifier's User Manual under the heading "Intended Use": "The DreamStation Heated Humidifier is an accessory for the Philips Respironics DreamStation therapy devices to provide moisture to the patient circuit."[148]

157.    The humidifier manual quoted above had, under the heading "DreamStation Heated Humidifier Specifications" had environmental specifications that included an "Operating Temperature: 5° to 35° C (41° to 95° F )" as well as "Storage Temperature: -20° to 60° C (-4° to 140° F)" and "Relative Humidity (operating & storage): 15 to 95% (non-condensing)."[149]

158.    Philips provided the humidifier option explaining in the DreamStation User Manual that "[y]ou can use the heated humidifier and the heated tube with your device. They are available from your home care provider. A humidifier may reduce nasal dryness and irritation by adding moisture to the airflow."[150]

159.    Philips not only knew but recommended the use of the humidifier, and also advised that the device could be stored in a room as warm as 140° F despite their knowledge that warm, hot and humid conditions contributed to rapid degradation of its sound insulating foam.

---

[147] Koninklijke Philips N.V. (2004-2023). *Simplified. Intuitive. Connected.* Available online at https://www.usa.philips.com/healthcare/solutions/sleep/sleep-therapy (last accessed Aug. 30, 2023).
[148] *See*
[149] *Id.* at 12.
[150] *Id.* at 22.

48

VI.    PHILIPS FINALLY RECALLED ITS DEFECTIVE DEVICES CONTAINING HAZARDOUS PE-PUR FOAM, BUT ONLY AFTER LAUNCHING ITS NEWEST DEVICE WITHOUT PE-PUR FOAM.

A.    Prior to the Recall, in April and May 2021, Philips Launched the DreamStation 2 (which does not Contain PE-PUR Foam).

160.    Two months prior to the Recall, Philips announced on April 13, 2021, that it was launching the DreamStation 2, a next-generation machine in its DreamStation product family. The DreamStation 2 does not contain PE-PUR foam.

161.    Philips, acting with willful, wanton, and reckless disregard for the safety of its consumers, chose to defer even warning patients about the foam degradation, particle debris and off gassing of toxic fumes, and also deferred the recall until such time as it had its new product commercially available so as to not lose market share to competitors.

162.    Not coincidentally, less than two weeks after its launch of the DreamStation 2, on April 26, 2021, Philips announced that its previous generation DreamStation products and other Recalled Devices posed serious health risks to users and, in the same release, Philips started trying to convince consumers to purchase and use its new DreamStation 2 device:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone,* and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. **Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected.** Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.[151]

---

[151] Koninklijke Philips N.V. (Apr. 26, 2021). *Philips' First-Quarter Results 2021.* Available online at https://www.philips.com/a-w/about/news/archive/corpcomms/news/press/2021/philips-first-quarter-results-2021.html (accessed Aug. 30, 2023).

49

B.     Testing Continued to Confirm the Recalled Devices were Defective and the
        FDA received additional MDRs.

163.    Even as it launched the DreamStation 2 device and announced publicly that its previous generation DreamStation products posed serious health risks to users, Philips continued to conduct tests that confirmed some of its breathing products were defective.

164.    For example, on May 17, 2021, Ken Cole from RJ Lee, an industrial forensics analytical laboratory and scientific consulting firm, produced a presentation analyzing the foam in Philips' Trilogy EVO devices. The presentation states that the investigation was "prompted by staff observation of color variance across both current production and previous builds."[152]

165.    The analysis involved six samples of foam, two from units built in 2018 and four taken from Philips' current production stock in May 2021.[153] Some of the samples from 2021 showed "differing cell structure" which is an "[i]ndication of poor process control."[154] The 2021 foam had "significant contaminants."[155] The foam was supposed to be ether-based,[156] but testing revealed indications that some of the foam was actually ester-based.[157]

166.    In addition, MDRs associated with the PE-PUR foam breakdown increased significantly.[158] From 2011 to April 2021 when Philips first notified the FDA of their intention to

---

[152] See RJ Lee Analysis Review of Trilogy EVO Foam (the Philips Recalled CPAP Litigation, ECF No. 589-3) at WTB 000003.
[153] Id. at WTB00006.
[154] Id. at WTB00008.
[155] Id. at WTB 000009; see also WTB 000010 ("Indication of poor process control and/or contamination.").
[156] Id. at WTB 000002.
[157] Id. at WTB 000013.
[158] As stated above, manufacturers, such as Philips, are required to submit medical device reports (MDRs) when information reasonably suggests that their device may have caused or contributed to a death or serious injury, or has malfunctioned, and that device or a similar device they manufacture would be likely to cause or contribute to a death or serious injury if the malfunction were to recur. Health professionals, consumers, and patients may voluntarily submit reports of device adverse events and malfunctions to the FDA. See, e.g., 21 C.F.R. § 803.20.

conduct a field action due to concerns pertaining to foam degradation (breakdown) in certain ventilators, BiPAP machines, and CPAP machines, Philips submitted only 30 MDRs that they identified as associated with the PE-PUR foam breakdown and there were no reports of patient injury or death among those 30 MDRs.[159] Eight of those reports were from the United States.

167.    After Philips notified the FDA of its intention to conduct a field action in April 2021 through July 31, 2022, the amount of MDRs the FDA received increased significantly as did the "reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown."[160] Specifically, the FDA reported:

- From April 2021 through April 30, 2022, the FDA received more than 21,000 MDRs, including 124 reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown.

- From May 1, 2022, through July 31, 2022, the FDA received more than 48,000 MDRs, including 44 reports of death, associated with the PE-PUR foam breakdown or suspected foam breakdown.

168.    The FDA continued: "A wide range of injuries have been reported in these MDRs, including cancer, pneumonia, asthma, other respiratory problems, infection, headache, cough, dyspnea (difficulty breathing), dizziness, nodules, and chest pain."[161]

C.    Finally, in June 2021, Philips Recalled its Defective Devices.

169.    Finally, on June 14, 2021, Philips issued a recall notice directed to its customers in the United States, stating:

---

[159] U.S. Food and Drug Administration (last updated Jun. 2, 2023). *UPDATE: Certain Philips Respironics Ventilators, BiPAP Machines, and CPAP Machines Recalled Due to Potential Health Risks: FDA Safety Communication.* Available online at https://www.fda.gov/medical-devices/safety-communications/update-certain-philips-respironics-ventilators-bipap-machines-and-cpap-machines-recalled-due?utm_medium=email&utm_source=govdelivery#mdr (last accessed Aug. 30, 2023).
[160] *Id.* (stating "The MDRs received included both mandatory reports from Philips and voluntary reports from health professionals, consumers, and patients.").
[161] *Id.*

51

To date, Philips has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam. Despite a low complaint rate (0.03% in 2020), Philips determined based on testing that there are possible risks to users related to this type of foam. The risks include that the PE- PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and the foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone,** and high heat and high humidity environments may also contribute to foam degradation.

Therefore, Philips has decided to voluntarily issue a recall notification* to inform patients and customers of potential impacts on patient health and clinical use related to this issue, as well as instructions on actions to be taken.[162]

170.    Philips stated that "[t]he majority of the affected devices within the advised 5-year service life are in the first-generation DreamStation product family."[163] Philips elaborated:

Based on the latest analysis of potential health risks and out of an abundance of caution, the recall notification advises patients and customers to take the following actions:

For patients using affected BiLevel PAP and CPAP devices: Discontinue use of your device and work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment. To continue use of your device due to lack of alternatives, consult with your physician to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.

For patients using affected life-sustaining mechanical ventilator devices: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.

**Possible health risks**

---

[162] *See* Exhibit A.
[163] *Id.*

52

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.[164]

171.    Corroborating the dangerous nature of the Recalled Devices, on July 22, 2021, the FDA upgraded Philips' recall of the Recalled Devices to its most serious classification, Class I, which according to the FDA means: "A situation in which there is a reasonable probability that the use of or exposure to a violative product will cause serious adverse health consequences or death."[165]

172.    Philips' Recall announcement instructed users to not use the Recalled Devices because of the health risks. This confirmed the true nature of the products, which at all times were adulterated and worthless.

173.    Philips took similar action with respect to its defective CPAP, BiPAP, and ventilator devices across the globe.

174.    Also, on June 14, 2021, Philips' main competitor, ResMed, issued "[a] message from ResMed's CEO" to the public regarding the Philips Recall. In this notice, ResMed CEO, Mick Farrell, stated that "ResMed devices are safe to use and are not subject to Philips' recall. ResMed devices use a different material than what Philips uses in their recalled machines."[166]

---

[164] *Id.*
[165] U.S. Food and Drug Administration (last updated Jul. 31, 2014). *Recalls Background and Definitions.* Available online at https://www.fda.gov/safety/industry-guidance-recalls-recalls-background-and-definitions (last accessed Aug. 31, 2023).
[166] ResMed (last updated Jul. 21, 2021). *HCP Information regarding Philips' recall.* Available online at https://www.resmed.com/en-us/healthcare-professional/other-manufacturer-recall-2021/ (last accessed Aug 31, 2023).

53

175.    ResMed devices and ventilators use polyether polyurethane or silicone-based foam, not PE-PUR foam, for sound abatement purposes.[167]

## VII.    THE MEASURES TAKEN BY PHILIPS TO RECALL THE DEFECTIVE DEVICES WERE INEFFECTIVE.

176.    Philips' CEO, Frans van Houten, stated in the Recall announcement: "We deeply regret any concern and inconvenience that patients using the affected devices will experience because of the proactive measures we are announcing today to ensure patient safety."[168]

177.    But Philips' "recall" was a recall in name only and did not effectively provide patients with notice of the risks of the Recalled Devices nor did it provide them with new Philips CPAP, BiPAP, or ventilator devices.

A.    Many Patients, Providers, and Others Were Not Notified About the Recall.

178.    On March 10, 2022, the FDA issued a Notification Order under § 518(a) of the FDCA.[169] The Notification Order stated that the "FDA has received a number of calls from patients and consumers who contacted FDA to report problems and/or concerns regarding the Recalled Products, but were unaware of the recall and had not been informed of the health risks presented by the Recalled Products."[170]

179.    The FDA estimated that, after nine months of the Recall, "approximately 50% of patients and consumers who have purchased or received the Recalled Products (excluding

---

[167] ResMed (last updated Dec. 6, 2021). *Information regarding Philips' recall.* Available online at https://www.resmed.com/en-us/other-manufacturer-recall-2021/ (last accessed Aug. 31, 2023).
[168] Koninklijke Philips N.V. (Jun. 14, 2021). *Philips issues recall notification\* to mitigate potential health risks related to the sound abatement foam component in certain sleep and respiratory care devices.* Available online at https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html (last accessed Aug. 31, 2023).
[169] *See* U.S. Food and Drug Administration (n.d.). *518(a) Notification Order.* Available online at https://www.fda.gov/media/156811/download (last accessed Aug. 31, 2023).
[170] 518(a) Notification Order at 2.

54

ventilators) within the last five years (the service life of the devices) have registered with Philips to obtain a replacement device."[171] But it was "unclear whether the remaining patients and consumers have not registered because they are unaware of the need to register, or because they do not want or need a replacement device from Philips."[172]

180.    The FDA surveyed 182 consignees to determine whether they had been notified of the Recall and found 28 "who had reported to FDA that they were not aware of the recall."[173] The FDA reported its results to Philips on September 8, 2021 and October 29, 2021, and Philips did not respond. On November 22, 2021, Philips stated that it had notified 23 of the 28 consignees of the Recall, but Philips did not "indicate whether the consignees identified by FDA had been sent notification before, or only after, they had been identified by FDA as being unaware of the recall."[174] Moreover, Philips' evidence of notification consisted of delivery confirmation receipts, reflecting that written correspondence was delivered to the consignees. As the FDA explained, "[t]ypically, firms demonstrate the effectiveness of its recall communications through evidence more meaningful than a delivery confirmation receipt, such as a returned response form or a documented telephone conversation."[175]

181.    Throughout the Recall, the FDA "on multiple occasions has informed Philips that FDA was concerned that Philips' efforts to notify patients and consumers, healthcare providers, and consignees regarding the recall have been insufficient" and has expressed concern that "it is

---

[171] *Id.*
[172] *Id.*
[173] *Id.*
[174] *Id.*
[175] *Id.* at 3.

55

likely that a significant portion of patients and consumers using the Recalled Products are unaware of the health risks presented by those products."[176]

182.    Noting "Philips' failure to timely provide effective notice to health professionals who prescribe or use the Recalled Products and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products," the FDA issued an order under Section 518(a) of the FDCA ordering Philips to "notify all health professionals who prescribe or use the Recalled Products, and other persons (including consignees, distributors, retailers, and device users) who should be notified, of the recall and the health risks presented by the Recalled Products **within the next 45 days**[.]"[177]

        B.    Philips' Repair/Replacement Program Has Been Extremely Slow.

183.    Those patients who registered their Recalled Devices with Philips for the Recall did not immediately receive replacement devices and were not told when a replacement device would be provided.

184.    As Philips' June 14, 2021 announcement explained:

> Repair and replacement program
>
> Philips is providing the relevant regulatory agencies with required information related to the launch and implementation of the projected correction. The company will replace the current sound abatement foam with a new material and has already begun the preparations, which include obtaining the relevant regulatory clearances. Philips aims to address all affected devices in scope of this correction as expeditiously as possible.
>
> As part of the program, the first-generation DreamStation product families will be modified with a different sound abatement foam and shipped upon receipt of the required regulatory clearances. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected by the issue. To support the program, Philips is increasing the production of its

---

[176] *Id.*
[177] *Id.* at 4 (emphasis in original).

DreamStation 2 CPAP devices, that are available in the US and selected countries in Europe.[178]

185.    In reality, patients may register their DreamStation Recalled Device with Philips for the Recall, but Philips has not immediately replaced the defective PE-PUR foam in the DreamStation Recalled Devices. Rather, patients have had to wait, sometimes for many months, for Philips to repair or replace their devices, and many patients are still waiting for a replacement device.

186.    As of the date of this Complaint—over a year after the Recall was announced—Philips continues to repair or replace defective DreamStation 1 Recalled Devices. In other words, the Recall remains ongoing.

187.    The replacement program for the Trilogy devices has been even slower. Philips has only just begun the rework of affected Trilogy 100/200 devices and Philips projects that the process will take approximately 12-14 months to complete.[179]

188.    There is no repair or replacement program for any of the other Recalled Devices recalled by Philips.

189.    Due to the design of the Recalled Devices, it is prohibitively difficult for patients to remove or replace the PE-PUR foam themselves. Also, the FDA warns:

> Do not try to remove the foam from your device. Trying to or successfully removing the foam may damage the device or change how the device works.

---

[178] U.S. Food and Drug Administration (Jun. 15, 2021). *COMPANY ANNOUNCEMENT: Philips Issues a Recall Notification\* to Mitigate Potential Health Risks Related to the Sound Abatement Foam Component in Certain Sleep and Respiratory Care Devices.* Available online at https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/philips-issues-recall-notification-mitigate-potential-health-risks-related-sound-abatement-foam (last accessed Aug. 31, 2023).
[179] Koninklijke Philips N.V. (last updated May 3, 2023). *Voluntary Recall Information Philips Respironics Sleep and Respiratory Care devices.* Available online at https://www.usa.philips.com/healthcare/resource-catalog/landing/experience-catalog/sleep/communications/src-update/news/ventilation-news-and-updates (last accessed Aug. 31, 2023).

57

It may also lead to more foam or chemicals entering the air tubing of the device.[180]

190.     As a result, the Recall leaves patients without safe, free options. Instead, patients may simply be forced to buy Philips' next-generation product or a competitor's product—at full price, and indeed, thousands of patients have already done so.

191.     Thus, Philips intends to, and is, profiting from its "recall" by selling more of its next generation product, the DreamStation 2, whose launch appears intentionally timed to coincide with the "recall," to affected patients.

192.     The FDA also believes that the Recall is not proceeding quickly enough. It recently stated:

> Based on the status of Philips' recall as of the date of this letter [May 2, 2022], CDRH believes that, if an order were to be issued to Philips under section 518(b), the plan submitted by Philips in response to that order should provide for significant improvements to Philips' ongoing repair and replacement activities to speed the pace of remediation and address other deficiencies identified by CDRH and communicated to Philips, to the extent such improvements are achievable by Philips.[181]

**PLAINTIFF'S INJURIES AS RESULT OF DEFENDANTS' ACTIONS**

193.     In 2018, Plaintiff was referred to Summa Health Sleep Clinic for a sleep study.

194.     On the evening of February 7, 2018 to the morning of February 8, 2018, Plaintiff underwent an overnight polysomnogram evaluation at Summa Health Sleep Clinic.

195.     On February 12, 2018, Dr. Nader Botros of Summa Health Sleep Clinic diagnosed Plaintiff as suffering from severe obstructive sleep apnea.

196.     An order was written for Plaintiff to receive a CPAP machine.

---

[180] U.S. Food and Drug Administration (last updated Jun. 2, 2023). *FAQs on Philips Respironics Ventilator, BiPAP Machine, and CPAP Machine Recalls.* Available online at https://www.fda.gov/medical-devices/safety-communications/faqs-philips-respironics-ventilator-bipap-machine-and-cpap-machine-recalls (last accessed Aug. 31, 2023).
[181] 518(b) Notice at 13.

197.    On April 4, 2018, Plaintiff received a Philips Respironics DreamStation machine (Model DSX500T11C) with heated humidifier and heated tubing (serial no. J21274897DC54) from Cornerstone Medical Services ("Cornerstone"). A copy of the delivery ticket is annexed hereto and marked as **EXHIBIT K**.

198.    Defendants, directly or through their subsidiaries or affiliates, designed, manufactured, distributed, and sold the Philips Respironics DreamStation Device prescribed to and received by Plaintiff.

199.    Based upon the patient population that Defendants intended its Philips Respironics DreamStation Device to be used by, when Plaintiff used the Device, Plaintiff was an appropriate patient to use the Device.

200.    At all times subsequent to the date of first use, Plaintiff used the Device in a normal and expected manner.

201.    At the time Plaintiff received the Device, it was in the same condition in all relevant aspects when it left Philips' control.

202.    Prior to Plaintiff's receipt of the Device, Philips did not warn patients (including Plaintiff, physicians, its customers, or its sales representatives/distributors) that the Device was known to emit toxic and/or carcinogenic particles from its PE-PUR sound abatement foam via degradation and/or off-gassing, which could then be directly inhaled by the user and causing severe injury or death.

203.    Plaintiff was never notified of the Philips Respironics medical device recall.

204.    On May 18, 2023, Plaintiff was given a transthoracic echocardiogram complete with contrast evaluation from Summa Health ACH 95 Arch Non-Invasive Cardiology as a routine follow-up to his 2011 diagnosis of a bicuspid aortic valve.

205.    Dr. Wissam Alajani diagnosed Plaintiff as having severe stenosis of the aortic valve.

206.    Dr. Steven M. Heupler, Plaintiff's longtime treating cardiologist, informed Plaintiff that if he experiences any chest pains, he needs to go to the emergency room for evaluation.

207.    On May 23, 2023, Plaintiff began to experience chest pains and went to Summa Health GMC emergency department for evaluation.

208.    After a physical examination performed by Dr. T. Gombash, it was recommended that Plaintiff be admitted to the hospital for a further evaluation.

209.    On May 23, 2023, Plaintiff was admitted to Summa Health Akron City Hospital for further testing.

210.    On May 26, 2026, Dr. Nkem Aziken and assistant Brian Heisler performed an aortic valve replacement with insertion of a 23mm mechanical valve, a triple coronary artery bypass graft, and an endoscopic vein harvest of the left lower extremity.

211.    As a direct result of the artificial aortic valve replacement, Plaintiff is required to be on blood thinners such as Warfarin for the rest of his life.

212.    On June 1, 2023, a permanent pacemaker was inserted into Plaintiff's chest to repress tachycardia that was present since Plaintiff came out of surgery.

213.    On June 2, 2023, Plaintiff was discharged from the hospital.

214.    On June 20, 2023, Plaintiff appeared at a scheduled appointment with Summa Health Cardiothroatic Surgery for a follow-up to his pacemaker device.

215.    During this appointment, Plaintiff was given a device that automatically checks the operation of Plaintiff's internal pacemaker and notifies him if there is a problem that requires medical intervention.

60

216.    On June 21, 2023, Plaintiff had an appointment with AeroCare for a scheduled replacement of his CPAP machine.

217.    An unknown staff member of AeroCare informed Plaintiff about the Philips Respironics Medical Device recall.

218.    Plaintiff was shocked that he was not notified by Philips about the recall.

## CAUSES OF ACTION

*I.     Strict Liability: Design Defect*

219.    Plaintiff re-alleges and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

220.    At all times mentioned herein, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, which were defective and unreasonably dangerous.

221.    Plaintiff was a foreseeable user of the Recalled Devices and Defendants knew that Plaintiff would use the Recalled Devices.

222.    The Recalled Devices are defective in design because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release particles and off-gas chemicals, including TDA, TDI, DEG. These chemicals and particles are then inhaled and ingested by Plaintiffs using the Recalled Devices and cause, among other problems, cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

223.    Defendants knew or should have known that the defective conditions of the Recalled Devices made the Recalled Devices unreasonably dangerous to Plaintiff.

61

224.    The Recalled Devices were unreasonably dangerous when used by ordinary users, such as Plaintiff, who used the Recalled Devices as they were intended to be used.

225.    The Recalled Devices are dangerous to an extent beyond what would be contemplated by the ordinary user of the Recalled Devices.

226.    The defective condition of the subject Recalled Devices rendered them unreasonably dangerous and/or not reasonably safe, and the devices were in this defective condition at the time they left the hands of Philips. Burnett, and PolyTech. The Recalled Devices reached Plaintiffs without substantial change in the condition in which they were designed, manufactured, labeled, sold, distributed, marketed, promoted, supplied, and otherwise released into the stream of commerce.

227.    Plaintiff was not able to discover, nor could he have discovered through the exercise of reasonable diligence, the defective nature of the subject devices. Further, in no way could Plaintiff have known that Philips had designed, developed, and manufactured the subject devices in a way as to make the risk of harm or injury outweigh any benefits.

228.    Safer alternative machines and designs were available which did not have an unreasonable risk of harm that the Recalled Devices and their unsafe PE-PUR foam did; for example, devices that included non-PE-PUR foam and designs that included other types of sound abatement technologies.

229.    At the time the Recalled Devices left Philips', Burnett's, and PolyTech's possession and continuing through when they were used by Plaintiff, the Recalled Devices were in a condition that made them unreasonably dangerous to Plaintiff.

Sandra Kurt, Summit County Clerk of Courts

230.    The Recalled Devices used by Plaintiff was expected to, and did, reach Plaintiff without substantial change in the condition in which the Recalled Devices were manufactured, sold, distributed, and marketed by Defendants.

231.    At all relevant times, Plaintiff used the Recalled Devices in the manner in which the devices were intended to be used.

232.    Defendants researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed the defective Recalled Devices which, when used in their intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiff, and Philips is therefore strictly liable for the injuries sustained by Plaintiff.

233.    As a direct and proximate cause of Defendants' conduct, Plaintiff has suffered serious and debilitating injuries.

234.    In addition, as a direct and proximate cause of Philips', Burnett's, and PolyTech's conduct, Plaintiff may suffer additional serious and debilitating illnesses or injuries in the future as a result of exposure to the Foam Toxins.

235.    Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

236.    Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, interest, costs of suit, attorneys' fees, and such further relief as the Court deems equitable and just.

## II.    *Strict Liability (Failure to Warn)*

237.    Plaintiff re-alleges and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

*Sandra Kurt, Summit County Clerk of Courts*

238.   At all times mentioned herein, Defendants designed, manufactured, and sold the Recalled Devices.

239.   Plaintiff was foreseeable users of the Recalled Devices.

240.   The Recalled Devices are defective because the PE-PUR foam comprising part of the devices is subject to degradation and off-gassing and the PE-PUR foam contains toxic and carcinogenic materials. The Recalled Devices release chemicals and particles, including but not limited to TDA, TDI, DEG. These chemicals and particles are then inhaled and ingested by Plaintiff using the Recalled Devices and cause, among other problems, cancer, COPD, kidney injuries, cardiac injuries, pulmonary injuries, liver damage, inflammation, respiratory issues, asthma, adverse effects to organs, and toxic and carcinogenic effects.

241.   Defendants knew that the defective condition of the Recalled Devices made the devices unreasonably dangerous to users such as Plaintiff.

242.   The Recalled Devices were dangerous when used by ordinary users, such as Plaintiff, who used the devices as they were intended to be used.

243.   The Recalled Devices are dangerous to an extent beyond what would be contemplated by the ordinary user of the device.

244.   Defendants knew or should have known of the defects in the Recalled Devices at the time Philips and PolyTech sold or provided the Recalled Devices that were used by Plaintiff.

245.   At the time the Recalled Devices left Philips', Burnett's, and PolyTech's possession, the Recalled Devices were defective and in a condition that made them unreasonably dangerous to Plaintiff.

246.   At the time Plaintiff used the Recalled Devices, the devices were defective and in a condition that made them unreasonably dangerous to Plaintiff.

64

247.    The Recalled Devices used by Plaintiff were expected to, and did, reach Plaintiffs without substantial change in the condition in which the devices were manufactured, sold, distributed, and marketed by Defendants.

248.    At all relevant times, Plaintiff used the Recalled Devices in the manner in which the devices were intended to be used.

249.    The Recalled Devices are defective because Defendants failed to warn or instruct that the PE-PUR foam in the Recalled Devices can degrade and off-gas dangerous and carcinogenic chemicals and particles, posing a serious risk to users.

250.    Defendants further failed to warn or instruct that the Recalled Devices had been adequately or properly tested.

251.    The warning and instructions that accompanied the Recalled Devices failed to provide the level of information that ordinary consumers, including Plaintiff, would expect when using the product in a manner reasonably foreseeable to Defendants.

252.    Defendants further failed to warn or instruct that the Recalled Devices, when used in conjunction with the Accessory Humidifiers, would hasten the degradation of the foam and make the Recalled Devices especially dangerous.

253.    Defendants further failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions, and that warm temperatures and humidity would hasten the degradation of the foam, and make the Recalled Devices especially dangerous.

254.    Had Plaintiff received proper or adequate warnings or instructions as to the risks of using the Recalled Devices, Plaintiff would not have used the Recalled Devices.

255.    Had Plaintiff received proper or adequate warnings or instructions as to the storage, climate and cleaning conditions and protocols, they would have heeded such warnings to mitigate the risk of premature foam degradation.

256.    Defendants researched, designed, manufactured, tested, advertised, promoted, marketed, sold, and distributed the defective Recalled Devices which, when used in their intended or reasonably foreseeable manner, created an unreasonable risk to the health of consumers, such as Plaintiffs, and Philips and PolyTech are therefore strictly liable for the injuries sustained by Plaintiff.

257.    As a direct and proximate cause of Philips', Burnett's, and PolyTech's conduct, Plaintiff has suffered serious and debilitating injuries.

258.    In addition, as a direct and proximate cause of Philips', Burnett's, and PolyTech's conduct, Plaintiff may suffer additional serious and debilitating illnesses or injuries in the future as a result of exposure to the Foam Toxins.

259.    Plaintiff demands judgment against Defendants and request compensatory damages, punitive damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

### III.    Strict Liability (Manufacturing Defect)

260.    Plaintiff re-alleges and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

261.    At all times mentioned herein, Defendants were involved in researching, designing, developing, manufacturing, testing, selling and/or distributing the Recalled Devices, which were unreasonably dangerous, unsafe and defective in their manufacturing when they left Philips' and PolyTech's possession.

262.    The Recalled Devices were expected to, and did, reach the Plaintiff without substantial change or adjustment to their mechanical function and condition in which they were sold.

263.    Plaintiff used the Recalled Devices as directed and for the purpose for which they were intended.

264.    The Recalled Devices are inherently dangerous for their intended used due to manufacturing defects. Defendants therefore are strictly liable.

265.    Philips failed to ensure that a subset of the purchased, or otherwise received, Recalled Devices and services conformed to specified requirements.

266.    Specifically, Philips used defective, incorrect and non-specified PE-PUR, raw foam product, not intended for use in Recalled Devices, to manufacture some of the Recalled Devices including certain recalled Trilogy Evo ventilators.

267.    This incorrect and non-specified PE-PUR foam was sourced from Philips' raw foam supplier, used in the muffler assembly of the affected Recalled Devices, including Trilogy Evo ventilators, and resulted in non-conforming Recalled Devices being approved, released and distributed by Philips to Plaintiff.

268.    Per design specifications, this foam was required to be polyether based, not polyester based foam.

269.    Upon information and belief, the Recalled Devices contain a manufacturing defect that differed from other typical units of the same product line.

270.    Philips sold the Recalled Devices in this defective condition.

271.    Philips failed to conduct proper and regular quality control sampling and testing.

67

272.   The Recalled Devices, as manufactured, were unsafe and unreasonably dangerous to Plaintiff.

273.   The Recalled Devices did not perform as safely as an ordinary consumer would expect.

274.   Defendants knew or should have known of the manufacturing defects and the risks of serious bodily injury exceeded the benefits associated with the Recalled Devices.

275.   Furthermore, the Recalled Devices and their defects presented an unreasonably dangerous risk beyond what the ordinary consumer would reasonably expect.

276.   As a direct and proximate cause of Defendants' manufacturing defect, Plaintiff suffered injuries and damages.

277.   In addition, as a direct and proximate cause of Philips' and PolyTech's manufacturing defect, Plaintiffs may suffer additional serious and debilitating illnesses or injuries, including various cancers, in the future as a result of their exposure to the Foam Toxins.

278.   Plaintiff demands judgment against Defendants and requests compensatory damages, punitive damages, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

*IV.   Breach of Express Warranty*

279.   Plaintiff re-alleges and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

280.   Philips warranted that all of the Recalled Devices "shall be free from defects of workmanship and materials and will perform in accordance with the product specifications for a period of two (2) years from the date of sale."[182]

---

[182] *See* **EXHIBIT**

68

281.    Philips breached this express warranty in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth herein, rendering them unsuitable and unsafe for personal use.

282.    Further, through Philips' public statements, descriptions, and promises relating to the Recalled Devices, Philips expressly warranted that the products were safe and effective for their intended use.

283.    Had Plaintiff known the Recalled Devices were unsafe for use, he would not have purchased or leased the Recalled Devices nor would he have used them.

284.    Philips has breached its warranty and refused to provide appropriate warranty relief notwithstanding the risks of using the Recalled Devices. Plaintiff reasonably expected, at the time of use, that the Recalled Devices were safe for their ordinary and intended use.

285.    To the extent privity may be required, Plaintiff can establish privity with Philips or alternatively, Plaintiff can establish that they fall into an exception to a privity requirement. Plaintiff relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

286.    Alternatively, Plaintiff were foreseeable third-party beneficiaries of Philips' sale of the Recalled Devices.

287.    Plaintiff is not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year.

288.    As a direct and proximate result of Philips' breach of its express warranties, Plaintiff has suffered serious and debilitating injuries.

69

289.   In addition, as a direct and proximate cause of Philips' breach of its express warranties, Plaintiff may suffer additional serious and debilitating illnesses or injuries in the future as a result of exposure to the Foam Toxins.

290.   Plaintiff demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

*V.      Breach of the Implied Warranty of Merchantability*

291.   Plaintiff re-alleges and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

292.   By operation of law, Philips, as the manufacturer of the Recalled Devices and as the provider of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiffs that the Recalled Devices were of merchantable quality and safe for their ordinary and intended use.

293.   Such implied warranty of merchantability, contained in U.C.C. § 2-314, has been codified in Ohio. *See, e.g.,* Ohio Rev. Code Ann. §§ 1302.27, et seq.

294.   Philips breached the implied warranty of merchantability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices, while appearing normal, contained latent defects as set forth herein rendering them unsuitable and unsafe for personal use.

295.   Had Plaintiff known the Recalled Devices were unsafe for use, he would not have purchased or leased the Recalled Devices nor would he have used them.

296.   To the extent privity may be required, Plaintiff can establish privity with Philips or alternatively, Plaintiff can establish that they fall into an exception to a privity requirement. Plaintiffs relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

70

297.    Alternatively, Plaintiff was a foreseeable third-party beneficiary of Philips' sale of the Recalled Devices.

298.    Plaintiff are not required to give notice to Philips, a remote manufacturer, and Philips has had notice of the type and source of claims in this matter for nearly a year.

299.    As a direct and proximate cause of Philips' conduct, Plaintiff has suffered serious and debilitating injuries.

300.    In addition, as a direct and proximate cause of Philips' conduct, Plaintiff may suffer additional serious and debilitating illnesses or injuries in the future as a result of exposure to the Foam Toxins.

301.    Plaintiff demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## VI.    Breach of the Implied Warranty of Usability

302.    Plaintiff re-alleges and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

303.    By operation of law, Philips, as the manufacturer of the Recalled Devices and as the providers of a limited warranty for the Recalled Devices, impliedly warranted to Plaintiff that the Recalled Devices were usable for their ordinary and intended use.

304.    Such implied warranty of usability, contained in U.C.C. § 2-314, has been codified in Ohio. See, e.g., Ohio Rev. Code Ann. §§ 1302.27, et seq.

305.    Through usage of trade, manufacturers of prescription drugs and medical devices impliedly warrant that their products are usable for the end consumer.

71

306.    Philips breached the implied warranty of usability in connection with the sale and distribution of the Recalled Devices. At the point of sale, the Recalled Devices while appearing normal—contained defects as set forth herein rendering them unusable.

307.    Philips, its agents and employees knew or should have known that the Recalled Devices suffer from a defect that causes negative health effects and/or places persons at risk for negative health effects to such an extent that the products are unusable.

308.    Philips' Recall announcement instructed Plaintiff to not use Recalled Devices because of the health risks. This confirmed the true nature of the products, which at all times were adulterated and worthless.

309.    To the extent privity may be required, Plaintiff can establish privity with Philips or alternatively, Plaintiff can establish that he falls into an exception to a privity requirement. Plaintiff relied on Philips' warranties and dealt directly with Philips through the exchange of warranty and recall information.

310.    Alternatively, Plaintiff was a foreseeable third-party beneficiary of Philips' sale of the Recalled Devices.

311.    Had Plaintiff known that Philips had breached the implied warranty of usability for their Recalled Devices, they would not have purchased or leased the Recalled Devices nor would they have used the Recalled Devices.

312.    As a direct and proximate cause of Philips' conduct, Plaintiff have suffered serious and debilitating injuries.

313.    In addition, as a direct and proximate cause of Philips' conduct, Plaintiff may suffer additional serious and debilitating illnesses or injuries in the future as a result of exposure to the Foam Toxins.

72

314.    Plaintiff demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

### VII.    Negligence

316.    Plaintiff re-alleges and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

317.    Defendants owed a duty to Plaintiff to use and exercise reasonable and due care in the design, materials procurement, manufacturing, testing, distribution, labeling, marketing, warnings, instructions for use and storage, disclosures, regulatory compliance, and sale of the Recalled Devices.

318.    Defendants owed a duty to Plaintiffs to ensure that the Recalled Devices it sold in the United States were safe, did not expose patients using the devices to toxic substances, and/or complied with current best manufacturing practices and regulatory requirements.

319.    Defendants owed a duty of care to Plaintiffs; because they were the foreseeable, reasonable, and probable users of the Recalled Devices. Defendants knew, or should have known, that the Recalled Devices were not safe, exposed their users to toxic and carcinogenic compounds, and/or did not comply with best manufacturing practices and regulatory requirements. Defendants were in the best position to uncover and remedy these shortcomings.

320.    Defendants negligently designed and manufactured the Recalled Devices, causing patients using the Recalled Devices to be exposed to the Foam Toxins and degraded particulate matter which are harmful, carcinogenic and/or toxic.

321.    Defendants failed to discharge their duties of reasonable care. Defendants inadequately conducted or oversaw the design, materials procurement, manufacturing, testing, labeling, distribution, marketing, warnings, disclosures, instructions for use and storage, regulatory

73

compliance and sale of the Recalled Devices. Defendants knew or should have known that the aforesaid wrongdoing would damage Plaintiff.

322.    Defendants negligently failed to promptly and immediately warn and disclose to Plaintiffs, and the medical and regulatory communities, of the potential and actual danger posed by the PE-PUR foam in the Recalled Devices as soon as it was discovered, delaying notice of this harmful and potentially fatal toxic exposure to carcinogens and thus causing continued exposure to the carcinogenic and/or hazardous compounds, and delaying cessation of use, necessary medical testing, examinations, surveillance, and treatment.

323.    Defendants failed to discharge their duties of reasonable care. Defendants failed to warn or instruct that the Recalled Devices should not be stored in warm climates and conditions; and that warm temperatures and humidity would hasten the degradation of the foam, and make the Recalled Devices especially dangerous.

324.    Defendants' negligent or grossly negligent conduct created and then exacerbated an unreasonable and dangerous condition for Plaintiff.

325.    Defendants acted with recklessness and willful and wanton disregard for the health of Plaintiff.

326.    Defendants' unreasonable, negligent actions and inactions were taken or not taken with willful and wanton disregard for the health of Plaintiff and created a foreseeable risk of harm to Plaintiff.

327.    As a direct and proximate result of Defendants' negligence, Plaintiff have suffered serious and debilitating injuries.

328.     In addition, as a direct and proximate cause of Defendants' negligence, Plaintiff may suffer additional serious and debilitating illnesses or injuries as a result of exposure to the Foam Toxins.

329.     Plaintiff demand judgment against Defendants and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

VIII.    *Unfair and Deceptive Practices in Violation of the Ohio Consumer Sales Practices Act*

330.     Plaintiff re-alleges and incorporate by reference the allegations set forth throughout the Complaint as if set forth herein and further allege as follows:

331.     Philips is on notice that such claims may be asserted by those Plaintiffs.

332.     Plaintiffs used the Recalled Devices and suffered ascertainable losses as a result of Philips' actions in violation of these consumer protection laws.

333.     Had Philips not engaged in the deceptive conduct described herein, Plaintiffs would not have purchased, leased, or used the Recalled Devices nor would Plaintiffs have incurred related medical costs and injuries from using the Recalled Devices.

334.     Fraudulent, unfair, and/or deceptive practices that violate consumer protection laws include the following:

    (a)     representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

    (b)     advertising goods or service with the intent not to sell them as advertised; and

    (c)     engaging in fraudulent or deceptive conduct that creates a likelihood of confusion.

335.     Plaintiff was injured and suffered ascertainable losses of money or property by Philips' unlawful conduct.

75

336.    Philips' deceptive, unconscionable, unfair, and/or fraudulent representations and material omissions to Plaintiffs constitute consumer fraud and/or unfair and deceptive acts and trade practices in violation of Ohio Rev. Code Ann. § 1345.01, et seq.

337.    Under these and other consumer protection statutes, Philips is the supplier, manufacturer, advertiser, and seller of the Recalled Devices, subject to liability under such legislation from fraudulent, unfair, deceptive, and unconscionable consumer sales practices.

338.    The actions and omissions of Philips are uncured or incurable.

339.    Philips was put on notice of these issues by the investigation of the FDA, numerous complaints filed against Philips, and individual letters and communications from certain Plaintiffs and others within a reasonable amount of time after Philips' conduct was publicly disclosed.

340.    Philips had actual knowledge of the defective and dangerous condition of the Recalled Devices and failed to take any action to cure those conditions.

341.    Plaintiffs relied upon Philips' misrepresentations and omissions in deciding to use the Recalled Devices.

342.    By reason of the fraudulent, deceptive, unfair, and/or otherwise unlawful acts engaged in by Philips, and as a direct and proximate result thereof, Plaintiffs have sustained injuries and other damages.

343.    Plaintiff demand judgment against Philips and request compensatory damages, punitive damages, medical monitoring, interest, costs of suit, attorneys' fees, and such other relief as the Court deems equitable and just.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court grant the following relief:

A.    Issue a judgment against Defendants on the first cause of action and award compensatory and punitive damages in the sum of **FIVE MILLION DOLLARS ($5,000,000.00)**;

76

B.     Issue a judgment against Defendants on the second cause of action and award compensatory and punitive damages in the sum of **FIVE MILLION DOLLARS ($5,000,000.00)**;

C.     Issue a judgment against Defendants on the third cause of action and award compensatory and punitive damages in the sum of **FIVE MILLION DOLLARS ($5,000,000.00)**;

D.     Issue a judgment against Defendants on the fourth cause of action and award compensatory and punitive damages in the sum of **FIVE MILLION DOLLARS ($5,000,000.00)**;

E.     Issue a judgment against Defendants on the fifth cause of action and award compensatory and punitive damages in the sum of **FIVE MILLION DOLLARS ($5,000,000.00)**;

F.     Issue a judgment against Defendants on the sixth cause of action and award compensatory and punitive damages in the sum of **FIVE MILLION DOLLARS ($5,000,000.00)**;

G.     Issue a judgment against Defendants on the seventh cause of action and award compensatory and punitive damages in the sum of **FIVE MILLION DOLLARS ($5,000,000.00)**;

H.     Issue a judgment against Defendants on the eighth cause of action and award compensatory and punitive damages in the sum of **FIVE MILLION DOLLARS ($5,000,000.00)**;

I.     Award Plaintiff his reasonable attorneys' fees and cost;

J.     Award Plaintiff interest; and

K.     Award Plaintiff any and all further relief that the Court deems just and proper.

Dated:  September 21 , 2023.                        */s/ Derrick M. King*

**DERRICK M. KING**
1445 Crestview Ave
Akron, OH 44320-4049
Phone: (330) 867-3979
Email: dmking12370@hotmail.com

*Pro se Plaintiff*

## **PLAINTIFF'S DEMAND FOR JURY TRIAL**

Please Take Notice that in accordance with Rule 38(A) of the Ohio Rules of Civil

Procedure, Plaintiff demands a trial by jury as to all issues in this action.

Dated: September 21, 2023.                    /s/ Derrick M. King
                                              **DERRICK M. KING**
                                              1445 Crestview Ave
                                              Akron, OH 44320-4049
                                              Phone: (330) 867-3979
                                              Email: dmking12370@hotmail.com

                                              *Pro se Plaintiff*

78

**dmking12370@hotmail.com**



| | |
|---|---|
| **From:** | Gordon, Zachary <zgordon@peircelaw.com> |
| **Sent:** | Thursday, September 28, 2023 2:57 PM |
| **To:** | Derrick Martin King; liaisons.mdl3014@pietragallo.com |
| **Subject:** | RE: Philips CPAP Litigation |

Hi Mr. King,

Thank you for your email. As a plaintiff, you are able to obtain access to that section of the website. Please register your information on the website, and we will be able to provide you with access.

Thank you,

Zach Gordon
Case Manager
Robert Peirce & Associates, P.C.
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 Phone
(800) 543-9859 Toll-Free
(412) 281-4229 Fax
zgordon@peircelaw.com

NOTICE: This electronic message is to be used exclusively by the individual or entity to which it is addressed. This message may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Unless you are the intended recipient, any copying, use or dissemination of the message is strictly prohibited. If you receive this message in error, please notify us immediately and permanently delete this message from your system without making any copies. Although this electronic message and any attachments are believed to be free of any virus or other defect that might affect computer systems by which it is received or opened, it is the responsibility of the recipient to ensure that it is virus free, and we disclaim any liability for loss or damage arising in any way from its use.

---

**From:** Derrick Martin King <dmking12370@hotmail.com>
**Sent:** Thursday, September 28, 2023 2:38 PM
**To:** liaisons.mdl3014@pietragallo.com
**Subject:** Philips CPAP Litigation

> **Caution:** This E-mail originated from outside the organization. Please take care when clicking links or opening attachments.

## Dear Sir or Madam:

My name is Derrick M. King and I am a pro se plaintiff in a case filed against Philips Respironics in an Ohio state court. The complaint deals with the CPAP recall. I was diagnosed with sleep apnea in January 2018 and was prescribed the use of a CPAP machine. I was eventually issued a Philips Respironics first-generation DreamStation CPAP device. I used the device between April 2018 and June 2023. I was never informed of the problems concerning the Philips Respironics CPAP device recall until my device was replaced by a ResMed device.

1

In May 2023, I was diagnosed with severe aortic stenosis. I was subsequently hospitalized and open-heart surgery was done. I have reason to believe that the daily use of the first-generation Philips Respironics DreamStation CPAP device contributed to my condition and subsequent surgery.

I recently discovered your website www.mdl3014.com and I noticed the tab marked "plaintiffs' only". Because of the likeliehood that my case in state court will end up part of the Philips multidistrict litigation in PA, I am requesting access to the "Plaintiff's Only" section of your website.

I have attached a copy of the complaint filed in the Summit County (Ohio) Court of Common Pleas.

Thank you for your time.

Sincerely yours,



DERRICK MARTIN KING
Phone: (330) 867-3979 or (330) 459-1122
E-Mail: dmking12370@hotmail.com or
dmking12370@gmail.com

NOTICE TO RECIPIENT: The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential, and/or privileged material. If you are not the intended recipient of this message, be aware that any use, review, retransmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.

**dmking12370@hotmail.com**

| | |
|---|---|
| **From:** | Derrick Martin King on behalf of dmking12370@hotmail.com |
| **Sent:** | Sunday, November 5, 2023 1:36 PM |
| **To:** | 'CPAP@browngreer.com' |
| **Subject:** | Request for Access to the MDL Centrality CPAP portal |

Dear Sir or Madam:

My name is Derrick Martin King and I am a pro se plaintiff in a products liability case against Koninklijke Philips N.V. regarding the recalled CPAP devices. My case was initially filed in state court in Ohio, then removed to the U.S. District Court for the Northern District of Ohio. The Philips defendants filed a notice of tag along action with the JPML, and the case was subsequently transferred and consolidated into the multidistrict litigation.

It is my understanding that your online portal MDL Certainty is the portal where the discovery documents can be accessed. I am requesting that I be given a username and password for that portal.

Attached is a copy of the JPML's conditional order of transfer that was filed in my case.



2023-10-26 MDL
Conditional Ord...



DERRICK MARTIN KING
Phone: (330) 867-3979 or (330) 459-1122
E-Mail: dmking12370@hotmail.com or
dmking12370@gmail.com

NOTICE TO RECIPIENT: The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential, and/or privileged material. If you are not the intended recipient of this message, be aware that any use, review, retransmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**


IN RE: PHILIPS RECALLED CPAP, BI–LEVEL PAP,
AND MECHANICAL VENTILATOR PRODUCTS
LIABILITY LITIGATION                                              MDL No. 3014


(SEE ATTACHED SCHEDULE)


**CONDITIONAL TRANSFER ORDER (CTO –84)**


On October 8, 2021, the Panel transferred 10 civil action(s) to the United States District Court for the Western District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 568 F.Supp.3d 1408 (J.P.M.L. 2021). Since that time, 293 additional action(s) have been transferred to the Western District of Pennsylvania. With the consent of that court, all such actions have been assigned to the Honorable Joy Flowers Conti.

It appears that the action(s) on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Western District of Pennsylvania and assigned to Judge Conti.

Pursuant to Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, the action(s) on the attached schedule are transferred under 28 U.S.C. § 1407 to the Western District of Pennsylvania for the reasons stated in the order of October 8, 2021, and, with the consent of that court, assigned to the Honorable Joy Flowers Conti.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Western District of Pennsylvania. The transmittal of this order to said Clerk shall be stayed 7 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 7–day period, the stay will be continued until further order of the Panel.


FOR THE PANEL:

*Tiffaney D. Pete*

Tiffaney D. Pete
Clerk of the Panel

**IN RE: PHILIPS RECALLED CPAP, BI–LEVEL PAP,
AND MECHANICAL VENTILATOR PRODUCTS
LIABILITY LITIGATION**                                      MDL No. 3014

## SCHEDULE CTO–84 – TAG–ALONG ACTIONS

| **DIST** | **DIV.** | **C.A.NO.** | **CASE CAPTION** |
|---|---|---|---|
| | | | |
| OHIO NORTHERN | | | |
| | | | |
| OHN | 5 | 23–02042 | King v. Koninklijke Philips N.V. et al. |

**dmking12370@hotmail.com**

**PLAINTIFF'S EXHIBIT**

**D**

| | |
|---|---|
| **From:** | Derrick Martin King on behalf of dmking12370@hotmail.com |
| **Sent:** | Sunday, November 5, 2023 12:38 PM |
| **To:** | D. Aaron Rihn (arihn@peincelaw.com); Peter St. Tienne Wolff (psw@pietragallo.com) |
| **Subject:** | In re Philips CPAP Products Liability Litigation, MDL-3014 |

Mr. Rihn and Mr. Wolff,

My name is Derrick Martin King and I am a pro se plaintiff in a personal injury products liability complaint against the Philips and PolyTech defendants. The complaint was initially filed in state court, then removed to the Northern District of Ohio. Philips RS North America filed a notice of potential tag along with the JPML, and on October 26, 2023 the JPML entered a conditional transfer order I have attached a copy of the conditional transfer order.

The reason for my email is twofold, First, I am requesting that I be provided with a copy of all documents that have been filed with the court. Since I am pro se, production of those court documents will be essential so that I do not submit something that may have already been adjudicated by the Court. I do have access to Adobe Acrobat and can download the documents either as a PDF file or a ZIP file.

My second request is for access to all the discovery that has occurred in this case to date. From what I understand, there is some online portal where the discovery documents and ESI is placed (that is password protected).

Any assistance you could provide me in this would be greatly appreciated.



2023-10-26 MDL
Conditional Ord...



DERRICK MARTIN KING
Phone: (330) 867-3979 or (330) 459-1122
E-Mail: dmking12370@hotmail.com or
dmking12370@gmail.com

NOTICE TO RECIPIENT: The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential, and/or privileged material. If you are not the intended recipient of this message, be aware that any use, review, retransmission, distribution, reproduction

or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

IN RE: PHILIPS RECALLED CPAP, BI–LEVEL PAP,
AND MECHANICAL VENTILATOR PRODUCTS
LIABILITY LITIGATION                                          MDL No. 3014

(SEE ATTACHED SCHEDULE)

**CONDITIONAL TRANSFER ORDER (CTO –84)**

On October 8, 2021, the Panel transferred 10 civil action(s) to the United States District Court for the Western District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 568 F.Supp.3d 1408 (J.P.M.L. 2021). Since that time, 293 additional action(s) have been transferred to the Western District of Pennsylvania. With the consent of that court, all such actions have been assigned to the Honorable Joy Flowers Conti.

It appears that the action(s) on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Western District of Pennsylvania and assigned to Judge Conti.

Pursuant to Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, the action(s) on the attached schedule are transferred under 28 U.S.C. § 1407 to the Western District of Pennsylvania for the reasons stated in the order of October 8, 2021, and, with the consent of that court, assigned to the Honorable Joy Flowers Conti.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Western District of Pennsylvania. The transmittal of this order to said Clerk shall be stayed 7 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 7–day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

*Tiffaney D. Pete*

Tiffaney D. Pete
Clerk of the Panel

**IN RE: PHILIPS RECALLED CPAP, BI–LEVEL PAP,**
**AND MECHANICAL VENTILATOR PRODUCTS**
**LIABILITY LITIGATION**                                    MDL No. 3014

**SCHEDULE CTO–84 – TAG–ALONG ACTIONS**

| DIST | DIV. | C.A.NO. | CASE CAPTION |
|------|------|---------|--------------|

OHIO NORTHERN

| OHN | 5 | 23–02042 | King v. Koninklijke Philips N.V. et al. |

**dmking12370@hotmail.com**



| | |
|---|---|
| **From:** | Gordon, Zachary <zgordon@peircelaw.com> |
| **Sent:** | Monday, November 13, 2023 3:33 PM |
| **To:** | Derrick Martin King |
| **Cc:** | psw@pietragallo.com; liaisons.mdl3014@pietragallo.com |
| **Subject:** | Recent MDL 3014 Inquiry |
| **Attachments:** | 4122814229-1699894261.34348.pdf |

Mr. King,

I am contacting you on behalf of Aaron Rihn, one of the co-liaisons in MDL 3014. Our office is in receipt of the attached fax.

To respond to your initial email from 11/5:

1. Please find the majority of the documents from the MDL 3014 public docket (2:21-mc-01230) available for download at this Dropbox link: https://www.dropbox.com/scl/fo/qnz0nsz07nuv2e2bblq10/h?rlkey=gmph9rk4npp8wanu3cgt7ntb1&dl=0 Please note this is only updated through 11.7.2023 – the most recent items can be added to the folder if you need them. There are 2,326 document numbers in the folder (plus document 2336), but 2,128 PDF documents in this folder, due to the fact that some of the orders (and miscellaneous corrections from the clerk, etc.) are "text only" entries in which no document was issued. The court website has all text orders (and all Pretrial Orders, available for download for free) here: https://www.pawd.uscourts.gov/mdl-3014-re-philips-recalled-cpap-bi-level-pap-and-mechanical-ventilator-products-litigation You can also access e-filing/docket via PACER yourself, you will need to review the Pro Se materials for the Western District of Pennsylvania for instructions, or call the clerk's office for information on how to get registered:  https://www.pawd.uscourts.gov/filing-without-attorney
2. Access to discovery materials is not available to non-MDL leadership at this time.

Mr. Rihn recommends that you familiarize yourself with all of the Pretrial Orders (PTOs). In particular, these are some of the most relevant for individual plaintiffs: PTO 1 regarding general filing procedures, PTO 28 regarding the filing procedures for Short Form Complaints, PTO 26(b) regarding the Fact Sheets, and PTO 27 authorizing service through MDL Centrality. All pretrial orders can be found both on the court website linked above as well as in the Dropbox link.

Service of the Short Form Complaint (and the fact sheet) is done through the MDL Centrality platform, run by BrownGreer. PTO#27 can walk you through the details. If you haven't already, you should contact BrownGreer about setting up an account for yourself – their dedicated email address for all inquiries related to this MDL is CPAP@BrownGreer.com. MDL Centrality houses many documents that will be helpful for you, including the Short Form Complaint and the Plaintiff Fact Sheet, in easy-to-use formats. The link to the website is here (you will need your account set up prior to accessing the materials): https://www.mdlcentrality.com/

We also have a plaintiff's website that has all of the Pretrial Orders as well as news and plaintiffs-only resources: https://mdl3014.com/

In the future, please direct liaison inquiries to the dedicated MDL 3014 liaison email address: liaisons.mdl3014@pietragallo.com, copied here, so that the liaisons and their teams also get the email. This email address also copies MDL leadership. Please let us know if you have any additional questions we might be able to assist with.

Best,

Zach Gordon
Case Manager
Robert Peirce & Associates, P.C.
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 Phone
(800) 543-9859 Toll-Free
(412) 281-4229 Fax
zgordon@peircelaw.com

NOTICE: This electronic message is to be used exclusively by the individual or entity to which it is addressed. This message may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Unless you are the intended recipient, any copying, use or dissemination of the message is strictly prohibited. If you receive this message in error, please notify us immediately and permanently delete this message from your system without making any copies. Although this electronic message and any attachments are believed to be free of any virus or other defect that might affect computer systems by which it is received or opened, it is the responsibility of the recipient to ensure that it is virus free, and we disclaim any liability for loss or damage arising in any way from its use.





# CONFIDENTIAL FAX TRANSMISSION

Sender Name: _____ **DERRICK MARTIN KING**

Sender Voice No. _____ **(330) 867-3979** _____ Date Sent: _____ **11/13/2023 11:41 am**

Receiver Fax Number: _____ **(412) 281-4229** _____ Receiver Voice Number: _____

Receiver Name and Title (if any): _____ **D. Aaron Rihn, Esq.**

Entity Name: _____ **Robert Peirce and Associates P.C.**

---

Remarks:

**Please see attached correspondence regarding the Philips CPAP litigation, MDL No. 3014.**

---

**IMPORTANT WARNING FOR THE RECIPIENT:** This fax transmission (and any attachments) is intended only for the use of the person/entity specified and may contain information that is confidential or otherwise legally restricted (the disclosure of such information is governed by applicable laws in the locality of the sender.

If the reader of this fax transmission is not the intended recipient or an employee/agent of the recipient and/or the entity named, you are hereby put on notice that any distribution, dissemination, or copying of the contents is strictly prohibited by law.

If you have received this fax transmission in error, please notify the sender **IMMEDIATELY** and destroy all material contained within the fax transmission. Your cooperation in this matter is greatly appreciated.



𝕯𝖊𝖗𝖗𝖎𝖈𝖐 𝕸𝖆𝖗𝖙𝖎𝖓 𝕶𝖎𝖓𝖌
1445 Crestview Avenue
Akron, Ohio 44320-4049

November 13, 2023

D. Aaron Rihn, Esq.                              Peter S. Wolff, Esq.
Robert Peirce & Associates P.C.                  Pietragallo Gordon Alfano Bostic & Raspanti LLP
700 Grant Street, Suite 125                      1 Oxford Centre, 38th Floor
Pittsburgh, Pennsylvania 15219-1906              Pittsburgh, Pennsylvania 15219-1400

*Sent via fax to (412) 281-4229*                 *Sent via fax to (412) 263-2001*

RE:   ***In re: Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products
      Liability Litigation***
      Case No. 2:21-mc-01230-JFC, MDL No. 3014 (W.D. Pa)

Gentlemen:

        My name is Derrick Martin King and I currently am a plaintiff in a products liability action
against Koninklijke Philips N.V. and several other entities over their recall of various CPAP, Bi-
PAP, and mechanical ventilators. My case initiated in the Summit County (Ohio) Court of
Common Pleas, then removed to the United States District Court for the Northern District of Ohio.
Counsel for Philips RS North America LLC filed a notice of tag-along action with the Judicial
Panel on Multidistrict Litigation.

        Following briefing, the J.P.M.L. issued a conditional transfer order (see attached) on
October 26, 2023 which sends this case to the MDL in the Western District of Pennsylvania. In
reviewing the Pretrial Order No. 15, ECF No. 574, it is my understanding that you are appointed
as discovery liaison counsel.

        In a November 2, 2023 pleading filed in the Northern District of Ohio, counsel for Philips
RS North America LLC stated the following in regards to discovery:

        Plaintiff argues only that he would be prejudiced with respect to his ability to
        conduct discovery, but expressly acknowledges that any such purported prejudice
        could be "dealt with" by being able to access the discovery already produced in the
        Philips MDL. Id at 2. This is not a legitimate ground to oppose a stay. Plaintiff can

D. Aaron Rihn, Esq. & Peter S. Wolff, Esq.
November 13, 2023
Page 2

      benefit from the common discovery once this action is transferred to the Philips
MDL, and any inquiries concerning discovery can be directed to the Plaintiffs'
Leadership Committee appointed by the Philips MDL court. The parties in the
MDL have substantially completed their document production (producing more
than two million documents to date), and depositions are well underway.

*Reply Memorandum in Further Support of Defendant Philips RS North America LLC's Motion to
Stay Proceedings Pending Transfer to MDL No. 3014* (N.D. Ohio ECF No. 9, Page ID 701-02).

      It should be noted that on November 5, 2023, I sent an email to the both of you explaining
the situation (see attached). Thus far, I have received **NO RESPONSE.** I am thus writing again
and if there is no response by November 20, 2023, I will have no choice but to seek relief with
Judge Conti.

      I look forward to hearing from you in the very near future.

                     Sincerely Yours,

                     Derrick M. King
                     *Pro se Plaintiff*

Enclosures

11/13/2023 11:50                                                                                    Page 4/14

Case 2:21-mc-01230-JFC   Document 2412-1   Filed 01/04/24   Page 136 of 165
Case MDL No. 3014   Document 826   Filed 10/27/23   Page 1 of 2

# UNITED STATES JUDICIAL PANEL
## on
## MULTIDISTRICT LITIGATION

**IN RE: PHILIPS RECALLED CPAP, BI−LEVEL PAP,
AND MECHANICAL VENTILATOR PRODUCTS
LIABILITY LITIGATION**                                                                    MDL No. 3014

(SEE ATTACHED SCHEDULE)

## CONDITIONAL TRANSFER ORDER (CTO −84)

On October 8, 2021, the Panel transferred 10 civil action(s) to the United States District Court for the Western District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. *See* 568 F.Supp.3d 1408 (J.P.M.L. 2021). Since that time, 293 additional action(s) have been transferred to the Western District of Pennsylvania. With the consent of that court, all such actions have been assigned to the Honorable Joy Flowers Conti.

It appears that the action(s) on this conditional transfer order involve questions of fact that are common to the actions previously transferred to the Western District of Pennsylvania and assigned to Judge Conti.

Pursuant to Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, the action(s) on the attached schedule are transferred under 28 U.S.C. § 1407 to the Western District of Pennsylvania for the reasons stated in the order of October 8, 2021, and, with the consent of that court, assigned to the Honorable Joy Flowers Conti.

This order does not become effective until it is filed in the Office of the Clerk of the United States District Court for the Western District of Pennsylvania. The transmittal of this order to said Clerk shall be stayed 7 days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this 7−day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

*Tiffaney D. Pete*

Tiffaney D. Pete
Clerk of the Panel

**IN RE: PHILIPS RECALLED CPAP, BI−LEVEL PAP,
AND MECHANICAL VENTILATOR PRODUCTS
LIABILITY LITIGATION**                                                MDL No. 3014

## SCHEDULE CTO−84 − TAG−ALONG ACTIONS

| DIST | DIV. | C.A.NO. | CASE CAPTION |
|------|------|---------|--------------|
| OHIO NORTHERN | | | |
| OHN | 5 | 23−02042 | King v. Koninklijke Philips N.V. et al. |

11/13/2023 11:50                                                                                                    Page 6/14

Case 2:21-mc-01230-JFC   Document 2412-1   Filed 01/04/24   Page 138 of 165
Case: 5:23-cv-02042-PAB   Doc #: 9   Filed: 11/02/23   1 of 5.   PageID #: 700

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION AT AKRON

| | |
|---|---|
| DERRICK M. KING | § |
| | § |
| *Plaintiff*, | § |
| | § |
| v. | § |
| | § |
| KONINKLIJKE PHILIPS N.V., PHILIPS | § |
| NORTH AMERICA, LLC; PHILIPS RS | § |
| NORTH AMERICA, LLC, PHILIPS | § |
| HOLDING USA, INC., PHILIPS RS | § CIVIL ACTION NO. 5:23-cv-02042 |
| NORTH AMERICA HOLDING CORP., | § |
| POLYMER TECHNOLOGIES, INC, | § |
| POLYMER TECHNOLOGIES, INC | § |
| MOLDED PRODUCTS DIVISION, and | § |
| POLYMER TECHNOLOGIES INC., | § |
| ELASTOMETRIC SOLUTIONS | § |
| DIVISION | § |
| | § |
| *Defendants*. | § |

## REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANT PHILIPS RS NORTH AMERICA LLC'S MOTION TO STAY PROCEEDINGS PENDING TRANSFER TO MDL NO. 3014

Defendant Philips RS North America LLC ("Philips RS") established in its Motion to Stay

Proceedings Pending Transfer to MDL No. 3014 (ECF No. 4) (the "Motion to Stay") that a stay

of this action (i) is warranted to promote judicial efficiency and to prevent inconsistent rulings in

light of its pending transfer to *In re: Philips Recalled CPAP, Bi-Level PAP, & Mechanical*

*Ventilator Products Litigation*, 2:21-mc-01230 (W.D. Pa.) (the "Philips MDL"), (ii) will be short

and will not prejudice Plaintiff, and (iii) is necessary to avoid significant prejudice to Defendants.

But, as Plaintiff made clear in his recent filing with the JPML, he ***does not oppose the transfer of***

***this case to the Philips MDL***. *In re: Philips Recalled CPAP, Bi-Level PAP, & Mechanical*

*Ventilator Products Litigation*, MDL No. 3014 (ECF No. 825 at ¶ 4). Plaintiff's non-opposition

11/13/2023 11:50                                                                                    Page 7/14

Case 2:21-mc-01230-JFC   Document 2412-1   Filed 01/04/24   Page 139 of 165
Case: 5:23-cv-02042-PAB   Doc #: 9   Filed: 11/02/23   2 of 5.   PageID #: 701

to transfer and the associated certainty that this case will be sent to the MDL strongly warrant a

stay of this action. *See generally*, Motion to Stay.[1]

      Moreover, and notwithstanding his agreement to proceed to the MDL rather than litigate

in this Court, Plaintiff filed what he styled as an Opposition to the Motion to Stay Proceedings

(ECF No. 5) (the "Opposition to Stay"). This Opposition to Stay rests on a lack of understanding

of the MDL process and does not meaningfully address the factors heavily weighing in favor of a

stay.

      *First*, Plaintiff does not articulate any real disagreement with Philips RS's demonstration

that the three factors—judicial economy, burden to the moving party absent a stay, and prejudice

to the non-moving party—weigh heavily in favor of a stay. Plaintiff does not dispute that a stay

of this action would promote judicial economy or that Defendants would be burdened if forced to

litigate in multiple venues.[2] Plaintiff argues only that he would be prejudiced with respect to his

ability to conduct discovery, but expressly acknowledges that any such purported prejudice could

be "dealt with" by being able to access the discovery already produced in the Philips MDL. *Id* at

2. This is not a legitimate ground to oppose a stay. Plaintiff can benefit from the common

discovery once this action is transferred to the Philips MDL, and any inquiries concerning

discovery can be directed to the Plaintiffs' Leadership Committee appointed by the Philips MDL

court. The parties in the MDL have substantially completed their document production (producing

---

[1] On October 27, 2023, the JPML issued an order conditionally transferring this action to the Philips MDL. *In re: Philips Recalled CPAP, Bi-Level PAP, & Mechanical Ventilator Products Litigation*, MDL No. 3014 (ECF No. 826). Transfer is anticipated on or around November 3, 2023.

[2] Plaintiff argues that "[t]he Defendants will not be prejudiced by continuing to litigate in the opening stages since many of them do not know about the litigation." Opposition to Stay at 2. This superficial argument does not warrant denial of a short stay to effectuate the uncontested transfer of this case.

11/13/2023 11:50                                                                Page 8/14
Case 2:21-mc-01230-JFC   Document 2412-1   Filed 01/04/24   Page 140 of 165
Case: 5:23-cv-02042-PAB  Doc #: 9  Filed: 11/02/23  3 of 5.  PageID #: 702

more than two million documents to date), and depositions are well underway. Moreover, the Philips MDL has issued numerous orders bearing on discovery,[3] which would each need to be replicated in this Court to ensure consistency. In sum, it would be incredibly inefficient to allow discovery, or to otherwise allow this action to proceed, in this Court. Upon transfer to the Philips MDL, Plaintiff will receive the benefit of each of these processes—which Plaintiff himself claims resolves any claim of prejudice. *Id.* Plaintiff also can access the Philips MDL court filings on the Western District of Pennsylvania court website: https://www.pawd.uscourts.gov/mdl-3014-re-philips-recalled-cpap-bi-level-pap-and-mechanical-ventilator-products-litigation.

*Second*, Plaintiff complains that Philips RS "failed to send Plaintiff an email notifying him of the filing of the motion." Opposition to Stay at 2. Email notification is not a requirement to effectuate service; service by mail is sufficient. *See* Federal Rule of Civil Procedure 5(b)(2)(C). All documents filed by Philips RS in this action, in all relevant courts, were properly served on Plaintiff via first-class mail. Philips RS properly served Plaintiff with all papers filed to date and his complaints are unfounded.[4]

## CONCLUSION

For the foregoing reasons, Philips RS respectfully requests that this Court grant its Motion To Stay Proceedings Pending Transfer To MDL No. 3014.

---

[3] *See, e.g.*, Pre-Trial Order No. 17 (Philips MDL ECF No. 605); Pre-Trial Order No. 18 (Philips MDL ECF No. 660); Pre-Trial Order No. 19 (Philips MDL ECF No. 661); Pre-Trial Order No. 29 (Philips MDL No. 946); Amended Stipulated Protective Order (Philips MDL ECF No. 765).

[4] Plaintiff also takes issue with Philips RS removing the matter before formal service of the Complaint. Opposition to Stay at 2. But a party is permitted to remove a case prior to formal service. 28 U.S.C. 1446(b).

- 3 -

11/13/2023 11:50                                                                    Page 9/14

Case 2:21-mc-01230-JFC   Document 2412-1   Filed 01/04/24   Page 141 of 165
Case: 5:23-cv-02042-PAB   Doc #: 9   Filed: 11/02/23   4 of 5.   PageID #: 703

Respectfully submitted,


John P. Lavelle, Jr.                              /s/ Wendy West Feinstein
**MORGAN, LEWIS & BOCKIUS LLP**                   Wendy West Feinstein (0064973), Trial Attorney
1701 Market Street                                **MORGAN, LEWIS & BOCKIUS LLP**
Philadelphia, PA  19103-2921                      One Oxford Centre
Telephone:     +1.215.963.5000                    Thirty-Second Floor
Facsimile:     +1.215.963.5001                    Pittsburgh, PA  15219
*john.lavelle@morganlewis.com*                    Telephone: +1.412.560.7455
                                                  Facsimile: +1.412.560.3300
                                                  *wendy.feinstein@morganlewis.com*


*Of Counsel for Defendant Philips RS North*       *Attorneys for Defendant Philips RS North*
*America LLC*                                      *America LLC*


Dated:  November 2, 2023


- 4 -

11/13/2023 11:50                                                                                      Page 10/14

Case 2:21-mc-01230-JFC   Document 2412-1   Filed 01/04/24   Page 142 of 165
Case: 5:23-cv-02042-PAB   Doc #: 9   Filed: 11/02/23   5 of 5.   PageID #: 704

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 2, 2023, a true and exact copy of the

foregoing document was served via ECF and first-class mail to:

Derrick M. King
1445 Crestview Ave
Akron, OH 44320-4049
Phone: (330) 867-3979
Email: dmking12370@hotmail.com

/s/ Wendy West Feinstein
Wendy West Feinstein (0064973)

**dmking12370@hotmail.com**

| | |
|---|---|
| **From:** | Derrick Martin King on behalf of dmking12370@hotmail.com |
| **Sent:** | Sunday, November 5, 2023 12:38 PM |
| **To:** | D. Aaron Rihn (arihn@peincelaw.com); Peter St. Tienne Wolff (psw@pietragallo.com) |
| **Subject:** | In re Philips CPAP Products Liability Litigation, MDL-3014 |

Mr. Rihn and Mr. Wolff,

My name is Derrick Martin King and I am a pro se plaintiff in a personal injury products liability complaint against the Philips and PolyTech defendants. The complaint was initially filed in state court, then removed to the Northern District of Ohio. Philips RS North America filed a notice of potential tag along with the JPML, and on October 26, 2023 the JPML entered a conditional transfer order I have attached a copy of the conditional transfer order.

The reason for my email is twofold, First, I am requesting that I be provided with a copy of all documents that have been filed with the court. Since I am pro se, production of those court documents will be essential so that I do not submit something that may have already been adjudicated by the Court. I do have access to Adobe Acrobat and can download the documents either as a PDF file or a ZIP file.

My second request is for access to all the discovery that has occurred in this case to date. From what I understand, there is some online portal where the discovery documents and ESI is placed (that is password protected).

Any assistance you could provide me in this would be greatly appreciated.

2023-10-26 MDL
Conditional Ord...



**DERRICK MARTIN KING**
Phone: (330) 867-3979 or (330) 459-1122
E-Mail: dmking12370@hotmail.com or
dmking12370@gmail.com

NOTICE TO RECIPIENT: The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential, and/or privileged material. If you are not the intended recipient of this message, be aware that any use, review, retransmission, distribution, reproduction

1

or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.

11/13/2023 11:50                                                                                          Page 13/14

Case 2:21-mc-01230-JFC   Document 2412-1   Filed 01/04/24   Page 145 of 165
Case MDL No. 3014   Document 826   Filed 10/27/23   Page 1 of 2

## UNITED STATES JUDICIAL PANEL
### on
## MULTIDISTRICT LITIGATION

**IN RE: PHILIPS RECALLED CPAP, BI–LEVEL PAP,
AND MECHANICAL VENTILATOR PRODUCTS
LIABILITY LITIGATION**                                               MDL No. 3014

(SEE ATTACHED SCHEDULE)

### CONDITIONAL TRANSFER ORDER (CTO –84)

On October 8, 2021, the Panel transferred 10 civil action(s) to the United States District Court for the
Western District of Pennsylvania for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. §
1407. *See* 568 F.Supp.3d 1408 (J.P.M.L. 2021). Since that time, 293 additional action(s) have been
transferred to the Western District of Pennsylvania. With the consent of that court, all such actions have been
assigned to the Honorable Joy Flowers Conti.

It appears that the action(s) on this conditional transfer order involve questions of fact that are common to the
actions previously transferred to the Western District of Pennsylvania and assigned to Judge Conti.

Pursuant to Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation,
the action(s) on the attached schedule are transferred under 28 U.S.C. § 1407 to the Western District of
Pennsylvania for the reasons stated in the order of October 8, 2021, and, with the consent of that court,
assigned to the Honorable Joy Flowers Conti.

This order does not become effective until it is filed in the Office of the Clerk of the United States District
Court for the Western District of Pennsylvania. The transmittal of this order to said Clerk shall be stayed 7
days from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within this
7–day period, the stay will be continued until further order of the Panel.

FOR THE PANEL:

*Tiffaney D. Pete*

Tiffaney D. Pete
Clerk of the Panel

**IN RE: PHILIPS RECALLED CPAP, BI−LEVEL PAP,
AND MECHANICAL VENTILATOR PRODUCTS
LIABILITY LITIGATION**                                    MDL No. 3014

### SCHEDULE CTO−84 − TAG−ALONG ACTIONS

| DIST | DIV. | C.A.NO. | CASE CAPTION |
|------|------|---------|--------------|

OHIO NORTHERN

| | | | |
|------|------|---------|--------------|
| OHN | 5 | 23−02042 | King v. Koninklijke Philips N.V. et al. |

**dmking12370@hotmail.com**

**PLAINTIFF'S EXHIBIT**

**F**

| | |
|---|---|
| **From:** | Derrick Martin King |
| **Sent:** | Wednesday, November 29, 2023 6:05 PM |
| **To:** | Wendy West Feinstein (wendy.feinstein@morganlewis.com); William B. Monahan (monahanw@sullcrom.com); Michael H. Steinburg (steinbergm@sullcrom.com); John P. Lavelle Jr. (john.lavelle@morganlewis.com); Eric Scott Thompson (ethompson@fandpnet.com) |
| **Subject:** | In re: Philips CPAP Litigation, MDL-3014 |
| **Attachments:** | 2023-11-29 State Court Update of Case Status.pdf; 2023-11-29 Exexuted Protective Order.pdf |

Lady and Gentlemen,

Please find attach my Notice of Case Status that was filed today in the Summit County (Ohio) Court of Common Pleas. The notice merely notifies that court of the transfer to the Western District of Pennsylvania.

Now that I am formally a part of the MDL litigation, we need to discuss discovery. I am formally requesting a copy of all discovery that has been provided to the other plaintiffs. After that information is provided, I can then provide you with a supplemental discovery request to cover anything that was not previously provided but may be relevant. Please be advised that I have attached my signed agreement to be bound by the December 21, 2021 stipulated protective order (ECF No. 104).

I look forward to hearing from you in the very near future.



DERRICK MARTIN KING
Phone: (330) 867-3979 or (330) 459-1122
E-Mail: dmking12370@hotmail.com or
dmking12370@gmail.com

NOTICE TO RECIPIENT: The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential, and/or privileged material. If you are not the intended recipient of this message, be aware that any use, review, retransmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

In Re: PHILIPS RECALLED CPAP, BI-LEVEL
PAP, AND MECHANICAL VENTILATOR
PRODS. LITIG.

Master Docket: Misc. No. 21-1230

MDL No. 3014

## EXHIBIT A
## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, <u>Derrick M. Kin</u>[name], of <u>1445 Crestview Ave</u> <u>Akron OH 44320</u> [address],

declare under penalty of perjury that I have been provided the opportunity to read in its entirety, the

Stipulated Protective Order ("Protective Order") that was issued by the United States District Court

for the Western District of Pennsylvania, in the case of *In Re: Philips Recalled CPAP, Bi-Level*

*Pap, And Mechanical Ventilator Prods. Litig.,* and that I have either read the Protective Order, or I

have knowingly and voluntarily waived the reading of the entire Protective Order. I further declare

that I understand I am not permitted to disclose any Discovery Material designated as Confidential

and/or Highly Confidential – Attorney's Eyes Only, or use any Discovery Material constituting or

containing Confidential and/or Highly Confidential – Attorney's Eyes Only information for any

purpose other than as permitted in the Protective Order. I agree to comply with, and to be bound by

the terms of the Protective Order, and I understand and acknowledge that I will be subject to such

sanctions and remedies as the Court deems appropriate for violations of this Protective Order.

I further agree to submit to the jurisdiction of the United States District Court for the

Western District of Pennsylvania for the purpose of enforcing the terms of the Protective Order,

even if such enforcement proceedings occur after termination of this lawsuit.

Date: <u>Nov 29 2023</u>

Signature: <u>Derrick M. King</u>

# IN THE SUMMIT COUNTY COURT OF COMMON PLEAS

## GENERAL DIVISION

| | |
|---|---|
| **DERRICK MARTIN KING,** | Case No. **CV-2023-09-3475** |
| Plaintiff, | Judge **ALISON BREAUX** |
| v. | **PLAINTIFF DERRICK MARTIN KING'S UPDATE TO THE COURT** |
| **PHILIPS NORTH AMERICA LLC, et al.,** | |
| Defendants. | |

Now comes the *pro se* Plaintiff **DERRICK MARTIN KING,** and he presents the following update on the case:

1.      On September 21, 2023, Plaintiff filed a complaint with this Court.

2.      On October 18, 2023, Defendant Philips RS North America filed a notice of removal with this Court. *See King v. Koninklijke Philips N.V., et al.,* No. 5:23-cv-02042-PAB (N.D. Ohio). See Exhibit A (which is a copy of the docket sheet for the United States District Court for the Northern District of Ohio case).

3.      On October 25, 2023, counsel for Defendant Philips North America LLC filed a motion to stay proceedings on the basis of a notice of potential tag-along action that was filed with the Judicial Panel on Multidistrict Litigation (hereinafter "J.P.M.L.").

4.      On November 29, 2023, this case was formally transferred to the United States District Court for the Western District of Pennsylvania. *King v. Koninklijke Philips N.V.,* No. 2:23-cv-02040-JFC (W.D. Pa.) (a copy of the docket sheet is annexed hereto and marked as Exhibit B).

Plaintiff King will keep this Court notified on the status of the proceedings.

Dated: November 29, 2023                    Respectfully Submitted

                                            /s/ Derrick M. King
                                            **DERRICK M. KING**
                                            1445 Crestview Avenue
                                            Akron, Ohio 44320-4049
                                            Phone: (330) 867-3979
                                            Email: dmking12370@hotmail.com

                                            *Pro se Plaintiff*

                        **<u>PROOF OF SERVICE</u>**

        I hereby certify that a true and correct copy of the foregoing document was tendered for filing with
the Clerk of Court through its electronic case filing system. Notice of this filing shall be provided to all
registered users via that system.

                                            /s/ Derrick M. King
                                            **DERRICK M. KING**
                                            *Pro se Plaintiff*

PLAINTIFF'S
EXHIBIT

**A**

Armstrong,Cat08,Termed,Transf

**U.S. District Court**
**NORTHERN DISTRICT OF OHIO (Akron)**
**CIVIL DOCKET FOR CASE #: 5:23–cv–02042–PAB**

King v. Koninklijke Philips N.V. et al.
Assigned to: Judge Pamela A. Barker
Demand: $5,000,000
Case in other court:  Summit County Court of Common Pleas,
                                           CV–23–00009–3575
Cause: 28:1332 Diversity–(Citizenship)

Date Filed: 10/18/2023
Date Terminated: 11/29/2023
Jury Demand: Plaintiff
Nature of Suit: 365 Personal Inj. Prod.
Liability
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 10/18/2023 | 1 | **Notice of Removal** from Summit County Court of Common Pleas, case number CV–2023–09–3575 with jury demand, Filing fee paid $ 402, receipt number AOHNDC–12233487. Filed by Philips RS North America, LLC. (Attachments: # 1 Exhibit A – Complaint, # 2 Exhibit B – Philips Holding USA Corporate Records & Business Registrations, # 3 Exhibit C – Philips RS Records & Business Registrations, # 4 Exhibit D – JPML Transfer Orders, # 5 Civil Cover Sheet). (Feinstein, Wendy) (Entered: 10/18/2023) |
| 10/18/2023 | 2 | Corporate Disclosure Statement identifying Corporate Parent Koninklijke Philips Nasalize Venootschap, Other Affiliate Philips North America LLC, Other Affiliate Philips Holding USA, Inc., Other Affiliate Philips RS North America Holding Corp. for Philips RS North America, LLC filed by Philips RS North America, LLC. (Feinstein, Wendy) (Entered: 10/18/2023) |
| 10/18/2023 | | Judge Pamela A. Barker assigned to case. (P,G) (Entered: 10/18/2023) |
| 10/18/2023 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Jennifer Dowdell Armstrong. (P,G) (Entered: 10/18/2023) |
| 10/18/2023 | | **Order** [non–document] This matter was removed to this Court on 10/18/2023. For the convenience of the Court, and by no later than 11/1/2023, the parties are directed to refile herein any motions that were previously filed in state court and which remained pending at the time of removal. Judge Pamela A. Barker on 10/18/2023. (P,K) (Entered: 10/18/2023) |
| 10/18/2023 | | **Order** [non–document] The parties are hereby advised that this Court will not accept ex parte telephone calls to Chambers regarding substantive issues in pending cases. The Court speaks through its docket. While it may be appropriate to call Chambers regarding routine, non–substantive matters (such as requests for the dial in information for an upcoming status conference, etc.), it is not appropriate under any circumstances for counsel to call Chambers ex parte for guidance or clarification regarding substantive matters, including matters relating to existing case management deadlines, requests to file briefing, and/or inquiries regarding the status of pending motions. All questions regarding substantive matters in pending cases must be filed as a motion on the public docket, with the following exception. If a dispute arises during a deposition that requires this Courts immediate assistance, the parties may call Chambers for assistance, but must do so jointly (and not on an ex parte basis). Judge Pamela A. Barker on 10/18/2023. (P,K) (Entered: 10/18/2023) |
| 10/18/2023 | | Copy of non–document Orders mailed to Derrick M. King 1445 Crestview Avenue Akron, OH 44320 on 10/18/2023. (P,K) (Entered: 10/18/2023) |
| 10/19/2023 | 3 | Magistrate Consent Form issued. (P,G) (Entered: 10/19/2023) |
| 10/25/2023 | 4 | **Motion** to stay *Proceedings Pending Transfer to MDL No. 3014* filed by Defendant Philips RS North America, LLC. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A (Tag Along Notice), # 3 Exhibit B (Stay Orders), # 4 Proposed Order)(Feinstein, Wendy) (Entered: 10/25/2023) |

| 10/26/2023 | 5 | **Response** in Opposition to defendant Philips RS North America LLC's 4 **Motion** to stay *Proceedings Pending Transfer to MDL No. 3014* filed by Derrick M. King. (E,CK) (Entered: 10/26/2023) |
|---|---|---|
| 11/01/2023 | 6 | **Amended complaint** for personal injuries and monetary damages against Koninklijke Philips N.V., Philips North America, LLC, Polymer Technologies, Inc. and adding new party defendant(s) Philips Holding USA, Inc.; Philips North America, Inc.; Philips RS North America Holding Corporation; Polymer Molded Products LLC. Filed by Derrick M. King. (Attachments: # 1 Exhibit 1 – Medical Devise Recall, # 2 Exhibit 2 – Observation Risk Analysis, # 3 Exhibit 3 – Sleep and Respiratory Care Update, # 4 Exhibit 4 – Recall Information, # 5 Exhibit 5 – DreamStation, # 6 Exhibit 6 – 518(a) Notification Order, # 7 Exhibit 7 – Hearing Notice, # 8 Exhibit 8 – Formaldehyde Info, # 9 Exhibit 9 – Report on Carcinogens, # 10 Exhibit 10 – Supplemental Clinical Information, # 11 Exhibit 11 – Toluene Ditsocyanates, # 12 Exhibit 12 – Report on Carcinogens, # 13 Exhibit 13 – Current Intelligence Bulletin 53, # 14 Exhibit 14 – Fact Sheet – TDI and Related Compounds, # 15 Exhibit 15 – Report of Carcinogens, # 16 Exhibit 16 – Diaminotoluene, # 17 Exhibit 17 – Sulfanilamide Disaster, # 18 Exhibit 18 – Affidavit of Lee Lawler, # 19 Exhibit 19 – DreamStation User Manual, # 20 Exhibit 20 – Delivery Ticket, # 21 Summons, # 22 USM–285) (B,DL) (Entered: 11/01/2023) |
| 11/01/2023 | 7 | **Motion/Application** to proceed in District Court without prepaying fees or costs filed by Plaintiff Derrick M. King. (B,DL) (Entered: 11/01/2023) |
| 11/01/2023 | 8 | Combined Response to Court's October 18, 2023 Order and Request for either the United States Marshal or the Clerk of Courts Perform Service of the Summons, Complaint, and First Amended Complaint upon Defendants filed by Derrick M. King. (Attachments: # 1 Exhibit A – Motion to Proceed in Forma Pauperis, # 2 Exhibit B – Omnibus Motion of Pro Se Litigant) (B,DL) (Entered: 11/01/2023) |
| 11/02/2023 | 9 | **Reply** in support of 4 **Motion** to stay *Proceedings Pending Transfer to MDL No. 3014* filed by Philips RS North America, LLC. (Feinstein, Wendy) (Entered: 11/02/2023) |
| 11/29/2023 | 10 | **Conditional Transfer Order (CTO 84)** by the Judicial Panel on Multidistrict Litigation. In re: MDL No. 3014 Phillips Recalled CPAP, Bi–Level PAP, and Mechanical Ventilator Products Liability Litigation. Case transferred to Western District of Pennsylvania and assigned to the Honorable Joy Flowers Conti. (M,CE) (Entered: 11/29/2023) |
| 11/29/2023 | | Copy of 10 Conditional Transfer Order mailed to Derrick M. King at 1445 Crestview Avenue, Akron, OH 44320 on 11/29/2023. Related document(s) 10 . (M,CE) (Entered: 11/29/2023) |
| 11/29/2023 | | Case transferred from Northern District of Ohio has been opened in Western District of Pennsylvania as case 2:23–cv–02040, filed 11/29/2023.Related document(s) 10 . (R,AP) (Entered: 11/29/2023) |



# U.S. District Court
## Western District of Pennsylvania (Pittsburgh)
## CIVIL DOCKET FOR CASE #: 2:23-cv-02040-JFC

King v. Koninklijke Philips N.V. et al.                    Date Filed: 11/29/2023
Assigned to: Judge Joy Flowers Conti                     Jury Demand: Plaintiff
Demand: $5,000,000                                        Nature of Suit: 365 Personal Inj. Prod.
Lead case: 2:21-mc-01230-JFC                              Liability
Member case: (View Member Case)                          Jurisdiction: Diversity
Case in other court: Ohio Northern, 5:23-cv-02042
                     Judicial Panel on Multidistrict Litigation,
                     MDL 3014
Cause: 28:1332 Diversity-(Citizenship)

**Plaintiff**

**Derrick M. King**                    represented by   **Derrick M. King**
                                                        1445 Crestview Avenue
                                                        Akron, OH 44320
                                                        330-867-3979
                                                        PRO SE

V.

**Defendant**

**PHILIPS NORTH AMERICA LLC**

**Defendant**

**PHILIPS RS NORTH AMERICA LLC.**      represented by   **Wendy West Feinstein**
                                                        Morgan, Lewis & Bockius LLP
                                                        One Oxford Centre
                                                        32nd Floor
                                                        Pittsburgh, PA 15219-6401
                                                        (412) 560-7455
                                                        Fax: (412) 560-7001
                                                        Email:
                                                        wendy.feinstein@morganlewis.com
                                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**KONINKLIJKE PHILIPS N.V.**

**Defendant**

**POLYMER TECHNOLOGIES INC**

**Defendant**

**Polymer Technologies, Inc., Molded
Products Division**

**Defendant**

**Polymer Technologies Inc.,
Elastometric Solutions Division**

**Defendant**

**PHILIPS HOLDING USA INC.**

**Defendant**

**Philips RS North America, Inc.**

**Defendant**

**Philips RS North America Holding
Corp.**

**Defendant**

**POLYMER MOLDED PRODUCTS LLC**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/18/2023 | 1 | **Notice of Removal** from Summit County Court of Common Pleas, case number CV-2023-09-3575 with jury demand, Filing fee paid $ 402, receipt number AOHNDC-12233487. Filed by Philips RS North America, LLC. (Attachments: # 1 Exhibit A - Complaint, # 2 Exhibit B - Philips Holding USA Corporate Records & Business Registrations, # 3 Exhibit C - Philips RS Records & Business Registrations, # 4 Exhibit D - JPML Transfer Orders, # 5 Civil Cover Sheet). (Feinstein, Wendy) (Entered: 10/18/2023) |
| 10/18/2023 | 2 | Corporate Disclosure Statement identifying Corporate Parent Koninklijke Philips Nasalize Venootschap, Other Affiliate Philips North America LLC, Other Affiliate Philips Holding USA, Inc., Other Affiliate Philips RS North America Holding Corp. for Philips RS North America, LLC filed by Philips RS North America, LLC. (Feinstein, Wendy) (Entered: 10/18/2023) |
| 10/18/2023 | | Judge Pamela A. Barker assigned to case. (P,G) (Entered: 10/18/2023) |
| 10/18/2023 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Jennifer Dowdell Armstrong. (P,G) (Entered: 10/18/2023) |
| 10/18/2023 | | **Order** [non-document] This matter was removed to this Court on 10/18/2023. For the convenience of the Court, and by no later than 11/1/2023, the parties are directed to refile herein any motions that were previously filed in state court and which remained pending at the time of removal. Judge Pamela A. Barker on 10/18/2023. (P,K) (Entered: 10/18/2023) |
| 10/18/2023 | | **Order** [non-document] The parties are hereby advised that this Court will not accept ex parte telephone calls to Chambers regarding substantive issues in pending cases. The Court speaks through its docket. While it may be appropriate to call Chambers regarding routine, non-substantive matters (such as requests for the dial in information for an upcoming status conference, etc.), it is not appropriate under any circumstances for counsel to call Chambers ex parte for guidance or clarification regarding substantive matters, including matters relating to existing case management deadlines, requests to file briefing, and/or inquiries regarding the status of pending motions. All questions regarding substantive |

| | | |
|---|---|---|
| | | matters in pending cases must be filed as a motion on the public docket, with the following exception. If a dispute arises during a deposition that requires this Courts immediate assistance, the parties may call Chambers for assistance, but must do so jointly (and not on an ex parte basis). Judge Pamela A. Barker on 10/18/2023. (P,K) (Entered: 10/18/2023) |
| 10/18/2023 | | Copy of non-document Orders mailed to Derrick M. King 1445 Crestview Avenue Akron, OH 44320 on 10/18/2023. (P,K) (Entered: 10/18/2023) |
| 10/19/2023 | 3 | Magistrate Consent Form issued. (P,G) (Entered: 10/19/2023) |
| 10/25/2023 | 4 | **Motion** to stay *Proceedings Pending Transfer to MDL No. 3014* filed by Defendant Philips RS North America, LLC. (Attachments: # 1 Memorandum in Support, # 2 Exhibit A (Tag Along Notice), # 3 Exhibit B (Stay Orders), # 4 Proposed Order) (Feinstein, Wendy) (Entered: 10/25/2023) |
| 10/26/2023 | 5 | **Response** in Opposition to defendant Philips RS North America LLC's 4 **Motion** to stay *Proceedings Pending Transfer to MDL No. 3014* filed by Derrick M. King. (E,CK) (Entered: 10/26/2023) |
| 11/01/2023 | 6 | **Amended complaint** for personal injuries and monetary damages against Koninklijke Philips N.V., Philips North America, LLC, Polymer Technologies, Inc. and adding new party defendant(s) Philips Holding USA, Inc.; Philips RS North America, Inc.; Philips RS North America Holding Corporation; Polymer Molded Products LLC. Filed by Derrick M. King. (Attachments: # 1 Exhibit 1 - Medical Devise Recall, # 2 Exhibit 2 - Observation Risk Analysis, # 3 Exhibit 3 - Sleep and Respiratory Care Update, # 4 Exhibit 4 - Recall Information, # 5 Exhibit 5 - DreamStation, # 6 Exhibit 6 - 518(a) Notification Order, # 7 Exhibit 7 - Hearing Notice, # 8 Exhibit 8 - Formaldehyde Info, # 9 Exhibit 9 - Report on Carcinogens, # 10 Exhibit 10 - Supplemental Clinical Information, # 11 Exhibit 11 - Toluene Ditsocyanates, # 12 Exhibit 12 - Report on Carcinogens, # 13 Exhibit 13 - Current Intelligence Bulletin 53, # 14 Exhibit 14 - Fact Sheet - TDI and Related Compounds, # 15 Exhibit 15 - Report of Carcinogens, # 16 Exhibit 16 - Diaminotoluene, # 17 Exhibit 17 - Sulfanilamide Disaster, # 18 Exhibit 18 - Affidavit of Lee Lawler, # 19 Exhibit 19 - DreamStation User Manual, # 20 Exhibit 20 - Delivery Ticket, # 21 Summons, # 22 USM-285) (B,DL) (Entered: 11/01/2023) |
| 11/01/2023 | 7 | **Motion/Application** to proceed in District Court without prepaying fees or costs filed by Plaintiff Derrick M. King. (B,DL) (Entered: 11/01/2023) |
| 11/01/2023 | 8 | Combined Response to Court's October 18, 2023 Order and Request for either the United States Marshal or the Clerk of Courts Perform Service of the Summons, Complaint, and First Amended Complaint upon Defendants filed by Derrick M. King. (Attachments: # 1 Exhibit A - Motion to Proceed in Forma Pauperis, # 2 Exhibit B - Omnibus Motion of Pro Se Litigant) (B,DL) (Entered: 11/01/2023) |
| 11/02/2023 | 9 | **Reply** in support of 4 **Motion** to stay *Proceedings Pending Transfer to MDL No. 3014* filed by Philips RS North America, LLC. (Feinstein, Wendy) (Entered: 11/02/2023) |
| 11/29/2023 | 10 | **Conditional Transfer Order (CTO 84)** by the Judicial Panel on Multidistrict Litigation. In re: MDL No. 3014 Phillips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator Products Liability Litigation. Case transferred to Western District of Pennsylvania and assigned to the Honorable Joy Flowers Conti. (M,CE) (Entered: 11/29/2023) |

| 11/29/2023 |    | Copy of 10 Conditional Transfer Order mailed to Derrick M. King at 1445 Crestview Avenue, Akron, OH 44320 on 11/29/2023. Related document(s) 10 . (M,CE) (Entered: 11/29/2023) |
|---|---|---|
| 11/29/2023 | 11 | Case transferred in from District of Ohio Northern; Case Number 5:23-cv-02042. Original file certified copy of transfer order and docket sheet received. (Entered: 11/29/2023) |

**dmking12370@hotmail.com**

**PLAINTIFF'S EXHIBIT G**

| | |
|---|---|
| **From:** | Lavelle, Jr., John P. <john.lavelle@morganlewis.com> |
| **Sent:** | Thursday, November 30, 2023 2:52 PM |
| **To:** | Derrick Martin King; Feinstein, Wendy West; William B. Monahan (monahanw@sullcrom.com); Michael H. Steinburg (steinbergm@sullcrom.com); Eric Scott Thompson (ethompson@fandpnet.com) |
| **Cc:** | Steven Schwartz; cseeger@seegerweiss.com; Sandra Duggan; Kelly Iverson |
| **Subject:** | RE: In re: Philips CPAP Litigation, MDL-3014 |
| **Attachments:** | 3014_Pretrial_Order_8.pdf |

Mr. King-

Please see attached Pretrial Order No. 8 entered by Judge Conti in MDL 3014 appointing plaintiffs' co-lead counsel and steering committee.  Under the Court's Order, plaintiffs' leadership coordinates and conducts all pretrial discovery on behalf of plaintiffs in the MDL.  You should direct your requests for discovery materials produced in the MDL directly to plaintiffs' leadership.  I have copied them on this email so they are aware of your request.

**John P. Lavelle Jr.**
**Morgan, Lewis & Bockius LLP**
2222 Market Street | Philadelphia, PA 19103-3007
Direct: +1.215.963.4824 | Main: +1.215.963.5000 | Mobile: +1.610.331.3910 | Fax: +1.215.963.5001
Assistant: Teresa G. Helm | +1.215.963.5590 | teresa.helm@morganlewis.com

502 Carnegie Center | Princeton, NJ 08540-6241
Direct: +1.609.919.6688 | Main: +1.609.919.6600 | Fax: +1.609.919.6701
john.lavelle@morganlewis.com | www.morganlewis.com

Morgan Lewis 150 YEARS

**150 YEARS OF RAISING THE BAR**

Learn More

**From:** Derrick Martin King <dmking12370@hotmail.com>
**Sent:** Wednesday, November 29, 2023 6:05 PM
**To:** Feinstein, Wendy West <wendy.feinstein@morganlewis.com>; William B. Monahan (monahanw@sullcrom.com) <monahanw@sullcrom.com>; Michael H. Steinburg (steinbergm@sullcrom.com) <steinbergm@sullcrom.com>; Lavelle, Jr., John P. <john.lavelle@morganlewis.com>; Eric Scott Thompson (ethompson@fandpnet.com) <ethompson@fandpnet.com>
**Subject:** In re: Philips CPAP Litigation, MDL-3014

[EXTERNAL EMAIL]
Lady and Gentlemen,

Please find attach my Notice of Case Status that was filed today in the Summit County (Ohio) Court of Common Pleas. The notice merely notifies that court of the transfer to the Western District of Pennsylvania.

1

Now that I am formally a part of the MDL litigation, we need to discuss discovery. I am formally requesting a copy of all discovery that has been provided to the other plaintiffs. After that information is provided, I can then provide you with a supplemental discovery request to cover anything that was not previously provided but may be relevant. Please be advised that I have attached my signed agreement to be bound by the December 21, 2021 stipulated protective order (ECF No. 104).

I look forward to hearing from you in the very near future.



DERRICK MARTIN KING
Phone: (330) 867-3979 or (330) 459-1122
E-Mail: dmking12370@hotmail.com or
dmking12370@gmail.com

NOTICE TO RECIPIENT: The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential, and/or privileged material. If you are not the intended recipient of this message, be aware that any use, review, retransmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.

**dmking12370@hotmail.com**



| | |
|---|---|
| **From:** | Derrick Martin King |
| **Sent:** | Thursday, November 30, 2023 3:30 PM |
| **To:** | Lavelle, Jr., John P. |
| **Subject:** | RE: In re: Philips CPAP Litigation, MDL-3014 |

<span style="color:red">Be advised that you have twenty-four hours to indicate whether you wish to cooperate or a motion to compel with sanctions will be filed with the trial court.</span>

<span style="color:red">This will be your final notice!</span>

**From:** Lavelle, Jr., John P. <john.lavelle@morganlewis.com>
**Sent:** Thursday, November 30, 2023 2:52 PM
**To:** Derrick Martin King <dmking12370@hotmail.com>; Feinstein, Wendy West <wendy.feinstein@morganlewis.com>; William B. Monahan (monahanw@sullcrom.com) <monahanw@sullcrom.com>; Michael H. Steinburg (steinbergm@sullcrom.com) <steinbergm@sullcrom.com>; Eric Scott Thompson (ethompson@fandpnet.com) <ethompson@fandpnet.com>
**Cc:** Steven Schwartz <steveschwartz@chimicles.com>; cseeger@seegerweiss.com; Sandra Duggan <sduggan@lfsblaw.com>; Kelly Iverson <kelly@lcllp.com>
**Subject:** RE: In re: Philips CPAP Litigation, MDL-3014

Mr. King-

Please see attached Pretrial Order No. 8 entered by Judge Conti in MDL 3014 appointing plaintiffs' co-lead counsel and steering committee.  Under the Court's Order, plaintiffs' leadership coordinates and conducts all pretrial discovery on behalf of plaintiffs in the MDL.  You should direct your requests for discovery materials produced in the MDL directly to plaintiffs' leadership.  I have copied them on this email so they are aware of your request.

**John P. Lavelle Jr.**
**Morgan, Lewis & Bockius LLP**
2222 Market Street | Philadelphia, PA 19103-3007
Direct: +1.215.963.4824 | Main: +1.215.963.5000 | Mobile: +1.610.331.3910 | Fax: +1.215.963.5001
Assistant: Teresa G. Helm | +1.215.963.5590 | teresa.helm@morganlewis.com

502 Carnegie Center | Princeton, NJ 08540-6241
Direct: +1.609.919.6688 | Main: +1.609.919.6600 | Fax: +1.609.919.6701
john.lavelle@morganlewis.com | www.morganlewis.com



150 YEARS OF RAISING THE BAR

Learn More

**From:** Derrick Martin King <dmking12370@hotmail.com>
**Sent:** Wednesday, November 29, 2023 6:05 PM
**To:** Feinstein, Wendy West <wendy.feinstein@morganlewis.com>; William B. Monahan (monahanw@sullcrom.com)

1

<[monahanw@sullcrom.com](mailto:monahanw@sullcrom.com)>; Michael H. Steinburg ([steinbergm@sullcrom.com](mailto:steinbergm@sullcrom.com)) <[steinbergm@sullcrom.com](mailto:steinbergm@sullcrom.com)>; Lavelle, Jr., John P. <[john.lavelle@morganlewis.com](mailto:john.lavelle@morganlewis.com)>; Eric Scott Thompson ([ethompson@fandpnet.com](mailto:ethompson@fandpnet.com))
<[ethompson@fandpnet.com](mailto:ethompson@fandpnet.com)>
**Subject:** In re: Philips CPAP Litigation, MDL-3014

[EXTERNAL EMAIL]
Lady and Gentlemen,

Please find attach my Notice of Case Status that was filed today in the Summit County (Ohio) Court of Common Pleas. The notice merely notifies that court of the transfer to the Western District of Pennsylvania.

Now that I am formally a part of the MDL litigation, we need to discuss discovery. I am formally requesting a copy of all discovery that has been provided to the other plaintiffs. After that information is provided, I can then provide you with a supplemental discovery request to cover anything that was not previously provided but may be relevant. Please be advised that I have attached my signed agreement to be bound by the December 21, 2021 stipulated protective order (ECF No. 104).

I look forward to hearing from you in the very near future.



DERRICK MARTIN KING
Phone: (330) 867-3979 or (330) 459-1122
E-Mail: [dmking12370@hotmail.com](mailto:dmking12370@hotmail.com) or
[dmking12370@gmail.com](mailto:dmking12370@gmail.com)

NOTICE TO RECIPIENT: The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential, and/or privileged material. If you are not the intended recipient of this message, be aware that any use, review, retransmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.

**dmking12370@hotmail.com**



| | |
|---|---|
| **From:** | Gordon, Zachary <zgordon@peircelaw.com> |
| **Sent:** | Monday, December 4, 2023 10:57 AM |
| **To:** | Derrick Martin King |
| **Subject:** | RE: In re: Philips CPAP Litigation, MDL-3014 |

I received the signed agreement. Thank you for sending!

Zach Gordon
Case Manager
Robert Peirce & Associates, P.C.
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 Phone
(800) 543-9859 Toll-Free
(412) 281-4229 Fax
zgordon@peircelaw.com

NOTICE: This electronic message is to be used exclusively by the individual or entity to which it is addressed. This message may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Unless you are the intended recipient, any copying, use or dissemination of the message is strictly prohibited. If you receive this message in error, please notify us immediately and permanently delete this message from your system without making any copies. Although this electronic message and any attachments are believed to be free of any virus or other defect that might affect computer systems by which it is received or opened, it is the responsibility of the recipient to ensure that it is virus free, and we disclaim any liability for loss or damage arising in any way from its use.

**From:** Derrick Martin King <dmking12370@hotmail.com>
**Sent:** Friday, December 1, 2023 5:29 PM
**To:** Gordon, Zachary <zgordon@peircelaw.com>
**Subject:** RE: In re: Philips CPAP Litigation, MDL-3014

**Caution:** This E-mail originated from outside the organization. Please take care when clicking links or opening attachments.

My apologies. I just seen the separate email from Adobe Sign.

Will be reviewing the documents promptly.

**From:** Gordon, Zachary <zgordon@peircelaw.com>
**Sent:** Friday, December 1, 2023 3:45 PM
**To:** Derrick Martin King <dmking12370@hotmail.com>
**Cc:** Rihn, Aaron <arihn@peircelaw.com>
**Subject:** RE: In re: Philips CPAP Litigation, MDL-3014

Hello Mr. King,

I just sent you a Participation Agreement via Adobe Sign that is necessary for you to sign in order for co-lead counsel to provide you with access to any Common Benefit Work. Please reach out if you have any questions.

Kind regards,

Zach Gordon
Case Manager
Robert Peirce & Associates, P.C.
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 Phone
(800) 543-9859 Toll-Free
(412) 281-4229 Fax
zgordon@peircelaw.com

NOTICE: This electronic message is to be used exclusively by the individual or entity to which it is addressed. This message may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Unless you are the intended recipient, any copying, use or dissemination of the message is strictly prohibited. If you receive this message in error, please notify us immediately and permanently delete this message from your system without making any copies. Although this electronic message and any attachments are believed to be free of any virus or other defect that might affect computer systems by which it is received or opened, it is the responsibility of the recipient to ensure that it is virus free, and we disclaim any liability for loss or damage arising in any way from its use.

---

**From:** Gordon, Zachary
**Sent:** Friday, December 1, 2023 1:55 PM
**To:** Derrick Martin King <dmking12370@hotmail.com>; Rihn, Aaron <arihn@peircelaw.com>
**Cc:** Sandy Duggan <sduggan@lfsblaw.com>; Steven Schwartz <steveschwartz@chimicles.com>; cseeger@seegerweiss.com; Kelly Iverson <kelly@lcllp.com>; psw@pietragallo.com
**Subject:** RE: In re: Philips CPAP Litigation, MDL-3014

Hello Mr. King,

Aaron Rihn attempted to call you today to discuss your questions. Please let me know a good time for you to connect with Aaron.

Best regards,

Zach Gordon
Case Manager
Robert Peirce & Associates, P.C.
707 Grant Street, Suite 125
Pittsburgh, PA 15219
(412) 281-7229 Phone
(800) 543-9859 Toll-Free
(412) 281-4229 Fax
zgordon@peircelaw.com

NOTICE: This electronic message is to be used exclusively by the individual or entity to which it is addressed. This message may contain information that is privileged, confidential or otherwise exempt from disclosure under applicable law. Unless you are the intended recipient, any copying, use or dissemination of the message is strictly prohibited. If you receive this message in error, please notify us immediately and permanently delete this message from your system without making any copies. Although this electronic message and any attachments are believed to be free of any virus or other defect that might affect computer systems by which it is received or opened, it is the responsibility of the recipient to ensure that it is virus free, and we disclaim any liability for loss or damage arising in any way from its use.

**From:** Sandy Duggan <sduggan@lfsblaw.com>
**Sent:** Thursday, November 30, 2023 4:04 PM
**To:** Derrick Martin King <dmking12370@hotmail.com>; Rihn, Aaron <arihn@peircelaw.com>; Gordon, Zachary <zgordon@peircelaw.com>; psw@pietragallo.com
**Cc:** Steven Schwartz <steveschwartz@chimicles.com>; cseeger@seegerweiss.com; Kelly Iverson <kelly@lcllp.com>
**Subject:** RE: In re: Philips CPAP Litigation, MDL-3014

> **Caution:** This E-mail originated from outside the organization. Please take care when clicking links or opening attachments.

Mr. King – I am one of the appointed co-lead counsel in this case. I've added our liaison counsel to this email. They will reach out to you to assist you in becoming familiar with the processes and existing pretrial orders in the MDL, as well as answering your questions. Thanks.

Sandra L. Duggan
Of-Counsel
LEVIN SEDRAN & BERMAN LLP
510 Walnut Street
Suite 500
Philadelphia, PA  19106
(215) 592-1500 office
(215) 870-8258 cell
(215) 592-4663 fax
www.lfsblaw.com

CONFIDENTIALITY NOTE: This email message contains information belonging to the law firm of LEVIN SEDRAN & BERMAN LLP and may be privileged, confidential and/or protected from disclosure.  The information is intended only for the use of the individual or entity named above. If you think you have received this message in error, please email the sender.  If you are not the intended recipient, please delete the message and understand that dissemination, distribution or copying is strictly prohibited.

**From:** Lavelle, Jr., John P. <john.lavelle@morganlewis.com>
**Sent:** Thursday, November 30, 2023 3:46 PM
**To:** Derrick Martin King <dmking12370@hotmail.com>; Feinstein, Wendy West <wendy.feinstein@morganlewis.com>; William B. Monahan (monahanw@sullcrom.com) <monahanw@sullcrom.com>; Michael H. Steinburg (steinbergm@sullcrom.com) <steinbergm@sullcrom.com>; Eric Scott Thompson (ethompson@fandpnet.com) <ethompson@fandpnet.com>
**Cc:** Steven Schwartz <steveschwartz@chimicles.com>; cseeger@seegerweiss.com; Sandy Duggan <sduggan@lfsblaw.com>; Kelly Iverson <kelly@lcllp.com>
**Subject:** RE: In re: Philips CPAP Litigation, MDL-3014

Mr. King-

I am forwarding your email below to all of the counsel copied on my previous email to you.  In that email I provided you with a copy of the Court's Pretrial Order No. 8 and explained that you should direct to plaintiffs' leadership appointed by the Court your request for the discovery materials previously produced to plaintiffs in the MDL.   Please contact plaintiffs' lead counsel – they are cc'd on this email – as they are conducting discovery on behalf of you and all MDL plaintiffs.

**John P. Lavelle Jr.**
**Morgan, Lewis & Bockius LLP**
2222 Market Street | Philadelphia, PA 19103-3007
Direct: +1.215.963.4824 | Main: +1.215.963.5000 | Mobile: +1.610.331.3910 | Fax: +1.215.963.5001
Assistant: Teresa G. Helm | +1.215.963.5590 | teresa.helm@morganlewis.com

502 Carnegie Center | Princeton, NJ 08540-6241
Direct: +1.609.919.6688 | Main: +1.609.919.6600 | Fax: +1.609.919.6701
john.lavelle@morganlewis.com | www.morganlewis.com

Morgan Lewis 150 YEARS

150 YEARS OF RAISING THE BAR

Learn More

---

**From:** Derrick Martin King <dmking12370@hotmail.com>
**Sent:** Thursday, November 30, 2023 3:30 PM
**To:** Lavelle, Jr., John P. <john.lavelle@morganlewis.com>
**Subject:** RE: In re: Philips CPAP Litigation, MDL-3014

[EXTERNAL EMAIL]
Be advised that you have twenty-four hours to indicate whether you wish to cooperate or a motion to compel with sanctions will be filed with the trial court.

This will be your final notice!

---

**From:** Lavelle, Jr., John P. <john.lavelle@morganlewis.com>
**Sent:** Thursday, November 30, 2023 2:52 PM
**To:** Derrick Martin King <dmking12370@hotmail.com>; Feinstein, Wendy West <wendy.feinstein@morganlewis.com>; William B. Monahan (monahanw@sullcrom.com) <monahanw@sullcrom.com>; Michael H. Steinburg (steinbergm@sullcrom.com) <steinbergm@sullcrom.com>; Eric Scott Thompson (ethompson@fandpnet.com) <ethompson@fandpnet.com>
**Cc:** Steven Schwartz <steveschwartz@chimicles.com>; cseeger@seegerweiss.com; Sandra Duggan <sduggan@lfsblaw.com>; Kelly Iverson <kelly@lcllp.com>
**Subject:** RE: In re: Philips CPAP Litigation, MDL-3014

Mr. King-

Please see attached Pretrial Order No. 8 entered by Judge Conti in MDL 3014 appointing plaintiffs' co-lead counsel and steering committee.  Under the Court's Order, plaintiffs' leadership coordinates and conducts all pretrial discovery on behalf of plaintiffs in the MDL.  You should direct your requests for discovery materials produced in the MDL directly to plaintiffs' leadership.  I have copied them on this email so they are aware of your request.

**John P. Lavelle Jr.**
**Morgan, Lewis & Bockius LLP**
2222 Market Street | Philadelphia, PA 19103-3007
Direct: +1.215.963.4824 | Main: +1.215.963.5000 | Mobile: +1.610.331.3910 | Fax: +1.215.963.5001
Assistant: Teresa G. Helm | +1.215.963.5590 | teresa.helm@morganlewis.com

502 Carnegie Center | Princeton, NJ 08540-6241
Direct: +1.609.919.6688 | Main: +1.609.919.6600 | Fax: +1.609.919.6701
john.lavelle@morganlewis.com | www.morganlewis.com

Morgan Lewis 150 YEARS

150 YEARS OF RAISING THE BAR

Learn More

---

**From:** Derrick Martin King <dmking12370@hotmail.com>
**Sent:** Wednesday, November 29, 2023 6:05 PM
**To:** Feinstein, Wendy West <wendy.feinstein@morganlewis.com>; William B. Monahan (monahanw@sullcrom.com) <monahanw@sullcrom.com>; Michael H. Steinburg (steinbergm@sullcrom.com) <steinbergm@sullcrom.com>; Lavelle, Jr., John P. <john.lavelle@morganlewis.com>; Eric Scott Thompson (ethompson@fandpnet.com) <ethompson@fandpnet.com>
**Subject:** In re: Philips CPAP Litigation, MDL-3014

[EXTERNAL EMAIL]
Lady and Gentlemen,

Please find attach my Notice of Case Status that was filed today in the Summit County (Ohio) Court of Common Pleas. The notice merely notifies that court of the transfer to the Western District of Pennsylvania.

Now that I am formally a part of the MDL litigation, we need to discuss discovery. I am formally requesting a copy of all discovery that has been provided to the other plaintiffs. After that information is provided, I can then provide you with a supplemental discovery request to cover anything that was not previously provided but may be relevant. Please be advised that I have attached my signed agreement to be bound by the December 21, 2021 stipulated protective order (ECF No. 104).

I look forward to hearing from you in the very near future.



DERRICK MARTIN KING
Phone: (330) 867-3979 or (330) 459-1122
E-Mail: dmking12370@hotmail.com or
dmking12370@gmail.com

NOTICE TO RECIPIENT: The information transmitted by this email is intended only for the person or entity to which it is addressed. This email may contain proprietary, business-confidential, and/or privileged material. If you are not the intended recipient of this message, be aware that any use, review, retransmission, distribution, reproduction or any action taken in reliance upon this message is strictly prohibited. If you received this in error, please contact the sender and delete the material from all computers.