IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA
*Pittsburgh Division*

| | |
|---|---|
| **IN RE: PHILIPS RECALLED CPAP, Bi-PAP, AND MECHANICAL VENTILATOR PRODUCTS LIABILITY LITIGATION**<br><br>This Document Relates To:<br><br>*King v. Koninklijke Philips N.V., et al.*<br>Case No. 2:23-cv-02040-JFC | Master Docket No. **2:21-mc-01230-JFC**<br><br>MDL No. 3014<br><br>Judge **JOY FLOWERS CONTI** |

### PLAINTIFF DERRICK MARTIN KING'S REPLY IN SUPPORT OF HIS MOTION TO COMPEL DISCOVERY OR IN THE ALTERNATIVE TO REMAND HIS CASE

I.      INTRODUCTION.

On January 4, 2024, Plaintiff Derrick Martin King (hereinafter "Plaintiff King") filed a motion to compel discovery or in the alternative remand his case back to either the United States District Court for the Northern District of Ohio or the Summit County (Ohio) Court of Common Pleas (ECF No. 2412). Defendant Philips RS North America LLC (hereinafter "Philips Respironics") filed its response in opposition on January 18, 2024 (ECF No. 2449) and Defendants Polymer Technologies Inc. and Polymer Molded Products LLC (hereinafter "PolyTech Defendants") filed a "joinder" in support of Philips Respironics on January 22, 2024

1

(ECF No. 2461). On January , 2024, Plaintiff King filed a motion to strike the PolyTech Defendants' joinder motion (ECF No.).

This Court held a status hearing on January 24, 2024 (the transcript of the hearing is in the record as ECF No. ) where Plaintiff King's motion was discussed. The conversation was as follows:

> THE COURT: Thank you. And then there's a pro se plaintiff, Mr. King, who has filed, you know, motions with this court. Respironics has responded. But there is one issue that I think it would be appropriate for the plaintiffs' counsel to weigh in on. He's challenging the authority of this court to essentially stay discovery for individual plaintiffs and have all his discovery going through the appointed leadership and that it's the leadership through this interim period that would determine if there's going to be any individual discovery.
>
> **So I think that really isn't something for Respironics, per se, but it's challenging the structure of the MDL, which I think would be helpful just to have it on record what the plaintiffs' position is on that. So if you could file a response, say, within two weeks, that would be great.**
>
> MS. IVERSON: Yes, Your Honor. Thank you.
>
> MS. DUGGAN: We can take care of that, Your Honor. And liaison counsel, Aaron Rihn, as well as the co-leads in this case have also reached out to Mr. King.
>
> THE COURT: It's a little different because he's pro se.
>
> MS. DUGGAN: Yes.
>
> THE COURT: So it creates complications, but I know I'll have to rule on that.
>
> MS. DUGGAN: We understand. Thank you.

*Transcript of Proceedings* (ECF No.) at 22-23 (emphasis added). Pursuant to this Court's request, Plaintiff Leadership Counsel filed their response on February 8, 2024 (ECF No. 2495). Plaintiff King will be confining the reply to the motion to compel only to statements made by Plaintiffs Leadership Counsel. With regard to the alternative motion to remand, Plaintiff King will set forth the reasons supporting the remand to state court.

II.   STATEMENTS MADE BY PLAINTIFFS LEADERSHIP COUNSEL.

    A.   Plaintiff King Will Suffer Prejudice if he Does Not Have Access to the Documents Already Produced.

In their response, Plaintiffs Leadership Counsel has acknowledged that "[t]o date, more than 2.5 million documents, including non-party productions, Plaintiff productions, and Defense productions, including Teams chats and mobile productions, have been produced" (ECF No. 2495 at 7). Obviously, Plaintiff King (as a *pro se* litigant) needs time to assess each of the documents produced during the discovery process.

On January 23, 2024, Plaintiffs Leadership Counsel and Defendants submitted a joint notice of updated timelines of pertinent MDL dates (ECF No. 2467). Under the proposed timeline, all personal injury cases have an April 30, 2024 deadline to conclude general causation fact discovery. In addition, the earliest that the MDL may conclude is April 2025. If Plaintiff King is denied the right to receive discovery until after the conclusion of the MDL, he will be denied due process of law.

3

B.   This Court Should Independently Review the Elizabeth Chamblee Burch Article for Law360.com as it Supports Plaintiff King's Position that He Should Have Access to Discovery Materials.

In his motion to compel, Plaintiff King referenced a June 9, 2019 article by Elizabeth Chamblee Burch in Law.360 entitled *Does Multidistrict Litigation Deny Plaintiffs Due Process?* See ECF No. 2412-1 at 23-28. Plaintiffs Leadership Counsel responded by stating in a footnote that:

> Plaintiffs' Leadership respectfully disagrees with Mr. King's suggestion that he is deprived of due process by involvement in this MDL. The Law360 article cited by Mr. King (ECF 2412-1 at 23–28) does not suggest consolidated pre-trial discovery infringes on due process rights. Instead, it cautions that courts should be cognizant of ensuring there is "adequate representation" to protect due process. It suggests that judges "select cognitively diverse leaders through a competitive process that considers adequate representation." Through the application and interview process, this Court did just that before entering PTO #8.

ECF No. 2495 at 2 fn 1. This Court should independently review the article (annexed herein and marked as Exhibit A) and make its own determination. In the article, the Fuller E. Callaway Chair of Law at the University of Georgia School of Law, and the author of *Mass Tort Deals: Backroom Bargaining in Multidistrict Litigation* writes that:

> 154,771 babies. That's a conservative estimate of the number of opioid-dependent children born in the United States since 2014. Every day, 75 more babies join that group.
>
> These babies enter the world as addicts. Their withdrawals are immediate and devastating — tremors, trouble sleeping, seizures, an inability to eat and sometimes even death. Their needs extend past their hospital stays: Effects on learning, cognition and behavior are long-term.

Lawyers representing these babies have been jostling for a seat at the decision-making table in the federal opioid multidistrict litigation, which includes more than 1,600 suits by cities, counties, states and Native American tribes.

"[B]abies in this case have a meaningful right to be heard, in a meaningful way, in a timely manner," attorney Scott Bickford argued at proceedings in 2018. "The MDL has chosen not to accommodate these babies' cases. And these babies essentially are now locked out of any kind of settlement discussions that are going on in the MDL."

"[Leaders] will not even provide us with notices of depositions. . . . [W]e have asked to participate or even listen to depositions, but we can't even get the notice," Bickford explained.[1]

Multidistrict proceedings, which place a single judge in charge of similar lawsuits filed across the country, consume a substantial portion of the federal courts' civil caseload. Federal judges certify some of these proceedings as class actions, which explicitly builds in due process protections.

Under Rule 23(b)(3), judges must consider whether class counsel adequately represents class members; notify class members; allow members to object to a settlement or opt-out; and ensure that class settlements are fair, reasonable and adequate. But judges rarely certify personal-injury classes.

Worries about inadequate representation, self-dealing and the chance to have a say in suits that affect your health and safety don't evaporate just because mass litigation can't be certified as a class. As plaintiffs become one of many, referred to as a number and not by name, they face significant risks: Their lawyer may sell them out, and the jury trials they've come to expect are even rarer than the Perry Mason reruns that feature them.

Yet they cannot opt out of an MDL. And judges consistently appoint leaders based on their experience, war chests and ability to get along with everyone — not their ability to provide adequate representation.

---

[1] [Footnote Original] Transcript of proceedings, *In re Infants Born Opioid-Dependent Prods. Liab. Litig.,* MDL No. 2872 (JPML Nov. 29, 2018).

Some judges communicate only with those leaders, leaving attorneys like Scott Bickford in the dark.

Creating an MDL simply requires that dispersed lawsuits share a common factual question. That question needn't predominate, as common questions must in a Rule 23(b)(3) class. So, plaintiffs' discovery needs and requested remedies may differ substantially.

For Bickford and his team to prove that opioid babies are entitled to ongoing medical monitoring, for example, they need information about drug companies' marketing efforts to obstetricians and gynecologists. They want to know what those companies knew about the harmful effects babies might experience in utero from opioid-addicted mothers.

But those aren't issues that relate to states' and counties' focus on government reimbursement. So Bickford requested that the Judicial Panel on Multidistrict Litigation create a separate MDL just for them. The current opioid MDL is a jumble of cases with tangled interests spearheaded by a group of repeat players.

That repeat players consistently occupy lucrative leadership positions is no surprise, given the factors that judges use to appoint them. One would hope that they'd use their expertise and connections to generate better outcomes for the plaintiffs. Evidence, however, suggests otherwise: The deals they make are often riddled with self-interest, and laced with provisions that goad plaintiffs into consenting.

Repeat players play the long game — which means that they can develop working relationships with their opponents, such that each side can use private settlement to bargain for what matters to them most from a self-interested standpoint. Corporate defendants and their lawyers want to end lawsuits with the least cost. And lead plaintiffs lawyers profit substantially from attorneys' fees — specifically common-benefit fees (the money they receive for the work they do on the whole group's behalf).

In all but one of the private settlements I examined, plaintiffs' leadership used their dealmaking authority to increase their common-benefit fees. Every deal likewise contained at least one settlement provision designed to strong-arm plaintiffs into settling, thereby ending the suits for defendants.

Of course, negotiating for a raise with one's opponent prompts questions about what plaintiffs' leaders may concede in return — clauses that pressure plaintiffs to settle, stringent claims criteria or less money to plaintiffs? It also severs the contingent-fee link that intertwines the fates of lawyers and clients. That uncoupling can cause mischief.

Take the lawsuits over the acid-reflux medicine Propulsid, for instance. The lead plaintiffs' lawyers in Propulsid (two of whom are also leaders in the opioid MDL — Peter Mougey and Chris Seeger) negotiated their common-benefit fees directly with the defendant, Johnson & Johnson (also a defendant in the opioid MDL).

Johnson & Johnson paid plaintiffs' leaders $27 million in common-benefit fees. But out of the 6,012 claimants who entered into the settlement program, only 37 received any money. Collectively, those claimants recovered little more than $6.5 million. Much of the remaining money in the settlement fund then reverted back to Johnson & Johnson.

Propulsid's lead plaintiffs' lawyer Russ Herman said, "Johnson & Johnson's express wish was to have all cases resolved. . . . One of the issues was that Johnson & Johnson insisted that unused funds would have 100% reversion to J&J." Consequently, he continued, "the [plaintiffs steering committee] and the state liaison folks who negotiated Propulsid II insisted that . . . J&J should pay [them] a reasonable attorney's fee, which was agreed to."[2] The deal was, in Herman's words, a "quid pro quo."

Propulsid's not a one-off. Its leaders announced that they were creating a template for all future deals — and they did. Every subsequent settlement I examined replicated and refined its cramdown mechanisms. Here's how they worked: First, unless lawyers convinced 85% of clients with death claims to enroll, then the deal was off. Johnson & Johnson could walk away, and neither plaintiffs' attorneys nor their clients would receive a dime.

Second, plaintiffs' lawyers had to recommend that all of their clients enter the settlement program. Entering the program required clients to dismiss their lawsuit without knowing what, if anything, they'd receive. Third, if a client chose not to settle, plaintiffs' lawyers designed an "opt-

---

[2] [Footnote Original] Transcript of Proceedings, at 7-8, *In re Propulsid Prod. Liab. Litig.,* No. 00-md-1355 (E.D. La. Aug. 22, 2012).

7

out" form — not to opt them out of the settlement, but to allow the attorney to get out of the attorney-client relationship. Settle your lawsuit, in other words, or I can no longer represent you.

Judges assume that because plaintiffs have their own counsel, no adequate-representation concerns exist. In Scott Bickford's argument for a separate MDL, Judge Lewis Kaplan said, "If there's a settlement and you don't like the settlement and it affects your clients, you have the right to object, isn't that true?"[3]

Is it true? Settlements are ubiquitous; less than 3% of the cases centralized through MDL ever return to the courts where plaintiffs filed them. And as Propulsid shows, most settlements require that lawyers treat their clients uniformly, not as the individuals that they are. Even if the Bickfords of the world could "object," who would they object to?

Most mass-tort MDLs conclude in private settlements. Are disgruntled lawyers to object to the same leaders who refused to grant them access to discovery and settlement negotiations? To the judge?

Judges are pro-settlement. Judge Dan Polster, who presides over the opioid MDL, made it clear in his first hearing that he wanted a settlement by the year's end.[4] He took a similar stance when he presided over the Gadolinium-Based Contrast Agents proceeding a few years earlier: "[T]he cases should be settled, all right? ... They can be settled and they should be settled," he declared.[5]

Polster is not an outlier. The judges who preside over products liability proceedings nudge plaintiffs into private settlements in many different ways: They appoint claims administrators or settlement masters to formally preside over private deals, thereby stamping them with a judicial imprimatur; they allow attorneys to withdraw from representing clients who refuse to settle; and they issue "Lone Pine orders," which

---

[3] [Footnote Original] Transcript of proceedings, *In re Infants Born Opioid-Dependent Prods. Liab. Litig.,* MDL No. 2872 (JPML Nov. 29, 2018).

[4] [Footnote Original] Transcript of Proceedings at 4-6, 9, *In re Nat'l Prescription Opiate Litig.,* No. 17-cv-2804 (E.D. Ohio Jan. 9, 2018) ("People aren't interested in depositions, and discovery, and trials. ... So my objective is to do something meaningful to abate this crisis and to do it in 2018").

[5] [Footnote Original] Transcript of Pretrial Proceedings at 51-52, *In re Gadolinium-Based Contrast Agents Prods. Liab. Litig.,* No. 08-gd-50000 (N.D. Ohio Mar. 18, 2010).

impose evidentiary burdens on nonsettling plaintiffs — sometimes with short deadlines attached.

The panel denied Bickford's request for a separate MDL. As a judge on the panel concluded at the end of Bickford's hearing: "There is no authority for the due process argument."

That's true when it comes to creating an MDL, but not in conducting one. There, transferee judges must do more to protect due process. As I elaborate in my new book, judges should select cognitively diverse leaders via a competitive process that explicitly considers adequate representation, open channels for dissenting voices to chime in and episodically remand cases that centralization no longer serves.

By tying common-benefit fees to the actual benefit that leaders confer on plaintiffs (not the sticker price of a settlement fund) and opening the courthouse doors to hear directly from affected clients, judges not only check self-dealing, they also empower plaintiffs who are faceless and nameless no more.

The Burch article clearly supports the proposition that plaintiffs should have access to all of the discovery materials in order to protect their due process rights. While this Court can restrict Plaintiff King's ability to conduct individual discovery, it should all each of the plaintiffs an opportunity to review the discovery material that is received on their behalf. If the material produced is indeed over 2.5 million documents, then the attorneys will need time to review the documents (like Plaintiff King does).

III.   CONCLUSION.

Plaintiff King has clearly demonstrated that he should receive access to all discovery materials that has already been produced. Plaintiff King has demonstrated that he would be denied due process of law if the discovery materials are not

9

immediately disclosed to him. Should this Court deny Plaintiff King's motion, he may exercise his rights to seek interlocutory relief with the Third Circuit Court of Appeals.

    For the reasons stated herein, Plaintiff King prays this Court grant the relief requested herein.

Dated: <u>February 10, 2024.</u>　　　　　　Respectfully Submitted,

　　　　　　　　　　　　　　　　　　*/s/ Derrick Martin King*
　　　　　　　　　　　　　　　　　　**DERRICK MARTIN KING**
　　　　　　　　　　　　　　　　　　1445 Crestview Avenue
　　　　　　　　　　　　　　　　　　Akron, Ohio 44320-4049
　　　　　　　　　　　　　　　　　　Phone: (330) 867-3979
　　　　　　　　　　　　　　　　　　Email: dmking12370@hotmail.com

　　　　　　　　　　　　　　　　　　*Pro se Plaintiff*

**CERTIFICATE OF SERVICE**

    I hereby certify that the foregoing document was tendered for filing with the Clerk of the Court. Upon receipt and approval by the Clerk, the document will immediately be listed on the Court's electronic filing system and served upon the parties either through the CM/ECF filing system or through the MDL Centrality website.

Dated: February 10, 2024.   /s/ Derrick Martin King
                                                  **DERRICK MARTIN KING**
                                                  *Pro se Plaintiff*