**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE: PHILIPS RECALLED CPAP BI-LEVEL PAP, AND MECHANICAL VENTILATOR PRODUCTS LITIGATION<br><br>This Document Relates to: All Actions | )<br>)<br>) Master Docket: Misc. No. 21-1230<br>)<br>)<br>) MDL No. 3014<br>)<br>)<br>) |

**REPORT FROM THE MDL 3014 LEADERSHIP DEVELOPMENT COMMITTEE AND DEFENDANTS' JUNIOR ATTORNEYS: REFLECTIONS AND RECOMMENDATIONS**

**I.     Introduction**

In the context of Federal Multidistrict Litigation (MDL), Leadership Development Committees (LDCs) are a recent and evolving initiative aimed at promoting mentorship and experience for attorneys newer to MDL practice. The MDL 3014 LDC, together with the attorneys whose firms represent Defendants in these actions, submit this report based on their experience and insights gained from participating in this MDL. In summary, LDCs are an important mechanism to develop new leaders within the MDL bar and the legal profession more broadly, and the LDC and Defendants commend Judge Conti for her willingness to implement an LDC in this MDL.

**II.     A Brief History**

Concerns about the need for a robust leadership pipeline in federal complex litigation have spurred the Judiciary and Plaintiffs' bar to evaluate the leadership appointment process in class

action and mass tort litigation.[1] Judges and attorneys alike agree that LDCs are accretive to cultivating new leaders in the MDL bar, ensuring that future MDLs have a wealth of talent from which to choose during the leadership appointment process.[2]

### III. MDL 3014

In 2022, Judge Conti—in addition to the twenty-three attorneys appointed to the instant leadership slate— established a ten-member LDC in MDL 3014 to facilitate mentorship and prepare attorneys on the LDC for future leadership roles in complex multidistrict litigation.[3] Recognizing the enthusiasm and talent among lawyers with less MDL experience, Judge Conti aimed to provide the LDC with the education, experience, and mentorship necessary to lead future MDLs.[4] This initiative reflects a broader effort within the legal industry to strengthen and enhance the leadership pipeline within mass tort and class action litigation.

By the end of 2024, through the efforts of the Court, special masters, and all counsel involved, the Parties in MDL 3014 reached settlements of the economic loss class action, medical monitoring class action, and personal injury claims, making MDL 3014's LDC the first to participate in an MDL from formation to completion.

#### A. Plaintiffs' Perspective

##### 1. Appointment of Leadership Development Committee Members

The attorneys appointed to the committee are made up of various backgrounds and legal

---

[1] *See generally, Inclusivity and Excellence: Guidelines and Best Practices for Judges Appointing Lawyers to Leadership Positions in MDL and Class-Action Litigation,* Bolch Jud. Inst., Duke L. Sch. (2021).
[2] *See In re: Phillips Recalled CPAP Bi-Level PAP, & Mech. Vent. Prods. Liab. Litig.* ("*Philips CPAP*"), MDL No. 3014, Hearing Tr. 42: 13-17, (W.D. Pa. Feb. 25, 2025).
[3] *See Philips CPAP*, Pretrial Order No. 8, (ECF No. 395) ("PTO 8"), at *11-13 (W.D. Pa. Feb. 15, 2022).
[4] *Id*. at 11.

experiences, unified by their limited prior MDL exposure. Judge Conti described this LDC as made of "talented attorneys who were expected to meaningfully participate in all aspects of the MDL" and their appointment as allowing for them to gain the "education, experience and mentorship necessary to lead future MDLs."[5] The table below summarizes the backgrounds of the LDC:

| Category | Details |
| --- | --- |
| Primary Practice Area | 1 class action, 1 antitrust, 1 mass tort, 4 hybrid[6], 2 personal injury, 1 bankruptcy |
| Position at Firm | Partner = 4; Associate = 6 |
| Firm Size (by attorneys) | 4, 4, 6, 10, 17, 20, 23, 24, 28, 61 |
| Years of Practice (Avg) | 10 years |
| Years of Practice (Range) | 2–20 years |
| Age Range | 30–59 |
| States | Connecticut, Florida, Louisiana, Missouri, Minnesota, Ohio, Pennsylvania |
| Gender | 8 women, 2 men |
| Geography | Midwest = 4, East = 4, South = 2 |
| Race/Ethnicities | White, Black, Cuban, Filipino, Native Hawaiian |
| Lived Experience | 1 LDC member was an active user of Defendant's device |

MDL 3014's LDC slate is distinguished from other LDCs by greater diversity in age and years of experience. LDCs are occasionally referred to as "the baby leadership" or "for younger and newer attorneys." While an LDC is certainly a valuable opportunity for newer attorneys, the value of participation on an LDC is exponentially higher for more experienced plaintiff attorneys. MDL 3014's LDC members include attorneys with double-digit trial experience, a board-certified trial attorney, attorneys who worked in unappointed roles on dozens of MDLs and class actions, and an attorney with expertise in corporate insolvency matters and federal bankruptcy proceedings.

The LDC provided key learning and mentorship opportunities that opened doors for these talented attorneys to prepare for more substantial leadership roles in future MDLs. Since their appointment to the LDC, some of the LDC members from MDL 3014 have already been appointed

---

[5] *See Id.* at 11-13.
[6] Hybrid = a mix of personal injury and mass tort practice.

to leadership roles in other MDLs, continuing to serve their clients with the skills they honed under their MDL 3014 mentors.

## 2. LDC and Case Management Conferences (CMC)

One of the most impactful components of serving on the LDC in this litigation was the opportunity to attend monthly case management conferences before Judge Conti. From the outset, Judge Conti recognized the importance of integrating LDC members into the broader litigation process. She made an update from the Leadership Development Committee a standing agenda item at each conference, allowing members to rotate attendance and gain direct exposure to the leadership and procedural flow of the case.

This rotation proved to be one of the most valuable learning experiences for all LDC members. Attending these conferences allowed the LDC members to observe firsthand how Judge Conti managed the docket, evaluated legal issues, and facilitated collaboration between parties. Members gained insight into the practicalities of overseeing a large and complex multidistrict litigation and the standards of professionalism and preparation expected in federal court.

Beyond the courtroom, these meetings also provided opportunities for professional development and relationship building that led to greater involvement in the litigation. At the beginning of the litigation, Judge Conti hosted an informal reception in her chambers, offering a collegial space for all plaintiff and defense counsel to interact. As the litigation progressed, this practice was carried forward by both plaintiff and defense firms, who graciously hosted similar receptions.

The LDC members unanimously agree that providing for participation at regular case management conferences should be continued in future MDLs. The structured exposure to high-level litigation strategy, court administration, and real-time advocacy was invaluable. It provided

LDC members with the opportunity to contribute while observing and engaging in the collaborative dynamic between Plaintiffs' counsel and provided an understanding of the coordination that drives large-scale litigation forward. The LDC also appreciated the chance to work with and observe attorneys that demonstrated how to balance zealous advocacy for their clients with professionalism and courtesy to opposing counsel.

The LDC is deeply grateful to Judge Conti for her foresight and dedication to fostering the LDC's professional growth. Her intentional inclusion of LDC members helped shape the members' understanding of complex litigation and the collaborative spirit it demands.

### 3. Expanding The LDC's Purpose

LDCs are still a new concept in the MDL world and as such, they continue to evolve. In overseeing MDL 3014, Judge Conti took an innovative approach to her interpretation of who was meant to participate in leadership development initiatives. In addition to the LDC, Judge Conti enjoyed updates from junior associates employed at the Lead Counsel firms who received opportunities to work on key aspects of the litigation by virtue of their firm's role. Defense associates also reported updates to Judge Conti. Eventually, in Judge Conti's courtroom, the term "LDC" became synonymous with "junior attorney" or "associate" regardless of whether the attorney was an appointed member of the Plaintiff's LDC. This inclusive redefining of the LDC—to include both the appointed LDC members *and* the younger associates of involved firms—advanced the overarching goals of an LDC by further strengthening the pipeline of future class action and MDL leaders.

### 4. LDC Mentorship Program

To encourage participation and experiential learning, Plaintiffs' Lead Counsel created an LDC mentorship program. Each LDC member's mentor was also a Co-Chair of their appointed

committee. LDC members reported very positive feedback for this program. Many members forged meaningful relationships inside and outside of the MDL and continue their mentorships outside of the MDL. LDC members reflected that it was helpful to have a non-judgmental space to ask questions and learn, and that their mentors did their best to keep them informed and involved in the litigation. The LDC appreciates the commitment that MDL Leadership has shown to the LDC members' professional development within MDL 3014 and as members of the MDL plaintiffs' bar going forward.

> 5. **LDC Monthly Committee Meeting**

The LDC functioned as a working committee and held monthly update meetings. LDC members presented status updates on their assigned committees, discussed assigned projects, and brainstormed various legal issues. Additionally, the committee held a "topics of the month" series, in coordination with Lead Counsel and other committee chairs, to learn about the life cycle of a multidistrict litigation.

The LDC members unanimously agree that the monthly meetings were a helpful aspect of this experience. As the LDC members gained knowledge through mentorship and work experiences, these meetings allowed the LDC members to share that knowledge internally and learn from each other, which fostered collegiality, consistency, and a spirit of inclusion among LDC members. The camaraderie and collaboration among peers became a vital support system and one of the most rewarding aspects of the appointment. For these relationships, the MDL 3014 LDC will be forever grateful to Lead Counsel and this Court.

> B. **Defendants' Perspective**
>> 1. **Defendants Request the Opportunity To Participate In Leadership Development Opportunities**

Courts generally do not appoint lawyers or law firms to leadership roles for defendants in MDLs. As a result, LDCs are far less common for junior attorneys representing defendants. However, the development of junior defense attorneys to lead the defense of future MDLs through experience, education and mentorship is equally important. Thus, if possible, junior attorneys on the defense-side of MDLs should be included in LDC opportunities, as Defendants' junior attorneys in MDL 3014 were.

Defendants' participation in MDL 3014's LDC program was established after members of Plaintiffs' LDC were asked periodically to report at the monthly CMCs "on how th[e] process is working . . . to make sure the next generation of lawyers coming up are able to get adequate opportunities." March 22, 2022 CMC Tr. at 6:9-20. Following several of these presentations, Defendants requested that their junior attorneys also be permitted to speak regarding their professional development, which the Court immediately accommodated.

### 2. **Defendants Establish Structures and Opportunities to Develop Junior Attorneys**

This Court's establishment of the LDC encouraged Defendants' more senior attorneys to be particularly mindful of the need to develop and mentor their junior attorneys through a variety of opportunities that presented themselves as part of the defense of MDL 3014. Defendants' senior attorneys established structures to ensure the ongoing development of all their associate attorneys, from junior to senior associates. As an initial matter, Defendants' senior attorneys selected a different junior attorney to provide an LDC update to the Court at each of the monthly CMCs, ensuring the full participation of less experienced attorneys . Defendants' senior attorneys also used the monthly CMCs, and the preparation for those CMCs, to carefully consider the various projects that each less experienced  was leading to ensure that each person received substantial developmental opportunities.

7

The disbursement of substantive opportunities and projects for Defendants' less experienced attorneys was driven primarily by the establishment of workstreams addressing various aspects of the MDL, including but not limited to briefing, written discovery, document collections and productions, and depositions, among others.  Defendants' LDC members would then join, or lead, these workstreams based on the demands of this action as it progressed through its various stages, including briefing, discovery, and settlement.  LDC members had the opportunity to take the lead on various projects under the direct and close supervision of Defendants' more senior attorneys, with the senior attorneys often encouraging Defendants' LDC members to take on more difficult, "stretch" assignments to encourage additional professional development.

By taking on leadership roles and a range of assignments across workstreams, Defendants' less experienced attorneys have developed a diverse set of substantive skills.  Indeed, many of Defendants' LDC members have reported on the robustness of their experiences during the monthly LDC updates at the CMCs in MDL 3014.  For example:

> This case . . . has me doing so many different types of work that have really contributed in a meaningful way to my development as a legal practitioner.  So myself and the other young lawyers on the team, we have had our hands quite full writing briefs and actually developing the arguments that go into the briefs, among other things. That's been the case pretty much since this case first started.

Nov. 17, 2022 CMC Tr. 32:1-9.

> I had a pretty broad variety of experiences. I conducted witness interviews, drafted review protocol, [document] review training, been working on a bunch of written discovery . . . , and actually, this Friday, we will be leading a meet and confer with my colleague Caleb Seeley from Seeger Weiss, who is here today, on plaintiffs' deficiency letter.

Dec. 14, 2022 CMC Tr. 46:11-16

> Another aspect that I have really enjoyed about this case team is the voice that I have had in our factual investigation, and I think as we embark on our factual

> development -- and I think I speak for myself and all of the other counsel on our team when I say this -- that the partners have been really great about getting us all really engaged in that process and . . . making sure that we have a voice in that narrative. That's been really great, too.

Feb. 22, 2022 CMC Tr. 20:1-9.

> I've been really lucky to work with and very closely with a lot of the partners on our team. I'm involved in a variety of work streams. . . . Overall, I feel like I have grown a ton in the past nine months of practice. I've improved my skills in communication, analysis, teamwork, and then, of course, today speaking, which is great.

June 15, 2022 CMC Tr. 16:2-17.

> In working on this case, I've been given really significant responsibilities in areas ranging from big picture strategy to preparing for and even taking depositions. . . . So it was a lot of work, but really great learning experience. And I feel very fortunate to be able to work on this case, particularly fortunate to have such a supportive team, a ton of support from the partners with whom I work.

Jul. 20, 2023 CMC Tr. 18:8-10, 19:12-16

As articulated by many of Defendants' LDC members, because of the diverse range of substantive projects and leadership opportunities with which they have been entrusted (under the close supervision of more senior attorneys), they have had the ability to take ownership over key workstreams propelling the MDL. As a result, Defendants' LDC members have developed a strong foundation of the skills and knowledge necessary to lead the defense of future MDLs—the very goal of the LDC.

### IV.  LDC Litigation Highlights and Contributions

#### A.  Plaintiffs' Perspective

Pre-trial Order No. 8 set forth the Court's intention that members of the Leadership Development Committee "will—where appropriate—meaningfully participate in all phases of this MDL including, but not limited to, participation on committees and subcommittees, drafting master complaints, drafting and arguing briefs, participating in settlement negotiations, and

9

preparing for and taking depositions of lay witnesses and expert witnesses."[7] The LDC contributed meaningfully across core areas of the litigation, including:

### 1. **Discovery**

- Presented oral argument in opposition to Defendants' discovery requests directed at the named plaintiffs in the medical monitoring class action.
- Advocated for the court to impose a narrowly tailored scope of discovery consistent with the limited purpose of the medical monitoring claims.
- Served as discovery coordinators for named plaintiffs across multiple jurisdictions and drafted discovery responses to interrogatories and requests for production.
- Reviewed and coded large volumes of documents from key productions.
- Participated in weekly meetings with the Discovery Special Master Carole Katz.

### 2. **Depositions**

- Served as deposition counsel and defended depositions for named plaintiffs in the medical monitoring class action.
- Prepared deposition dossiers, summarizing key evidence, and reviewing relevant medical and billing records.
- Attended and summarized depositions of corporate representatives and other witnesses.

### 3. **Science and Expert**

- Completed the interviewing and vetting process for all expert witnesses, researched potential experts' qualifications, and prepared memoranda on the reliability and admissibility of expert testimony.
- Conducted factual legal research related to Daubert issues and drafted related memoranda.

---

[7] *See Phillips CPAP*, PTO 8 at *11.

- Assisted in the preparation of the presentation team for Science Day by completing whitepapers and primers for device introduction, and on various injuries.
- Participated in the development of the device inspection protocol and coordinated visual device inspections across the country.

### 4. Legal Briefing and Motion Practice

- Drafted sections of the oppositions to numerous motions to dismiss, drafted motions to unseal complaints and corresponding exhibits.
- Drafted objections to confidentiality designations in deposition transcripts and portions of briefs for various issues in front of the Special Master.
- Drafted portions of the Master Complaints and the Medical Monitoring Complaint.
- Aided in the establishment of the online MDL Centrality system for Census Registry Forms, Short Form Complaints and Answers, Fact Sheets, authorizations, and records.
- Conducted legal research and produced memoranda regarding jurisdiction, fraudulent omission, and choice of law.
- Supported plaintiff counsel's preparation for oral arguments before the Court.

### 5. Bellwether Case Vetting and Case Management

- Reviewed cases filed in the MDL and evaluated the same for potential class representatives and/or bellwether cases.
- Drafted and edited case vignettes for Bellwether Committee review.
- Maintained a master spreadsheet of filed cases for monitoring claims, injuries, and jurisdictional data.

### 6. Committee Leadership and Mentorship

- Co-chaired the LDC and served as liaison with the Plaintiffs' Steering Committee.

- Organized monthly committee meetings and facilitated learning experiences.
- Advocated for increased exposure and assignments on behalf of the Committee.
- On a rotating basis, reported to the Court updates on the status of the LDC.

B. **Defendants' Perspective**

Given the fast-paced and complex nature of the MDL, Defendants' LDC members were expected to develop a robust understanding of Plaintiffs' claims, including the underlying facts and governing law, to ensure they could fully participate in all aspects of the case. From initial pleadings through settlement, Defendants' less experienced attorneys were expected to contribute substantively to the Philips parties' defense, including by: drafting pleadings, briefing, and various discovery requests; reviewing and producing documents; preparing deponents to testify; preparing for evidentiary hearings; and conducting legal research on a variety of matters, including to facilitate settlement negotiations. Through the MDL, Defendants' LDC members gained valuable substantive experiences, which included many of Defendants' LDC members taking and defending their first depositions. Because many of the MDL work streams happened concurrently, rather than sequentially as in many other litigation contexts, Defendants' less experienced attorneys were able to gain experience across the life cycle of a case in a much shorter time than less complex litigation.

1. **Legal Briefing and Motion Practice**

The MDL provided Defendants' LDC members with significant writing experience, both in terms of substance, volume and subject matter variety. Due to the 50-state nature of Plaintiffs' claims (spread across three different operative complaints), Rule 12 motions were an all-hands on deck experience. Accordingly, even the most junior Defendants' associates were responsible for important legal research and were given the opportunity to draft substantive sections of Philips'

briefs. The senior attorneys worked closely with Defendants' LDC members throughout the brief-writing process by providing strategic guidance on substantive arguments and direct written feedback on associates' writing. Beyond Rule 12 motions, Defendants' less experienced attorneys gained valuable experience in drafting (i) both party and third-party discovery requests as well as responses and objections, (ii) a variety of motions, including to remand and to compel, and (iii) findings of fact and conclusions of law. Defendants' LDC members valued the opportunity to hone their writing skills at such an early stage of their careers and have already used these skills to contribute meaningfully to other matters, including MDLs.

2. **Discovery**

Discovery in an MDL is often a massive undertaking, and it certainly was in this case, as reflected by the millions of documents produced, dozens of depositions taken and various disputes that arose over the course of litigation. At all stages of discovery, Defendants' less experienced attorneys were a driving force in keeping the process moving. Defendants' LDC members played an integral role in managing and conducing the document review and production process, preparing witnesses for depositions, propounding and responding to written discovery, managing the exchange and review of Defendants' and Plaintiffs' Fact Sheets, and conferrals with Plaintiffs' counsel on discovery disputes. In addition, Defendants' less experienced attorneys were given the important opportunity to take offensive depositions of named Plaintiffs around the country in connection with the Medical Monitoring litigation track. For many of Defendants' LDC members, this was their first time taking a deposition. Through these experiences and opportunities, Defendants' less experienced attorneys gained valuable knowledge with respect to managing the robust and complex discovery that is a part and parcel of MDLs.

3. **Evidentiary Hearing**

In modern litigation, it has become increasingly rare for associates to participate meaningfully at trial. Here, when the Court held an evidentiary hearing on personal jurisdiction over KPNV, Defendants' LDC members were given the unique opportunity to develop skills similar to those gained through trial. For example, Defendants' less experienced attorneys drafted cross examinations and developed legal and factual case theories in preparation for the hearing. At the hearing, Defendants' LDC members sat at counsel's table and were actively involved driving real time responses to Plaintiffs' presentation. Throughout the evidentiary hearing, Defendants' less experienced attorneys honed their ability to make creative arguments, develop novel legal arguments on unsettled areas of the law, and think on their feet in response to live presentations of evidence.

### 4. Oral Advocacy

With the support and guidance of Defendants' senior attorneys, several of Defendants' LDC members had the opportunity to argue motions before the Court and Special Master, including motions to dismiss and motions to compel, among others. Defendants' less experienced attorneys also provided status updates to the Court on a regular basis at the CMCs. And when not presenting, Defendants' LDC members played an integral role in assisting Defendants' more senior attorneys prepare for argument on a variety of topics and issues across the life of the MDL, from "Science Day" to settlement.

### 5. Settlement

Defendants' less experienced attorneys were given the opportunity to play a meaningful role in the development of the various settlement agreements in this case, including by conducting legal research to support the structure of the settlements, coordinating responses to objections, and drafting the text of the settlement papers themselves. In addition, Defendants' LDC members

prepared materials for the preliminary and final approval hearings and benefitted from observing the Court's handling of objections. Because many cases take years to settle, the MDL provided a rare opportunity for Defendants' less experienced attorneys to work on diverse range of projects underpinning a settlement of this magnitude over the course of just three years.

**V.      Insights for Future MDLs**

    **A. Plaintiffs' Perspective**

The LDC are all extremely grateful for the opportunity to participate in this litigation and improve their skills as complex litigation attorneys. Based on this experience, the LDC respectfully offers the following insights for future Leadership Development Committees, and courts considering appointing an LDC, many of which were employed in this MDL:

1. Encourage appointments of attorneys at every stage of their career, not just associates or attorneys with minimal years of overall experience.

2. Having Co-Lead Counsel "appoint a member of the PSC to chair [the LDC] and oversee the incorporation of the talents of the members of this committee throughout the litigation"[8] is a helpful way to ensure LDC members are positioned to contribute meaningfully to the litigation while also receiving individual mentorship.

3. Judicial oversight at regular intervals can be helpful. As discussed, Judge Conti's requirement that LDC members report during status conferences emphasized LDC involvement and provided a forum for LDC members to make connections that allowed them to contribute more meaningfully to the litigation.

4. In the interest of best utilizing each of the LDC members' strengths and allowing them to organically find their place in the litigation, it may be beneficial to have the LDC members

---

[8] *Id.*

    work on various committees at the outset of the MDL to gain exposure to their co-counsel and several aspects of the litigation.

5. It would be beneficial to create a clear workflow process that facilitates assigning open projects/tasks to LDC members who have time and the requisite skill and would also suggest creating a process whereby LDC attorneys can offer assistance in certain areas of interest.

6. Implement a mentorship program with the following suggestions:

    a. Take each LDC member's interests into account and match accordingly;

    b. Encourage check-ins at a regular interval; and

    c. Provide direction and guidance to mentors about their responsibilities to the mentor/mentee relationship.

### B. <u>Defendants' Perspective</u>

Defendants' LDC members thank the Court for the opportunity to participate in an LDC and encourage the Court to continue the practice so that others can receive the significant substantive experiences that they have had here. This Court and others overseeing future MDLs should encourage the participation of less experienced defense-side attorneys in LDC programs so that they can receive the benefit of participating in all aspects of MDL practice.

## VI. <u>CONCLUSION</u>

Leadership Development Committees are a forward-thinking innovation in MDLs. The undersigned LDC members' experiences show they are a useful tool for the litigation bar to develop talent with excellent results. LDCs cultivate the next generation of MDL leaders and represent a vital investment in the future of the legal profession. The MDL 3014 LDC members strongly encourage the continued inclusion of LDCs in future MDL leadership slates.

Dated: May 30, 2025                                              Respectfully submitted,

/s/ Ava Marie M. Cavaco                           /s/ Kevin Tucker
Ava Marie M. Cavaco                                Kevin W. Tucker
Nigh Goldenberg Raso & Vaughn            East End Trial Group LLC
60 South 6th Street Suite 2800                 6901 Lynn Way Suite 215
Minneapolis, MN 55402                           Pittsburgh, PA 15208
Tel: 612-656-0220                                    Tel: 412-877-5220
ava@nighgoldenberg.com                        ktucker@eastendtrialgroup.com

/s/ Miriam Fresco Agrait                          /s/ Kristina Anderson
Miriam Fresco Agrait                                Kristina Anderson
Rubenstein Law, P.A.                                Wallace Miller
9130 S. Dadeland Blvd, Suite PH             150 N Wacker Drive Suite 1100
Miami, FL 33156                                      Chicago, IL 60606
Tel: (305) 661-6000                                  Tel: 312-261-6193
E-mail: mfagrait@rubensteinlaw.com      kja@wallacemiller.com

/s/ Claire Kreider                                      /s/ Syreeta Defrance-Poindexter
Claire Kreider                                           Syreeta Defrance-Poindexter
Garcia & Artigliere                                   Babin Law, LLC
400 Poydras Street                                    22 E. Gay Street Suite 200
New Orleans, LA 70130                           Columbus, OH 43215
Tel: 504-354-9750                                    Tel: (614) 761-8800
ckreider@lawgarcia.com                         syreeta.poindexter@babinlaws.com

/s/ Ashley B. DiLiberto                            /s/ Kathryn L. Harrison
Ashley B. DiLiberto                                  Kathryn L. Harrison
Messa & Associates, P.C.                         Campbell & Levine, LLC
123 S. 22nd Street                                     1700 Grant Building
Philadelphia, Pa. 19103                            Pittsburgh, PA 15219
215-568-3500                                           Tel: 412-261-0310
adiliberto@messalaw.com                       klh@camlev.com

/s/ Ian W. Sloss
Ian W. Sloss
Silver Golub & Teitell LLP
184 Atlantic Street
Samford, CT 06901
Tel: 203-325-4491
isloss@sgtlaw.com

*Plaintiffs' Leadership Development Committee*[9]

---

[9] Ms. Inez Ross was appointed to the MDL 3014 LDC and has recently left her firm and plaintiff practice. She intends to file a motion to withdraw shortly.

17

/s/ Ashley M. Gindle_____
Ashley M. Gindle
Morgan, Lewis & Bockius LLP
2222 Market Street
Philadelphia, PA 19103-3007
ashley.gindle@morganlewis.com
+1.215.963.5000

/s/ Conor D. Ferrall_____
Conor D. Ferrall
Sullivan & Cromwell LLP
125 Broad Street
New York, NY  10004-2498
Tel:  (212) 558-4000
Fax:  (212) 558-3588
ferrallc@sullcrom.com

/s/ Emily Pyclik_____
Emily Pyclik
Baker Botts LLP
700 K Street, NW
Washington, DC  20001
Tel:  (202) 639-7973
Fax:  (202) 585-1086
Emily.pyclik@bakerbotts.com

*Defendants' Associate Representatives*